UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIMOTHY O'SULLIVAN, et al., | |
| Plaintiffs, | |
| -against- | |
| DEUTSCHE BANK AG; HSBC BANK USA, N.A.; HSBC HOLDINGS Plc; HSBC BANK Plc; HSBC BANK MIDDLE EAST LIMITED; HSBC NORTH AMERICA HOLDINGS, INC.; COMMERZBANK AG; COMMERZBANK AG, NEW YORK BRANCH; BARCLAYS BANK Plc; BNP PARIBAS S.A.; STANDARD CHARTERED BANK; THE ROYAL BANK OF SCOTLAND N.V.; THE ROYAL BANK OF SCOTLAND PLC; CRÉDIT AGRICOLE S.A.; CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK; CREDIT SUISSE AG; and BANK SADERAT Plc, | 17-CV-08709-LTS-GWG |
| Defendants. | |

**DEFENDANTS' JOINT MEMORANDUM OF
LAW IN SUPPORT OF MOTION TO DISMISS**

March 2, 2018

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.      STATUTORY BACKGROUND ................................................................................... 3

II.     PLAINTIFFS' ALLEGATIONS ................................................................................. 5

        A.     Alleged USD Financing and Expert Advice ................................................ 7

        B.     Iran's Alleged Role in the Attacks ............................................................. 10

        C.     Aims and Effects of the Purported Conspiracy ......................................... 11

        D.     The Attacks ................................................................................................ 12

        E.     Claims for Relief ....................................................................................... 13

ARGUMENT ...................................................................................................................... 14

I.      THE RULE 12(b)(6) STANDARD .............................................................................. 14

II.     PLAINTIFFS' PRIMARY LIABILITY CLAIMS (CLAIMS I-IV AND VIII-X)
        FAIL PLAUSIBLY TO ALLEGE PROXIMATE CAUSE .............................................. 15

        A.     *Rothstein* and Its Progeny Hold That the Alleged Provision of Financial
               Services to Iran, Even When in Violation of U.S. Law, Is Too Remote To
               Support Civil Liability Under Section 2333(a) for Injuries Caused
               by Terrorist Entities Allegedly Funded by Iran. .................................... 15

        B.     *Rothstein* and Its Progeny Foreclose Plaintiffs' Causal Theory Here .................. 21

III.    PLAINTIFFS' PRIMARY LIABILITY CLAIMS (CLAIMS I-IV AND VIII-X)
        FAIL PLAUSIBLY TO ALLEGE THAT THE MOVING DEFENDANTS
        ENGAGED IN AN ACT OF INTERNATIONAL TERRORISM ................................... 24

IV.    PLAINTIFFS' PRIMARY LIABILITY CLAIMS I-III FAIL PLAUSIBLY TO
        PLEAD THE ELEMENTS OF SECTION 2339A ......................................................... 26

V.     PLAINTIFFS' PRIMARY LIABILITY CLAIMS VIII-X FAIL PLAUSIBLY TO
        ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED
        STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL

i

TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION
2332d....................................................................................................................28

VI.     PLAINTIFFS' SECONDARY LIABILITY CLAIMS (CLAIMS V-VII) FAIL AS
        A MATTER OF LAW ...................................................................................31

        A.      Nearly All of the Attacks Do Not Meet JASTA's Threshold Requirement
                of an Act of International Terrorism "Committed, Planned, or Authorized"
                by a Designated FTO ............................................................................32

        B.      The Complaint Fails Plausibly To Plead the Elements of a Conspiracy ...............33

        C.      The Complaint Fails Plausibly To Allege the Moving Defendants Aided
                and Abetted an Act of Terrorism .........................................................36

CONCLUSION....................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) .............................................29

*Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) ........................................39

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................. passim

*Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)............................22, 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................14, 15, 38

*Corley v. United States*, 556 U.S. 303 (2009).............................................................29

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ....................................29

*EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78 (2d Cir. 2015) ...............30, 31

*Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018) .....................................................22

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U. S. 611 (1983)...............................................................................................30

*Greenbaum v. Handelsbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998)..........................30

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ..........................................37, 39

*Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167 (S.D.N.Y. 2017) .................25

*Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) ...........................39

*Lexmark Int'l. Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377 (2014) ..................15, 24

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)...........................9

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), *vacated*, No. 16-2098-CV (CON), 2018 WL 797454 (2d Cir. Feb. 9, 2018)...........................25

*Linde v. Arab Bank, PLC*, No. 16-2098-CV (CON), 2018 WL 797454 (2d Cir. Feb. 9, 2018) ................................................................................ passim

*Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 CIV. 7955 (GEL), 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008)...............................................................38

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014).......................................14, 26

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118
    (2d Cir. 2013) ................................................................................................. passim

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387
    (S.D.N.Y. 2012) .................................................................................................... 6

*Ofisi v. BNP Paribas S.A.*, 2017 WL 4355922 (D.D.C. Sept. 29, 2017), *order
    vacated in part on other grounds and reconsideration denied*, 2018 WL
    385408 (D.D.C. Jan. 11, 2018) ....................................................................... passim

*Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85 (D.D.C. 2017) ............................... 20, 27

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705
    (2d Cir. 2013) .................................................................................................. 14, 15

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ................................................... passim

*Shaffer v. Deutsche Bank AG*, 16-cv-0497 (S.D. Ill.) ............................................... passim

*Shatsky v. Palestine Liberation Org.*, No. 02-2280 (RJL), 2017 WL 2666111
    (D.D.C. June 20, 2017) ........................................................................................ 22

*Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 1995) ......................................................... 6

*Stansell v. BGP, Inc.*, No. 8:09-cv-2501-T-30AEP, 2011 WL 1296881 (M.D. Fla.
    Mar. 31, 2011) ...................................................................................................... 26

*Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..................... 18

*Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y.
    June 30, 2006) ...................................................................................................... 26

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ............................ 29

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) .......................... 26

*Zito v. Leasecomm Corp.*, 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ................. 35

**Statutes & Rules**

31 C.F.R. § 560 ..................................................................................................... 7, 31

18 U.S.C. § 2331(1) .......................................................................................... passim

18 U.S.C. § 2332d ............................................................................................. passim

18 U.S.C. § 2333 .............................................................................................. passim

18 U.S.C. § 2339A ............................................................................................ passim

18 U.S.C. § 2339B ..................................................................................................3, 4

Fed. R. Civ. P. 8(a)(2) ...............................................................................................15

Fed. R. Civ. P. 12(b)(6)..........................................................................................14, 19

## INTRODUCTION

Attacks on U.S. soldiers, including those committed during the Iraq War, are abhorrent.  But the undersigned Defendants—Western financial institutions (the "Moving Defendants")[1]—are not responsible for these heinous acts.  The Moving Defendants did not commit any of the attacks and did not support any terrorists.  Nonetheless, the Complaint seeks to stretch the civil provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, beyond its bounds in an effort to obtain monetary damages from these financial institutions in regard to attacks with which they are entirely unconnected.  The Complaint weaves together broad and conclusory allegations in an effort to conjure a portrait of a decades-old purported conspiracy between the Moving Defendants, Iranian banks, the Government of Iran, various Iranian state entities, and named and unnamed terrorist groups to process U.S. dollar-denominated transactions, and then, through a far-fetched causal theory that relies on numerous unspecified actors, attempts to jump from these transactions to the detonation of explosive devices and other attacks in Iraq.

As demonstrated below, the plain language of the statute and clear and controlling precedents in this Circuit establish that the Complaint fails to state a claim under the ATA as a matter of law.  *First*, as to Plaintiffs' primary liability claims (Claims I-IV and VIII-X), the Complaint fails plausibly to allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), the Second Circuit held that

---

[1] The "Moving Defendants" are Deutsche Bank AG ("Deutsche Bank"); HSBC Bank USA, N.A.; HSBC Holdings plc; HSBC Bank plc; HSBC Bank Middle East Limited; HSBC North America Holdings, Inc.; Commerzbank AG ("Commerzbank"); Commerzbank AG, New York Branch; Barclays Bank PLC; BNP Paribas S.A. ("BNPP"); Standard Chartered Bank ("SCB"); The Royal Bank of Scotland N.V. ("RBS N.V.") (f/k/a ABN AMRO Bank N.V.); The Royal Bank of Scotland plc; Crédit Agricole Corporate & Investment Bank; and Credit Suisse AG.

plaintiffs asserting Section 2333 claims must plausibly allege proximate cause, and affirmed

dismissal of such claims against a European bank based on causal allegations that were more

plausible, direct and substantiated than those alleged here.  *O'Neill v. Al Rajhi Bank (In re

Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 123 (2d Cir. 2013), applying *Rothstein*, also

rejected the kind of indirect causal allegations asserted here.

      *Second*, these same primary liability claims (Claims I-IV and VIII-X) also fail

plausibly to allege that the Moving Defendants committed "an act of international terrorism" as

required by the ATA, *see* 18 U.S.C. § 2331(1); *Linde v. Arab Bank, PLC*, No. 16-2098-CV

(CON), 2018 WL 797454, at *9 (2d Cir. Feb. 9, 2018), because the Complaint fails plausibly to

allege that the Moving Defendants' purported conduct (i) involved violent acts or acts dangerous

to human life and (ii) objectively appears to have been intended to intimidate a population or

coerce a government.

      *Third*, primary liability Claims I-III must be dismissed for the additional and

independent reason that they fail plausibly to allege that the Moving Defendants "provided

material support . . . knowing or intending" that support would be used for an act of international

terrorism, as required for the predicate violation of Section 2339A, on which those claims are

based.

      *Fourth*, primary liability Claims VIII-X, brought against a subset of the Moving

Defendants for allegedly engaging in financial transactions with Iran in violation of 18 U.S.C.

§ 2332d, fail for the additional and independent reasons that the Complaint fails plausibly to

allege that those Moving Defendants are "United States person[s]" or that they engaged in "a

financial transaction with the government" of Iran as required by Section 2332d.

      *Finally*, Plaintiffs' secondary liability claims (Claim V (conspiracy liability) and

2

Claims VI-VII (aiding-and-abetting liability)), must be dismissed because the Complaint (i) fails to allege that an officially designated Foreign Terrorist Organization ("FTO") "planned, committed, or authorized" 50 of the 55 attacks; (ii) fails plausibly to allege that the Moving Defendants conspired with, or aided and abetted by providing substantial assistance to, the person or entity that "committed" such a terrorist attack, as required under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), and *Linde*; (iii) as to Plaintiffs' conspiracy claim, fails plausibly to allege that the Moving Defendants joined any conspiracy with the intent to commit an act of terrorism, *see Shaffer v. Deutsche Bank AG*, 16-cv-0497, Mem. & Order, 10-11 (S.D. Ill. Dec. 12, 2017) and (iv) as to Plaintiffs' aiding-and-abetting claims, fails plausibly to allege that the Moving Defendants were aware of the "role" that they purportedly had in allegedly furthering terrorist acts, or that the Moving Defendants knowingly and substantially assisted those acts, as required under *Linde*.

## BACKGROUND

## I.  STATUTORY BACKGROUND

Although the ATA is largely comprised of criminal prohibitions relating to terrorism,[2] Section 2333(a) creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism".  Section 2333(a) incorporates the definition of "international terrorism" in 18 U.S.C. § 2331(1), to wit, activities that:

    (A)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

    (B)    appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or

---

[2] For example, 18 U.S.C. § 2339B, a criminal provision of the ATA, makes it unlawful to "provide[] material support or resources to a foreign terrorist organization".

> > (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (C)   occur primarily outside the territorial jurisdiction of the United States.

A Section 2333(a) claim consists of several basic elements. *First*, the plaintiff must be a U.S. national. *Second*, the plaintiff must plausibly allege that the defendant itself committed an act of international terrorism as defined in Section 2331, *see Linde*, 2018 WL 797454, at *8; *Rothstein*, 708 F.3d at 97, which requires the plaintiff to allege each element of Section 2331(1)'s definition of "international terrorism" to state a claim under the ATA, *see Linde*, 2018 WL 797454, at *2-*3. The provision of material support to a terrorist organization in violation of the criminal provisions of the ATA, such as 18 U.S.C. §§ 2339A or 2339B, can serve as a predicate crime under Section 2331, but "does not invariably equate to an act of international terrorism". *Linde*, 2018 WL 797454, at *8. *Third*, to state a primary liability claim, the plaintiff must plausibly allege that he or she was injured "by reason of" the defendant's act of international terrorism, 18 U.S.C. § 2333(a)—which the Second Circuit has construed to require plausible allegations that the defendant's act proximately caused the plaintiff's injury. *See Rothstein*, 708 F.3d at 95; *accord Al Rajhi*, 714 F.3d at 123-24.

In 2016, Congress enacted JASTA, which amended the ATA to provide a narrow cause of action for civil secondary liability. *See* 18 U.S.C. § 2333(d). JASTA's secondary liability provision has two significant limitations. *First,* it applies only to injuries caused by a specific type of terrorist act, namely, one that is "committed, planned, or authorized" by an officially designated FTO. 18 U.S.C. § 2333(d)(2). *Second*, JASTA liability applies only to a "'person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed such an act of international terrorism'". *Linde*, 2018 WL 797454, *3 (alteration in original) (quoting 18 U.S.C. § 2333(d)(2)). "[A]iding and abetting

an *act* of international terrorism requires more than the provision of material support to a

designated terrorist *organization*.  Aiding and abetting requires the secondary actor to be 'aware'

that, by assisting the principal, it is itself assuming a 'role' in terrorist activities."  *Id.* at *11

(citation omitted) (emphasis in original).  There is no secondary liability under Section 2333(a)

for claims to which JASTA does not apply.  *See id.* at *3 (citing *Rothstein*, 708 F.3d at 97-98);

*accord Al Rajhi*, 714 F.3d at 123.

## II.    PLAINTIFFS' ALLEGATIONS

The Complaint avers that the Moving Defendants entered into an alleged

conspiracy to evade U.S. economic sanctions against Iran (the "Conspiracy"):

> "Defendants entered into a conspiracy with Iran and its Agents and
> Proxies, agencies and instrumentalities, including the IRGC, the
> IRGC-QF, Hezbollah, al Qaeda, the Terrorist Groups, Bank Melli
> Iran, the CBI, Bank Mellat, Bank Tejarat, Bank Refah and Bank
> Sepah, the IRISL, the NIOC, Mahan Air, and other front
> companies, alter egos, and entities owned, controlled by or
> affiliated with the foregoing, by and through which Defendants
> knowingly agreed to transfer hundreds of billions of dollars and
> conduct billions of dollars in illicit trade-finance transactions, as
> well as provide expert advice, all in violation of U.S. and
> international laws and sanctions, by altering, falsifying, or omitting
> information from bank-to-bank payment orders sent on SWIFT-
> NET operated by the SWIFT that involved Iran or Iranian parties
> and that serve as financial and logistical conduits for the IRGC and
> its terrorist activities."

Compl. ¶ 1371; *see also e.g.*, *id.* ¶¶ 1375 ("Iran conspired with Defendants to evade and

overcome . . . laws and sanctions"), 1384 ("The objective of the Conspiracy was to defeat the

sanctions").

The Complaint alleges that the Moving Defendants entered into the purported

Conspiracy to evade economic sanctions with "Iran and its Agents and Proxies".  *See, e.g.*, *id.*

¶ 4.  The Complaint fails to define these "Agents and Proxies" in full, but instead loosely applies

the phrase to include over two dozen entities including Iranian banks, Iranian corporations, Iranian state organizations, and various named and unnamed terrorist groups.  *Id.* n.4-n.5.  The only specific allegations in the Complaint aver that the Moving Defendants variously provided[3] U.S.-dollar financing and expert advice (discussed in further detail below) to certain Iranian banks and corporations, not to any terrorist groups.  *See, e.g.*, *id.* ¶ 2411 (alleging the Moving Defendants variously facilitated the transfer of funds to "the [National Iranian Oil Company], Mahan Air, Iran Air, Khatam-al Anbiya Construction, [Islamic Republic of Iran Shipping Lines] (and multiple IRISL entities), Bank Melli (including Bank Melli plc), Bank Saderat (including Bank Saderat plc), Bank Mellat, Bank Sepah, and Bank Markazi").  The Complaint does not allege any contact between the Moving Defendants and any entities other than these.

The Complaint alleges that the Moving Defendants, by attempting to evade economic sanctions, took part in the purported Conspiracy "by illegally providing hundreds of

---

[3] The Complaint relies extensively on impermissible group pleading, often referring collectively to "Defendants" rather than making specific allegations as to each defendant.  *See Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. 2012) ("A plaintiff cannot merely 'lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)).  This improper lumping together of different defendants occurs with respect to not only (a) unaffiliated defendants, *see, e.g.*, Compl. ¶¶ 1371, 1375-78, 1444 (making allegations against the "Defendants"), but also (b) affiliated entities within a particular family of companies, *see e.g.*, *id.* ¶¶1525-1636 (making allegations against the "HSBC Defendants"), as well as (c) defendants that are presently affiliated but were not affiliated at the time of the allegations in question.  With respect to the last category, the Complaint makes allegations against "RBS" that, to the extent supported by any factual matter at all, fail to distinguish between allegations that apparently arise from regulatory settlements by The Royal Bank of Scotland plc (*see, e.g.*, *id.* ¶¶ 2113-14) and other allegations that apparently arise from regulatory settlements of ABN AMRO Bank N.V. (now The Royal Bank of Scotland N.V.) (*see, e.g.*, *id.* ¶¶ 2115, 2120, 2125-48).  The ABN AMRO Bank N.V. settlements concerned ABN AMRO Bank N.V. conduct that occurred before it became affiliated with The Royal Bank of Scotland plc in October 2007, when ABN AMRO Bank N.V. was acquired by a consortium that included The Royal Bank of Scotland plc's parent company.  *Id.* ¶¶ 774-76.  Group allegations of this nature should be disregarded in deciding the motion to dismiss.

billions of USD over a decade-plus long period" to "Iran, Iranian entities, and Iranian SDNs".

*Id.* ¶ 1444.  The Complaint alleges that absent the Conspiracy, "Iran would not have been able to

transfer such a large volume of funds to its Agents and Proxies", *id.* ¶ 1402, funds which the

Complaint conclusorily asserts "ultimately supported the Terrorist Groups", *id.* ¶ 1444.

      **A.**     **Alleged USD Financing and Expert Advice**

      The crux of the Complaint is that the Moving Defendants allegedly participated in

the purported Conspiracy by variously providing U.S. dollar-clearing services, trade-finance

services and expert advice to certain Iranian banks and corporations.  *Id.* ¶ 1371.

      *U.S. dollar-clearing allegations.*  Plaintiffs allege that the Moving Defendants

provided U.S. dollar-denominated correspondent banking services to certain Iranian banks.  *See,*

*e.g.*, *id.* ¶¶ 1421, 1656.  For most of the period during which the Moving Defendants are alleged

to have provided such services, there was no blanket prohibition against clearing transactions

denominated in U.S. dollars for Iranian banks.  To the contrary, the U.S. government permitted

certain dollar-clearing services pursuant to the "U-Turn" exemption,[4] *see* 31 C.F.R. § 560.516

(2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008), at least until November 2008.  Compl.

¶¶ 1426-29.  Plaintiffs allege, however, that when dealing with Iranian entities under the U-Turn

exemption, the Moving Defendants altered or concealed (or "stripped") certain Iranian

identifying information in the payment messages for transactions being processed through U.S.

clearing banks to avoid U.S. scrutiny of the transactions and consequent delay.  *See, e.g.*, *id.*

¶¶ 1418, 1422, 1486, 2335.  According to Plaintiffs, Iran needed international banks, such as the

---

[4] "The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank."  Compl. ¶ 1427.

Moving Defendants, to "intentionally disguise financial payments to and from USD-denominated accounts" to access U.S. dollars needed to support terrorism.  *See id.* ¶ 854.

Plaintiffs also allege that, at various times between 2005 and 2015, the Moving Defendants separately acknowledged to prosecutors and/or regulators their respective failures to include such identifying information in banking transactions with certain Iranian entities, entered into settlements or deferred prosecution agreements with the U.S. Government and other regulatory authorities, and agreed to pay civil penalties and/or forfeitures.  *See, e.g.*, *id.* ¶¶ 1520-23, 1582, 1631, 1643, 1698-1703, 1764, 1785, 1791-94, 2065.  Significantly, nothing in these deferred prosecution agreements or other resolutions connects the Moving Defendants with, or alleges the Moving Defendants provided any support to, any terrorist, terrorist organization or terrorist activity.  *See id.*  Nor does the Complaint fill in these gaps.

*Trade finance allegations.*  Similarly, the Complaint conclusorily alleges that "Defendants provided trade finance to Iran and Iran's trading partners".[5]  *Id.* ¶ 1430.  The Complaint identifies Iranian banks to which the Moving Defendants allegedly provided trade financing, *see, e.g.*, *id.* ¶ 1204 (alleging that SCB provided "trade-finance services for Bank Saderat and Bank Melli"), which it asserts was "on behalf of" various named and unnamed Iranian entities, *see id.* ¶ 1943 (alleging "trade-finance and Eurodollar transactions on behalf of other MODAFL sub-agencies, including IAMIC").  For nearly all of its trade finance assertions,

---

[5] Plaintiffs allege that trade finance serves two primary functions:  "First, trade finance is used to decrease the risk of buying and selling goods in the international market. This is accomplished when a trusted bank acts as the intermediary between two untrusting trading partners.  In such cases, the bank acting as intermediary will hold the intended proceeds until it confirms the underlying transaction has been completed, (*i.e.*[,] the oil has arrived at the intended destination) at which time the bank will transfer the money to the seller. . . .  The second function of trade finance is, as the name implies, to provide financing for the buyer or the seller, or both."  Compl. ¶¶ 1431-32.

the Complaint does not identify which of the Moving Defendants—if any—allegedly conducted

such trade financing.[6]  *See, e.g.*, *id.* ¶ 1438 (alleging that "there were a handful of banks more

than willing to provide trade financing for" Iran).  The Complaint merely suggests that at least

some of the Moving Defendants were among the "handful", and that without the alleged actions

of these unspecified banks, Iran would have been forced to sell its oil at a lower price.  *See id.* ¶

1433.  As a result of trade financing, Plaintiffs assert, "Iran benefited from the illegal sale of its

oil on the world market, and filled its coffers with funds that were now available to fund its illicit

campaign of terror".  *Id.* ¶ 867.  But the Complaint does not allege that absent the alleged trade

financing, Iran would have lacked the funds to support terrorism.  *See id.* ¶¶ 1430-44.

     *Expert advice allegations.*  The Complaint also conclusorily alleges that the

Moving Defendants provided "expert advice" to "Iran and its Agencies and Proxies, specifically

including the terrorist groups".  *Id.* ¶ 2412.  Plaintiffs allege that this expert advice related to

evading economic sanctions.  *See, e.g.*, *id.* ¶ 49 ("Defendants even provided expert advice to

Iranian entities concerning how to deceive OFAC and ensure payments would be processed

---

[6] Correspondent banking involves the use of wire transfer instructions to facilitate the transfer of funds from an account in one bank to an account in another bank.  *See generally Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013).  There may be multiple banks involved:  a local bank (acting as the sending party); a receiving bank (acting as the receiving party); and one or more intermediary banks that provide correspondent banking services to the banks at either end of the transaction if they do not have direct relationships with each other.  Banks providing clearing services for U.S. dollar-denominated transactions are often located in the U.S.  *See, e.g.*, Compl. ¶ 819.  At the relevant time, a U.S. bank or a U.S. branch of a foreign bank acting as a clearing bank often would have information only about its direct counterparties, but not about every participant in the transaction.  Plaintiffs here allege that Iranian banks maintained accounts at the Moving Defendants or at other banks—the Complaint is unclear—and that the Moving Defendants either cleared U.S. dollar-denominated fund transfers for these Iranian banks (when acting as a clearing bank) or used their own correspondent relationships with clearing banks to execute U.S. dollar-denominated wire transfers for the Iranian banks.  *See, e.g.*, *id.* ¶¶ 1426-29.

without delay or interference"). The Complaint does not specify to which groups the Moving Defendants are alleged to have provided such expert advice, other than some Iranian banks and unnamed "Iranian entities". *See, e.g.*, *id.* ¶ 1730 (alleging that "following the expert advice provided by Defendants, Bank Melli Iran instructed Barclays to process USD transactions"). The Complaint does not allege provision of expert advice to any "terrorist groups".[7]

**B.      Iran's Alleged Role in the Attacks**

The Complaint alleges that Iran is "the world's leading state sponsor of terrorism." *Id.* ¶ 3. The Complaint further alleges that "Iran had the goal of sponsoring terrorism to kill and maim U.S. nationals as a means to serve its foreign policies." *Id.* ¶ 1372. The Complaint also alleges that certain "key Iranian Agents and Proxies: MODAFL, the IRGC, the IRGC-QF, Hezbollah" and "Special Groups" in Iraq are used to "further[]" Iran's "terrorism-based foreign policy". *See id.* ¶ 893. The Complaint alleges that it was Iran, and not any of the Moving Defendants, that funded terrorist organizations. *See, e.g.*, *id.* ¶ 2395 ("Defendants provided sanctioned Iranian entities with significant access to the U.S. financial system— allowing Iran to launder billions of USD to fund its terrorist campaign.").

The Complaint alleges that the purported Conspiracy enabled the "Terrorist Groups" to carry out attacks with the "scale and with the lethality in which they were perpetrated", *id.* ¶ 2403; without the Conspiracy, Plaintiffs maintain, "Iran and the Terrorist Groups would not have had the funding or material support necessary to carry out the Terrorist Attacks", *id.* ¶ 98, and "Iran would not have been able to transfer such a large *volume* of funds to

---

[7] The single conclusory allegation that Commerzbank provided "Orphans Project Lebanon e.V. with expert advice", Compl. ¶ 2487, also does not specifically allege the provision of any support, expert or otherwise, to a terrorist organization, as further explained in Commerzbank's supplemental brief.

its Agents and Proxies", *id*. ¶ 1402 (emphasis added).  The Complaint further asserts, without specific factual allegations, that money transferred by the Moving Defendants to Iranian entities was "used to fund Iran's Agents and Proxies, specifically including the Terrorist Groups, and to perpetrate the Terrorist Attacks which killed or injured Plaintiffs."  *Id.* ¶ 1413.

### C.   Aims and Effects of the Purported Conspiracy

The Complaint relies on a litany of conclusory allegations regarding the purpose of the alleged Conspiracy that the Moving Defendants supposedly either "knew" of or were "deliberately indifferent to", *id.* ¶¶ 629, 631, 644, 645-48, and the conduct that the Conspiracy supposedly "[f]acilitated", including:  (i) "illicit transactions totaling at least $50 million USD for the benefit of Hezbollah";  (ii) "illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC";  (iii) "at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL"; and (iv) "tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state sponsored terror to further numerous violations of the U.S. trade embargo against Iran".  *Id*. ¶ 1386.

The Complaint fails to identify a single banking transaction by any of the Moving Defendants that allegedly was used by Iran or any Iranian entity to transfer funds to any terrorist organization.  *See*, *e.g.*, *id.* ¶ 1371 (alleging generally that bank-to-bank payment orders "serve as financial and logistical conduits for the IRGC and its terrorist activities")*.*  Moreover, there is no non-conclusory allegation that, in processing U.S. dollar-denominated transactions for Iranian banks, the Moving Defendants processed even one dollar that allegedly funded terrorist organizations or groups, much less that the Moving Defendants processed transactions directly for any terrorist entity.

Plaintiffs further claim in conclusory fashion that the Conspiracy "[e]nabled Iran and its Agents and Proxies to authorize, plan and commit acts of international terrorism". *Id.* ¶ 1386.  Plaintiffs also make conclusory allegations that the Moving Defendants' alleged misconduct amounted to a "substantial cause" and "significant factor" in an unspecified "chain of events" that culminated in Plaintiffs' deaths and injuries. *Id.* ¶ 2438.  None of these allegations connects any of the Moving Defendants' alleged dollar-clearing transactions or trade financing to any of the attacks that injured Plaintiffs, or to any terrorist organizations or groups in Iraq or elsewhere.  Further, Plaintiffs do not allege any agreement among any of the Moving Defendants and Iran's so-called "Agents and Proxies".  Plaintiffs allege instead that "[t]hrough the Conspiracy, and with the assistance of Defendants, *Iran provided* substantial and material support to its Agents and Proxies". *Id.* ¶ 1394 (emphasis added).

### D.    The Attacks

Plaintiffs' injuries resulted from 55 attacks committed from 2003 to 2011.  For the overwhelming majority of these attacks, the Complaint does not specify the group that "committed" the attack. *See, e.g.*, *id.* ¶¶ 145-49.  For others, Plaintiffs make vague allegations that a particular group was "operating in the area" at the time of the attack. *See, e.g.*, *id.* ¶ 129. As to the few attacks in which the alleged perpetrator of the attack is identified  (*see id.* ¶¶ 143, 390, 430, 440, 577), there are no allegations detailing any connection between those attackers and the Moving Defendants, or the financial services they provided to Iranian banks.

12

E.        **Claims for Relief**

Based on these conclusory—if voluminous—allegations, Plaintiffs contend that

the Moving Defendants are civilly liable under 18 U.S.C. § 2333(a) for attacks in Iraq that killed

or injured Plaintiffs.  *Id.* (Claims I-IV, VIII-X (alleging primary liability under § 2333(a)),

Claims V-VII (alleging secondary liability under § 2333(a))).[8]  Claims I-III allege that by

"providing material support . . . to terrorists, knowing or intending that such material support" be

used to commit an offense, the Moving Defendants violated Section 2339A and engaged in an

act of international terrorism.  *Id.* ¶ 2410; *see also id.* ¶¶ 2408-40 (Claim I).  Plaintiffs further

allege that certain Moving Defendants violated 18 U.S.C. § 2332d, *see id.* ¶¶ 2533-69

(Claims VIII-X), which makes it unlawful for "a United States person", except as permitted by

regulation, "knowing or having reasonable cause to know that a country is designated . . . as a

country supporting international terrorism", to "engage[] in a financial transaction with the

government of that country".

Plaintiffs also assert theories of secondary liability.  Plaintiffs allege conspiracy

liability (Claim V), that by "participating in the Conspiracy" "each Defendant knowingly and

purposefully agreed to provide . . . material support and services to Iran and its Agents and

Proxies in an illegal manner" in violation of Section 2339A, *id.* ¶ 2472, and that "it was

reasonably foreseeable that the material support Defendants provided in furtherance of the

Conspiracy would be used in preparation for and in carrying out said acts of international

terrorism".  *See id.* ¶ 2467; *see also id.* ¶ 2466-82 (Claim V).  Plaintiffs also allege aiding-and-

---

[8] The Complaint alleges claims as to specific individual Moving Defendants.  *See* Compl.
Claims II, IV, VI (Commerzbank); Claim III (SCB); Claim VIII (HSBC Bank USA, N.A.).  Each
of these claims fails to state a claim for the reasons set forth in this joint brief and for the
additional reasons addressed in the pertinent individual Moving Defendants' supplemental briefs.

abetting liability (Claim VII), that "Defendants knowingly or with deliberate indifference aided and abetted the FTOs . . . by illegally facilitating the transfer of billions of USDs through the international financial system to Iran and its Agents and Proxies". *Id.* ¶ 2496; *see also id.* ¶ 2495-512 (Claim VII).

## ARGUMENT

### I.   THE RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility". *Id.* A plaintiff cannot cross the threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent with' a defendant's liability", *id.* (quoting *Twombly*, 550 U.S. at 557); the plaintiff instead must plead facts that are "suggestive of" wrongdoing, *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

In making the plausibility determination, a court may consider only well-pleaded factual allegations. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). A court must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements". *Id.* (citation omitted). "[L]abels and conclusions", "formulaic recitation[s] of the elements of a cause of action" and "'naked assertion[s]' devoid of 'further factual enhancement'" all must be disregarded. *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 678) (internal citations omitted).

14

The portions of the Complaint not excluded must be assessed to determine whether the inferences drawn from the specific alleged facts are actually "plausible".  *Twombly*, 550 U.S. at 556.  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense".  *Mastafa*, 770 F.3d at 177 (internal quotation marks and citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2))).

## II.    PLAINTIFFS' PRIMARY LIABILITY CLAIMS (CLAIMS I-IV AND VIII-X) FAIL PLAUSIBLY TO ALLEGE PROXIMATE CAUSE

In *Rothstein*, the Second Circuit rejected an indirect causal theory that was similar to—and if anything, stronger than—the disconnected theory of causation alleged here.  708 F.3d at 95-97.  Because Plaintiffs fail plausibly to allege proximate cause, Plaintiffs' primary liability claims (Claims I-IV and VIII-X) must be dismissed as a matter of law.  *See id.*; *see also Lexmark Int'l. Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (proximate cause "must be adequately alleged at the pleading stage in order for the case to proceed") (citation omitted).

### A.    *Rothstein* and Its Progeny Hold That the Alleged Provision of Financial Services to Iran, Even When in Violation of U.S. Law, Is Too Remote To Support Civil Liability Under Section 2333(a) for Injuries Caused by Terrorist Entities Allegedly Funded by Iran.

In *Rothstein*, plaintiffs who were injured in bombings and rocket attacks "conducted by Hamas or H[e]zbollah" brought a Section 2333 claim against a European financial institution, UBS, alleging that UBS "facilitated" those attacks by directly "furnishing United States currency to Iran".  *Rothstein*, 708 F.3d at 84-87.  The *Rothstein* plaintiffs alleged

that U.S. sanctions on Iran "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations", *id.* at 87, and that defendant UBS "solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash", *id.*, "kn[owing] full well that the cash dollars it was providing . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas [and] H[e]zbollah", *id.* at 97 (emphasis omitted). The *Rothstein* plaintiffs further alleged that "the ability of H[e]zbollah and Hamas to . . . carry out those attacks was substantially increased by those organizations' receipt of cash dollars from Iran". *Id.* at 87. In affirming dismissal of these claims, the Second Circuit held that plaintiffs had failed plausibly to allege that UBS's actions were the proximate cause of plaintiffs' injuries. *Id.* at 95.

The Second Circuit's proximate cause holding rested on Section 2333's requirement that persons seeking recovery have been injured "*by reason of* an act of international terrorism". 18 U.S.C. § 2333(a) (emphasis added). The Second Circuit found that the phrase "by reason of" has a "well-understood meaning" in other statutes such as RICO and federal antitrust laws and has "historically been interpreted as requiring proof of proximate cause". *Rothstein*, 708 F.3d at 95. Thus, the *Rothstein* court held that to state a Section 2333 claim, a plaintiff must plausibly allege that the defendant's conduct was the "proximate cause" of the plaintiff's injury. *Id.*; *accord Linde,* 2018 WL 797454, at *9; *Al Rajhi*, 714 F.3d at 123-24.

The Second Circuit also squarely rejected the argument that a bank's violation of U.S. laws by engaging in financial transactions with Iran, a state sponsor of terrorism, is a sufficient basis to hold a bank "liable for injuries subsequently caused by a terrorist organization associated with that state." *Rothstein*, 708 F.3d at 96. The court ruled that "plaintiffs' contention that proximate cause is established because they were injured after [defendant] violated federal

law is a *post hoc, ergo propter hoc* proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable [under the ATA]." *Id.*

The Second Circuit rejected as legally insufficient the following indirect causal allegations regarding defendant UBS's alleged financial transactions with Iran:

- The plaintiffs were injured by attacks committed by Hamas and Hezbollah, both of which allegedly received extensive funding directly from Iran. *See id.* at 85, 87.

- Due to restrictions imposed on wire transfers involving Hamas, Hezbollah and related entities, the terrorists needed physical U.S. banknotes—actual dollar bills—to fund their operations. *See id.* at 86.

- "Iran was subject to United States government sanctions", which "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations". *Id.* at 87. "UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004." *Id.*

- UBS transferred significant amounts of U.S. banknotes directly to the Iranian Government. *See id.*

- "UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ." *Id.* at 97 (emphases omitted).

The Second Circuit found that these indirect causal allegations failed to satisfy Section 2333's proximate cause requirement for a number of reasons, including:

- **UBS did not participate in the attacks:**  "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.*

- **UBS did not provide banknotes directly to terrorists:**  "[The Complaint] does not allege that UBS provided money to H[e]zbollah or Hamas.  It does not allege that U.S. currency UBS transferred to Iran was given to H[e]zbollah or Hamas." *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:**  "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

17

- **Iran has legitimate uses for financial services:** "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

The Second Circuit concluded that, while "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism", these allegations were insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by H[e]zbollah and Hamas that injured plaintiffs". *Id.*

There is a "meaningful" difference between a proximate cause allegation that a defendant provided funds directly to a foreign terrorist organization, such as Hezbollah, and a proximate cause allegation that a defendant provided funds to the Government of Iran, a state sponsor of terrorism that "performs myriad legitimate functions in addition to allegedly funding terrorist organizations". *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013). "Congress has specifically found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct . . . . The same thing cannot be said about a government." *Id.* (citation omitted); *accord Rothstein*, 708 F.3d at 97.

The Second Circuit's decision in *Al Rajhi* reaffirmed the inadequacy, as a matter of law, of proximate cause allegations lacking a direct connection between the defendant and the terrorist organization and terrorist acts that allegedly caused the plaintiff's injury. In *Al Rajhi*, the Second Circuit rejected as a matter of law claims that several financial institutions were liable under Section 2333 to victims of the September 11, 2001 attacks because the defendants allegedly provided "financial support" and "financial [and bank account] service" to purported

18

charities that in turn allegedly supported al Qaeda.  714 F.3d at 123 (alteration in original)

(internal citations omitted).  In affirming dismissal of those claims under Rule 12(b)(6) for

failing adequately to plead proximate cause, the Second Circuit, relying on *Rothstein*, held that

"plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001

attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the

money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was

transferred to al Qaeda and aided in the September 11, 2001 attacks."  *Id.* at 124.

        Courts outside the Second Circuit also have embraced *Rothstein*'s reasoning.  In

*Shaffer v. Deutsche Bank AG*, 16-cv-0497 (S.D. Ill. Dec. 12, 2017), for example, plaintiffs

alleged that Deutsche Bank "knowingly conspired with [Iran] and its banking agents to evade

U.S. economic sanctions and disguise financial payments, thereby foreseeably enabling Iran's

involvement in the terrorist acts that injured the Plaintiffs", also U.S. service members killed or

injured in Iraq, *id.*, Compl., Dkt. No. 1 ¶ 1.  Applying *Rothstein*, the *Shaffer* court held that

plaintiffs had failed plausibly to plead proximate cause.  *Shaffer*, Mem. & Order, at 6-7.  Finding

the allegations in *Rothstein* to be "strikingly similar to Plaintiffs' complaint", the *Shaffer* court

noted that plaintiffs' claims were "difficult to separate" from *Rothstein*'s "clear statement

warning of the importance of separating illegal processing of financial transactions from civil

liability for terrorist attacks".  *Id.*; *see also id.* at 10 (holding that "the degree of separation

between Deutsche Bank and the attacks cuts against liability").  *Shaffer* concluded that such

allegations—the kind of allegations also made here—fail plausibly to plead proximate cause.  *Id.*

at 6-7; *see also id.* at 10-11 ("Processing funds for Iranian financial institutions, even if done to

evade U.S. sanctions, is not the same as processing funds for a terrorist organization, and a

conclusory allegation that it was foreseeable that Iran might give some of the money to terrorist

organizations if the transactions succeeded is insufficient to establish liability".).

Likewise, in a pair of recent decisions, the U.S. District Court for the District of Columbia applied *Rothstein* to grant BNPP's motions to dismiss. *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85 (D.D.C. 2017); *Ofisi v. BNP Paribas S.A.*, 2017 WL 4355922 (D.D.C. Sept. 29, 2017), *order vacated in part on other grounds and reconsideration denied*, 2018 WL 385408 (D.D.C. Jan. 11, 2018). In *Owens*, the plaintiffs alleged that U.S.-dollar clearing transactions between certain banks and sanctioned Sudanese entities materially assisted al Qaeda and Hezbollah, which allegedly then used those U.S. dollars to finance terrorist bombings in Kenya and Tanzania. 235 F. Supp. 3d at 99. Relying on *Rothstein*, the court rejected plaintiffs' allegation that proximate causation had been established because it was "reasonably foreseeable" that processing transactions for Sudan might allow Sudan to provide those funds to al Qaeda and that those funds might then be used to carry out terror attacks. *Id*. at 97. The court held that "[b]ased on plaintiffs' allegations, there is simply not enough to sustain a sufficiently direct causal connection between defendants' conduct and the embassy bombings that injured plaintiffs." *Id*. at 99. Similarly, in *Ofisi*, plaintiffs alleged that BNPP had conspired with Sudan, Sudanese banks, and al Qaeda to evade U.S. sanctions against Sudan and thereby caused plaintiffs' injuries in terror attacks. 2017 WL 4355922, at *7. Applying *Rothstein* to dismiss the Complaint, the court found plaintiffs' allegations—similar to those made here—wanting because the complaint here contained no well-pled allegations "that BNPP . . . provided money directly to any terrorist group, that any money BNPP processed for Sudan or Sudanese banks was transferred to al Qaeda prior to the attacks, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed." *Id.* at *9.

B.      ***Rothstein* and Its Progeny Foreclose Plaintiffs' Causal Theory Here.**

The very gaps in causation that were dispositive in *Rothstein* and its progeny are dispositive here:

- **The Moving Defendants did not participate in the attacks:**  As in *Rothstein*, there are no allegations here that the Moving Defendants were "participant[s] in the terrorist attacks that injured plaintiffs".  *Rothstein*, 708 F.3d at 97.

- **The Moving Defendants did not provide banking services directly to terrorists:**  As in *Rothstein*, Plaintiffs here do not plausibly allege that the Moving Defendants provided services directly to terrorist entities.  *See id.*

- **The Moving Defendants' alleged actions were not necessary to any terrorism funding by Iran:**  As in *Rothstein*, Plaintiffs here do not plausibly allege that, if the Moving Defendants had not provided dollar-clearing transactions for Iranian banks, Iran would not have been able to fund terrorist groups.  *See id.*

- **Iran has legitimate uses for financial services:** As in *Rothstein*, "[t]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund".  *Id.*

In light of *Rothstein* and its progeny, Plaintiffs have not, as a matter of law, pleaded a proximate causal relationship between the Moving Defendants' alleged conduct and the attacks that killed or injured Plaintiffs.  The Second Circuit already has held that the mere provision of banking services to Iran, a state sponsor of terrorism, is too indirect to satisfy the proximate cause standard.  *See id.* at 96; *see also Al Rajhi*, 714 F.3d at 124.  The causal theory alleged here with respect to the Moving Defendants' provision of banking services is even more attenuated than the causal theory the Second Circuit rejected in *Rothstein*.  In *Rothstein*, "UBS allegedly provided funding to a known state sponsor of terrorism that, in turn, provided funding to H[e]zbollah and Hamas", the perpetrators of the terror attacks.  *Al Rajhi*, 714 F.3d at 124.

Here Plaintiffs do not in most cases name the terrorist groups that carried out the attacks, and do not allege any specific connection between the purported recipients of the

21

banking services and those who committed the attacks or, as in *Al Rajhi*, 714 F.3d at 124, that the money from the U.S. dollar-denominated transactions conducted by the Moving Defendants for Iranian banks was "transferred" to the individuals or entities that committed the attacks. Under *Rothstein* and its progeny, the theory of causation pleaded by Plaintiffs here—even more attenuated than in *Rothstein* itself—fails as a matter of law.

Plaintiffs' repetition of the conclusory allegation that Iran's provision of material support for terrorism was a "foreseeable" consequence of the Moving Defendants' conduct does not cure Plaintiffs' failure plausibly to plead proximate cause. *See, e.g.*, Compl. ¶¶ 1388, 1396, 1399, 1401, 1406, 1912, 2338, 2404, 2405, 2426, 2433. As the Supreme Court held in *Bank of America Corp. v. City of Miami*, "to establish proximate cause" under statutes like the ATA that are analogous to tort actions, "a plaintiff must do more than simply show that its injuries foreseeably flowed from the alleged statutory violation". 137 S. Ct. 1296, 1301 (2017). The Supreme Court held that "foreseeability alone is not sufficient to establish proximate cause under the FHA" without also satisfying the requirement of directness. *Id*. at 1305.

*Bank of America*'s proximate cause analysis applies here and further confirms that Plaintiffs' foreseeability allegations are insufficient plausibly to allege proximate cause under the ATA. *See Fields v. Twitter*, 881 F.3d 739, 748 (9th Cir. 2018) (applying *Bank of America* and finding that "for purposes of the ATA, it is a direct relationship, rather than foreseeability, that is required"). The ATA, like the FHA, is a statute that is "analogous" to "tort actions recognized at common law". *Bank of America*, 137 S. Ct. at 1301 (citation omitted). In enacting the ATA, Congress "create[d] a federal cause of action akin to tort action". *Shatsky v. Palestine Liberation Org.*, No. 02-2280 (RJL), 2017 WL 2666111, at *6 (D.D.C. June 20, 2017). Because the ATA is a statute with "common-law foundations" in tort, the same directness principles the Supreme

Court applied to proximate cause under the FHA also apply to the ATA. *See Bank of America*, 137 S. Ct. at 1306 (citation omitted). Plaintiffs' assertions that their injuries "foreseeably" flow from the Moving Defendants' financial services cannot make up for the lack of directness.

Plaintiffs' remaining conclusory allegations (i) that the Moving Defendants "facilitated", Compl. ¶¶ 697, and "[e]nabled", *id.* ¶ 1386, "Iran and its Agents and Proxies to authorize, plan, and commit acts of international terrorism", (ii) that "[a]bsent the collusion and conspiratorial conduct of Defendants, Iran and its agents . . . could not have successfully hidden the volume of USD clearing and trade-finance transactions", *id.* ¶ 1389, and (iii) that, without the Conspiracy, "Iran could not have concealed and disguised the nature, location, source, and origin of the material support it provided to its Agents and Proxies", *id.* ¶ 1395, are the same kinds of allegations *Rothstein* rejected as far too remote to establish proximate cause. The *Rothstein* plaintiffs alleged that the defendant's provision of funds to Iran "substantially increased" the ability of terrorist organizations funded by Iran to carry out the attacks. 708 F.3d at 87. The Second Circuit rejected those allegations, holding that the plaintiffs' claim that the defendant's transfer of funds to Iran made it "more likely that the moneys would be used for terrorism" did not adequately plead a proximate causal connection. *Id.* at 97. Plaintiffs' conclusory allegation here that the "volume" of Iranian support for terrorism was enhanced, Compl. ¶ 1402, is materially identical to what *Rothstein* rejected, and is a tacit admission that Iran *would* have still funded terrorism in the absence of the purported conspiracy, *see Rothstein*, 708 F.3d at 97. Moreover, notwithstanding the conclusory allegations that the Moving Defendants "facilitated" transactions "on behalf of" or "for the benefit of" unspecified "Iranian Agents and Proxies", Plaintiffs do not allege *any* details whatsoever tying the Moving Defendants, even indirectly, to any terrorist groups, let alone the specific attacks alleged in the Complaint. *See* Compl. ¶¶ 696-

23

98; *Rothstein*, 708 F.3d at 96; *see also Al Rajhi*, 714 F.3d at 124.

> In sum, when, as in *Rothstein* and its progeny, a defendant is alleged to have dealt with a state sponsor of terrorism and not with a terrorist organization allegedly supported by that state, that "alleged harm" is simply "'too remote' from the defendant's [allegedly] unlawful conduct". *Bank of Am.*, 137 S. Ct. at 1306 (quoting *Lexmark Int'l, Inc.*, 134 S. Ct. at 1390). And this is *a fortiori* the case when, as here, the Moving Defendants are alleged to have dealt only indirectly (if at all) with a state sponsor of terrorism, or with unspecified "Agents and Proxies" that allegedly supported or carried out the attacks that injured or killed Plaintiffs.

## III.   PLAINTIFFS' PRIMARY LIABILITY CLAIMS (CLAIMS I-IV AND VIII-X) FAIL PLAUSIBLY TO ALLEGE THAT THE MOVING DEFENDANTS ENGAGED IN AN ACT OF INTERNATIONAL TERRORISM

> The Complaint's asserted primary liability claims (Claims I-IV and VIII-X) fail for the additional and independent reason that Plaintiffs do not plausibly allege that the Moving Defendants themselves committed "act[s] of international terrorism". *See* 18 U.S.C. § 2333(a). The Second Circuit has held that to state an ATA primary liability claim, a plaintiff must plausibly allege that the defendant itself committed an act of "international terrorism" as defined in 18 U.S.C. § 2331(1). *Linde*, 2018 WL 797454, at *8-9. Section 2331(1) requires the following to constitute an act of international terrorism:  the activity must (A) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; (B) "appear to be intended" "to intimidate or coerce a civilian population", "to influence the policy of a government by intimidation or coercion", or "to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (C) "occur primarily outside the territorial jurisdiction of the United States, or transcend national

boundaries".  18 U.S.C. § 2331(1); *accord Linde*, 2018 WL 797454, at *8.

> *Linde* made clear that Section 2331(1)(A) itself contains two distinct elements: the defendant's activity must both violate a criminal statute and also involve violent acts or acts dangerous to human life.  *Linde*, 2018 WL 797454, at *8 ("[Section 2331(1)(A)] states that for an act to constitute international terrorism, it must violate federal or state law if committed within this country. . . [it] must *also* involve violence or endanger human life." (emphasis in original)).  Thus, a defendant's alleged violation of the ATA's criminal material support statutes, such as 18 U.S.C. § 2339A, "does not invariably equate to an act of international terrorism" within the meaning of Section 2331(1), because violation of those statutes does not necessarily involve "violent acts or acts dangerous to human life".  *Linde*, 2018 WL 797454, at *9.[9]  Here, Plaintiffs fail plausibly to allege that the Moving Defendants have satisfied these elements.

> *First*, Plaintiffs have not plausibly alleged that the Moving Defendants themselves committed violent acts or acts dangerous to human life, as required by 18 U.S.C. § 2331(1)(A). *Linde*, 2018 WL 797454, at *9 (citing 18 U.S.C. § 2331(1)(A)).  Plaintiffs only allege that the Moving Defendants provided certain banking services to entities in Iran.  *See, e.g.*, Compl. ¶¶ 1204, 1421, 1614, 1656.  There is no allegation that such banking services themselves were violent acts or dangerous to human life.  *Id.*; *see Linde*, 2018 WL 797454, at *10.

> *Second*, Plaintiffs fail plausibly to allege that the Moving Defendants possessed the requisite intent "to intimidate or coerce a civilian population", "influence the policy of a

---

[9] *Linde* thus rejects prior district court holdings that a violation of the material support statutes automatically satisfies the "international terrorism" requirement.  *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 175 (S.D.N.Y. 2017); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), *vacated*, No. 16-2098-CV (CON), 2018 WL 797454 (2d Cir. Feb. 9, 2018).

government by intimidation or coercion", or "affect the conduct of a government by mass destruction, assassination, or kidnapping", as required by 18 U.S.C. § 2331(1)(B).  As the Second Circuit observed in *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014), this element must be assessed under an objective standard and "does not depend on the actor's beliefs".  The Complaint alleges no facts that suggest the Moving Defendants had the intent to "intimidate or coerce a civilian population", "influence the policy of a government by intimidation or coercion", or "affect the conduct of a government by mass destruction, assassination, or kidnapping".  Thus, nowhere does the Complaint aver facts that would "lead an objective observer to conclude [the Moving] Defendants intended to achieve" any of the coercion or intimidation objectives enumerated in the ATA.  *See Stansell v. BGP, Inc.*, No. 8:09-cv-2501-T-30AEP, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011) (payment of protection money to Colombian terrorists to allow defendants to conduct oil exploration "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)"); *see also Mastafa*, 770 F.3d at 194 (rejecting, in the context of the Alien Tort Statute, "the plausibility of a large international corporation intending . . . [to assist] the Saddam Hussein regime's torture and abuse of Iraqi persons"); *Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *2-*3 (E.D.N.Y. June 30, 2006) (finding that "engaging in commercial banking activity" with suppliers of chemicals to Iraq was not "designed to coerce civilians or government entities as required under § 2331").  The Complaint confirms this commonsense conclusion by alleging that the Moving Defendants were motivated by business interests, not terrorist intent.  *See* Compl. ¶¶ 1414, 1439, 1469, 1518, 2070.

## IV.   PLAINTIFFS' PRIMARY LIABILITY CLAIMS I-III FAIL PLAUSIBLY TO PLEAD THE ELEMENTS OF SECTION 2339A

Claims I-III must be dismissed for the additional reason that the Complaint fails

plausibly to allege the knowledge required to state a violation of Section 2339A, which Plaintiffs invoke to attempt to satisfy the criminal violation element of an act of international terrorism under Section 2331(1).  Section 2339A makes it illegal to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of [federal criminal laws including terrorism]."  18 U.S.C. § 2339A(a) (emphasis added).  Section 2339A thus requires Plaintiffs plausibly to allege that Defendants knew the banking services they were allegedly providing to Iran and Iranian banks would be used to support terrorist activities.  *See id.*  Here, Plaintiffs fail plausibly to allege that Moving Defendants knew either that (1) Iran or the Iranian banks were acting as agents of a terrorist; or (2) the ultimate beneficiaries of the financial services allegedly provided to Iran or Iranian banks would be a terrorist organization.

*Ofisi v. BNP Paribas, S.A.* analyzed Section 2339A's "knowledge" requirement and required plaintiffs to allege sufficient facts to show that (1) BNPP knew Sudan "was acting as an agent of al Qaeda or of an individual terrorist[] or (2) [BNPP] knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist".  2017 WL 4355922, at *7 (alteration in original) (quoting *Owens*, 235 F. Supp. 3d at 98-99).  There, the plaintiffs' allegation that it was "well-known" that Sudan was a state sponsor of terrorism and harboring terrorists failed to satisfy Section 2339A's knowledge requirement.  *Id.* at *8.  It was "insufficient for plaintiffs to allege that it was 'foreseeable' that if BNPP processed transactions for Sudan and Sudanese banks, some of that money might end up in the hands of al Qaeda to carry out attacks.  Plaintiffs' allegations simply do not satisfy the scienter element required by § 2339A and cannot serve as a predicate act of international terrorism for plaintiffs' ATA

claims."  *Id.* at *9.

Ofisi's inadequate knowledge allegations parallel those here.  In *Ofisi*, BNPP allegedly knew that Sudan acted as "an agent of al Qaeda", *Ofisi*, 2017 WL 4355922, at *7; here, the Moving Defendants are alleged to have known or been deliberately indifferent to "the fact Iran provided funding, financial services, and material support to al Qaeda", Compl. ¶ 666. BNPP was also alleged to have known that a terrorist organization or terrorist was the ultimate beneficiary of the financial services, *Ofisi*, 2017 WL 4355922, at *7; here, the Moving Defendants are alleged to have known or been deliberately indifferent to the fact that "funds it transferred on behalf of the Iranian Agents and Proxies were being used to support the Terrorist Groups", Compl. ¶ 696.  BNPP was further alleged to know that "Sudan was a state sponsor of terrorism" that "harbor[ed], fund[ed], and facilitate[ed] terrorists", *Ofisi*, 2017 WL 4355922, at *8; here, the Moving Defendants are alleged to have known that Iran was "a State Sponsor of Terrorism" that provides "safe harbor, U.S. currency" and other support for terrorists, Compl. ¶¶ 862, 990.  Like *Ofisi*, these allegations against the Moving Defendants fail plausibly to state a violation of Section 2339A.  Accordingly, Claims I-III must be dismissed.

## V.       PLAINTIFFS' PRIMARY LIABILITY CLAIMS VIII-X FAIL PLAUSIBLY TO ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION 2332d

Claims VIII-X, which allege that some Moving Defendants violated a prohibition on certain financial transactions by "United States person[s]" with "the government" of a designated state sponsor of terrorism, must be dismissed for the additional and independent reason that they fail to satisfy the statutory requirements of 18 U.S.C. § 2332d.

*First*, Claim IX—alleged against the non-U.S. entities SCB, RBS N.V. (f/k/a ABN AMRO Bank N.V.), Commerzbank, Deutsche Bank, Barclays and Credit Suisse AG—and

Claim X—alleged against BNPP—fail because none of these Moving Defendants qualifies as a "United States person" under the ATA. A "United States person" includes any: "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person in the United States". 18 U.S.C. § 2332d(b)(2).

Plaintiffs do not dispute that these entities are not juridical persons "organized under the laws of the United States" under subparagraph (C). They instead allege that these banks qualify as "any person in the United States" under subparagraph (D). That argument is legally untenable: subparagraph (D) reaches only natural persons located within the territory of the United States—as three district courts have held. *See Ofisi*, 2017 WL 4355922, at *6-7; *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011); *United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007). The Supreme Court, in construing the term "United States persons" with respect to sanctions against Burma, noted that this prohibition does not apply to "foreign companies". *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000).

*Ofisi*, which analyzed the definition of "United States person" under the ATA, concluded that defendant BNPP, a "French multinational bank, *incorporated under the laws of France*" (and one of the Moving Defendants here), was not a United States person under subparagraphs (C) or (D). *Ofisi*, 2017 WL 4355922, at *6-7 (emphasis in original) (internal quotations omitted). *Ofisi* held that subparagraph (D) applies only to "natural persons who are physically present in U.S. territory". *Id.* at *6. The court noted that "subparagraph (C) uses the term 'juridical' to qualify person, while subparagraph (D) does not". *Id.* "[I]nterpreting subparagraph (D) to apply to juridical persons would render subparagraph (C) superfluous because companies organized under the laws of the U.S. are by definition located in the U.S., as that is their place of incorporation". 2017 WL 4355922, at *6 (citing *Corley v. United States*,

556 U.S. 303, 314 (2009) (a "statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous")).[10]  Thus, Claims IX-X must be

dismissed because Section 2332d does not apply to foreign corporations.

       *Second*, Claims VIII—alleged against HSBC Bank USA, N.A.—IX and X fail for

the additional and independent reason that Plaintiffs do not allege a "financial transaction with

the government" of Iran.  18 U.S.C. § 2332d(a).  Although Plaintiffs conclusorily allege that the

Moving Defendants named in these Claims "engaged in thousands of illegal financial

transactions with the government of Iran", *see* Compl. ¶¶ 2537, 2553, the only *facts* that are pled

in support of this conclusion are that the Moving Defendants engaged in transactions with

Iranian *banks*.[11]  The Complaint's conclusory allegations that certain of these banks are "organs"

or "instrumentalities" of Iran, *e.g.*, Compl. ¶¶ 1166, 1171, are—even if plausibly shown by well-

pled factual allegations—insufficient to allege that such banks are "the government" of Iran as a

matter of law.  *See EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 89-90

(2d Cir. 2015) ("*BCRA*") ("[G]overnment instrumentalities established as juridical entities

distinct and independent from their sovereign should normally be treated as such") (quoting *First

Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U. S. 611, 626-27 (1983)).

---

[10] Plaintiffs cannot plead around *Ofisi* and similar decisions by alleging that the Moving Defendants' "New York branches" constitute "United States persons."  *See, e.g.*, Compl. ¶ 2534. The New York branches are not natural persons as required by subparagraph (D), and, further, it is "well-settled" that, for purposes of being sued, "the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law".  *Greenbaum v. Handelsbanken*, 26 F. Supp. 2d 649, 651-54 (S.D.N.Y. 1998).

[11] Moreover, Plaintiffs fail plausibly to allege that U.S. clearing banks such as HSBC Bank USA, N.A. knew that Iranian banks were the beneficiaries of wire transfers, in light of Plaintiffs' allegations that this information was "stripped" from payment messages before they were cleared through the U.S.

And, although the Complaint alleges that Bank Markazi, Iran's central bank, is an "alter ego" of the government of Iran, Compl. ¶ 1160, that single conclusory allegation is insufficient to plausibly allege that Bank Markazi is Iran's alter ego such that it is effectively the government itself.  *See BRCA*, 800 F.3d at 92 (conclusory allegations of Argentina's "extensive control" over its central bank were insufficient to show central bank was Argentina's alter ego "because whatever control Argentina exerted it was not tied to [the central bank]'s *day-to-day* operations" (emphasis in original)).

Plaintiffs' reliance on the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, to assert that certain Iranian entities "constitute the government of Iran" under Section 2332d does not change this conclusion.  *See* Compl. ¶ 2538.  The Office of Foreign Assets Control ("OFAC"), does maintain a list of certain entities constituting the government of Iran for purposes of the ITSR, but nowhere does this list or 31 C.F.R. § 560.304 state that the Iranian entities identified therein constitute the "government of Iran" for any other statutory or regulatory regime—let alone Section 2332d.  Indeed, 31 C.F.R. § 560.304 defines the "term Government of Iran" for purposes of the ITSR to include persons and entities that are patently not the government of Iran, including, *inter alia*, any person owned or controlled, directly or indirectly, by the government or its instrumentalities, which would include, for example, state-owned airlines and commercial banks that cannot plausibly be said to perform governmental functions.  The Iranian entities identified by OFAC in the ITSR thus have no bearing on the meaning of the term "government" as used in Section 2332d.

## VI.   PLAINTIFFS' SECONDARY LIABILITY CLAIMS (CLAIMS V-VII) FAIL AS A MATTER OF LAW

Plaintiffs' secondary liability claims (Claims V-VII) fail as a matter of law to state a claim under JASTA.  *See* 18 U.S.C. § 2333(d); *Linde*, 2018 WL 797454, at *10-12.

31

Plaintiffs must allege facts (in a non-conclusory manner) meeting JASTA's requirements for their secondary liability claims to survive dismissal, because it is the law of this Circuit that there is no secondary liability under Section 2333(a) for claims to which JASTA does not apply. *See Linde*, 2018 WL 797454, at *3 ("Initially, the ATA afforded civil relief only against the principals perpetrating acts of international terrorism. It provided no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others.") (citing *Rothstein*, 708 F.3d at 97); *accord Al Rajhi*, 714 F.3d at 123 (rejecting Section 2333(a) aiding-and-abetting civil liability). Here, for nearly all of the attacks, Plaintiffs cannot even clear the threshold requirement of JASTA, that Plaintiffs' injuries arose from an act of international terrorism "committed, planned, or authorized" by a designated FTO, and for all of the attacks Plaintiffs have failed plausibly to allege the elements of either conspiracy or aiding and abetting under JASTA.

A.   **Nearly All of the Attacks Do Not Meet JASTA's Threshold Requirement of an Act of International Terrorism "Committed, Planned, or Authorized" by a Designated FTO**

In enacting JASTA, Congress declined to create a general secondary liability cause of action under the ATA, but instead limited such liability (whether on a conspiracy or aiding-and-abetting theory) to cases where the plaintiff's injury arises from an act of international terrorism that is "committed, planned, or authorized" by an entity designated as an FTO as of the date of the attack. 18 U.S.C. § 2333(d)(2). For 50 of the 55 attacks alleged in the Complaint, Plaintiffs either attribute responsibility to a non-FTO, *see* Compl. ¶¶ 109, 129, 137, 167, 176, 184, 216, 318, 339, 541, 557, 589, 596, or do not identify any entity responsible for the attack, *see id.* ¶¶ 112-24, 145-62, 188-211, 221-313, 325-34, 348-85, 392-425, 529-36, 548-52,

559-72, 580-84.[12]  Plaintiffs do not attempt to plead facts purporting to show that these non-FTO

attacks were "planned" or "authorized" by an FTO.[13]  Accordingly, the claims based on the 50

non-FTO attacks do not clear JASTA's first hurdle and must be dismissed for this reason.

**B.      The Complaint Fails Plausibly To Plead the Elements of a Conspiracy**

Claim V also fails because it does not satisfy the requirement that the defendant

"conspires with" the perpetrator of the act of terrorism, *see* 18 U.S.C. § 2333(d), and because the

Complaint fails plausibly to allege that the Moving Defendants had the conspiratorial intent to

further any alleged co-conspirator's act of terrorism.

(1)      *Plaintiffs Fail Plausibly To Allege the Moving Defendants
Conspired with the Person Who Committed an Act of Terrorism*

Where a plaintiff plausibly alleges that an act of international terrorism was

"committed, planned, or authorized" by a designated FTO, a defendant is liable for conspiracy

under JASTA only if it "conspires *with the person who committed* such an act of international

terrorism." *Id.* (emphasis added).  The clear meaning of this provision is that Plaintiffs must

plausibly allege that the Moving Defendants conspired with the person or entity who actually

committed the attack (and not even, for example, the FTO that "planned" or "authorized"

it).  *See id.*  Thus in *Shaffer*, the court dismissed the complaint where plaintiffs alleged that

Deutsche Bank entered into "a conspiracy with Iran" rather than an FTO (or some other entity

that committed an act of terrorism that was "planned or authorized" by an FTO).  *Shaffer*, at 2

---

[12] Five attacks are alleged to have been committed by an organization designated as an FTO as of the date on which the attack was committed.  *See* Compl. ¶¶ 143 (Kata'ib Hizballah), 390, 430, 440, 577 (Ansar al-Islam).

[13] Instead, Plaintiffs merely assert periodically that "[t]he Terrorist Attacks were committed, planned, and/or authoried [sic] by FTOs", *e.g.*, Compl. ¶ 2468—a mere "formulaic recitation of the elements" of a JASTA claim that cannot suffice, *Iqbal*, 556 U.S. at 678.

n.1, 10; *see also id.* at 2 n.1 ("JASTA added conspiracy liability for parties who conspire *with* a Foreign Terrorist Organization" (emphasis added)).

The Complaint does not plausibly allege facts showing that the Moving Defendants conspired with any entity, FTO or otherwise, that "committed" any of the attacks at issue. Indeed, for the vast majority of the attacks the Complaint does not even specify the group that "committed" the attack. *See, e.g.*, Compl. ¶¶ 145-49. The Complaint attempts to plead around this flaw by making conclusory assertions that the conspiracy was with "Iran and its Agents and Proxies," which Plaintiffs define to include named and unnamed "Terrorist Groups". *E.g.*, *id.* ¶ 1371. But conclusory assertions are not enough. *Iqbal*, 556 U.S. at 678. As in *Shaffer*, "the complaint does not establish that [the banks] participated in any conspiracy other than perhaps to evade economic sanctions." *Shaffer*, at 10. There is not a single factual allegation showing that the Moving Defendants had any relationship at all with the various groups that allegedly "committed" the attacks—let alone allegations that demonstrate how Defendants "conspired with" those groups. Indeed, Plaintiffs contradict their own pleading artifice when they acknowledge that their theory is that the Defendants "conspired with . . . *Iran* in its commission of the Terrorist Attacks", Compl. ¶ 96 (emphasis added)—exactly what *Shaffer* held fails to state a claim under JASTA. Accordingly, Plaintiffs' conspiracy claims fail as a matter of law.

(2)     *Plaintiffs Fail Plausibly To Allege that the Moving Defendants Had the Conspiratorial Intent To Commit an Act of Terrorism*

Even if Plaintiffs had plausibly alleged that the Moving Defendants conspired with the persons who committed the attacks, Claim V would fail for the independent reason that the Complaint fails plausibly to allege that the Moving Defendants had the conspiratorial intent to commit an act of terrorism. To establish a conspiracy claim, "a plaintiff must show that a

defendant joined the conspiracy with the intent to commit the offenses that are its object." *Zito v. Leasecomm Corp.*, 2003 WL 22251352, at *20 (S.D.N.Y. Sept. 30, 2003). In the case of the ATA, the object of the conspiracy is an act of terrorism. Courts have thus dismissed ATA conspiracy claims where, as here, the plaintiffs have not plausibly alleged the defendant possessed an intent to support an act of terrorism. *See Shaffer*, at 10-11.

      As discussed in Section II, *supra*, the *Shaffer* plaintiffs made allegations substantially similar to Plaintiffs'. *See* Compl., *Shaffer*, Dkt. No. 1 ¶ 1. In *Shaffer*, plaintiffs alleged that Deutsche Bank "knowingly conspired with [Iran] and its banking agents . . . to evade U.S. economic sanctions and disguise financial payments", *id.*; here, Plaintiffs allege that the Moving Defendants conspired with Iran to "purposefully transfer[] hundreds of billions of USDs through the United States financial system in a manner expressly designed to . . . evade U.S. sanctions", Compl. ¶ 2498. The *Shaffer* plaintiffs' "conspiracy allegations largely focus[ed] on a conspiracy to avoid U.S. economic sanctions to assist Iranian banks in securing U.S. currency", *Shaffer*, at 10; here, the crux of the Complaint is that "Defendants entered into a conspiracy with Iran and its Agents and Proxies . . . to transfer hundreds of billions of [U.S.] dollars . . . by altering, falsifying, or omitting information from bank-to-bank payment orders", Compl. ¶ 1371. The *Shaffer* plaintiffs "describe[d] the object of the conspiracy as completing the dollar-clearing transactions", *Shaffer*, at 10; here, Plaintiffs allege that "[t]he object of the Conspiracy was to defeat the economic sanctions imposed by the U.S. government", Compl. ¶ 60.

      The *Shaffer* court found that these "conspiracy allegations largely focus on a conspiracy to avoid U.S. economic sanctions to assist Iranian banks in securing U.S. currency" and that "Plaintiffs, by their own allegations, describe the object of the conspiracy as completing dollar-clearing transactions". *Shaffer*, at 10. In dismissing the complaint, the *Shaffer* court held

that "[f]or a claim to be viable under the ATA, the object of the participants' conspiracy must be to provide material support for terrorism", *id.*, and because plaintiffs had not plausibly alleged that Deutsche Bank intended to join a conspiracy whose object was terrorism, plaintiffs' allegations failed to plead a conspiracy to support or to commit terrorism as a matter of law, *see id.* at 10-11.  The same result applies here, where the alleged "*object of the Conspiracy was to defeat the economic sanctions*".  Compl. ¶ 60. (emphasis added).

C. **The Complaint Fails Plausibly To Allege the Moving Defendants Aided and Abetted an Act of Terrorism**

Aiding-and-abetting liability under JASTA is similarly limited to cases where the defendant "aids and abets, by knowingly providing substantial assistance [to] . . . the person who committed such an act of international terrorism'".  *Linde*, 2018 WL 797454, at *3 (alteration in original) (quoting 18 U.S.C. § 2333(d)(2)).  Plaintiffs' aiding-and-abetting claims fail plausibly to allege that the Moving Defendants "provided" *any* assistance to "the person who committed such an act of international terrorism".  *Id.*  In addition, even if Plaintiffs had plausibly alleged that the Moving Defendants provided any assistance to any persons who committed acts of international terrorism—and they have not—Plaintiffs do not plausibly allege the "*Halberstam* elements of civil aiding and abetting, or the factors relevant to the substantial assistance element [of JASTA]", as required by *Linde*.  2018 WL 797454, at *11.  For these reasons, Plaintiffs' aiding-and-abetting claims must be dismissed as a matter of law.

(1) *Plaintiffs Fail Plausibly To Allege that the Moving Defendants Provided Any Assistance To the Person Who Committed an Act of International Terrorism*

As explained above, *see* Section II, Plaintiffs do not plausibly allege that the Moving Defendants provided any assistance to the named and unnamed terrorist groups that carried out the attacks.  Instead, Plaintiffs allege that the Moving Defendants "facilitate[ed] the

transfer of USDs through the international system to Iran and its Agents and Proxies, knowing or with deliberate indifference to the fact that Iran and its Agents and Proxies would use at least a portion of those funds to provide material support to Hezbollah, AAI, KH, and al Qaeda." Compl. ¶ 2496. Plaintiffs' allegations regarding the alleged provision of assistance to Iran and its unspecified "Agents and Proxies" do not meet the pleading standard set by *Iqbal* and must be disregarded, 556 U.S. at 678; as explained above, and just like in *Rothstein*, Plaintiffs cannot trace any transactions with Iranian banks to funds that wound up in the hands of terrorist groups. *Supra* § II. Moreover, Plaintiffs tacitly admit that it was "Iran and its Agents and Proxies", and not the Moving Defendants, that transferred "funds to . . . Hezbollah, AAI, KH, and al Qaeda". Compl. ¶ 2496. Plaintiffs thus fail to plead the first element of aiding-and-abetting liability under JASTA.

> (2)     *Plaintiffs Fail Plausibly To Allege the Elements of Aiding-and-Abetting and "Substantial Assistance"*

Even if Plaintiffs did plausibly allege that the Moving Defendants provided assistance to the groups that "committed" the attacks, they fail plausibly to allege either the "*Halberstam* elements of civil aiding and abetting, or the factors relevant to the substantial assistance element", each of which is required under JASTA. *Linde*, 2018 WL 797474, at *11. JASTA requires that (i) "'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance'", *id.* at *10 (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)), and (ii) "'the defendant must knowingly and substantially assist the principal violation'", *id.* The Complaint fails plausibly to plead either of these requirements.

*First*, the Complaint contains no plausible allegations that the Moving Defendants were aware that, by providing assistance to Iranian banks, they were assuming a role in the

37

terrorist activities of other entities.  The Complaint alleges, in conclusory fashion, that

"Defendants knew, or were deliberately indifferent to the fact, [that] the resources and assistance

they were providing would be used to materially support terrorist attacks that were part of Iran's

extensive terrorism campaign."  Compl. ¶ 1378.  Such allegations do not meet the standard set

forth under *Twombly* and *Iqbal* and do not establish that the Moving Defendants were aware of

any alleged role in any attacks.  *See Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 CIV. 7955

(GEL), 2008 WL 4378443, at *5 (S.D.N.Y. Sept. 25, 2008) ("The knowledge element of aiding

and abetting requires that a defendant have 'actual knowledge' that it is assisting in the tortious

conduct."); *see also id.* (dismissing aiding and abetting claims where plaintiffs alleged that

defendants "'knowingly provided knowing practical assistance' to the Hussein regime" as

"nothing more than a 'formulaic recitation' of the requirement, . . . not sufficient by itself to

make the claim for relief 'plausible.'").

   There is no well-pleaded allegation that the Moving Defendants' evasion of

economic sanctions was intended to further, or done with awareness of their purported role in

furthering, attacks.  While the Complaint conclusorily alleges "Defendants knew the FTOs with

which they were doing business were designated terrorist organizations", Compl. ¶ 1405,

Plaintiffs do not allege any facts showing that the Moving Defendants were in fact "doing

business" with designated terrorist organizations.  Rather, the Moving Defendants were, at most,

providing clearing services to Iranian banks or entities acting on behalf of Iranian banks, and

there are no allegations that any such services were identified to the Moving Defendants as being

for purposes of supporting terrorist activities.  Such allegations do not give rise to any plausible

inference that the Moving Defendants were aware of their purported role in terrorist activity, or

had a desire to commit attacks, or to provide support for any such attacks, or "to make the

[terrorist] venture succeed", as is required under *Halberstam* and *Linde*.  *See Halberstam,* 705

F.2d at 488; *Linde*, 2018 WL 797454, at*10-*11; *see also Khulumani v. Barclay Nat. Bank Ltd.*,

504 F.3d 254, 318 (2d Cir. 2007), aff'd sub nom. *Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S.

1028 (2008) ("One who merely sells goods to a buyer is not an aider and abettor of crimes that

the buyer might commit, even if the seller knows that the buyer is likely to use the goods

unlawfully, because the seller does not share the specific intent to further the buyer's venture.")

(citation omitted).

   *Second*, the Complaint fails plausibly to allege that the Moving Defendants

"knowingly and substantially assisted" those who perpetrated the attacks at issue here.  *Linde*,

2018 WL 797474, at *11.  The Complaint contains no plausible allegations that the Moving

Defendants provided any assistance, much less "substantial assistance", to any terrorists or

terrorist organizations who committed any of the attacks.  *Linde* directs courts to consider in

deciding "whether a defendant's assistance is 'substantial enough' to constitute aiding and

abetting," "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant,

(3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the

principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Id.* at *11

(citing *Halberstam*, 705 F.2d at 484-85).  In *Ofisi*, 2018 WL 396234, at *5, the court dismissed

aiding-and-abetting claims under *Halberstam* where "plaintiffs failed to plausibly allege that

BNPP directly funded any terrorist group, had knowledge of Sudan's use of BNPP-provided

funds to sponsor terrorist activities, or knew that BNPP's conduct actually enabled the attacks".

   Likewise, here, there is no well-pled allegation that the Moving Defendants

"encouraged" an act of terrorism, the first *Halberstam* factor; rather, Plaintiffs allege merely that

the Moving Defendants conspired to evade economic sanctions to their supposed profit.  Compl.

¶ 1414.  As to the "amount" of assistance supposedly provided, Plaintiffs assert that the Moving Defendants' banking services were "necessary" to carry out the attacks, but the Complaint fails to plead any facts to support that conclusory allegation.  *See id.* ¶¶ 98, 1398, 1402.  Similarly, the Moving Defendants were clearly "absen[t]" at the time of the tort as there is no allegation that they were present at the attacks that caused Plaintiffs' injuries.  *See, e.g.*, *id.* ¶¶ 568-79.  Further, despite the conclusory allegations that the Moving Defendants conspired with "Iran and its Agents and Proxies", *see, e.g.*, *id.* ¶ 1371, there are no well-pleaded allegations that the Moving Defendants had any relationship with the groups that committed the attacks.  The Moving Defendants' conduct—allegedly evading economic sanctions by processing funds for Iranian banks, *id.* ¶ 3—is far removed from the attacks by terrorist groups in Iraq, *see, e.g.*, *id.* ¶¶ 106-07.  And, as discussed above, Plaintiffs have not pled any facts suggesting that the Moving Defendants actually knew that money that passed through their accounts was furthering any acts of terrorism.  Similar to *Ofisi*, this case is a far cry from *Halberstam*, in which a burglar's live-in partner "had actual knowledge of the ongoing tortious activity of her companion and . . . provided substantial assistance to directly further the continued success of the illicit burglary scheme."  2018 WL 396234, at *5.  Accordingly, Claims VI-VII must be dismissed.

## CONCLUSION

For the reasons set forth above, the Complaint fails to state a claim and should be dismissed with prejudice in its entirety as to each of the Moving Defendants.

40

Dated: March 2, 2018

                                  Respectfully submitted,

COVINGTON & BURLING LLP,        MAYER BROWN LLP,

by                                 by

*/s/ John E. Hall*                      */s/ Mark G. Hanchet*
(with permission)                     (with permission)

John E. Hall                         Mark G. Hanchet
Mark P. Gimbel                     Robert W. Hamburg
The New York Times Building     1221 Avenue of the Americas
620 Eighth Avenue               New York, NY 10020-1001
New York, New York 10018       (212) 506-2500
(212) 841-1000                  mhanchet@mayerbrown.com
jhall@cov.com                    rhamburg@mayerbrown.com
mgimbel@cov.com

David M. Zionts                    Andrew J. Pincus
One CityCenter                     Marc R. Cohen
850 Tenth Street NW            Alex C. Lakatos
Washington, DC 20001          1999 K Street, N.W.
(202) 662-6000                 Washington, DC 20006-1101
dzionts@cov.com              (202) 263-3000
                                apincus@mayerbrown.com
                                mcohen@mayerbrown.com
*Attorneys for Defendant Deutsche*   alakatos@mayerbrown.com
*Bank AG*

                                *Attorneys for Defendants HSBC Bank*
                                *USA, N.A., HSBC Holdings plc, HSBC*
                                *Bank plc, HSBC Bank Middle East*
                                *Limited and HSBC North America*
                                *Holdings, Inc.*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP,

by

  */s/ Jonathan I. Blackman*
      (with permission)

      Jonathan I. Blackman
      Carmine D. Boccuzzi, Jr.
      Avram E. Luft
One Liberty Plaza
New York, NY 10006
(212) 225-2000
jblackman@cgsh.com
cboccuzzi@cgsh.com
aluft@cgsh.com

*Attorneys for Defendants Commerzbank*
*AG, Commerzbank AG, New York Branch,*
*and BNP Paribas, S.A.*

SULLIVAN & CROMWELL LLP,

by

  */s/ Michael T. Tomaino, Jr.*
      (with permission)

      Michael T. Tomaino, Jr.
      Jeffrey T. Scott
      Jonathan M. Sedlak
125 Broad Street
New York, NY 10004
(212) 558-4000
tomainom@sullcrom.com
scottj@sullcrom.com
sedlakj@sullcrom.com

*Attorneys for Defendant Barclays*
*Bank PLC*

SULLIVAN & CROMWELL LLP,               CLIFFORD CHANCE US LLP,

by                                     by

  _/s/ Sharon L. Nelles_____     _/s/ Robert G. Houck_____
     (with permission)                      (with permission)

    Sharon L. Nelles                        Robert G. Houck
    Bradley P. Smith                        Michael G. Lightfoot
    Alyssa A. Hill                      31 West 52nd Street
125 Broad Street                       New York, NY 10019-6131
New York, NY 10004                     (212) 878-8000
(212) 558-4000                         robert.houck@cliffordchance.com
nelless@sullcrom.com                   michael.lightfoot@cliffordchance.com
smithbr@sullcrom.com
hilla@sullcrom.com                     *Attorneys for Defendants The Royal Bank of
                                       Scotland N.V. (formerly known as ABN
*Attorneys for Defendant Standard      AMRO Bank N.V.) and The Royal Bank of
Chartered Bank*                        Scotland plc*

43

SULLIVAN & CROMWELL LLP,

by

   */s/ Joseph E. Neuhaus*         
     (with permission)

     Joseph E. Neuhaus
     Alexander J. Willscher
     Colin A. Chazen
125 Broad Street
New York, NY 10004
(212) 558-4000
neuhausj@sullcrom.com
willschera@sullcrom.com
chazenc@sullcrom.com

*Attorneys for Defendant Crédit Agricole*
*Corporate & Investment Bank*

CRAVATH, SWAINE & MOORE LLP,

by

   */s/ John D. Buretta*           

     Richard W. Clary
     John D. Buretta
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rclary@cravath.com
jburetta@cravath.com

*Attorneys for Defendant Credit Suisse AG*