UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TIMOTHY O'SULLIVAN, et al.,                    :

                                                      :         OPINION AND ORDER
            Plaintiffs,                  17 Civ. 8709 (LTS) (GWG)
                                                        :

   -v.-
                                                         :
DEUTSCHE BANK AG, et al.,
                                                         :

           Defendants.                 :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      This case has been brought on behalf of members of the U.S. armed services who served in Iraq from 2003 through 2011 and were injured or killed by terrorist groups financially supported by Iran. The defendants are a number of financial institutions who are alleged to have violated laws imposing sanctions against Iran. Defendants have moved for a stay of discovery pending resolution of their motions to dismiss.[1] For the reasons set forth below, the motion for a stay is granted.

---

[1] Notice of Defendants' Motion to Stay Discovery During the Pendency of the Motions to Dismiss, filed Feb. 7, 2018 (Docket # 94) ("Defs. Not."); Defendants' Joint Memorandum of Law in Support of Motion to Stay Discovery During the Pendency of the Motions to Dismiss, filed Feb. 7, 2018 (Docket # 95) ("Defs. Mem."); Declaration of Andrew Hruska in Support of Defendants' Motion to Stay Discovery During the Pendency of the Motions to Dismiss, filed Feb. 7, 2018 (Docket # 96) ("Hruska Decl."); Declaration of John D. Buretta in Support of Defendants' Motion to Stay Discovery During the Pendency of Motions to Dismiss, filed Feb. 7, 2018 (Docket # 97); Plaintiffs' Opposition to Defendants' Motion to Stay Discovery, filed Feb. 9, 2018 (Docket # 98) ("Pls. Mem."); Defendants' Joint Reply Memorandum of Law in Further Support of Motion to Stay Discovery During the Pendency of the Motions to Dismiss, filed Feb. 12, 2018 (Docket # 99).

I. BACKGROUND

　　A. Complaint

This case is brought under the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"). The crux of plaintiffs' complaint is that the defendants provided financial services to the government of Iran or groups and entities affiliated with Iran (referred to throughout the complaint as Iran's "Agents and Proxies") in violation of sanctions imposed on Iran, and thereby helped Iran fund the terrorist organizations that carried out the attacks in which the plaintiffs were harmed. See Complaint, filed Nov. 9, 2017 (Docket # 1) ("Compl."), ¶¶ 1-67. Since 1984, the United States has designated Iran as a "State Sponsor of Terrorism" and has implemented a variety of economic sanctions against Iran in response to Iran's material and financial support of terrorist groups. See id. ¶¶ 13, 1341-1358. As a result of the sanctions imposed on Iran, it is unlawful to export goods and services, including financial services, from the United States to Iran without a license, and "virtually all trade and investment activities with Iran involving the U.S. financial system, including the processing of [United States Dollar] transactions through the United States," are prohibited. Id. ¶¶ 690-91. Also as part of these sanctions, "banks [a]re prohibited from processing wire transfers to or from [United States Dollar]-denominated accounts owned or controlled by, individuals or companies, acting for or on behalf of Iran," are required to follow certain reporting and record-keeping requirements, and are prohibited from structuring certain transactions for Iran. Id. ¶¶ 848-53.

Plaintiffs allege that these sanctions were imposed to cripple the Iranian economy and force Iran's leaders to stop supporting terrorism. Id. ¶¶ 845-53. Nevertheless, Iran continued to provide support to terrorist organizations that operated in Iraq between 2003 and 2011. See id.

2

¶¶ 835-44, 960-1112. Such terrorist groups include several Shi'a terrorist groups referred to as the "Special Groups," as well as Kata'ib Hizbollah, Asa'ib Ahl Al-Haq, Al Qaeda, and others. See id. ¶¶ 657, 960-1112.

The plaintiffs in this case are members of the U.S. armed forces who served in Iraq between 2003 and 2011, as well as the family members of service members who were injured or killed. See id. ¶ 11. The service members were injured or killed in the course of 55 separate terrorist attacks in Iraq carried out by groups supported by Iran. See id. ¶¶ 11, 95-597. Plaintiffs allege that Iran, or its Agents and Proxies, used U.S. dollars to support the terrorist organizations that carried out these attacks. See id. ¶ 2402.

Plaintiffs assert that the defendant financial institutions "knew the economic sanctions were put in place to cripple the Iranian economy, which would force Iran's leaders to cease their sponsorship of terrorism." Id. ¶¶ 864, 1391. The complaint also alleges that "[e]ach co-conspirator knew Iran was a designated State Sponsor of Terrorism at the time it entered into the Conspiracy, as well as throughout the course of the Conspiracy" and that "[e]ach co-conspirator knew it was illegal to facilitate the transfer of funds to Iran and its Agents and Proxies, specifically including the Terrorist Groups, without providing sufficient data to allow the transactions to be adequately detected." Id. ¶ 1400. Nevertheless, "[t]o obtain the [United States dollars] necessary to fund this massive terrorism campaign, Iran conspired with Defendants to evade and overcome the laws and sanctions that were put in place with the singular goal of stopping Iran from sponsoring and spreading terrorism, especially in the Middle East, including against U.S. nationals[,]" id. ¶ 1375, thereby helping launder billions of U.S. dollars to Iran, see id. ¶¶ 56, 1371-2400. As plaintiffs put it, "[t]he object of the Conspiracy was to defeat the economic sanctions imposed by the U.S. government, which were put in place with the sole

3

purpose of deterring, disrupting, and preventing acts of international terrorism, the very terrorist attacks at issue in this case." Id. ¶ 60.

Plaintiffs allege several methods by which defendants violated the sanctions. One method included removing key information from wire transfers (or "stripping" wire transfers) to prevent detection from regulators. Id. ¶¶ 44-50, 1418-22. Defendants also purportedly used an incorrect form of SWIFT messages[2] to conceal the fact that sanctioned entities were parties to wire transfers. See id. ¶¶ 1423-25. The complaint also alleges that the defendants performed "U-Turn"[3] transactions on behalf of Iran and its Agents and Proxies. See id. ¶¶ 1413, 1426-29. The complaint also alleges that the defendants conducted "trade finance" for Iran by acting as intermediaries in certain transactions, and by providing financing to buyers and sellers in transactions involving Iran and its Agents and Proxies. See id. ¶¶ 1430-43. Finally, plaintiffs allege that defendants provided "expert advice and financial services to Iran and its Agents and Proxies." See id. ¶ 1385.

As a result of these services, plaintiffs allege that defendants helped Iran transfer hundreds of billions of U.S. dollars and facilitated its sale of oil on the world market, which in turn allowed Iran to continue financing and supporting terrorist organizations. See id. ¶¶ 865-73. Based on their violations of sanctions imposed on Iran, as well as other countries and regimes,

---

[2] SWIFT stands for the "Society for Worldwide Interbank Financial Telecommunication," which is a Belgium-based company. Compl. ¶ 1367. SWIFT messages are messages sent through a worldwide messaging system maintained by SWIFT that is "used to transmit financial transaction [sic] in the Eurodollar market, among other financial markets, in a standardized message format." Id.

[3] A U-Turn transaction refers to the processing of U.S. Dollar transactions where such transactions "began and ended with non-U.S. financial institutions, but were cleared through a U.S. correspondent bank." Compl. ¶ 1427.

4

the defendants were investigated by, and entered into consent orders, settlements, or deferred prosecution agreements with, various government agencies, including the New York State Department of Financial Services, the Department of Justice, the New York County District Attorney's Office, the Board of Governors of the United States Federal Reserve System, the Department of Treasury, and the United States Office of Foreign Asset Control. Id. ¶¶ 1519-23, 1587-88, 1628-32, 1698-1701, 1717-19, 1764-65, 1784-86, 1820, 1841-47, 2072-73, 2083, 2163-2180, 2197, 2233-2238, 2303-2313.

Plaintiffs allege that the services provided by the financial institutions "overlapped" with the terrorist attacks causing plaintiffs' injuries. Id. ¶ 696. Although plaintiffs' memorandum of law on this motion does not point to any specific transaction in which Iran, or its Agents and Proxies, used funds provided by defendants to support the terrorist groups in the attacks alleged, the complaint alleges generally that these attacks could not have occurred without U.S. dollars because that currency is the one most commonly used to support international terrorism, and Iran's own currency is essentially worthless outside of Iran and can be traced back to Iran. Id. ¶ 34. "To obtain [U.S. dollars], Iran needed access to the U.S. financial system," which the defendants provided. Id. ¶ 35. The complaint further asserts that "[w]ithout the active participation of Defendants in the Conspiracy, Iran would not have been able to transfer such a large volume of funds to its Agents and Proxies, and thus, would not have been able to perpetrate the Terrorist Attacks." Id. ¶ 1402.

B. Procedural History

Plaintiffs filed their complaint in this case on November 9, 2017. See Compl. On December 19, 2017, the Court ordered a briefing schedule on defendants' proposed motion to dismiss under which their briefs were to be filed on March 2, 2018, opposition papers by May 2,

5

2018, and replies by June 1, 2018.  See Order, filed Dec. 19, 2017 (Docket # 58), at 3.  On January 16, 2018, plaintiffs' counsel "contacted Defendants and requested that a meeting be scheduled to discuss discovery and to conduct the Rule 26(f) Conference."  Declaration of Christopher G. Paulos in Support of Plaintiffs' Opposition to Defendants' Motion to Stay Discovery (annexed as Docket # 98-2 to Pls. Mem.) ("Paulos Decl."), ¶ 2.  Defendants' and plaintiffs' counsel spoke by telephone on January 18, 2018, at which time plaintiffs proposed "limited and targeted discovery," Paulos Decl. ¶ 2, including discovery relating to "[a]nti-money laundering policies, procedures, guidelines, and manuals; [a]uditing reports; SWIFT messages related to the illegal transactions described in the Complaint; Suspicious Activity Reports (SARs), which the banks are required to file with the Financial Crimes Enforcement Network following a suspected incident of money laundering; and [c]orporate structure information," as well as "limited subpoenas to third-party entities, including government agencies, in possession of relevant documents," see Letter from Seth A. Katz, filed Jan. 29, 2018 (Docket # 91) ("Katz Letter"), at 5.  Defendants thereafter jointly filed the instant motion to stay discovery pending the disposition of their motions to dismiss.  See Defs. Not.; Defs. Mem.  The Court stayed the parties' obligation to confer under Rule 26(f)(1) until the disposition of the stay motion.  See Order, filed Jan. 31, 2018 (Docket # 93).

II. APPLICABLE LAW

    A. Motion to Stay Discovery

"A motion to dismiss does not automatically stay discovery, except in cases covered by the Private Securities Litigation Reform Act."  Hong Leong Fin. Ltd. (Singapore) v. Pinnacle Performance Ltd., 297 F.R.D. 69, 72 (S.D.N.Y. 2013) (citation omitted).  Thus, "discovery should not be routinely stayed simply on the basis that a motion to dismiss has been filed."  Id.

(quoting Moran v. Flaherty, 1992 WL 276913, at *1 (S.D.N.Y. Sept. 25, 1992)). However, "upon a showing of good cause a district court has considerable discretion to stay discovery" pursuant to Fed. R. Civ. P. 26(c). Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc., 2009 WL 2777076, at *1 (S.D.N.Y. Sept. 1, 2009); accord Ellington Credit Fund, Ltd. v. Select Portfolio Servs., Inc., 2009 WL 274483, at *1 (S.D.N.Y. Feb. 3, 2009).

In some circumstances, a pending motion to dismiss may constitute "good cause" for a protective order staying discovery. See, e.g., Brooks v. Macy's, Inc., 2010 WL 5297756, at *1 (S.D.N.Y. Dec. 21, 2010); Picture Patents, LLC v. Terra Holdings LLC, 2008 WL 5099947, at *2 (S.D.N.Y. Dec. 3, 2008). "[A] court determining whether to grant a stay of discovery pending a motion must look to the particular circumstances and posture of each case." Alford v. City of New York, 2012 WL 947498, at *1 (E.D.N.Y. Mar. 20, 2012) (citation omitted). Courts consider: "(1) [the] breadth of discovery sought, (2) any prejudice that would result, and (3) the strength of the motion." Hong Leong Fin. Ltd. (Singapore), 297 F.R.D. at 72 (internal quotation marks and citation omitted); accord Integrated Sys. & Power, Inc., 2009 WL 2777076, at *1.

As we have previously determined in another case with respect to the "strength of the motion" prong of this analysis, the party seeking a stay must present "substantial arguments for dismissal[]." Hong Leong Fin. Ltd. (Singapore), 297 F.R.D. at 72 (quoting Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 206 F.R.D. 367, 368 (S.D.N.Y. 2002)). Phrased otherwise, this standard requires "a strong showing that the plaintiff's claim is unmeritorious." Id. (quoting Telesca v. Long Island Hous. P'ship, Inc., 2006 WL 1120636, at *1 (E.D.N.Y. Apr. 27, 2006)); accord Giminez v. Law Offices of Hoffman & Hoffman, 2012 WL 2861014, at *2 (E.D.N.Y. July 11, 2012); Flores v. S. Peru Copper Corp., 203 F.R.D. 92, 94 (S.D.N.Y. 2001).

B. ATA and JASTA

18 U.S.C. § 2333(a) provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States." This type of liability under the ATA is commonly known as "primary" liability. To be held primarily liable for an act of international terrorism, a plaintiff must show that a defendant's acts proximately caused the act of international terrorism that caused the plaintiff's injury. See Rothstein v. UBS AG, 708 F.3d 82, 95 (2d Cir. 2013). With respect to a bank that has provided financial services to Iran, the Second Circuit has held that a complaint fails to adequately allege proximate cause where "the Complaint does not allege that [the bank] was a participant in the terrorist attacks that injured plaintiffs. . . . [P]rovided money to [the terrorist organizations that caused the injury] . . . . [T]hat U.S. currency [the bank] transferred to Iran was given to [the terrorist organizations]. . . . [Or] that if [the bank] had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." Id. at 97.

In 2016, Congress amended the ATA by enacting the JASTA. The JASTA amends 18 U.S.C. § 2333 by providing a cause of action "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed [] an act of international terrorism." 18 U.S.C. § 2333(d). We will refer to these methods of proof as involving "secondary liability." In enacting the JASTA, Congress stated that its purpose is to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to

8

foreign organizations or persons that engage in terrorist activities against the United States." See JASTA § 2(b).

In the findings contained in the JASTA, Congress has instructed courts to apply the test for aiding and abetting and conspiracy liability found in "[t]he decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) . . . ." See JASTA § 2(a)(5). In that case, the D.C. Circuit stated that to be held liable for aiding and abetting, the aider or abettor's conduct must satisfy the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Halberstam, 705 F.2d at 477. Halberstam also suggested looking to five factors listed in the Restatement (Second) of Torts § 876 (Am. Law. Inst. 1979), to determine whether a party should be held liable for aiding-abetting, which include: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind." 705 F.2d at 478 (alteration in original) (internal quotation marks and citation omitted).

In interpreting this standard in the context of a claim brought under 18 U.S.C. § 2333, the Second Circuit has noted that "[a]iding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." Linde v. Arab Bank, PLC, 882 F.3d 314, 329 (2d Cir. 2018) (citing Halberstam, 705 F.2d at 477). The Second Circuit further noted with respect to the aiding and abetting analysis that liability attaches only when the alleged aider/abettor

> was "generally aware" that [by virtue of its conduct] it was [] playing a "role" in [a

9

terrorist organization's] violent or life-endangering activities. This is different from the mens rea required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities.

Id. at 329-30 (citations omitted).

Halberstam noted that the elements of a conspiracy include: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." 705 F.2d at 477 (citation omitted). With respect to the agreement requirement, Halberstam noted that "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." 705 F.2d at 477 (citations omitted). Halberstam further explained that "[t]he prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." 705 F.2d at 478.

III. DISCUSSION

    A. Strength of the Motion to Dismiss

Defendants argue that they have made a "strong showing" that they will prevail on their motions to dismiss because plaintiffs have failed to adequately allege that the defendants may be held either primarily or secondarily liable under 18 U.S.C. § 2333, which is the only statute under which this lawsuit was brought. See Defs. Mem. at 7-11. We agree.

First, defendants have easily made this showing with respect to plaintiffs' claims that defendants are primarily liable for their injuries. In their complaint, plaintiffs assert claims of

primary liability against defendants on the theory that the defendants are liable for acts of terrorism because they evaded sanctions by providing financial services to Iran and its Agents and Proxies, which in turn supported terrorist organizations. See, e.g., Compl. ¶¶ 2408-40. However, the complaint fails to show that any defendant "was a participant in the terrorist attacks that injured plaintiffs[,] . . . provided money to [the terrorist organizations that carried out the attacks] [,] . . . that U.S. currency [the defendants] transferred to Iran was given to [those terrorist organizations,] . . . [or] that if [defendants] had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." Rothstein, 708 F.3d at 97. Instead, plaintiffs assert that proximate cause may be satisfied by showing:

> [a]t all relevant times, Defendants knew or were deliberately indifferent to the fact they were unlawfully conducting business with Agents and Proxies of Iran. Thus, Defendants knew they were directly involved with Iran and its Agents and Proxies — entities Defendants knew, or were recklessly indifferent to the fact that they, were engaged in terrorist activities and that such terrorist activities were aimed at U.S. nationals, including Plaintiffs. Because all terrorist activities carry the foreseeable risk of killing or injuring innocent persons, including Plaintiffs, Defendants conduct as set forth herein was a proximate cause of Plaintiffs' deaths and injuries.

Compl. ¶ 2405.

This allegation of proximate cause is similar to the allegations at issue in Rothstein, where plaintiffs alleged in their complaint that UBS illegally transferred billions of U.S. dollars to Iran, and that Iran funded the terrorist organizations Hamas and Hizbollah, which in turn injured or killed plaintiffs and their family members in bombings and rocket attacks against Israel between 1997 and 2006. See 708 F.3d at 85-87. The Second Circuit held that these allegations were insufficient to plead proximate cause in asserting claims against UBS under the primary liability provision of the ATA. See id. at 93-95; accord In re Terrorist Attacks on Sept.

11

11, 2001, 714 F.3d 118, 124 (2d Cir. 2013) (complaint failed to allege proximate cause sufficiently to state a claim of primary liability under the ATA where, with respect to the September 11, 2001 attacks committed by Al Qaeda, "plaintiffs d[id] not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to [] purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks.") (citations omitted). Likewise here, plaintiffs' allegations of proximate cause with respect to their claims of primary liability are insufficient.

As to secondary liability, defendants have also made a strong showing that plaintiffs' claims are unmeritorious. As noted, "[a]iding and abetting [under the JASTA] requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." Linde, 882 F.3d at 329 (citing Halberstam, 705 F.2d at 477). This requires a showing that "in providing [financial] services, the bank was 'generally aware' that it was thereby playing a 'role' in [the terrorist organizations's] violent or life-endangering activities," which "requires more than the provision of material support to a designated terrorist organization." Linde, 882 F.3d at 329 (emphasis omitted). The complaint alleges that the defendants knew that they were circumventing sanctions by providing Iran with financial services. See, e.g., Compl. ¶ 863. It also alleges that the defendants "knew that sanctions were imposed against Iran with the sole and specific purpose of stopping Iran's sponsorship of terrorism." Id. Accepting these statements as true, however, they do not show that the defendants knew that the financial services they provided to Iran and its Agents and Proxies would in turn be given to terrorist organizations to carry out violent or life-endangering activities, given that "Iran is a government, and as such it has many legitimate agencies,

12

operations, and programs to fund." Rothstein, 708 F.3d at 97. Plaintiffs have failed to cite to any allegations in their complaint that show in a plausible, non-conclusory fashion that the defendants knowingly aided or abetted any terrorist organization's violent or life-endangering activities. Thus, defendants have made a strong showing that plaintiffs' aiding and abetting claims asserted under 18 U.S.C. § 2333(d) are not meritorious.

With respect to the conspiracy theory of secondary liability under 18 U.S.C. § 2333(d), subsection (d)(2) imposes conspiracy liability on a defendant who "conspires with the person who committed [] an act of international terrorism." Plaintiffs repeatedly assert that "Defendants [] misstate the law when they imply that a conspiracy claim requires proof that Defendants conspired with a foreign terrorist organization," and that "JASTA requires only that the plaintiff's injury 'aris[e] from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization.'" See Pls. Mem. at 7 (quoting 18 U.S.C. § 2333(d)(2)). That position is wrong, however, because § 2333(d)(2) specifically requires a defendant to conspire with "the person who committed [] an act of international terrorism."

Plaintiffs assert that their complaint alleges "a conspiracy with foreign terrorist organizations, especially Hezbollah, Iran's de facto terrorism arm in Iraq, as well as Al Qaeda, Ansar Al Islam, and Katib Hezbollah, and the persons who committed the terrorist attacks." See Pls. Mem. at 7 (citation omitted). But plaintiffs's brief makes no effort to marshal facts in support of this assertion. Instead, in a single sentence, it cites to more than 240 pages of the complaint, see id. (citing Compl. ¶¶ 1371-2400), and asserts that the complaint alleges "in great detail . . . a conspiracy with foreign terrorist organizations." Id. These 240 pages of the complaint certainly contain detail. But plaintiffs do not explain how that detail shows that the

13

defendants conspired with the foreign terrorist organizations that carried out the attacks at issue.

Based on our own examination of these 240 pages, we find that they contain a lengthy discussion of how each defendant evaded the requirements of the sanctions regime against Iran and its banks through various means including, for example, by concealing the involvement of Iran in financial transactions. The complaint notes that the defendants paid fines and penalties of hundreds of millions of dollars because of their violation of the sanctions imposed against Iran. See, e.g., Compl. ¶¶ 1420, 1520, 1587, 1632, 1699, 1701. It also alleges that Iran, its banks, and other Iranian entities that did business with defendants provided assistance to various foreign terrorist organizations. See, e.g., id. ¶¶ 1762, 1902-03, 1915, 2317. As to any allegation of conspiracy between the defendants and foreign terrorist organizations, however, the complaint seems to rest on the following syllogism: (1) defendants knew the purpose of the sanctions regime was to prevent Iran from obtaining U.S. dollars; (2) the reason the sanctions regime attempted to prevent Iran from obtaining U.S. dollars was to stop Iran and its Agents and Proxies from using those dollars to sponsor terrorism or to cripple Iran financially so that it could not sponsor terrorism; (3) without U.S. dollars, Iran and its Agents and Proxies could not have sponsored terrorism; and (4) Iran and its Agents and Proxies in fact used the dollars to sponsor terrorism. Id. ¶¶ 1387, 1391, 1402, 1412. Accepting these allegations as true, they simply do not show a conspiracy or agreement between any defendant <u>and a foreign terrorist organization</u> as opposed to a conspiracy or agreement between a defendant and Iran or the Agents and Proxies sponsoring such organizations.

In sum, the defendants have made a strong showing that they are likely to succeed on their motion to dismiss with respect to liability under 18 U.S.C. § 2333.

    B. <u>Burden on Defendants and Third Parties</u>

The defendants argue that permitting discovery in this case would be burdensome because the defendants are large financial institutions and plaintiffs' discovery requests in this case seek a voluminous amount of material. See Defs. Mem. at 12-19. To mitigate this burden, plaintiffs have proposed limiting discovery to "[a]nti-money laundering policies, procedures, guidelines, and manuals; [a]uditing reports; SWIFT messages related to the illegal transactions described in the Complaint; Suspicious Activity Reports (SARs), which the banks are required to file with the Financial Crimes Enforcement Network following a suspected incident of money laundering; and [c]orporate structure information," as well as "limited subpoenas to third-party entities, including government agencies, in possession of relevant documents." See Katz Letter at 5. Plaintiffs also hope to obtain documents relating to prior government and third-party investigations into the defendants' violation of economic sanctions from the defendants themselves. See Pls. Mem. at 12. Plaintiffs argue that these requests are narrower than "full, unbridled discovery," and may be further limited so as to prevent too great of a burden from being imposed on the defendants while their motions to dismiss are pending. Id.

We agree with defendants that the breadth of discovery here would pose a significant burden on defendants. Even limiting the boundaries of discovery as plaintiffs propose, plaintiffs would nevertheless seek discovery regarding over two thousand allegations in the complaint (covering 514 pages) involving seventeen defendants and thousands of financial transactions. In Chesney v. Valley Stream Union Free Sch. Dist. No. 24, 236 F.R.D. 113 (E.D.N.Y. 2006), the court noted that the complaint named "sixteen [] entities or individuals" in finding that "[t]o set a discovery schedule and require all of the named defendants, institutional and individual, to participate would, in my opinion, be unreasonable and inappropriate under the circumstances

15

presented here."[4] Id. at 116. Instead, the court noted that "[b]y waiting until a decision is reached on the pending motion, the areas of discovery may well be substantially reduced, if not eliminated, as to certain named defendants here." Id. The same considerations apply here.

Moreover, plaintiffs' claims relate to documents that go back decades in time. To give but one example involving a single defendant, plaintiffs allege that "[f]rom as early as 1995 through at least 2007, BNP circulated memoranda among its operations staff with [a] blanket directive for USD transactions involving Iran" instructing its employees to refrain from naming Iranian entities in messages transmitted to U.S. banks. Compl. ¶ 1835. Thus, even under plaintiffs' proposed limitations, discovery would span information generated over the course of many years. See Integrated Sys. & Power, Inc., 2009 WL 2777076, at *1 (granting stay of discovery in part because the "breadth of the discovery sought in this action will cover a six-year period."); see also Bethpage Water Dist. v. Northrop Grumman Corp., 2014 WL 6883529, at *3 (E.D.N.Y. Dec. 3, 2014) (finding that "the burdens of discovery are considerable" based in part on the fact that plaintiff's discovery request sought documents spanning many years).

Limiting discovery to documents already produced in connection with earlier investigations, as plaintiffs propose, see Pls. Mem. at 12, would still impose a significant burden on defendants and third parties. Although defendants have gathered these documents for regulators, this does not obviate the need for the defendants or third parties to review these

---

[4] Chesney concerned primarily municipal defendants, and thus the burden was considered great in part because of the limited public resources available to these defendants. See 236 F.R.D. at 116. Nevertheless, this fact alone does not undermine the general proposition that the breadth of discovery may be particularly burdensome when sought against a large number of defendants. Moreover, to the extent that some of the third parties from which the plaintiffs seek discovery are government entities, see Pls. Mem. at 13-14, this fact weighs in favor of finding that permitting discovery as to these entities would be burdensome.

16

documents prior to production to plaintiffs. For example, with respect to one defendant, Credit Suisse, defendants assert that the investigations into its violations of economic sanctions "concerned U.S. dollar-clearing transactions processed by Credit Suisse from as early as 1995 to 2006 involving entities located" not only in Iran but also in "Sudan, Libya, Burma, Cuba and the former Liberian Regime of Charles Taylor." See Hruska Decl. ¶ 8 (citations omitted). In connection with these investigations, Credit Suisse allegedly reviewed "at least 4 Terabytes (4,000 Gigabytes) of data, including over 12 million SWIFT messages and over 1 million pages of documents." Id. ¶ 10. Many of the other defendants assert that the investigations into their actions covered the violation of sanctions as to numerous countries and regimes over several years. See Defs. Mem. at 14-16. By contrast, plaintiffs allegations in this case concern only the violation of economic sanctions with respect to Iran that caused terrorist attacks between 2003 and 2011. See generally Compl. We thus reject plaintiffs' assertion that these documents would not have to be reviewed again in order to respond to plaintiffs' requests. This burden would likely be particularly onerous on the third parties plaintiffs seek to subpoena, many of which are government agencies with limited resources. See Chesney, 236 F.R.D. at 116 (noting with respect to municipal entities that "[c]ompliance with discovery in the posture of this case would result in a substantial diversion of public resources which may not be ultimately necessary in this action.").[5]

In sum, the breadth of discovery sought by plaintiffs would impose a significant burden

---

[5] While we accept that some items of discovery (for example organizational charts) might impose very little burden, such items would be of little value in the absence of the ability to conduct other discovery. Plaintiff's reference to Discover Fin. Servs., Inc. v. Visa U.S.A., Inc., 2006 WL 1699566 (S.D.N.Y. June 20, 2006), see Pls. Mem. at 12 n.4, is inapt because that case involved document subpoenas served on third parties, and did not reference or apply the factors relevant to a stay of discovery pending the resolution of a motion to dismiss.

on both the defendants and third parties.

### C. Prejudice to Plaintiffs

Plaintiffs give several reasons why a stay would prejudice them. First, they argue that the motions to dismiss will not be fully briefed until June 1, 2018, and may not be decided for some time after that. See Pls. Mem. at 17. Plaintiffs therefore suggest that granting a stay may delay the case by as much as one year, and would thus "unfairly and unreasonably delay the case." Id. However, the passage of a reasonable amount of time, without any other form of attendant prejudice, cannot itself constitute prejudice sufficient to defeat a motion to stay discovery. Otherwise, stays of discovery would never be granted given that some delay is inherent in any stay. See also In re Initial Pub. Offering Sec. Litig., 236 F. Supp. 2d 286, 287 (S.D.N.Y. 2002) (delay alone does not constitute an undue burden because "delay is an inherent part of every stay of discovery required by the PSLRA.").

Plaintiffs also argue that a stay of discovery may prejudice plaintiffs with respect to their requests for discovery from third parties because "[p]laintiffs have already been informed by third parties that, without subpoenas, requests to preserve documents are not binding and [] documents in their possession may be destroyed in the ordinary course." Pls. Mem. at 17 (citing Paulos Decl. ¶¶ 5, 7, 9). The risk that non-parties may destroy documents, however, is one of the "usual litigation risks that affect all the parties equally, regardless of the amount of time permitted for discovery." In re Term Commodities Cotton Futures Litig., 2013 WL 1907738, at *7 (S.D.N.Y. May 8, 2013). This ordinary risk of litigation does not constitute sufficient prejudice to warrant denying a stay of discovery, particularly in light of the burden that such

18

discovery might pose on the third parties and the strength of the defendants' motion.[6]

Plaintiffs cite In re Chase Manhattan Corp. Sec. Litig., 1991 WL 79432 (S.D.N.Y. May 7, 1991), for the proposition that if the complaint is sustained, then "commencement of the discovery process, while no doubt imposing some burden on defendants, will advance the ultimate disposition of this action." Id. at *1. In other words, plaintiffs claim that permitting discovery to go forward now would be more efficient than issuing a stay. However, In re Chase Manhattan Corp. Sec. Litig., did not reach the issue of whether defendants' motion to dismiss was likely to succeed. See id. at *1. By contrast, here the defendants have made a strong showing that this case will be dismissed. See Section III.A.

\*      \*      \*

While there is some potential that plaintiffs will be prejudiced by the institution of a stay, the strength of the defendants's showing on the merits combined with the potential burden arising from discovery convinces us that a stay of discovery should be granted pending resolution of the upcoming motions to dismiss. This stay is without prejudice to a specific showing that a particular item of non-burdensome discovery is in danger of being lost absent plaintiffs' ability to use the discovery process.

IV. CONCLUSION

For the reasons set forth above, defendants' motion for a stay of discovery pending disposition of the defendants' motions to dismiss (Docket # 94) is granted.

SO ORDERED.

---

[6] Plaintiffs alternatively requested that this Court issue "a preservation order to preclude material already produced" to certain third parties from being lost or destroyed. Pls. Mem. at 17. However, plaintiffs provide no authority for the proposition that this Court has the power to issue such an order.

Dated: April 26, 2018
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge