**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TIMOTHY O'SULLIVAN, et al.,** )<br>)<br>**Plaintiffs,** )<br>)<br>-against- )<br>)<br>**DEUTSCHE BANK AG, et al.,** )<br>)<br>**Defendants.** )<br>)<br>_____ ) | **Civil Action No. 1:17-cv-08709-LTS-GWG** |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     JUDICIAL AND LEGISLATIVE BACKGROUND ............................................ 2

     A.      The ATA Before Congress Enacted JASTA ............................................... 2

     B.      The ATA After Congress Enacted JASTA .................................................. 6

III.    LEGAL STANDARD .......................................................................................... 9

IV.     STATEMENT OF FACTS ................................................................................. 10

     A.      This Case Is About FTO-Involved Terrorism ........................................... 10

     B.      Iran Sponsored and Promoted Terrorism in Iraq Through FTOs ............. 10

     C.      Iran and the FTOs Needed Access to the U.S. Financial System ............. 11

     D.      Banks Are the Frontline Defenders Against Terror Financing .................. 12

     E.      Iran and Iranian Entities Were Sanctioned and "High Risk" ................... 14

     F.      Defendants Broke Anti-Terrorism-Financing Laws and Hid Their Crimes ......... 15

     G.      The Conspiracy Required the Circumvention of U.S. Sanctions .............. 16

          1.      The U-Turn Exemption ................................................................. 16

          2.      The Conspiracy Involved Bypassing the U-Turn Exemption ....... 17

          3.      The Conspiracy Included Defendants' Customers—Designated Entities of Iran's Terror Apparatus ................................................ 18

          4.      Defendants' Participation in The Conspiracy ............................... 19

               i.      Deutsche Bank's Participation in the Conspiracy ....................... 21

               ii.     HSBC's Participation in the Conspiracy ...................................... 22

               iii.    Royal Bank of Scotland's Participation in the Conspiracy .......... 23

               iv.     BNP Paribas S.A.'s Participation in the Conspiracy .................. 25

               v.      Standard Chartered Bank's Participation in the Conspiracy ........ 26

               vi.     Barclays Bank Plc's Participation in the Conspiracy ................. 27

               vii.    Commerzbank's Participation in the Conspiracy ....................... 28

               viii.   Credit Suisse's Participation in the Conspiracy .......................... 29

               ix.     Credit Agricole's Participation in the Conspiracy ...................... 30

           5.      Uncovering the Conspiracy: Blacklisting Banks and Revoking the U-Turn Exemption ................................................................... 31

          6.      The Conspiracy Caused Plaintiffs' Injuries and Deaths .............. 33

i

V.      PRIMARY LIABILITY CLAIMS ...................................................................... 33

        A.      Plaintiffs Plausibly Allege Proximate Cause Under *Rothstein* ............................ 33

                1.      Proximate Cause Under the ATA ............................................................. 34

                2.      *Rothstein* Held Plaintiffs Sufficiently Alleged "Causal Nexus".............. 36

                3.      The Facts Here Differ Significantly From Those in *Rothstein* and *O'Neill*
                        .................................................................................................................. 37

        B.      Plaintiffs Sufficiently Allege Defendants Committed Acts of International
                Terrorism................................................................................................................ 38

        C.      Plaintiffs Plausibly Allege Knowledge Under § 2339A ...................................... 40

        D.      Plaintiffs Plausibly Allege Violations of 18 U.S.C. § 2332d (Claims VIII–X).... 42

                1.      Each Defendant is a "United States Person" Under § 2332d(b)(2) .......... 42

                2.      Defendants Transacted with the Government of Iran ............................... 45

VI.     SECONDARY LIABILITY CLAIMS ................................................................. 47

        A.      The Legal Framework Established by *Halberstam v. Welch*................................ 48

        B.      The Complaint Plausibly Alleges Secondary Liability Against Defendants ........ 50

                1.      Plaintiffs Specifically Tailored Their Allegations to the Claim
                        Requirements of JASTA .......................................................................... 51

                2.      Pre-JASTA Cases Do Not Help Defendants............................................. 51

                3.      *Linde* Supports Plaintiffs' Claims, Not Defendants' Motion................... 52

        C.      The Complaint Plausibly Establishes Aiding and Abetting Liability.................. 53

                1.      Element 1: The FTOs For Whom Defendants Performed Wrongful Acts
                        Caused Injury ........................................................................................... 54

                2.      Element 2: Defendants Knowingly Joined the Enterprise ....................... 57

                3.      Element 3: Defendants Knowingly and Substantially Assisted the Terrorist
                        Activities. ................................................................................................. 58

        D.      Plaintiffs' Complaint Plausibly Establishes Conspiracy Liability...................... 61

                1.      *Halberstam* Supports Plaintiffs' Conspiracy Allegations........................ 62

                2.      Defendants' Reliance on *Shaffer* is Misplaced ....................................... 63

VII.    PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS AGAINST COMMERZBANK ......... 67

VIII.   COMMERZBANK AG, NEW YORK SHOULD NOT BE DISMISSED .................... 69

IX.     CONCLUSION.................................................................................................... 70

## TABLE OF AUTHORITIES

<u>Cases</u>

*Abecassis v. Wyatt,*
   785 F. Supp. 2d 614 (S.D.Tex.2011) ..................................................................Passim
*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006) .............................................................................................. 34
*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................... 9, 67
*Bank of America Corp. v. City of Miami, Fla.,*
   137 S.Ct. 1296 (2017) ...................................................................................... 34, 35
*Bayerische Landesbank v. Barclays Capital, Inc.,*
   902 F. Supp. 2d 471 (S.D.N.Y. 2012) .................................................................. 70
*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................................... 9, 67
*Boim v. Holy Land Foundation for Relief and Development,*
   549 F.3d 685 (7th Cir. 2008) ..........................................................................Passim
*Cohen v. S.A.C. Trading Corp.,*
   711 F.3d 353 (2d Cir. 2013) .................................................................................. 9
*Cox v. Admr. U.S. Steel & Carnegie,*
   17 F.3d 1386 (11th Cir. 1994) ............................................................................. 59
*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) .............................................................................................. 44
*EM Ltd. v. Banco Cent. de la República Arg.,*
   800 F.3d 78 (2d Cir. 2015) .................................................................................... 46
*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch,*
   919 F. Supp. 2d 411 (S.D.N.Y. 2013) .................................................................. 46
*Foman v. Davis,*
   371 U.S. 178 (1962) ............................................................................................... 2
*Shaffer v. Deutsche Bank AG,* 16-cv-0497,
   2017 WL 8786497 (S.D. Ill. Dec. 12, 2017) ....................................................Passim
*Goldberg v. UBS AG,*
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) ......................................................... 4, 35, 47
*Greenbaum v. Handlesbanken,*
   26 F. Supp. 2d 649 (S.D.N.Y. 1998) .................................................................... 70
*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983) ........................................................................Passim
*Hartford Acc. & Indem. Co. v.* Sullivan,
   846 F.2d 377 (7th Cir. 1988) ................................................................................ 49
*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................................................................ 7, 8, 35
*Holmes v. Securities Inv'r Protection Corp.,*
   503 U.S. 258 (1992) .............................................................................................. 34
*In re Chiquita Brands Internatl.,*
   284 F. Supp. 3d 1284 (S.D.Fla.2018) .............................................................. 35, 40

*In re Terrorist Attacks on September 11, 2001*,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ................................................................. 69

*In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD),
    2018 WL 1626255 (S.D.N.Y. Mar. 28, 2018) ................................................... 50, 61

*ITC Ltd. v. Punchgini, Inc.*,
    482 F.3d 135 (2d. Cir. 2007) .............................................................................. 40

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) ......................................................................... 49, 66

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ............................................................................... 34

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
    134 S.Ct. 1377 (2014) ........................................................................................ 34

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir.2018) ........................................................................... Passim

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) .............................................................................................. 5

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017) ................................................................. Passim

*Owens v. BNP Paribas, S.A.*,
    235 F. Supp. 3d 85 (D.D.C. 2017) ........................................................................ 6

*O'Neill v. Al Rajhi Bank*,
    714 F.3d 118 (2d Cir. 2013) ...................................................................... 6, 36, 38

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley
        Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ................................................................................. 9

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ................................................................................. 2

*Rosemond v. United States*,
    —— U.S. ——, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014) ................................. 52

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ............................................................................ Passim

*Rubinbaum, L.L.P. v. Related Corp. Partners V, L.P.*,
    154 F. Supp. 2d 481 (S.D.N.Y. 2001) .................................................................. 69

*Silent Drive, Inc. v. Strong Indus.*,
    326 F.3d 1194 (Fed. Cir. 2003) ............................................................................ 69

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ................................................................................. 9

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ................................................................ 35, 68

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966) ............................................................................................ 69

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017) .................................................................................. 67

*United States ex rel. Gelman v. Donovan*,
    2017 WL 4280543 (E.D.N.Y. Sep. 25, 2017) ...................................................... 67

iv

*United States v. Bonanno Organized Crime Family of La Cosa Nostra,*
    879 F.2d 20 (2d Cir. 1989) ................................................................................ 6
*United States v. Chalmers,*
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) ............................................................ 44
*United States v. Gallerani,*
    68 F.3d 611 (2d Cir.1995) .............................................................................. 49
*United States v. Lanza,*
    790 F.2d 1015 (2d Cir. 1986) ......................................................................... 65
*United States v. Norman,*
    776 F.3d 67 (2d Cir. 2015) ............................................................................. 59
*United States v. Parkes,*
    497 F.3d 220 (2d Cir.2007) ............................................................................ 50
*United States v. Reed,*
    790 F.2d 208 (2d Cir. 1986) ........................................................................... 65
*United States v. Tarantino,*
    846 F.2d 1384 (D.C. Cir. 1988) ................................................................ 49, 66
*United States v. Zarrab,*
    2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ................................................ 44
*Weinstein v. Islamic Republic of Iran,*
    609 F.3d 43 (2d Cir. 2010) ............................................................................. 45
*Weiss v. National Westminster Bank PLC,*
    768 F.3d 202 (2d Cir. 2014) ....................................................... 3, 4, 35, 47, 58
*Wultz v. Islamic Republic of Iran,*
    755 F. Supp. 2d 1 (D.D.C. 2010) .......................................................... 4, 47, 48


Statutes

8 U.S.C. § 1189 ............................................................................................. 7, 20
18 U.S.C. § 2331 ....................................................................................... 1, 42, 47
18 U.S.C. § 2332 ................................................................................................ 20
18 U.S.C. § 2332a .............................................................................................. 20
18 U.S.C. § 2332d ....................................................................................... 42, 43, 44
18 U.S.C. § 2332f .............................................................................................. 20
18 U.S.C. § 2333 ........................................................................................ Passim
18 U.S.C. § 2339A ............................................................................................ 20
18 U.S.C. § 2339B ............................................................................................ 20
22 U.S.C. § 2656f .............................................................................................. 20
31 U.S.C. §§ 5311 ............................................................................................. 12
Justice Against Sponsor of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 ................. Passim

## I.      INTRODUCTION

Defendants are multinational banks that made the calculated decision to participate in a near decades-long criminal enterprise to launder hundreds of billions of dollars for Iran (the world's leading state sponsor of terrorism) and its front companies, knowing full well the consequences of their conduct—that the money would be funneled to foreign terrorist organizations perpetrating attacks on U.S. soldiers in Iraq. With eyes wide open, Defendants joined the criminal enterprise, deliberately breaking U.S. counterterrorism laws and hiding their (and Iran's) crimes from the U.S. government—until they were caught. This was all done with the goal of maximizing profits and with the expectation that they would enjoy corporate impunity. Given Defendants' astounding and outrageous indifference to the massive loss of life and injuries, they cannot now ignore the facts and plead innocence.

This case, brought on behalf of U.S. veterans and Gold Star families, seeks to hold Defendants accountable for the foreseeable consequences of their criminal conduct, and is brought under the ATA (the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.), as recently amended by JASTA (the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016)). Defendants' arguments in support of their Motion to Dismiss rely almost exclusively on pre-JASTA cases. But we are in a post-JASTA world, and this first-of-its-kind litigation is different from *Rothstein*, *Owens*, *Ofisi*, and other pre-JASTA cases. Congress enacted JASTA to close the loophole through which some banks were able to slip and avoid liability, despite the fact those banks were knowingly supporting, albeit indirectly, terrorism.

Because no Court has yet to rule on a post-JASTA ATA complaint, and because of the novel issues presented by Defendants' Motion and this Response, Plaintiffs respectfully request oral argument. For the reasons discussed below, Defendants' Motion should be denied and

Plaintiffs should be permitted to proceed with this litigation and seek justice against Defendants for the harms and losses for which they are legally responsible.[1]

## II.      JUDICIAL AND LEGISLATIVE BACKGROUND

### A.      The ATA Before Congress Enacted JASTA

Congress fundamentally changed the legal landscape in 2016 by enacting JASTA, which amended the ATA. Before JASTA, only *primary* liability claims could be brought under the ATA. After, and as a result of JASTA, *secondary* (*i.e.*, vicarious) liability claims are now viable. To appreciate the significance of this change—a change that bears directly on this case—it is important to understand the legal backdrop against which Congress enacted JASTA.

The ATA imposes civil liability on anyone who commits "an act of international terrorism" that causes injury to a U.S. national. 18 U.S.C. § 2333(a). Before Congress enacted JASTA, federal courts held that secondary liability was not available under the ATA—*i.e.*, no civil liability for conspiring with, or aiding and abetting, a person who commits an act of international terrorism. Courts came to this conclusion based on the unremarkable principle that Congress does not create secondary liability by implication; it does so only expressly. *See, e.g.*, *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) ("[S]tatutory silence on the subject of secondary liability means there is none."). And because the pre-JASTA ATA did "not mention aiders and abettors or other secondary actors," there was no secondary liability. *Id.*

---

[1]   If the Court determines Plaintiffs' Complaint does not sufficiently allege any claim, Plaintiffs respectfully request leave to amend. Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." *See 3 Moore's Federal Practice* para. 15.08[4], at 15-65 (2d ed. 1991). And it is rare that such leave should be denied, especially when there has been no prior amendment. S*ee Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion"); *Ronzani*, 899 F.2d at 198 ("Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground.").

Despite that holding, courts still construed the scope of primary liability broadly. A perfect example is the Seventh Circuit's *en banc* decision, written by Judge Posner, in *Boim v. Holy Land Foundation*, 549 F.3d. 685 (7th Cir. 2008) (en banc), *cert. denied*, 130 S.Ct. 458 (2009). The case arose from a terrorist attack in Jerusalem that killed David Boim, a Jewish American citizen living in Israel. *Boim*, 549 F.3d at 687. The attack was committed by Hamas gunmen, but Boim's parents sued individuals and organizations who donated money to Hamas, even though the donations were earmarked for Hamas's charitable activities. *Id.* The Seventh Circuit held that, despite the defendants' benign intent, they would still be subject to primary liability—*i.e.*, their actions still qualified as an "act of international terrorism." *Id.* at 688. As the court explained, "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook." *Id.* at 698. That is because money is fungible (Hamas could simply transfer a $100,000 charitable donation to its terrorism account) and because Hamas's "social welfare activities reinforce its terrorist activities." *Id.* So "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." *Id.*

There are other examples where federal courts interpreted primary liability under the ATA expansively. In *Weiss v. National Westminster Bank PLC*, 768 F.3d 202, 204 (2d Cir. 2014), the Second Circuit vacated the lower court's decision granting summary judgment (and held there were triable issues of fact) where the defendant-bank (National Westminster) was alleged to have provided "material support and resources to a foreign terrorist organization by maintaining bank accounts and transferring funds for the Palestine Relief & Development Fund," an organization that in turn provided support for Hamas (the foreign terrorist organization),

3

which used the funds to support terrorist attacks that killed a number of Americans. *Id.* at 204.

Another example is *Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009), which arose

from a 2004 terrorist attack in Jerusalem committed by Hamas. The widow of the victim killed in

the attack sued UBS AG, a bank headquartered in Switzerland. *Id.* at 414. The gravamen of the

complaint was that UBS made three transfers totaling $25,000 to a Swiss organization that

served as a fundraiser for Hamas, and UBS "disregarded the fact that it was supporting a terrorist

organization, despite a strong probability that the bank's services would be used to further the

organization's terrorist activities." *Id.* at 415, 428. This was sufficient to state a claim for primary

civil liability under the ATA. *Id.* at 434. *See also Abecassis v. Wyatt*, 785 F. Supp. 2d 614

(S.D.Tex.2011) (denying motion to dismiss where defendants made illegal payments to Saddam

Hussein's regime in a way that circumvented the U.N.-sanctioned Oil for Food Program and

where Hussein used the funds to provide money to terrorist organizations that sponsored suicide

attacks that killed Americans in Israel); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1

(D.D.C. 2010) (denying motion to dismiss where defendant (Bank of China) executed wire

transfers to a third person the bank knew was funneling money to the terrorist organization that

carried out the bombing).

These decisions demonstrate the "broad sweep" of primary liability under the ATA and

show that Congress set "the liability bar low" in order to "resist terrorism by cutting off the

source of funding to terrorist groups." *Abecassis*, 785 F. Supp. 2d at 634, 645. Liability was thus

held to extend beyond those with a direct connection to the on-the-ground terrorists—even to

those many layers removed from the attacks. Judge Posner explained well the need to interpret

the ATA in such a broad manner:

> Nor should donors to terrorism be able to escape liability because terrorists and
> their supporters launder donations through a chain of intermediate organizations.

> Donor A gives to innocent-appearing organization B which gives to innocent-appearing organization C which gives to Hamas. As long as A either knows or is reckless in failing to discover that donations to B end up with Hamas, A is liable…But to set the knowledge and causal requirement higher than we have done in this opinion ***would be to invite money laundering***, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare). Donor liability would be eviscerated, and the statute would be a dead letter.

*Boim*, 549 F.3d at 701–02 (emphasis added).

Despite the expansive interpretation of primary liability, it still did not extend far enough to reach certain instances of wrongful conduct, as illustrated by the Second Circuit's decision in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013). *Rothstein* arose from a series of terrorist attacks in Israel that injured and killed U.S. citizens. The victims sued UBS for transferring millions of USD to Iran, which in turn provided support to the terrorist organizations responsible for the attacks. The Second Circuit dismissed the case because the complaint failed to allege plausibly that the plaintiffs' injuries were proximately caused by UBS's conduct. However, the court indicated the case would fare differently if the law allowed secondary liability. *Id.* at 97-98. And the *Rothstein* opinion ended by inviting Congress to amend the ATA to create secondary liability:

> We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence.... ***It of course remains within the prerogative of Congress to create civil liability on an aiding-and-abetting basis and to specify the elements, such as mens rea, of such a cause of action***.

*Id.* at 98. (Emphasis added.)

These pre-JASTA decisions provide the context in which JASTA was drafted. And a fundamental principle of statutory interpretation is that Congress presumed to know the federal courts' interpretation of a statute it amends.[2] The judicial interpretations of ATA are thus key to

---

[2]   *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 524 (1984) ("Congress is presumed to be aware of judicial

5

understanding what Congress meant to accomplish with JASTA.

### B.    The ATA After Congress Enacted JASTA

Congress was aware when it passed JASTA that courts were dismissing claims against banks and other financiers of terrorism, including in *Rothstein* and *O'Neill v. Al Rajhi Bank*, 714 F.3d 118 (2d Cir. 2013). Indeed, Congress recognized the ATA was not fully capturing within its liability net all providers of material support along the terrorism chain, including a major cog in the terrorism machine—the banks—and was aware courts were holding that the ATA did not allow for secondary liability. So Congress accepted the Second Circuit's invitation in *Rothstein* to specifically legislate secondary (vicarious) liability.[3]

Congress enacted JASTA and declared it "necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability" under the ATA. 130 Stat. 852, 853. Congress was clear about its intent to make liability as broad as constitutionally possible and to impose liability on ***indirect***, not just direct, supporters of terrorism:

> The purpose of this Act is to provide civil litigants with ***the broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, ***directly or indirectly***, to foreign organizations or persons that engage in terrorist activities against the United States.

*Id.* at 853. (Emphasis added.) Still, liability under JASTA is not unbounded.

---

interpretations of a statute."); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 25 (2d Cir. 1989) ("[I]t is generally presumed that Congress is (a) knowledgeable about existing laws pertinent to later-enacted legislation…(b) aware of judicial interpretations given to sections of an old law incorporated into a new one…, and (c) familiar with previous interpretations of specific statutory language.").

[3]   Courts deciding cases under the pre-JASTA law, but issuing opinions after the enactment of JASTA, recognize that JASTA changed the law—and indicate that the ATA claims against the banks in those cases would have survived had JASTA applied. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 235 F. Supp. 3d 85 (D.D.C. 2017) ("[T]he fact that Congress just months ago amended the ATA to specifically include aiding and abetting liability . . . further underscores that Congress recognizes the import of its statutory silence and does indeed know how to provide for such liability when it chooses to do so. ***Unfortunately for the plaintiffs here, this new provision of the ATA does not apply to those injured before September 11, 2001, and hence does not aid them***.") (Emphasis added.).

JASTA's main target is terrorism sponsored or promoted by foreign terrorist organizations (abbreviated hereafter as FTOs). *Id.* at 852; *see also* 18 U.S.C. § 2333(d). It is no surprise Congress targeted FTO-involved terrorism, for FTOs are the most insidious, virulent terrorist organizations on the planet, as the Executive and Legislative branches of the federal government have concluded—a conclusion the Supreme Court endorsed. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

In *Holder*, the Supreme Court reviewed a First Amendment challenge to a criminal statute in the ATA that outlaws the provision of "material support" to FTOs. *Id.* at 8. The challengers were U.S. citizens and domestic organizations that wanted to teach peaceful negotiation techniques and political advocacy to certain FTOs. *Id.* at 10. They claimed the ATA, by outlawing their proposed activities, violated their First Amendment rights. *Id.* at 10-11.

Before resolving the constitutional question, the Court explained how an organization comes to be designated an FTO[4] and discussed why such a designation is critical in the fight against terrorism. *Id.* at 9-10, 25-36. The Court deferred to—and agreed with—Congress's findings "regarding the serious threat posed by international terrorism," noting "the Government's interest in combating terrorism is an urgent objective of the highest order." *Holder*, 561 U.S. at 28-29. As for FTOs in particular, the Court explained: "[P]roviding material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization" because such support "frees up other resources within the organization that may be put to violent ends," and also "helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members,

---

[4]   The authority to designate an organization an FTO lies with the Secretary of State, who, in consultation with the Secretary of the Treasury and the Attorney General, must make a finding that the organization engages in terrorism that "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4). The Secretary of State publishes the list of FTOs on its website and in the Federal Register. *Id.* at (a)(2)(A)(ii).

and to raise funds—all of which facilitate more terrorist attacks." *Id.* at 30, 36. The Court turned to the particular activities at issue in the case—teaching negotiation and political advocacy skills to FTOs—and discussed why these seemingly innocent activities should nonetheless be criminally banned. "It is wholly foreseeable," the Court found, that the "specific skills that plaintiffs propose to impart" could be used by the FTO "as part of a broader strategy to promote terrorism." *Id.* at 36-37. "This possibility is real, not remote," the Court held. *Id.* at 37. For instance, the FTO could use the peaceful negotiation techniques taught by the plaintiffs to buy time, "lull opponents into complacency, and ultimately prepar[e] for renewed attacks." *Id.* Likewise, teaching an FTO how to petition representative bodies, such as the United Nations, for humanitarian aid could result in the FTO's using those techniques to obtain money that "could be redirected to funding the group's violent activities." *Id.* at 37. Given the grave threat posed by FTOs, the Court held that criminalizing the provision of material support to FTOs, even in the form of speech, is constitutional—a holding the Court almost certainly would not have reached outside of the counterterrorism context. *Id.* at 28. *Holder* highlights the unique threat FTOs pose to national security, the need for laws designed to thwart FTO-involved terrorism by outlawing any and all material support to them (no matter how attenuated), and why laws aimed at stopping FTOs may—indeed should—be interpreted broadly.

Even before JASTA, the ATA was already unusually capacious. Congress, knowing how broadly the ATA was interpreted (and what some of its judicially imposed limits were), went even further with JASTA, adding another tool to the counterterrorism arsenal. To be sure, JASTA liability is limited to the universe of FTO-involved terrorism. But once inside that universe, the scope of liability is as broad as constitutionally possible. It is within this framework that Plaintiffs' Complaint—one of the first cases to be filed after JASTA—must be examined.

### III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). After all, the Federal Rules of Civil Procedure require only a short and plain statement that provides the defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* at 555. The complaint does ***not*** need to allege every fact and marshal all the evidence that ultimately will be necessary to prove the case and "does ***not*** need detailed factual allegations," only enough "to raise a right to relief above the speculative level." *Id.* (emphasis added). A claim is plausible and thus survives a motion to dismiss "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). And all allegations in the complaint must be taken as true and all reasonable inferences drawn therefrom construed in the light most favorable to the plaintiff. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 732 (2d Cir. 2013). As will be shown below, Defendants' motion to dismiss "reflects a misunderstanding of *Iqbal*, which requires assertions of facts supporting a ***plausible*** inference" and "not of facts which can have no conceivable other explanation, no matter how improbable that explanation may be." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013) (original emphasis); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

## IV.     STATEMENT OF FACTS

### A.     This Case Is About FTO-Involved Terrorism

This case concerns international terrorism perpetrated by Iran through FTOs and committed in Iraq against U.S. soldiers. The FTOs at issue include al Qaeda, Ansar al Islam, and Kata'ib Hezbollah, but principally Hezbollah (designated an FTO in 1997—a designation still in force).[5] Hezbollah is a militant group created by the Iranian government in the early 1980s and has been actively involved in promoting terrorism at Iran's behest in Iraq since the U.S. invasion in 2003. Compl. at ¶14. *See also* ¶20 (describing Hezbollah's genesis).

Hezbollah openly acknowledges its "budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." *Id.* at ¶918. Indeed, Hezbollah relies almost exclusively for financial support on the largesse of Iran. *Id.* at ¶¶919. It is also trained and organized by a contingent of more than a thousand Iranian soldiers. *Id.* Hezbollah's manifesto, published in 1985, mirrors Iran's political objectives and calls the U.S. one of "the major enemies in the Middle East." *Id.* at ¶¶21, 654. In 2004, Hezbollah declared jihad against Coalition Forces in Iraq, calling for "Death to America." *Id.* at ¶657. And Iran directed Hezbollah to create a unit—Unit 3800—to recruit, radicalize, and train militants to inflict mass casualties on U.S. nationals in Iraq. *Id.* at ¶¶914, 927, 1336.[6] Hezbollah is Iran's de facto terrorism arm in Iraq and, more broadly, the Middle East. *Id.* at ¶¶19, 916.

### B.     Iran Sponsored and Promoted Terrorism in Iraq Through FTOs

Iran and its Agents and Proxies (including the Terrorist Groups that attacked Plaintiffs), particularly Hezbollah, were actively involved in supporting and promoting terrorism in Iraq

---

[5]   https://www.state.gov/j/ct/rls/other/des/123085.htm, last visited April 24, 2018.

[6]   The Complaint provides further details about Hezbollah, its direct ties to and utter dependence on Iran, its mission to wipe out Americans in Iraq, and its development and management of terrorist cells in Iraq. *See Id.* at ¶¶17-33, 649-659, 916-930.

since 2003. *Id.* at ¶14.[7] Iran openly acknowledged its goal to wage terror in Iraq. *Id.* at ¶21.

In 2004, Iran began flooding Iraq with fighters and weapons, including improvised explosive devices known as Explosively Formed Penetrators ("EFPs"). Iranian EFPs wreaked havoc on American troops. According to General Stanley McChrystal, then head of Joint Special Operations Command, "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The EFPs killed hundreds of Americans." *Id.* at ¶912. Pentagon Press Secretary Geoff Morrell reported on the "smuggling system in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us [sic], whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians." *Id.* at ¶894.

Between 2003 and 2011, Iran supported the FTOs in Iraq by supplying money, munitions, training, advisors, safe haven, and safe passage, and by solidifying an operational network between the FTOs and the on-the-ground terrorists. *Id.* at ¶¶22-23, 887, 892, 910, 913-915, 920-921, 967, 974-977, 989-1008, 1059, 1082, 1083, 1087, 1091.

Iran provided up to $200 million a year in equipment and funds to the Terrorist Groups, as well as an additional $100-$200 million per year to Hezbollah. *Id.* at ¶¶32-33.

### C.   Iran and the FTOs Needed Access to the U.S. Financial System

To finance this expensive, large-scale campaign of terror, Iran and the FTOs needed U.S. dollars ("USD"). *Id.* at ¶¶34, 836-844, 1326-1340. To obtain USD, they needed access to the U.S. financial system. *Id.* at ¶¶35-37, 836-837, 1151-1325. But Iran, its front companies, and the FTOs have been banned from the U.S. financial system for decades, precisely because they sponsor, promote, and commit acts of terrorism on such a scale that any U.S. dollar that finds its

---

[7]   The capitalized terms, such as Agents and Proxies and Terrorist Groups, are defined terms in the Complaint. Terrorist groups include FTOs responsible for Plaintiffs' attacks. *See* Compl. at fn. 4 & 5.

way into the hands of Iran and its front companies will almost inevitably be used for terrorism. Indeed, the U.S. government has since 1984—the year Iran was designated a "State Sponsor of Terrorism"—implemented a host of laws designed to thwart Iran-sponsored terrorism. *Id.* at ¶39. These laws were fortified through the Patriot Act, which amended the Bank Secrecy Act, and was intended to strengthen the tools designed to prevent, detect, and prosecute international money laundering and the financing, directly and indirectly, of terrorism. *Id.* at ¶42. (For more on these laws, *see id.* at ¶¶835-853, 1341-1358.) So the only way for Iran to access the U.S. financial system was to find partners willing to break laws the very purpose of which was to stop Iran-sponsored terrorism. Enter a handful of banks—the Defendants in this case.

### D.     Banks Are the Frontline Defenders Against Terror Financing

Banks in the U.S. are not passive providers of financial services. On the contrary, they have affirmative obligations to know their customers—to investigate, detect, and report suspicious customers and transactions—and to implement anti-money laundering and anti-terrorist-financing programs and controls. *Id.* at ¶¶1444-1486. Banks are supposed to act as frontline defenders against terrorism financing.

The key legal source of the banks' duties is the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*, which was enacted in 1970 and augmented over the years, including by the Patriot Act in 2001, to combat money laundering and terrorism financing by assigning important responsibilities to banks, who are required to work hand in hand with the U.S. government to prevent terrorism financing. *Id.* at ¶¶1466-1467.[8] The obligations under the Bank Secrecy Act are detailed in a manual published by the Federal Reserve.[9]

---

[8]     *See generally* https://www.occ.treas.gov/topics/compliance-bsa/bsa/index-bsa.html, last visited April 24, 2018.

[9]     *See generally* https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf, last visited April 24, 2008.

The manual reminds banks that "[t]errorist networks are able to facilitate their activities if they have financial means and access to the financial system" and that "[t]errorist groups develop sources of funding that are relatively mobile to ensure that funds can be used to obtain material and other logistical items needed to commit terrorist acts. Thus, money laundering is often a vital component of terrorism financing."[10] The manual advises banks of their obligation to "develop, implement, and maintain effective AML [anti-money laundering] programs that address the ever-changing strategies of money launderers and terrorist who attempt to gain access to the financial system."[11] One such mandatory program is the customer identification program by which the banks must determine "whether the customer appears on any federal government list of known or suspected terrorists or terrorist organizations."[12] Not surprisingly, those organizations, as well as countries designated as state sponsors of terrorism, are considered "high risk"—the highest category of risk the manual contemplates.[13]

International standards likewise impose on banks the duty to scrutinize their customers, including by monitoring publicly accessible information and allegations in relation to "high risk" customers and by identifying the true beneficial owners of accounts—and, of course, by not engaging in "willful blindness" when it comes to terrorism financing. *Id.* at ¶¶1448, 1457, 1461.

The banks' duties complement the responsibilities of the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC"), which administers and enforces legal sanctions against targeted foreign countries and terrorism-sponsoring organizations. *Id.* at ¶1470. OFAC publishes a list of individuals and companies owned or controlled by, or acting on behalf of,

---

[10]   *Id.* at p. 7.

[11]   *Id.*

[12]   *Id.* at p. 50.

[13]   *Id.* at 22, Appendix K.

targeted countries. *Id.* It also lists individuals, groups, and entities known to be terrorists and designates them as Specially Designated Nationals ("SDNs"). *Id.* Naturally, banks are prohibited from conducting transactions with SDNs. *Id.* at ¶1471.[14]

E.   **Iran and Iranian Entities Were Sanctioned and "High Risk"**

Over the years, Iran and its Agents and Proxies have been the subject of numerous counter-terrorism sanctions by both the Executive and Legislative branches of the federal government. In 1995, Executive Order No. 12957 was issued, finding the actions and policies of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and declaring a national emergency to deal with that threat. *Id*. at. ¶1345. Executive Order No. 12959 imposed further trade and financial sanctions on Iran and prohibited the exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by U.S. persons, wherever located. *Id*. at ¶1346. Pursuant to these Executive Orders, the Secretary of the Treasury promulgated the Iranian Transactions Regulations. 31 C.F.R. Part 560. *Id.* at ¶1347. The purpose of these sanctions was to deny Iran the "financial means" to further its international terrorism aims. *Id*. at ¶1348.

President Bush issued Executive Order 13224, authorizing the U.S. Treasury to designate and block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, terrorist organizations, as well as their subsidiaries, front organizations, agents, and associates. *Id*. at ¶1352. The resulting framework of counter-terrorist financing sanctions against Iran is administered by OFAC. *Id.* at ¶45.

---

[14] OFAC's "SDN" list identifies organizations, entities, aircraft, vessels, and individuals that have been sanctioned under various sanctions programs. SDNs consist of "SDGTs" (Specially Designated Global Terrorists) and "SDTs" (Specially Designated Terrorists). This list includes the State Department's FTO list. The difference between the State Department's FTO list and the Treasury Department's SDN list is that the SDN list includes individuals and is not limited to foreign organizations. The individuals designated as SDNs are often members or associates of the FTOs. https://www.justice.gov/usao-wdmi/anti-terrorism-advisory-council/terrorist-financing, last visited April 30, 2018.

Recognizing the importance of U.S. dollar-denominated transactions to Iran's terrorism campaign, including those it orchestrated in Iraq, U.S. authorities sanctioned key Iranian financial institutions, entities, and individuals under Executive Orders 13382, 13224, and 13438. *Id*. at ¶¶1281, 1352-1354, 895. For example, the United States designated Iran's Islamic Revolutionary Guard Corps – Qods Force as a Specially Designated Global Terrorist ("SDGT") pursuant to E.O. 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support…The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701… ***the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.***

*Id*. at ¶911. (Emphasis added). *See also id*. at ¶¶895-896. Not only were Iran's terroristic goals and conduct in Iraq well known to the Defendants and the banking industry due to the repeated sanctions imposed on Iran and its Agents and Proxies, but numerous open source materials, which detailed Iran's sponsorship of terrorism in Iraq aimed directly at U.S. nationals, were also published and available to Defendants. *See, e.g., id*. at ¶¶21; 657; 675; 881; 897; 912; 915; 918; 925; 929; 930; 972; 990-991; 1043; 1104; 1173; 1175; 1180; 1214; 1254; 1261-1264.

### F.     Defendants Broke Anti-Terrorism-Financing Laws and Hid Their Crimes

Each Defendant was required to have world-class anti-money-laundering and anti-terrorism-financing programs in place. Instead, they deliberately circumvented these requirements to handle USD for Iran and Iranian front companies. Worse, they then deceived U.S. law enforcement agencies about the illegal, "high risk" transactions, which totaled hundreds of billion dollars. *Id*. at ¶1469. Defendants knew what they were doing was wrong, did it anyway, and covered up their wrongdoing.

G.     **The Conspiracy Required the Circumvention of U.S. Sanctions**

Defendants were willing, active, and essential participants in the Conspiracy, and aided and abetted the Terrorist Attacks. To monitor, flag, and interdict financial transactions used to support terrorism, OFAC requires the disclosure and tracking of specific information related to every transaction. This information is then "filtered," allowing banks and U.S. regulatory agencies to automatically flag and review transactions to or from sanctioned entities. *Id*. ¶46. The U.S. Government relies on banks to comply with federal law and counter-terrorist financing sanctions to prevent the flow of money to terrorists. *Id*. at ¶¶1444-1486.

1.     **The U-Turn Exemption**

During the Relevant Period (*i.e.*, 2003 through 2011), Iran had the fourth largest oil reserves in the world. *Id*. ¶847. Because oil is generally transacted in dollars, the vast majority of Iran's assets are held in off-shore, U.S. dollar-denominated deposits called Eurodollars.[15] Since Eurodollars must be cleared through the Federal Reserve Bank in New York, U.S. authorities are, if the transactions are done legally, able to monitor them. To prevent Iran from spending its Eurodollars on terrorism—but without cutting Iran off from its assets entirely—the U.S. implemented the so-called "U-Turn exemption."[16] *See id*. ¶¶852; 1426.

Until 2008, the U-Turn exemption permitted Iran to transfer its dollar-denominated oil revenues through the U.S. only if it (1) used non-Iranian banks that had correspondent accounts

---

[15]   "Eurodollar" refers to a time deposit denominated in USD that is maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse, and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the Society for Worldwide Interbank Financial Telecommunication network – "SWIFT-NET" – messages sent between the counterparties and their correspondent banks). Compl. at ¶ 34 n.10.

[16]   *See* former 31 C.F.R. § 560.516. The U-Turn exemption was added to the Iranian Trade Regulations in June 1995 and remained in force until its repeal in November 2008. *See* Iranian Transactions Regulations: Implementation of Executive Orders 12,957 & 12,959, 60 Fed. Reg. 47061 (Sept. 11, 1995); Implementation of Executive Order 12,959 With Respect to Iran, 60 Fed. Reg. 40881 (Aug. 10, 1995).

16

in the U.S. (the Iranian Trade Regulations prohibited Iranian banks from directly processing dollar-denominated transactions through the United States), (2) *did not transfer funds to or from SDNs*, and (3) transmitted all funds in USD *transparently* by identifying the counterparties to the transactions, so that the correspondent banks could properly screen the transfers against OFAC's SDN list. *Id*. at ¶1427.

In theory, the exemption allowed Iran to access its Eurodollar accounts for its *legitimate* purposes, agencies, operations, and programs. *Id*. at ¶¶1426-1429. These types of "clearing" transactions are executed through a series of messages generated through the SWIFT, CHIPS, and Fedwire messaging systems. Central to these messages are "payment order" messages, particularly the "MT 103" and "MT 202" messages generated through the SWIFT system. MT 103 messages are the primary message type for international wire transfers, and identify all of the parties to the transaction, including the originating and beneficiary banks and parties. MT 202 messages describe bank-to-bank "cover transactions" that do not identify all of the parties to the transaction. *Id*. This information is critical to the U.S. government's ability to enforce counter-terrorism financing sanctions. *Id* at ¶1423. In practice, Iran, with knowledge by and great assistance from Defendants, routinely exploited the exemption in order to fund terrorism in Iraq.

The effectiveness of the sanctions regime, however, relied upon the transparency, honesty, and integrity of the banks entrusted with the responsibility of ensuring compliance.

## 2.     The Conspiracy Involved Bypassing the U-Turn Exemption

To obtain the USD necessary to fund its terrorism campaign in Iraq, Iran conspired with Defendants to evade sanctions put in place with the singular goal of stopping Iran from sponsoring and spreading terrorism. *Id*. at ¶1375. To effectuate the conspiracy, Defendants, with the knowledge, assistance, and agreement of Iran: (1) stripped wire transfer information; (2)

made non-transparent cover payments; and (3) utilized U-turn exemptions from certain wire transfers in their concerted effort to hide information which would identify the fact funds being wired originated from and/or were transferred to Iran and its Agents and Proxies and then used to support the FTOs who planned, authorized or committed the Terrorist Attacks.

### 3. The Conspiracy Included Defendants' Customers—Designated Entities of Iran's Terror Apparatus

Iran exports terrorism through an established network of government-controlled Agents and Proxies, such as Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), Islamic Republic of Iran Shipping Lanes ("IRISL"), National Iranian Oil Company ("NIOC"), Ministry of Intelligence and Security, Islamic Revolutionary Guard Corps ("IRGC"), and the businesses and sub-entities they control, such as Mahan Air. In turn and under the direction of the Iranian regime, these entities work with Hezbollah and other FTOs to direct or orchestrate acts of terror beyond Iran's borders *Id*. at ¶893. Iran's network of FTOs in Iraq had at least two logistical necessities: (1), Hezbollah, Al Qaeda, Ansar al Islam, KH and Qods Force operatives had to be safely and reliably transported in and out of Iraq; and (2), they needed money and materials, including specific weapon components and manufacturing equipment, to supply their operatives with the weapons used in the attacks. The support for these groups had to be dependable and of sufficient quantity to effectively attack Iraqi civilians and Coalition Forces lethally and consistently. Defendants illegally evaded sanctions and provided financial services on behalf of designated entities, including MODAFL, IRISL, NIOC, Ministry of Intelligence and Security, IRGC, and Mahan Air, and for accounts where these SDNs/FTOs were intended beneficiaries. *See e.g.* ¶¶1189; 1191; 1207; 1210; 1220; 1684; 1664; 1674; 1689; 1903; 1981; 2458. This included the following:

- **Iran's Ministry of Defense and Armed Forces Logistics**: Defendants facilitated millions of dollars in illicit transactions for MODAFL, concealing Iran's efforts to evade counterterrorism sanctions, and enabling Iran's illegal acquisition of goods and technologies, including components of Improvised Explosive Devices (IEDs). *See Compl*. ¶¶1189, 1207-1210, 1386, 1902-1903, 1942-1946, 1957-1959, 1963-1965, 1993, 1998, 2005-2007, 2051-2059.

- **Islamic Republic of Iran Shipping Lines**: Iran's state-owned shipping line with a long history of facilitating arms shipments for the IRGC, including rockets, guns, ammunition, and the copper disks that form the key component in EFPs. *Id*. at ¶¶1212-1213. Defendants HSBC, Standard Chartered Bank ("SCB"), Royal Bank of Scotland N.V. ("RBS"), and Commerzbank facilitated illegal funds transfers through the United States on IRISL's behalf, totaling more than $100 million. *See id*. at ¶¶1386, 1626; 1672-1674; 2161.

- **Islamic Revolutionary Guard Corp and Qods Force**: From 2002 to 2006, the Qods Force received at least $100 million from Bank Melli, an SDN for whom Defendants provided access to USD. *See, e.g., id*. at ¶¶1504; 1533; 1624; 1645; 1734; 1851. The Qods Force developed a distribution channel for the transfer of weapons from Iran to Iraq. *Id*. at ¶25. The Qods Force provided up to $3 million worth of equipment and funding to terrorist groups in Iraq every month. *Id*. at ¶32.

- **The National Iranian Oil Company**: Defendants SCB, RBS, and HSBC maintained accounts for the NIOC when it was IRGC-controlled, and after being designated by the U.S. *See id*. ¶¶1574; 1857-1958; 2150-2145; 2353-2357. NIOC took an active role in support of Iran's terrorist activities in Iraq by using its own helicopters to conduct surveillance on Coalition Forces and providing intelligence in support of attacks against Coalition Forces. *Id*. at ¶2350.

- **Mahan Air**: Was the conduit from Iran of thousands of radio frequency modules recovered by Coalition Forces in Iraq from IEDs used to target U.S. nationals, including Plaintiffs, and Coalition Forces. *See id*. ¶¶1916; 1265-1268. Defendants, particularly SCB, engaged in transactions valued at over $150 million with Mahan Air. On October 12, 2011, the United States designated the Iranian airline Mahan Air an SDGT for having provided financial, material, and technological support to the Qods Force and FTO Hezbollah. *Id*. at ¶¶ 837; 1179-1180; 1224-1225; 1234; 1264-1268; 1914-1938.

### 4.  Defendants' Participation in The Conspiracy

Defendants knowingly joined the Conspiracy to conceal and disguise their financial

transactions with their Iranian co-conspirators. The object of the Conspiracy was to give Iran, a State Sponsor of Terrorism, concealed access to the U.S. financial system, enabling it to provide material support for international terrorism. In furtherance of the Conspiracy, Defendants knowingly:

a) Concealed Iran's dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

b) Prevented U.S. intelligence and law enforcement agencies from interdicting the illicit payments and financing transactions, and stopping the flow of billions of dollars to Special Designated Nationals, some of which are FTOs, SDTs, or SDGTs;

c) Provided expert advice and financial services to Iran and its Agencies and Proxies;

d) Facilitated illicit transactions totaling at least $50 million for the benefit of Hezbollah;

e) Facilitated illicit transactions totaling at least $100 million for the direct benefit of the IRGC and billions in USD for the benefit of the NIOC, then controlled by the IRGC;

f) Facilitated hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated an SDN;

g) Facilitated tens of millions of illicit USD transactions on behalf of MODAFL, the IRGC, Mahan Air, and other instrumentalities of Iranian state-sponsored terror to further evade U.S. sanctions, and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs;

h) Enabled Iran and its Agents and Proxies to authorize, plan, and commit acts of international terrorism, including (1) providing material support to terrorists prohibited by 18 U.S.C. § 2339A; (2) providing material support or resources to designated FTOs prohibited by 18 U.S.C. § 2339B; and (3) engaging in financial transactions with a government of a country designated under 6(j) of the Export Administration Act prohibited by 18 U.S.C. § 2332d; and

i) Enabled Iran and its Agents and Proxies to authorize, plan, and commit acts of international terrorism or conspiracies to commit homicide prohibited by 18 U.S.C. § 2332(a)-(c); bombings using destructive devices prohibited by 18 U.S.C. § 2332a; bombings and attempted bombings prohibited by 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

Compl. ¶¶1371-1406.

### i.       Deutsche Bank's Participation in the Conspiracy

In a Consent Order that Deutsche Bank ("DB") entered with the New York State Department of Financial Services ("DFS") in 2015, DB admitted it "developed and employed several processes to handle dollar payments in non-transparent ways that circumvented the controls designed to detect potentially-problematic payments" – i.e., the stripping and covering methods central to the conspiracy. *Id*. at ¶¶1491-1493. DB adopted what a DB officer overseeing these payments called "the tricks and cunning of MT103 and MT202." *Id*. at ¶1497. DB even actively marketed its concealment of illegal Iranian transactions as "OFAC-safe." *Id.* at ¶¶1504-1506; 1516.

These illegal practices were institutionalized at DB when it prepared training manuals for newly-hired payments staff in an overseas office directing that "[s]pecial attention has to be given to orders in which countries/institutes with embargos are involved. Banks under embargo of the US (*e.g., Iranian banks*) must not be displayed in any order to [Deutsche Bank New York] or any other bank with American origin as the danger exists that the amount will be frozen in the USA." *Id*. at ¶1512 (emphasis added, alteration original to Consent Order). DB actively concealed its "OFAC safe" business patterns because it knew its conduct was illegal and violated terrorism sanctions. *See id*. at ¶1516. DB worked closely with several government-owned Iranian banks (its "sanctioned customers") in order to keep its practices secret. Notably, DB employees not only "recognized that U.S. sanctions rules . . . applied to Iranian . . . customers," they also understood they were working on behalf of "***customers who were listed on OFAC's SDN list***" and that this "would pose problems for U.S. dollar payments sent to or cleared through the U.S." *Id*. at ¶1492 (emphasis added, quoting Consent Order).

From at least 1999 through 2006, DB used these non-transparent methods and practices

to conduct more than 27,200 USD clearing transactions valued at over $10.86 billion on behalf of SDNs, including Iranian sanctioned entities. *Id*. at ¶1491.

### ii.      HSBC's Participation in the Conspiracy

On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering and OFAC sanctions violations, and entered into a Deferred Prosecution Agreement ("DPA"). The DOJ summarized HSBC's illegal conduct and charged HSBC for: (1) willfully failing to maintain an effective Anti-Money Laundering program; (2) willfully failing to conduct due diligence on their foreign correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act. HSBC waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct. *Id*. at ¶¶1582-1583.

Beginning in the late 1990s, HSBC devised a procedure whereby it and its co-conspirators put a cautionary note in their SWIFT-NET payment order messages including language such as, "care sanctioned country," "do not mention our name in NY," and "do not mention Iran." *Id*. at ¶1535. In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran. *Id*. at ¶1534. In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal for processing Bank Melli payments, boasting that HSBC-Europe was "confident that we have found a solution to processing your payments with minimal manual intervention." *Id*. at ¶1558.

In an October 9, 2006 email, HBME's Regional Head of Legal and Compliance informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-turn exemption from all Iranian banks. This on the basis that, whilst ***having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah***, they suspected all major Iranian State-owned banks of involvement in terrorist funding[.]" *Id.* at ¶1576 (emphasis added). In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to examine HSBC Group's OFAC sensitive USD funds transactions involving Iran and other prohibited countries or persons that went through the bank. That "review" identified more than 25,000 illegal transactions that involved Iran, worth a total of more than $19.4 billion in USD funds. *Id.* at ¶¶1542-1543. In addition, through March 2010, HSBC-US was the conduit for at least twenty-four post-U.S. designation Eurodollar transactions on behalf of IRISL and/or its various subsidiaries and front companies. *Id.* at ¶1626.

A July 13, 2012 article published by Reuters entitled "Special Report: HSBC's Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC-US compliance officer had identified ***suspicious transactions involving Hezbollah***, specifically Tajco and Kairaba Supermarket. *Id.* at ¶1586 (emphasis added).[17] In September 2012, the U.S. Senate's Permanent Subcommittee on Investigations issued a report regarding the HSBC Defendants, finding, among other things, that HSBC-US "***provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing***." *Id.* at ¶1635 (emphasis added).

### iii.    Royal Bank of Scotland's Participation in the Conspiracy

On May 10, 2010, the DOJ announced that ABN Amro's successor entity, Defendant RBS, had agreed to forfeit $500 million to the United States in connection to its active

---

[17]    *See*    https://www.reuters.com/article/us-hsbc-compliance-delaware/special-report-hsbcs-money-laundering-crackdown-riddled-with-lapses-idUSBRE86C18H20120714 (last visited May 1, 2018).

participation in a conspiracy to: (1) defraud the United States, (2) violate the IEEPA; (3) violate the Trading with the Enemy Act, and (4) violate the Bank Secrecy Act. *Id*. at ¶¶2162-2165.

According to DOJ, RBS's participation in the conspiracy continued "until in or about December 2007." Up to that time, RBS willfully and knowingly conspired to "engage in financial transactions with entities affiliated with Iran … in violation of the IEEPA,…and regulations and embargoes issued thereunder…" *Id*. at ¶2164. As part of this process, RBS instructed employees to omit information from USD transactions that would inform banks in the United States the transaction violated U.S. sanctions. *Id*. at ¶2169. Such illegal payment processing was knowingly supported by senior RBS employees who were fully aware of, and in some instances even provided, the Iranian USD transaction instructions to other RBS employees. *See, e.g., id*. at ¶¶ 2115; 2142; 2149-2155.

For example, the Head of Operational Risk warned all Payment Processing Center Heads via email to: "Please take care when making [payments] … to ensure that there is no wording within the message that could potentially lead to the payment being stopped e.g. reference to a sanctioned country …" *Id*. at ¶2174. Moreover, even after RBS adopted official bank policies in July 2006 to curb the illegal transaction processing, RBS nevertheless continued to process transactions through New York in a non-transparent manner using these and other means. *Id*. From at least 2002 to 2011, RBS conducted more than 3,500 transactions valued at approximately $523 million through New York correspondent banks involving SDNs, including Iran and Iranian sanctioned entities. *Id*. at ¶2113. U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN Amro's [RBS's] overseas branches such that any reference to Bank Melli Iran was removed." *Id*. at. ¶2158. Also, RBS's then-New York

branch was the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various front companies through March 2010. *Id*. at ¶2161.

### iv.  BNP Paribas S.A.'s Participation in the Conspiracy

In 2014, BNP Paribas S.A. ("BNP") pleaded guilty to violating U.S. and New York laws, including conspiring with Iranian and Sudanese SDNs to violate U.S. sanctions, BNP agreed to pay a fine, terminate senior executives, and suspend USD clearing operations for one year at select business lines. BNP was also sentenced to five years' probation. The guilty plea was based in part on evidence that showed, at least as early as 2002, BNP had entered into criminal agreements with Iran and Sudan to violate U.S. counter-terrorism financing sanctions. In doing so, BNP provided Iran and Sudan with at least $160 billion USD. *Id.* at ¶1789.

BNP conspired with and aided Iranian SDNs in circumventing counter-terrorism financing sanctions and accessing USD on behalf of FTOs, including Al Qaeda. *See id*. at ¶¶1794-1847. From 1995 through at least 2007, BNP circulated memoranda among its operations staff with the blanket directive for USD transactions involving Iran: "[d]o not stipulate in any case the name of the Iranian entities on messages transmitted to American banks or to foreign banks installed in the U.S." *Id*. at ¶1835. BNP continued these illegal transactions for nearly two years after it commenced an internal investigation into its sanctions compliance and pledged to cooperate with the government. *Id*. at ¶1793.

For example, from July 15, 2005 to November 27, 2012 alone, BNP processed at least 318 electronic funds transfers in the aggregate amount of $1,182,075,543 to or through financial institutions located in the U.S. in violation of the prohibitions against the exportation or re-exportation of services from the United States to Iran. Between 2009 and November 2012, BNP transferred at least $686,600,000.00 on behalf of sanctioned Iranian SDNs in violation of U.S.

counter-terrorism financing sanctions. *Id.* at ¶1806.

When co-Defendant RBS (ABN Amro at that time) reached a settlement with United States regulators in 2005 for similar sanction violation practices, the Head of Ethics and Compliance North America for BNP stated in an email ***"the dirty little secret, isn't so secret anymore, oui?"*** *Id.* ¶1819 (emphasis added).

**v.   Standard Chartered Bank's Participation in the Conspiracy**

On September 21, 2012, SCB and the New York DFS executed a Consent Order resolving charges that, from at least 2001 through 2007, SCB provided Eurodollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through SCB's New York branch. NYDFS found that:

> [M]otivated by greed, SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped sustain a global threat to peace and stability. By definition, any banking institution that engages in such conduct is unsafe and unsound.

Compl. at ¶¶2070-2072.

On December 10, 2012, SCB agreed to forfeit $227 million to DOJ for conspiring to violate the IEEPA, and the forfeiture was part of DPAs entered into by SCB with DOJ and the Manhattan District Attorney's office for illegally moving millions of USD through the U.S. financial system on behalf of Iranian SDNs. *Id.* at ¶2073. To do so, SCB utilized similar cover payment and "stripping" techniques as its co-Defendants, as well as provided illegal trade finance transactions. *See id.* at ¶¶1848-2110.

By 2006, SCB's New York branch was fully aware of the bank's Iran dollar-clearing program. In October 2006, SCB's CEO for the Americas sent a message to the Group Executive Director in London. "Firstly," he wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are… still commensurate with the potential to cause *very serious or even catastrophic reputational damage* to the Group." He continued: "[s]econdly, there is equally important potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/*or serious criminal liability.*" *Id.* at ¶1889 (quoting New York DFS Consent Order). SCB's obvious contempt for U.S. banking laws was succinctly communicated by SCB's Group Executive Director in response. As quoted by an SCB New York branch officer, the Group Director caustically replied: "*You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians*." *Id.* at ¶1890.

From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit through stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions. Many of these Letters of Credit were issued for the benefit of Iran's military/terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States, and components for IEDs and EFPs used against Coalition Forces, including Plaintiffs, in Iraq. SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. *Id.* at ¶¶1902-1921.

### vi.    Barclays Bank Plc's Participation in the Conspiracy

On August 18, 2010, Barclays entered into a DPA with federal and New York State

prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and the Trading with the Enemy Act. *Id*. at ¶1764.

From the mid-1980s through at least 2008, Barclays violated both New York and United States law by knowingly and intentionally moving, or permitting to be moved, hundreds of millions of dollars through the United States financial system on behalf of Iranian SDNs. *Id*. at ¶1770. *See also id.* at ¶¶1195-1197 (summarizing Barclays' criminal conduct).

In December 2002, internal correspondence brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

*Id*. at ¶1757. According to DOJ and the District Attorney of New York, the net effect of these intentional efforts by Barclays targeting the United States financial system caused approximately $500 million dollars in prohibited transactions to be processed through the United States, a significant portion of that was steered back to Iranian SDNs. *Id*. at ¶1783.

### vii.    Commerzbank's Participation in the Conspiracy

In 2015, Commerzbank entered into a DPA with DOJ based on a four-count criminal information filed for conspiring with Iran and other sanctioned entities to violate the IEEPA, violate the Bank Secrecy Act, failing to report suspicious activities, and failing to establish due diligence for foreign correspondent accounts. *Id*. at ¶1698.

From 2002 to 2008, Commerzbank knowingly and willfully moved $253 billion through the U.S. financial system on behalf of Iranian and Sudanese SDNs. Commerzbank engaged in this criminal conduct using numerous schemes designed to conceal the true nature of the illicit

transactions from U.S. regulators. *Id*. at ¶1642. During the Relevant Period, Commerzbank maintained account number 7001688 for an open and notorious Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project"). *Id*. at ¶1691. Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact on July 24, 2007 the United States designated the Lebanese organization that was primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank knowingly, or with deliberate indifference, continued to provide financial services to the Orphans Project and hence continued to transfer funds to Hezbollah. *Id*. at ¶1692.

In addition to laundering funds for Iranian SDNs, Commerzbank also intentionally laundered USD for IRISL. *Id*. at. ¶1705. Four months following IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions. *Id*. at ¶1674. Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization. *Id*. at ¶1676-1677.

Less than a year after Commerzbank provided IRISL with at least $40 million in illegal USD, in October 2009, U.S. troops boarded a German-owned freighter under charter to IRISL and found seven containers of small arms ammunition, as well as one container containing copper discs—a key component in EFPs used to kill and maim Plaintiffs. *Id*. at ¶¶1678-1680.

### viii.  Credit Suisse's Participation in the Conspiracy

In December 2009, the DOJ charged Credit Suisse with violating the IEEPA. Credit Suisse waived the indictment, agreed to the filing of the information, entered into a DPA,

accepted and acknowledged responsibility for its criminal conduct, and agreed to forfeit $536 million. *Id*. at ¶¶2303-2304.

From at least August 19, 2003 to November 1, 2006, Credit Suisse transferred at least $480,072,032.00 in 4,775 transactions on behalf of Iranian SDNs in violation of U.S. sanctions. *Id*. at ¶2242. Before 2003, Credit Suisse was an active participant in the conspiracy, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Bank Melli Plc, Defendant Bank Saderat, and other Iranian Agents and Proxies moved their accounts to Credit Suisse. *Id*. at ¶2248. For the next two years, Credit Suisse became one of the main USD funds clearing banks for the Iran, quadrupling its number of Iranian USD transactions, from approximately 49,000 in 2002 to nearly 200,000 in 2005. *Id*. at ¶2249.

Credit Suisse also facilitated payments on Letters of Credit involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts. *Id*. at ¶2299-2300. Credit Suisse illegally directed USD payments through the United States in furtherance of the conspiracy. *Id*. at ¶2301.

### ix.     Credit Agricole's Participation in the Conspiracy

Credit Agricole Corp. & Investment Bank ("CACIB") entered into a DPA with DOJ and OFAC in 2015, agreeing to hundreds of millions of dollars in fines for violating U.S. counter-terrorism sanctions. *Id*. ¶2197. CACIB was also charged with violations of New York State Penal law for falsifying business records and failing to maintain accurate books, accounts and records. *Id*. at ¶2195. During its review of $32 billion of transactions, the New York DFS found that more than 4,000 of those transactions, valued at approximately $442 million, were illegal under U.S. sanction programs. The New York DFS also found, from just the sample it reviewed, the bank processed 280 transactions totaling approximately $50 million involving SDNs. *Id*. at ¶2184.

CACIB, a subsidiary of Crédit Agricole (Suisse) SA, and its predecessor entities, intentionally used non-transparent methods for payment messages, as described above, to conceal the involvement of sanctioned entities and SDNs in USD transactions processed in the United States. CACIB, through its predecessor entities, engaged in those acts with the specific intent to evade U.S. sanctions. *Id*. ¶2194. The practice of omitting or removing sanctions-identifying information in outbound USD payment messages was spread to multiple business lines throughout the bank and was noted in a February 2, 2004 notice:

> Various payments of ours were stopped by the U.S. banks, because within the text body of our instructions (MTI 03 or 202), certain words such as *Iraq, Iran*, etc. were used, words which appear on the U.S. Banks [sic] automatic block list. Consequently, ***be vigilant and do not put too much detailed information in your payments***, thus avoiding costly back values.

Compl. at ¶2205 (emphasis added).

### 5. Uncovering the Conspiracy: Blacklisting Banks and Revoking the U-Turn Exemption

By spring 2006, New York and federal authorities discovered the broad outlines of the conspiracy and began identifying Defendants and their Iranian counterparties and co-conspirators (though not yet all Defendants) as instruments of Iran's "sanctions evasion" techniques to provide material support to terrorism. For example, according to the U.S. Treasury, Bank Melli transferred at least $100 million to the Qods Force from 2002 to 2006. *Id.* at ¶1174. Bank Saderat "facilitate[d] Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year" through the conspiracy, including transferring $50 million "directly from Iran" to "a Hezbollah-controlled organization." *Id.* at ¶¶2314-2394.

As a result, on September 8, 2006, OFAC shut Bank Saderat off from the U-Turn exemption, explaining, "Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah..." *Id.* The

following year, the U.S. designated Bank Saderat an SDGT. *Id.* at ¶821, and Bank Melli a SDN.

*Id.* at ¶1174. A State Department cable from March 2008 reported:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm . . . . Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force… When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

Another U.S. diplomatic cable reported:

> Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

*Id.* at ¶¶1175; 2367.

Defendants admitted in DPAs, Consent Orders, and Settlement Agreements that they each worked directly with Iranian Banks, including Bank Saderat, Bank Melli, the Central Bank of Iran, and other SDNs (which by definition includes FTOs, SDTs, and SDGTs) to conceal and disguise their financial transactions, with the knowledge and intent that such "OFAC-safe" transactions would escape the oversight of U.S. regulators and evade counter-terrorism sanctions.

By 2008 it was clear this system of wire transfers had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for U-turn transactions. *Id.* at ¶1428. In doing so, the Treasury explained: "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation." *Id.* at ¶¶1428-

1429. The U.S. also suspected Iran was using its banks to finance terrorist groups, including Hezbollah, and engaging in deceptive conduct to hide its involvement in prohibited transactions. *Id*. As a result the U-Turn Exemption program that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program was discontinued.

### 6.     The Conspiracy Caused Plaintiffs' Injuries and Deaths

Plaintiffs and their loved ones were injured, and some were killed, by acts of international terrorism while serving in Iraq. *Id*. at ¶12. The FTOs Hezbollah, Ansar al Islam, Al Qaeda, and Kata'ib Hizballah ("KH") committed, planned, or authorized the Terrorist Attacks. The Terrorist Attacks involved EFPs, IRAMs, IEDs, mortars or other munitions that were designed, manufactured, and smuggled into Iraq, at the direction of Iran, and with the assistance of Hezbollah, Ansar al Islam, Al Qaeda and KH, and with the specific intent to be used to kill Americans. Iran, acting through its Agents & Proxies—the IRGC, Qods Force, Ministry of Intelligence and Security, MODAFL, NIOC, Mahan Air, and others—provided EFPs, IRAMS, IEDs, mortars and other munitions, as well as money, training, safe haven, and safe passage, to Hezbollah, Ansar al Islam, Al Qaeda, and KH operatives who carried out the Terrorist Attacks. *See, e.g.*, *id*. at ¶¶59; 65; 95-597; 600; 687; 872; 886; 894; 914; 918; 919-930; 1175; 1180; 1213; 1214; 1240; 2468.

## V.     PRIMARY LIABILITY CLAIMS

### A.     Plaintiffs Plausibly Allege Proximate Cause Under *Rothstein*

Defendants assert, "when, as in *Rothstein* and its progeny, a defendant is alleged to have dealt with a state sponsor of terrorism and not with a terrorist organization allegedly supported by that state, that alleged harm is simply too remote from the defendant's [allegedly] unlawful conduct." Jt. Mem. at 24. Defendants in essence ask this Court to hold, as a matter of law, that a bank can never be held primarily liable under the ATA for dealing directly with Iran. However,

33

*Rothstein* does not stand for such a broad-sweeping proposition. It cannot be the case that, under the ATA, Iran serves as a proximate-cause black hole, such that any money flowing into Iran is, *ipso facto*, legally severed from Iran's sponsorship of terrorism. Congress did not intend this result.

### 1.  Proximate Cause Under the ATA

Proximate cause under the ATA requires a showing that a defendant's conduct was a substantial factor in the sequence of events causing plaintiff's injury.

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his ***acts were a substantial factor in the sequence of responsible causation*** and whose injury was reasonably foreseeable or anticipated as a natural consequence.

*Rothstein*, 708 F.3d at 91 (*quoting Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)) (original emphasis). The Supreme Court and the Second Circuit have long required "some direct relation" between the injury and the wrongdoing to satisfy the principle of proximate cause. *See Holmes v. Securities Inv'r Protection Corp.*, 503 U.S. 258, 268–69 (1992)*; see also Rothstein*, 708 F.3d at 91 ("[W]ith respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries.'") (quoting *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006)). That causation requirement is satisfied by showing the defendant's conduct "was a substantial factor in the chain of causation that led to plaintiffs' losses." *Lerner,* 318 F.3d at 123.

Defendants' citation to *Bank of America Corp. v. City of Miami, Fla.*, 137 S.Ct. 1296 (2017), is misplaced because the scope of the "directness" analysis depends upon the statute at issue. *See Lexmark Intern., Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1390 (2014) (The "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct

the statute prohibits."); *Bank of America*, 137 S.Ct. at 1305 (quoting same). Indeed, the Court in *Bank of America* remanded the case, stating the "lower courts should define, in the first instance, the contours of proximate cause under the FHA." *Id.* at 1306. In this Circuit, a plaintiff can prove proximate causation in ATA cases by satisfying the substantial factor test.[18]

The question then is: What conduct constitutes a "substantial factor" in the causal chain leading to injuries under the ATA? The Supreme Court has emphasized that any amount of money or support provided to an FTO can directly cause far reaching injuries. *See Holder v. Humanitarian Law Project*, 561 U.S. at 37 ("This possibility is real, not remote."). "[T]he ATA's legislative history references Congress's intent to authorize the 'imposition of liability at *any point* along the causal chain of terrorism,' including by 'interrupt[ing] or at least imperil[ing] the flow of money' to terrorist groups." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir.2018) (citing S. Rep. No. 102–342, at 22 (1992)) (emphasis added). Furthermore, Plaintiffs are the exact persons the ATA was meant to protect and Defendants are the entities the ATA intended to reach.

*Rothstein* held the plaintiff had not plausibly alleged proximate cause when the defendant bank had illegally transferred hundreds of *millions* of dollars in cash to Iran, but where there were no further allegations about additional wrongful conduct by the bank (*e.g.*, fraud or providing expert advice) or about how Iran used the cash it received. Unlike *Rothstein*, Plaintiffs allege that for over a decade Defendants illegally funneled hundreds of *billions* of dollars to the world's foremost sponsor of terrorism, while U.S. authorities desperately tried to cut off the funding of terrorism. Even worse, Defendants provided training and instruction ("expert advice") to Iran, its bankers, and other SDNs regarding how to covertly access the U.S. financial system,

---

[18]   *See, e.g., Linde*, 882 F.3d at 328 (noting the jury was correctly instructed on the substantial factor test); *Weiss*, 768 F.Supp.3d at 640; *Rothstein*, 708 F.3d at 91; *Goldberg*, 660 F.Supp.2d at 429; *see also In re Chiquita Brands Internatl.*, 284 F. Supp. 3d 1284, 1313 (S.D.Fla.2018).

enabling these individuals and entities to continue financing terrorism. It is implausible that none

of the hundreds of billions of illegally obtained dollars went to FTOs.

### 2. *Rothstein* Held Plaintiffs Sufficiently Alleged "Causal Nexus"

*Rothstein* involved two distinct holdings. First, plaintiffs sufficiently alleged a "causal

nexus" between UBS's transferring money to Iran and the plaintiff's injuries. *Rothstein*, 708 F.3d

at 91-93. The Court explained:

> It is reasonable to infer that Iran's ability to amass U.S. currency was increased by
> UBS's transfers. Iran thus had available more U.S. currency than it would have
> had without UBS's transfers; the more U.S. currency Iran possessed, the greater
> its ability to fund Hizbollah and Hamas for the conduct of terrorism; and the
> greater the financial support Hizbollah and Hamas received, the more frequent
> and more violent the terrorist attacks they could conduct.

*Id.* at 93. Second, despite the causal nexus, the complaint did not sufficiently allege proximate

cause. *Id.* at 96-97. UBS argued, "the dollars provided by Iran to Hizbollah and Hamas could not

be fairly traced to the U.S. currency transfers to Iran from UBS . . . [,]" because Iran held

between ten to twenty billion dollars of USD reserves. *Id.* In so holding, the court reasoned, "the

fact that Iran was obtaining U.S. currency from multiple sources should not affect plaintiffs'

standing to sue[,]" but "the size of Iran's well-publicized reserve affects the issue of proximate

cause." *Id.* at 93. Stated simply, as alleged in *Rothstein*, UBS provided Iran with approximately

1% of its U.S. cash dollars, but did nothing else to support Iran, its mission to sponsor terrorism,

or its ability to gain access to the U.S. financial system.[19]

> The fact that the transfers were made to a state sponsor of terrorism of course
> made it more likely that the moneys would be used for terrorism than if the
> transfers were to a state that did not sponsor terrorism. But the fact remains that
> Iran is a government, and as such it has many legitimate agencies, operations, and
> programs to fund. We see no nonconclusory allegation in the Complaint that
> plausibly shows that the moneys UBS transferred to Iran were in fact sent to

---

[19]   Similarly, in *O'Neill*, the defendant banks provided "routine" banking services for charities who were alleged
to be front companies for al Qaeda. There were no allegations regarding the amount of the financial support that the
banks allegedly provided to the front companies for the terrorists.

> Hizbollah or Hamas or that Iran would have been unable to fund the attacks by
> Hizbollah and Hamas without the cash provided by UBS.

*Id.* at 97.

As set forth above, Plaintiffs specifically alleged that Defendants provided support to Iran and its network of FTOs, and the material support Defendants provided to Iran was sent to the FTOs in question. *See, e.g.*, Compl. ¶¶ 1385-1386. Further, Plaintiffs' Complaint is distinct from those in *Rothstein* and *O'Neill* in that it plausibly explains how Iran conducted business for its legitimate needs (through the U-turn exemption) and that the illegitimate funding of terrorism was financed through Iran's illegal access to the U.S. financial system—with Defendants' full support. Said another way, Iran and other SDNs for whom Defendants laundered money ***did not use transparent methods because the laundered funds were not intended for legitimate purposes***. *See e.g.*, *Id.* at ¶2366 (Bank Melli transferring approximately $100 million to the IRGC-QF that trained, armed and funded terrorist groups). Plaintiffs extensively allege Iran, its banks, and other FTOs/SDNs did not obtain USD illegally to perform legitimate governmental functions. It is (at a minimum) plausible that the world's foremost state sponsor of terrorism used illegitimately obtained USD to sponsor terrorism.

### 3. The Facts Here Differ Significantly From Those in *Rothstein* and *O'Neill*

This case involves facts that differ significantly from those in *Rothstein* and *O'Neill*:

a)  1,000 *Rothstein*s. The *Rothstein* complaint "alleged that between 1996 and 2004, in violation of U.S. laws, UBS provided Iran with *hundreds of millions of dollars* in cash..." *Id.* at 93 (emphasis added). This case involves allegations of *hundreds of billions* of dollars transferred to Iran—over 1,000 times the amount in *Rothstein*. It is implausible that none of the funds were going to FTOs.

b)  Defendants Dealt Directly with SDNs and SDGTs. The *Rothstein* complaint alleged only transfers from UBS to Iran and unspecified Iranian Government Agencies. Plaintiffs' Complaint alleges transfers to and for specific entities within the Iranian

terrorist apparatus—specially designated entities known for sponsoring terrorism, including the FTOs responsible for Plaintiffs' injuries.

c) <u>Evading Sanctions Is Not Routine Banking</u>. In *O'Neill*, the court rejected the argument that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries." 714 F.3d at 124. Here, Defendants actively violated laws and falsified banking records so the transactions would not be identified or halted by the U.S. authorities. Defendants admitted (1) their conduct was illegal; (2) they conspired with sanctioned entities like Iran and other FTOs/SDNs; and (3) they laundered billions for sanctioned entities. *See* Compl. at ¶¶1487-1524 (Deutsche Bank); 1525-1636 (HSBC); 1637-1719 (Commerzbank); 1720-1787 (Barclays); 1788-1847 (BNP); 1849-2110 (SCB); 2111-2180 (RBS); 2181-2238 (Credit Agricole); 2239-2314 (Credit Suisse). The reports from the U.S. Senate make particular findings that, for example, "HSBC-US provided U.S. Correspondent accounts to some foreign banks despite evidence of links to terrorist financing." Compl. at ¶1634; *see also* Compl. at ¶¶1635, 1636, 1664, 1697, 2065.

d) <u>Knowledge is Power</u>. Unlike the instant case, neither *Rothstein* nor *O'Neill* involved allegations that defendants provided expert advice to sponsors of terrorism. Here, Defendants educated and trained Iran, "the premier state sponsor of international terrorism" and "the central banker for terrorism around the world," *Rothstein*, 708 F.3d. at 97, on ways to defeat counterterrorism regulations. Defendants provided Iran with explicit instructions on how to fill out wire transfers to gain access to the U.S. financial system without being detected and without its assets being frozen. Once Iran gained this expertise, it could share it and continue its scheme with other banks. This is akin to showing a child how to unlock a safe in which guns are stored. *See generally Boim,* 549 F.3d at 690.

e) <u>Raw Materials for Creating Weapons</u>. *Rothstein* did not allege UBS provided trade financing for materials specifically designed for use in terror attacks, as Plaintiffs' Complaint does. *See, e.g.,* Compl. at ¶¶1178, 1206, 1207, 1210, 1325, 1381, 1391, 1635, 1974, 1999, 2299, 2300, 2455.

f) Further, Plaintiffs provide factually specific allegations that the illegal funds Defendants provided to Iran allowed it to fund more terrorism than it otherwise would have been able. Plaintiffs also allege the Terrorist Attacks would not have occurred on the scale or with the lethality in which they were perpetrated without Defendants' participation in the Conspiracy. *See, e.g.,* Compl. at ¶2403.

**B.     Plaintiffs Sufficiently Allege Defendants Committed Acts of International Terrorism**

Defendants argue the Complaint does not allege they committed, (1) an act (or acts)

dangerous to human life, (2) that appeared intended to intimidate or coerce civilians or to

38

influence or affect governments. Plaintiffs' Complaint explains why Defendants' conduct in illegally funneling hundreds of billions of dollars to Iran's terrorist apparatus and educating Iran on how to covertly access the U.S. financial system was dangerous to human life. The court in *Rothstein* stated, "[i]t is reasonable to infer that Iran's ability to amass U.S. currency was increased by UBS's transfers. . . . [and] the more U.S. currency Iran possessed, the greater its ability to fund Hizbollah and Hamas for the conduct of terrorism . . . [and] the more frequent and more violent the terrorist attacks [Hizbollah and Hamas] could conduct." *Rothstein*, 708 F.3d at 97. Such an inference is all that is necessary at this stage.

> *Boim* analogized "[g]iving money to Hamas" to "giving a loaded gun to a child," explaining that, while neither transfer is a violent act, both are acts "dangerous to human life." *Id.* Further, *Boim* observed that "donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill" more people in Israel. *Id.* at 694. **And given such foreseeable consequences, those donations would "appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1)** in order to distinguish terrorist acts from other violent crimes ...." *Id.* (internal quotation marks omitted).

*Linde*, 882 F.3d at 327 (emphasis added). Defendants cite *Linde* for support, but *Linde* held the question should be answered by a *jury*, and the Court could not find, as a matter of law, that such financial services "were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Id*. Further, Defendants provided more than mere routine banking services. Defendants also argue the Complaint confirms Defendants were motivated by business interests and not terrorist intent, but:

> If a defendant gives money to a terror organization, knowing of the aims and activities of that organization, this conduct creates a jury question as to whether it may objectively be viewed as that which "appears to be intended" to immediate or coerce a civilian population or government. **That Chiquita's material support may have had multiple motivational triggers, some salutary, are factors for the trier of fact to consider.**

*In re Chiquita Brands Int'l., Inc.*, 284 F. Supp. 3d at 1319. Under *Linde*, the Complaint contains allegations sufficient to overcome Defendants' Motion to Dismiss.

### C.   Plaintiffs Plausibly Allege Knowledge Under § 2339A

Defendants rely on an overly generalized view of Plaintiffs' Complaint and *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017), to argue Plaintiffs do not plausibly allege Defendants knew "Iran or the Iranian banks were acting as agents of a terrorist [] or the ultimate beneficiaries of the financial services allegedly provided to Iran or Iranian Banks would be a terrorist organization." Jt. Mem. at 27. But, knowledge allegations are rarely suited for summary judgment, much less dismissal on the pleadings. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 150 (2d. Cir. 2007) ("As this court has recognized, 'intent is always a subjective matter of inference and thus rarely amenable to summary judgment.'"). Further, *Ofisi* is not controlling. Plaintiffs' Complaint contains 573 paragraphs of factual allegations of knowledge either held by or imputable to Defendants (Compl. at ¶834-1406)—a level of detail not present in *Ofisi*. Plaintiffs' knowledge allegations far exceed even those in *Abecassis*, 785 F. Supp. 2d at 647-48, wherein allegations of knowledge under § 2339A were found sufficient.

Defendants' tellingly cite only four paragraphs from the Complaint to generalize the allegations and make *Ofisi* seem analogous. Jt. Mem. at 27. Unlike *Ofisi*, however, Plaintiffs provide explicit detail about the widely-known fact that Iran and its banks have long supported Terrorist Groups. *See* Compl. at ¶¶834-1406. Defendants knew of this connection because they were required to and because it was common knowledge, widely publicized, and the subject of regulation and legislation for decades. *See id.*; *see, e.g.*, ¶¶1344-1358 (noting decades of legislation directed at the financial sector attempting to disrupt Iran's efforts to support terrorism).

Further, the Complaint alleges the U.S., E.U., and the U.N. knew (1) Iran and its banks funded terrorism and (2) sought to curb their access to USD through the imposition of anti-money laundering regulatory laws applicable to banks. *Id*. at ¶¶834-853; 1341-1370. Moreover, recognizing the connection between Iran, its banks, and terrorism financing, the banking industry created best practices, customs, and recommendations to prevent money laundering related to the financing of terrorism. *Id*. at ¶¶1444-1487. Plaintiffs even detail the Wolfsberg Group's (which includes Defendants Barclays, Credit Suisse, Deutsche, HSBC, and Standard Chartered) efforts to implement internal policies and guidelines addressing anti-terrorism financing efforts. *Id*. at ¶¶1459-1464. Further yet, Plaintiffs cite to warnings provided to Defendants by the Federal Reserve to strengthen their anti-money laundering efforts to disrupt terrorism financing. *Id*. at ¶¶859-864. There is no doubt Defendants understood the purpose of the myriad terror-focused, anti-money laundering regulations with which they were to comply.

The Complaint details allegations of each Defendant's specific actions intentionally laundering enormous amounts of USD for Iran and its Agents and Proxies by skirting anti-money laundering laws, regulations, and their own internal policies related to counterterrorism financing. *Id*. at ¶¶1487-1524 (Deutsche Bank); ¶¶1525-1636 (HSBC); ¶¶1637-1719 (Commerzbank); ¶¶1720-1787 (Barclays); ¶¶1788-1847 (BNP); ¶¶1849-2110 (SCB); ¶¶2111-2180 (RBS); ¶¶2181-2238 (Credit Agricole); ¶¶2239-2314 (Credit Suisse). These actions caused Defendants to incur civil and/or criminal liability, including ***over $14 billion*** in fines and penalties. *See id*. Defendants' actions and subsequent massive penalties render totally implausible the contention they did not "know" Iran and its banks were acting as agents of terror. *See id*.; *see, e.g., id*. at 1635(d) (US Senate finding "[f]or decades, HSBC has been one of the most active global banks in the Middle East, Asia and Africa, despite being aware of terrorist

financing risks in those regions. . . HSBC-US provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing"). Plaintiffs' allegations of knowledge are sufficient under § 2339A. *See Abecassis*, 785 F. Supp. 2d at 647.

### D.     Plaintiffs Plausibly Allege Violations of 18 U.S.C. § 2332d (Claims VIII–X)

Certain Defendants[20] argue they are not U.S. persons under 18 U.S.C. § 2332d (Jt. Mem. at 28-30) and aver that Plaintiffs do not allege financial transactions with Iran. Jt. Mem. at 30-31. Both arguments fail because (1) interpreting § 2332d's definition of U.S. persons to exclude § 2332d Defendants results in an absurd reading of the statute; and (2) the ATA does not require a financial transaction *in the name* of the Iranian government. Even if it did, Plaintiffs sufficiently allege Defendants processed financial transactions for Iran that, ultimately, resulted in the Terrorist Attacks.

#### 1.     Each Defendant is a "United States Person" Under § 2332d(b)(2)

Section 2332d prohibits (1) domestic U.S. entities from engaging in financial transactions with State Sponsors of Terrorism anywhere in the world; and (2) U.S. persons from engaging in financial transactions with State Sponsors of Terrorism in the U.S. Yet, Defendants absurdly claim Congress did not intend to impose liability on U.S.-licensed branches of foreign banks that deliberately launder money for State Sponsors of Terrorism in the U.S.

The ATA defines a "person" as "any individual *or entity* capable of holding a legal or beneficial interest in property." 18 U.S.C. § 2331(3) (emphasis added). That includes corporations like Defendants. A "United States person" includes "*any* person in the United States." 18 U.S.C. § 2332d(b)(2)(D) (emphasis added). The use of the word "any" in § 2332d(b)(2)(D) reinforces its broad meaning. Thus, Congress separately, specifically, and

---

[20]   These moving Defendants include SCB, RBS N.V. (f/k/a ABM AMRO Bank N.V.), Commerzbank, Deutsche Bank, Barclays, and Credit Suisse AG, and BNP.

unambiguously provided that corporations are "persons" for purposes of § 2332d(b)(2)(D). Plaintiffs plausibly plead all § 2332d Defendants are "United States persons," in that they maintain a legal and beneficial interest in property—*i.e.,* multiple bank branches and offices— and conduct significant business in the U.S. *See, e.g.*, Compl. ¶¶704-705, 707-708 (DB); 732-736 (HSBC-US); 745-746 (Commerzbank); 751-753, 755-759 (Barclays); 761-763, 766 (BNP); 768, 770 (SCB); 773, 778, 781, 786 (RBS N.V.); 803-806, 815 (Credit Suisse); 2534, 2536, 2550, and 2552 (all § 2332d Defendants).

Defendants' interpretation of the applicable statutes misapplies canons of statutory construction. Defendants rely heavily on the currently appealed decision in *Ofisi*, *supra*. Jt. Mem. at 29-30. There, the court mistakenly held Congress intended § 2332d(b)(2)(C) to apply to "juridical" persons and § 2332d(b)(2)(D) to apply to only natural persons physically present in a U.S. territory. *Ofisi*, 278 F. Supp. 3d at 99. The court reasoned that any other construction would render subparagraph (C) superfluous vis-à-vis subparagraph (D), because a "juridical person organized under the laws of the United States" would therefore always be "any person in the United States." *Id*. However, *Ofisi*'s own reasoning renders § 2332d(b)(2)(A) (B) superfluous because both "United States citizens or national[s]" in subparagraph (A) and "permanent resident alien[s]" in subparagraph (B) are, by definition, located "in the United States;" thus, the U.S. may impose U.S. laws on persons represented by each of these subparagraphs *and* those of subparagraph (C), wherever found.

There is but one relevant difference between the subparagraphs of § 2332d(b): Congress included "in the United States" only in subparagraph (D). The U.S. cannot legislate conduct of foreign persons not present "in the United States." Thus, subparagraph (D) applies the ATA to foreign persons, both natural and otherwise, found "in the United States," without surplusage.

Defendants' erroneous interpretation would allow a domestic company with multiple branches and headquarters in the U.S. to avoid liability under § 2332d by simply reorganizing overseas. Congress did not intend such an absurd result. In addition to *Ofisi*, Defendants cite a district court opinion, *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007),[21] for the contention that § 2332d(b)(2)(D) excludes foreign corporations operating in the U.S.

In *Chalmers*, a criminal case, the court refused to impute a U.S. subsidiary's conduct to a Bahamian corporation with no independent presence in the U.S. *Chalmers* did not address a factual scenario involving a U.S.-licensed branch of a foreign corporation or that entity's U.S.-based or directed conduct. Further, *Chalmers* relied, as do Defendants, on *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000), a Supreme Court case that considered the preemption of a state statute (inapplicable here) boycotting wholly foreign corporations (having no branch, office, operation, or other presence in the state or the U.S.). But *Crosby*'s reasoning does not apply because it addressed a specific section of a *different* federal statute that provides no definition of "United States person."[22] The only definition of "United States person" in the differing statute, § 581(c), differs vastly from § 2332d. *Crosby* is also inapposite because (1) the statute at issue there has a different purpose than the ATA; and (2) Plaintiffs' Complaint alleges thousands of financial transactions were purposefully conducted with Iran and its Agents and Proxies by the § 2332d Defendants through their U.S.-licensed branches—the very conduct prohibited by the Iranian Trade Regulations.

---

[21]  Defendants also cite *Abecassis*, 785 F. Supp. 2d 614, but *Abecassis* merely cites *Chalmers* without further analysis. *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at *8 (S.D.N.Y. Oct. 17, 2016) (discussing the issuing extraterritorial application of the IEEPA and ITSR criminal statutes and relationship to 18 USC § 2332d and stating, "[it] has been clear for a long time that foreign nationals are not permitted to use the U.S. financial system to conduct transactions that are for the benefit of Iran or for the government of Iran).

[22]  Foreign Operations, Export, Financing, and Related Programs Appropriations Act ("FOEFRPAA"), 1997, § 570, 110 Stat. 3009-166 to 3009-167 (enacted by the Omnibus Consolidated Appropriations Act, 1997, § 101(c), 110 Stat. 3009-121 to 3009-172).

Even if *Ofisi* was correct, which it is not, HSBC-US is indisputably a U.S. person under § 2332d, as it is a national bank chartered under federal law with corporate headquarters in McLean, Virginia, and its principal office in New York. Compl. ¶716.

### 2.    Defendants Transacted with the Government of Iran

Contrary to Defendants' argument, Plaintiffs' Complaint alleges plausibly Defendants engaged in financial transactions with agents and proxies of the Iranian government, and with Iran directly. *See, e.g.*, Compl. ¶¶827, 832, 849, 1154, 1487-2180, 2308(h), 2315, 2335, 2314 – 2394 and Fn. 4. Further, Credit Suisse admits to "processing of electronic wire transfers in USD for Iranian banks." *See* Credit Suisse Motion to Dismiss (Dkt. No. 105), pp. 7-8. Moreover, the ATA does not require such transactions occur *in the name of* the Iranian government.

Section 2332d reaches instrumentalities and entities controlled by the Iranian government. *See Abecassis*, 785 F. Supp. 2d at 620 (payments to an account "held by Al Wasel and Babel General Trading, a United Arab Emirates company allegedly 'secretly owned and controlled' by Hussein," sufficient to plead proscribed financial transaction with the government of Iraq). Bank Melli, formerly the National Bank of Iran, is a de facto governmental administration.[23] Further, Bank Melli admitted in prior proceedings that it is an instrument of Iran. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010). Bank Markazi, now the Central Bank of Iran, follows and often speaks for the Iranian government and promotes its economic policies.[24] IRISL has also been held to be an instrumentality of the government of

---

[23] *See* Ardalan Sayami, *Iranian Banks Under Sanctions: Government Looking Towards Foreign Banks*, PAYVAND.COM (July 7, 2010), available at http://www.payvand.com/news/10/jul/1063.html ("Ever since banks in Iran were nationalized by the government and brought under its direct control, the executive branch sees it as its right to intervene in the most detailed aspects of banking operations while those who deposit money into banks and constitute its main donors, do not have any rights in electing bank managers. The result is the absence of independence of the Central Bank from the executive branch of government.").

[24] *See, e.g.*, *Iranian and European Banks Prepared to Re-Establish Banking Relationships, Central Bank of The Islamic Republic Of Iran*, CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN (Nov. 21, 2015), available at http://www.cbi.ir/showitem/13926.aspx.

Iran. *See Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 420 (S.D.N.Y. 2013) ("As Iran's 'national maritime carrier,' IRISL functions as an instrumentality of the government of Iran."). Defendants' reliance on *EM Ltd. v. Banco Cent. de la República Arg.*, 800 F.3d 78, 93 (2d Cir. 2015) ("BCRA") falls short. Jt. Mem. at 30-31. The BCRA court clearly identified what it deemed missing from plaintiffs' allegations: "claims that Argentina…*interfere[d] in and dictate[d]* BCRA's daily business decisions." *Id*. (emphasis added). That is precisely the conduct Plaintiffs allege. *See, e.g.*, Compl. ¶¶1685, 1810-1812, 1904-1911, 1944, 2020-2040, 2157, 2340, 2349, 2364, and 2370.

Credit Suisse's argument that Plaintiffs fail to allege its "processing of electronic wire transfers in USD for Iranian banks (even if allegedly 'stripped') involved any terrorist group in Iran, Iraq or elsewhere," (*see* Credit Suisse Motion to Dismiss, pp. 7-8) completely misses the point. By transacting business with instrumentalities of Iran (*e.g.*, Bank Markazi, Bank Melli Iran, Bank Melli, Bank Mellat, Bank Tejarat, Bank Refah, Bank Sepah, Bank Saderat, IRISL, Mahan Air, Iran Air, NIOC, IRGC, and IRGC-QF, to name a few), all Defendants, including Credit Suisse, provided funding to the FTOs responsible for the Terrorist Attacks.

Defendants' attempt to discredit the weight of the Iranian Trade Regulations fails. The IRGC and other entities are agents and proxies of the Iranian government.[25] The Complaint clearly and plausibly alleges Defendants illegally transacted with these governmental entities.[26]

---

[25]   Pursuant to 31 C.F.R. § 560.304, Bank Markazi, Bank Sepah, Bank Melli Iran, and the NIOC constitute the government of Iran.

[26]   Defendants' argument that "Plaintiffs fail plausibly to allege that U.S. clearing banks such as HSBC Bank USA, N.A. knew that Iranian banks were the beneficiaries of wire transfers, in light of Plaintiffs' allegations that this information was 'stripped' from payment messages before they were cleared through the U.S." is ludicrous. Jt. Mem. at 30. The Complaint sets forth in detail Defendants' awareness and participation in the unlawful acts of the conspiracy. *See, e.g.*, Compl. ¶¶1487-2180, 2314-2394 (detailing Defendants' practices and knowledge). By knowingly and unlawfully "stripping" and otherwise laundering Iranian dollar transactions through the United States to evade U.S. terror-financing controls, in violation of those regulations, Defendants intentionally chose to subvert and evade the regulations.

## VI.    SECONDARY LIABILITY CLAIMS

A person is subject to **primary** liability for committing "an act of international terrorism" that proximately causes injury to "any national of the United States." 18 U.S.C. § 2333(a). *Rothstein*, 708 F.3d at 82. "International terrorism" includes violent acts **and** "acts dangerous to human life that are a violation of the criminal laws of the United States." 18 U.S.C. § 2331(1)(A). It encompasses more than detonating the bomb, pulling the trigger, or otherwise committing the actual physical terrorist **attack**. It includes giving money to a foreign terrorist organization. *See Boim*, 549 F.3d at 690 ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life,'" and "violates a federal criminal statute" and therefore constitutes an act of international terrorism.) That is why donors to terrorist organizations were liable under the ATA even before Congress enacted JASTA. *See Weiss*, 768 F.3d at 202; *Goldberg*, 660 F. Supp. 2d at 410; *Abecassis*, 785 F. Supp. 2d at 614; *Wultz*, 755 F. Supp. 2d at 1.

JASTA subjects a person to **secondary** liability for conduct that falls short of an "act of international terrorism." Section 2333(d), which codifies JASTA, provides: "[F]or an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization…, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." Thus, secondary liability applies when (1) the injury arose from an act of international terrorism committed, planned, or authorized by an FTO; and (2) the defendant aided and abetted or conspired with the person who committed the FTO-involved act of international terrorism.

47

Secondary liability is ***not*** limited to persons who aided and abetted or conspired with the specific person who committed the actual terrorist attack. Instead, secondary liability applies to persons who aided and abetted or conspired with a person who committed "an act of international terrorism." Defendants overlook this critical distinction, wrongly insisting that secondary liability requires proof that "Defendants conspired with the person or entity who actually committed the attack." Jt. Memo. at p. 33. It does not.

Defendants also insist secondary liability requires proof that they had the "intent to further any alleged co-conspirator's act of terrorism." *Id.*, *see also*, *Id.* at 35. That, too, is wrong, as is Defendants' related argument that Plaintiff must prove Defendants "had a desire to commit attacks." Defendants' arguments are belied by the case Congress instructed the courts to use when analyzing secondary liability under JASTA—*Halberstam v. Welch*—and would eviscerate the purpose of JASTA: To make civil liability as broad as constitutionally possible.

## A.    The Legal Framework Established by *Halberstam v. Welch*

In enacting JASTA, Congress instructed the courts on the proper legal framework for analyzing secondary liability claims: *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* 130 Stat. 852. In *Halberstam,* Welch operated a burglary enterprise for years until he murdered Halberstam while burglarizing his home. Halberstam's family sued Welch and his longtime girlfriend. The girlfriend never participated in the burglaries and claimed to have been under the impression Welch "bought estates and invested in coins, jewelry stores, and real estate." 705 F.2d at 475. She performed "secretarial work for Welch's 'business,'" including depositing checks and keeping records of Welch's transactions. *Id.* The issue was whether the girlfriend could be liable for the murder. The court set forth the elements of a conspiracy claim and then the elements of aiding and abetting (the elements are discussed below), applied the elements to the facts, and concluded the girlfriend could be liable for the murder, even though she did not

48

commit the burglaries or the murder. *Id.* at 477, 489.

In reaching its conclusion, the court clarified important aspects of secondary liability. First, secondary liability is vicarious. *Id.* at 479. Second, the aider-abettor/co-conspirator need not benefit from or even know about the underlying tort (the murder). Once the tortious enterprise has been formed, the only requirement is that the underlying tort be committed pursuant to or in furtherance of the enterprise. *Id.* at 481. Because the murder was within the foreseeable scope of their burglary enterprise (of which the girlfriend was aware, despite her professed ignorance), the girlfriend was liable. *See id.* at 486-488. The court further held that, just as knowledge and intent about the underlying tort (murder) is not an element of secondary liability, neither is motive: Proof the girlfriend wanted, or desired, murder was not necessary. *Id.*

Subsequent case law further establishes that secondary liability does not require co-conspirators to deal directly with each other or even know of each other's existence. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are."); *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988) ("A single conspiracy may be established when each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities.").[27] Furthermore, once a conspiracy has been established, the liability of its members "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir.1995). Thus, "a defendant who does not directly commit a substantive offense

---

[27]   The elements of criminal and civil conspiracy are the same, "so that the abundant precedents on the meaning of criminal conspiracy are available for use in the civil context." *Hartford Acc. & Indem. Co. v.* Sullivan, 846 F.2d 377, 383 (7th Cir. 1988); *Jones*, 856 F.2d at 992.

may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir.2007).

In sum, *Halberstam* (and subsequent case law applying its framework) establishes that a defendant may be liable even though it does not benefit from, desire, know about, or intend the underlying tort, provided that the tort is within the foreseeable scope of the illegal enterprise. And a defendant may be liable even though it does not know all the details of the illegal enterprise or know the other participants.

### B.   The Complaint Plausibly Alleges Secondary Liability Against Defendants

Applying that legal framework, Defendants' Motion to Dismiss Plaintiffs' secondary liability claims (Claims 5, 6, and 7) must fail. Because of JASTA, the ATA now allows Plaintiffs' exact aiding and abetting and conspiracy secondary liability claims.[28] This case is not, as Defendants would have this Court believe, analogous to other prior dismissed ATA cases. This is one of the first cases in the country where a court will consider the plausibility of a post-JASTA complaint containing factual allegations crafted to meet the requirements of JASTA. Unlike previous cases, Plaintiffs' Complaint provides highly detailed, non-conclusory, factual allegations that plausibly allege aiding and abetting and conspiracy claims against Defendants.

Defendants do not deny aiding and abetting and conspiracy claims are available to Plaintiffs under the ATA, or that such claims are constitutional. Instead, Defendants attack Plaintiffs' claims by placing all their eggs in the *Iqbal/Twombly* basket and arguing that the

---

[28]   Courts recognize JASTA significantly changed the law upon which courts in cases like *Rothstein* based their dismissal of aiding and abetting and conspiracy claims against banks and other financiers of terrorism. *See, e.g.*, *In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD), 2018 WL 1626255, n.6 (S.D.N.Y. Mar. 28, 2018) (JASTA "amends the ATA to specifically authorize claims against 'any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism.'. . . Before Congress enacted JASTA, the ATA was construed to preclude such claims.").

Complaint fails to state plausible claims of aiding and abetting and conspiracy. Plausibility is the only objection Defendants can muster, and that objection fails.

*First*, Plaintiffs' Complaint exceeds the pleading requirements and asserts claims specifically allowed by JASTA. *Second*, because this case is governed by the broadened secondary liability principles of JASTA, the analysis used by courts to evaluate primary liability plausibility in pre-JASTA cases like *Rothstein, Ofisi,* and others, is not applicable to the post-JASTA plausibility standard. *Third*, Defendants principally rely on two cases for their secondary-liability analysis—*Linde* and *Shaffer*—which do not help them. *Fourth*, contrary to Defendants' inaccurate portrayal of Plaintiffs' Complaint as "conclusory," the Complaint contains far more factually detailed, non-conclusory allegations than any previously dismissed ATA case and establishes the plausibility of every element of the JASTA claims.

> ### 1.    Plaintiffs Specifically Tailored Their Allegations to the Claim Requirements of JASTA

Unlike previous ATA complaints, including those filed in *Rothstein*, *Shafer*, *Ofisi*, *Owens*, and others,[29] Plaintiffs' Complaint asserts the aiding and abetting and conspiracy claims available under JASTA. Plaintiffs' Complaint provides hundreds upon hundreds of non-conclusory, factual allegations that establish non-conclusorily the elements of the JASTA claims. Defendants' argument that Plaintiffs have set forth a "formulaic recitation of the elements of a JASTA claim" is disingenuous. Jt. Mem. at 33 n.13.

> ### 2.    Pre-JASTA Cases Do Not Help Defendants

Defendants attempt to overlay a pre-JASTA plausibility analysis onto a few selected allegations of the more than 2,500 allegations in the 514 page, JASTA-tailored Complaint. For

---

[29]   Briefing on a similar motion to dismiss in *Freeman et al v. HSBC Holdings PLC et al*, 1:14-CV-06601, another ATA case filed in the S.D.N.Y., is pending. The complaint in that case was prepared and filed before JASTA.

their attack on Plaintiffs' aiding and abetting claim, Defendants try to apply a primary liability proximate cause requirement to Plaintiffs' secondary liability claims. *See* Jt. Mem. at 36 (referring the Court to its primary liability proximate cause arguments); Jt. Mem. at 37 (calling this case "just like in *Rothstein*"); Jt. Mem. at 39, 40 (citing *Ofisi's* plausibility analysis: "Similar to *Ofisi*"). *Ofisi*, *Rothstein*, and a primary liability proximate cause analysis are not relevant here. Indeed, the Second Circuit in *Linde* recognized that JASTA/*Halbertam*—not *Rothstein*—governs secondary liability claims. *Linde*, 882 F.3d at 319-20, 328-29, 331.

For their attack on Plaintiffs' JASTA conspiracy claim, Defendants rely solely on the legally-flawed, non-JASTA based opinion in *Shaffer v. Deutsche Bank AG*, 16-cv-0497, 2017 WL 8786497 (S.D. Ill. Dec. 12, 2017). Jt. Mem. at 33-36. But *Shaffer*'s pre-JASTA liability analysis is inapplicable and of no value in evaluating the secondary liability claims here.[30]

### 3. *Linde* Supports Plaintiffs' Claims, Not Defendants' Motion

The Second Circuit's recent decision in *Linde*, which evaluated ATA claims in the context of JASTA, supports the conclusion that the allegations in Plaintiffs' Complaint cannot be resolved as a matter of law, but must be resolved by the jury:

> Under an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1). . . . Aiding and abetting requires the secondary actor to be "aware" that, by assisting the principal, it is itself assuming a "role" in terrorist activities. *Halberstam v. Welch*, 705 F.2d at 477. Such awareness may not require proof of the specific intent demanded for criminal aiding and abetting culpability, i.e., defendant's intent to participate in a criminal scheme as "something that he wishes to bring about and seek by his action to make it succeed." *Rosemond v. United States*, —— U.S. ——, 134 S.Ct. 1240, 1248, 188 L.Ed.2d 248 (2014) (internal quotation marks omitted). **Nor does awareness require proof that Arab Bank knew of the specific attacks at issue when it provided financial services for Hamas. What the jury did have to find was that, in providing such services, the bank was "generally aware"**

---

[30] *See* Section V(A)(4)(ii) for further discussion regarding *Shaffer* as it relates to Plaintiffs' primary liability claims.

> **that it was thereby playing a "role" in Hamas's violent or life-endangering activities.** *Halberstam v. Welch*, 705 F.2d at 477.

*Linde*, 882 F.3d at 328 (emphasis added).

### C.     The Complaint Plausibly Establishes Aiding and Abetting Liability

Using the proper JASTA/*Halberstam* rubric, Plaintiffs' Complaint plausibly alleges aiding and abetting liability against Defendants. Plaintiffs supported each element of every claim with extensive factual allegations and proper inferences—not mere legal conclusions. Of course, to the extent Defendants dispute the facts alleged in the Complaint, as well as reasonable inferences that can be drawn from those facts, that will be a question for the jury. The *Linde* court sets forth the proper framework for determining the nature of an aiding and abetting claim under JASTA:

> [W]e are mindful that Congress, in enacting JASTA, instructed that the "proper legal framework for how [aiding and abetting] liability should function" under the ATA is that identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)…. In *Halberstam*, the District of Columbia Circuit observed that, in the civil context, aiding and abetting liability requires proof of three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 487. Halberstam further identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the third element: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Linde*, 882 F.3d at 328.

As directed by Congress, the Second Circuit court follows the *Halberstam* framework for determining the nature of an aiding and abetting claim under JASTA. *Id*. Under that framework, Plaintiffs' Complaint plausibly alleges aiding and abetting liability.[31]

---

[31]   Of course, to the extent Defendants dispute the plethora of facts and inferences alleged in the Complaint, those

### 1.    Element 1: The FTOs For Whom Defendants Performed Wrongful Acts Caused Injury

Rather than address the numerous allegations and the reasonable inferences, Defendants' motion cites a handful of allegations and asserts in (ironic) conclusory fashion that the Complaint rests on a "formulaic recitation" of JASTA's elements. But each element is supported by extensive factual allegations and proper inferences.

The first element of aiding and abetting is: "the party whom the defendant aids must perform a wrongful act that causes an injury." *Id.* (*quoting Halberstam*, 705 F.2d at 487). In the context of the ATA, those wrongful acts are acts of international terrorism committed, planned, or authorized by an FTO, which injured Plaintiffs. A reading of the entire Complaint reveals how Defendants, through their illegal banking scheme, substantially aided the FTOs that committed acts of international terrorism against Plaintiffs.

Defendants' argument that Plaintiffs must name specific FTOs for each of the fifty-five attacks is wrong and misconstrues JASTA. Jt. Mem. at 31-32. Under JASTA, so long as the Complaint allegations make it plausible that "an" FTO organization "committed, planned, or authorized" "an" act of international terrorism that caused a Plaintiff's injury, the Complaint plausibly states a claim under § 2333(d)(2). Such is the case here.

Plaintiffs allege generally that the "Terrorist Attacks were committed, planned, and/or authori[z]ed by FTOs." Compl. ¶2468. For some attacks, Plaintiffs identify the FTOs that committed the specific Terrorist Attacks. Jt. Mem. at 33, n. 12.[32] And for Terrorist Attacks where Plaintiffs did not identify a specific FTO that committed the attack, Plaintiffs plausibly allege that "an" FTO "committed, planned, or authorized" those attacks. Contrary to Defendants' view,

---

will be questions for the trier of fact to resolve.

[32]  As Defendants acknowledge, Plaintiffs' Complaint identifies Kata'ib Hizballah (Compl. ¶143) and Ansar al-Islam (Compl. ¶¶390, 430, 440, 577) as the FTOs that directly committed the attacks.

plausibility under JASTA does not require Plaintiffs to identify *the* specific FTO responsible for each attack at the pleading stage. Proving which specific FTO "committed, planned, or authorized" each attack is not Plaintiffs' burden at this stage of the litigation. That information will come through discovery and expert testimony, with the jury resolving factual disputes.

Defendants misread the allegations that plausibly allege FTOs committed, planned, or authorized all the attacks with money received from Defendants. Plaintiffs specifically allege five of the Terrorist Attacks were *committed* directly by FTOs. Compl. ¶¶143, 390, 430, 440, 577. For eleven additional Terrorist Attacks, Plaintiffs allege that specific **"Special Groups"** claimed responsibility for each. Compl. ¶¶109, 129, 137, 167, 176, 184, 216, 318, 339, 541, 557, 589, 596. And for each of the remaining Terrorist Attacks, Plaintiffs allege the weapons used were Iranian weapons manufactured provided and supplied by "**Iran and/or its Agents and Proxies** to Iranian-funded and Iranian-trained terror operatives, **including the Terrorist Groups**, in Iraq." Compl. ¶¶115, 148, 153, 161, 191, 199, 204, 224, 235, 241, 246, 251, 256, 266, 271, 283, 293, 302, 307, 312, 328, 333, 351, 361, 366, 374, 379, 384, 395, 402, 407, 414, 419, 424, 532, 551, 562, 571, 583. Defendants ask the Court to read these allegations in isolation to say no specific FTO is named for each attack and, thus, no FTO was involved. But this ignores the Complaint detail and sophistication, including definitions of "Special Groups," "Iran and/or its Agents and Proxies," and "Terrorist Groups." The Complaint must be read in its entirety.

Plaintiffs define "Iran's Agents and Proxies" to include "the Terrorist Groups." Compl. ¶3, n. 4.[33] "Terrorist Groups" includes many groups that are FTOs, including Hezbollah, al

---

[33]   The term also includes a host of other entities whose involvement in the terrorist activities and ties to the Special Groups and FTOs are detailed extensively in the Complaint. These entities include Bank Markazi Jomhouri Islami Iran ("Bank Markazi") (a/k/a the "Central Bank of the Islamic Republic of Iran"); Bank Melli Iran; Melli Bank Plc; Bank Mellat; Bank Tejarat; Bank Refah; Bank Sepah; Bank Saderat Plc; the IRISL; Mahan Air; Iran Air; the state owned and operated National Iranian Oil Company ("NIOC"); the Islamic Revolutionary Guard Corps ("IRGC"); Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"); and Khatam-al Anbiya Construction. Compl. ¶3, n. 4.

Qaeda, all al Qaeda subgroups (including al Qaeda in Iraq), Ansar al Islam, and Kata'ib Hizballah, as well as other unnamed FTOs. *See* Compl. ¶4, n. 5. and ¶600, n. 15.[34] Further, the term "Terrorist Groups" as used in the Complaint specifically encompasses the "Special Groups."[35] The identification and naming of "Special Groups" in Plaintiffs Complaint is significant, because the Complaint specifically alleges Hezbollah provided training, weapons, safe harbor, USD, and intelligence to the Special Groups in carrying out attacks alleged in Plaintiffs' Complaint. *See, e.g.,* Compl. ¶¶ 990, 992, 1054, 1116, 1149, 1409, 2431.

The Complaint details facts showing Defendants' connection to Iran and its Agents and Proxies and Defendants' ultimate connection to the FTOs and details the aid Defendants supplied to the FTOs, which allowed those FTOs to engage in acts of international terrorism, including the Terrorist Attacks that killed or injured Plaintiffs. The Complaint must be read in its entirety, as each allegation contains important facts and inferences, supporting the FTOs' connection to the Terrorist Attacks, and Defendants' connection and aid to the FTOs responsible for those Terrorist Attacks, particularly Complaint sections VI, VII, VIII. *See, e.g.,* Compl. ¶¶4, 96, 600, 651, 660, 667, 678, 836, 837, 879, 882, 910, 916, 923, 984, 1026, 1057, 1101, 1151, 1180, 1240, 1241, 1312, 1326-1340, 1385, 1386, 1405, 2401, 2415, 2416, 2417, 2425, 2463, 2468, 2474, 2481, 2484-2494, 2495-2512. Defendants' argument that it is implausible that an FTO committed, planned, or authorized those attacks because Plaintiffs do not name a specific FTO within each attack allegations is driven by Defendants' deliberately superficial misreading of the Complaint.

---

[34]  "Terrorist Groups," as identified in the Complaint, also include "**Foreign Terrorist Organizations**, Specially Designated Global Terrorists, Specially Designated Terrorists, and/or Specially Designated Nationals, IRGC-QF and other terrorists, **which were responsible for the Terrorist Attacks**." Compl. ¶4, n. 5 (emphasis added).

[35]  As alleged in the Complaint, the "Special Groups" included Jayesch al Mehdi (JAM), Badr Organization/Badr Brigades, Kata'ib Hizballah (KH) (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq (AAH), Promised Day Brigades (PDB), Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network. *Id.*

Discovery and continuing investigation (including expert analysis) will yield evidence of the specific FTOs involved in each attack, with factual issues to be determined by the trier of fact. Plaintiffs plausibly supports the first element of aiding and abetting under JASTA/*Halberstam*.

### 2.    Element 2: Defendants Knowingly Joined the Enterprise

The second aiding-and-abetting element is: "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Linde*, 882 F.3d at 329 (*quoting Halberstam*, 705 F.2d at 487). Contrary to Defendants' Motion, the Complaint is replete with allegations plausibly establishing Defendants were aware of their role in the Terrorist Attacks when they were violating the law (and covering up their violations) to transfer billions of USD that materially supported those acts of international terrorism.

Defendants cherry pick a mere two allegations to argue the Complaint fails to allege Defendants were generally aware of the role they played in the overall illegal or tortious enterprise. Jt. Mem. at 38 (citing only Compl. ¶¶1378 and 1405.). But the Complaint tells a lengthy, plausible, fact-laden story of Defendants' general knowledge and understanding of their role in illegally financing terrorism. The entire purpose of the laws and regulations Defendants consciously and purposefully violated to transfer hundreds of billions of USD to Iran and its Agents and Proxies was to prevent Iran from sponsoring the very terrorist acts committed by the Terrorist Groups (including FTOs) that led to Plaintiffs' injuries and deaths. *See* Compl. ¶¶ 3, 60-66, 631, 1345-1348, 1352-1353, 1444. That alone is sufficient to infer Defendants' knowledge that the money they illegally transferred to Iran substantially and materially assisted terrorism and that such illegal transfers themselves were acts dangerous to human life.

The Complaint establishes Defendants knew (1) Iran sponsored and funded terrorism, including FTOs; (2) the identity and nature and activities of the terrorist organizations sponsored and funded by Iran, including FTOs; (3) the money they were illegally transferring to Iran in violation of U.S. law and banking regulations was being used by Iran to fund terrorism, including FTOs; and (4) the conspiracy in which they were participating was funding Iran's sponsorship of terrorist activities, including the Terrorist Attacks alleged in the Complaint. As *Linde* holds, awareness does ***not*** require proof that Defendants knew of the specific attacks at issue when they provided their financial services supporting terrorism. *Linde*, 882 F.3d at 329. Plaintiffs have plausibly alleged that Defendants were "generally aware" of their "role" in supporting terrorism financing. Any dispute regarding Defendants' awareness of their roles in this enterprise is a matter for the jury, not for the Court to decide as a matter of law—let alone at the pleading stage. *Id*. at 330 ("There is some record evidence that might permit a jury, properly instructed as to aiding and abetting, to infer the requisite awareness. . . . Thus, we are obliged to vacate and remand for a jury to decide that question.").

There is, moreover, a lenient pleading standard in the Second Circuit concerning scienter allegations. *See, e.g.*, *Weiss*, 768 F.3d at 211. Given the copious factual allegations in Plaintiffs' Complaint that demonstrate Defendants' general awareness of their role in financing and supporting acts of international terrorism by FTOs and, in particular, the Terrorist Attacks, Plaintiffs' plausibly support the second element of aiding and abetting.

3.    **Element 3: Defendants Knowingly and Substantially Assisted the Terrorist Activities.**

The third element of aiding and abetting is: "the defendant must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (*quoting Halberstam*, 705 F.2d at 487). Defendants provided substantial assistance to the Terrorist Groups that committed

the Terrorist Attacks by knowingly facilitating the transfer of hundreds of billions of USD to terrorist organizations through Iranian front companies. *See* Compl. ¶¶ 822, 921, 925, 1158, 1172, 1174, 1175, 1320, 1386, 1914, 2317, 2333, 2366, 2369, 2370, 2428). These funds were provisioned illegally—stripping wire information—when Iranian parties could have obtained the banking services legally through the U-Turn exemption. Defendants knew the billions of dollars would be funneled to terrorist groups, including FTOs, that would injure or kill U.S. soldiers, including Plaintiffs/Plaintiffs' Decedents. Compl. ¶¶1-7, 13-67, 685-833, 834-2407.

*First*, Defendants' knowledge that they assisted in acts of international terrorism is a factual matter for the jury, not for the Court. Further, Defendants' "[k]nowledge may be shown by circumstantial evidence, or by reckless conduct.'" *Cox v. Admr. U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994).

*Second*, whether a defendant's assistance is "substantial enough" to constitute aiding and abetting requires consideration of: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Halberstam*, 705 F.2d at 484–85; *Linde*, 882 F.3d at 328. Disputed facts pertinent to these factors, as well as the weight to assign to those factors, are factual issues for the trier of fact and not matters that can be determined as a matter of law. *Linde*, 882 F.3d at 330. (*citing, inter alia, United States v. Norman*, 776 F.3d 67, 79 (2d Cir. 2015)).

*Third,* Defendants' analysis of the above factors above is shallow and misleading. Defendants once again select a mere handful of allegations from the Complaint to make their argument (Jt. Mem. at 39-40) and ignore the hundreds of extensive factual allegations that individually and collectively support these factors. As to the "nature of the act encouraged," the

acts of international terrorism as alleged throughout the Complaint were unquestionably encouraged and indirectly supported by Defendants. The very first allegation in the Complaint states "[M]oney is the oxygen of terrorism"; thereafter, more than 2,500 allegations detail how that terrorism was financed by Defendants through their illegal actions and participation in the conspiracy. The "amount of assistance"—billions of dollars—was unquestionably substantial. Defendants' banking services were indeed essential to carrying out the Terrorist Attacks. *See, e.g.*, Compl. ¶¶1-64, 834-1112, 1151-1370.

The fact that Defendants were not physically on the ground and present when the Terrorist Attacks were carried out by the FTOs supported by Defendants does not absolve Defendants, just as the physical absence of the girlfriend from the scene of the murder in *Halberstam* did not get her off the liability hook. Defendants' illegal transfer of billions of USD to Iran and its Agents and Proxies, including FTOs responsible for Terrorist Acts, occurred before and during the time of the Terrorist Attacks, making Defendants very much a part of the illegal enterprise that enabled the FTOs to commit, plan, and authorized the Terrorist Attacks. *See* Compl. ¶¶11-56, 59 (allegations of timing and amounts of illegal transfers), ¶¶95-597 (identifying dates of attacks causing injury or death claimed by Plaintiffs), ¶¶685-833 (identifying Defendants' and their operations during the relevant times); ¶¶834-2407 (containing detailed allegations of the timing, nature, and extent of the illegal transfers, and the amounts of illegal transfers).

Defendants' actions in financing terrorism are the exact kind of "indirect" support for which JASTA was enacted. There is a substantial and close connection between the timing of Defendants' knowing participation in the illegal enterprise and the acts of international terrorism, including the Terrorist Attacks that followed. Compl. ¶¶11-56, 59, 95-597, 685-2407.

Defendants try to compare Plaintiffs' allegations to those in *Ofisi*. Jt. Mem. at 39-40. The comparison is flawed. First, *Ofisi* was not decided under JASTA. 278 F. Supp. 3d at 97 n.3. The *Ofisi* court dismissed the plaintiffs' aiding and abetting claim because that claim was not available under the ATA at that time. *Id*. at 97-98. Here, a claim for aiding and abetting is now a specific claim available under the ATA/JASTA. Second, regarding its purported *Halberstam* analysis of common law aiding and abetting, the *Ofisi* court provided almost no analysis of the plaintiffs' complaint allegations and discounted a number of facts alleged, rather than presuming them to be true and drawing all reasonable inferences in favor of the plaintiff as required. Third, relying on *Rothstein* and other pre-JASTA cases, the *Ofisi* Court determined the plaintiffs did not make the requisite factual allegations to establish a "direct causal connection" between the bank's conduct and the terrorist activity. *Id*. at 103. But, a "direct" causal connection is not required under JASTA. *See In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD), 2018 WL 1626255, *7 (S.D.N.Y. Mar. 28, 2018) (JASTA "was not meant to incorporate 'but' for' causation," and adopting a more stringent standard of causation "would require a plaintiff to plead sufficient facts to chart a direct and unbroken causal line between a state's provision of material support and an ultimate act of terrorism. . . Yet neither the plain text of JASTA nor its stated purpose . . . support the adoption of such a rigid standard of causation."). Even if the *Ofisi* court were correct that there were no allegations in the plaintiffs' complaint in that case that plausibly alleged indirect support, Plaintiffs' Complaint here is substantially more detailed in describing Defendants' material support to the Terrorist Groups—including FTOs. Plus, *Ofisi* was decided by a D.C. trial court and is not binding here.

### D. Plaintiffs' Complaint Plausibly Establishes Conspiracy Liability

Plaintiffs' Complaint provides extensive facts—contained in hundreds of paragraphs—demonstrating Defendants' knowing, intentional, and illegal participation in the conspiracy. *See*

Compl. ¶¶834-899, 1371-2400, 2466-2482. As with aiding and abetting, the proper analysis for a

JASTA conspiracy claim is set forth in *Halberstam,* not *Rothstein. See Linde,* 882 F.3d at 320.

To establish conspiracy liability, *Halberstam* only requires "an injury caused by an unlawful

overt act performed by one of the parties to the" scheme and "which overt act was done pursuant

to and in furtherance of the common scheme." 705 F.2d at 477. Under this analysis, the injury

need only be a "reasonably foreseeable consequence of the scheme." *Id*. at 487.

### 1. *Halberstam* Supports Plaintiffs' Conspiracy Allegations

Defendants are liable for their participation in the unlawful conspiracy that led to the

injuries and deaths caused by the Terrorist Attacks. Defendants' liability stems from their

participation in the conspiracy involving the illegal provision of billions of USD to Iran and its

Agents and Proxies—financing the Defendants knew provided substantial and material support

to FTOs operating in Iraq. *See* Compl. ¶¶1-7, 13-66, 644-684, 834-2407. The FTOs that received

such material support from Defendants—directly or indirectly—committed, planned, and/or

authorized the Terrorist Attacks for which they needed substantial amounts of USD to

accomplish. *See* Compl. ¶¶1-4, 96, 600, 651, 660, 667, 678, 836, 837, 879, 882, 910, 916, 923,

984, 1026, 1057, 1101, 1151, 1180, 1240, 1241, 1312, 1326-1340, 1385, 1386, 1405, 2401,

2415, 2416, 2417, 2425, 2463, 2468, 2474, 2481, 2484-2494, 2495-2512.

Defendants provided Iran, a state sponsor of terrorism and supporter of the FTOs that

committed, planned or authorized the Terrorist Acts, with substantial amounts of USD in

violation of economic sanctions and OFAC regulations. Compl. ¶¶1359-2400. The very purpose

of those sanctions was to thwart terrorist activity by preventing Iran from obtaining USD

because—as Defendants knew—Iran used USD to support terrorist organizations and activities.

*See* Compl. ¶¶3, 60-66, 631, 863, 864, 1345-1348, 1352-1353, 1391, 1444. The very purpose of

the OFAC regulations was to ensure detection of sanction violations. Compl. ¶¶43-46, 1419.

Iran's goal in masterminding the conspiracy was to commit terrorism and did so in concert with Defendants by defeating "the economic sanctions imposed by the U.S. government, which were put in place with the sole purpose of deterring, disrupting, and preventing acts of international terrorism, the very terrorist attacks at issue in this case." Compl. ¶¶3-7, 60, 61-66, 631, 863, 864, 1345-1348, 1352-1353, 1391, 1444.

Just as the girlfriend in *Halberstam* did not commit the burglaries, the sale of stolen goods, or the murder, Defendants here did not commit the Terrorist Attacks, themselves. Just as the girlfriend agreed to be part of the illegal burglary conspiracy, Defendants agreed to be part of the illegal conspiracy alleged in the Complaint. And just as the girlfriend's participation in the illegal burglary scheme in *Halberstam* was sufficient to hold her liable for conspiracy because the murder was a reasonably foreseeable consequence of the burglary enterprise, Defendants' participation in the conspiracy makes them liable because Plaintiffs' deaths and injuries caused by Iranian-supported FTOs were a reasonably foreseeable consequence of the conspiracy.

### 2.    Defendants' Reliance on *Shaffer* is Misplaced

To oppose the conspiracy allegations, Defendants rely exclusively on *Shaffer v. Deutsche Bank AG,* 16-cv-0497, 2017 WL 8786497 (S.D. Ill. Dec. 12, 2017). *See* Jt. Mem. at 33-36. *Shaffer*, however, does not support Defendants' Motion. The court in *Shaffer* does not provide a persuasive analysis to be followed by this Court because the *Shaffer* court incorrectly analyzed and misapplied conspiracy law and eschewed *Halberstam* in the process.[36] Despite recognizing the bank defendant in *Shaffer* was in fact part of an illegal conspiracy with Iran to violate sanctions, the court did not then apply the *Halberstam* foreseeability framework. *Shaffer* does

---

[36]   JASTA was enacted after the *Shaffer* complaint was filed and thus, the *Shaffer* plaintiffs did not allege their claims under JASTA.

not cite *Halberstam* at all.[37] Instead, the *Shaffer* court stated, "[f]or a claim to be viable under the ATA, the object of the participants' conspiracy must be to provide material support for terrorism." *Shaffer*, slip op. at 10. Relying on that passage, Defendants argue JASTA only recognizes conspiracy liability if Defendants joined the conspiracy with the intent to commit an act of terrorism. *See* Jt. Mem. at 3, 35. That is a fundamentally misguided view of conspiracy law under *Halberstam* and Second Circuit precedent. As the court in *Halberstam* emphasized, the girlfriend was liable under conspiracy law even though she did not intend to commit (or to even facilitate the commission of) a murder. She was nonetheless liable because murder was a foreseeable consequence of the burglary enterprise. The same logic applies here: terrorism was a foreseeable consequence of Defendants' deliberate evasion of sanctions designed to stop terrorism, notwithstanding Defendants' professed aversion to terrorism.

And even if *Shaffer* were correct (it is not) about what the object of the conspiracy must be under the ATA, a "conspiracy to evade economic sanctions" is in fact a conspiracy to provide material support to terrorism in violation of the ATA. The U.S. sanctions against Iran and the banking regulations Defendants conspired to violate were imposed from their inception to specifically prevent Iran's funding of acts of international terrorism. *See* Compl. ¶¶60, 631, 1345-1348, 1352-1353, 1444. Defendants' evasion of sanctions—which they knew were to prevent Iran's support of terrorism—was a necessary and integral part of the overall conspiracy (as alleged in *Shaffer* and as alleged here) to provide funding for terrorism. Plaintiffs' Complaint provides all the necessary allegations to support the conspiracy claim here.

Further, the court in *Shaffer* believed Deutsche Bank had to have the same goal as the other conspirators. But neither *Halberstam* nor its progeny require each co-conspirator to share

---

[37] The *Shaffer* Court accuses the plaintiffs there of trying to "plead around *Rothstein*" to try to "open[] the possibility for civil conspiracy under the ATA." Slip op. at 9. But that criticism does not apply here, where JASTA specifically authorizes conspiracy claims, and where *Halberstam*—not *Rothstein*—provides the correct analysis.

or even know about all of the same aims, objects, or acts that further the conspiracy. Conspiracy liability attaches to participants in a conspiracy *even if they have different objectives* within the conspiracy, so long as the ultimate acts for which the conspirators are being held liable are reasonably foreseeable. *Halberstam,* 705 F.2d at 487. To put a fine point on it, had the *Shaffer* analysis applied in *Halberstam*, then the girlfriend would have been required to know and intend her boyfriend would murder homeowners. Of course, *Halberstam* did not impose such an onerous requirement. Nor would such a requirement make sense in the context of the ATA, the capacious counterterrorism law that courts (including the Supreme Court) have repeatedly insisted must be construed broadly—indeed per JASTA) as broadly as constitutionally possible. Accordingly, allegations of Defendants' "knowing participation or membership in the scheme charged" and "some knowledge of the unlawful aims and objectives of the scheme" is sufficient. *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986). Which is exactly what Plaintiffs plead. *See, e.g.*, Compl. ¶¶4, 11-56, 79, 96, 628, 631, 644, 645, 646, 647, 648, 659, 666, 670, 673, 676, 681, 684, 693, 695, 696, 801, 808, 862, 863, 864, 1151, 1371-1416, 1444-2313. A conspirator cannot avoid liability by "closing his eyes to what is readily apparent." *United States v. Reed*, 790 F.2d 208, 211 (2d Cir. 1986).

The requisite (and only) intent required under JASTA is to participate in and take affirmative steps to further the illegal enterprise. Defendants knew the objective of illegally providing banking services to Iran and its Agents and Proxies was to fund terrorism (because the sanctions they willfully violated were intended to prevent Iranian funding of terrorism). When Defendants conspired with Iran and its Agents and Proxies to transfer billions of USD in violation of those sanctions, a jury could reasonably find from the combination of knowledge and action, that Defendants adopted the underlying intent to fund terrorism. Given this, it is

65

reasonable to infer Defendants' intent and knowledge to provide funding to the FTOs responsible for the Terrorist Attacks. Compl. ¶¶1-7, 60, 61-66, 631, 863, 864, 1345-1348, 1352-1353, 1391, 1444. This is precisely the kind of "indirect" material support Congress envisioned when it enacted JASTSA to "provide civil litigants with the broadest possible basis . . . to seek relief" and follows *Halberstam* exactly. 705 F.2d at 487.

What Defendants really dispute is their knowledge of the full scope of the conspiracy in which they participated. Again, under *Halberstam*, that does not get them off the liability hook. And, as with aiding and abetting liability, there is no requirement that Defendants directly conspire with the FTOs or the terrorists who committed the attacks. Conspiracy law does not require a direct connection between all the conspirators, nor do they even need to know all the persons involved. *Jones*, 856 F.2d at 992; *Tarantino*, 846 F.2d at 1392. To require a direct connection would upend JASTA's purpose to impose liability on indirect supporters of terrorism at every point along the terrorism chain.

Regarding *Shaffer*'s statement that extending liability to defendants would result in too broad of liability, that assertion is wrong. After all, the entire point of JASTA was to give civil litigants the broadest basis to hold aiders and abettors and conspirators liable. Moreover, JASTA is not so broad so as to create the kind of strict liability the *Shaffer* court feared. Certainly, there are facts, including knowledge, foreseeability, the various *Halberstam* factors for establishing substantial assistance, etc., that a jury must find before an aider and abettor or conspirator can be held liable. In addition, secondary liability is limited to international terrorism involving FTOs. Unlimited liability is simply not a concern here, and this case does not open the floodgates for liability against other commercial companies.

Finally, *Shaffer*, a decision outside this district, is not binding on this Court, and is currently on appeal to the Seventh Circuit.

In sum, because JASTA expanded secondary liability under the ATA to specifically authorize claims of aiding and abetting and conspiracy, what is plausible today is a much broader universe than what was plausible before JASTA's enactment. Defendants' motion misleads by casting Plaintiffs' 500+ page Complaint in a misleading light. Plaintiffs' Complaint does not rest on a "formulaic recitation" of JASTA's elements. Jt. Mem. at 33 n.13. The purpose of plausibility pleading is to prevent plaintiffs from bootstrapping their way into court, not to require them to prove their case at the outset, as Defendants want here. *See* Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). Indeed the veracity of Plaintiffs' factual allegations—and of the reasonable factual inferences drawn therefrom—is presumed. *Iqbal*, 556 U.S. at 678.

## VII.   PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS AGAINST COMMERZBANK

Plaintiffs' Complaint plausibly alleges Commerzbank's transactions for and assistance to Hezbollah through the Orphan's Project occurred through its U.S. branch and using USD. Any lack of reference to specific transactions does not justify dismissal of the Orphans Project related claims (IV and VI) against Commerzbank. *See United States ex rel. Gelman v. Donovan*, No. 12 CV 5142 (RJD), 2017 WL 4280543 (E.D.N.Y. Sep. 25, 2017) (failing to plead specific bills in FCA liability case is not fatal where specifics are strongly and plausibly inferable from the allegations).[38]

*First*, Defendants' transactions and assistance to terrorist organizations, like Hezbollah, occurred in the U.S. and in USD. *Second*, the Complaint describes how Defendants, including

---

[38] *See United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 87 (2d Cir. 2017) (the "level of notice is especially fair and adequate" where defendant is "in possession of the most relevant records.").

Commerzbank, hid illegal USD transactions. *See, e.g.*, Compl. ¶¶48, 53, 697, 699. *Third*, Commerzbank New York serves as the clearing house for international USD transactions for "Commerzbank's variety of international clientele." Compl. ¶¶1637-1639, 1715. *Fourth*, the Complaint alleges plausibly Commerzbank's close relationship to the Orphans Project, the mutual trust between them, and the material support Commerzbank provided to the Orphans Project, which was then provided to FTO Hezbollah to carry out, plan, and/or authorize terrorist attacks on U.S. nationals, including Plaintiffs. Compl. ¶¶1691-1693, 2462, 2463, 2484, and 2486-2493. Commerzbank knew, or was deliberately indifferent to the fact, that Orphans Project was transferring funds through Commerzbank to FTO Hezbollah and that Hezbollah would use that material support in preparation for, or in carrying out, acts of international terrorism" (*see* Compl. ¶¶2462 and 2463, 2486) and Commerzbank's illegal expert advice, illicit financial services, and other illegal assistance to the Orphans Project facilitated the illegal transfer of USD to FTO Hezbollah. Compl. ¶¶2487, 2488, 2489, 2490, 2492, 2493.

Taken together, Plaintiffs' Complaint plausibly alleges, factually and non-conclusorily, the USD transactions and assistance to the Orphans Project (and hence to Hezbollah) involved Commerzbank's material support by and through its New York branch. Thus, the Court has personal jurisdiction over Defendant Commerzbank for Plaintiffs' Fourth and Sixth Claims.

The Court may also exercise pendant, ancillary, or supplemental personal jurisdiction over Commerzbank. *See Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (holding a court may properly assert personal jurisdiction over another claim that "arises from the same common nucleus of fact as another claim for which the court properly has jurisdiction over the defendant."). Commerzbank does not contest this Court has personal jurisdiction over Plaintiffs' conspiracy-based claims against it relating to its participation in the conspiracy. All of

Commerzbank's conduct in financing terrorist organizations, including the Orphans Project and Hezbollah, arise from a common nucleus of operative facts: ATA claims predicated on Defendant Commerzbank's providing material support to Iran and its Agents and Proxies, including Hezbollah, to fund terrorist activities thorough, *inter alia*, stripping of transaction information to illegally launder money, all during the same time period. *See* Compl. ¶¶1637-1719. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) (A "common nucleus of operative facts" is a situation where "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding."); *Rubinbaum, L.L.P. v. Related Corp. Partners V, L.P.*, 154 F. Supp. 2d 481, 489 (S.D.N.Y. 2001) ("supplemental personal jurisdiction under § 1367(a) is an available basis of personal jurisdiction over a defendant who has been properly served pursuant to nationwide service of process authorized by a federal statute."); *Silent Drive, Inc. v. Strong Indus.*, 326 F.3d 1194, 1206 (Fed. Cir. 2003) ("Having determined that the district court had personal jurisdiction here with respect to Count I" the court held it could assert supplemental personal jurisdiction over the other two counts because they arose out of "a common nucleus of operative fact.").[39]

## VIII.   COMMERZBANK AG, NEW YORK SHOULD NOT BE DISMISSED

The New York DFS entered into a Consent Order with Commerzbank AG and Commerzbank AG, New York Branch relating to the events and actions alleged in Plaintiffs' Complaint—and both entities separately signed the Consent Order.[40] *See* Compl. ¶¶1642 n.171

---

[39]   To the extent the Court believes a more substantial record is necessary to decide personal jurisdiction over Claims IV and VI, Plaintiffs request the Court allow limited jurisdictional discovery concerning Orphans Project's Commerzbank transactions through the United States. *See In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 561 (S.D.N.Y. 2005) ("Courts enjoy great discretion in deciding whether to order jurisdictional discovery before resolving motions to dismiss for lack of personal jurisdiction . . .").

[40]   The U.S. Department of Justice also named both in a Deferred Prosecution Agreement relating to the events and actions alleged in the Plaintiffs' Complaint, and although the Agreement was entered into on behalf of just Commerzbank AG, it was signed on behalf of both Commerzbank AG and Commerzbank (New York Branch). See Compl. ¶1643. n. 172 and DPA incorporated therein.

and n.173. Given this, there is a question of fact as to whether Commerzbank AG New York Branch is a separate legal entity and dismissal of Commerzbank AG, New York Branch would therefore be inappropriate. *C.f. Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 652 (S.D.N.Y. 1998) (discussing factual issues surrounding separate nature of New York branch of Swedish bank, determining the facts did not show branch was separate from parent bank).

Further, under New York and federal law, it appears that unless separately incorporated, "the domestic branch of a foreign bank is not a separate legal identity from its parent bank…As such, it is the same legal entity as its parent bank…" *Bayerische Landesbank v. Barclays Capital, Inc.*, 902 F. Supp. 2d 471, 472 (S.D.N.Y. 2012). Commerzbank's New York Branch is licensed as a domestic branch of a foreign bank. Compl. ¶1637. Commerzbank AG even admits they are one and the same. Commerzbank Suppl. Mem., p. 10, n. 6. If Commerzbank AG, New York Branch is the same legal entity as Commerzbank AG, there is no separate legal entity to "dismiss." Commerzbank AG's Motion to Dismiss should be denied.

## IX.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Dated: May 2, 2018                                     Respectfully submitted,

                                                       By: /s/ Seth A. Katz_____
                                                           Seth A. Katz
                                                           SDNY Bar No. SK4518
                                                           **BURG SIMPSON**
                                                           **ELDREDGE HERSH & JARDINE, P.C.**
                                                           40 Inverness Drive East
                                                           Englewood, Colorado 80112
                                                           Telephone: 303.792.5595
                                                           Facsimile: 303.708.0527
                                                           Email: skatz@burgsimpson.com

                                                           *Counsel for Plaintiffs*