UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIMOTHY O'SULLIVAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -against- | ) Civil Action No. 1:17-cv-08709-LTS-GWG |
| | ) |
| DEUTSCHE BANK AG, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' SURREPLY IN SUPPORT OF
<u>THEIR OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## I. INTRODUCTION

In the Supplemental Reply Memorandum submitted by Defendants Deutsche Bank, HSBC, and RBS (Doc. # 134) ("Supplemental Reply"), Defendants Deutsche Bank and HSBC wrongly accuse Plaintiffs of mischaracterizing certain Consent Orders, Senate Reports, and Federal Reserve Orders. Additionally, all Defendants contend in their Joint Reply that Plaintiffs did not address certain arguments and, as such, have conceded them. *See* Def. Joint Reply Mem. (Doc. # 133) at pp. 2, 13; and Commerzbank AG Supp. Reply Mem. (Doc. # 137) at p. 4. The arguments made by Defendants are disingenuous and misleading. The allegations in Plaintiffs' Complaint, as well as the arguments made in Plaintiff's Opposition to Defendants' Motion to Dismiss, are accurate. Moreover, Plaintiffs addressed the arguments Defendants wrongly argue Plaintiffs now concede.

## II. ARGUMENT AND AUTHORITY

### A. Defendant Deutsche Bank's Mischaracterizations of Plaintiffs' Arguments

Contradicting the express language of the New York Department of Financial Services ("DFS") Consent Order entered against it, Deutsche Bank claims "virtually all the transactions identified in the [DFS] Consent Order were found not to violate sanctions" and that no sanctions were "terrorism" sanctions. (Supplemental Reply, p. 3). That is wrong. The basis for the DFS Consent Order as described in the "Whereas" clauses of that Order was that "Deutsche Bank used non-transparent methods and practices to conduct more than 27,200 U.S. dollar clearing transactions valued at **over $10.86 billion** on behalf of Iranian . . . financial institutions and other entities subject to U.S. economic sanctions, including entities on the SDN List . . ." Consent Order p. 2 (emphasis added). In fact, the *entire* DFS Consent Order concerns Deutsche Bank's deliberate, conscious, purposeful, and secretive sanction-evading conduct. *See id.* at pp. 2-12. The Consent Order supports Plaintiffs' plausible and factual allegations that Deutsche Bank knew its "non-

1

transparent" processing of Iranian transactions violated counter-terrorism sanctions.[1]

Further, Deutsche Bank's argument that only 600 of its **more than 27,200** "non-transparent" transactions violated sanctions is simply a self-serving reference to the Bank's own internal extrapolation methodology and an unverified self-reported sanction violation figure.[2] At minimum, Deutsche Bank concedes more than 600 of its transactions (valued at over $38 million) violated U.S. sanctions, and thus supports that Deutsche Bank knowingly violated U.S. sanctions with its non-transparent transactions involving Iranian financial institutions and other entities. *Cf. Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 416 (E.D.N.Y. 2009) ("Three transfers . . . totaling approximately $25,000" sufficient to constitute an act of international terrorism); *Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 18 (D.D.C. 2010) ("[D]ozens of dollar wire transfers . . . totaling several million dollars" sufficient to constitute an act of international terrorism). At most, Deutsche Bank's argument creates a factual dispute.

Moreover, Plaintiffs agree Bank Melli, Bank Saderat, Bank Mellat, and Bank Sepah were designated as SDNs or SDGTs in 2007 and Bank Refah in 2011. *See* Compl. at ¶¶1174, 1199, 1972, 2332. But, to the extent Deutsche Bank argues all its non-transparent transactions ended in 2006, the Complaint alleges "DB instituted a series of policies ***starting in 2006*** to end these practices and wind down business with U.S.-sanctioned entities. ***However, some instances of***

---

[1] Deutsche Bank also incorrectly argues the Iran sanctions were not "counter-terrorism" sanctions. (Supplemental Reply, p. 3-4). As Plaintiffs allege in their Complaint, the Iranian sanctions—including the economic sanctions upon which the DFS Consent Order is based and which Deutsche Bank sought to evade through its non-transparent transactions with the "Iranian . . . financial institutions and other entities"—were undeniably sanctions aimed to combat terrorism. *See* Compl. at ¶¶ 13; 37-54; 845-853; 1326-1357; 1363-1370. Any argument to the contrary simply raises a factual dispute as to the nature of the sanctions Deutsche Bank admitted to violating.

[2] The Consent Order footnote referenced by Defendant states, "**Deutsche Bank reported**, employing **extrapolation methodology** to the transaction messages reviewed, that **over 600 of those transactions** valued at more than $38 million **were illegal under various U.S. Sanctions and other programs**." Consent Order, at n.2 (emphasis added). Importantly, Deutsche Bank agreed to pay a $200 million penalty to DFS and another $58 million to the U.S.—quite hefty sums if, as Deutsche Bank now suggests, its illegal transactions totaled only $38 million.

***resubmitting rejected payments or processing sanctions-related payments through New York persisted even after the formal policies were instituted.*** " Compl. at ¶1502 (emphasis added). The timing concerning Deutsche Bank's illegal transactions are factual issues.[3]

Defendant's argument also illuminates an important issue regarding the timing of its transactions and the SDN and SDGT designations: Defendants' practices deceived the Department of Treasury, thereby allowing the entities to go undesignated despite the fact they were engaging in the wrongful conduct which resulted in them ultimately being designated. Indeed, decision to enact SDN and SDGT designations is necessarily based on known, pre-designation conduct.

The Department of Treasury excluded Bank Saderat from the U-Turn exemption in 2006 because it "has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah," abusing the U.S. financial system, including the U-Turn exemption, to transfer millions of dollar-denominated assets to Hezbollah and Hezbollah-controlled entities. Compl. at ¶¶2314-2321. Bank Saderat was designated a SDGT in 2007 for channeling funds to terrorist organizations, including $50 million for the benefit of Hezbollah fronts. *Id*. Bank Melli was designated a SDN in 2007 for sending at least $100 million through the U.S. financial system to the Qods Force, including by using "deceptive banking practices to obscure its involvement from the international banking system," such as "request[ing] that its name be removed from financial transactions." Compl. at ¶2367-2370. **This is exactly what Deutsche Bank admitted to doing in the DFS Consent Order for its Iranian counterparties**. Compl. at ¶¶1489-1518; *see also* NYDFS Consent Order pp. 6, ¶11. It is highly plausible that by stripping both otherwise "legal" and illegal transactions for Iran outside of the U-

---

[3] Further, the timing of those designations does not minimize or mitigate Deutsche Bank's involvement in the conspiracy alleged in the Complaint. Compl. at ¶¶ 1487-1524.

Turn exemption, Deutsche Bank played a vital role in helping Iran "conceal[]" and "disguise[]" its material support to terrorism, 18 U.S.C. §2339A(a), and it was certainly foreseeable that the world's leading State Sponsor of Terrorism would in turn use this support to commit terrorism.[4]

When Deutsche Bank intentionally conducted and concealed more than 27,200 non-transparent USD transactions valued at over $10.86 billion from 2002 to *at least* 2006, it is plausible Deutsche Bank knew its conduct was illegal and supported terrorism. Indeed, though Deutsche Bank and its sanctioned Iranian customers could have used lawful means (through the U-Turn mechanism) to transfer funds for legitimate purposes, its deliberate choice to coordinate and conceal billions of USDs of unlawful transactions raises a reasonable and plausible inference that those transactions were for illegitimate purposes, including, principally, terror financing. The Complaint[5] and DFS Consent Order[6] support that plausible and factual conclusion.

B.     **Defendant HSBC's Mischaracterizations of Plaintiffs' Arguments**

Like Deutsche Bank, HSBC improperly downplays the publicly-available documents related to its illegal conduct. Plaintiffs' arguments are accurate, supported by the non-conclusory factual allegations and reasonable inferences in the Complaint (which allegations and inferences the Court must assume are true at this stage of the litigation), and supported by the HSBC Senate

---

[4] Defendant Standard Charter Bank ("SCB") makes similar arguments related to the timing of designations with certain entities (e.g. Mahan Air, MODAFL, and AIO) for which it conducted illegal trade finance transactions. *See* Doc. #136 at 3-4. These arguments fail to appreciate the fact that Defendants are required to know the nature and purpose of their costumers' business and the true beneficiaries of the accounts. Additionally, SCB relies on *Stutts v. De Dietrich Grp*. No. 03 Civ. 4058 (ILG), 2006 WL 1867060, at *4 (E.D.N.Y June 30, 2006) for the proposition that "the theory that proximate cause can be established on the premise that goods underlying an LC transaction were merely capable of being used for malicious purpose was already rejected." This completely misinterprets *Stutts* and that decision is wholly distinguishable from this case. For example, in *Stutts*, the LC's were issued from the defendant banks to a defendant supplier in the 1980s, before many of the sanctions applicable here were in place. Further, (1) *Stutts* involved Iraq not Iran; (2) the plaintiffs in *Stutts* did not properly allege "material support" (*See Stutts* at Fn. 7); (3) the plaintiffs were not injured by an "act of international terrorism;" and (4) the *Stutts* court dismissed the plaintiffs' aiding and abetting claim because, *inter alia*, no such claim was statutorily available at that time.

[5] The majority of examples contained in the DFS Consent Order identify Iran or Iranian sanctioned customers.

[6] *See* Consent Order, p. 2-11 (describing Deutsche Bank's illegal and deceptive banking conduct).

Report.[7] At best, what HSBC argues as "mischaracterizations" are simply disputed facts.

HSBC incorrectly argues the portions of the HSBC Senate Report (outlining HSBC's links to terrorist financing) to which Plaintiffs cite,[8] "have nothing to do with Iran or sanctions evasion." (Supplemental Reply, p. 4). The Complaint (citing information contained in the Senate Report) alleges that "HBEU systematically altered transaction information to strip out any reference to Iran and characterized the transfers as between banks in approved jurisdictions." Compl. at ¶ 1635. Such allegations and findings have everything to do with Iran and sanction evasion. Moreover, HSBC's connection to Al Rajhi bank,[9] as well as the HSBC Senate Report, are evidence of HSBC's *eagerness* to overlook numerous *warnings* about a bank with whom it chose to do business, despite *knowledge* of that bank's ties to 9/11, Hezbollah, and terrorist financing. HSBC knew the risks of doing business with Al Rahji Bank, but, continued to do business with it. *See* HSBC Senate Report Exhibit #80, pp. 942, 944, 945 (facts establishing Al Rajhi Bank's connections to terrorism); HSBC Senate Investigation Exhibit # 73, p. 924 (internal HSBC email from 2005: "Looks like you're fine to continue dealing with Al Rajhi. You'd better be making lots of money!").

The factual findings and HSBC's internal emails found in the HSBC Senate Report support the link between HSBC and terrorist financing, making Plaintiffs' Complaint allegations concerning that very connection to Iran and its terrorist proxies even more plausible. Thus, contrary to HSBC's argument, the reasonable inferences and circumstantial evidence found in the HSBC Senate Report support the plausibility of Plaintiffs' allegations.

HSBC further misconstrues Plaintiffs' Complaint when it alleges Plaintiffs

---

[7] It is no wonder HSBC wants to characterize the HSBC Senate Report as unhelpful or irrelevant. That Report paints a damning portrait of HSBC and its terrorist financing activities—activities that resulted in an agreement for it to pay over $1.25 billion as forfeiture amount to the Department of Justice. *See* Compl. at ¶ 1581.

[8] The HSBC Senate Report is incorporated into the Complaint at ¶ 1633, n. 170.

[9] Plaintiffs are well aware that Al Rajhi is a Saudi bank. Plaintiffs do not purport to allege otherwise.

"mischaracterize their own allegations" as they relate to HSBC's dealings with SDNs and SDGTs. Plaintiffs' Complaint references ample non-conclusory facts and evidence in the HSBC-related DPA, Treasury Settlement Agreement, and Senate Report supporting Plaintiffs' argument. *See* Compl. at ¶¶ 1525-1636, and footnotes 168, 169, and 170. Moreover, within the Senate Report, multiple emails document that HSBC illegally and knowingly dealt with known designated terrorist groups. *See* HSBC Senate Report, Exhibit # 26 p. 689 (November 9, 2006 email from OFAC to HSBC, establishing HSBC was dealing with both SDNs and SDGTs: "This email is to inform you of the following two payments, initiated by HSBC offices, and blocked due to OFAC sanctions. The first was blocked under terrorist sanctions. The second was blocked due to involvement of a Sudanese SDN."); p. 689 (December 14, 2006 and December 15, 2006 internal HSBC emails: "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re: Sudan)"; "How is it that these payments continue to be processed by our affiliates in light of the GCLs?"). Contrary to HSBC's argument, Plaintiffs do not "mischaracterize" the Complaint or the supporting HSBC Senate Report, which adds significantly to the plausibility of Plaintiffs' allegations.[10]

Finally, regarding HSBC's assertion that Plaintiffs do not plausibly allege HSBC US ("HBUS") knew Iranian banks were beneficiaries of wire transfers it cleared, the Senate Report and internal HSBC emails establish plausible knowledge by HBUS that it would be clearing questionable USD payments for Bank Melli—in fact, it received a proposal in 2001 to do just that:

- HSBC Senate Investigation Exhibit # 40, p. 762 (Internal HSBC/HBUS email dated 7/11/2001, regarding questionable Bank Melli transactions, providing training to Bank

---

[10] HSBC transacted directly with Hezbollah. *See. e.g.,* Compl. at ¶¶ 1386, 1576, 1584-1589. Moreover, HSBC whistleblower, Everett Stern, corroborated the Senate Report findings that HSBC was dealing with terrorist organizations, including Hezbollah, belying HSBC's contention that Plaintiffs misuse the Report, and ultimately making Plaintiffs' Complaint allegations more plausible. *See, e.g.,* Halasa, M. (2013, August 28). *Is Anybody Listening? HSBC Continues to Launder Money for Terrorist Groups Says Whistleblower,* Retrieved June 12, 2018, from https://www.huffingtonpost.com/marni-halasa/is-anybody-listening-hsbc_b_3831412.html.

> Melli on formatting transactions, and outsourcing compliance assurance to Bank Melli: "As you know, **HBUS was initially approached in January 2001 with the proposal that HBEU would use its USD account with HBUS to clear USD payments for Bank Melli** . . . There continues to be some disagreement between the advice from our two outside law firms [as to whether the transactions meet the U-Turn definition] but we could probably resolve this difference. Of more concern . . . HBUS will not be able to confirm whether or not the underlying transactions actually meets the "U-Turn requirement. . . In an effort to facilitate "straight-through processing", it now appears that **HBEU will train Bank Melli on formatting the payments and that we will be relying on Bank Melli** to ensure that only qualified payments are processed through HBEUs account with HBUS." (emphasis added)).

- HSBC Senate Investigation Exhibit # 40, p 762 (Internal HSBC/HBUS email dated 7/11/2001: "This is an issue that you should be aware of. As described in Carolyn's memo, **we have had ongoing discussions on the topic of Iranian payments** both internally, with HBEU and with I -IBME IRN. **HBUS Compliance and HBEU have also consulted with external counsel. The genesis for the discussion was an RFP for HBEU Treasury to handle Bank Melli's USD clearing.**" (emphasis added)).

Further, HBUS knew Bank Melli would not disclose the beneficiaries of its transaction payments—most certainly a red flag for HBUS as confirmed by HBUS personnel who were "not comfortable" with that business:

- HSBC Senate Investigation Exhibit # 40, p. 756 (Internal HSBC/HBUS email dated 5/22/2001: "I met Melli yesterday and enquired re **names of the principal beneficiaries of their payments** – as you will see from the attached Call Report, **as expected Melli could not assist**." (emphasis added))

- HSBC Senate Investigation Exhibit # 40, p. 755: (Internal HSBC/HBUS email dated 5/25/2001, recognizing the questionable nature of the Bank Melli business: "I wish to be on the record as **not comfortable with this piece of business**." (emphasis added)).

Astonishingly, HSBC's Head of Compliance, David Bagley—the person whose job it was to ensure legal compliance, claims he was unsure whether HSBC's sister bank, HBUS, was aware that HSBC was using it clear transactions for Iranian banks. This evidence adds to the factual question as to what HBUS knew and when it knew it:

- HSBC Senate Investigation Exhibit # 1d, p. 578 (Internal HSBC email by HSBC Head of Compliance, David Bagley, dated 10/21/2003: "I am not sure that HBUS are aware of the fact that HBEU are already providing clearing facilities for four Iranian banks, presumably including USD clearance.")

7

Moreover, the law—of which HSBC and HBUS must be presumed to have knowledge—establishes their transactions involved Iranian state-owned banks. The term "Iran" means the Government of Iran, including the central bank or monetary authority of that Government and any agency or instrumentality of that Government. 22 USC §8772; *see also* 31 CFR 560.304 ("The term Government of Iran includes: (a) The state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Iran").

Bank Melli is a known supporter of terrorism and an instrumentality of Iran:

- On October 25, 2007, OFAC designated Bank Melli pursuant to Executive Order 13382 of June 28, 2005, "Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters," and added Bank Melli to the List of Specially Designated Nationals and Blocked Persons (the "SDN List").

- Bennett v. Bank Melli, No. 13-15442 (9th Cir. 2015). "The Terrorism Risk Insurance Act (TRIA) and 28 U.S.C. 1610(g) abrogate the asset immunity of all of a terrorist state's instrumentalities, including those that are not alter egos of the state." "Bank Melli's assets aren't subject to attachment because it's an Iranian company, but because it's an instrumentality of a state that has sponsored terrorism."

Bank Markazi Jomhouri Islami Iran is known to be the Central Bank of Iran:

- 31 CFR 535.433 The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the Government of Iran for all purposes under this part.

- According to OFAC Sanctions List Search, Bank Markazi is a/k/a Central Bank of Iran.

- Bank Markazi aka Central Bank of Iran, v. Peterson, April 20, 2016 (136 S.Ct. 1310).

Thus, for their claims arising under 18 U.S.C. § 2332d, Plaintiffs sufficiently and plausibly allege HSBC and HBUS "knowingly or had reasonable cause to know," they were performing financial transactions for the government of Iran. *See* 18 U.S.C. 2332d(a). HSBC's argument that Plaintiffs "mischaracterized" their Complaint or the public record is clearly without merit.

### C. Plaintiffs Addressed All of Defendants' Arguments

Defendants also claim Plaintiffs conceded, by not disputing, certain arguments. That too is

wrong. Specifically, Defendants argue Plaintiffs failed to address (and therefore concede) that several causal gaps in *Rothstein* are present here, including that (1) the Moving Defendants did not participate in the attacks; (2) the Moving Defendants did not provide banking services to terrorists; (3) the Moving Defendants' alleged actions were not necessary to any terrorism funding by Iran; and (4) Iran, as a government, has legitimate uses for financial services. *See* Jt. Mem. at 21; Stay Dec. at 11 ("This allegation of proximate cause is similar to the allegations at issue in Rothstein."). Defendants' arguments completely disregard and ignore Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. # 119) ("Ptfs.' Opposition").

Plaintiffs' specifically address Defendants' arguments and provide ample argument and authority supporting that (1) Defendants did participate in the attacks (*see, e.g.,* Ptfs.' Opposition, pp. 47-67); (2) Defendants did illegally provide banking services to terrorists (*see, e.g., id*.); (3) Defendants' actions were necessary to terrorism funding by Iran (*see, e.g., id.* at pp. 12-31, 64); and (4) that Iran, as a government, has legitimate uses for financial services, but that Defendants illegally and knowingly provided Iran with financial services it used for illegitimate purposes. *See, e.g., id*. at pp. 17, 36-38. In addition to these joint arguments, Defendant Commerzbank argues Plaintiffs do not address its specific arguments concerning Plaintiffs' IRISL Claim (the Second Claim for Relief) and the Orphans Project Claims (the Fourth and Sixth Claims for Relief). This, too, is wrong. *See* Ptfs. Opposition, pp. 19-20, 28-29, 45-46, and 67-70.

### III.  CONCLUSION

For the reasons set forth in Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. # 119), as well as the reasons set forth herein, Defendants' Motion to Dismiss should be denied in its entirety. Plaintiffs renew their request for oral argument on Defendants' Motion to Dismiss.

Dated: July 2, 2018.

Respectfully submitted,

By: */s/ Christopher G. Paulos*
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY AND PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6123
Email: cpaulos@levinlaw.com

*Counsel for Plaintiffs*