UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

TIMOTHY O'SULLIVAN et al.,

      Plaintiffs,

   -v-                               No.  17 CV 8709-LTS-GWG

DEUTSCHE BANK AG et al.,

      Defendants.

--------------------------------------------------------x

MEMORANDUM OPINION & ORDER

Plaintiffs, members of the United States armed forces who were killed or injured in one of 55 terrorist attacks in Iraq between December 17, 2003, and October 12, 2011, as well as estates and family members of deceased military victims of such attacks, bring this action against seventeen financial institutions[1] pursuant to the civil liability provision of the Antiterrorism Act of 1992, 18 U.S.C. § 2333(a) (the "ATA"), as amended by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 854 (2016) ("JASTA") (codified at 18 U.S.C. § 2333(d)(2)).  Defendants now move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Complaint (docket entry no. 1, the "Compl.") for failure to state a

---

[1]    Defendants in this action are Deutsche Bank AG ("Deutsche Bank"), HSBC Bank USA, N.A., HSBC Holdings Plc, HSBC Bank Plc, HSBC Bank Middle East Limited, HSBC North America Holdings, Inc. (together, the "HSBC Defendants"), Commerzbank AG ("Commerzbank"), Commerzbank AG, New York Branch, Barclays Bank Plc ("Barclays"), BNP Paribas S.A. ("BNPP"), Standard Chartered Bank ("SCB"), Royal Bank Of Scotland N.V., Royal Bank Of Scotland Plc (together, the "RBS Defendants"), Crédit Agricole S.A. ("CASA"), Crédit Agricole Corporate & Investment Bank ("CACIB"), Credit Suisse AG ("Credit Suisse") and Bank Saderat Plc ("Bank Saderat"). Defendants, with the exception of Bank Saderat, jointly file this motion to dismiss, and the moving Defendants are collectively referred to herein as "Defendants."  Bank Saderat has not appeared or otherwise defended this action, and a certificate of default as to Bank Saderat was entered on May 17, 2018.  (See docket entry no. 126.)

claim upon which relief can be granted.  (Docket entry no. 102.)  Defendant Commerzbank also

moves to dismiss certain claims asserted solely against Commerzbank, for lack of personal

jurisdiction.  (Docket entry no. 107.)  The Court has subject matter jurisdiction of this action

pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2338.  The Court has considered the submissions

of the parties carefully and, for the following reasons, Defendants' motion to dismiss the

Complaint pursuant to Rule 12(b)(6) is granted.

BACKGROUND

The following abbreviated recitation of relevant facts is drawn from the

Complaint, the well-pleaded factual content of which is taken as true for purposes of this motion

practice.

Plaintiffs are members of the United States armed forces who were killed or

injured in one of 55 terrorist attacks in Iraq between December 17, 2003, and October 12, 2011,

as well as estates and family members of deceased military victims of such attacks.  (Compl. ¶¶

11-12, 99.)  Defendants are international financial institutions with banking operations in the

United States.  (Id. ¶¶ 703-815.)  The Complaint alleges primarily that Defendants' provision,

from 2003 to 2011, of financial services to the government of Iran and its "Agents and Proxies"[2]

---

[2]      The Complaint defines Iran's "Agents and Proxies" to include over a dozen entities,
including Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank
Melli"), Bank Saderat, the Islamic Republic of Iran Shipping Lines ("IRISL"), Mahan
Air, the National Iranian Oil Company ("NIOC"), the Islamic Revolutionary Guard
Corps-Qods Force ("IRGC-QF"), Iran's Ministry of Defense and Armed Forces Logistics
("MODAFL"), the Iranian Ministry of Intelligence and Security ("MOIS"), and the
"Terrorist Groups."  (Compl. ¶¶ 3 n.4, 893, 2430.)  The term "Terrorist Groups" refers to,
among others, Hezbollah, al Qaeda, Ansar al Islam ("AAI"), the "Special Groups" and
"other terrorists, which were responsible for" the attacks that injured Plaintiffs."  (Id. ¶ 4
n.5).  The "Special Groups" include, among others, Jayesch al Mahdi ("JAM"), Kata'ib
Hizballah ("KH"), Asa'ib Ahl al Haq ("AAH"), and "a network similar to Hezbollah"
that "operate[s] throughout Iraq and, at all relevant times, remained under the control of

in violation of U.S. sanctions helped Iran fund and support the terrorist organizations that carried out the attacks that injured Plaintiffs.  (Id. ¶¶ 1-67.)

Since 1984, Iran has been designated a state sponsor of terrorism by the U.S. State Department.  (Id. ¶ 13.)  Iran has provided funding, transport, and safe harbor to terrorist organizations through government agencies and organizations such as the IRGC-QF, al Qaeda, and Hezbollah.  (Id. ¶¶ 835-844, 874-959.)  The IRGC-QF is a Specially Designated Global Terrorist ("SDGT") entity, and both al Qaeda and Hezbollah have been designated as Foreign Terrorist Organizations ("FTOs").[3]  (Id. ¶¶ 651, 660, 911.)  In turn, the IRGC-QF, al Qaeda, and Hezbollah have provided, both directly and indirectly, funding, weapons, and training to terrorist organizations in Iraq, including AAI, AAH, JAM, and KH.  (Id. ¶¶ 900-959, 960-987, 1021-1056.)  Plaintiffs allege that designated FTOs AAI and KH either perpetrated, or were operating in the area where, nine of the 55 attacks that injured Plaintiffs occurred.  (Id. ¶¶ 143, 184, 318, 339, 390, 430, 440, 541, 577.)  AAI has "well-established ties" to al Qaeda and the IRGC, and

---

Iran, through its Agents and Proxies, the IRGC, the IRGC-QF, and Hezbollah."  (Id. ¶¶ 4 n.5, 988-1008.)

[3] The Specially Designated Global Terrorist designation covers, inter alia, foreign persons who "pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." 31 C.F.R. §§ 594.310, 594.201(a).  A Foreign Terrorist Organization is any organization designated by the Secretary of State pursuant to 8 U.S.C. § 1189(a) because it "engages in terrorist activity" or "retains the capability and intent to engage in terrorist activity or terrorism."  31 C.F.R. § 597.309; 8 U.S.C. § 1189(a).  A Specially Designated Terrorist ("SDT") designation includes all foreign persons designated by the Secretary of State, in coordination with the Secretary of the Treasury and the Attorney General that are found to have "committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process," or to "assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence."  31 C.F.R. § 595.311.  Persons and organizations designated as FTOs, SDTs, and SDGTs are included in the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List ("SDN List").

KH has received assistance from the IRGC-QF and Hezbollah.  (Id. ¶¶ 960-987, 1021-1038.)  The Complaint also alleges that Special Groups AAH and JAM either perpetrated, or were operating in the area where, an additional seven attacks occurred.  (Id. ¶¶ 109, 129, 137, 167, 176, 216, 557, 589, 596.)  Neither AAH nor JAM is alleged to be a designated FTO, although both are alleged to have been connected to, and armed and trained by, the IRGC-QF and Hezbollah.  (Id. ¶¶ 1039-1047, 1048-1056.)  The Complaint does not identify who perpetrated the remaining 39 attacks that killed or injured Plaintiffs or their decedents, but it does allege that each of the 55 attacks involved Iranian-manufactured rockets, explosive devices, and other weapons "provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including the Terrorist Groups, in Iraq."  (See id. ¶¶ 108, 115, 128, 136, 142, 148, 161, 166, 175, 183, 191, 199, 204, 217, 224, 234, 241, 246, 251, 256, 266, 271, 283, 293, 302, 307, 312, 317, 338, 351, 361, 366, 374, 379, 384, 402, 407, 414, 419, 424, 429, 443, 521, 532, 540, 556, 562, 571, 576, 583, 588, 594.)

    To reduce Iran's ability to utilize proceeds from the sale of its substantial oil reserves to fund and support terrorist activities, the United States has enacted a comprehensive sanctions regime.  (Id. ¶¶ 845-853, 1344-1351); see also Exec. Order No. 12959, 60 Fed. Reg. 24757 (May 6, 1995).  Among other things, U.S. sanctions prohibit the servicing of Iranian accounts by U.S. depository institutions, with some exceptions.[4]  (Compl. ¶ 1348.)  Plaintiffs

---

[4]    For instance, until November 2008, banks were permitted under the "U-Turn exemption" to process Iranian U.S. dollar transactions that "began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank."  (Compl. ¶¶ 1349-1351, 1427); see also 31 C.F.R. § 560.516 (1995), amended 73 Fed. Reg. 66,541 (Nov. 10, 2008).  Because the oil market is operated in U.S. dollars and Iran's economy is dependent on oil revenues, the U-Turn exemption was necessary to ensure that Iran could still access oil revenues for "legitimate, non-terroristic purposes."  See Kemper v. Deutsche Bank AG, 911 F.3d 383, 387 (7th Cir. 2018) (discussing U-Turn exemption).

allege that Defendants provided U.S. dollar-denominated banking services to Iran and its Agents

and Proxies in violation of U.S. sanctions by altering, falsifying, or omitting wire transfer

information (id. ¶¶ 1418-1422), utilizing non-transparent cover payment messages[5] (id. ¶¶ 1423-

25), and improperly employing U-Turn exemptions (id. ¶¶ 1426-1429) for transactions involving

sanctioned Iranian entities.  For example, Plaintiffs allege that Defendant Deutsche Bank

conducted U.S. dollar-clearing transactions for Iranian banks such as Bank Saderat and Bank

Melli in violation of U.S. sanctions.  (Id. ¶¶ 1487-1524.)  Bank Saderat is an SDGT that is

owned, in part, by the Iranian government and has allegedly facilitated the transfer of hundreds

of millions of dollars to Hezbollah and other terrorist organizations.  (Id. ¶¶ 821, 823, 828, 2314-

2338.)  Bank Melli is an SDN that has, among other things, provided banking services to the

IRGC-QF.  (Id. ¶¶ 1161-1183.)  Plaintiffs allege that Deutsche Bank instructed its Iranian bank

clients to include notes or codes in their payment messages to trigger special handling by

Deutsche Bank, and that Deutsche Bank directed staff in overseas offices to remove information

indicating a connection to a sanctioned entity before sending the payment to be processed by a

correspondent bank in the United States.  (See, e.g., id. ¶¶ 1493-1506.)  Plaintiffs allege that

BNPP provided similar services to al Shamal Islamic Bank, a Sudanese bank owned in part by

Osama bin Laden that has provided funding for al Qaeda operations.  (Id. ¶¶ 1795-1805, 1821-

1833.)

Plaintiffs also allege that, between September 10, 2008, and December 31, 2008,

Commerzbank maintained an account for Orphans Project Lebanon e.V. (the "Orphans Project")

---

[5]      Plaintiffs use the term "non-transparent cover payment messages" to refer to the practice
of using MT202 wire transfer messages, which are typically used for bank-to-bank
transfers and do not require banks to identify the originating party to the transaction, for
transactions involving sanctioned entities, rather than the detailed MT103 messages
ordinarily employed to execute international wire payments.  (Compl. ¶¶ 1423-1425.)

(id. ¶ 1691), and that the funds in that account primarily went to the Hezbollah Martyrs Foundation ("Martyrs Foundation"), a "designated" organization (id. ¶ 1692).  The Complaint also alleges that Commerzbank "worked directly with IRISL to facilitate illicit payments" by allowing IRISL to use the accounts of its subsidiaries to initiate U.S. dollar transfers, and then zeroing out those accounts daily to allow IRISL to keep track of the funds that belonged to it, as opposed to its subsidiaries.  (Id. ¶¶ 1671-1672.)  IRISL is a "global operator of merchant vessels with a worldwide network of subsidiaries" that "provides a variety of maritime transport services."  (Id. ¶ 1212 n.135.)  IRISL has allegedly facilitated arms shipments for the IRGC and Hezbollah, including copper discs used to make explosively formed penetrator ("EFP") devices, and was listed as an SDN in September 2008.  (Id. ¶¶ 1213-1219, 1240-1241.)

In addition to engaging in improper U.S. dollar-denominated banking services, Plaintiffs allege that Defendants violated U.S. sanctions by providing trade finance services (id. ¶¶ 1430-1443) and expert advice to Iran and its Agents and Proxies on how to evade economic sanctions (id. ¶¶ 49, 1371, 1385, 1396, 1444, 2412, 2435, 2500).  For example, Plaintiffs allege that SCB facilitated letter of credit transactions to finance the purchase of aircraft, aircraft parts, and electromotors for hydraulic presses by, among others, Mahan Air.[6]  (Id. ¶¶ 1905-2063.) Mahan Air was listed as a SDGT in October 2011, and has allegedly transported weapons,

---

[6]    In a letter of credit transaction, an "issuing bank" sends a letter of credit on behalf of the purchaser to an "advising bank" that notifies the seller that an authentic letter has been issued.  The seller then ships the goods to the purchaser and presents shipping documents to a "negotiating bank," which forwards the shipping documents on to the issuing bank, which in turn authorizes the negotiating bank to pay the seller.  The negotiating bank is then reimbursed by a "reimbursing bank," oftentimes through a correspondent bank that facilitates U.S. dollar-denominated payments.  (See docket entry no. 104 at 1-2.) Plaintiffs allege that SCB served as the negotiating bank, advising bank, or reimbursing bank for many of these transactions, and that various Iranian banks acted as the issuing bank.  (See Compl. ¶¶ 1948, 1969, 2024, 2031, 2381-85.)

personnel, and goods on behalf of Hezbollah and the IRGC-QF, including radio frequency modules used in explosive devices recovered by U.S. forces in Iraq.  (Id. ¶¶ 1906, 1916-1919.) Similarly, the Complaint alleges that SCB served as a clearing bank for four transactions involving "U.S. origin goods" purchased by Kala Naft, a NIOC subsidiary.  (Id. ¶¶ 2042-2045.) NIOC is "owned and overseen by the Government of Iran through its Ministry of Petroleum" and is "responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."  (Id. ¶ 1243.)  NIOC appears on the SDN List and is allegedly "controlled by Iran through the IRGC."  (Id. ¶¶ 1247, 1252.)  SCB is also alleged to have facilitated letter of credit transactions for Mac Aviation, an Irish trading company that, on one occasion, directed the shipment of aircraft parts from a Malaysian company to Sasadja Moavanate Bazargani, an alleged "alter ego" of the Defense Industries Organization ("DIO").  (Compl. ¶¶ 1954, 1956, 1960, 1963, 1967.)  DIO is an Iranian entity operated by MODAFL, and MODAFL procures and develops weapons for the IRGC-QF.  (Id. ¶¶ 931, 940.)  Both DIO and MODAFL have been designated as SDNs.  (Id. ¶¶ 931, 1216 n.136.)

The Complaint details numerous additional examples of financial services allegedly provided by Defendants to various Iranian entities, including banks, airlines, shipping and oil companies, in violation of U.S. sanctions.  (See id. ¶¶ 1487-1524 (Deutsche Bank), 1525-1636 (the HSBC Defendants), 1637-1719 (Commerzbank), 1720-1786 (Barclays), 1787-1847 (BNPP), 1848-2110 (SCB), 2111-2180 (the RBS Defendants), 2181-2238 (CASA and CACIB), 2239-2313 (Credit Suisse).)  Plaintiffs allege that, by providing these services to sanctioned Iranian entities, Defendants gave Iran access to hundreds of billions of U.S. dollars that it would not have otherwise received.  (Id. ¶¶ 59, 1376).  Plaintiffs aver that Defendants' efforts prevented law enforcement agencies from intercepting these payments (id. ¶ 1385), and that Iran and its

Agents and Proxies "could not have conducted their terror campaign to the same extent and magnitude" without Defendants' financial services (id. ¶ 1333).

The Complaint alleges that Defendants either knew or were deliberately indifferent to the facts that the Iranian entities with which they transacted business engaged in terrorist activities (id. ¶ 2397), and the funds Defendants helped transfer on behalf of Iran and its Agents and Proxies "were being used to perpetrate acts of international terrorism," including the attacks that killed or injured Plaintiffs (id. ¶ 2396). Plaintiffs also allege that Defendants knew that Iran was a state sponsor of terrorism (id. ¶ 1400), that the purpose of U.S. sanctions was to prevent Iran's sponsorship of terrorism (id. ¶¶ 863-864, 1444), and that it was foreseeable that the funds transferred to Iran and its Agents and Proxies would be used to carry out acts of international terrorism against U.S. nationals, including Plaintiffs (id. ¶¶ 1388, 1396, 1399).

The Complaint asserts ten claims for relief. Plaintiffs' First, Second, and Third Claims for Relief allege that Defendants are liable under the ATA's primary liability provision, 18 U.S.C. § 2333(a), for providing material support to Iran and its Agents and Proxies in violation of 18 U.S.C. § 2339A. (Id. ¶¶ 2408-2460.) Plaintiffs' Fourth Claim for Relief alleges that Defendant Commerzbank is liable under 18 U.S.C. § 2333(a) because it maintained an account for Orphans Project Lebanon e.V. and thus provided material support to Hezbollah in violation of 18 U.S.C. § 2339B. (Id. ¶¶ 2461-2465.) Plaintiffs' Fifth and Seventh Claims for Relief allege that Defendants are liable under JASTA's secondary liability provision, 18 U.S.C. § 2333(d)(2), for conspiring to commit, and aiding and abetting, an act of international terrorism. (Id. ¶¶ 2466-2482, 2495-2512.) The object of the conspiracy, Plaintiffs allege, was to "defeat the economic sanctions imposed by the U.S. government" (id. ¶ 60), and to provide material support to Iran and its Agents and Proxies in violation of U.S. sanctions (id. ¶ 2474). As participants in

the conspiracy, Defendants' own aims and objectives were allegedly to "profit by keeping U.S. depository institutions, law enforcement, and counter-terrorism agencies blind to Iran's and/or its Agents' and Proxies' movement of USD through the U.S. and international financial systems." (Id. ¶ 1414.)  Plaintiffs' Sixth Claim for Relief alleges that Defendant Commerzbank AG is liable under 18 U.S.C. § 2333(d)(2) for aiding and abetting Hezbollah.  (Id. ¶¶ 2483-2494.) Plaintiffs' Eighth, Ninth, and Tenth Claims for Relief allege that various Defendants are liable under 18 U.S.C. § 2333(a) for engaging in financial transactions with Iran and its Agents and Proxies in violation of 18 U.S.C. § 2332d.[7]  (Id. ¶¶ 2513-2569.)

DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content plead that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Under the Rule 12(b)(6) standard, the court accepts as true the nonconclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Primary Liability Claims Under 18 U.S.C. § 2333(a)

Under the primary civil liability provision of the ATA, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of

---

[7]     Plaintiffs' Tenth Claim for Relief, which is asserted solely against BNPP, also alleges that BNPP is liable for engaging in financial transactions with the government of Sudan in violation of 18 U.S.C. § 2332d.

international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C.S. § 2333(a) (LexisNexis 2008).  To prevail on a claim for primary civil liability under the ATA, a plaintiff must show: "(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation."  Shaffer v. Deutsche Bank AG, 2017 WL 8786497, at *3 (S.D. Ill. Dec. 7, 2017), aff'd sub nom. Kemper v. Deutsche Bank AG, 911 F.3d 383, 387 (7th Cir. 2018).  Defendants argue principally that Plaintiffs' primary liability claims must be dismissed because Plaintiffs have failed to allege plausibly that (1) their injuries were proximately caused by Defendants' actions, and (2) that Defendants' conduct constituted an "act of international terrorism," as that term is defined in the ATA.  The Court agrees, and addresses each argument below.

A.  Proximate Cause

Defendants argue that Plaintiffs' primary liability claims must be dismissed because Plaintiffs have failed to allege facts from which the Court can infer that Defendants' conduct proximately caused Plaintiffs' injuries.  In Rothstein v. UBS AG, the Second Circuit held that the "by reason of" language employed by Congress in creating a civil right of action under § 2333(a) required a showing of proximate cause "as the term is ordinarily used" establish liability.  708 F.3d 82, 95 (2d Cir. 2013).  The Rothstein court observed that "[c]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence."  Id. at 91 (quoting Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003)).  Accordingly, Plaintiffs must allege plausibly that Defendants' provision of financial services was a "substantial factor in the sequence of responsible

causation," and that Plaintiffs' injuries were "reasonably foreseeable" or "anticipated as a natural consequence."[8]  Id.

Defendants argue that the Complaint here, like the complaint in Rothstein, relies solely on indirect allegations of causation and should therefore be dismissed.  In Rothstein, plaintiffs alleged that defendant UBS engaged in unlawful U.S. currency transactions with Iran, which in turn provided support to Hamas and Hezbollah, directly and indirectly, through "Iranian Government Organs," including several Iranian banks.  708 F.3d at 85-87.  The Rothstein plaintiffs alleged that the money received by Hamas and Hezbollah from Iran substantially increased those entities' ability to carry out terrorist attacks, including the attacks that killed or injured the plaintiffs.  Id. at 87.  In affirming the dismissal of plaintiffs' claims as insufficient to frame plausibly the requisite allegation of proximate cause, the Rothstein court noted that "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism.  But the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund."  Id. at 97.

---

[8]      Although the parties agree that the ATA contains a proximate cause requirement, they dispute how that that requirement is defined.  Quoting Rothstein, Plaintiffs argue that proximate cause requires them to allege that Defendants' conduct was a "substantial factor" in the sequence of events that caused Plaintiffs' injuries, and that Plaintiffs' injuries were a "foreseeable" consequence of Defendants' actions.  In response, Defendants argue that proximate cause requires a "direct relationship" between Defendants' conduct and Plaintiffs' injuries.  As the Seventh Circuit has noted, this debate is, to some extent, beside the point because "directness and foreseeability are logically linked."  Kemper, 911 F.3d at 392.  While courts may formulate the inquiry differently, "[i]t is enough to note that all of the factors identified by the parties and [the circuit courts]—foreseeability, directness, and the substantiality of the defendant's conduct—are relevant to the inquiry."  Id.

Here, as in <u>Rothstein</u>, the Complaint alleges that Defendants provided financial services to Iran and various Iranian banks, airlines, shipping and oil companies that had connections to terrorist organizations such as the IRGC-QF, Hezbollah, and Al-Qaeda.  (<u>See, e.g.</u>, Compl. ¶¶ 1504 (describing Deutsche Bank's provision of services to Bank Melli), 1161-1183 (describing Bank Melli's relationship with the IRGC-QF).)  However, the Complaint does not even allege that the IRGC-QF, Hezbollah, and Al-Qaeda carried out the attacks that killed or injured Plaintiffs.  Instead, Plaintiffs add still another link to the causal chain, alleging that the IRGC-QF, Hezbollah, and Al-Qaeda funded and supported AAI, AAH, JAM, KH, and other unidentified "Terrorist Groups" and "Special Groups" that actually perpetrated the attacks against Plaintiffs.[9]  (<u>See id.</u> ¶¶ 101-597.)  As in <u>Rothstein</u>, the Complaint does not allege that Defendants participated in the attacks or provided money or goods directly to AAI, AAH, JAM, KH, or any other direct perpetrator of a relevant attack.  Indeed, the Complaint does not even allege that Defendants provided money directly to the IRGC-QF, Hezbollah, or Al-Qaeda, but rather alleges that Defendants indirectly supported those organizations by providing financial services to Iranian banks, airlines, shipping and oil companies with relationships to those organizations.  The Complaint proffers no nonconclusory allegation that the funds processed by Defendants for various Iranian entities were in fact transferred to AAI, AAH, JAM, or KH, nor does it allege facts sufficient to support plausibly the inference that Iran and its Agents and

---

[9]    In some instances, the causal chain is even more elongated.  For example, Plaintiffs allege that Defendant SCB facilitated letter of credit transactions for Mac Aviation, an Irish trading company that, on one occasion, directed the shipment of aircraft parts from a Malaysian company to Sasadja Moavanate Bazargani, an alleged "alter ego" of the Defense Industries Organization ("DIO").  (Compl. ¶¶ 1954, 1956, 1960, 1963, 1967.)  Plaintiffs allege that DIO is an Iranian entity operated by MODAFL, that MODAFL procures and develops weapons for the IRGC-QF, and that the IRGC-QF, in turn, supports AAI, AAH, and KH, which allegedly perpetrated some of the attacks that injured Plaintiffs.  (Id. ¶¶ 931, 940, 972, 1024, 1048.)

Proxies would have been unable to assist AAI, AAH, JAM and KH in carrying out the attacks without Defendants' assistance.

Plaintiffs attempt to distinguish <u>Rothstein</u> in several ways. First, they argue that the instant case involves the provision of expert advice and trade financing, forms of support that were not at issue in <u>Rothstein</u>. While this may be true, Plaintiffs' argument has no bearing upon the deficiencies of the causation allegations of their Complaint. Although the nature of the assistance allegedly provided to Iran and its Agents and Proxies differs from that alleged in <u>Rothstein</u>, it does not shorten the attenuated causal chain that links Defendants' conduct to Plaintiffs' injuries.

Next, Plaintiffs argue that, unlike the unspecified "Iranian Government Organizations" identified in <u>Rothstein,</u> the Defendants here "dealt directly" with "specific entities within the Iranian terrorist apparatus." (Docket entry no. 119 (the "Opp'n") at 37-38.) Plaintiffs' argument finds no support in the Complaint, which only alleges direct connections between Defendants and various Iranian banks, airlines, shipping and oil companies that Plaintiffs characterize broadly as part of the "Iranian terrorist apparatus" despite the fact that they also provide a variety of legitimate services.[10] (<u>See, e.g.</u>, Compl. ¶ 1212 n.135 (noting that

---

[10]     Even where Plaintiffs allege that Defendants provided services to an alleged terrorist fundraising organization, they plead no facts from which the Court can infer that Defendants knew of the organization's connection to terrorism, or that the funds were subsequently transferred to one of the entities that committed the attacks. For example, Plaintiffs allege that Commerzbank maintained an account for Orphans Project Lebanon e.V., and that the funds in this account were transferred primarily to the Hezbollah Martyrs Foundation, a "designated" organization. (Compl. ¶¶ 1691-1692.) However, the Complaint does not allege facts from which the Court can infer that Commerzbank knew about the Orphans Project's transfers to the Martyrs Foundation, or that the funds transferred to the Martyrs Foundation account were then used to support AAH, JAM, KH or any of the other "Terrorist Groups" or "Special Groups" that allegedly committed the attacks that injured Plaintiffs.

IRISL is a "global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships," that "provides a variety of maritime transport services.")).  The Complaint does not allege facts demonstrating that these entities exist solely to further terror.  Cf. Kemper, 911 F.3d at 393 ("Even if Hamas's non-terroristic endeavors were closely tied to its terroristic mission, it strains credulity to suggest that a worldwide network of banks or shipping lines is similarly dedicated to terrorism.").

Finally, Plaintiffs argue that Rothstein involved the transfer of hundreds of millions of dollars to Iran, whereas the instant Complaint alleges that Defendants transferred hundreds of billions of dollars to Iran.  Plaintiffs reason that the magnitude of the transfers, combined with Iran's status as a state sponsor of terror, render it implausible that none of the funds were used to support AAI, AAH, JAM, KH, and unidentified "Terrorist Groups" and "Special Groups" that carried out the attacks.  Plaintiffs' argument is unpersuasive because it ignores the fact that Iran "is a sovereign state with 'many legitimate agencies, operations, and programs to fund.'"  Owens v. BNP Paribas, 897 F.3d 266, 276 (D.C. Cir. 2018) (quoting Rothstein, 708 F.3d at 97).  As the Owens court recognized, Congress found, in enacting other provisions of the ATA, that a total prohibition on financial support to terrorist organizations was justified because "money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends."  Id.  Congress, however, made no similar findings with respect to state sponsors of terrorism, even permitting certain financial transactions with the appropriate licenses.  Id.  This is not to say, as Plaintiffs suggest, that Iran "serves as a proximate-cause black hole."  Instead, as other courts have observed, Iran's role as both an intermediary and a state sponsor of terrorism simply "does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or

organization." Id.; see also Kemper, 911 F.3d at 393. Absent further factual allegations connecting Defendants' conduct to the terrorist organizations and attacks that injured Plaintiffs, the provision of financial services to Iran or various Iranian entities is insufficient on its own to support a plausible inference that the transferred funds were subsequently used to finance terrorism.[11]

Because the Complaint does not allege plausibly that Defendants' conduct proximately caused Plaintiffs' injuries, Plaintiffs' primary liability claims must be dismissed.

B. An Act of "International Terrorism"

Even if the allegations in the Complaint were sufficient to plead proximate cause, Plaintiffs' primary liability claims would still fail because Plaintiffs have not alleged plausibly that Defendants' conduct constituted acts of international terrorism under the ATA. The ATA defines "international terrorism" as activities that: "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States . . . . (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial

---

[11]    For substantially similar reasons, the Court cannot properly infer a causal connection between Defendants' conduct and Plaintiffs' injuries simply because one of the primary purposes of U.S. sanctions is to prevent terror financing, or because Defendants opted to use non-transparent methods, rather than the U-Turn exemption, to facilitate transfers. While wrongful, Defendants' alleged evasion of U.S. sanctions and provision of financial services to sanctioned Iranian entities does not support a plausible inference that those services played a substantial role in bringing about the attacks that injured Plaintiffs. See Kemper, 911 F.3d at 394 ("Without some other fact suggesting either an intent to support terrorism or a direct provision of services to terrorists, the violation of such a broad prohibition does not create a sufficient link to establish liability for terrorism-related torts under any traditional notion of proximate cause.")

jurisdiction of the United States . . . ."  18 U.S.C.S. § 2331(1) (LexisNexis 2008).  Although a

violation of 18 U.S.C. § 2332d, 18 U.S.C. § 2339A, or 18 U.S.C. § 2339B is a "violation of the

criminal laws of the United States," it is not necessarily sufficient in and of itself to constitute an

act of international terrorism under the ATA.  Linde v. Arab Bank, PLC, 882 F.3d 314, 326 (2d

Cir. 2018) ("The provision of material support to a designated terrorist organization in violation

of § 2339B can certainly satisfy [] part of the statutory definition.  But, to qualify as international

terrorism, a defendant's act must also involve violence or endanger human life.") (emphasis in

original).[12]

        Plaintiffs allege that Defendants' provision of financial services to various Iranian

entities was an act of international terrorism insofar as those services constituted the provision of

material support to a terrorist organization in violation of 18 U.S.C. § 2339A and 18 U.S.C. §

2339B, and/or the engagement in a financial transaction with the government of a country

supporting international terrorism in violation of 18 U.S.C. § 2332d.  (Compl. ¶¶ 2410, 2446,

2460, 2465, 2532, 2548, 2569.)  Relying primarily on Boim v. Holy Land Foundation for Relief

and Development, 549 F.3d 685 (7th Cir. 2008), Plaintiffs argue that facilitating the transfer of

---

[12]    Section 2332d provides that any "United States person, knowing or having reasonable
cause to know that a country is designated . . . as a country supporting international
terrorism, [that] engages in a financial transaction with the government of that country,
shall be fined under this title, imprisoned for not more than 10 years, or both."  18
U.S.C.S. § 2332d (LexisNexis 2008).  Section 2339A criminalizes the provision of
material support or resources "knowing or intending that they are to be used in
preparation for, or in carrying out, a violation of [certain specified statutory provisions,
including 18 U.S.C. § 2332, which criminalizes killing or inflicting bodily injury on U.S.
nationals abroad]."  18 U.S.C.S. § 2339A (LexisNexis 2008).  Section 2339B
criminalizes the provision of material support or resources to a foreign terrorist
organization with the knowledge that "the organization is a designated terrorist
organization," that "the organization has engaged or engages in terrorist activity," or "that
the organization has engaged or engages in terrorism."  18 U.S.C.S. § 2339B (LexisNexis
2008).

hundreds of billions of dollars to Iran's "terrorist apparatus" and "educating Iran on how to covertly access the U.S. financial system" was dangerous to human life and arguably appeared to be intended to intimidate or coerce civilians or influence or affect the conduct of a government. In Boim, the Seventh Circuit reasoned that a foundation's direct donations to Hamas were dangerous to human life because the donations were akin to "giving a loaded gun to a child." Id. at 690.  The Boim court observed that those same donations could appear to be intended to intimidate or coerce a civilian population because a donor who "knew the aims and activities" of Hamas would know that "donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel." Id. at 693-94. The court noted, however, that "as the temporal chain lengthens, the likelihood that a donor has or should know of the donee's connection to terrorism shrinks." Id. at 702.

Unlike the defendants in Boim, Defendants here did not make direct donations to AAI, AAH, JAM or KH.  Instead, Plaintiffs posit that Defendants provided financial services to various Iranian banks, airlines, shipping and oil companies with connections to terrorist organizations such as the IRGC-QF, Hezbollah, and Al-Qaeda, and those terrorist organizations, in turn, provided funding and other assistance to AAI, AAH, JAM and KH.  (See, e.g., Compl. ¶¶ 2042-2045 (describing SCB's provision of bank clearing services to Kala Naft, a NIOC subsidiary), 1243, 1247 (describing NIOC's connection to Iran and the IRGC), 901, 972, 1024, 1045, 1054 (alleging that the IRGC's special operations branch, the IRGC-QF, provided assistance to AAI, AAH, JAM, and KH).)  These allegations provide no proper factual basis for an inference that Defendants' provision of financial services to various Iranian entities augmented the resources of the terrorist organizations that ultimately injured Plaintiffs.  The Complaint does not allege plausibly that the provision of banking services, which are not

inherently violent or dangerous, can be considered as acts dangerous to human life, particularly because the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated.

In light of the Court's determination that the Complaint fails to allege plausibly that Defendants proximately caused Plaintiffs' injuries or engaged in an act of international terrorism, Plaintiffs' First, Second, Third, Fourth, Eighth, Ninth and Tenth Claims for Relief are dismissed as against the moving Defendants.

Secondary Liability Claims Under 18 U.S.C. § 2333(d)(2)

Plaintiffs argue that, even if their primary liability claims must be dismissed, they have alleged facts sufficient to state a claim for secondary liability under JASTA.  JASTA provides that, "[i]n an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U.S.C. § 1189] as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  18 U.S.C.S. § 2333(d)(2) (LexisNexis 2018).  In enacting JASTA, Congress noted that the decision in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework for how [civil aiding and abetting and conspiracy] liability should function."  18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5).  Plaintiffs assert secondary liability claims

based upon both aiding and abetting and conspiracy liability theories.  The Court discusses each

theory below.[13]

A.  Conspiracy Liability

To state a claim for civil conspiracy under the Halberstam analytical structure, a

plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an

unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act

performed by one of the parties to the agreement; (4) which overt act was done pursuant to and

in furtherance of the common scheme."  705 F.2d at 477.  The plain language of JASTA, which

creates liability "in any action . . . arising from an act of international terrorism," with respect to

"any person . . . who conspires with the person who committed such an act," suggests that

JASTA liability lies where "the secondary tortfeasor [conspired with] the principal tortfeasor in

committing 'such an act of international terrorism.'"  Taamneh v. Twitter, Inc., 343 F. Supp. 3d

904, 916 (N.D. Cal. 2018) (emphasis in original).  In other words, to be subject to secondary

---

13      As an initial matter, Defendants urge the Court to dismiss Plaintiffs' secondary liability
        claims because the Complaint does not identify the organizations that perpetrated most of
        the 55 attacks that killed or injured Plaintiffs, and thus does not allege that even a
        substantial number of Plaintiffs were injured in attacks "committed, planned, or
        authorized by" a designated FTO.  Although the Complaint only alleges in general terms
        that the attacks were "committed, planned, and/or authori[z]ed by FTOs" (Compl. ¶
        2468), the Court construes the Complaint in the light most favorable to Plaintiffs and
        infers for purposes of this motion practice that designated FTOs "committed, planned, or
        authorized" the attacks based upon Plaintiffs' allegations that the attacks were committed
        using Iranian-manufactured weapons (see, e.g., id. ¶ 115), that Iran has provided funding
        and weapons to Hezbollah, a designated FTO (id. ¶¶ 841, 872, 876), and that Hezbollah
        trains and supports Iraqi terrorist groups, including the unnamed "Special Groups" that
        perpetrated the attacks that injured Plaintiffs (id. ¶¶ 926-927, 988-1008).  The Court
        notes, however, that to the extent that Plaintiffs' JASTA claims are premised upon
        attacks committed by JAM and AAH, the claims must be dismissed because neither
        group is alleged to be a designated FTO pursuant to 8 U.S.C. § 1189, and the Complaint
        alleges no facts from which the Court can infer that an FTO like Hezbollah otherwise
        planned or authorized those attacks.

liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international terrorism.  See id. at 915 ("If Congress had [intended for anybody who helps a terrorist organization to be held accountable], it could easily have used language similar to that in the ATA, § 2339B, but it did not do so."); see also Linde, 882 F.3d at 329 ("[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization.")(emphasis in original).

Plaintiffs allege that Defendants conspired with various Iranian banks, airlines, shipping and oil companies, as well as the IRGC-QF, Hezbollah, al Qaeda, AAI, AAH, JAM, KH and "other front companies, alter egos, and entities owned, controlled by or affiliated with" those entities to "defeat the economic sanctions imposed by the U.S. government."  (Compl. ¶¶ 60, 1371.)  Plaintiffs argue that, because Defendants knew that the purpose of U.S. economic sanctions was to counter Iran's support for terrorism (id. ¶¶ 863-864, 1444), "terrorism was a foreseeable consequence of Defendants' deliberate evasion of sanctions designed to stop terrorism."  (Opp'n at 64.)  Plaintiffs also argue that, because Defendants knew about the relationship between various Iranian entities and certain FTOs, the conspiracy was, in effect, also a conspiracy to provide material support to terrorists and terrorist organizations.

Plaintiffs' allegations are insufficient to state a claim for JASTA conspiracy liability because Defendants' alleged provision of material support to Iranian entities is so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism.[14]

---

[14]     The Court respectfully disagrees with Freeman v. HSBC Holdings PLC, 2018 WL 3616845 (E.D.N.Y. July 27, 2018), which appears to assume that a conspiracy to provide material support for terrorism is equivalent to a conspiracy whose object is to commit an act of international terrorism, despite the fact that not all conduct that violates a material

Moreover, even accepting that Defendants knew generally about the purpose of U.S. sanctions, Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue.  Plaintiffs do not allege any facts from which the Court can infer that the connection between Defendants' activities and those of various Iranian entities and FTOs was so coordinated or monolithic that Defendants shared a common purpose or plan with FTOs like Hezbollah, AAI or KH.  Nor does Defendants' knowledge of the animating purpose behind U.S. sanctions support Plaintiffs' assertion that the attacks were a foreseeable consequence of any alleged agreement to evade U.S. sanctions.  The Complaint pleads no facts from which the Court can infer that Defendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah, AAI and KH for the purpose of committing violent or life-endangering acts.  Indeed, in some instances, the Complaint alleges that certain Iranian entities were only designated as SDGTs years after Defendants transacted business with them, further undermining any inference that Defendants had reason to knew about these entities' connections with FTOs.  (See, e.g., Compl. ¶¶ 1261 (Air Mahan designated as SDGT in October 2011) and 1914 (alleging that SCB facilitated letter of credit transactions for Air Mahan between 2000 and 2006).)  Because the Complaint fails to allege plausibly the existence of an unlawful agreement to commit an act of international terrorism, Plaintiffs' conspiracy liability claims must be dismissed.

## B.  Aiding and Abetting Liability

Aiding and abetting liability under the Halberstam construct requires proof of three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes

---

support statute also satisfies § 2331(1)'s definition of an act of international terrorism. See Linde, 882 F.3d at 326.

an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."  705 F.2d at 477.  In the ATA context, aiding and abetting liability "requires the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activities."  Linde, 882 F.3d at 329 (internal quotations omitted).  Thus, although a defendant need not know of or intend to bring about the specific attacks at issue, the Complaint must allege plausibly that, in providing financial services, Defendants were "generally aware" that they were thereby playing a "role" in an FTO's violent or life-endangering activities.  Id.

Here, as explained above, the Complaint is devoid of any factual allegations from which the Court can properly infer that Defendants knew that the financial services they provided to the various Iranian entities were destined to aid the FTOs responsible for the attacks that injured Plaintiffs.  Allegations regarding Iran's status as a state sponsor of terrorism, as well as allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that Defendants were "generally aware" that they had taken a "role" in the attacks that killed or injured Plaintiffs.  See Siegel v. HSBC Bank USA, N.A., 2018 WL 3611967, at *4-5 (S.D.N.Y. July 27, 2018) (dismissing similar aiding and abetting liability claims under JASTA); cf. Twombly, 550 U.S. at 570 (a plaintiff must "nudge" his claims "across the line from conceivable to plausible").  Accordingly, Plaintiffs' aiding and abetting liability claims must be dismissed.

Because Plaintiffs have failed to allege plausible factual bases for conspiracy and aiding and abetting liability under JASTA, Plaintiffs' Fifth, Sixth, and Seventh Claims for Relief are also dismissed as against the moving Defendants.[15]

CONCLUSION

For the foregoing reasons, Defendants' motion is granted and the Complaint is dismissed in its entirety as against Defendants Deutsche Bank AG, HSBC Bank USA, N.A., HSBC Holdings Plc, HSBC Bank Plc, HSBC Bank Middle East Limited, HSBC North America Holdings, Inc., Commerzbank AG, Commerzbank AG, New York Branch, Barclays Bank Plc, BNP Paribas S.A., Standard Chartered Bank, Royal Bank Of Scotland N.V., Royal Bank Of Scotland Plc, Crédit Agricole S.A., Crédit Agricole Corporate & Investment Bank, and Credit Suisse AG.

Plaintiffs, who requested an opportunity to amend their Complaint in the event Defendants' motion was granted, may move for leave to amend by **April 22, 2019**.  Any such motion must comply with the Federal Rules of Civil Procedure, the Local Rules of this Court, and the individual rules of practice of the undersigned, and must be accompanied by a proposed amended complaint, a blackline of that proposed complaint against the Complaint, and a memorandum of law.  If Plaintiffs do not file a timely motion for leave to amend, the dismissal of the Complaint against the moving Defendants will be with prejudice.

---

[15]    In light of the Court's dismissal of Plaintiffs' Complaint with respect to each of the moving Defendants, including Commerzbank, the Court declines to consider Commerzbank's additional arguments in favor of dismissal due to lack of personal jurisdiction.

This Memorandum Opinion and Order resolves docket entry no. 102.  This action remains referred to Magistrate Judge Gorenstein for general pre-trial management.


SO ORDERED.

Dated: New York, New York
       March 28, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge