# EXHIBIT A

| | |
|---|---|
| TIMOTHY O'SULLIVAN, DOMENICK J. ALAGNA, BRIAN CLARK ALLDRIDGE, JOANN ALLDRIDGE, ANDREW CHARLES MAJOR, ASHLEY MEIKEL MAJOR, A.M.M, a minor, RONALD ALLDRIDGE, DIANNA ALLDRIDGE, TODD ALLDRIDGE, CHRISTOPHER B. ANDERSON, TAHNEE ANDERSON, T.A.1, a minor, T.A.2, a minor, K.A., a minor, ERIC J. ATKINSON, TRAVIS R. BASS, HAROLD C. BASS, MARY L. MILTON,  HAROLD ALLEN MILTON, AARON BASS, ADAM C. BASS, LISA LAMBERT, MICHAEL J. BELL, MARK H. BEYERS, DENISE BEYERS,  WILLIAM R. BIGGS, DANIEL BIVENS, GRANT R. BLACKWELL, TERAY A. BUNDY, EVAN W. BYLER, GUILLERMO CASTILLO, WILLIAM M. CHINN, WALTER L. THOMAS, THOMAS M. COE II, HEATHER N. COE, V.T.C., a minor, QUENTIN D. COLLINS, MELIDA COLLINS, SIERA N. COLLINS, SHAWN COLLINS, MICHAEL A. COLLINS, I.C.C., a minor, JOSHUA J. COOLEY, CHRISTINE COOLEY, JAY M. FONDREN, ANNE H. FONDREN, M.J.F, a minor, ANTONIO M. FREDERICK, ERNESTO P. HERNANDEZ III, LAURA F. HERNANDEZ, ERNESTO HERNANDEZ IV, N.H., a minor, ERNESTO I HERNANDEZ II, KADE L. HINKHOUSE, JONATHAN B. HOGGE, JOSHUA L. HOLLADAY, SHIRLEY ATKINSON, CRYSTAL HASTINGS, TINA L. HOUCHINS INDIVIDUALLY, AND FOR THE ESTATE OF AARON D. GAUTIER, | **PLAINTIFFS' AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No. 1:17-cv-08709-LTS-GWG** |

(The § symbols appear in a column between the plaintiffs' names and the right-hand text throughout.)

DANIEL GAUTIER, PATRICIA A.                    §
GAUTIER, ALEXIS HOUCHINS,                       §
GREGORY E. HOGANCAMP, TARA                      §
K. HUTCHINSON, JERRALD J.                       §
JENSEN, WYMAN H. JONES,                          §
DOUGLAS H. KINARD JR.,                           §
RANDALL L. KLINGENSMITH,                         §
ANGELA KONEN, JONATHAN F.                        §
KUNIHOLM, MICHELE TERESE                         §
QUINN, S.K., a minor, BRUCE                      §
KUNIHOLM, ELIZABETH                              §
KUNIHOLM, ERIN KUNIHOLM,                         §
JOHN MAINE, HARDY P. MILLS IV,                   §
CATHY JEAN MILLS, JACOB MILLS,                   §
JOSHUA MILLS, JOSEPH C.                          §
MIXSON, VIRGINIA B. MIXSON,                      §
JOSEPH JOHNSON MIXSON, JR.,                      §
KARON MIXSON, ALICIA MIXSON,                     §
BALTAZAR MORIN JR., MIRANDA                      §
A. HARELSTON, JAMES R. NICHOLS                   §
III, QUEEN NICHOLS, JAMES                        §
NICHOLS JR., THOMAS NICHOLS,                     §
SHARON NICHOLS, SEAN M.                          §
NIQUETTE, LAUREN NIQUETTE,                       §
MELINA ROSE NOLTE                                §
INDIVIDUALLY, AND FOR THE                        §
ESTATE OF NICHOLAS S. NOLTE,                     §
A.N., a minor, ANITA NOLTE,                      §
JESSICA NOLTE, JAMES M. OHRT,                    §
MICHAEL L. OWEN, LAURIE                          §
MILLER, R.O., a minor, COLIN L.                  §
PEARCY, LAIRD PEARCY, ANNE                       §
PEARCY, JODY STRIKER, KARYN                      §
MCDONALD, ANDREW PEARCY,                         §
PATRICK PEARCY, ROBERT J.                        §
PEARSON, JAMES J. POOLE III,                     §
ALLISON P. ROOSIEN, MARK J.                      §
PRATT, SONJA RUHREN                              §
INDIVIDUALLY, AND FOR THE                        §
ESTATE OF DAVID ALAN RUHREN,                     §
BRIAN R. SCHAR, BRAD LEE                         §
SCHWARZ, DANIEL W. SEGERS,                       §
LARRY SEGERS, SHARON W.                          §
PARKER, DAVID L. SEGERS,                         §
MARTIN SICAIROS, DAVID A.                        §
SIMMONS II, KEVIN R. SMITH,                      §

JACKAY SMITH, DYLAN ELIJAH SMITH, L.D.R.S., a minor, KAYLA MICHELLE GULLEY, ARTHUR B. STOKENBURY, TRAVIS M. STRONG, TAYLER HESTON, ANTHONY J. DURKACS, KOMA K. TEXEIRA, BRIMA TURAY, RUTH TURAY, ALLEN R. VAUGHT, GRANT BLANEY VON LETKEMANN II, KELLY LYNN VON LETKEMANN, ANTONIO H. WARD, DENNIS WARD, DALIS WARD, GEORGE L. WILLIAMS, ELIZABETH G. WILLIAMS, KAYLEIGH A. WILLIAMS, NICKOLAS A. WILLIAMS, SEAN LEE WILLIAMS, SUE ANN WILLIAMS, JOSHUA B. WOLFE, JEFF M. WRIGHT, ROGER L. YOUNG,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Plaintiffs,

§
§
§

vs.

§
§

DEUTSCHE BANK AG; HSBC BANK USA, N.A.; HSBC HOLDINGS Plc; HSBC BANK Plc; HSBC BANK MIDDLE EAST LIMITED; HSBC NORTH AMERICA HOLDINGS, INC.; COMMERZBANK AG; COMMERZBANK AG, NEW YORK BRANCH; BARCLAYS BANK Plc; BNP PARIBAS S.A.; STANDARD CHARTERED BANK; ROYAL BANK OF SCOTLAND N.V.; ROYAL BANK OF SCOTLAND PLC; CRÉDIT AGRICOLE S.A.; CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK; CREDIT SUISSE AG; and BANK SADERAT Plc,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Defendants.

§

# TABLE OF CONTENTS

I.  NATURE OF ACTION ........................................................................................ 1

1.  IRAN'S INTERNATIONAL TERRORISM NETWORK ........................................... 4

2.  BANKS ARE THE FRONTLINE DEFENDERS AGAINST TERROR FINANCING - IRANIAN SANCTIONS AND BANKS' AFFIRMATIVE DUTIES TO PREVENT TERROR FINANCING ................................................................................ 11

3.  DEFENDANTS KNOWINGLY HELPED IRAN EVADE SANCTIONS .............. 27

4.  THE CONSPIRACY ................................................................................... 38

II.  JURISDICTION AND VENUE ........................................................................ 49

1.  THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES 49

A.  SUBJECT MATTER JURISDICTION ................................................. 49

B.  PERSONAL JURISDICTION .......................................................... 49

2.  VENUE IS PROPER IN THIS COURT ....................................................... 52

III.  THE DEFENDANTS ....................................................................................... 53

1.  THE HSBC DEFENDANTS ..................................................................... 53

2.  DEFENDANT BARCLAYS BANK PLC & ITS NEW YORK BRANCH ............. 57

3.  DEFENDANT STANDARD CHARTERED BANK & ITS NEW YORK BRANCH . ................................................................................................................ 58

4.  DEFENDANTS ROYAL BANK OF SCOTLAND N.V. AND ROYAL BANK OF SCOTLAND PLC (N/K/A NATWEST MARKETS PLC), & ITS NEW YORK BRANCH ................................................................................................. 59

5.  DEFENDANT CREDIT SUISSE AG & ITS NEW YORK BRANCH .................. 61

6.  DEFENDANT BNP PARIBAS S.A. & ITS NEW YORK BRANCH .................. 62

7.  DEFENDANT DEUTSCHE BANK A.G. & ITS NEW YORK BRANCH ............. 63

8.  DEFENDANTS CRÉDIT AGRICOLE S.A., & CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, & ITS NEW YORK BRANCH ...................................... 64

9.  DEFENDANTS COMMERZBANK AG & COMMERZBANK AG, NEW YORK BRANCH ................................................................................................. 65

10. DEFENDANT BANK SADERAT PLC ....................................................... 67

i

IV.  FACTUAL ALLEGATIONS ........................................................................... 68

1.  IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING
    INTERNATIONAL TERRORISM ......................................................... 68

2.  U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS ...................... 69

3.  IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION, AND UNITED
    NATIONS' SANCTIONS ........................................................................ 71

4.  THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND
    ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS .................................. 74

    A.  THE CONSPIRACY'S SHARED GOALS ........................................... 74

    B.  EURODOLLAR MARKET OPERATIONS ......................................... 75

5.  THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION ...................... 76

6.  LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING
    THE IRANIAN SANCTIONS PROGRAM ................................................... 82

    A.  THE BASICS OF TRADE FINANCE ............................................... 82

    B.  THE U.S. TRADE EMBARGO – UNITED STATES MUNITIONS LIST
        (USML) AND COMMERCE CONTROL LIST (CCL) ...................... 84

7.  IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH THE ISLAMIC REPUBLIC
    OF IRAN SHIPPING LINES ("IRISL") ................................................... 86

8.  IRAN'S USE OF NIOC AND STATE PETROLEUM REVENUES FOR ITS
    ILLEGITIMATE TERRORIST ACTS ........................................................ 90

9.  IRAN'S AGENTS, HEZBOLLAH, THE IRGC, AND MOIS FOMENT
    TERRORISM IN IRAQ ........................................................................ 92

10. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION
    AND DEPLOYMENT OF EXPLOSIVELY FORMED PENETRATORS ("EFPS")
    USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS ........... 99

11. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION
    AND DEPLOYMENT OF ROCKETS, MORTARS AND IRAMS USED TO KILL
    OR INJURE AMERICANS, INCLUDING PLAINTIFFS. .................................... 104

12. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION
    AND DEPLOYMENT OF OTHER LETHAL WEAPONS AND TACTICS USED
    TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS. ...................... 106

13. IRAN USED THE IRGC AND FTO HEZBOLLAH TO MATERIALLY SUPPORT THE SPECIAL GROUPS IN ORDER TO AUTHORIZE, PLAN, AND COMMIT TERRORIST ATTACKS IN IRAQ. ........................................................................ 111

    A. THE BADR CORPS / BADR ORGANIZATION ............................................. 111

    B. JAYSH AL MAHDI ("JAM" OR THE "MAHDI ARMY")............................... 114

    C. ASA'IB AHL AL-HAQ ("AAH" OR "THE LEAGUE OF THE RIGHTEOUS") . ............................................................................................................................ 117

    D. KATA'IB HEZBOLLAH ("KH") ........................................................................ 119

    E. FTO HEZBOLLAH AUTHORIZED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ......................... 124

    F. FTO HEZBOLLAH PLANNED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ................................................ 131

    G. IRAN, THROUGH FTO HEZBOLLAH, PROVIDED THE SHIA SPECIAL GROUPS WITH WEAPONS TO CARRY OUT TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ................................................................... 142

14. IRAN MATERIALLY SUPPORTED SUNNI FTOS AL QAEDA ("AQ") AND ANSAR AL ISLAM ("AAI") TO PLAN, COMMIT, AND AUTHORIZE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ .............................. 143

    A. IRAN'S HISTORY OF SUPPORTING SUNNI TERROR GROUPS ............. 146

    B. FTO AL QAEDA ("AQ").................................................................................... 147

    C. FTO AL QAEDA IN IRAQ ("AQI") ................................................................. 154

    D. FTO ANSAR AL ISLAM ("AAI") ..................................................................... 159

    E. IRAN'S SUNNI FTO NETWORK IN IRAQ PLANNED AUTHORIZED & COMMITTED ATTACKS AGAINST PLAINTIFFS ....................................... 166

15. THE CONSPIRACY INVOLVED MULTIPLE ACTS OF INTERNATIONAL TERRORISM LEADING UP TO & INCLUDING EACH OF THE TERRORIST ATTACKS AT ISSUE IN THIS COMPLAINT ....................................................... 169

V.    OVERVIEW OF THE CONSPIRACY ......................................................................... 174

    1. AGREEMENT AND KNOWLEDGE..................................................................... 174

    2. ACTS AND EFFECTS ............................................................................................. 178

3. DEFENDANT BANK SADERAT PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 181

4. THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 186

5. BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 190

6. BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 197

7. BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 198

8. THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 200

   A. HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL" ................................. 204

   B. DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332d ......................... 211

9. DEFENDANT BARCLAYS BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 220

10. DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................ 227

   A. STANDARD CHARTERED BANK CONSPIRED TO CONCEAL IRAN'S FINANCIAL ACTIVITIES AND TRANSACTIONS FROM DETECTION, SCRUTINY, AND MONITORING BY U.S. REGULATORS, LAW ENFORCEMENT, AND/OR DEPOSITORY INSTITUTIONS. ..................... 227

   B. SCB FACILITATED TRANSACTIONS ON BEHALF OF MODAFL, MAHAN AIR AND OTHER INSTRUMENTALITIES OF IRANIAN STATE-SPONSORED TERROR (INCLUDING A HEZBOLLAH AFFILIATED ENTITY) IN FURTHERANCE OF NUMEROUS VIOLATIONS OF THE U.S. TRADE EMBARGO, THEREBY SUBSTANTIALLY CONTRIBUTING TO THE PLAINTIFFS' INJURIES. ......................................................... 236

   C. STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MAHAN AIR. ....................................................... 238

   D. STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MODAFL COMPANIES: AIO, IACI, IHRSC AND HESA.243

E.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL'S [IRAN] AVIATION INDUSTRIES ORGANIZATION (IAIO) ........................................................................................... 244

F.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY DOWNTOWN TRADING LTD. ... ................................................................................................................ 244

G.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MAC AVIATION ..................... 246

H.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MONARCH AVIATION (SINGAPORE) ................................................................................................ 250

I.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY JETPOWER INDUSTRIAL LTD (HONG KONG) .............................................................................................. 254

J.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRAN POWER DEVELOPMENT COMPANY ("IPDC"), MAPNA AND ZENER ELECTRONICS SERVICES (AN AGENT OF HEZBOLLAH) ......... 257

K.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH NATIONAL IRANIAN OIL COMPANY (NIOC) SUBSIDIARIES .... 259

L.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRANIAN FRONT COMPANY KHORAM SANAT PRODUCING CO.-IRAN ................................................................................................................ 261

M.  REGULATORY ACTIONS AND CRIMINAL INVESTIGATIONS AGAINST STANDARD CHARTERED BANK FROM 2012 – PRESENT ....................... 263

11. DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AND ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................. 271

12. DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .............................................................................. 282

13. DEFENDANT BNP PARIBAS S.A.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .............................................................................. 293

14. DEFENDANT DEUTSCHE BANK AG'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .............................................................. 310

15. DEFENDANT CREDIT AGRICOLE S.A. & CREDIT AGRICOLE CORPORATE & INVESTMENT BANK'S, AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ................................................................................. 323

16. DEFENDANT COMMERZBANK AG'S AND COMMERZBANK AG NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ................................................................................. 343

17. DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON E.V. .............. 352

VI. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM ................................................................................. 354

1. SECONDARY LIABILITY PURSUANT TO JASTA ............................................. 354

2. DEFENDANTS AIDED AND ABETTED IRANIAN BANKS AND THEIR CUSTOMERS IN PROVIDING MATERIAL SUPPORT DIRECTLY TO FTOS 356

3. DEFENDANTS WERE GENERALLY AWARE THAT BY ASSISTING THE IRANIAN BANKS AND THEIR CUSTOMERS COMMIT FRAUD THEY WERE ASSUMING A ROLE IN THE FINANCING OF TERRORISM .......................... 359

VII. THE PLAINTIFFS ................................................................................. 370

1. THE MARCH 2, 2008 ATTACK – SAFWAN, IRAQ ........................................... 372

   A. PLAINTIFF TIMOTHY JOSEPH O'SULLIVAN .............................................. 372

2. THE OCTOBER 12, 2011 ATTACK – COS GARRY OWEN .............................. 373

   A. PLAINTIFFS THE ALLDRIDGE FAMILY ..................................................... 373

3. THE JULY 10, 2011 ATTACK – COS GARRY OWEN ....................................... 375

   A. PLAINTIFFS THE NIQUETTE FAMILY ....................................................... 375

   B. PLAINTIFF WILLIAM M. CHINN ................................................................. 377

4. THE JUNE 6, 2011 ATTACK – JSS LOYALTY .................................................... 378

   A. PLAINTIFF WALTER LEMAN THOMAS ....................................................... 378

5. THE FEBRUARY 16, 2011 ATTACK—ROUTE TOMATOES, NISSAN ............ 379

   A. PLAINTIFF WALTER LEMAN THOMAS ....................................................... 379

6. THE NOVEMBER 20, 2009 ATTACK – MSR TAMPA NEAR FOB KALSU ..... 380

    A. PLAINTIFFS THE HOLLADAY FAMILY ...................................................... 380

7. THE AUGUST 21, 2009 ATTACK – ROUTE VERNON, BAGHDAD ............... 381

    A. PLAINTIFF RANDALL LAVIS KLINGENSMITH ....................................... 381

8. THE NOVEMBER 22, 2008 ATTACK –EN ROUTE TO FOB KALSU .............. 382

    A. PLAINTIFFS THE OWEN FAMILY ........................................................... 382

    B. PLAINTIFFS THE WILLIAMS FAMILY ....................................................... 384

9. THE OCTOBER 10, 2008 ATTACK – ROUTE JACKSON, BAGHDAD............. 385

    A. PLAINTIFFS THE MORIN/HARELSTON FAMILY .................................... 385

10. THE APRIL 28, 2008 ATTACK – FOB LOYALTY ............................................. 386

    A. PLAINTIFFS THE COE FAMILY .................................................................. 386

11. THE APRIL 13, 2008 ATTACK – SADR CITY ................................................... 387

    A. PLAINTIFF MICHAEL JAMES BELL............................................................ 387

12. THE APRIL 8, 2008 ATTACK – ASR MILTON, SOUTH-EAST OF BALAD .... 388

    A. PLAINTIFFS THE COLLINS FAMILY ......................................................... 388

13. THE APRIL 4, 2008 ATTACK – VICTORY BASE COMPLEX, BAGHDAD..... 390

    A. PLAINTIFFS THE VON LETKEMANN FAMILY......................................... 390

14. THE MARCH 26, 2008 ATTACK – FOB PHOENIX............................................ 391

    A. PLAINTIFFS THE HERNANDEZ FAMILY .................................................. 391

15. THE NOVEMBER 2, 2007 ATTACK – ROUTE SENATORS HIGHWAY,
    BAGHDAD............................................................................................................ 393

    A. PLAINTIFFS THE POOLE FAMILY ............................................................. 393

16. THE OCTOBER 31, 2007 ATTACK – SADR CITY, BAGHDAD ........................ 394

    A. PLAINTIFF KOMA KEKOA TEXEIRA ......................................................... 394

17. THE SEPTEMBER 29, 2007 ATTACK – DORA, BAGHDAD ............................ 395

    A. PLAINTIFF ERIC JAMES ATKINSON ......................................................... 395

18. THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA, BAGHDAD................. 396

A. PLAINTIFF BRIAN ROBERT SCHAR ............................................................ 396

19. THE SEPTEMBER 4, 2007 ATTACK – ROUTE PREDATOR NEAR SADR CITY . ................................................................................................................................. 397

A. PLAINTIFFS THE MIXSON FAMILY ............................................................ 397

20. THE AUGUST 22, 2007 ATTACK – RUSAFA DISTRICT, BAGHDAD............. 399

A. PLAINTIFF JERRALD J. JENSEN .................................................................... 399

21. THE JULY 17, 2007 ATTACK – ADHAMIYAH DISTRICT, BAGHDAD.......... 400

A. PLAINTIFFS THE PEARCY FAMILY ............................................................ 400

22. THE JULY 11, 2007 ATTACK – FOB HAMMER .................................................. 401

A. PLAINTIFFS THE SMITH FAMILY ................................................................ 401

23. THE JULY 10, 2007 ATTACK – PATROL BASE CAVALIER, TAJI................. 403

A. PLAINTIFFS THE SEGERS FAMILY .............................................................. 403

24. THE JUNE 17, 2007 ATTACK – ASR ASPEN, DHI QAR PROVINCE.............. 404

A. PLAINTIFF GRANT RANSOM BLACKWELL ............................................. 404

25. THE MAY 31, 2007 ATTACK – ROUTE SENATORS, BAGHDAD .................. 405

A. PLAINTIFF JOHN MAINE ................................................................................ 405

26. THE MAY 28, 2007 ATTACK – NEW BAGHDAD DISTRICT .......................... 406

A. PLAINTIFF GREGORY EDWARD HOGANCAMP ..................................... 406

27. THE MAY 17, 2007 ATTACK – DORA DISTRICT, BAGHDAD....................... 407

A. PLAINTIFFS THE GAUTIER/HOUCHINS FAMILY .................................... 407

28. THE APRIL 27, 2007 ATTACK – FALLUJAH, IRAQ .......................................... 408

A. PLAINTIFF GUILLERMO CASTILLO............................................................ 408

29. THE FEBRUARY 26, 2007 ATTACK – CSC SCANIA......................................... 409

A. PLAINTIFF JOSHUA BRADLEY WOLFE...................................................... 409

30. THE FEBRUARY 3, 2007 ATTACK – ROUTE DOVER, SOUTH OF CAMP TAJI . ................................................................................................................................. 410

    A.  PLAINTIFFS THE BASS FAMILY ................................................. 410

31. THE JANUARY 29, 2007 ATTACK – ROUTE MICHIGAN, BAGHDAD .......... 412

    A.  PLAINTIFFS THE NICHOLS FAMILY ....................................... 412

32. THE DECEMBER 19, 2006 ATTACK - RAMADI ................................. 413

    A.  PLAINTIFF WILLIAM ROBERT BIGGS .................................... 413

33. THE NOVEMBER 27, 2006 ATTACK – KADAMIYAH, BAGHDAD ................ 414

    A.  PLAINTIFFS THE STRONG FAMILY ....................................... 414

34. THE FEBRUARY 14, 2006 ATTACK – KADAMIYAH, BAGHDAD ................ 415

    A.  PLAINTIFF TARA KATHLEEN HUTCHINSON ........................... 415

35. THE OCTOBER 26, 2005 ATTACK – AL AZIM, DIYALA PROVINCE ............ 416

    A.  PLAINTIFF MARTIN SICAIROS........................................... 416

36. THE OCTOBER 8, 2005 ATTACK – RAMADI, IRAQ ........................ 417

    A.  PLAINTIFF KADE LUTHER HINKHOUSE .................................. 417

37. THE AUGUST 26, 2005 ATTACK – HIT, IRAQ ................................... 417

    A.  PLAINTIFFS THE BEYERS FAMILY ....................................... 417

38. THE AUGUST 13, 2005 ATTACK – SADR CITY, BAGHDAD ......... 419

    A.  PLAINTIFF BRAD LEE SCHWARZ................................... 419

39. THE JULY 5, 2005 ATTACK – HIT, IRAQ .......................... 420

    A.  PLAINTIFFS THE COOLEY FAMILY ................................ 420

40. THE APRIL 19, 2005 ATTACK – ROUTE MIDLAND, NORTH-WEST OF
ISKANDARIYA................................................................ 421

    A.  PLAINTIFF ANTONIO MARTINEZ FREDERICK ........................ 421

    B.  PLAINTIFF WYMAN HARRELL JONES ...................................... 421

41. THE MARCH 13, 2005 ATTACK – AMERIYA, BAGHDAD ............................. 422

    A.  PLAINTIFF DOUGLAS HAMILTON KINARD JR. ...................... 422

42. THE JANUARY 1, 2005 ATTACK – HADITHA.................................. 423

 A. PLAINTIFFS THE KUNIHOLM FAMILY ....................................... 423

43. THE DECEMBER 21, 2004 ATTACK – FOB MAREZ, MOSUL ......................... 424

 A. PLAINTIFFS THE RUHREN FAMILY ............................................ 426

 B. PLAINTIFF MARK JOSEPH PRATT ............................................... 426

 C. PLAINTIFF EVAN WAYNE BYLER ............................................... 427

 D. PLAINTIFF TERAY ANTON BUNDY ............................................ 427

 E. PLAINTIFF JEFF MCKINLEY WRIGHT ....................................... 428

 F. PLAINTIFFS THE TURAY FAMILY ................................................ 428

 G. PLAINTIFF DANIEL BIVENS ....................................................... 429

 H. PLAINTIFF ERIC JAMES ATKINSON .......................................... 429

 I. PLAINTIFF ANGELA KONEN .......................................................... 430

 J. PLAINTIFF JONATHAN B. HOGGE ............................................... 430

 K. PLAINTIFF JAMES MICHAEL OHRT ........................................... 430

 L. PLAINTIFFS THE WILLIAMS FAMILY ....................................... 431

 M. PLAINTIFFS THE WARD FAMILY ............................................... 432

 N. PLAINTIFFS THE ANDERSON FAMILY ..................................... 433

 O. PLAINTIFFS THE COLLINS FAMILY .......................................... 434

44. THE NOVEMBER 24, 2004 ATTACK – ZAYONA, BAGHDAD ....................... 435

 A. PLAINTIFFS THE FONDREN FAMILY ........................................ 435

45. THE NOVEMBER 9, 2004 ATTACK – ISKANDARIYA .................................... 436

 A. PLAINTIFFS THE NOLTE FAMILY .............................................. 436

46. THE OCTOBER 31, 2004 ATTACK – FOB MAREZ, MOSUL, IRAQ ............... 438

 A. PLAINTIFF JONATHAN B. HOGGE .............................................. 438

47. THE AUGUST 16, 2004 ATTACK – SADR CITY, BAGHDAD .......................... 439

 A. PLAINTIFF DAVID ALLEN SIMMONS II ................................... 439

48. THE JUNE 29, 2004 ATTACK – CAMP FALLUJAH ........................................... 440

    A.  PLAINTIFFS THE MILLS FAMILY ................................................. 440

49. THE JUNE 21, 2004 ATTACK – COP APACHE, ADHAMIYAH, BAGHDAD.. 441

    A.  PLAINTIFF ARTHUR B. STOKENBURY....................................... 441

50. THE APRIL 9, 2004 ATTACK – MARKET AREA OF BAIJI ............................ 441

    A.  PLAINTIFF DOMENICK JARED ALAGNA................................... 441

51. THE MARCH 13, 2004 ATTACK – KARBALA...................................... 442

    A.  PLAINTIFF ROBERT JAMES PEARSON...................................... 442

52. THE DECEMBER 23, 2003 ATTACK – SADR CITY, BAGHDAD.................... 443

    A.  PLAINTIFF ROGER LEE YOUNG ................................................. 443

53. THE DECEMBER 17, 2003 ATTACK – SADR CITY, BAGHDAD.................... 444

    A.  PLAINTIFF ALLEN RYAN VAUGHT ........................................... 444

VIII.   VIOLATING COUNTER-TERRORISM FINANCING SANCTIONS CAUSES ACTS OF INTERNATIONAL TERRORISM ....................................................................... 445

IX.   CLAIMS FOR RELIEF ................................................................................ 450

    FIRST CLAIM FOR RELIEF ....................................................................... 450

    SECOND CLAIM FOR RELIEF .................................................................. 464

    THIRD CLAIM FOR RELIEF ...................................................................... 479

    FOURTH CLAIM FOR RELIEF .................................................................. 491

    FIFTH CLAIM FOR RELIEF ....................................................................... 498

    SIXTH CLAIM FOR RELIEF....................................................................... 512

    SEVENTH CLAIM FOR RELIEF ................................................................ 521

    EIGHTH CLAIM FOR RELIEF ................................................................... 527

    NINTH CLAIM FOR RELIEF ..................................................................... 529

    TENTH CLAIM FOR RELIEF ..................................................................... 534

    ELEVENTH CLAIM FOR RELIEF ............................................................. 537

TWELFTH CLAIM FOR RELIEF.................................................................................... 544

THIRTEEN CLAIM FOR RELIEF.................................................................................. 548

X.      PRAYER FOR RELIEF ................................................................................................. 552

## INDEX OF ACRONYMS

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam

**AEOI** – Atomic Energy Organization of Iran

**AIO** – Aerospace Industries Organization

**AML –** Anti-money laundering

**AO –** Area of Operation

**ASR** – Alternate Supply Route

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, *et seq.*

**ATCA** – Anti- Terrorism Clarification Act

**ATF** – Anti-Terrorist Financing

**AQ** – AL Qaeda

**AQI** – Al Qaeda In Iraq

**BIAP** – Baghdad International Airport

**BIC –** Bank Identifier Code

**BIS** – Bank of International Settlements

**BNP** – BNP Paribas S.A.

**BSA -** Bank Secrecy Act

**CACIB –** Crédit Agricole Corporate and Investment Bank

**CAGE** – Commercial and Government Entity

**CAIS** - Crédit Agricole Indosuez (Suisse)

**CASA** - Crédit Agricole S.A.

**CBI –** Central Bank of Iran

**CCL** – Commerce Control List

**CFT** – Combating the Financing of Terrorism

**CHIPS-NY** – Clearing House Interbank Payment System

**CIF –** Customer Information File

**CL –** Crédit Lyonnais

**CLS –** Credit Lyonnais (Suisse) S.A.

**COP** – Combat Outpost

**COS** – Contingency Operating Site

**CSAM** – Credit Suisse Asset Management Limited, United Kingdom

**CSC** – Convoy Support Center

**DB** – Deutsche Bank AG

**DFAC** – Dining Facility

**DFS –** Department of Financial Services

**DFT** – Discrete Fourier Transform

**DIO** – Defense Industries Organization

**DN** – Specially Designated Nation

**DOJ -** Department of Justice

**DPA** – Deferred Prosecution Agreement

**EAA** – European American Armory

**EAR** – Export Administration Regulations

**EFP** – Explosively formed penetrators

**EU** – European Union

**FATF –** Financial Action Task Force

**FDIC** – Federal Deposit Insurance Corporation

**FFIEC** – Federal Financial Institutions Examination Council FI – Financial Institute

**FinCEN** – Financial Crimes Enforcement Network

**FINMA –** The Swiss Financial Market Supervisory Authority

**FIU** – Foreign Financial Intelligence Unit

**FOB** – Forward Operating Base

**FRBNY –** Federal Reserve Board of New York

**FTO** – Foreign Terrorist Organization

**HAMAS** – Ḥarakat al-Muqāwamah al-ʾIslāmiyyah Islamic Resistance

**HBEU –** HSBC Bank Plc aka HSBC-London

**HBME –** HSBC Middle East Limited aka HSBC-Middle East

**HKMA** – Hong Kong Monetary Authority

**HSBC-US –** HSBC Bank USA, N.A.

**IAMIC –** Iran Aircraft Manufacturing Industrial Company aka HESA

**IACI** – Iran Aircraft Industries

**IAIO** – Iran Aviation Industries Organization

**ICC Statute** – Rome Statute of the International Criminal Court

**IED** – Improvised explosive device

**IEEPA –** International Emergency Economic Powers Act

**IHL** – International Humanitarian Law

**IHRL** – International Human Rights Law

**IHSRC –** Iran Helicopter Support and Renewal Company aka PAHNA

**ING** – Iraq National Guard

**IOVB –** Bank Saderat in London

**IPDC** – Iran Power Development Company

**IRAM** – Improvised Rocket Assisted Munitions

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRIAA** – Islamic Republic of Iran Army Aviation

**IRIAF** – Islamic Republic of Iran Air Force

**IRINA** – Islamic Republic of Iran Navy Aviation

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh"

**ITAR** – International Traffic in Arms Regulations

**ITR** – Iranian Transactions Regulations

**ITRSHRA** – Iran Threat Reduction and Syrian Human Rights Act of 2012

**JAM** – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**JSS** – Joint Service Support

**KAA** - Khatam al-Anbiya Construction Company (a/k/a Khatam al-Anbiya Construction Headquarters, Qaragah-e Sazandegi-ye Khatam al-Anbiya, or "Seal of the Prophets")

**KALA** – Kala Naft UK

**KH** – Kata'ib Hizballah

**KYC** – Know Your Customer

**LC** – Letter of Credit

**LOC** – List of Correspondents

**MAS** – Muqtada al Sadr

**MNF-I** – Multi National Forces in Iraq

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MOIN –** Monitoring and Investigations Unit

**MOIS –** Iran's Ministry of Intelligence and Security a/k/a

**MPD –** Multicurrency Payments Department

**MSR** –  Main Supply Route

**MT –** Message Type

**NIGC** –  National Iranian Gas Company

**NIOC** – National Iranian Oil Company

**NPC** –  National Petrochemical Company

**NSN –** National Stock Number

**NYDFS** –  New York Department of Financial Services

**NYSBD** –  New York State Banking Department

**OBU** –  Offshore Booking Unit

**OCC** –  Office of the Comptroller of the Currency

**OFAC –** U.S. Department of Treasury Office of Foreign Asset Control

**OPEC** - Organization of Petroleum Exporting Countries

**PAHNA** – *See* IHSRC

**PCM** – Payment and Cash Management

**PDB** – Promised Day Brigades

**PFLP-GC** – Popular Front for the Liberation of Palestine- General Command

**PJCC** –  Provincial Joint Coordination Center

**POGC** –  Pars Oil &Gas Company

**POO** –  Point Of Origin

**PUK** –  Patriotic Union of Kurdistan

**RBS Plc** – The Royal Bank of Scotland Plc

**RBS Group** – The Royal Bank of Scotland Group Plc

**RBS N.V.** – The Royal Bank of Scotland N.V.

**RPG** –  Rocket-Propelled Grenade

**SAR** –  Suspicious Activity Report

**SBIG** –  Shahid Bakeri Industries Group

**SCB** – Standard Chartered Bank

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National

**SDT** – Specially Designated Terrorist

**SHIG** –  Shahid Hemmat Industries Group

**SWIFT –** Society for Worldwide Interbank Financial Telecommunication

**TBI** – Traumatic Brain Injury

**TWEA** – Trading with the Enemy Act

**UAE –** United Arab Emirates

**UBL** – Usama bin Laden

**UNSCR** – United Nations Security Council Resolution

**USCS** – United States Customary Units

**USD** – United States Dollars

**USML**– United States Munitions List

**VBIED –** Vehicle-Borne Improvised Explosive Device a/k/a car bomb

**WMD** – Weapons of Mass Destruction

Plaintiffs by and through their attorneys, allege the following:

## I.   NATURE OF ACTION

1.    In perhaps one of the most egregious instances of placing profit over people, Defendants[1] conspired with Iran and its Agents and Proxies,[2] including Defendant Bank Saderat,[3] to illegally misuse the U.S. banking system to provide material support for terrorism. The Defendants did this by deliberately evading U.S. economic sanctions, conducting illicit trade-finance transactions, using evasive money-laundering tactics and disguising financial payments to and from U.S. dollar-denominated accounts, which resulted in the foreseeable deaths and injuries to thousands of U.S. nationals in Iraq.

2.    As Secretary of State Colin Powell observed in 2001, "money is the oxygen of terrorism. Without the means to raise and move money around the world, terrorists cannot function."

3.    Iran is the world's leading state sponsor of terrorism. In order to fund, direct, and support its terrorism campaign against Coalition Forces in Iraq, Iran required access to billions of

---

[1] Defendants are: (1) HSBC Bank USA, N.A.; (2) HSBC Holdings Plc; (3) HSBC Bank Plc; (4) HSBC Bank Middle East Limited; (5) HSBC North America Holdings, Inc.; (6) Commerzbank A.G.; (7) Commerzbank A.G., New York Branch; (8) Barclays Bank Plc; (9) BNP Paribas S.A.; (10) Standard Chartered Bank; (11) Royal Bank of Scotland N.V.; (12) Royal Bank of Scotland Plc (n/k/a NatWest Markets Plc); (13) Crédit Agricole S.A.; (14) Crédit Agricole Corporate & Investment Bank; (15) Credit Suisse A.G.; (16) Deutsche Bank A.G.; (17) Bank Saderat Plc.

[2] Iran's terrorism network is made up of its "Agents and Proxies" that include the individuals and entities listed on the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") Sanctions Lists including, but not limited to: (1) Bank Markazi Jomhouri Islami Iran ("Bank Markazi") (a/k/a the "Central Bank of the Islamic Republic of Iran"); (2) Bank Melli Iran; (3) Melli Bank Plc; (4) Bank Mellat; (5) Bank Tejarat; (6) Bank Refah; (7) Bank Sepah; (8) Bank Saderat Plc; (9) the Islamic Republic of Iran Shipping Lines ("IRISL"); (10) Mahan Air; (11) Iran Air; (12) National Iranian Oil Company ("NIOC"); (13) the Islamic Revolutionary Guard Corps ("IRGC"); (14) Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"); (15) Iranian Ministry of Intelligence and Security (MOIS); (16) Khatam-al Anbiya Construction; and (17) the Terrorist Groups (*see* fn. 5). Pursuant to 31 C.F.R. § 560.304, IRGC, IRGC-QF, MOIS, Bank Markazi, Bank Sepah, Bank Melli, IRISL, Khatam-al Anbiya, and the NIOC are considered part of the government of Iran.

[3] According to the Treasury Department, Tehran used its state-owned banks, including Defendant Bank Saderat, to channel funds to designated Foreign Terrorist Organizations, including Hezbollah, Hamas, the Popular Front for the Liberation of Palestine-General Command, and Palestinian Islamic Jihad. U.S. Dept., of Treasury Fact Sheet: *Treasury Strengthens Preventive Measures Against Iran No. 1258* (Nov. 6, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx.*See also,* Avi Jorisch, *Iran's Dirty Banking – How the Islamic Republic Skirts International Financial Sanctions* (2010).

1

United States dollars ("USDs"), as well as Eurodollars,[4] both because waging terrorism is expensive, and because the USD is the currency of international terrorism. Iran's own domestic currency, the Rial, is one of the world's least valued currencies and is essentially worthless outside of Iran. Additionally, if Iran used its own currency to fund terrorism those funds could be more easily traced back to Iran.

4. To obtain USDs, Iran needed access to the U.S. financial system. However, because of economic sanctions imposed against Iran due to Iran's well-known status as a state sponsor of terror, Iran could not obtain that access or USDs without Defendants' help to break the law and evade those sanctions. The very purpose of these sanctions was to deny Iran and the terrorists the USD needed to fund, direct, and support terrorism.

5. Defendants laundered money for Iran's Agents and Proxies, including the Terrorist Groups[5], and obstructed law enforcement's efforts to cut off the flow of USDs to Iran, sanctioned entities, and terrorists.

6. Defendants knew, or were deliberately indifferent to the fact Iran intended to, and did, use the laundered money to materially support the Terrorist Groups, thereby enabling them to plan, authorize and commit heinous acts of international terrorism against United States nationals, including Plaintiffs. One of the most fundamental duties and obligations a bank owes

---

[4] Eurodollar refers to a deposit denominated in USD maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the SWIFT-NET) messages sent between the counterparties and their correspondent banks. The global Eurodollar market involves a network of banks outside the United States that makes loans and accepts deposits denominated in U.S. dollars, and nearly all U.S. dollar transactions initiated outside the United States are processed through correspondent banks located almost exclusively in New York.

[5] As used herein, the term "Terrorist Groups" refers to Hezbollah (designated a Foreign Terrorist Organization "FTO" on October 8, 1997), al Qaeda, (designated an FTO on October 8, 1999), all al Qaeda subgroups, (including al Qaeda in Iraq, which was designated an FTO on December 17, 2004), Ansar al Islam/Ansar al Sunna (designated an FTO on March 22, 2004), the Iranian Special Groups (including Jaysch al Mahdi, Badr Organization/Badr Brigades, Kata'ib Hizballah (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq, Promised Day Brigades, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and others discussed below, which were responsible for the terrorist attacks at issue in this Action.

is "Know Your Customer." Defendants had a duty to know their customers and report all suspicious and/or illegal transactions to the U.S. Government. Defendants not only failed to report these transactions, but actively engaged in wrongful and evasive money laundering conduct to cover up these repeated transactions over a multiple year period to provide material support to Terrorist Groups in Iraq.[6]

7.      Defendants' state of mind and contempt for the sanctions and related banking regulations that were designed to stop Iran's sponsorship of terrorism is demonstrated in the response by Standard Chartered Bank Group's Executive Director to an October 2006 email from Standard Chartered's CEO.

8.      In pertinent part, the CEO wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause **very serious or even catastrophic reputational damage to the Group**… [T]here is equally important potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/**or serious criminal liability**."[7]

9.      The Group Director's response was: "**You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians**."[8]

10.      Iran's actions were more recently confirmed, on October 13, 2017, in an official White House statement, wherein President Donald J. Trump stated:

In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to

---

[6] Exhibit 3, Declaration of Robert Mazur at 30.
[7] Memorandum entitled *Business with Iran – USA Perspective* by SCB's CEO, Americas to SCB's Group Executive Director for Risk, its Group Head of Public Affairs dated October 5, 2006, SCB INT 0005759-5762 (Emphasis added).
[8] Note of Interview with SCB's Head of Cash Management Services (2002-2005), Head of Compliance (2005-2007) at the New York branch, SCB INT 0004733-4734. (Emphasis added).

this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks. It develops, deploys, and proliferates missiles that threaten American troops and our allies. It harasses American ships and threatens freedom of navigation in the Arabian Gulf and in the Red Sea. It imprisons Americans on false charges. And it launches cyberattacks against our critical infrastructure, financial system, and military.

11.     This Civil Action is brought on behalf of U.S. nationals and the families of U.S. nationals who were serving as members of, or contractors for, the U.S. armed forces at the time they were injured or killed by Terrorist Groups in Iraq from 2003 to 2011 pursuant to the Anti-Terrorism Act (18 U.S.C. § 2331, et seq.) (hereinafter "ATA") and the Justice Against Sponsors of Terrorism Act (Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852) ("JASTA").

12.     JASTA was enacted by Congress "to provide civil litigants **with the broadest possible basis**, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, **wherever acting and wherever they may be found**, that have provided material support, **directly or indirectly**, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

13.     Plaintiffs named herein were killed or injured by acts of international terrorism that were planned, authorized or committed by Foreign Terrorist Organizations ("FTOs") working at the behest of Iran.

14.     The terrorist acts that resulted in the injury and/or death of Plaintiffs were substantially funded by Iran using U.S. Dollars (USD), and the Defendants, all global financial institutions entrusted to prevent terrorism financing, knowingly facilitated Iran's much-needed illegal access to USD so that it could systematically target and kill Americans serving in Iraq between 2003 and 2011.

## 1.     IRAN'S INTERNATIONAL TERRORISM NETWORK

15.     Since 1984, Iran has been the world's leading state sponsor of terror.

16.     Iran, through its Agents and Proxies (including the Terrorist Groups – especially Hezbollah),[9] has been actively involved in supporting and promoting terrorism in Iraq since before the U.S. invasion in 2003.

17.     Since then, Iran continually supplied money, weapons, training and safe haven to insurgent groups, both Sunni and Shia, in Iraq and supported the groups as they targeted Coalition Forces,[10] Iraqi security forces, and the Iraqi government itself.

18.     The Iranian Ministry of Defense and Armed Forces Logistics ("MODAFL") is the principal procurement arm of Iran's military and terror network. In November 2000, the U.S. government learned that MODAFL controls the Iranian Defense Industries Organization, which was sanctioned under the Arms Export Control Act and Export Administration Act for its involvement in missile technology proliferation activities. In October 2007, the United States designated MODAFL as a Specially Designated National ("SDN").[11]

19.     The Islamic Revolutionary Guard Corp ("IRGC") is a subordinate directorate of MODAFL. The IRGC-QF, also known as the Qods Force, is a special branch of the IRGC.

20.     The IRGC-QF was designated as a Specially Designated Global Terrorist ("SDGT") in October 2007 for its long history of supporting Hezbollah's terrorist activities,

---

[9] The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah), is based on region and dialect, but all translate to the "Party of Allah." As used herein, Hezbollah and Hizbollah refer to a Shiite Muslim militant group the United States and European Union consider a Foreign Terrorist Organization.

[10] The Coalition Forces comprised armed service members from the United States, United Kingdom, Australia, Spain, and Poland.

[11] U.S. Dept. of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, United States Department of the Treasury (2007), https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (last visited December 20, 2018). "SDN" is the commonly-used acronym for "Specially Designated National," that is, a person or entity designated and sanctioned by the United States Treasury Department pursuant to Executive Order 13382. The Office of Foreign Assets Control, "OFAC," administers and enforces economic sanctions program against SDNs and others. "SDN" refers to individuals and companies "owned or controlled by, or acting for or on behalf of, targeted countries," and also "lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific." Resource Center, United States Department of the Treasury (2018), https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited December 20, 2018). *SDN" is an umbrella term that includes sanctioned entities, including FTOs and SDGTs, and their individual members or front companies.*

operating training camps, and supplying guidance, funding, weapons, intelligence and logistical support to terrorists. The Treasury report designation of IRGC-QF as a SDGT specifically linked the group to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.[12]

21.     The IRGC-QF uses MODAFL to procure and develop weapons and equipment for its use.

22.     Iran's Ministry of Intelligence and Security ("MOIS") functions as Iran's intelligence service and was a primary facilitator and conduit for Iranian weapons, personnel, money, and technologies into Iraq.[13]

23.     Iran's terrorism campaign in Iraq was directly overseen by the IRGC-QF, MOIS, Hezbollah, and cell leaders in Iraq.

24.     The IRGC-QF was responsible for the creation of Hezbollah in 1983. Hezbollah, a Shi'a Islamist militant group based in Lebanon, is one of the most influential groups the IRGC-QF has created.

25.     Hezbollah serves as a proxy for Iran to support terrorists in Iraq.

26.     As the *New York Times* recently noted:

Hezbollah is involved in nearly every fight that matters to Iran and, more significantly, has helped recruit, train and arm an array of new militant groups that are also advancing Iran's agenda…. Hezbollah has evolved into a virtual arm of Iran's Islamic Revolutionary Guards Corps, providing the connective tissue for the growing network of powerful militia… The roots of that network go back to

---

[12] The United States Department of the Treasury designates SDGTs pursuant to Executive Order 13224 of September 23, 2001. *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a)"). This designation allows for the United States to block property and prohibit transactions with the designated entity. While every designation is accompanied by a specific set of factual findings as to the entity's actions, Executive Order 13224 itself makes a finding of a "need . . . for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism." SDGTs are frequently associated with terrorist organizations designated as "FTOs." *Id.*

[13] MOIS is commonly referred to as "Intal'at," and this term (and its variations and abbreviations) used to identify the Iranian intelligence service and its agents are frequently used by Iranian-supported terrorists in Iraq.

the American invasion of Iraq in 2003, when Iran called on Hezbollah to help organize Iraqi Shiite militias that in the coming years killed hundreds of American troops and many more Iraqis.[14]

27.     Hezbollah is a major component of the Iranian terrorism network.

28.     In 1995, the United States designated Hezbollah a Specially Designated Terrorist ("SDT"). In 1997, Hezbollah was designated a Foreign Terrorist Organization ("FTO") pursuant to 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which authorizes the Secretary of State to designate an FTO based on certain findings, including that the organization engages in terrorist activity that threatens the security of U.S. nationals or the national security of the United States.

29.     Al Qaeda, which was designated an FTO on October 8, 1999, and Al Qaeda in Iraq, which was designated an FTO on December 17, 2004, Ansar al Islam/Ansar al Sunna, which was designated an FTO on March 22, 2004, and Kata'ib Hizballah, which was designated an FTO on July 2, 2009, are, like Hezbollah, important components making up the "tip of the spear" of the Iranian terrorism network.

30.     During times relevant to the claims alleged herein, Hezbollah, Al Qaeda, Al Qaeda in Iraq, Ansar al Islam/Ansar al Sunna, and Kata'ib Hizbollah, helped Iran to arm, train, and fund a variety of Special Groups[15] in an effort to kill or maim Coalition Forces, to coerce the United States into withdrawing those forces, and to terrorize Iraq's civilian population in order to increase Iran's own influence in Iraq.

31.     The Islamic Republic of Iran Shipping Lines ("IRISL") is Iran's state-owned

---

[14] Ben Hubbard, *Iran Out to Remake Mideast With Arab Enforcer: Hezbollah*, New York Times (Aug. 27, 2017), (https://www.nytimes.com/2017/08/27/world/middleeast/hezbollah-iran-syria-israel-lebanon.html?smid=tw-share
[15] The term "Special Groups" refers to terrorist organizations established and funded by Iran, including Jaysch al Mehdi, Badr Organization/Badr Brigades, Kata'ib Hizballah (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq, Promised Day Brigades, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and others discussed below.

shipping line that is an agent of the IRGC. IRISL has a long history of facilitating arms shipments for the IRGC, including copper disks that are a key component in EFPs. In 2007, a diplomatic cable from the State Department noted concern over IRISL shipments of Chinese arms to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah." The cable referred specifically to an "IRISL-flagged vessel" loaded at a Chinese port with cartridges to be used in AK-47 assault rifles, and stated that "[w]e have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

32.     On September 10, 2008, IRISL and several IRISL subsidiaries were designated by the United States as SDNs. The designations were based on evidence that the IRISL network had engaged in the proliferation of weapons of mass destruction and had "pursued new strategies which could afford it the potential to evade future detection of military shipments."

33.     Defendant Bank Saderat, along with Bank Melli and other sanctioned Iranian state-owned financial institutions, served as a primary funding arm of the terrorism network, working in concert with the IRGC, IRISL, NIOC, and front companies to obtain access to the global financial system.[16]   These entities conspired with Iran and the Defendant Banks, and others, to ensure the fraudulent flow of U.S. dollars to Iran's terrorism campaign. In doing so, the Defendant Banks acted as essential members of Iran's terror network. When the U.S. Treasury sanctioned Bank Melli, it noted that the institution facilitated transactions for the IRGC and

---

[16] From 2000-2010, the United States imposed sanctions on six Iranian banks due to their ties to the IRGC: Ansar, Mehr, Melli, Arian, Kargoshaee, and Future Bank. See U.S. Dept. of Treasury, Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL, United States Department of the Treasury, (2010) https://www.treasury.gov/press-center/press-releases/Pages/tg1010.aspx (last visited April 19, 2019).

engaged in deceptive financial practices to hide the IRGC's involvement.[17]

34.     The National Iranian Oil Company ("NIOC") has been identified as an agent of the IRGC and was designated as a SDN in 2008. (*Id.* ¶ 152).[18] NIOC used its own helicopters to conduct surveillance on bases occupied by Coalition Forces along the Iranian border. The Iran Threat Reduction and Syria Human Rights Act of 2012 reflects Congress' belief that NIOC "provide[s] significant support to Iran's Revolutionary Guard Corps and its affiliates."

35.     According to the U.S. Treasury Department, Mahan Air, a privately-operated Iranian airline, facilitated the covert transport of IRGC-QF officers into and out of Iraq by bypassing normal security procedures and omitting certain information on flight manifests to eliminate any record of the IRGC travel. In addition, Mahan Air transported arms shipments on behalf of the IRGC-QF and has been the conduit for radio frequency modules recovered from IED devices used to target the Coalition Forces in Iraq.

36.     The Treasury Department's 2011 notice designating Mahan Air as a SDGT indicated that Mahan Air provided transportation services to Hezbollah and transported personnel, weapons, and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

37.     Iran openly acknowledged its terroristic goals in Iraq. In 2003, for example, Ayatollah Ahmad Janati, the secretary general of Iran's Council of Guardians, called on Iraqis to commit attacks against U.S.-led forces in Iraq. Two months later, Coalition Forces uncovered a fatwa (religious edict) issued by Iran urging "holy fighters" in Iraq to attack U.S. nationals.

---

[17]  U.S. Dept. of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, United States Department of the Treasury (2007), https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (last visited April 19, 2019).

[18]  *See* OFAC Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2008, United States Department of the Treasury (2008), https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew08.pdf (last visited December 20, 2018).

38.    There is no question that Iran, from 2003 to 2011 and beyond, substantially and materially supported and promoted terrorism against U.S. nationals in Iraq.

39.    The support included, among other things, money, weapons, training, safe haven, intelligence, and advisors and solidified an operational relationship between FTO's AQ/AQI. AAI. KH, Hezbollah and its various Special Groups within the terrorism network.

40.    The IRGC-QF's role within the terrorism network was to establish and control a network of cells in Iraq the aim of which was to assassinate key leaders, support death squads, and distribute highly lethal weapons for use against American forces and Iraqi citizens.

41.    The IRGC-QF developed a distribution channel for the terrorism network that would transfer weapons from Iran to Iraq through the Ilam region in western Iran, as well as other main supply routes. The weapons included mortars, rockets, sniper rifles, road side bombs,[19] bullets, and rocket propelled grenades ("RPGs").

42.    In December 2003, for instance, Iranian agents shipped 1,000 rocket-propelled grenades and several boxes of explosives from Iran to Iraqi Terrorist Groups in the network.

43.    Hezbollah and the IRGC-QF's network of terrorist cells were responsible for firing Iranian rockets and mortars at Americans in Baghdad and at bases around Iraq.

44.    U.S. military forces estimated that the IRGC-QF, alone, provided up to $3 million worth of equipment and funding to Terrorist Groups in Iraq every month.

45.    American officials estimate that Iran, through its terrorism network, supplied at least $100 - $200 million per year to Iraqi Terrorist Groups, in addition to at least $70 million per year supplied to the Badr Organization and $700 - $800 million per year to Hezbollah.

---

[19] One of the signature weapons supplied by the IRGC-QF is a device known as an explosively formed penetrator ("EFP"). EFPs are highly lethal explosive devices capable of penetrating tank armor. EFPs have been used in terrorist attacks in Iraq against U.S. forces since 2004 and were used in some of the Terrorist Attacks that injured or killed the Plaintiffs. The EFPs used to kill or injure U.S. forces and other civilians during the times relevant to this Action were first used by Hezbollah against Israeli armor in Lebanon.

## 2. BANKS ARE THE FRONTLINE DEFENDERS AGAINST TERROR FINANCING - IRANIAN SANCTIONS AND BANKS' AFFIRMATIVE DUTIES TO PREVENT TERROR FINANCING

46. As evidenced by the horrific terrorist attacks alleged in this Complaint, our world harbors a contingent of unscrupulous minds with nefarious hearts whose goal is to kill, maim, and terrorize U.S. citizens.

47. Because of the inherent trust, security, and every-day-necessity provided by (and bestowed to banks), they are expected to play a critical role in preventing crime and wrongdoing. This role is defined (and assumed) through a series of controls, regulations, duties, and responsibilities governing the banking system. Without this system of trust, criminals and terrorists would enjoy unmitigated freedom to facilitate financial transactions across the globe to support their illicit activities, including committing terrorist attacks on U.S. citizens.

48. Since 1984, the U.S. government has implemented a host of laws designed to thwart Iran's sponsorship of terrorism, and that rely primarily on the cooperation and diligence of financial institutions, including Defendants.

49. Which is why over many years, governments, regulators, and the banking industry, have imposed comprehensive controls and regulations on banks with international operations or correspondent bank relationships, in order to disrupt and dismantle the financing of fraudulent, criminal, and terrorist enterprises.

50. On January 19, 1984, Iran was designated by the United States as a State Sponsor of International Terrorism pursuant to Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, and Section 620 of the Foreign Assistance Act. Such a designation is made by the U.S. Secretary of State, who must first determine the government in question has repeatedly provided support for acts of international terrorism. Iran's designation is still in force.

51. In 1996, Congress passed the Iran and Libya Sanctions Act, which was designed to prevent acts of international terrorism by "deny[ing] Iran the financial means" to sustain its various weapons programs.

52. As stated in the U.S. DEPARTMENT OF THE TREASURY - Press Center Fact Sheet: Treasury Strengthens Preventive Measures Against Iran 11/6/2008:[20]

- Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

- The Islamic Revolutionary Guard Corps (IRGC) Qods Force, which has been designated under Executive Order 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad.

- It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. For example, Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to determine the true parties to a transaction. Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC.

53. In 1994, The Money Laundering Suppression Act was enacted and required regulators to improve the identification of money laundering schemes in financial institutions and made numerous references to the fact that the crime of money laundering included terrorist

---

[20] Exhibit 1, Declaration of Thomas E. Nollner at 3.

financing.

54.     Since at least 1994, international banks, including the Defendants in this case, have been aware that money laundering is used by terrorist organizations to finance their operations.[21]

55.     From at least 1970 there have been numerous U.S. laws and regulations, a large volume of publicly available information, and many references in regulatory guidance and examination procedures addressing the fact that banks and financial institutions needed to be aware of and have knowledge of the fact that terrorist organizations could use the financial system to support terrorist aims and plans.[22]

56.     Until approximately 1994, money laundering included references to "other crimes" related to money laundering, such as illegal drug sales, but beginning with the Money Laundering Suppression Act of 1994, terrorist financing was included when discussing money laundering.  By the mid-2000's, there were more than 170  predicate crimes for money laundering, including funds that support terrorist activity, profits from illegal drug sales, and structuring of transactions to avoid recordkeeping and reporting requirements.[23]

57.     By at least 2003, the financial industry knew that U.S. sanctions were intended to discourage support for terrorism, that Iran was a state sponsor of terrorism, and that Iran's support for terrorist-facilitated attacks on coalition forces in Iraq and Afghanistan.  In addition to numerous other documents which address these issues, State Department Declarations "Patterns of Global Terrorism, Overview of State–Sponsored Terrorism" published from 1996 through 2003, and "Country Reports on Terrorism–State Sponsors of Terrorism Overview" which replaced the original declaration in 2004 and is still published annually, clearly inform the public

---

[21] Exhibit 1, Declaration of Thomas E. Nollner at 2.
[22] Id.
[23] Id. 2, 8.

of these issues.[24]

58.     All banks, including Defendants, that "have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know-your-customer ('KYC'), anti-money laundering ('AML') and anti-terrorist financing ('ATF') standards, as defined by and enforced by the Financial Action Task Force ('FATF') and its supporting governments." *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).

59.     The adoption and enforcement of these standards elevate the banks from mere passive providers of financial services to having critical affirmative obligations to know customer identities (establish KYC standards), to investigate, detect, and report suspicious customers and transactions, and to implement AML and ATF programs and controls.

60.     Through these controls, regulations, duties, responsibilities, obligations, and standards, banks are intended to be—and have agreed to be—frontline defenders against terrorism financing.

61.     The effectiveness of these laws and policies inherently relies upon banks, including Defendants, to uphold their duties and obligations.

62.     The sources and authorities for the controls, regulations, duties, responsibilities, standards, and obligations placed on and agreed to by the Defendants include U.S. laws and regulations, the FATF Recommendations and standards, the Wolfsberg Group principles, the Basel Committee standards, the Department of the Treasury and Office of Foreign Assets Control regulations, and other governments and international groups and their laws, regulations, and standards.

63.     **U.S. Laws and Regulations, & Executive Orders**: The Bank Secrecy Act, 31

---

[24] Exhibit 1, Declaration of Thomas E. Nollner at 3-4.

U.S.C. §§ 5311 *et seq.,* enacted in 1970 and augmented over the years,[25] combats money laundering and terrorism financing by assigning important responsibilities to banks,[26] who are required to work hand in hand with the U.S. government to prevent terrorism financing.[27]

64.     The Bank Secrecy Act is intended to prevent banks and other financial institutions from being used as intermediaries for, or to hide the transfer or deposit of money derived from, criminal activity. The Office of the Comptroller of the Currency (OCC) regulates national bank compliance with the Bank Secrecy Act and its implementing regulations,[28] and authors publications[29] to ensure compliance with anti-money laundering laws and anti-terrorist financing legislation. Due to its regulatory prominence and the importance of its role, Defendants, including foreign subsidiaries, foreign branches, foreign affiliates, and Edge Act Banks[30], are aware of the guidance, bulletins, and other information published by the OCC.

65.     The Bank Secrecy Act requires banks to undertake a number of AML and ATF efforts to ensure they do not become conduits for terrorist financing. Those AML and ATF efforts include the creation of explicit written policies and procedures to designate a compliance officer, to train employees in all aspects of the Bank Secrecy Act regulations, internal compliance, and AML policies and procedures, to establish internal recordkeeping and auditing processes, to establish and follow "Know Your Customer" standards, and to file reports

---

[25] Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, and 31 U.S.C. § 5311 et seq.; Money Laundering Control Act (1986), 18 U.S.C. § 1956; The Money Laundering Prosecution Improvements Act, 31 U.S.C. §§ 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992)(Pub. L. 102-550, Title XV, Oct. 28, 1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. §§ 5341(b) and 5342(b).

[26] *See generally* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_002.htm, last visited December 16, 2018.

[27] *See generally* https://www.occ.treas.gov/topics/compliance-bsa/bsa/index-bsa.html last visited December 16, 2018.

[28] *See* 31 CFR 103 § 103, *et seq.* (regulations recodified in 2010 at 31 CFR Chapter X).

[29] *See, e.g.,* OCC BULLETIN 2008-13, "Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity."

[30] Edge Act Bank – a bank operating in the United States that is a subsidiary of a foreign bank and allowed to engage in international banking pursuant to the Edge Act, 12 U.S.C.

identifying suspicious activities. Other government agencies and organizations play a critical role in implementing the Bank Secrecy Act regulations, including the U.S. Treasury, FinCEN, the Federal Reserve Board of Governors, the FDIC, and the FFIEC.

66. The banks' obligations under the Bank Secrecy Act are detailed in a manual published by the FFIEC,[31] which reminds banks that "[t]errorist networks are able to facilitate their activities if they have financial means and access to the financial system" and that "[t]errorist groups develop sources of funding that are relatively mobile to ensure that funds can be used to obtain material and other logistical items needed to commit terrorist acts. Thus, money laundering is often a vital component of terrorism financing."

67. In September 2000, the "Bank Secrecy Act/Anti-Money Laundering Comptroller's Handbook" was published that clearly states that a bank was required under 12 CFR 21.21, to develop, administer, and maintain a program that ensures and monitors compliance with the BSA and its implementing regulations, including recordkeeping and reporting requirements. Part of this program included the requirement that a bank must designate a qualified bank employee as its BSA compliance officer, who has day-to-day responsibility for managing all aspects of the BSA compliance program and compliance with all BSA regulations. The bank's board of directors and senior management must ensure that the BSA compliance officer has sufficient authority and resources to administer effectively a comprehensive BSA compliance program.[32]

68. Thus, banks were required to have a BSA compliance officer who knew the requirements of AML/CFT laws, rules, regulations, industry standards, and business

---

[31] *See generally* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_002.htm, last visited December 16, 2018.
[32] Exhibit 1, Declaration of Thomas E. Nollner at 4.

norms.[33]

69.     The FFIEC manual outlines the obligations of banks to "develop, implement, and maintain effective AML programs that address the ever-changing strategies of money launderers and terrorists who attempt to gain access to the financial system."

70.     One of the mandatory and critical AML programs is a program by which banks must determine "whether the customer appears on any federal government list of known or suspected terrorists or terrorist organizations." Those organizations, as well as countries designated as state sponsors of terrorism, are considered "high risk"—the highest category of risk the FFIEC manual contemplates.

71.     The USA PATRIOT Act,[34] which augmented the Bank Secrecy Act, was adopted in response to the September 11, 2001 terrorist attacks and is intended, along with its implementing regulations, to strengthen U.S. measures to prevent, detect, and prosecute international money laundering and the financing of terrorism. Under The USA PATRIOT Act, banks were required to establish AML programs, report suspicious activity, verify the identity of customers, and apply enhanced due diligence to certain types of accounts involving foreign persons.

72.     The requirements of the USA PATRIOT Act related to the establishment of AML programs, reporting suspicious activity, verifying the identity of customers, and applying enhanced due diligence to certain types of accounts involving foreign persons are clearly set forth in its implementing regulation, 31 CFR 103 - Financial Recordkeeping and Reporting of Currency and Foreign Transactions May 9, 2003, and an updated issue of  31 CFR 103 - Financial Recordkeeping and Reporting of Currency and Foreign Transactions dated July 1,

---

[33] Exhibit 1, Declaration of Thomas E. Nollner at 4.
[34] 107 P.L. 56, 115 Stat. 272 *, 107 P.L. 56, 2001 Enacted H.R. 3162, 107 Enacted H.R. 3162.

2005.  Accordingly, these requirements were clearly known to Defendants no later than May 9, 2003 and July 1, 2005, respectively.

73.    The Iran Sanctions Act, first enacted in 1996, further regulates the financial industry to, *inter alia*, deny Iran the financial ability to support acts of international terrorism.[35]

74.    U.S. Presidential Executive Orders over the years have further regulated the financial industry to prohibit business and transactions with Iran in order to avoid terrorism financing.[36]

75.    **The Financial Action Task Force ("FATF")**: The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit.  "The objectives of the FATF are to set standards and promote effective implementation of legal, regulatory and operational measures for combating money laundering, terrorist financing and other related threats to the integrity of the international financial system."[37] The FATF currently includes 36 Member countries, 2 regional organizations, 2 Observer countries, 9 international organization Associate Members, and 23 Observer Organizations, including the major financial center countries of Europe, North America, and Asia.  At all relevant times, the United States, the United Kingdom, Germany, France and Switzerland, were all participants in the FATF.

76.    Except for Defendant HBME,[38] Defendants are all headquartered in countries that are members of the FATF and therefore are all obligated to comply with the standards set by the

---

[35] Iran Sanctions Act of 1996. Act Aug. 5, 1996, P.L. 104-172, 110 Stat. 1541; Aug. 3, 2001, P.L. 107-24, § 2(a) (applicable to investments made on or after 6/13/2001, as provided by § 2(b) of such Act), §§ 3-5, 115 Stat. 199; Aug. 4, 2006, P.L. 109-267, § 1, 120 Stat. 680; Sept. 30, 2006, P.L. 109-293, Title II, § 201, § 202(a), (b) (applicable to actions taken on or after 6/6/2006, as provided by § 202(c) of such Act), §§ 203-205(g)(1), 120 Stat. 1345, 1346.

[36] *See, e.g.,* Executive Order No. 12211 of April 17, 1980; Executive Order 12613 of October 29, 1987; Executive Order 12957 of March 15, 1995; Executive Order 12959 of May 6, 1995; Executive Order 13059 of August 19, 1997.

[37] Financial Action Task Force, *Who we are*, http://www.fatf-gafi.org/about/, last visited April 19, 2019.

[38] The Co-operation Council for the Arab States of the Gulf, which includes the United Arab Emirates, has also been a regional organization member since 1991. FATF evaluations are conducted jointly with the regional AML/CFT body for the FATF associated member, the Middle East and North Africa Financial Action Task Force, (MENAFATF), of which United Arab Emirates is a member

FATF. Thus, the Defendants and their directors operating in and from these countries are bound by the FATF standards.

77.     The Recommendations developed by the FATF in 1990 and revised in 1996, 2001, 2003, and most recently in 2012, are recognized as the international standard for combating money laundering, the financing of terrorism, and the proliferation of weapons of mass destruction. They form the basis for a coordinated response to these threats.

78.     The FATF monitors the progress of its members in implementing necessary measures, reviews money laundering and terrorist financing techniques and counter-measures, and promotes the adoption and implementation of appropriate measures globally. In collaboration with other international stakeholders, the FATF works to identify national-level vulnerabilities with the aim of protecting the international financial system from misuse.

79.     In 1990, and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that establish a minimum for international AML standards. These Recommendations have been endorsed by the countries in which the Defendants do business.

80.     Among those Forty Recommendations, banks are to "develop programmes against money laundering and terrorist financing" and should include the "development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees; an ongoing employee training programme; and an independent audit function to test the system."

81.     Complementing the Forty Recommendations, the FATF addressed terrorist financing directly in October 2001 by establishing a set of Eight Special Recommendations on Terrorist Financing. Under those Special Recommendations, banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism,

terrorist acts or by terrorist organizations," are required to report their suspicions to the government.

82.     These standards set forth by FATF "include a due diligence obligation to monitor publicly accessible information relating to 'high risk' customers."[39] *Weiss,* 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).

83.     In April 2002, the FATF issued a report, entitled "Guidance for Financial Institutions in Detecting Terrorist Financing," to all major financial institutions, including Defendants, to "ensure that financial institutions do not unwittingly hide or move terrorist funds. Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity…"

84.     That April 2002 report underscored to banks, including Defendants, the risks to financial institutions of terrorist financing:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

85.     The FATF has also warned banks that mere financial accounting and auditing might be insufficient protection against the abuse: "Direct field audits of programmes may be, in some instances, the only method for detecting misdirection of funds. Examination of field operations is clearly a superior mechanism for discovering malfeasance of all kinds, including

---

[39]These high-risk customers include charities and other non-profit organizations. Non-profit organizations, particularly those held out as charitable organizations, constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the mechanism of charitable fundraising has, been used to provide a cover for the financing of terror. The duty to monitor and profile charity customers arises independently of any particular transaction.

diversion of funds to terrorists."[40]

86.　　**The Financial Crimes Enforcement Network (FinCEN):**  FinCEN is a bureau of the U.S. Department of the Treasury. FinCEN's mission is to safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.[41]

87.　　FinCEN carries out its mission by receiving and maintaining financial transactions data; analyzing and disseminating that data for law enforcement purposes; and building global cooperation with counterpart organizations in other countries and with international bodies.[42]

88.　　FinCEN exercises regulatory functions primarily under the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act" (BSA). The BSA is the nation's first and most comprehensive Federal anti-money laundering and counter-terrorism financing (AML/CFT) statute. In brief, the BSA authorizes the Secretary of the Treasury to issue regulations requiring banks and other financial institutions to take a number of precautions against financial crime, including the establishment of AML programs and the filing of reports that have been determined to have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings, and certain intelligence and counter-terrorism matters. The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the

---

[40] FATF Task Force on Money Laundering; *Combating the Abuse of Non-Profit Organisations,* (October 11, 2002).
[41] Financial Crimes Enforcement Network, *What We Do*, https://www.fincen.gov/what-we-do, last visited April 19, 2019.
[42] *Id.*

BSA and associated regulations.[43]

89.     Congress has given FinCEN certain duties and responsibilities for the central collection, analysis, and dissemination of data reported under FinCEN's regulations and other related data in support of government and financial industry partners at the Federal, State, local, and international levels. To fulfill its responsibilities toward the detection and deterrence of financial crime, FinCEN:

- Issues and interprets regulations authorized by statute;
- Supports and enforces compliance with those regulations;
- Supports, coordinates, and analyzes data regarding compliance examination functions delegated to other Federal regulators;
- Manages the collection, processing, storage, dissemination, and protection of data filed under FinCEN's reporting requirements;
- Maintains a government-wide access service to FinCEN's data, and networks users with overlapping interests;
- Supports law enforcement investigations and prosecutions;
- Synthesizes data to recommend internal and external allocation of resources to areas of greatest financial crime risk;
- Shares information and coordinates with foreign financial intelligence unit (FIU) counterparts on AML/CFT efforts; and
- Conducts analysis to support policymakers; law enforcement, regulatory, and intelligence agencies; FIUs; and the financial industry.[44]

90.     **The Federal Financial Institutions Examination Council (FFIEC):** The FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the Federal examination of financial institutions. The FFIEC also makes recommendations to promote uniformity in the supervision of financial institutions.[45]

91.     The FFIEC publishes and disseminates the BSA/AML Examination Manual, which provides regulatory requirements and guidance for carrying out BSA/AML examinations.

---

[43] *Id.*
[44] *Id.*
[45] Federal Financial Institutions Examination Council, *Welcome to the Federal Financial Institutions Examination Council's (FFIEC) Web Site - FFIEC Council,* https://www.ffiec.gov/, last visited April 19, 2019.

It also provides guidance to financial institutions on developing an effective BSA/AML compliance program and identifying and controlling risks associated with money laundering and terrorist financing. [46]

92.     The FFIEC also maintains the FFIEC Bank Secrecy Act/Anti-Money Laundering InfoBase to provide field examiners and financial institutions with training and information. The goal of the FFIEC InfoBase is to disseminate "just-in-time" training for new regulations and topics of specific concern regarding BSA and AML issues. [47]

93.     **The Wolfsberg Group**: The Wolfsberg Group is an association of large global banks that, in 2000, developed and agreed to a set of global AML principles and guidelines for international private banks to promote transparency in financial transactions and to increase the effectiveness of global anti- money laundering and anti-terrorist financing programs. [48]

94.     The standards and principles developed by the Wolfsberg Group of banks affect the correspondent banks of Wolfsberg Group member financial institutions. At the relevant times hereto, Defendants Barclays, Credit Suisse, Deutsche, HSBC, Standard Chartered, and RBS, have been members of the Wolfsberg Group.

95.     The Wolfsberg Principles for the Suppression of Terror Financing committed the banks to "implement 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business

---

[46] Federal Financial Institutions Examination Council, *BSA/AML Manual – Introduction*, https://bsaaml.ffiec.gov/manual/Introduction/01, last visited April 19, 2019.

[47] Federal Financial Institutions Examination Council, *BSA/AML InfoBase,* https://bsaaml.ffiec.gov/, last visited April 19, 2019.

[48] The banks initially involved included, but was not limited to, Barclays Bank, Credit Suisse Group, Deutsche Bank AG, Royal Bank of Scotland (ABN AMRO Bank) and HSBC. The Group's purpose is to develop financial services industry standards for "Know Your Customer," Anti-Money Laundering, and Counter Terrorism Financing Policies. The Wolfsberg Anti-Money Laundering Principles for Private banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

relationship appears on such a list.'"[49]

96.    The Wolfsberg AML principles require significant due diligence to collect and record account information, including the identity of the principle beneficial owners of an account (whether natural persons, legal entities, or unincorporated associations); the purpose and reasons for opening the account; anticipated account activity; source of wealth (description of the economic activity which has generated net worth); estimated net worth; source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening); and references or other sources to corroborate reputation information.

97.    According to the Wolfsberg AML principles, a "bank will endeavor to accept only those clients whose source of wealth and funds can be reasonably established to be legitimate…Mere fulfillment of internal review procedures does not relieve the private banker of this basic responsibility."

98.    On April 19, 2007, the Wolfsberg Group issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global AML and anti-terrorist financing programs. The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system."

99.    This April 2007 statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments"—one of the methods Defendants used to conceal their illegal USD funds transfers on behalf of Iran through the Eurodollar market, as further alleged and detailed in this Complaint.

100.    Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, DB, and HSBC

---

[49] *Weiss*, 453 F. Supp. 2d at 619, 626-27.

were all listed on the April 19, 2007 press statement.

101. **The Basel Committee on Banking Supervision**: In 1988, the Basel Committee, an international standards organization of central banks, bank supervisors, and regulators, which formulates broad supervisory standards and guidelines and recommends statements of best banking practices, including those regarding customer due diligence, set out the following principles, among others:

   a. Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

   b. Banks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities;

   c. Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information; and

   d. Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts.[50]

102. These standards were at all relevant times known by the Defendants.

103. **The U.S. Department of the Treasury - Office of Foreign Assets Control**: The Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury administers and enforces economic and trade sanctions against targeted foreign countries, terrorism sponsoring organizations, and international narcotics traffickers.

104. As part of its enforcement efforts, OFAC publishes a list of individuals and

---

[50] Basel Committee, *Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, State of Principles* (Dec. 1988), reprinted in BSA Manual, Section 1501.0 (September 1977).

companies owned or controlled by, or acting for or on behalf of, targeted countries as well as individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. These are, collectively, called SDNs.[51]

105.    Naturally, because of the obvious risks, banks are prohibited from conducting transactions with SDNs. The law, including the Trading with the Enemy Act (50 U.S.C. §§4301 *et seq.*), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*), the Anti-Terrorism and Effective Death Penalty Act of 1996 (Pub. L. No. 104-132, 110 Stat. 1214), and the Foreign Narcotics Kingpin Designation Act (21 U.S.C. § 1901 *et seq.*), prohibit transactions with SDN's and required banks, including the Defendants, to ensure that no wire transfers were made to or from any SDNs.

106.    The U.S. Department of the Treasury also developed the "Terrorist Finance Tracking Program" to use banking information to identify, track, and pursue suspected foreign terrorists, like Hamas, Hezbollah, and Al Qaeda and their financial supporters. The Program relies on complete and accurate SWIFT data to do so. Based on information provided by the banks, the U.S. Government, through its Program, conducts targeted searches in order to trace financial transactions related to suspicious terrorist activity.[52]

107.    The efficacy of the Terrorist Finance Tracking Program depended on the integrity of the banks, including Defendants, and the accuracy and completeness of the SWIFT data.

108.    The Department of the Treasury has also issued publications and advisories to provide standards and guidance to financial institutions, including Defendants, on the money

---

[51] *See* paragraph 17, footnote 11, above.
[52] U.S. Dep't of the Treasury, *Terrorist Finance Tracking Program Fact Sheet* (June 23, 2006), https://www.treasury.gov/press-center/press-releases/Pages/js4340.aspx, last visited December 17, 2018.

laundering threat involving illicit Iranian activity.[53]

109.    **<u>Other International Standards:</u>** International standards applicable to the financial services industry likewise impose on banks the duty to implement and enforce AML and ATF procedures, including the requirement to scrutinize customers by monitoring publicly accessible information and allegations in relation to "high-risk" products, services, entities, geographic locations and customers, by identifying the true beneficial owners of accounts, and by not engaging in "willful blindness" when it comes to terrorism financing.

110.    To the extent the United States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, those standard or principles are requirements for financial institutions, including Defendant Banks, to conduct business in the United States.

111.    Despite being fully aware of the duties and responsibilities imposed on Defendants, and agreed to by Defendants, as outlined above, Defendants knowingly and intentionally violated the controls, regulations, duties, and responsibilities governing their conduct, as more fully described herein in order to facilitate the transfer of  billions of dollars used to finance terrorism.

**3.    DEFENDANTS    KNOWINGLY    HELPED    IRAN    EVADE SANCTIONS**

112.    To Iran, Defendants were familiar faces. Many of Iran's state controlled banks had already developed banking relationships with these Defendants, several of which operated branches in Tehran.

113.    During all times relevant to this Action, Defendants used the U.S. financial system to funnel hundreds of billions of USDs to Iran and its Agents and Proxies.

---

[53] For example, Department of the Treasury – Financial Crimes Enforcement Network Advisory # FIN-2008-A002 Issued: March 20, 2008.

114.    This practice/action was illegal, and Defendants knew it was illegal.[54]

115.    Defendants, knowing the type of USD transfers they performed on behalf of sanctioned Iranian entities were illegal, devised clever ways of evading the laws and the U.S. government's mechanisms of enforcement.  They intentionally disguised financial payments to and from USD-denominated accounts and conducted illicit trade-finance transactions on Iran's behalf. By doing so, Defendants provided the billions of dollars of support Iran needed to fund its terrorism campaign in Iraq that U.S. sanctions would otherwise have denied them.

116.    One of the mechanisms used by the U.S. Government, which is related to international wire transfers, is administered and enforced by OFAC.

117.    OFAC enforces economic sanctions by blocking sanctioned entities from accessing the U.S. banking system.

118.    To block illegal financial transactions, OFAC mandates the use of filters that automatically flag transactions to or from sanctioned entities. To evade the filtering mechanism, Defendants purposefully removed key information from the wire transfers, a practice known as "stripping."

119.    Defendants stripped the wire transfers of information that would trigger the detection systems. Defendants would then manually re-enter the payment information so the transfer would be processed undetected by regulators. The transfers were executed through correspondent bank accounts in New York and through the Federal Reserve Bank in New York.

120.    Defendants went even further by providing expert training and advice to Iranian entities concerning how to deceive OFAC and ensure payments would be processed without delay or interference.

---

[54] Exhibit 3, Declaration of Robert Mazur at 30.

121.    By intentionally disguising financial payments to and from USD-denominated accounts and conducting illicit trade-finance transactions on Iran's behalf, Defendants provided the billions of dollars of support Iran needed to fund its terrorism campaign in Iraq.

122.    These resources enabled Iran and its agents to provide a combination of funding, weapons, munitions, intelligence, logistics, and training to Hezbollah, the IRGC-QF, and Iran's terrorist agents (including the Special Groups), who killed, injured, or maimed the U.S nationals, including Plaintiffs and/or their family members, in Iraq from 2003 to 2011.

123.    Eventually, after many years, the scheme was uncovered by U.S. law enforcement, and Defendants entered into criminal plea agreements and/or deferred prosecution agreements.

124.    Defendants admitted to willfully evading U.S. laws and regulations, conducting illicit trade-finance transactions, and intentionally disguising financial payments to and from USD-denominated accounts.

125.    Defendants further admitted to laundering billions of dollars on behalf of Iran and Iran-sanctioned entities.

126.    The amounts of USD Defendants laundered are reflected in the various agreements they signed and amount to hundreds of billions of dollars.

127.    The bank services provided and transactions allowed by the Defendant banks in this case to and for their customers, as set forth above, were not routine banking services in that the services and transactions were made purposefully to avoid reporting and/or recordkeeping requirements of the BSA.  These transactions were in violation of 12 CFR Part 21.11 (c) (4) (i) in that a Suspicious Activity Report (SAR) was not filed as required.  This section states that a SAR is required when the transaction involves funds derived from illegal activities or is intended or

conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any law or regulation or to avoid any transaction reporting requirement under Federal law.[55]

128.     Stripping information from a wire transfer document is not a routine banking practice and was part of a purposeful plan to avoid a transaction reporting requirement under Federal law.[56]

129.     Any person or institution involved with stripping, altering, or working in collusion with another to conceal, hide, or obscure the true identity of the person or entity for whom the transaction will ultimately benefit, is conducting a non-routine transaction.  Allowing a transaction that should have been initially identified as suspicious and subsequently identified as illegal is not a routine banking practice.[57]

130.     If wire transfers had not been stripped or altered, the sanctioned Iranian entities involved with the wires would have been identified and flagged through the OFAC system, the transactions would have been blocked, and the funds would not have been used to provide material support of terrorism.  However, because of the intentional concealment by the Defendant Banks of information required to be identified on such wire transfers, the Iranian entities involved with the wires were able to evade the OFAC system and carry out illegal and fraudulent transfers.[58]

131.     Banks that engage in non-routine transactions such as those described here (including the failure to file SARs and concealing or stripping information in wire transfer

---

[55] Exhibit 1, Declaration of Thomas E. Nollner at 2.
[56] *Id*. at 3.
[57] *Id*.
[58] *Id*.

requests to hide or disguise funds) were engaging in conduct intended to assist the organization conducting money laundering.[59]

132.    Had the Defendant Banks not engaged in the wire stripping and other deceptive conduct described in this action, the sheer U.S. dollar amount of the transactions Iran was engaging in would have been known years earlier and would have been a red flag for regulators, which likely would have triggered action such as Treasury designations and revocation of the U-turn exemption much earlier than 2007.[60]

133.    By the mid-1990s and early 2000s, and certainly during the relevant time period of this action (2003 to 2011), information was readily available for banks to know that their institutions could be used to support terrorism and that financial institutions were required to have a program and an identified BSA compliance officer on staff to ensure that financial institutions were aware of and followed AML/CFT laws, regulations, and guidelines.[61]

134.    As to the transactions at issue in this case, the Defendant Banks knew, or were willfully and purposefully ignorant or indifferent to, the fact that Iran was engaging in wire stripping to avoid U.S. Sanctions, to engage in illicit and illegal activities, including its support and coordination of terrorist attacks through its proxies in Iraq.[62]

135.    The Defendant Banks knew, or were willfully and purposefully ignorant or indifferent to, the fact that U.S. Dollars processed in these non-routine transactions would provide support for terrorist attacks.[63]

136.    **Defendant Banks Enabled Iran to Evade OFAC Filters and Fund Terrorism**: By way of example, and to show how the OFAC filters in New York work to regulate the flow of

---

[59] Exhibit 1, Declaration of Thomas E. Nollner at 3.
[60] *Id.*
[61] *Id.*
[62] *Id.*; *See also* Exhibit 3, Declaration of Robert Mazur at 30.
[63] *Id.*

U.S. dollars, consider funds denominated in U.S. dollars are being transferred from a customer in Singapore to a company in Germany to pay for an airplane. The customer's bank in Singapore is ABC bank. The bank for the company in Germany is XYZ bank. ABC bank has a correspondent relationship account with a very large UK bank, MNO bank, through which ABC bank conducts its international transactions and its U.S. dollar denominated transactions. MNO bank has a branch in New York, which if chartered by the OCC is considered a federal branch for regulatory purposes. The MNO bank branch could also be state chartered. The MNO bank branch in New York is the office MNO uses to conduct its U.S. dollar transactions, like this:[64]

- The Singapore customer goes into his bank, ABC bank, and initiates the transaction to send the funds to the company in Germany.
- ABC bank sends instructions to UK MNO bank to process the transaction so that funds are withdrawn from ABC's bank account at UK MNO bank and paid to the German company at his account with XYZ bank.
- UK MNO bank conducts the transaction through its MNO New York branch.
- The FED Wire System is used to move the funds.
- The funds in-processed from Singapore ABC bank are received by the MNO New York branch in order to conduct the transaction.
- The funds out-processed to German XYZ bank are then sent by the MNO New York branch to XYZ bank so the German company can be paid.
- Because both the in-processing and out-processing of the transaction is in U.S. dollars, since the transactions are being conducted in the US, and since the transaction is being conducted through a U.S. bank, OFAC laws apply.
- This means that all parties to the transaction are screened against the OFAC sanctions list.
- If there are no OFAC concerns, the funds are moved from ABC bank's account at MNO bank to XYZ bank so the company can be paid.
- If there are OFAC concerns then the funds can be blocked.
- If there are no OFAC concerns the funds are placed in German XYZ bank for the use of the German company.

137. AML/CFT issues can arise, for example, if ABC bank initiates the transaction for

---

[64] Exhibit 1, Declaration of Thomas E. Nollner at 15-16.

the Singapore customer but does not list the customer's name on the wire transfer document, if ABC bank lists a fake name on the document, or if ABC bank conducts the transfer as if ABC bank was the party for whom the transfer was made and there is no note made as to the identity of the ultimate beneficiary of the funds transfer.[65]

138.    Here, in order for Iran to do business by wire transfers in U.S. Dollars with its terror proxies, it needed to access the U.S. Financial system.  It also needed the ability to evade the OFAC filters, or the transfers would be blocked and the terrorists could not be funded.  Also, it needed secrecy of the amount of U.S. Dollars being processed by Iran through the U.S. Financial system, in order to avoid detection by U.S. authorities.[66]

139.    Iran and its state-controlled Banks did not have access to the U.S. financial system.  Therefore, Iran needed the Defendant Banks to provide access and to conceal and deceive the U.S. authorities about the actual parties to the wire transactions in order to fund the terrorists in U.S. Dollars.  Otherwise, the U.S. Dollar transfers would never have occurred, the terrorists would not have been funded, and the terror attacks would not have occurred.[67]

140.    One example comes from the October 25, 2007, U.S. Treasury Designations regarding Iran and several Iranian entities and organizations.  The Fact Sheet states: "The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah[.]" The Quds (a.k.a. "Qods") Force, as discussed herein, is an arm of the Iranian government.  These payments, in U.S. Dollars, were payments made to a known foreign terrorist organization (FTO) (i.e., Hizballah) that would have had to go through the OFAC filters in New York.  Iranian banks cannot send transfers directly to New York, and therefore would have had to engage a non-

---

[65] Exhibit 1, Declaration of Thomas E. Nollner at 16.
[66] *Id.*
[67] *Id.*

Iranian bank with a U.S. correspondent bank account to process the transfers.[68]

141.    **Defendant Banks Displayed Intent to Aid Terrorists or Willful and Purposeful Indifference in Ignoring High Risk Iranian Transactions:** Although attempts to launder money through a financial institution can emanate from many different sources, certain products and services, types of entities, and geographic locations are more vulnerable to money laundering.[69]

142.    High-risk products and services include activity such as: International Correspondent Banking Relationships, Wire (Funds) Transfers, and Special Use Accounts.[70]

143.    High-risk entities can include businesses such as offshore corporations and banks located in tax and/or secrecy havens, import/export companies, and ship, bus, and plane operators.[71]

144.    High-risk geographies include: countries subject to OFAC sanctions, including state sponsors of terrorism, countries identified as supporting international terrorism under section 6(j) of the Export Administration Act of 1979, as determined by the Secretary of State, and jurisdictions/countries identified as non-cooperative by the Financial Action Task Force on Money Laundering.[72]

145.    If a financial institution had a proper AML/CFT program in place and if the institution fully complied with AML/CFT laws and regulations, the institution would have identified that Iranian related entities, customers, and transactions were high risk based on the institution's offering and providing high-risk products and services, based on the fact that products and services included high-risk entities, and based on the fact that the locations where

---

[68] Exhibit 1, Declaration of Thomas E. Nollner at 16-17.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

the transactions occurred involved high-risk geographies. This would have required the institution to then increase its monitoring and surveillance of Iranian banking activity to preclude Iran from using the institution to conduct financial activity in support of terrorism.[73]

146. Instead, the Defendant Banks here either knew, or were willfully and purposefully ignorant or indifferent to, the High Risks posed by these Iranian transactions.[74]

147. **Defendant Banks Displayed Intent to Aid Terrorists or Willful and Purposeful Indifference in Ignoring Red Flags Raised by Iranian Transactions:** There were several publications issued during the early 2000s that discussed red flags related to certain transactions that a bank should be aware of that might indicate activity in the support of terrorism.[75]

148. In 2002, the OCC published "Money Laundering: A Banker's Guide to Avoiding Problems," that listed specific activity as red flags for terrorist financing. This included activity such as funds generated by a business owned by nationals of countries associated with terrorist activity, charity/relief organization-linked transactions, currency exchange buying/selling foreign currencies from various countries in the Middle East, and business account activity conducted by nationals of foreign countries associated with terrorist activity with no obvious connection to the business.[76]

149. The FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual of June 2005 provided even more examples of terrorist related red flags in Appendix F of the Manual. These include sixteen types of activity to include: funds transfers that do not include information on the originator or the person on whose behalf the transaction is conducted, they

---

[73] Exhibit 1, Declaration of Thomas E. Nollner at 17.
[74] *Id.*; Exhibit 3, Declaration of Robert Mazur at 30.
[75] Exhibit 1, Declaration of Thomas E. Nollner at 17.
[76] *Id.*.

include fund transfers that are sent or received via international transfers from or to high-risk locations, and instances where the stated occupation of the customer is not commensurate with the type or level of activity.[77]

150.    If a financial institution had a proper AML/CFT program in place and if the institution fully complied with AML/CFT laws and regulations, the institution would have known that some of the Iranian banking activity consisted of transactions (red flags) that a bank should be aware of that might indicate activity in the support of terrorism. This would have required the institution to increase its monitoring and surveillance of Iranian banking activity to preclude Iran from using the institution to conduct financial activity in support of terrorism.[78]

151.    Instead, the Defendant Banks either knew, or were willfully and purposefully ignorant or indifferent to, the Red Flags raised by these Iranian transactions.[79]

152.    **Defendant Banks Displayed Intent to Aid Terrorists or Willful and Purposeful Indifference in Failing to Follow FATF Recommendations**: The FATF is an inter-governmental body which sets standards, and develops and promotes policies to combat money laundering and terrorist financing. In 1990, FATF developed "Forty Recommendations" as an initiative to combat the misuse of financial systems by persons laundering drug money. Recognizing the vital importance of taking action to combat the financing of terrorism, in October 2001, the FATF expanded its mandate to deal with the issue of the financing of terrorism, and took the important step of creating the "Nine Special Recommendations on Terrorist Financing." These Recommendations contain a set of measures aimed at combating the funding of terrorist acts and terrorist organizations, and are complementary to the Forty Recommendations. In February 2012, FATF revised the Recommendations to incorporate the

---

[77] Exhibit 1, Declaration of Thomas E. Nollner at 17-18.
[78] *Id*. at18.
[79] *Id*.

Nine Special Recommendations on Terrorist Financing into the original Forty Recommendations. There are now FATF 40 Recommendations that include the terrorist issues.[80]

153. If a financial institution had a proper AML/CFT program in place and if the institution fully complied with AML/CFT international standards and business norms, the institution would have known that FATF revised its Recommendations to include specific recommendations related to dealing with terrorism. This would have required the institution to increase its monitoring and surveillance of Iranian banking activity to preclude Iran from using the institution to conduct financial activity mentioned in the FATF Recommendations in support of terrorism.[81]

154. Instead, the Defendant Banks either knew, or were willfully and purposefully ignorant or indifferent to, the FATF Recommendations regarding support of terrorism.[82]

155. **Defendant Banks Displayed Intent to Aid Terrorists or Willful and Purposeful Indifference in Failing to Follow Wolfsberg AML Principles:** In 2000, a group of thirteen of the world's largest banks, to include Barclays, Credit Suisse, Deutsche Bank, and HSBC, began to work on drafting anti-money laundering guidelines for Private Banking.[83]

156. The Wolfsberg Anti-Money Laundering (AML) Principles for Private Banking were subsequently published in October 2000, revised in May 2002, and revised again most recently in June 2012.[84]

157. The materials published by the Wolfsberg Group are designed to provide financial institutions with an industry perspective on effective financial crime risk management and

---

[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

included a framework and guidance for the management of financial crime risks, particularly with respect to Know Your Customer, Anti-Money Laundering, and Counter Terrorist Financing policies.[85]

158.    Other materials published by the group have included a Statement on the Financing of Terrorism, Anti-Money Laundering Principles for Correspondent Banking, Guidance on a Risk Based Approach for Managing Money Laundering Risks, FAQs on Politically Exposed Persons (PEPs), Trade Finance Principles, Guidance on Anti-Bribery & Corruption Compliance Programs, and a statement endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global AML and CFT programs.[86]

159.    If a financial institution had a proper AML/CFT program in place and if the institution fully complied with AML/CFT international standards and business norms, the institution would have known the Wolfsberg AML Principles and other published AML/CFT guidance related to dealing with terrorism.  This would have required the institution to increase its monitoring and surveillance of Iranian banking activity to preclude Iran from using the institution to conduct financial activity in contradiction of the Wolfsberg AML Principles and guidance as related to terrorism.[87]

160.    Instead, the Defendant Banks either knew, or were willfully and purposefully ignorant or indifferent to, the Wolfsberg AML Principles and guidelines as related to terrorism.[88]

### 4.      THE CONSPIRACY

161.    Each Defendant committed acts of international terrorism and violated 18 U.S.C.

---

[85] Exhibit 1, Declaration of Thomas E. Nollner at 18-19.
[86] *Id*.
[87] *Id*.
[88] *Id*.

§ 2339A, § 2339B, and § 2332d when it conspired with Iran to provide material support for terrorism.

162.     The Conspiracy was led by Iran, who along with the other members of the terrorism network shared the goal of sustaining and advancing Iran's international terrorism campaigns.

163.     Starting in 2003, the members of Iran's terrorism network shared the goal of pushing U.S. and Coalition forces out of Iraq while avoiding a direct military conflict with the international community. The Bank Defendants participated in the Conspiracy for financial gain. Collectively they gained business worth hundreds of millions of dollars.

164.     This terrorism network became more cohesive after 2003, continually adapting to the defensive improvements of U.S. forces and showing agility in circumventing the improved and sophisticated methods the U.S. forces developed in response to Iran's terrors attacks. The agility and technological advancement of Iran's terrorism campaign in Iraq was made possible by the covert U.S. dollars fraudulently flowing through the United States' OFAC system directly and indirectly to the terrorism network. These funds could not have been transferred without the help of the Bank Defendants.

165.     They accomplished these acts of terrorism by evading U.S. economic sanctions and arms embargos against Iran, knowing, or being deliberately indifferent to the fact, that Iran would use the laundered funds[89] to finance the Terrorist Groups for the purpose of killing and maiming, *inter alia*, American citizens serving as part of the Coalition Forces in Iraq from 2003 to 2011.

166.     As used in this Complaint, "the Conspiracy" refers to an illegal criminal

---

[89] USD funds include the following U.S. dollar-denominated financial instruments: deposit balances in domestic or Eurodollar bank accounts, repurchase agreements, letters of credit, bills of exchange, payment orders, checks, banknotes and coins.

agreement to commit international terrorism, beginning in 1987 and, continuing to the present, between Iran, its banking agents and various international financial institutions by and through which Defendants participated in a scheme whereby they agreed to alter, falsify or omit information from bank to bank payment orders in order to:

a) Conceal Iran's dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

b) Facilitate illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

c) Facilitate illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

d) Facilitate at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated a SDN;

e) Facilitate tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

f) Enable Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, MOIS, Hezbollah, the Special Groups, and Al Qaeda, Ansar al Islam to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 18 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

167.    The object of the Conspiracy was to provide material support for, and to commit, international terrorism.

168.    In addition to monetary support described in more detail in this Complaint, the

terrorist attacks themselves constitute "material support," in that they advanced the overall object of the Conspiracy.

169.   As noted by the U.S. Treasury Department's Financial Crimes Enforcement Network in a March 20, 2008 advisory: "Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."[90]

170.   Although the Conspiracy was effectuated in a variety of ways, four primary techniques were used by Defendants acting in concert with Iran and its Agents and Proxies as follows:

a)   Defendants removed or altered the names and other identifying information of the Iranian Bank co-conspirators or Iranian counter-parties in the payment orders sent through U.S. correspondent banks via SWIFT-NET– a practice commonly known and referred to as "stripping" SWIFT-NET messages;

b)   Defendants converted ordinary transactions involving SWIFT-NET message type 103 ("MT 103") payment orders (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT-NET message type 202 ("MT 202") payment orders (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers;

c)   Defendants deliberately chose not to conduct the required screening of Iran-linked SWIFT-NET messages[91] and letters of credit documents, worth at least tens of millions in USD funds on an annual basis, for compliance with the OFAC list of SDNs; the U.S. State Department's United States Munitions List of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's Commerce Control List of dual-use export controlled items, and Denied Persons List of export denied entities; and

d)   Defendants knowingly and willfully facilitated the illicit export and import of Iranian petroleum products for the NIOC and other sanctioned Iranian entities. These petrodollar transactions, including trade-finance and foreign exchange,

---

[90] *See*, https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

[91] Including, but not limited to, SWIFT-NET messages for customer credit transfers ("MT 100" series messages), bank-to-bank transfers ("MT 200" series messages), foreign exchange ("MT 300" series messages), trade finance ("MT 400" and "MT 700" series messages), precious metals trading ("MT 600" series messages), and account management ("MT 900" series messages).

provided Iran with illegal access to billions of dollars, including the direct funding through the Defendants of the IRGC and its network of front companies.

171.    The specific conduct of the Defendants as detailed in this Complaint, were overt acts in furtherance of the Conspiracy and were themselves illegal and violated criminal laws in the United States including: 1) Bank Secrecy Act, Title 31, United States Code, Section 5311 et seq. (the "BSA"); 2) Title 31, United States Code, Section 5318(h)(1) and Title 12, Code of Federal Regulations, Section 21.21, which required the Defendants to establish and maintain an anti-money laundering ("AML") compliance program; 3) Pursuant to Title 31, United States Code, Section 5318(i)(1), banks that manage private banking or correspondent accounts in the United States for non-U.S. persons must establish due diligence, and, in some cases, enhanced due diligence, policies, procedures, and controls that are designed to detect and report suspicious activity related to certain specified accounts. For foreign correspondent accounts, the implementing regulations require that the due diligence requirements set forth in Section 5318(i)(1) include an assessment of the money laundering risk presented by the account based on all relevant factors, including, as appropriate: (i) the nature of the foreign financial institutions' business and the market it serves; (ii) the type, purpose, and anticipated activity of the account; (iii) the nature and duration of the bank's relationship with the account holder; (iv) the AML and supervisory regime of the jurisdiction issuing the license for the account holder; and (v) information reasonably available about the account holder's AML record. 4) The International Emergency Economic Powers Act; 5) Trading with the Enemy Act; 6) Iranian Transaction Regulations; 7) New York State Banking Law 8) OFAC Regulations. OFAC promulgates regulations to administer and enforce the economic sanctions laws, including regulations for economic sanctions against specific countries, as well as sanctions against Specially Designated Nationals ("SDNs"). SDNs are individuals, groups, and entities that have been designated by

OFAC as terrorists, financial supporters of terrorism, proliferators of weapons of mass destruction, and narcotics traffickers.

172.    Absent the criminal collusion and conspiratorial conduct of the Defendants, Iran and its Agents and Proxies could not have successfully conducted or disguised the large volume of illegal USD transactions.

173.    Iran's goals were not secret. Its pursuit and development of Weapons of Mass Destruction—including IEDs, EFPs, and similar explosive munitions, its role supporting Terrorist Groups, and its role in using munitions in Iraq, were the subject of numerous publicly available news reports, U.S. government reports, and congressional testimony, as well as U.N. Security Council resolutions and European Union regulations prior to and during the period of the Conspiracy.

174.    Multiple news reports from the BBC in 2005 and 2006 discussed Iran's supplying weapons and technology to Shi'a extremist groups. CNN, in September 2008, reported that Iran had provided Shi'a militias in Iraq with millions of dollars in funding as well as high-grade military explosives and military equipment.

175.    State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq munitions, training, and funding.

176.    These official reports and other publicly disseminated information demonstrate that, by agreeing to participate in the illegal funding scheme, Defendants knew, or were deliberately indifferent to the fact that, they were providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism in 1984 and was subjected to sanctions in 1996, long in advance of Defendants' conduct.

177.    In addition to various efforts by law enforcement and intelligence agencies to

thwart Iranian efforts to circumvent U.S. economic sanctions and embargo, the Treasury Department and Commerce Department blacklisted Iranian front companies and middlemen believed to be complicit in the efforts to avoid U.S. sanctions.

178.    In 2006, the U.S. Treasury and State Department launched a campaign to warn a number of major international banks about the risks of conducting business with Iran. Defendants Standard Chartered, Commerzbank and HSBC were briefed at that time about these risks of terror financing in conducting business in Iran.

179.    Defendants RBS, Barclays, Credit Suisse, Deutsche Bank, Standard Chartered, and HSBC were also part of the Wolfsberg Group, an association of global banks that issued a statement in 2007, endorsing certain measures to promote transparency in financial transactions and to increase the effectiveness of global anti-money laundering and anti-terrorist financing programs. The Wolfsberg Principles for the Suppression of Terror Financing committed the banks to "implement 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.'" *Weiss*, 453 F. Supp. 2d at 619, 626-27.

180.    Despite Defendants' knowing Iran had been designated a State Sponsor of International Terrorism by the United States, each Defendant took affirmative steps to assist Iran and its agents in clandestinely routing billions of dollars through the United States to hide its unlawful conduct, and each Defendant knew or was deliberately indifferent to the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

181.    Each of the Defendants knew about the existence of the Conspiracy; directly

conspired with Iran, through Defendant Bank Saderat Plc, Bank Melli Iran, the CBI and others, to advance the Conspiracy through affirmative, extensive, and unlawful actions over long periods of time; and was aware of the existence and participation of other co-conspirators, including other Defendants named herein.

182. In fact, on numerous occasions, three or more of the Defendants acted jointly to facilitate the same illegal trade-finance transaction (*e.g.* providing material assistance to Mahan Air because the Iranian airline wanted to purchase U.S. manufactured aircraft and needed help circumventing U.S. export restrictions against Iran).

183. Each of the Defendants engaged in a multitude of transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.

184. Each of the Defendants, at the time it agreed to join and actively take part in the Conspiracy, knew that Iran was a U.S.-designated State Sponsor of International Terrorism and that Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct; and each Defendant took affirmative steps to help Iran in its unlawful conduct.

185. Each of the Defendants also knew, or was deliberately indifferent to, the fact that Iran, as a U.S.-designated State Sponsor of International Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC, MOIS, and the Terrorist Groups.

186. Each of the Defendants also knew, or was deliberately indifferent to, the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq as part of a sustained campaign of international terrorism, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those

dollars provided to the IRGC, MOIS, and the Terrorist Groups.

187.     Each of the Defendants also knew, or was deliberately indifferent to, the foreseeable (and inevitable) consequences of providing Iran, a State Sponsor of International Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting funding of Iranian-controlled organizations and terrorism proxies that targeted American civilians and servicemen through acts of international terrorism in Iraq from 2003 to 2011.[92]

188.     Without the active participation of the Defendants in the Conspiracy, Iran could not have transferred the same volume of USD to the IRGC, MOIS and the Terrorist Groups, to carry out the terrorist attacks nor could it have done so with the same ease and efficiency.

189.     Without the active participation of the Defendants in the Conspiracy, Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade EFPs, Rockets, Mortar and other munitions to kill and maim Americans in Iraq, as discussed below.

190.     Without the Defendant Banks' funding, the Terrorist Groups would not have been able to engage in the overt acts of authorizing, planning, and committing the attacks that killed or injured Plaintiffs to the same extent and magnitude as they did, and Iran and its Agents and Proxies would have been severely hampered in its terror financing and operations.

191.     Violence against American and other Coalition troops and civilians as a result of Defendants' role on the Conspiracy was within the foreseeable scope of and done in furtherance of the Conspiracy to provide material support for terrorism and commit terrorism.

192.     Each member of the Conspiracy played a crucial role in the success of the Conspiracy: (1) Defendants provided funding to Iran and its agents through their methods for

---

[92] Exhibit 3, Declaration of Robert Mazur at 30.

circumventing U.S. sanctions and regulations; (2) Bank Saderat and other agents of Iran, including the IRGC, MOIS, MODAFL and others, were conduits for the funds; (3) the funds were then transferred to the Terrorist Groups that committed, planned, and /or authorized the terror acts.

193.     As set forth below, the HSBC Defendants, Commerzbank, Commerzbank AG New York Branch, Standard Chartered Bank,   Barclays, and Credit Suisse AG altered, falsified, and omitted information from payment order messages that they facilitated on behalf of Bank Saderat, knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was a SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat's "funding of Hezbollah."

194.     As set forth below, the HSBC Defendants, Defendants Standard Chartered Bank, ABN Amro (RBS N.V.), The Royal Bank of Scotland Plc, Commerzbank and Commerzbank AG, New York Branch facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact, that IRISL was and agent of the IRGC and designated a SDN by the United States for, as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation, "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition Forces, including American nationals. IRISL, in fact, facilitated shipments of military cargo to Hezbollah.

195.     As alleged below, Defendants Standard Chartered Bank, Credit Suisse, Bank Saderat Plc and Commerzbank all altered, falsified, or omitted information from payment

messages (worth billions of U.S. dollars) that they facilitated on behalf of the NIOC, knowing the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement, and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

196.	As alleged below, Defendant Standard Chartered Bank also knowingly and actively financed and facilitated illegal trade-finance transactions worth hundreds of millions of dollars on behalf of MODAFL, the IRGC and various instrumentalities of Iranian state-sponsored terror, including companies working directly for Hezbollah and the IRGC-Qods Force.

197.	Furthermore, as alleged below, Defendants committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

198.	Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

199.	Plaintiffs further allege that the U.S. branches of Defendants Deutsche Bank, BNP Paribas, Credit Agricole, Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank, including but not limited to Deutsche Bank AG, New York Branch, BNP Paribas, S.A. New York Branch, Credit Agricole Corporate & Investment Bank, New York Branch, Barclay's Bank PCL, New York Branch, Standard Chartered Bank, New York Branch, The Royal Bank of Scotland Plc, New York Branch and Commerzbank AG, New York Branch are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide

material support to acts of international terrorism that killed and injured American citizens in Iraq.

200.     Each Plaintiff was injured as a result of an act of international terrorism for which Iran and its terrorism network, including FTOs Hezbollah, Al Qaeda, Al Qaeda in Iraq, and Ansar Al Islam, were provided material support and which were within the foreseeable scope of and in furtherance of the Conspiracy.

## II.     JURISDICTION AND VENUE

### 1.     THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES

#### A.     SUBJECT MATTER JURISDICTION

201.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2338 since all claims are being brought under 18 U.S.C. § 2333.

#### B.     PERSONAL JURISDICTION

202.     This Court properly exercises personal jurisdiction over all of Defendants.

203.     Personal jurisdiction is appropriate under Fed. R. Civ. P. 4(k)(1)(A) because each defendant is subject to personal jurisdiction in a court of general jurisdiction in New York State and personal jurisdiction comports with the U.S. Constitution.

204.     Each defendant is subject to personal jurisdiction in a court of general jurisdiction in New York State pursuant to N.Y. C.P.L.R. 302 because this case arises out of Defendants' laundering of USD in New York by executing tens of thousands of fund transfers totaling hundreds of billions of dollars through the Federal Reserve Bank of New York as well as Defendants' New York branches and correspondent accounts in New York.

205.     Such activity constitutes "transacting business" within New York State pursuant to C.P.L.R. 302(a)(1).

206. Defendants sent or cleared USD payments through the U.S., including clearing done through U.S. subsidiaries.

207. Defendants maintained correspondent bank accounts at financial institutions in New York and utilized the accounts to effectuate a significant number of fund transfers on behalf of Iran and its Agents and Proxies.

208. Defendants purposefully directed their activities at residents of this forum, and this litigation results from injuries arising out of and related to those activities. Defendants' culpable conduct stems from their use of the Federal Reserve Bank of New York and the New York branches of other financial institutions.

209. Defendants' fund-transfer activities also fall within C.P.L.R. 302(a)(2) because by executing the transfers Defendants committed tortious acts within New York State.

210. In furtherance of the Conspiracy, Defendants executed numerous USD transfers knowing (or being deliberately indifferent to the fact) the money would be used to provide material support and resources to a state sponsor of terror to enable terrorist organizations to carry out terrorist attacks, including the terrorist attacks in which the plaintiffs and their family members were injured or killed.

211. The transferred funds did in fact provide material support and resources to the Terrorist Groups who committed the acts of terrorism that caused injuries or death to plaintiffs and their family members.

212. Defendants deliberately and repeatedly directed their money laundering activities toward New York's banking system specifically and the United States generally by executing the nefarious fund transfers in New York and, in doing so, knowingly provided substantial financial support to the Terrorist Groups whose aim was to target American interests generally by

attacking United States nationals.

213.     The financial support enhanced the Terrorist Groups' ability to plan, prepare for, and carry out the terrorist attacks.

214.     Personal jurisdiction over Defendants comports with the Due Process Clause of the Fourteenth Amendment because Defendants purposefully availed themselves of the privilege of doing business in New York (by executing thousands of transfers worth billions of dollars) and because this lawsuit arises out of and relates to Defendants' deliberate and recurring contacts with and activity in New York State.

215.     Congress issued findings when it enacted JASTA, indicating that personal jurisdiction is proper over entities that, like Defendants, "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States." Congress found that those entities "should reasonably anticipate being brought to court in the United States to answer for such activities."

216.     Section 317 of the Patriot Act further shows that Defendants who are foreign entities should reasonably anticipate defending suit in the United States for their money-laundering activities directed towards New York. It provides that district courts have jurisdiction over a defendant if service of process is made and "the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;" or "the foreign person is a financial institution that maintains a bank account at a financial institution in the United States."

217.     Defendants expressly aimed their illegal conduct at New York.

218. This Court's exercise of personal jurisdiction over Defendants is proper, reasonable, and comports with traditional notions of fair play and substantial justice.

219. This Court therefore has specific personal jurisdiction over Defendants.

220. This Court also has specific personal jurisdiction over most of Defendants pursuant to the nationwide service of process provision of the Anti-Terrorism Act, 18 U.S.C. § 2334(a), which provides that "[a]ny civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent."

221. All Defendants can be served with process in the United States, with the exception of HSBC Holdings Plc ("HSBC Holdings"), HSBC Middle East, and Bank Saderat.

222. This Court's exercise of personal jurisdiction over said Defendants comports with the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

223. Said Defendants have sufficient minimum contacts with the United States as a whole and they purposefully availed themselves of the benefit of the U.S. banking system when they executed the numerous illegal fund transfers.

224. This Court also has general personal jurisdiction over the following Defendants, who, as detailed below, are either headquartered in New York or have their principal place of business in New York: HSBC North America Holdings, Inc. ("HSBC North America"); HSBC Bank USA, N.A.; and Commerzbank AG, New York Branch.

## 2. VENUE IS PROPER IN THIS COURT

225. Venue is proper under 18 U.S.C. § 2334(a) because several Plaintiffs reside in this District and at least one defendant resides, was served, or has an agent in this District.

226. Venue is also proper in this district, in the alternative, pursuant to 28 U.S.C. §

1391(b)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

## III. THE DEFENDANTS

### 1. THE HSBC DEFENDANTS

227. **Defendant HSBC Holdings Plc** ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC North America Holdings, Inc., Defendant HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

228. Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

229. HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

230. HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

231. HSBC Holdings may be properly served in accordance with the Hague Convention at its agent located at 8 Canada Square, London E14 5HQ, England.

232. **Defendant HSBC Bank Plc**: Also known as "HSBC-London," and often referred

to internally by members of HSBC Group as "HBEU," is a financial institution registered under the laws of England and Wales, and operates nearly 1,000 branches in the United Kingdom, Isle of Man, and the Channel Islands.

233. HSBC-London is one of the four major clearing banks in the United Kingdom and is a wholly owned subsidiary of HSBC Holdings.

234. HSBC-London may be properly served in accordance with the Hague Convention, at its registered office at 8 Canada Square, London E14 5HQ, England or its authorized agent at HSBC-London, 11 West 39th Street, New York, New York 10018.

235. **Defendant HSBC Bank Middle East Limited**: Also known as "HSBC-Middle East," and often referred to internally by members of HSBC Group as "HBME," is a financial institution headquartered Dubai, United Arab Emirates ("UAE"), and registered under the laws of the Jersey Channel Islands.

236. HBME maintained correspondent bank accounts at financial institutions in New York and utilized the respective account to effectuate a significant number of wire transfers on behalf of Iran, its Agents and Proxies, and the Terrorist Groups.

237. HBME may be properly served in accordance with the Hague Convention through its agent located at Unit GV08-1st Floor-Full Floor, L Gate Village Building 8 Dubai AE.

238. **Defendant HSBC North America Holdings, Inc**.: Known "HSBC North America," and often referred to internally by members of HSBC Group as "HNAH," is a Delaware corporation and is an indirect subsidiary of HSBC Holdings.

239. According to fact sheets published on HSBC's official website, HSBC North America is headquartered in New York City and Illinois.

240. HSBC North America is the holding company for HSBC Holding's operations in

the United States.

241.    HSBC North America's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

242.    HSBC North America may be properly served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

243.    **Defendant HSBC Bank USA, N.A.**: Also known as "HSBC-US," and often referred to internally by members of HSBC Group as "HBUS," is a national bank chartered under the National Bank Act (12 U.S.C. § 2 et seq.) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

244.    According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

245.    HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

246.    HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America.

247.    HSBC-US is a federally chartered banking institution under the National Bank Act (12 U.S.C. ch. 2 et seq.), is registered, organized, or incorporated in New York.

248.    The Department of the Treasury, Office of the Comptroller of the Currency is HSBC Bank USA's primary regulator.

249.    The HSBC-US "Global Banking and Markets" line of business, with offices in

more than 60 countries, provides a wide range of "tailored financial solutions" to major government, corporate, and institutional clients. This line of business includes an extensive network of correspondent banking relationships in which HSBC-US provides banks from other countries with USD accounts to transact business in the United States. Due to its affiliates in over 80 countries, HSBC is one of the largest providers of correspondent banking services in the world.

250.    In 2010, HSBC-US had about 2,400 correspondent customers, including more than 80 HSBC affiliates. Among other services, HSBC-US provides financial institution clients with access to the U.S. financial system by handling international wire transfers, clearing a variety of USD instruments, including travelers' checks and money orders, and providing foreign exchange services. HSBC-US Payment and Cash Management is a key banking division, located in New York, and supports HSBC-US' correspondent relationships.

251.    In addition, as part of this line of business, until 2010, HSBC-US housed the Global Banknotes Department, which used offices in New York City, London, Hong Kong, and elsewhere to buy, sell, and ship large amounts of physical USD. The Banknotes Department derived its income from the trading, transportation, and storage of bulk cash, doing business primarily with other banks and currency exchange businesses, but also with HSBC affiliates. In addition, for a number of years, HSBC-US held a contract with the U.S. Federal Reserve Bank of New York ("FRBNY") to operate U.S. currency vaults in several cities around the world to assist in the physical distribution of USD to central banks, large commercial banks, and businesses involved with currency exchange. In June 2010, however, HSBC-US exited the wholesale U.S. banknotes line of business.[93]

---

[93] United States Senate Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Case Financing: HSBC Case History* (Jul. 17, 2012),

252. HSBC-US may be properly served through its registered agent, The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, MD 21093.

253. The HSBC Defendants routinely conducted business in the State of New York through a correspondent account it maintained at its New York branch, and utilized that account to clear USD transfers requested by its customers.

## 2. DEFENDANT BARCLAYS BANK PLC & ITS NEW YORK BRANCH

254. Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, England. Barclays is a wholly owned subsidiary of Barclays Plc, a public limited liability company organized under the laws of England and Wales. This complaint refers to the subsidiary company.

255. Barclays maintains an extensive network of twelve corporate and investment banking branches and subsidiaries in the United States spread throughout Georgia, Massachusetts, Illinois, Texas, California, Florida, New York, Washington, and Washington D.C.

256. Barclays resides, is found, or has an agent in New York, Nevada, New Jersey, Delaware, Ohio, Texas, Maine, Georgia, Massachusetts, Illinois, California, Florida, Washington and Washington, D.C.

257. Barclays lists its corporate banking office in the United States as its New York City branch and this branch functioned as its primary clearance house for USD transactions for itself, its affiliates and clients.

258. At all relevant times, Barclays maintained a New York ("Barclays-NY") branch

https://www.hsgac.senate.gov/subcommittees/investigations/hearings/us-vulnerabilities-to-money-laundering-drugs-and-terrorist-financing-hsbc-case-history. Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the HSBC Senate Report as if fully set forth herein. Relevant excerpts from this Report are attached to this Amended Complaint as Exhibit No. 14, "HSBC REPORT."

that functioned as the primary USD clearer for all of Barclays, its affiliates, and its customers.

259.     Barclays-NY has more than 500 employees and total assets in excess of $36 billion.

260.     Barclays has operated in and been licensed and regulated by the State of New York since 1963.

261.     Barclays-NY thus constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

262.     Barclays may be properly served through their agent for service at its offices located at 745 7th Avenue, New York, New York 10019.

### 3.     DEFENDANT STANDARD CHARTERED BANK & ITS NEW YORK BRANCH

263.     Defendant Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. SCB operates principally in Asia, Africa, and the Middle East, but maintains its principal place of business in London.

264.     SCB-London is listed on the London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

265.     SCB resides, is found, or has an agent in New York, New Jersey, Texas, California, Florida, and Washington D.C.

266.     Since 1976, SCB has been licensed by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY"). SCB-NY is the seventh largest U.S. dollar correspondent bank in the world. The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments.

267.     SCB-NY provides wholesale banking services, primarily clearing for international

wire payments, at approximately $195 Billion in USD funds per day.

268.    SCB-NY constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

269.    SCB may be properly served through its registered agent CT Corporation System, 818 W 7th Street, Ste. 930, Los Angeles, CA 90017 or through its agent authorized to receive process at its offices located at 1095 Avenue of the Americas New York, New York 10036.

### 4.    DEFENDANTS ROYAL BANK OF SCOTLAND N.V. AND ROYAL BANK OF SCOTLAND PLC (N/K/A NATWEST MARKETS PLC), & ITS NEW YORK BRANCH

270.    The Royal Bank of Scotland Plc, a/k/a NatWest Markets Plc ("RBS Plc") is an international banking and financial services institution and a wholly owned subsidiary of The Royal Bank of Scotland Group Plc ("RBS Group").[94]

271.    At all relevant times, RBS Plc was licensed by the New York Department of Financial Services ("DFS") to operate as a foreign bank branch in New York.

272.    In October 2007, a consortium consisting of Fortis, the RBS Group, and Banco Santander, acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle, RBS Holdings.

273.    The former ABN Amro Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

274.    On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed Royal Bank of Scotland, N.V. ("RBS N.V.")

---

[94] Effective April 30, 2018, The Royal Bank of Scotland plc changed its name to NatWest Markets Plc. *See*, https://www.newyorkfed.org/markets/fxcplist-180430ap.html (last visited Dec. 21, 2018).

275. Ultimately, RBS Group acquired ABN Amro Holding N.V. As such, RBS Group acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations.

276. These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

277. RBS Plc and RBS N.V. are collectively referred to herein as "RBS."

278. At all times relevant to this Complaint and through 2015, RBS Group conducted banking operations in the United States through branches of RBS Plc in New York, New York and Stamford, Connecticut, and branches of RBS N.V. in New York (Royal Bank of Scotland N.V., (New York)) and Chicago, Illinois (Royal Bank of Scotland N.V., (Chicago)).

279. RBS currently provides banking services and products in the United States through its offices in Stamford, Connecticut.

280. RBS routinely conducted business in the State of New York through a correspondent account it maintained at that branch, utilizing that account to clear USD transfers requested by its customers.

281. RBS is subject to supervision and regulation by a variety of U.S. state and federal regulatory agencies, including the Connecticut Department of Banking and the Federal Reserve.

282. RBS N.V. may be properly served through its agent for service at 600 Washington Blvd., Stamford, CT 06901.

283. RBS Plc may be properly served through its registered agent, Corporation Service Company which does business in California as CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

284. RBS Group may be properly served through its agent for service at 600

Washington Blvd., Stamford, CT 06901.

285. This Court may exercise personal jurisdiction over RBS pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**5.     DEFENDANT CREDIT SUISSE AG & ITS NEW YORK BRANCH**

286. Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Credit Suisse serves clients worldwide and, at the time of the events giving rise to this action, Defendant Credit Suisse conducted business in the United States, and continues to do business in the United States.

287. Specifically, (according to its official corporate website), Credit Suisse conducts business in the United States through numerous offices and branches, including offices/branches in Atlanta, Georgia; Birmingham, Michigan; Boston, Massachusetts; Chicago, Illinois (2 offices/branches); Dallas, Texas; Houston, Texas; Los Angeles, California; Montgomery, Alabama; New York, New York; Northbrook, Illinois; Portland, Oregon; Raleigh, North Carolina; San Diego, California; San Francisco, California (2 offices/branches); Washington, D.C.; West Conshohocken, Pennsylvania; and West Palm Beach, Florida.

288. Credit Suisse's United States headquarters is located at 11 Madison Avenue, New York, New York.

289. In addition to its direct operations in the United States, Credit Suisse further transacts business in the United States though certain subsidiaries, including Credit Suisse Holdings (USA) Inc., Credit Suisse Securities, (USA) LLC, and Credit Suisse (USA), Inc.

290. Credit Suisse's operations in the United States are subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System, the Securities and Exchange Commission, and various state banking regulatory agencies.

291. Credit Suisse's New York branch is licensed by the New York Superintendent of

Financial Services, examined by the DFS, and subject to laws and regulations applicable to a foreign bank operating a New York branch.

292.    Credit Suisse's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

293.    According the CHIPS-NY website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

    a)   Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

    b)   The Bank of New York Mellon (identified by CHIPS-NY participant number 0001 and Fedwire routing number 011001234);

    c)   Defendant Deutsche Bank's subsidiary Deutsche Bank Trust Company Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033); and

    d)   Wells Fargo Bank NY International (identified by CHIPS-NY participant number 0509 and Fedwire routing number 026005092).

294.    Defendant Credit Suisse may be properly served through its registered agent, Corporation Service Company located at 80 State Street, Albany, New York 12207-2543 or through its agent for service at its Principal Executive Office located at 11 Madison Avenue, New York, New York 10010.

295.    This Court may exercise personal jurisdiction over Credit Suisse pursuant to Fed. R. Civ. P. 4(k)(1)(C).

## 6.    DEFENDANT BNP PARIBAS S.A. & ITS NEW YORK BRANCH

296.    Defendant BNP Paribas S.A. ("BNP") is the largest bank in France and is one of the five largest banks in the world by total assets. BNP has branches all through the world, including the United States.

297.    Its operations in the United States are headquartered in New York, with branch offices in California, Texas, and Illinois.

298.    BNP's New York branch is located at 787 Seventh Ave., New York, New York, and is licensed by the New York Superintendent of Financial Services, examined by the DFS, and subject to laws and regulations applicable to a foreign bank operating a New York branch.

299.    BNP's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

300.    BNP routinely conducted business in the State of New York through a correspondent account it maintained at its New York branch, utilizing that account to clear USD transfers requested by its customers.

301.    BNP may be properly served through its General Counsel, Peter Cooke, at 787 7th Avenue, New York, NY 10019 and in accordance with the Hague Convention at is offices located at 16, boulevard des Italiens, Paris, Ile-de-France, France.

302.    This Court may exercise personal jurisdiction over BNP pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**7.    DEFENDANT DEUTSCHE BANK A.G. & ITS NEW YORK BRANCH**

303.    Deutsche Bank AG ("DB") is a large international bank with over 98,000 employees and over $1.6 trillion dollars in total assets. DB is headquartered in Taunusanlage 12, Frankfurt, Germany.

304.    DB operates a branch in located at 60 Wall St. New York, New York, ("DB New York") and through which it conducts correspondent banking services and USD clearing activities for its international branches and customers. Specifically, DB conducted business in the United States through its offices in New York, California, Texas, Florida, Illinois, and

Washington, D.C., among others.

305.    In addition to the New York branch, DB operates over thirty banking locations throughout the United States in 18 different states.

306.    DB New York is subject to the oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The branch thus constitutes a "U.S. Person" under the Iranian Transaction Regulations and 18 U.S.C. § 2332d(b)(2).

307.    DB may be properly served through their agents located at Deutsche Bank AG, 60 Wall Street, New York, NY 10005 or its registered agent CT Corporation System 1200 South Pine Island Road, Plantation, FL 33324.

308.    This Court may exercise personal jurisdiction over DB  pursuant to Fed. R. Civ. P. 4(k)(1)(C).

## 8.    DEFENDANTS CRÉDIT AGRICOLE S.A., & CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, & ITS NEW YORK BRANCH

309.    Defendant Crédit Agricole S.A. ("CASA") is the largest retail banking group in France and is headquartered in Montrogue, France. Defendant Crédit Agricole Corporate and Investment Bank ("CACIB") have a number of subsidiaries and affiliated entities.

310.    In June of 2003, CASA purchased Crédit Lyonnais ("CL"). CL owned a subsidiary named Credit Lyonnais (Suisse) S.A. ("CLS"). CLS then merged with a CACIB subsidiary in Switzerland, Crédit Agricole Indosuez (Suisse) S.A. ("CAIS"). The resulting entity became Crédit Agricole (Suisse) S.A.

311.    CACIB is the result of a 2004 transfer of the corporate and investment banking operations of CL to another CASA subsidiary, Crédit Agricole Indosuez. CACIB initially operated as "Caylon." In 2010, it began operating under its current name, CACIB. Hereinafter,

regardless of whether the entity was operating under the name Caylon or CACIB, the entity is identified as CACIB.

312.    CACIB resides, is found, has an agent, and operates a branch, Crédit Agricole Corporate & Investment Bank, New York Branch, in New York.

313.    CACIB's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department.

314.    CASA and CACIB routinely conducted business in the State of New York through a correspondent account it maintained at that branch, utilizing that account to clear USD transfers requested by its customers.

315.    CACIB's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

316.    CASA may be properly served in accordance with the Hague Convention by and through its agent for service, at its headquarters located at 50 avenue Jean Jaurès 92 120 Montrouge, France, or its agent for service at its offices located at 1301 Avenue of the Americas, New York, New York 10019.

317.    CACIB may be properly served through its registered agent Corporation Company of Miami, 200 S. Biscayne Blvd., Ste. 4100 (GR), Miami, FL 33131.

318.    This Court may exercise personal jurisdiction over Defendants CASA and CACIB pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**9.    DEFENDANTS COMMERZBANK AG & COMMERZBANK AG, NEW YORK BRANCH**

319.    Defendant Commerzbank AG ("Commerzbank") is a financial services company formed under the laws of Germany and headquartered in Frankfurt, Germany and has over 1,200 branches in Germany alone.

320. Commerzbank is listed on stock exchanges in Germany, London, and Switzerland.

321. Commerzbank has locations in 50 countries, including a representative office in Tehran, Iran and a New York branch licensed by the State of New York since 1967.

322. Commerzbank AG, New York Branch ("Commerzbank New York") is headquartered in New York, New York.

323. Commerzbank New York constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2)

324. According to the CHIPS-NY website, Commerzbank AG used, *inter alia*, the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

   a) Defendant Commerzbank's New York branch (identified by CHIPS-NY participant number 0804 and Fedwire routing number 026008044);

   b) Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

   c) Defendant SCB-NY (identified by CHIPS-NY participant number 0256 and Fedwire routing number 026002561); and

   d) Defendant Deutsche Bank's subsidiary, Deutsche Bank Trust Company Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033).

325. Commerzbank and Commerzbank New York may be properly served through their agents for service at their offices located at 225 Liberty Street, New York, New York 10281.

326. This Court may exercise personal jurisdiction over Commerzbank and Commerzbank New York pursuant to Fed. R. Civ. P. 4(k)(1)(C).

327. Defendants HSBC Group members, Barclays, Standard Chartered Bank, RBS, Credit Suisse, BNP, DB, CASA/CACIB, and Commerzbank and its New York branch, are

sometimes referred to herein collectively as "the Western Bank Defendants."

### 10. DEFENDANT BANK SADERAT PLC

328. Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed herein, a United Kingdom subsidiary, Defendant Bank Saderat Plc, and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

329. Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

330. In 2002, Bank Saderat Iran's London bank branch, Defendant Bank Saderat Plc, became a wholly-owned bank subsidiary, incorporated under United Kingdom law.

331. Defendant Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank, London.

332. Iran Overseas Investment Bank changed its name to Bank Saderat Plc in March 2002.

333. On July 1, 2005, OFAC determined that Bank Saderat Iran and its branches at 707 Wilshire Boulevard, Suite 4880, Los Angeles CA 90017 and at Lothbury, London EC2R 7HD, England are financial institutions owned or controlled by the Government of Iran within the meaning of 31 C.F.R. § 560.313.

334. On September 8, 2006, the United States Department of Treasury designated Bank Saderat as a SDGT, declaring that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."[95]

---

[95] See U.S. Dep't. of Treasury, *Treasury Cuts Iran's Bank Saderat off From U.S. Financial System* (Sept. 8, 2006) https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx.

335.    In October 2007, Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated a SDGT by the United States pursuant to Executive Order ("E.O.") 13224. The U.S. Treasury Department's 2007 press release regarding Bank Saderat's designation stated:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and European Union-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

336.    On March 3, 2008, The United Nations Security Council adopted Resolution 1803 (UNCSR 1803, 2008) by a vote of 14 in favor and none against, with 1 abstention (Indonesia), essentially black listing *all* banks domiciled in Iran, in particular Bank Saderat, and its branches and subsidiaries abroad, including Bank Saderat Plc.

337.    Bank Saderat Plc maintains its principal office in London, United Kingdom.

338.    Defendant Bank Saderat Plc may be served in accordance with the Hague Convention by and through its registered office of Bank Saderat Plc, at 5 Lothbury, London, EC2R 7HD, England.

## IV.    FACTUAL ALLEGATIONS

### 1.    IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING INTERNATIONAL TERRORISM

339.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

340.    As noted above, the United States designated Iran a State Sponsor of International Terrorism on January 19, 1984. That designation has remained in force throughout the relevant

time period to this Action.

341.    Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

## 2.    U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

342.    On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people.

343.    It was soon established that the terrorist operatives responsible for the bombing were trained and equipped by the IRGC.

344.    Soon thereafter, Congress responded by passing the 1996 Iran-Libya Sanctions Act finding that:

(1)    The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them *and its support of acts of international terrorism* endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

(2)    The objective of preventing the proliferation of weapons of mass destruction and *acts of international terrorism* through existing multilateral and bilateral initiatives *requires additional efforts to deny Iran the financial means* to sustain its nuclear, chemical, biological, and missile weapons programs. (Emphasis added.)

345.    To ensure that U.S. financial institutions that process international wire transfers in the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems and software algorithms to monitor and

screen all wire transfer activities.

346. Banks in New York that process most of the world's Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

347. At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originated from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"[96]), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.[97]

348. Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, and to fuel its other terrorism and weapons proliferation activities through the IRGC.

349. To Iran, the importance of funding Hezbollah, the IRGC and subsequently, the Terrorist Groups in Iraq, became even more acute after the 2003 U.S. invasion of Iraq. After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting greater financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for Weapons of Mass Destruction.

---

[96] The petrodollar market developed because, *inter alia*, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in USD since the end of World War II.
[97] The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

350.     None of these goals could be accomplished by Iran without USD funds, access to the Eurodollar market, and the agreement of Western financial institutions, such as the Western Bank Defendants, to shield Iran's unlawful Eurodollar and trade-finance activities from detection.

### 3.     IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION, AND UNITED NATIONS' SANCTIONS

351.     Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass Destruction technology and military equipment to Iran.

352.     On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

353.     On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),[98] as well as the 1985 International Security and Development Cooperation Act ("ISDCA"), substantially tightening sanctions against Iran.

354.     On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959, and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

355.     In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

356.     In addition, Iran sought to clandestinely acquire dual-use technologies from

---

[98] On October 16, 2007, President Bush signed into law the International Emergency Economic Powers (IEEPA) Enhancement Act, Public Law No. 110-96, amending IEEPA section 206. The Act enhanced criminal and administrative penalties that could be imposed under IEEPA.

European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

357.    For years, U.S. law enforcement officials, customs agents and intelligence services have worked to thwart Iranian efforts to circumvent U.S. economic sanctions and arms embargos.

358.    A few brief examples illustrate the larger U.S. government effort:

- On March 12, 2001, criminal and civil sanctions were imposed on Refinery Industries, Inc., of Budd Lake, New Jersey, for attempted exports of gas detection equipment to Iran.

- On June 11, 2001, Saeed Homayouni and Yew Leng Fung, officials of Multicore, Inc., pled guilty in the U.S. in connection with the firm's purchase of commercial and military aircraft parts and missile components for export to Iran.

- In March 2007, the U.S. led efforts to pass U.N. Security Council Resolution 1747 that declared: "Iran shall not supply, sell or transfer directly or indirectly from its territory or by its nationals or using its flag vessels or aircraft any arms or related materiel."

- In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states "to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad" and "to inspect the cargoes to and from Iran, of aircraft and vessels, at their airports and seaports, owned or operated by Iran Air Cargo and Islamic Republic of Iran Shipping Line, provided there are reasonable grounds to believe that the aircraft or vessel is transporting [prohibited] goods…"

- On September 17, 2008, the U.S. Department of Justice unsealed a criminal indictment against 16 foreign-based defendants related to Mayrow General Trading Company, for their involvement in providing Weapons of Mass Destruction-related, military, and dual-use items to Iran, specifically components found in IEDs in Iraq that caused deaths and injuries to U.S. military personnel.

- On December 11, 2009, at the request of the U.S. government, the Thai government detained a Russian aircraft containing a cargo of

weapons from North Korea destined for Iran.

- On June 23, 2010, the U.S. Department of Justice charged an Iranian company and citizen, as well as Opto Electronics PTE, Ltd., a Singapore company and others with, *inter alia*, violations of the Arms Export.

- Control Act (22 U.S.C. §2778) for facilitating the unlawful transfer of long range radio frequency modules used in IEDs targeting Coalition Forces in Iraq. The modules were flown to Iran by Mahan Air.

- On May 11, 2010, Balli Aviation Ltd., a subsidiary of the U.K.-based Balli Group Plc., was sentenced in the District of Columbia to pay a $2 million fine, and to serve a five-year corporate period of probation after pleading guilty to a two-count criminal information in connection with its illegal export of a commercial Boeing 747 aircraft from the United States to Iran.

- In December 2012, the U.S. Department of Justice charged Business Machinery World Wide, an Iranian corporation based in Tehran, Iran; three of its subsidiary companies located in Dubai, United Arab Emirates; and nine officers and individuals for conspiring to violate the IEEPA by facilitating the shipment of computers to the United Arab Emirates for delivery to Iran.

- In April 2014, John Alexander Talley was sentenced to 30 months in prison for conspiracy to violate the IEEPA and Iranian Transaction and Sanctions Regulations. Talley's company, Tallyho Peripherals, Inc., was also sentenced to one year of probation. According to court documents, from 2009 to September 2012, Talley and his company conspired with others to unlawfully export sophisticated computer equipment from the United States to Iran. The shipments of the computers and the payments transited through the United Arab Emirates.

359. In addition, both the U.S. Treasury Department and Commerce Department have blacklisted a long list of Iranian front companies, shell companies and middlemen that the U.S. has determined to be complicit in Iran's sanctions evasion efforts.

## 4. THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS

### A. THE CONSPIRACY'S SHARED GOALS

360. As noted *supra*, Iran needed access to the Eurodollar market in order to sustain the Islamic Revolutionary government that has ruled Iran since 1979.

361. Specifically, the Government of Iran used the Eurodollar market for the following economic activities:

      a.     Investing petrodollar (in USD funds) revenue from Iran's oil and gas export sales;

      b.     Exporting the Iranian Islamic Revolution through acts of international terrorism; and

      c.     Illicitly acquiring U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

362. Iran did not have a legitimate need to access the Eurodollar market for the benefit of any Iranian civilian agency, operation or program. It could have operated with funds denominated in any number of other Eurocurrencies[99] (deciding, instead, to continually conduct its international trade primarily in Eurodollars).

363. Specifically, Iran did in fact have access to viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than Eurodollars) to meet the needs of its civilian programs, including, but not limited to, its credit at the European Central Bank denominated in Euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian Rial.

---

[99] The term Eurocurrency refers to deposits of funds transferred to, and maintained by, banks outside of the home country for the respective currency. Thus, had Iran chosen to convert its petrodollars into Japanese Yen, it would have held "Euroyen" deposits at banks outside of Japan.

364.    However, Iran would not have been able to move its funds undetected through the Eurodollar market without the covert operational and technical assistance it received from the Defendants.

365.    Likewise, Iran would not have been able to substantially fund Hezbollah and Shi'a militias in Iraq—and acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—without access to USD funds through the Eurodollar market.

366.    In mid-2012, Iran's access to the Eurodollar market through the Defendant Banks was cut-off by SWIFT-Brussels.

367.    Soon thereafter, Iran's domestic currency collapsed.

368.    The CBI was forced to intensify the use of its gold reserves in order to prop-up the Rial's value.

369.    Absent the Defendant Banks providing Iran and its proxies with decades of clandestine access to the Eurodollar market, Iran's foreign policy goal of furthering its Islamic Revolution through the financing of terrorism—including Iran's sponsorship of terrorist attacks against Coalition Forces in Iraq between 2003 and 2011—would have been severely constrained.

## B.    EURODOLLAR MARKET OPERATIONS

370.    As mentioned above, the global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

371.    According to the FRB-NY, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

372.    Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar

market were conducted electronically by telegraphic transfer ("TELEX").

373.    By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.

374.    A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one trillion in USD funds.

375.    As mentioned *supra*, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

376.    The Clearing House Interbank Payment System ("CHIPS-NY") represents that it processes 95 percent of those Eurodollar funds transfers.

### 5.    THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION

377.    Alongside its economic sanctions against Iran, the United States government designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade Regulations). At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market conduct careful monitoring of all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, *inter alia*, Iran's terrorism and weapons proliferation activities.

378.    The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.

379.    Until November 2008, U.S. financial institutions were authorized to process

certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the U.S. financial system en route to another offshore, *non-Iranian,* non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated a SDN, or that the transaction was for a SDN's benefit.

380.    The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

381.    Because so much of Iran's international trade has historically flowed through the United States for the clearing and settlement and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

382.    Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all USD-denominated wire transfers.

383.    Because Iran could have correctly and transparently used the U-Turn exemption to access USD for its legitimate governmental purposes, the Western Bank Defendant's illegal manipulation and abuse the U-Turn process on behalf of sanctioned Iranian entities establishes that the Western Bank Defendants understood that the USD to which they provided Iran access could and would be used for Iran's illegitimate and illegal activities, including acts of

international terrorism.

384.    The Western Bank Defendants, despite their duties and obligations to prevent terrorism financing, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT-NET MT 103 and MT 202) and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations.

385.    Over time, however, U.S. authorities began to understand the contours of the Conspiracy involving Iran and the Defendants that is set forth in this Complaint.

386.    Initially, the realization that Iran was engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, counter-terrorism, and Iran-related sanctions (i.e., E.O. 13382, E.O. 13224, and E.O. 13438, respectively).

387.    The apparent assumption made initially by U.S. authorities was that Iran and its banking agents (Iranian Bank Co-conspirators Bank Sepah, Bank Melli, Bank Saderat and others) were engaged in deception that was exploiting unwitting Western financial institutions that were engaged in high risk but legal, foreign exchange, precious metals, and trade-finance business with Iran.

388.    The truth was otherwise.

389.    *First*, despite Iran's feeble domestic economy during the entire relevant period of time, its oil and natural gas exports still provided the Iranian regime with substantial revenues denominated in U.S. dollars.

390.    *Second*, Iran's petrodollar revenues were managed by, and through, among others,

the Central Bank of Iran ("CBI") and the Iranian Ministry of Petroleum (including the National Iranian Oil Company; later designated a SDN pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC).[100]

391.     *Third*, the challenge Iran faced was that it was almost entirely dependent on USD funds, but U.S. economic sanctions—and the attendant monitoring of Iran's financial activities—were incompatible with its terror financing and Weapons of Mass Destruction proliferation goals.

392.     *Fourth*, between 2004 and 2011, both Lebanon (where Iran's agent, Hezbollah, is based) and Iraq (where Iran's proxies were launching terror attacks, killing and maiming the Plaintiffs) were U.S.-dollarized economies, a fiscal reality that made Iran's funding of its terror proxies a highly "dollar-sensitive" endeavor.

393.     *Fifth*, in order to free itself from U.S. economic sanctions, and circumvent the U.S., European Union ("EU") and United Nations ("U.N.") monitoring of its financial activities, Iran needed more than a single willing partner among western financial institutions to assist its illegal goals.

394.     *Finally*, Iran needed the active assistance of at least several of the world's largest (non-U.S.) multinational banks that were already accustomed to handling large volumes of dollar clearing and settlement transactions, and thus would be less likely to raise suspicions with U.S. authorities.

395.     For example, in early 2001, the Central Bank of Iran asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Iranian petrodollar payments, trade-finance and foreign exchange transactions on behalf of NIOC.

396.     As set forth *infra*, Standard Chartered Bank agreed to participate in the

---

[100] That designation was removed in January 2016.

Conspiracy and deliberately removed identifying data on NIOC's payment orders (SWIFT-NET MT 103 and MT 202 payment order messages) for these and other wire transfers.

397. The sheer size and volume of these NIOC transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing USD clearing and settlement volume.

398. However, even the large international banks worried about attracting attention from U.S. authorities when their illegal dollar clearing activities for Iran markedly increased.

399. As detailed below, in 2003, Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal Eurodollar clearing activities on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

400. In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the Conspiracy engaged in by certain European banks (including the Western Bank Defendants herein) on behalf of Iran and Iranian banks.

401. As the New York State Department of Financial Services ("DFS") later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers*.

(Emphasis added.)

402. These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements ("DPAs") with the Western Bank Defendants (as well as other European and Japanese banks), and it exposed catastrophic

vulnerabilities in America's counter-financing of terrorism ("CFT") security architecture inherent in the U-Turn exemption because foreign banks, including the Western Bank Defendants herein, were actively conspiring with Iran to help it evade U.S. economic sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

403. On October 11, 2007, the Financial Action Task Force (FATF) released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counterterrorist finance regime represents a significant vulnerability within the international financial system."

404. FATF's October 11, 2007 statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

405. The U.S. criminal investigations would ultimately find that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active, **critical*** assistance of the Defendants herein.

406. Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas export sales totaled approximately $972.9 billion USD.

407. Without the Conspiracy between the Defendants herein, and other foreign financial institutions, Iran could not have (a) transferred the overall volume of USD funds through the international financial system that it did; (b) surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC; and (c) exploited the Iranian U-Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did.

408. As former Manhattan District Attorney Robert M. Morgenthau pointedly told

Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

409.   Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety, and, as of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

410.   In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

> The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

## 6.   LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM

### A.   THE BASICS OF TRADE FINANCE

411.   Letters of Credit ("LCs") are often used in international transactions to ensure that payment will be received. Due to the nature of international transactions, including factors such as the distance goods must travel, differing laws in each country, and the difficulty of trading parties knowing each party personally, the use of LCs has become a very important aspect of international trade.

412.   The LC transaction process begins when an "Applicant" opens the Letter of Credit with a bank.

413.   Normally, the Applicant is the purchaser of goods and the LC is opened with his/her bank according to the terms and conditions of the purchase order and business contract

between buyer and seller.

414.    The "Beneficiary" of the LC is the party to the transaction who receives the payment amount agreed upon in the LC.

415.    In order to receive payment for the goods, the Beneficiary company submits all required documents under the terms and conditions of the LC.

416.    When an LC is required to be secured, an "Issuing Bank" agrees to guarantee payment for its customer upon the completion of the terms and conditions of the LC.

417.    The Issuing Bank's role is to provide a guarantee to the seller that if the required documentation is presented, the bank will examine the documents and pay the contract sum if these documents comply with the terms and conditions set out in the LC.

418.    Typically, the documents requested will include a commercial invoice, a transport document such as a bill of lading or airway bill and an insurance document; there are many other documents such as certificates of origin, packing lists and inspection certificates that can be included. LC transactions deal in documents, not in the underlying goods themselves.

419.    An "Advising Bank" is usually a foreign correspondent bank of the Issuing Bank that will advise the beneficiary of the transaction. Generally, a Beneficiary of an LC wants to use a local bank to insure that the LC is valid.

420.    In addition, the Advising Bank is usually responsible for sending the documentation to the Issuing Bank. Generally, the Advising Bank has no other obligation under the LC. If the Issuing Bank does not pay the beneficiary, the Advising Bank is not obligated to pay the obligation under the LC.

421.    The "Confirming Bank" is usually a correspondent bank that confirms the LC for the Beneficiary. At the request of the Issuing Bank, the Confirming Bank obligates itself to

ensure payment under the LC.

422. Because the Confirming Bank does not confirm the credit until it evaluates the country and bank where the LC originates, the Confirming Bank usually acts as the Advising Bank.

423. In the middle of this serpentine process is the "Negotiating Bank," which negotiates documents delivered by the Beneficiary of the LC.

424. The Negotiating Bank examines the drafts and/or documents, and verifies and confirms the terms and conditions under the LC on behalf of the Beneficiary to avoid discrepancies.

425. A Negotiating Bank gives value to, and relies upon (or may rely upon), such drafts and/or documents, and may purchase or agree to purchase the drafts and/or documents presented.

426. A Reimbursing Bank usually pays part or all of the amount due to the Beneficiary of the LC on behalf of the Issuing Bank once it receives a statement from the Negotiating Bank that the documents required comply with the LC's terms; however, in certain cases a Reimbursing Bank serves only as a guarantor for the payment by the Issuing Bank.

### B. THE U.S. TRADE EMBARGO – UNITED STATES MUNITIONS LIST (USML) AND COMMERCE CONTROL LIST (CCL)

427. For decades, U.S. trade with Iran has been carefully circumscribed by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs").

428. Certain types of U.S. defense articles and defense services, such as nuclear or conventional weapon systems, are identified based on the ITARs promulgated by the U.S. Department of State and its Directorate of Defense Trade Controls through a publically available

United States Munitions List ("USML").[101]

429.    In addition to USML items, certain types of U.S. dual-use products, such as nuclear materials, aerospace and other potentially sensitive materials, are identified based on the EARs and ITRs by the U.S. Department of Commerce and its Bureau of Industry and Security ("BIS") on a publicly available Commerce Control List ("CCL").[102]

430.    Dual-use items that are not published on the CCL by BIS are commonly referred to by U.S. manufacturers and shipping companies as "EAR99."

431.    These EAR99 items generally consist of low-technology consumer goods and do not always require a license; however, shipment from the United States of an EAR99 item to Iran, or any other embargoed country, often requires disclosure to BIS in addition to a license from the Commerce Department.

432.    As set forth below, one of the aims of the Conspiracy was to evade the U.S. ITARs, ITRs, and EARs—and also various EU decisions and U.N. Security Council Resolutions—prohibiting Iran from conducting both conventional weapons-trafficking and WMD proliferation.

433.    To facilitate this aim, Iran and its Co-Conspirators, including the Defendants herein, used LCs drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies and weapons that were listed on the USML and/or CCL.

434.    Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were

---

[101] The updated USML is available at:
https://www.pmddtc.state.gov/regulations_laws/documents/official_itar/ITAR_Part_121.pdf.
[102] The updated list is available at http://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear.

instrumental in facilitating the activities of these terrorist organizations, including, but not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

### 7. IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES ("IRISL")

435. As Iran's national maritime carrier, IRISL has a long history of facilitating arms shipments as an agent of and on behalf of the IRGC, and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[103]

436. For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….

> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

437. The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

438. The cargo included Iranian Defense Industries Organization ("DIO")[104] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

---

[103] Improvised Explosive Device ("IED") is a term commonly used by the U.S. military as shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah and the Special Groups in Iraq were not "improvised," but, instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.

[104] DIO was designated a SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the EU since 2008 (*see,* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32008D0475). He was later sanctioned by the U.S. on January 17, 2016.

439.    DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

440.    An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri.*

441.    In September 2008, the U.S. Treasury Department designated IRISL a SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

442.    The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

443.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

444.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

445.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

446.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to

Syria from Iran.

447.     The vessel carried seven containers of small arms ammunition (including *12 million bullet casings*), as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein.

448.     The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization (DIO).

449.     The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

450.     In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

451.     The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

452.     The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

453.     United Nations Security Council Resolution 1929, adopted on June 9, 2010, froze certain assets of IRISL and called on the international community to cease providing financial and insurance services to both the IRGC and IRISL.

454.     In addition, a July 2010 European Union ("EU") sanctions implementing

regulation confirmed that IRISL conducted deceptive business practices in order to access USD funds.

455.    Specifically, EU Council Implementation Regulation Number 668/2010 stated that "IRISL subsidiaries have used US dollar-denominated bank accounts registered under cover-names in Europe and the Middle East to facilitate routine fund transfers."

456.    Similarly, the June 2011 indictment of IRISL in New York stated:

> In many aspects of global commerce, including the international maritime industry, contracts and payments are denominated in U.S. dollars. Such U.S. dollar transactions are primarily executed, or "cleared," through correspondent banks in the United States. The U.S. dollar clearing operations for many large U.S. financial institutions are processed through correspondent bank accounts domiciled in New York County.

> In order to deceive and bypass these OFAC filters, SDNs designated under OFAC's non-proliferation of weapons of mass destruction program must falsify, or cause to be falsified, the originator and/or beneficiary information in wire transfers. In other words, by omitting or falsifying data regarding their roles as the true originators or beneficiaries, SDNs are able to send and receive wire transfers that would otherwise be blocked by U.S. financial institutions. Through the fraudulent use of a web of subsidiary entities and front companies, IRISL and the other defendants were able to deceive U.S. financial institutions and maintain their access to the U.S. financial system.

457.    Because the DIO, as discussed infra, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

458.    Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

459.    The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

460.    During 2006 and 2007, weapons caches seized by Coalition Forces from the

Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

461. In sum, at no point in time was the DIO a legitimate agency of the Iranian government.

462. According to the U.S. State Department, the DIO was the owner of a Eurodollar account that was maintained by Bank Melli Iran's branch in Hamburg; and this bank account was used to send and receive USD funds transfer transactions for the benefit of the DIO.

463. Bank Melli Iran's branch in Hamburg was a customer of Defendant Commerzbank during the relevant period, and both Bank Melli Iran and Commerzbank were active participants in the Conspiracy set forth herein.

## 8. IRAN'S USE OF NIOC AND STATE PETROLEUM REVENUES FOR ITS ILLEGITIMATE TERRORIST ACTS

464. During the time that Defendants provided illegal financial services to NIOC, it was well known that NIOC was controlled and commandeered by the IRGC and used to fuel IRGC illicit activities.

465. In 2005, at a public conference in Tehran sponsored by NIOC and the Petroleum Ministry, officials of International Oil Companies operating in Iran expressed their concern over the anticipated personnel changes in the petroleum and petrochemicals sectors. During this conference, it was publicly stated that "the CEOs of the four main NIOC subsidiaries - NIOC's CEO and those of National Petrochemical Company ("NPC"), National Iranian Gas Company ("NIGC") and Pars Oil & Gas Company ("POGC") - will be among the first to go to the IRGC

hands."[105]

466.    As a sign of the IRGC's influence over and control of NIOC, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum in 2011. Even after his appointment, Qasemi publicly stated his allegiance to the IRGC.[106] According to the confidential 2009 gasoline report, POGC officers and officials were also loyal members of the IRGC.[107]

467.    Similarly The Minister of Energy, Majid Namjou, is also an IRGC commander, as is the Minister of Industries and Mining, Mehdi Gazanfari. These three IRGC veterans sit on NIOC's general assembly and ensure IRGC's total control over its NIOC decision-making.[108]

468.    Not surprisingly, NIOC's profits go directly to the IRGC as evidenced in a confidential 2009 gasoline import shipments list describing the flow of funds from NIOC and its subsidiaries (KALA and POGC) to the IRGC.[109]

469.    As the Minister of Petroleum, Qasemi provided projects worth of billions of dollars to IRGC companies, such as the development of the South Pars oil field by Khatam al-Anbiya Construction Company ("KAA").  Some of these projects were non-bid projects granted to KAA, including 900KM gas pipeline from Asaluyeh to Iranshahr.[110]

470.    The appointment of IRGC leaders to officer positions in NIOC and its wholly-controlled subsidiaries, coupled with the flow of money from NIOC and its subsidiaries directly to the IRGC, as well as the IRGC's favored position in being awarded contracts and lucrative deals from NIOC, spurned the U.S Treasury to deem NIOC an agent and/or affiliate of the

---

[105] WikiLeaks - https://wikileaks.org/gifiles/attach/9/9847_Iran%20Gasoline%20Shipment%20report.pdf at 14.

[106] WikiLeaks - https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx
[107] WikiLeaks - https://wikileaks.org/gifiles/attach/9/9847_Iran%20Gasoline%20Shipment%20report.pdf at p.4

[108]  *See* https://www.fdd.org/analysis/2012/07/12/are-iranian-sanctions-working/
[109] WikiLeaks - https://wikileaks.org/gifiles/attach/9/9847_Iran%20Gasoline%20Shipment%20report.pdf at p.6.
[110] *See* https://www.opec.org/library/Annual%20Statistical%20Bulletin/interactive/current/FileZ/XL/T410.HTM

IRGC.[111]

471.    As an agent of the IRGC, NIOC and its subsidiaries serve the financial needs of the IRGC and fuel its efforts to effectuate Iran's terroristic goals.

### 9.    IRAN'S AGENTS, HEZBOLLAH, THE IRGC, AND MOIS FOMENT TERRORISM IN IRAQ

472.    As previously noted, Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

473.    Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty-nine people) and the 1994 bombing of a Jewish community center (killing eighty five people).

474.    As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a Specially Designated Terrorist ("SDT") by the United States.

475.    On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained that designation since that time.

476.    On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated a SDGT by the United States.

477.    For more than 30 years, Iran, through MOIS and the IRGC, has funded, trained and equipped Hezbollah.

---

[111]    *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx

478. The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade EFPs, anti-tank guided missiles ("ATGMs"), and various rockets, such as the Fajr-5.

479. Beginning with the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its ambitions.

480. In doing so, Iran has primarily relied on MOIS, the IRGC, and Hezbollah, along with the terrorist network these entities supported.

481. According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran." (More recent reports estimate this amount closer to $1 billion per year).

482. Iran provided tens of millions of U.S. dollars in funding to Hezbollah through the international financial system, including $50 million USD that Defendant Bank Saderat Plc provided to Hezbollah.

483. Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces in Iraq ("MNF-I").

484. Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

485. Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the "Special Groups."

486. Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's

expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC and MOIS's operations in Iraq between 2004 and 2011.

487.    Iran's support of Terrorist Groups in Iraq was described in the U.S. State Department's 2005 *Country Reports on Terrorism*, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

488.    The IRGC's subversion of Iraq has not been limited to terrorism.

489.    The IRGC and MOIS have also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

490.    The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

491.    All of these "investments" required substantial funding in USD funds (as Iraqi local currency was not widely accepted in Iraq during this time period).

492.    According to the same U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in *supplying lethal assistance* to Iraqi militant groups, which destabilizes Iraq …Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that *Iran provided funding, safe passage, and arms to insurgent elements*." (Emphasis added).

493.    The IRGC and MOIS' direct involvement with Hezbollah and its terror proxies in Iraq is further evidenced by recently declassified interrogation reports involving AAH founder and leader Qais al-Khazali. For example, according to Qais al-Khazali, Jaysch al Mahdi ("JAM")

Leader Muqtada al Sadr ("MAS") worked closely with a person named "Hajj Yusif/Sheikh Yusi," who was an Iranian official, and member of Iranian "intal'at" and the IRGC. Khazali described Sheikh Yusif's official position in the IRGC as related to his work with JAM as a "cultural affairs officer." Khazali believed that he was also a member of the Quds Force and that his name was false. Hajji Yasir also acted as the "chief of protocol" for the first visit of MAS to Iran, and subsequent visits to Iran from Sadr movement or Jaysh al-Mahdi (JAM) visitors.[112]

494.    Also according to Qais al-Khazali, MAS and JAM worked with another MOIS agent called "Shekh Ansari."  Khazali reported that this person was also a member of the IRGC-QF and that his name was false. Khazali also verified that, during the second battle of Najaf from approximately July 2004 to September 2004, an Iranian male, "Shayikh Ansari" was operating in Najaf in support of JAM against coalition forces and was taking part in combat operations with JAM.[113]

495.    Qais al-Khazali also revealed that, for those in Iraq seeking financial support from Iran, "the best way to access support from the Iranians" was to go "through Intal'at." (a/k/a MOIS).[114]

496.    By early 2005, the presence of IRGC, MOIS, and Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

497.    Two years later, according to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—the IRGC-QF provided

---

[112] Summary of Tactical Interrogation of Qayis al-Khazali, Report No. 1 (March 21, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-1.pdf).

[113] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 1 (March 21, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-1.pdf); and *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 4 (March 23, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-4.pdf).

[114] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 37 (April 10, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-37.pdf). As is alleged specifically below, MOIS/Intal'at, supported and participated in certain terrorist attacks that injured/killed Plaintiffs.

Hezbollah and one of its local trainers, Ali Musa Daqduq (discussed in greater detail below), up to $3 million in U.S. currency *every month*.

498.    In October 2007, the IRGC-QF was designated as a SDGT pursuant to E.O. 13324 for its terrorism-related activities.[115]

499.    The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added).

500.    In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system—in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

501.    Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, Special Groups in Iraq used U.S. currency almost exclusively.

502.    According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for Multi-National Forces in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling

---

[115] As discussed below, the IRGC-QF was also designated an FTO on April 15, 2019.

them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

503.    General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

504.    On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

505.    Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early - May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC*

*headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*

(Emphasis added).

506.     On April 8, 2019, the White House released the "Statement for the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization" with which President Donald Trump formally announced his administration's plan to "designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act." The Statement further provided:

> [T]he Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the ***IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft.*** The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign.
>
> This designation will be the first time that the United States has ever named a part of another government as a FTO. ***It underscores the fact that Iran's actions are fundamentally different from those of other governments***. This action will significantly expand the scope and scale of our maximum pressure on the Iranian regime. ***It makes crystal clear the risks of conducting business with, or providing support to, the IRGC. If you are doing business with the IRGC, you will be bankrolling terrorism***.
>
> To that end, Iran (with the IRGC and Hezbollah's aid) has armed, trained, and funded the Terrorist Groups in Iraq and infiltrated and co-opted Iraqi security forces in an effort to kill or maim Coalition Forces to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.[116]

507.     On April 15, 2019, the U.S. Treasury Department's designation of the IRGC and the IRGC-QF as a Foreign Terrorist Organizations took effect.[117]

508.     Although the designation of the IRGC and IRGC-QF as an FTO is quite recent,

---

[116] https://www.whitehouse.gov/briefings-statements/statement-president-designation-islamic-revolutionary-guard-corps-foreign-terrorist-organization/ (last accessed April 21, 2019).

[117] *See* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20190415_33.aspx (last accessed April 21, 2019).

the underlying conduct and bases for the designations stretches back nearly two decades, including the specific conduct of the IRGC and IRGC-QF that is detailed and alleged in this Complaint.

509. The underlying actions of the IRGC and IRGC-QF that resulted in their current designation as FTOs was well known and publicized at the time that it occurred, and was the basis for prior attempts by the U.S. Government to designate these entities as FTOs during the time that Plaintiffs were being targeted and attacked by IRGC-backed terrorists in Iraq. For example, on March 22, 2007, then-Senators Barrack Obama and Hilary Clinton, along with 70 other U.S. Senators called upon President George W. Bush to designate the IRGC an "FTO" but such efforts stalled at the time.[118]

510. The prior efforts by the U.S. government to designate the IRGC as an FTO for its crucial role in Iran's terror network occurred during the time that the IRGC was actively orchestrating terrorism in Iraq and illegally transacting business with Defendants, who could have reasonably anticipated that the IRGC could be designated at any time during the relevant period of this case.

**10. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS**

511. As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

512. EFPs constitute "weapons of mass destruction" as that term is defined in 18

---

[118] *See e.g.* S.970 The Iran Counter-Proliferation Act of 2007, 110th Congress (2007-2008) ("A bill to impose sanctions on Iran and on other countries for assisting Iran in developing a nuclear program, and for other purposes.).

U.S.C. § 2332a(2)(A).

513.    First used by Hezbollah against Israeli armor in Lebanon, EFPs are categorized by the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

514.    In Iraq, EFPs were often triggered by a passive infra-red device that ultimately set off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

515.    To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

516.    This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon. If not perfectly and precisely milled and assembled, the EFP loses its functionality as a weapon.

517.    Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, nevertheless Hezbollah and the Special Groups indiscriminately deployed them against both military and civilian soft targets.

518.    Iran and Hezbollah's signature and specialized weapons knowledge spread like wildfire throughout its terror network in Iraq, the U.S. State Department's 2006 Country Reports on Terrorism further documented Iran's success with lethal EFPs to ambush and murder U.S. and other Coalition Forces, stating:

Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*

(Emphasis added.)

519.  In 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

520.  That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

521.  Major General Zahner further added:

[T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

522.  General Bergner commented on Iran funding Hezbollah operatives in Iraq:

Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is

training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

523.    Bergner further noted that:

The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran.

524.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army

Major General Richard Lynch, stated that:

Most of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

525.    According to the U.S. State Department's 2007 *Country Reports on Terrorism*:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

526. Other U.S. Government reports, such as the Department of Defense's 2007 *Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

527. These observations continued in 2008.

528. According to the U.S. State Department's 2008 *Country Reports on Terrorism*:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

529. One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic

presses used to form copper into the shape of disks used in EFPs.

530. Likewise, the State Department's 2011 Country Reports on Terrorism reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

531. Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

> [F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian.

532. According to a 2013 New York Times report, EFPs were the "single most lethal weapon American forces faced in Iraq."[119]

533. According to one declassified CENTCOM study, there were at least 1,534 EFP detonations in Iraq between July 2005 and December 2011, resulting in at least 196 Americans killed in action and at least 861 Americans wounded in action.[120]

534. Hezbollah-trained terrorist operatives typically used EFPs by placing them on public roadways.

## 11. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF ROCKETS, MORTARS

---

[119] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.
[120] *See* U.S. Army Central Command, "OIF EFP Detonations by Month," https://admin.govexec.com/media/gbc/docs/pdfs_edit/enclosure_tab_a_document_for_review_%28150813_oif_efp_pull_no_summary%29_%281%29.pdf.

**AND IRAMS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS.**

535.     In addition to EFPs, Iran also provided material support to the Terrorist Groups by providing them with rockets, mortars, and Improvised Rocket Assisted Munitions (IRAMs).

536.     Along with EFPs, rockets, mortars and IRAMs were a signature weapon of terrorists in Iraq that were supplied by Hezbollah and the IRGC.

537.     **IRAMs**: An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal, and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

538.     According to The Joint Improvised Explosive Device Defeat Organization of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

539.     Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not publicly disclosed until 2010.

540.     IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

541.     **Mortars.** A mortar is an artillery-like weapon that fires explosives at short ranges. Iranian-supported terrorists frequently used mortars against Americans in Iraq. Between January 2007 and June 2008, there were more than 1,500 mortar attacks in Baghdad alone. In raids within the Iranian-proxy group Jaysh al-Mahdi's stronghold of Sadr City in October 2008, Iraqi forces discovered numerous weapons caches containing mortars and other munitions traced to

Iran.

542. **Rockets.** Iranian-sponsored Terrorist Groups fired a variety of rockets at Coalition targets on numerous occasions in Iraq. The rockets fired by these groups included 107mm rockets, 122mm rockets, and man-portable air-defense systems commonly associated with Iran and its Agents and Proxies. The purpose of the rocket attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel. The rocket attacks were a key part of the broader of Iran's terror campaign, as Iran's Agents & Proxies boasted about America's alleged inability to protect civilians in the Green Zone. In one instance, Hezbollah operatives used Misagh-1 surface-to-air missiles to destroy at least one American helicopter. In March 2008, Iranian-sponsored operatives within Sadr City launched coordinated rocket attacks on the International Zone (commonly known as the "Green Zone") in southeast Baghdad, several miles away. Officials estimated that the ensuing violence – all directly caused by these rocket attacks on the Green Zone – killed 925 people and injured 2,605 others.[121]

**12.    IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF OTHER LETHAL WEAPONS AND TACTICS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS.**

543. Not only did Iran, through IRGC, MOIS and Hezbollah provide the large sophisticated explosive munitions discussed above, but it spent millions of dollars, arming, training and directing its terrorist proxies to commit a variety of terrorist attacks using a vast array of tactics and weapons against Coalition forces and Iraqi citizens. These other distinctive weapons and tactics used by Iran-sponsored terrorists include the following:

---

[121] *See* David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*"), https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/ RAND_RR160.pdf at 98.

544.    **IEDs**. Improvised explosive devices ("IEDs") are homemade bombs that are often used as booby traps by terrorist organizations. Frequently, IEDs are set up as roadside bombs that terrorists can detonate when a vehicle passes by. According to a 2013 New York Times report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq.[122] IEDs were a signature weapon of Iranian-sponsored terrorists in Iraq. For example, just one area of operation of an Iranian proxy group (Jaysh al-Mahdi's Sadr City headquarters), experienced more than 1,500 IED attacks between January 2007 and June 2008. In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches containing IEDs and bomb-making materials. One specific IED technique reportedly used by Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells. IEDs require significant skill to successfully and secretly source, manufacture, emplace and trigger.

545.    **RPGs**. Iranian-sponsored terrorists expertly used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions. In one such attack in May 2007, Hezbollah-trained terrorists killed 12 people and wounded another 75. Iraqi and Coalition forces discovered numerous weapons caches containing RPGs in raids within areas controlled by Iranian proxy groups.

546.    **Complex Attacks**. Iranian-sponsored terrorists in Iraq frequently carried out professed "complex attacks" against American peacekeeping forces. Complex attacks involve multiple teams of terrorists using different weapons and tactics in concert. In March 2008 for example, an Iranian-trained operative explained to journalists that, to attack a vehicle, one group of terrorists would attack it with a barrage of small-arms fire to distract the soldiers while another

---

[122] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.

group planted an IED underneath the vehicle.[123] In other complex attack scenarios experienced by certain Plaintiffs, terrorists would detonate EFPs/IEDs which were then immediately followed by attacking the disoriented victims with highly accurate and well-coordinated multi-directional small-arms fire. Or the opposite, terrorists would "bait" Coalition forces by attacking patrols or Iraqi citizens with small arms fire, and draw a larger responsive force into a coordinated EFP/IED/Mortar/Sniper attack. Such tactics are commonly associated with training by Hezbollah and the IRGC.

547. **Permissive Environments**. Iran, through its FTO Agents and Proxies, established, maintained and exploited permissive operational environments throughout Iraq in which they could effectively plan and commit terrorist attacks that killed and/or injured Americans, including the Plaintiffs. In order to successfully plan and execute terrorist attacks, terrorists need freedom of movement, local support, concealment, controlled positions, intelligence, and other tactical advantages. The single most effective means of creating and maintaining a permissive environment is money. Iranian-sponsored terrorists successfully created and maintained such environments throughout Iraq, and insurgent or terrorist activity in such areas only occurred at Iran's behest.

548. **Personnel & Manpower**: Iran funded and provided a steady supply of well-trained foreign (non-Iraqi) and domestic jihadists used to command, lead or otherwise advise and support the Terrorist Groups. This manpower filled ranks, promoted "the revolution," inspired confidence, and shared expert advice gained in Iranian-funded and Iranian-hosted training camps

---

[123] *See* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

(discussed in detail below).[124] These individuals were hardened terror operatives with command and leadership skills, bomb making ability, and knowledge of advanced tactics, training and procedures specifically developed by Iran and Hezbollah to lethally engage and defeat Coalition forces.[125] Iran covered the attendant costs and logistics of providing this reliable source of personnel, including the effective training, transportation into, shelter, safe haven, embedment, and movement of operatives throughout, Iraq.[126]

549.     **Direct Financing & USD Currency**: The common thread that ties all of Iran's material support to the Terrorist Groups in Iraq is money. Not only did Iran use its unfettered access to USD to fund the design, production, provision, and deployment of the above-listed weapons, training, and personnel, it ensured that its massive investment had guaranteed returns. Iran provided financial support to the Terrorist Groups that best effectuated its long term strategy of killing Americans, expelling the United States from Iraq, and preventing the stabilization of the new government. Iran fueled the Terrorist Groups with monetary incentives in the form of rewards, bounties and bonuses to those who attacked Coalition Forces. For example, Iran, through MOIS and IRGC, offered **$150,000.00** USD rewards for every killed or captured American Special Forces soldier.[127] "Iran also paid the Terrorist Groups between **$4,000 -**

---

[124] *See e.g.* Combating Terrorism Ctr. at West Point Harmony Program, *Translated Iraq Intelligence Report (October 2000)*, https://ctc.usma.edu/app/uploads/2013/09/Iraqi-Intelligence-Study-of-the-Iranian-Revolutionary-Guard-Corps-Translation.pdf; *see also*, Combating Terrorism Ctr. at West Point Harmony Program, *Translated Iraqi Intelligence Report about the Quds Force Activities in Iraq (trans. April 7, 2005)*, https://ctc.usma.edu/app/uploads/2013/09/Iraqi-Intelligence-Report-about-the-Quds-Force-Activities-in-Iraq-Translation.pdf
[125] Megan Greenwell, "Iran Trains Militiamen Inside Iraq, U.S. Says," Washington Post (Aug. 20, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/08/19/AR2007081901394.html (Last accessed on Dec. 11, 2018).
[126] *See e.g.* U.S. Dept. of Defense, American Forces Press Service, News Release, *Petraeus: Interrogations Reveal Iranian Influence in Iraq*, (April 26, 2007).
[127] WikiLeaks - (https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_COA_Scimitar_-_Muqtada_Al_Sadr_-_Mahdi_Militia_(June_3,_2006)

**$13,000** USD per rocket or roadside bomb attack, depending on the circumstances."[128] Iranian operatives also lured locals into their plans by offering locals money to emplace IEDs. For example, in August 2007, a "recruiter and organizer for [JAM/SG/Badr]… suspected of using local charities as a front to screen and recruit individuals by offering them **$500** to emplace improvised explosive devices." It was also believed that this same detainee was also "facilitating cross-border training, garnering financial support, and transporting equipment and weapons with Persian [Iranian] militant groups to be used against Iraqi and coalition forces and supplying the IED that killed two coalition soldiers in Karbala and is linked to other deadly attacks in Diwaniyah, Najaf and Karbala."[129] Such funding was agreed to by no later than June 2003, when Iran began to fund domestic Iraqi terror groups, including JAM and the Special Groups.[130] Furthermore, in return for their violent efforts, Iran financed the Special Groups' ability to provide posthumous support and services to families of "martyrs" – in the overall average amount of **$2 million** USD per month.[131] In 2004, Iran provided JAM with **$80 million**.[132] In 2007, Iran was providing AAH **$20 million** a month to train its members.[133] In 2008, U.S diplomats estimated Iran's financial "largesse" to its "Iraqi surrogates" at **$100 - $200 million per year**."[134] Such funds were above and beyond the **$700 - $800 million** per year Iran provides

---

[128] Michael Knights, *The Evolution of Iran's Special Groups in Iraq,* CTC Sentinel (Nov. 2010) available at: https://www.washingtoninstitute.org/uploads/Documents/opeds/4d06325a6031b.pdf (Last accessed on Dec. 11, 2018)

[129] Dept. of Defense, American Forces Press Service, News Release, *Coalition Forces Target al Qaeda Leaders Around Baghdad*, (Aug. 7, 2007) (available at: http://archive.defense.gov/news/newsarticle.aspx?id=46974).

[130] *See* Summary of Interrogation of Qayis al-Khazali, Report No. 4 (March 23, 2007), (available at https://www.aei.org/spotlight/qayis-al-khazali-papers/

[131] Summary of tactical Interrogation of Qayis al-Khazali, Enclosure 1-16, Report No. 200243-008 (June 30, 2007), (available at https://www.aei.org/spotlight/qayis-al-khazali-papers/).

[132] Geoffrey Gresh, *Instigating Instability: Iran's Support of Non-State Armed Groups in Iraq*, Al Nakhlah Online Journal, The Fletcher School, Tufts Univ. (Spring 2006).

[133] Michael Weiss, *Trust Iran Only as Far as You Can Throw It*, Foreign Policy (June 23, 2014), https://foreignpolicy.com/2014/06/23/trust-iran-only-as-far-as-you-can-throw-it/

[134] WikiLeaks - https://wikileaks.org/plusd/cables/09BAGHDAD2992_a.html

Hezbollah and the annual budgets for the IRGC and Qods Force.[135]

550.    All of the foregoing support from Iran and its Agents & Proxies for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, *inter alia*, the Central Bank of Iran, Bank Melli Iran and Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the IRGC, MOIS, IRISL and the Terrorist Groups as part of the Conspiracy set forth in detail herein.

551.    Because of the size and scope of Iran's efforts to murder Americans in Iraq—and subvert the U.S.-sponsored and freely elected Iraqi government, Iran required access to hundreds of millions of dollars that it could only be reliably and effectively transferred through the global financial system with the illicit assistance of the Western Bank Defendants.

**13.    IRAN USED THE IRGC AND FTO HEZBOLLAH TO MATERIALLY SUPPORT THE SPECIAL GROUPS IN ORDER TO AUTHORIZE, PLAN, AND COMMIT TERRORIST ATTACKS IN IRAQ.**

**A.    THE BADR CORPS / BADR ORGANIZATION**

552.    The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

553.    Badr Organization is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

554.    From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

---

[135] David Adesnik, *Iran Spends $16 Billion Annually to Support Terrorists and Rogue Regimes*, FDD Policy Brief (January 10, 2018), https://www.fdd.org/analysis/2018/01/10/iran-spends-16-billion-annually-to-support-terrorists-and-rogue-regimes/

555. Iran intended the Special Groups to operate like Hezbollah, and thus, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

556. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

557. Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

558. The Badr Corps received training and weapons from Iran through the IRGC and Hezbollah.

559. After Saddam Hussein's overthrow, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

560. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

561. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Agents and Proxies and the Terrorist Groups in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hezbollah ("KH," discussed below).

562. "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest IRGC-QF command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

563. The Badr Organization played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corps agents and operatives.

564.    Through the Badr Corps, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g. the Iraqi Ministry of Interior Intelligence structure) during the time relevant to this Action.

565.    According to seized Iraqi intelligence documents, the Badr Corps employed a *modus operandi*—common among Iranian-sponsored groups—of establishing clandestine offices in businesses, hospitals, and nongovernmental organizations in Iraq. One undated Iraqi intelligence report explained that among the many functions of these fronts was to help "secure and support the Badr Corps, and the different groups belonging to the al-Qods Force, such as the movement of Hezbollah."

566.    In addition to participating in some of the terrorist attacks that are the subject of this lawsuit, Badr Organization intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

   a)  During at least 2003-2004, Badr Organization inserted numerous assassination teams from its bases in Iran who systematically murdered hundreds of Sunni former (Hors de combat) Iraqi army pilots and officers;

   b)  On May 14, 2005, Ahmed al-Khafaji, a top leader in the Badr Organization, ordered the arrest and torture of retired (Hors de combat) Brigadier General Muhammed al-Azzawi and the torture and extrajudicial killing of his brother and 11 other civilians;

   c)  On February 16, 2006, U.S. Maj Gen Joseph Peterson reported that U.S. forces had arrested 22 Iraqi policemen in northern Baghdad, members of Badr Organization death squad, who told U.S. soldiers they were taking a Sunni man away to be shot dead.[136] Hundreds of thousands of Sunni civilians have been kidnapped, tortured and killed by Badr Organization death squads;

---

[136] BBC News, *Iraq 'death squad caught in act'* (Feb. 16, 2006), http://news.bbc.co.uk/2/hi/middle_east/4719252.stm.

d) Badr Organization leader Hadi al-Amiri personally ordered attacks on up to 2,000 Iraqi Sunni civilians from 2004-2006 (when 2,000 were killed and an unknown number were wounded);

e) Al-Amiri's preferred methods of killing allegedly involved using a power drill to pierce the skulls of his adversaries;[137]

f) In July 2005, the morgue in Baghdad received 1,100 Sunni bodies, about 900 of which bore evidence of torture or summary execution;[138] and

g) On November 13, 2005, there was a discovery of a detention center in Baghdad, run by Iraqi intelligence officials linked to Badr, where captives, mostly Sunni Arabs, were beaten, blindfolded, or subjected to electric shocks.[139]

567. The Badr Corps' control of a wide array of Iraq government, cultural and social institutions allowed Iran to provide its Agents and Proxies with falsified, albeit legitimately produced credentials, passports, security badges, uniforms and other material support used to commit terrorism in Iraq.

568. Badr Corps also controlled and directed specific military units of the Iraqi Army. When its members were not personally carrying out terrorist attacks, Badr Corps capitalized on its military control of various regions of Iraq to provide safe haven, support, access, and permissive operational environments for other Terrorist Groups to operate.

569. Defendants knew, or were deliberately indifferent to, the fact Iran provided funding, financial services, and material support to the Badr Corps/Organization.

**B.    JAYSH AL MAHDI ("JAM" OR THE "MAHDI ARMY")**

570. Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed

---

[137] Loveday Morris, *Appointment of Iraq's new interior minister opens door to militia and Iranian influence*, Wash. Post, (Oct. 18, 2014), https://www.washingtonpost.com/world/appointment-of-iraqs-new-interior-minister-opens-door-to-militia-and-iranian-influence/2014/10/18/f6f2a347-d38c-4743-902a-254a169ca274_story.html?utm_term=.6ddc94d5364a.

[138] Andrew Buncombe & Patrick Cockburn, *Iraq's death squads: On the brink of civil war*, Independent, (Feb. 26, 2006), http://www.independent.co.uk/news/world/middle-east/iraqs-death-squads-on-the-brink-of-civil-war-6108236.html.

[139] Council on Foreign Relations, *Shiite Militias and Iraq's Security Forces* (Nov. 30, 2005), https://www.cfr.org/backgrounder/shiite-militias-and-iraqs-security-forces.

confrontation by Shi'a militia against U.S.-led forces in Iraq.

571.    JAM and its subsidiary, the Promise Day Brigades ("PDB"), are international terrorist organizations and not "military forces" and intentionally violate all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statute.

572.    JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship of terrorist activities."[140] Prior to September 11, 2001, Mughniyah was ranked number one on the FBI's most wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

573.    In Iraq, JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

574.    JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

575.    In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house . . . about 20 miles east of Baghdad . . . They arrested one of our division's most valued targets, . . . [who] acted as a link between Iran and the [JAM]. He was the main Shia conduit in that region for getting Iranian EFPs and rockets into Baghdad, . . ."[141]

576.    In addition to participating in some of the terrorist attacks that are the subject of

---

[140] "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008. Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence [MOIS] and a direct role in Iran's sponsorship of terrorist activities." *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *106–07.
[141] Kimberly Kagan, *The Surge: A Military History* (2010).

this lawsuit, Jaysh al-Mahdi and PDB intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions, and engage in widespread and systematic acts of mass murder, torture, ethnic cleansing, and genocide. For example:

a)   On April 2, 2004, in a sermon, Muqtada al Sadr issued what became known as the hawasim fatwa. Asserting the fundamental illegitimacy of Saddam Hussein's regime, he declared that any claims of ownership of goods or property were invalid – and that looters were entitled to the fruits of their plunder so long as they paid khums, a 20 percent religious tax on its value, to Sadrist officials;

b)   In a subsequent sermon, Muqtada proclaimed the September 11th attacks on the United States were "a miracle and blessing from God;"

c)   Muqtada further threatened that "[i]f America persists [in advocating for independent Sunni and Kurdish states], then it will cease to exist;"

d)   On July 9, 2006, JAM terrorists set up checkpoints across the Hay al Jihad neighborhood of Baghdad, asking drivers and passengers for identification. All Sunni males were taken to a bus and driven to a waste ground where over 50 civilian Sunni captives were murdered. In addition, JAM perpetrated numerous suicide bombings across Sunni neighborhoods in Baghdad from July 4-9, 2006, killing over 150 civilians as part of its widespread and systematic campaign of ethnic cleansing;

e)   In October 2006 in Samara, the group carried out an attack which resulted in 18 civilian casualties and 90 injuries;

f)   In March 2008 in Baghdad, JAM militants fired up to 30 mortar rounds and rockets at the International Green Zone, killing 14 civilians, including several children, one U.S. government contractor, wounding between 4 and 8 people, between 39-47 civilians, including several children; and

g)   On June 24, 2009, a JAM/PDB vehicle-borne IED resulted in 62 civilian deaths and 120 civilian casualties.

577.   Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the PDB to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

578. PDB and JAM have received funding, training, and weapons from the IRGC and Hezbollah. For example, captured JAM-member and founder of AHH (discussed below), Qais al-Khazali, stated "[t]he Sadr groups that receive training from Hezbollah are the special groups and the Jaysh al Mahdi (JAM) groups that fight the coalition forces."[142]

579. PDB and JAM actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

580. For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. service members were killed.

581. Defendants knew, or were deliberately indifferent to, the fact Iran, through FTO Hezbollah, provided funding, financial services and material support to JAM/PDB.

## C. ASA'IB AHL AL-HAQ ("AAH" OR "THE LEAGUE OF THE RIGHTEOUS")

582. Asa'ib Ahl Al Haq (or the "League of the Righteous") terrorist organization is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

583. AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

584. AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

585. AAH is an international terrorist organization and not a "military force" and

---

[142] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 54 (April 18, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-54.pdf).

intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

586.     During the time relevant to this Action, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

587.     Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

588.     Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

589.     In addition to participating in some of the terrorist attacks which are the subject of this lawsuit, AAH intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

a)     AAH has launched over 6,000 attacks in Iraq, thousands of which targeted civilians, including the October 3, 2007 attempted assassination of Gen. Edward Piertrzyk, the Polish ambassador to Iraq. Three bombs struck the embassy's three-car convoy (all bearing Polish flags) killing three members of the Polish embassy, injuring the ambassador and 8 other civilians and 3 soldiers.

b)     In May 2007, AAH kidnapped Peter Moore, a British IT expert, along with four bodyguards from a government building in Baghdad. Peter Moore was beaten on a near-daily basis and the bodyguards were tortured and murdered.

c)     In February 2010, AAH kidnapped Department of Defense civilian employee Issa T. Salomi who was released in March 2010 in exchange for the release of 4 AAH terrorists held in Iraqi custody.

590.     AAH is one of the Iranian entities determined to be legally responsible (along with Iran), for the January 20, 2007, attack on the Provincial Joint Coordination Center

("PJCC"), in Karbala, Iraq, that killed and injured U.S. nationals.[143]

591.     Defendants knew, or were deliberately indifferent to, the fact Iran provided funding, financial services and material support to AAH.

### D.     KATA'IB HEZBOLLAH ("KH")

592.     KH has functioned as Iran's go-to militia in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks.

593.     Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

594.     KH is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

595.     On June 24, 2009, the United States designated KH an FTO.

596.     The State Department's notice of KH's FTO designation stated that:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

597.     KH was also simultaneously designated a SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

598.     The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

599.     The Treasury Department's 2009 press release announcing KH's designation

---

[143] *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018).

explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

600. The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

601. The Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

602. The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

603. Furthermore, the 2009 U.S. Treasury Department press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

> One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

> Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

604. In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

> …also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

605. As noted above—and as stated by the U.S Treasury Department in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops.

606. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

607. In addition to committing some of the terrorist attacks that are the subject of this lawsuit, KH intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

    a) On June 4, 2008, KH killed 18 and injured 29 Iraqi civilians, destroying 19 homes;

    b) On November 29, 2008, KH launched a rocket attack, killing 2 U.N. contractors and injuring 15 other civilians;

c) In July 2009, KH threatened the lives of Iraqi politicians and civilians who supported Iraq's political process;

d) On July 2011, KH issued a statement threatening Kuwait and the workers who were building a port near Kuwait's border with Iraq;

e) In June 2014, Human Rights Watch found KH and AAH and other Shite terrorist groups had carried out "indiscriminate attacks in civilian areas," and had also conducted kidnapping operations and carried out summary executions of Sunnis in the towns of Buhriz, Mada'in, al-Heetawy, and other towns;

f) In November 2008, KH threatened to attack the Iraq government if it signed the security agreement with the United States; and

g) KH kidnapped 18 Turkish construction workers in Baghdad, in September 2015.

608.    KH committed a systematic and widespread campaign of ethnic cleansing, terrorism, torture, extrajudicial killings, kidnappings, and mayhem against Sunni civilians across areas of Iraq formerly held by the Islamic State. For example:

a) On July 5, 2016, Zeid Ra'ad Al Hussein, United Nations High Commissioner for Human Rights, said more than 700 Sunni men and boys (out of the 1,500 Sunni males over the age of 15 taken captive by KH) are missing two months after the Islamic State was vanquished from Fallujah. The men and boys were shot, beaten with rubber hoses, and in at least 4 cases, beheaded. At least 69 have been summarily executed or tortured to death while in the initial custody of KH;

b) On May 27, 2016, approximately 90 males aged 15 and older were taken by KH and have not been located since;

c) On May 29, 2016, twenty men from a group of fleeing men, women, and children were killed. Another group of families, raising white flags, surrendered. The males were separated and 17 of them were then summarily shot and killed by KH; and

d) On June 3, 2016 KH rounded up 1,500 Sunnis males, aged 15 and older from the town of Saqlawiya, and moved them into warehouses and an Iraqi base called Camp Tariq. The survivors described being crammed into small rooms and halls and denied food and water, straining to breathe in the stifling heat. KH terrorists, using sticks, pipes, and hoses, beat the detainees and declared that they were taking revenge for Camp Speicher – a June 2014 massacre by the Islamic State of 1,566 Shi'ite and other non-Sunni Air Force cadets. A 47-year-old survivor described how he watched his 17-year-old son repeatedly beaten and the corpses of 15 other men carried off who appeared to have been beaten to

death. The man was one of the 605 survivors released on June 5, 2016. His son was not among them, he said; the boy hasn't been seen since.

609.    Although KH's leadership remains in the shadows, one individual reportedly associated with the group is Abu Mahdi al-Muhandis.

610.    Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

611.    The U.S. Treasury Department designated al-Muhandis a SDGT in July 2009, and announced the designation in the same press release announcing KH's designation.

612.    The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups

members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

613. In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq.

614. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

615. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

## E. FTO HEZBOLLAH AUTHORIZED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

616. After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. It did so primarily through two channels. First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq. Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks. As a Middle East Intelligence Bulletin dispatch explained in March 2004, Hezbollah operatives in Iraq "have focused mainly on

establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future."[144]

617.    Hezbollah's message of authorization was effective because The Special Groups and many of their members looked to Hezbollah as a moral and religious authority on par with Iraqi Shia figures, including al-Sadr himself. As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad. In August 2006, tens of thousands of Special Group operatives staged a massive, public, pro-Hezbollah rally in Sadr City. Rally-goers burned American flags, chanted "Death to America," and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad. Members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for "victory to Hassan Nasrallah."[145] Jaysh al-Mahdi members also asked "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to participate with Hizbullah against" the Coalition government in Iraq.[146] In a subsequent demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures of Sadr and Nasrallah side-by-side. And, after Hezbollah terrorist mastermind Imad Mugniyeh was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

618.    Grand Ayatollah Muhammad Hussein Fadlallah, whom the U.S. Treasury Department has called "Hizballah's Spiritual Leader,"[147] occupied a similarly exalted position

---

[144] *See, e.g.,* Gary C. Gambill, *Dossier: Hassan Nasrallah*, Middle East Intell. Bull. (Feb.-Mar. 2004).
[145] *Shiites Hold pro-Hezbollah Rally in Baghdad*, NBC News (Aug. 4, 2006), http://www.nbcnews.com/id/14179529/ns/world_news-mideast_n_africa/t/shiites-hold-pro-hezbollah-rally-baghdad/.
[146] *Middle East Media Research Inst., Iraqi Shi'a View of the Lebanon Crisis, Inquiry & Analysis Series No. 290 (Aug. 11, 2006), https://www.memri.org/reports/iraqi-shia-views-lebanon-crisis.*
[147] *Press Release, U.S. Dep't of Treasury, Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area (June 10, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js1720.aspx*

among Iraqi Shi'a. Fadlallah himself became a Specially Designated Terrorist in 1995[148] as a result of his role as a "Leading Ideological Figure of Hizballah."[149] Among other things, the U.S. government concluded that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief 'spiritual leader,' reportedly issued the fatwa (religious ruling) authorizing the Marine Corps barracks bombing" in Beirut in 1983,[150] which was the deadliest terrorist attack against America before September 11th. Although he was of Lebanese descent, Fadlallah was born in Najaf, grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a theologian, and was close with the Sadr family, including the First and Second Martyrs as well as Muqtada himself. When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to observe three days of mourning in honor of Hezbollah's spiritual leader.

619.    Hezbollah's religious and moral authority was especially powerful because The Special Groups, like many other terrorist organizations, looked to religious authorities for validation. As Professor Bruce Hoffman has explained, "'Shiites do not believe in the legitimate authority of secular governments.'"[151] Instead, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine."[152] Thus, for religious terrorist organizations such as The Special Groups, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological

---

[148] *Id.*

[149] *U.S. Dep't of Treasury, Publication of the Hizballah International Financing Prevention Act of 2015 Related Sanctions Regulations; Counter Terrorism Designations Updates; Syria Designations Updates* (Apr. 15, 2016), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160415.aspx; *see also* Harvey W. Kushner, *Encyclopedia of Terrorism* 128 (Sage Publications 2003)

[150] Government's Written Proffer in Support of Its Request for Detention Pending Trial at 7, *United States v. D-2 Elfat El Aouar*, Crim. No. 06-20248 (E.D. Mich. filed May 22, 2006), ECF No. 8.

[151] *Bruce Hoffman, "Holy Terror": The Implications of Terrorism Motivated by a Religious Imperative, 18 Stud. in Conflict & Terrorism 271, 274 (1995) (quoting Marvin Zonis & Daniel Brumberg, Behind Beirut Terrorism, N.Y. Times (Oct. 8, 1984)).*

[152] *Id.* at 272.

demand or imperative."[153] As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of The Special Groups.

620.    Hezbollah's leaders leveraged their moral and religious authority over The Special Groups by publicly calling for "jihad" and issuing fatwas against Americans in Iraq.[154] An April 2003 dispatch from the Middle East Intelligence Bulletin reported that "Hezbollah has recently begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar.[155] Such propaganda, which explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.[156]

621.    In furtherance of this campaign, Secretary-General made repeated and direct communications to Iraqi Jaysh al-Mahdi members to attack Americans:

- In a March 2003 speech, Nasrallah publicly declared Hezbollah's support for attacks against Americans, promising that "peoples of this part of the world will receive [America] . . . *with guns, blood, weapons, and martyrdom operations*."[157]

- In an April 2003 speech, Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "*[t]he Iraqi people must resist this occupation*" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."[158]

- In an October 2006 interview that aired on Al-Jazeera, Nasrallah stated: "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and *we support and endorse this resistance*."[159]

---

[153] *Id.*

[154] *Niles* Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[155] Avi Jorisch*, Al-Manar and the War in Iraq*, Middle East Intell. Bull. (Apr. 2003), http://www.washingtoninstitute.org/policy-analysis/view/al-manar-and-the-war-in-iraq.

[156] *Id.*

[157] Nicholas Noe, Voice of Hezbollah: The Statements of Sayyed Hassan Nasrallah 285 (2007).

[158] Deborah Horan, *Hezbollah Chief to Iraqis: Resist U.S.*, Chi. Trib. (Apr. 23, 2003), http://articles.chicagotribune.com/2003-04-23/news/0304230260_1_hezbollah-iraqi-shiites-iraqi-people.

[159] Excerpts from Interview with Hassan Nasrallah, Middle East Media Research Inst. TV Monitor Project (Oct. 31, 2006), https://www.memri.org/tv/hizbullah-secretary-general-hassan-nasrallah-when-we-were-young-i-cannot-forget-sight-american/transcript (last accessed Sept. 21, 2017).

- In a January 2007 interview broadcast on al-Manar, Nasrallah declared: "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect. We believe that the solution in Iraq begins with adopting the option of armed resistance – ***jihad against the occupation forces***."[160]

- In a December 2009 speech broadcast on al-Manar, Nasrallah promised "***all-out war***" against "the Great Satan" of America over a chorus of "Death to America" chants.[161]

622.　Nasrallah's call for "jihad" was particularly potent because of its religious significance. As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam."[162] This religious sanctioning was thus highly significant to members of The Special Groups, militantly Shi'a terrorist organizations that frequently engaged in religious violence.

623.　Grand Ayatollah Fadlallah echoed similar themes in an August 2004 fatwa in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation. "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder."[163] The Grand Ayatollah's fatwa, which received widespread coverage in the Iraqi and Western media, was a critical green light for Special group terrorists in Iraq to attack Americans in Iraq.

624.　Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans. In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to The Special Groups –

---

[160] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.
[161] Excerpts from December 25, 2009 Speech by Hassan Nasrallah, Middle East Media Research Inst. (Dec. 29, 2009), https://www.memri.org/reports/hizbullah-secretary-general-hassan-nasrallah-al-manar-tv-us-beast-one-bite-our-nation-and (last accessed Sept. 21, 2017).
[162] *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016).
[163] *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000).

Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

625.    Information gathered by Coalition forces during raids upon the Special Groups confirmed the power of Nasrallah's and Fadlallah's messages of authorization. For example, according to a U.S. military incident report (as published by WikiLeaks), an October 9, 2008 raid on a JAM safe house in Basra yielded "religious Iranian video clips," "MAS [i.e., Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."[164]

626.    Hezbollah also wielded significant influence over Special Group leadership, including personally leading the Special Groups during critical times or during specific attacks. Special Groups were modeled after Hezbollah and had deep personal ties to Hezbollah's leaders. For example, The Arab Weekly reported that al-Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age."[165] According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,] [because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]."[166] Accordingly, Sadr publicly declared his loyalty to Hezbollah, co-founded JAM with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh, expressly modeled his organization on Hezbollah, and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009.

627.    Hezbollah used its close relationship with The Special Groups to authorize and

[164] 358 *WikiLeaks* (Oct. 9, 2008), https://wikileaks.org/irq/report/2008/10/IRQ20081009n11927.html.
[165] Sami Moubayed, *Iran Invests in Iraq's Mahdi Army*, Arab Weekly (May 22, 2016), http://www.thearabweekly.com/Iran/5187/Iran-invests-in-Iraq%E2%80%99s-Mahdi-Army.
[166] Babak Rahimi, *Moqtada al-Sadr's New Alliance with Tehran*, Jamestown Found. (Mar. 1, 2007), https://jamestown.org/program/moqtada-al-sadrs-new-alliance-with-tehran/.

incite The Special Groups to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.

628.     During his interrogation, AAH founder and former JAM member Qais al-Khazali Khazali confirmed that Hezbollah's relationship with the Special Groups was militaristic (command and control) and that in the beginning Hezbollah operatives had used Iranian passports and had spoken Farsi. This helped conceal the fact that Hezbollah was operating in Iraq, and that "[a]nything the Iranians asked of Hezbollah they would get as they considered Hezbollah a product of the IRGC."[167]

629.     Qais al-Khazali also confirmed that FTO Hezbollah played an authoritative role in Iraq, "where its vast experience and knowledge is being brought to bear in an advisory capacity. Access to [Hezbollah] advisors is possible through the IRGC by using proper channels."[168]

630.     On March 20, 2007, when Khazali was captured by Coalition Forces, he was present at a residential home in preparation for a funeral to occur the next day "and to meet with two of the regional leaders of special groups, Karar, Adnan al-Dulaymi along with the Hezbollah advisor, Hamid. The purpose of the meeting was to discuss a plan that Hamid had come to present… about the structure and breakdown of the Special Groups to closer resemble Lebanese Hezbollah."[169]

631.     Hezbollah's leaders have directly connected Hezbollah's authorization of terror attacks against Americans in Iraq to Hezbollah's terrorist objective of forcing the U.S. to abandon Iraq. For example, in a speech on October 25, 2011, Nasrallah stated that "resistance

---

[167] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 59 (April 22, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/r_TIR-N1228A-59.pdf).
[168] *Summary of Tactical Interrogation of Qayis al-Khazali, Report No. 28* (April 5, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-28.pdf).
[169] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 200243-019 (July 14, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/Enclosure-TAB-A-Documents-for-Release-18-32.pdf).

groups" Hezbollah had backed (that is, the Terrorist Groups) pressured the U.S. to reduce its presence in Iraq. In the same speech, Nasrallah boasted that the Hezbollah-JAM campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

### F.   FTO HEZBOLLAH PLANNED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

632.   Hezbollah trained The Special Groups in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that The Special Groups in fact used successfully to perpetrate terrorist attacks against Americans in Iraq. This training began with JAM at its inception in April 2003, when Imad Mugniyeh recruited and trained some of JAM's first 300 fighters in Lebanon. It continued through at least 2008, when Hezbollah held training camps for Special Group fighters in Iran (in conjunction with Iran's Qods Force), Lebanon, and Iraq. According to a captured JAM operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[170]

633.   From 2003-2008, Special Group recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes. Because of the logistical challenges associated with bringing Special Group militants into Iran and Lebanon, Hezbollah occasionally trained members of The Special Groups to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Special Group members in Iraq.[171] U.S. officials have referred to this practice as "training the trainer."[172]

---

[170] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008), https://ctc.usma.edu/app/uploads/2013/10/Redacted-Intelligence-Report-002-Summary.pdf

[171] Michael R. Gordon, Hezbollah Trains Iraqis in Iran, Officials Say, N.Y. Times (May 5, 2008), http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html.

[172] *Id*.

Hezbollah also trained members of The Special Groups inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

634.    Although Hezbollah training in Iran often occurred in conjunction with the Iranian Qods Force, Hezbollah's role was crucial to The Special Groups for at least three reasons. First, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Qods Force counterparts. Second, Hezbollah operatives typically spoke Arabic, the language spoken by most Special Group members, while members of the Qods Force did not. Third, Hezbollah and Special Group shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Qods Force.

635.    Iran and FTO Hezbollah provided training for terrorists, including JAM and its Special Groups at three (if not more) IRGC bases inside Iran. Qais al-Khazali personally received training at the IRGC Imam Khomeini base, approximately 2-3 hours outside of Tehran. For purposes of training, the IRGC were considered experts in conventional warfare, while Hezbollah were experts in urban or guerilla warfare.[173]

636.    In late 2006, more Hezbollah soldiers went to Iran to help train insurgents to attack Americans and sow discord in Iraq. According to Khazali, the IRGC "[was] in charge of deciding who is going to get the training."[174]

637.    Hezbollah's training was rigorous. According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[175] Trainees were awakened at 5:30 a.m. every day to pray and exercise. Classes

---

[173] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 200243-008 (June 18, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/Enclosure-TAB-A-Documents-for-Release-1-16.pdf).
[174] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 19 (March 30, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-19.pdf).
[175] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-005-Summary.pdf.

started at 8:00 a.m. and continued until dusk. Each class lasted roughly 50 minutes, with 10-minute breaks in between classes. Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations. The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the New York Times in November 2006.[176] The topics covered in these training programs included the following:

638. **Basic Weapons Training**. Many Special Group recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Special Group recruits were expected to have was the ability to read and write. Accordingly, Hezbollah provided basic training intended to give new Special Group recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

639. **IEDs**. Hezbollah trained Special Group members in the creation and deployment of IEDs. For instance, Hezbollah provided an IED Specialty Training Course to members of Special Groups at its training camps designed to teach Special Group fighters how to create and deploy improvised explosives such as roadside bombs.

640. **EFPs**. In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[177] Hezbollah trained members of the Special Groups in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon. Indeed, at that point, Hezbollah

---

[176] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.
[177] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

was the world's foremost expert on EFPs. Hezbollah also provided the Special Groups with the complex expert knowledge required to precisely and successfully manufacture and use EFPs, by drawing on its experience in Lebanon. Hezbollah instructed the Special Groups to use EFPs against American soldiers. The New York Times reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[178] In October 2008, Iraqi forces discovered and EFP factory in JAM's Sadr City stronghold that was built using the EFP technology that Hezbollah had provided to JAM. As a declassified British intelligence report concluded, EFPs used in Iraq during this time period were "exclusively associated with Hizballah."[179]

641. Hezbollah planned the Special Group EFP terrorist attack campaign (as with the other Special Group attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above. Hezbollah's planning of the Special Group's EFP attacks against Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Special Groups were permitted to launch EFP attacks; (2) instructing Special Groups to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Special Groups with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Special Group terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Special Group members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and

---

[178] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/.
[179] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

642. **Rockets**. Hezbollah trained members of The Special Groups in the use of rocket launchers and anti-aircraft missiles. In particular, Hezbollah directed Special Group members to launch indirect-fire rocket attacks on the Green Zone and other U.S Installations, and it instructed them on how to do so.

643. On September 26, 2005, Coalition Forces received intelligence reports that alerted them to possible rocket attacks being planned, committed and authorized by Hezbollah operatives, in concert with known members of JAM, Habib Muhammad Jabar and Mahir Jawad Hassn. According to the report, Jabar and Hassn were working with a Hezbollah "platoon" to attack the then-new al Nejef Airbase. Jabar received militia training in Iran and had been specifically trained as sniper there, and Hassn received his militia training in Lebanon and was considered "very skilled" with RPG weapons systems.[180]

644. Soon after the receipt of this intelligence, rocket attacks on the air base began. For example, on November 6, 2005, JCC Najaf reported incoming rocket fire intended to strike aircraft at the airbase. The rocket used in the attack was an 107mm T-63 - a rocket known to be possessed by the IRGC and provided to terrorist in Iraq - and the point of origin (POO) of the rocket was near Kufa University, a neighborhood that was a hub of an insurgent cell that would later become known as main incubator of JAM/AAH leaders and fighters.[181]

645. Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks in 2008, JAM rocket teams showed an ability to hit specific targets several miles away,

[180] WikiLeaks - https://wikileaks.org/irq/report/2005/09/IRQ20050924n2498.html
[181] WikiLeaks - https://wikileaks.org/irq/report/2005/11/IRQ20051106n2865.html

demonstrating the effectiveness of Hezbollah's instruction. By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel. Indeed, the Long War Journal reported that the rockets JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[182]

646. **Mortars**. Hezbollah trained Special Group members in the use of mortars, including by providing a Mortar Specialty Training Course to members of Special Groups at its training camps in Iran. The purpose of this training was to teach Special Group members to hit distant targets with mortar strikes. American military personnel have noted that The Special Group mortar strikes were particularly accurate.

647. **RPGs and Anti-Tank Missiles.** Hezbollah trained Special Group operatives in the use of RPGs and advanced anti-tank missiles, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions. Hezbollah's RPG and anti-tank missile training focused on attacks against armored vehicles and command structures such as the ones the United States used in Iraq. For example, a Hezbollah "planning guide" that U.S. forces recovered from Daqduq provided tactical instructions to Special Group terrorists for the use of RPGs against Americans, including commands concerning volume of fire and specific vehicles in the convoy to target in order to inflict maximum casualties.

648. **Complex Attacks**. Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team. One unclassified (as redacted) U.S. military-intelligence report summarized these tactics:

> For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is

---

[182] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

simultaneously responsible for launching mortars or rockets at the same vehicles. A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles. The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back. Each team functions together but does not get involved in what the other team is doing. A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.[183]

649.    Hezbollah also instructed Special Group operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the New York Times).[184]

650.    **Kidnappings/Assassinations.** Hezbollah is well-known for its kidnapping and assassination operations. In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers. Hezbollah also trained Special Group operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the New York Times).[185] JAM/KH, together with the Qods Force and Hezbollah, put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where JAM/AAH terrorists kidnapped four U.S. soldiers and killed another. And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Special Groups on "how to conduct intelligence and kidnapping operations."

651.    Qais al-Khazali substantiated this training regime when reported to Coalition Forces that, "the training that Hezbollah is giving to Iraqi fighters in Iran is training on EFPs, RPGs (sa-7s), mortars (120mm,' 81mm, and 60mm), and small arms training. The training lasts

---

[183] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 001, at 3 (Spring2007-Early 2008), https://ctc.usma.edu/app/uploads/2013/10/Redacted-Intelligence-Report-001-Summary.pdf.
[184] *The War Logs: Secret Dispatches From the War in Iraq, Alleged Jaysh Al-Mahdi Plans to Kidnap U.S. Soldiers in Baghdad, Iraq*, N.Y. Times (Dec. 22, 2006), http://www.nytimes.com/interactive/world/iraq-war-logs.html?_r=report/ABD1B1E9-D673-93B1-757861100C0728BC.
[185] *Id.*

approximately one month and if a group or an individual wants more specialized training in an area such as mortars or EFPs, the detainee thinks that group or individuals can go back later for another month and get that training."[186]

652.     The extent of Hezbollah's involvement in Special Groups' attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hezbollah's instruction as reflected in this "planning guide" enabled The Special Groups to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

653.     On October 9, 2005, Coalition Forces developed information related to the planned assassination of Dr. Adnan Al Dulaimi, a Sunni Iraq political figure. The assignation was planned and authorized by Hezbollah, and was to be carried out by an Iranian-trained JAM cell.  This cell was led by an Iranian Intelligence Officer using the name "Dhai," who was to travel to Iraq from Iran using a fake Iraqi passport indicating that he was "mute," so as to avoid detection of his Iranian accent and broken Arabic. The source of this information to Coalition Forces had been specifically instructed by to provide support the JAM Cell by a known member of Hezbollah, Sayid Sadiq, who was also a known affiliate of JAM.[187]

654.     Hezbollah trained, and coordinated with, Special Group terrorists who were responsible for Hezbollah-authorized terrorist attacks throughout Iraq. This sophisticated training and coordination extended to the following areas (among others):

---

[186] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 54 (April 18, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/TIR-54.pdf).
[187] WikiLeaks - https://wikileaks.org/irq/report/2005/10/IRQ20051009n2722.html

- **Baghdad – West Al Rashid District.** Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Victory Base Complex, a consolidated facility containing a range of Coalition military and civilian personnel that surrounded Baghdad International Airport ("BIAP") and so was a focus of Special Group attacks in western Baghdad. Special Groups coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah. According to a U.S. military incident report (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kawtharani, the latter of whom personally advised Nasrallah. Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad.[188]

- **Baghdad – Kadamiyah District.** Kadamiyah was one of The Special Groups' strongholds in western Baghdad. Hezbollah training and coordination enabled Special Groups to target Americans in Kadamiyah. According to a U.S. military incident report (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother, and his daughter, whom the U.S. government determined "was a member of Hezbollah," provided targeting support for JAM operations against Coalition forces in Kadamiyah.[189]

- **Baghdad – Rusafa District.** Rusafa is a Special Group stronghold in eastern Baghdad. Hezbollah trained, locally supported, and coordinated with the Special Group IED/EFP cells operating in and near Rusafa. For example, JAM cells trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the Green Zone.

- **Baghdad – Sadr City (Thawra District).** Sadr City serves as JAM/AAH's command-and-control center, safe haven, and principal power base in Iraq. Hezbollah trained, locally supported, and coordinated with JAM/AAH IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and JAM/AAH propaganda concerning such attacks. For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [JAM] element working in the area."[190]

- **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.** New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Special Groups in eastern Baghdad. For example, one U.S. military report (as published by *WikiLeaks*) concluded that, with respect to attacks near FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing SG to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[191] Similarly, according to an arrest report (as published by *WikiLeaks*), Abu Aloze served as "JAM leadership" in the area, was responsible for coordinating attacks against Americans in the New Baghdad and Karadah Districts

---

[188] *WikiLeaks* (Nov. 22, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081122n11950.html.
[189] *WikiLeaks* (Oct. 19, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061019n5720.html.
[190] *WikiLeaks* (Aug. 12, 2008), https://wikileaks.org/irq/report/2008/08/IRQ20080812n11209.html.
[191] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

(including against FOBs in the area), and was specifically trained by Hezbollah in Lebanon.[192]

- **Babil, Wasit, and Salman Pak (Central Iraq).** Hezbollah trained, locally supported, and coordinated with Special Group cells operating in central Iraq, including Babil, Wasit, and Salman Pak. As published by *WikiLeaks*, Ahmad Sahib Ghali was a commander of JAM's "assassination cell and IED cell" in Hillah.[193] Ghali and his co-commanders were JAM terrorists who were trained by Hezbollah to conduct attacks against Coalition forces near Hillah.

- **Basra, Amarah and Nasiriyah (Southern Iraq).** Basra, Amarah and Nasiriyah are Special Group strongholds in southern Iraq. Hezbollah trained, locally supported, and coordinated with Special Group cells operating in and near Basra and Amarah. For example, in July and August 2008, U.S. government reports (as published by *WikiLeaks*) confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their training in Iran" were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs."[194]

- **Diyala (Northern Iraq).** Diyala is a province in northern Iraq and was (and remains) a central area of emphasis for Hezbollah and Special Groups (as well as Iranian-supported Sunni terrorist cells, discussed below) because of the critical role its capital, Baqubah, plays with respect to the Shiite terrorists' desire to have a secure land corridor linking Iran to Syria. Hezbollah trained, locally supported, and coordinated with Special Group cells operating in and near Diyala. As published by *WikiLeaks*, on June 23, 2008, Coalition forces detained a JAM commander in Baqubah, Rezul Sami Mohammed, who was "in possession of JAM and Hezbollah propaganda material."[195] Similarly, on September 27, 2008, as published by *WikiLeaks*, Coalition forces conducted a raid to capture Hezbollah operative Mohammed Radam in order to "reduce Hezbollah influence" near Baqubah.[196]

- **Kirkuk (Northern Iraq).** Kirkuk is a province in northern Iraq that played (and continues to play) a key role in radical Shiite terrorists' transportation, logistics, and communications networks. Consequently, Hezbollah and Special Groups have had a longstanding presence in Kirkuk. Hezbollah trained, supported, and coordinated with Special Group cells operating in and near Kirkuk. As published by *WikiLeaks*, a March 9, 2006 Department of State cable reported that a senior Kurdish official, when addressing the security challenges in Kirkuk province with U.S. counterparts, specifically identified the threat posed in Kirkuk province by Muqtada al- Sadr, whom

---

[192] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11207.html
[193] *WikiLeaks* (June 15, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080615n11261.html
[194] *WikiLeaks* (July 16, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html; and *WikiLeaks* (July 20, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080720n11400.html.
[195] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11209.html.
[196] *WikiLeaks* (Sept. 27, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080927n11997.html.

the Kurdish official noted "was in league with Iran, Syria and Hezbollah."[197]

655.    On January 1, 2019, AAH co-founder Sheikh Akram Al-Kaabi, was interviewed on the MEMRI Television (Iranian) network, Al-Nujaba TV. In the interview, Al-Kaabi fully admitted that the IRGC and Hezbollah helped the militant Shi'ite forces fighting the U.S. forces as early as 2004. He recounted the details of the 2004 battle of Najaf between U.S. and Iraqi forces and JAM, in which 13 American servicemen were killed and over 100 were wounded. He said that IRGC and Hezbollah officers were present on the ground and helped the JAM in the battle. Al-Kaabi added that when the battle of Najaf was over, he traveled to Lebanon and met Hassan Nasrallah and Imad Mughniyah, who he debriefed about the battle. According to Al-Kaabi, Hezbollah put all its capabilities and expertise at JAM/AAH's disposal. Going on to describe how JAM/AAH began by using rudimentary IEDs and evolved to using EFPs that they would deploy against American armor, he further stated:

> …Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice…

> …We realized that if we use these capabilities and expertise in a more extensive way, we will have better results. One brother, called Abu Turab, was known to all the brothers in the Mahdi Army. He was with us in Baghdad also…

> …This brother from Hizbullah specialized in engineering and had a lot of expertise in matters of combat. He trained many of our brothers.

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hizbullah and by the brothers from the IRGC. So we realized that if we acquired more capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So we decided to take this path and acquire a lot of expertise. So we developed our relationship with the brothers in Hizbullah and the IRGC. Both Hizbullah and the IRGC were open with us about everything...

---

[197] U.S. State Dep't Cable, *Kurdistan Regional Government PUK Prime Minister Pushes for Kirkuk Against Spread of Political Islam and Iranian Influence* (Mar. 9, 2006), https://wikileaks.org/plusd/cables/06KIRKUK58_a.html.

The brothers [in Hizbullah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.

…Hizbullah and The IRGC provided great expertise during the resistance to the American occupation and through the ISIS occupation[.][198]

656.     In 2007, during press interviews with Britain's *The Independent*, Muqtada al Sadr openly admitted that he and members JAM were coordinating their efforts with Hezbollah, stating:

We have formal links with Hezbollah, we do exchange ideas and discuss the situation facing Shiites in both countries… It is natural that we would want to improve ourselves by learning from each other. We copy Hezbollah in the way they fight and their tactics, we teach each other and we are getting better through this.

657.     *The Independent* also interviewed several JAM members, including a person named Abu Muhannad, who stated, "I was one of the experienced fighters from the Mahdi army to go for training there… We learned how to take advantage of an armored vehicle's weakness, and how to wait and kill the soldiers who try to escape."[199]

### G.     IRAN, THROUGH FTO HEZBOLLAH, PROVIDED THE SHIA SPECIAL GROUPS WITH WEAPONS TO CARRY OUT TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

658.     Hezbollah supplied many of the weapons that Special groups used to commit acts of terror against Americans in Iraq – and Special Groups also required money and resources (derived in significant part from their relationship to Iran) to acquire those weapons and transport them to the appropriate cells in Iraq. A JAM commander told journalists in June 2007 that "[a]ll

---

[198] See interview at: https://www.memri.org/reports/al-nujaba-militia-leader-sheikh-akram-al-kaabi-irgc-and-lebanese-hizbullah-officers-have (last visited April 21, 2019).
[199] Bill Roggio, Mahdi Army Trains with Hezbollah, FDD Long War Journal (Aug. 20, 2007) (https://www.longwarjournal.org/archives/2007/08/mahdi_army_trains_wi.php).

of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[200]

659. Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with The Special Groups to set up cross-border smuggling networks. The *Long War Journal* reported in June 2007 that rockets that JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[201] Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq. Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

660. Hezbollah has also purchased weapons for Special Groups outright. For example, according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in 2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."[202]

### 14. IRAN MATERIALLY SUPPORTED SUNNI FTOS AL QAEDA ("AQ") AND ANSAR AL ISLAM ("AAI") TO PLAN, COMMIT, AND AUTHORIZE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

661. In order to sow discord and with the intent to expel Coalition forces from Iraq, Iran supported both Shia and Sunnis groups – the common goal of which was to kill Americans.

662. The 9/11 Commission reported that "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to

---

[200] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007), http://www.mcclatchydc.com/news/nation-world/world/article24465475.html.
[201] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.
[202] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iranconnection&catid=33&Itemid=115 (alteration in original).

cooperation in terrorist operations."[203]

663. From the beginning, Iran also supported FTOs al Qaeda ("AQ") and Ansar al-Islam ("AAI," also known as Ansar al-Sunna), a radical terrorist group with close ties to al Qaeda and JAM.

664. Iran used Hezbollah, IRGC and MOIS to materially support these terrorist groups within Iraq and elsewhere, allowing them to authorize, plan and commit attacks against Americans in Iraq.

665. In his speech, Hezbollah Secretary-General Hassan Nasrallah incited and pledged to support not only for the Shiite special groups (which he refers to as "Resistance Groups," but also for Sunni religious groups—which necessarily include AAI and AQ). In relevant part, Nasrallah stated as follows:

> Our march today is to defend every grain of dust in Iraq and all its cities from Najaf to Karbala to Fallujah to Al-Qaim to Baghdad to Basra and to Rafah and the olive and Gaza neighborhoods and to every location where there is a conflict between the resistance and the occupiers. . . Today in Iraq, what we demand is that the nation defends all of Iraq and the people of Iraq as a whole, from the entire Iraqi population and from the resistance[204] in all its forms in Iraq. . . . There is one camp called America and "Israel," and we say to this camp: Death to America…And we say to the same killers in Rafah, Najaf, and Karbala, and Qaim: Death to "Israel" . . . We know how to continue this battle to end the defeat of the enemy and our victory, we bear the burden of blood and loss and sacrifices, and I affirm that our solidarity with our people in Palestine and Refah and our people in Iraq is not incompatible with our national interests, because here we do not pretend, we do not challenge our partners at home, but we challenge the enemies of our homeland and the enemies of our nation who if they managed to eliminate part of this nation will continue to eliminate the rest of this nation. [205]

666. Hezbollah Commander Talal Hamiyeh worked closely with Imad Moughniyeh

---

[203]The National Commission on Terrorist Attacks Upon the United States, T*he 9/11 Commission Report*, p. 61 (July 22, 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf.

[204] The term "resistance" is a Hezbollah code word meaning armed struggle, including terrorism.

[205] *See* https://archive.alahednews.com.lb/alahed.org/archive/2004/2805/file/doc1.htm (last visited, Oct. 15, 2017) (translation to English available).

and Hezbollah's External Security Organization, (also known as 910 unit), to orchestrate and execute terror attacks outside of Lebanon,[206] including attacks in Iraq involving AQ and AAI.

667.    According to Lebanese sources, Hamiyeh traveled to Iraq frequently and was in close contact with the leaders of Terrorist Groups who were attacking Coalition forces.[207]

668.    Hezbollah's Hamiyeh played a key role in trafficking foreign jihadists into Iraq for the sole purpose of attacking Americans, and he "has been responsible for… and sending Al-Qaida volunteers to Iraq via Syria."[208]

669.    Qais al-Khazali also confirmed that Hezbollah did not let the ideological differences between Shia and Sunni prevent it from supporting groups that were united with it in their desire to kill Americans. Khazali stated "Hezbollah is not only supportive of the Shi'a but Sunni groups as well. Their goals are geared towards Islam and not just the Shi'a. They support the Muslim brotherhood movement, the Iraq Islamic party, and the Muslim ulama council."[209]

670.    Khazali "was certain that Lebanese Hezbollah also had a relationship with other groups in Iraq, such as the Badr corps, sciri and the office of the Grand Ayatollah Ali al-sistani, as well as Sunni groups through the Hezbollah connection to the Muslim Brotherhood."[210]

671.    Iran assisted AQ to infiltrate Iraq from Syria, and attack Americans in the Northern and Western areas of Iraq, supplied and supported by the rat lines flowing from Syria.

672.    In November 2017, The U.S. Central Intelligence Agency declassified hundreds

---

[206] Thomas Joscelyn, "Analysis: 2 US cases provide unique window into Iran's global terror network", The Washington D.C. based think tank Foundation for Defense of Democracies' Long War Journal, June 23, 2007, https://www.longwarjournal.org/archives/2017/06/analysis-2-us-cases-provide-unique-window-into-irans-global-terror-network.php

[207] *See* "Who Are the Two Hezbollah Military Commanders Wanted by the U.S.?," Haaretz, October 11, 2017, https://www.haaretz.com/us-news/who-are-the-two-hezbollah-leaders-wanted-by-the-u-s-1.5456968; *See also* "Who are the Two Hezbollah Senior Officials Whom [the U.S.] Offered 12 Million Dollars Rewards for Information [Leading to their Arrest] ", BBC Arabic, October 11, 2017, http://www.bbc.com/arabic/middleeast-41583624

[208] *Id*.

[209] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 48 (April 15, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/r_TIR-N1228A-48.pdf).

[210] *Summary of Tactical Interrogation of Qayis al-Khazali*, Report No. 59 (April 22, 2007), (available at https://www.aei.org/wp-content/uploads/2018/08/r_TIR-N1228A-59.pdf

of thousands of pages of documents, images and computer files recovered during the raid on Usama bin Laden's compound in Abbottabad, Pakistan. This included a 19-page document containing:

> a senior jihadist's assessment of the group's relationship with Iran. The author explains that Iran offered some 'Saudi brothers' in al Qaeda 'everything they needed,' including 'money, arms' and 'training in Hezbollah camps in Lebanon, in exchange for striking American interests in Saudi Arabia and the Gulf.' Iranian intelligence facilitated the travel of some operatives with visas, while sheltering others. Abu Hafs al-Mauritani, an influential ideologue prior to 9/11, helped negotiate a safe haven for his jihadi comrades inside Iran… the author explains that al Qaeda is not at war with Iran and some of their 'interests intersect,' especially when it comes to being an enemy of America.[211]

673. In a previously released letter, bin Laden described Iran as al Qaeda's "***main artery for funds, personnel, and communication***."[212]

## A. IRAN'S HISTORY OF SUPPORTING SUNNI TERROR GROUPS

674. Iran's terrorism network also includes Sunni terrorist proxies that plan, commit and authorize acts of international terrorism at Iran's behest. Iran's material support for Sunni FTOs has been routinely established in prior criminal investigations and civil cases, and such support has furthered Iran's goals of destabilizing its rivals, and the region, in order to provide Iran with opportunities to make strategic gains in the Middle East (and beyond) without engaging in conventional state-craft or warfare. Iran's support for and work with Sunni terror groups also provides Iran with the plausibility deniability that it uses to avoid accountability on the world stage. Iran's history of close ties to and significant support of Sunni terrorist to attack and kill Americans is long and extensive.

---

[211] *See* Thomas Joscelyn and Bill Roggio, *Analysis: CIA Releases Massive Trove of Osama bin Laden's files*. Long War J. (Nov. 1, 2017), https://www.longwarjournal.org/archives/2017/11/analysis-cia-releases-massive-trove-of-osama-bin-ladens-files.php
[212] *Id*.

### B. FTO AL QAEDA ("AQ")

675.    AQ is a designated international terrorist organization, widely recognized as such by all civilized nations and the United Nations, and is not a legitimate "*military force*" or a recognized sovereign state.

676.    The United States has designated AQ, including its branches, subsidiaries and "franchisees" (including al-Qaeda in Iraq) as a FTO and a SDGT. AQ was designated as a FTO on October 8, 1999.

677.    Commencing in the early 1990s and continuing until at least 2011, Iran (and Sudan) provided AQ significant indispensable funding, weapons, safe haven, training, intelligence, passports, and centers for command and control. Iran also provided undocumented transport between Afghanistan, Iraq and Pakistan across its borders and other significant material support.

678.    In the 1990s, AQ developed a close relationship with Iran and the IRGC. Usama bin Laden ("UBL") and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and Ahmad Vahidi (then commander of the Qods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…Thereafter, senior AQ operatives and trainers traveled to Iran to receive training in explosives. [UBL] also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[213]

679.    On June 30, 1989, General Omar Hassan al-Bashir led a coup d'état toppling the exiting regime in Sudan. The radical Salafi cleric, Hassan Abd Allah al Turabi served as the "intellectual architect," or "the power behind the throne," sometimes officially as leader of the National Islamic Front and sometimes as speaker of the parliamentary assembly.

---

[213] *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *110–11.

680.     In 1990-1991, Turabi founded the Popular Arab and Islamic Congress, which included representatives from the Palestine Liberation Organization, Hamas, Egyptian Islamic Jihad, AQ, Algerian Islamic Jihad, Hezbollah, Abu Nidal Group, and the Islamic Revolutionary Guard Corp.

681.     In 1991, the Kingdom of Saudi Arabia expelled AQ leader UBL") and UBL moved his base of operations to Sudan.

682.     The Sudanese army protected UBL's home in Khartoum and his terrorist training bases within the country as well as providing AQ with access to the international and United States financial networks. In addition, Sudan provided AQ with 200 Sudanese passports, allowing AQ operatives to travel under fictitious identities.

683.     Turabi brought together UBL and leaders of the IRGC-QF and leaders of Hezbollah. Commencing in April, 1991, Turabi hosted meetings bringing together leaders from AQ, Hezbollah and Iranian and Sudanese officials. According to AQ shura council member Abu Hajer al-Iraqi, the purpose of these meetings was to focus on common enemies, the West and the United States.

684.     In 1991, Hezbollah opened a base of operations in Khartoum, Sudan.

685.     On December 13, 1991, Iranian President Ali Akbar Hashemi Rafsanjani arrived in Khartoum, Sudan for a six-day visit, by a delegation of 157 members, including Mohsen Rezai then Commander of the IRGC, Iranian Intelligence Minister Ali Fallahian and Iranian Defense Minister Ali Akbar Torkan. Various agreements were signed between Iran and Sudan, pursuant to which, *inter alia*, Iran delivered $300 million of Chinese weapons and 2,000 IRGC operatives were sent to train Sudan's Popular Defense Forces.

686.     According to the 9/11 Commission Report, in late 1991 or 1992, discussions in

Sudan between AQ and Iranian operatives led to an agreement to cooperate in providing support - specifically, training - for actions carried out primarily against Israel and the United States. Not long afterward, senior AQ operatives and trainers traveled to Iran to receive training in explosives.

687.     Iran was a valuable connection for UBL and AQ, and AQ was highly beneficial to Iran, given AQ's extreme and violent position against America and its animosity against the Kingdom of Saudi Arabia. Iran and Hezbollah played significant roles in the buildup of AQ's terrorist capabilities.

688.     As a result of the creation of this terrorist alliance, AQ leader Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with Minister Ali Fallahian and other officers of MOIS, and IRGC-QF Commander Ahmad Vahidi.

689.     Throughout the 1990s, the AQ-Iran-Hezbollah terrorist training arrangement continued. Hezbollah leader Imad Mughniyah coordinated these training activities, including training of AQ personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

690.     AQ operative Ali Mohammed provided security for one prominent meeting between Hezbollah's chief external operations officer, Imad Mughniyah, and UBL in Sudan. Mohammed testified at his plea hearing that "*Hezbollah provided explosives training for al Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks*."

691.     Iran trained Saif al-Adel, head of AQ security, and other AQ members, including shura council members, at Hezbollah training camps in the mid-1990s. AQ leader Mustafa Hamid was one of AQ's primary points of contact with IRGC. He negotiated the agreement

between AQ and Iran, which secured safe transit between Iran and Afghanistan and to Iraq for AQ members.

692.    These training camps were used by AQ in planning and perpetrating the terrorist attacks conducted against U.S. civilians, diplomats, and servicemen and women, such as: the suicide bombing of U.S. Air Force personnel and their families in Khobar, Saudi Arabia; the U.S. embassies in Nairobi and Dar es Salaam; and the World Trade Center on September 11, 2001.

693.    In 1995 and again in 1996, UBL approached MOIS and asked to join forces against the United States. UBL's phone records, obtained by U.S. investigators working on the U.S. embassy bombings in Kenya and Tanzania, show that 10% of phone calls made by UBL and his lieutenants were to Iran.

694.    Seif al-Adl, one of AQ's top-ranking leaders at the time, was the liaison between Iranians and AQ. He coordinated meetings with the IRGC's leaders and MOIS officials.

695.    On June 25, 1996, Iranian-backed Hezbollah terrorists, with the support of AQ, bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S. servicemen and wounding approximately 500 others. FBI investigators concluded: the operation was undertaken on direct orders from senior Iranian government leaders; the bombers had been trained and funded by the IRGC in Lebanon's Bekaa Valley; and senior members of the Iranian government, including Ministry of Defense, Ministry of Intelligence and Security and the Supreme Leader's office, had selected Khobar as the target and commissioned Hezbollah to carry out the operation.

696.    AQ was involved in the planning and preparations for the Khobar Towers bombing. UBL tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the

operation, UBL was, according to NSA intercepts, congratulated on the telephone.[214]

697.     The 9/11 Commission examined classified CIA documents establishing that IRGC-QF commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al Mugassil, a Saudi-born al Qaeda operative.

698.     Iran aided, abetted and conspired with Hezbollah, UBL, and AQ to launch the large-scale bombing attacks against the United States embassies in Nairobi and Dar es Salaam on August 7, 1998. Prior to their meetings with Iranian officials and agents, UBL and AQ did not possess the technical expertise required to carry out the embassy bombings. The Iranian defendants, through Hezbollah, provided explosives training to UBL and AQ and rendered direct assistance to AQ operatives.[215]

699.     As stated in the 9/11 Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole…*" For example, Iranian officials facilitated the travel of AQ members – including at least 8 of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at AQ's terrorist training camps.[216]

700.     U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel UBL in May 1996. Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited UBL to join him in Afghanistan. UBL then relocated to Afghanistan with the assistance of the Iranian intelligence services.[217]

701.     Iran provided material support to AQ after the 9/11 attacks in several ways, most significantly by providing safe haven to AQ leaders and operatives, keeping them safe from

---

[214] The 9/11 Commission, https://www.9-11commission.gov/report/911Report.pdf.
[215] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139. D.D.C. 2011.
[216] The 9/11 Commission, https://www.9-11commission.gov/report/911Report.pdf.
[217] *Id*. at 65.

retaliation by U.S. forces, which invaded Afghanistan. According to the U.S. Treasury Department press release on January 16, 2009, in late 2001, while in Tehran, AQ senior operative Mustafa Hamid negotiated with the Iranians to relocate AQ families to Iran after the 9/11 attacks.

702.    In the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous AQ leaders, operatives, and their families. The Iran-Afghanistan safe passageway, established earlier to get AQ recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of AQ fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these AQ fighters and their families entering Iran.

703.    Among the high-level AQ officials who arrived in Iran from Afghanistan at this time were Saad bin Laden and the man who would soon lead FTO al Qaeda in Iraq ("AQI"), Abu Musab al Zarqawi.

704.    In late 2001, Sa'ad bin Laden facilitated the travel of UBL's family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for AQ and was part of a small group of AQ members involved in AQ from Iran.

705.    By 2002, AQ had established in Iran its 'management council,' a body that UBL reportedly tasked with providing strategic support to the organization's leaders in Pakistan. Key members of the council included Saif al-Adel, Sulayman Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, and Mahfouz Ould al-Walid (a.k.a. Abu Hafs al-Mauritani). All five senior operators remained influential over the next several years and retained close ties to UBL. Adel organized groups of fighters to overthrow Hamid Karzai's regime in Afghanistan and

provided support for the May 12, 2003 terrorist attacks in Riyadh.[218]

706.    The Iranian regime offered AQ this safe haven in order to advance its own interests. Having AQ operatives in the country gave Iran a bargaining chip and important leverage with the U.S. and Saudi Arabia. In addition, it enabled Iran to protect itself from a possible attack against targets in Iran. The deal enabled Iran to cause chaos in Iraq and thus preventing it from becoming a Muslim democratic regime, which would endanger the security of the Iranian regime by the example and influence it would pose to the tens of thousands of Iranian pilgrims who visit the Shiite shrines in Iraq each year.

707.    The deal was reportedly reached between IRGC-QF commander Qassem Soleimani and AQ senior commander Abu Hafs al-Mauritani at Iran's Zahedan (near the Pakistani and Afghanistan border) during December 2001.[219]

708.    In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said, "we see disturbing signs that al Qaeda has established a presence in both Iran and Iraq."[220]

709.    Senior AQ members continued to conduct terrorist operations from inside Iran. For example, U.S. intercepted communications from Saif al Adel, then in Mashad, Iran, to AQ assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. AQ leaders in Iran planned and ordered the Riyadh bombing.

710.    CIA Director General Michael Hayden noted UBL understood that Iran was providing safe harbor to AQ. For example, he quoted communications between senior AQ commanders and UBL, found on UBL's computer:

---

[218] Seth Jones, *Al Qaeda in Iran* (Jan. 29, 2012), https://www.foreignaffairs.com/articles/iran/2012-01-29/al-qaeda-iran.

[219] Cathy Scott-Clark & Adrian Levy, *The Exile: The Stunning Inside Story of Osama bin Laden and Al-Qaeda in Flight* (2017).

[220] David Johnston, *Threats and Responses: Washington; Top U.S. Officials Press Case Linking Iraq to Al Qaeda*, N.Y Times (Feb. 12, 2003), http://www.nytimes.com/2003/02/12/world/threats-responses-washington-top-us-officials-press-case-linking-iraq-al-qaeda.html.

"everybody is threatened – as long as he moves – by a missile…There is an idea preferred by some of the brothers to avoid attrition [loss of staff, leaders, and the organization's old elites] the idea is that some brothers will travel to 'safe' areas with their families, just for protection." The author offers some ideas for safe havens: Sind, Baluchistan, Iran. Two months later bin Laden agrees they should be taking refuge in safer areas."[221]

711. After the September 19, 2008 attack on the American embassy in Sana'a, Yemen, which killed 19 people, Ayman al Zawahiri sent a letter to IRGC (which was intercepted) which stated: "Al-Qaeda's leadership pays tribute to Iran's generosity, stating that *without its 'monetary and infrastructure assistance' it would have not been possible for the group to carry out the terror attacks*.[222] (Emphasis added).

712. Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command General David Petraeus stated that AQ "[c]ontinues to use Iran as a key facilitation hub, where facilitators connect al Qaeda's senior leadership to regional affiliates..."[223]

713. Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to FTO AQ.

## C. FTO AL QAEDA IN IRAQ ("AQI")

714. In 1999, Abu Musab Zarqawi founded and was the operational leader of Al Tawhid al Jihad (a/k/a Jund al-Islam), an organization with close personal and organizational links to the AQ terror network. UBL provided Zarqawi $200,000 to set up a training camp in Afghanistan near the border with Iran. In 2000, a Jordanian court sentenced Zarqawi in absentia to fifteen years of hard labor for his role in the AQ millennial terror plot targeting Western

---

[221] Michael W. Hayden, *American Intelligence in the Age of Terror – Playing to The Edge*, at 339-340 (2016).
[222] Con Coughlin, *Iran receives al Qaeda praise for role in terrorist attacks*, THE TELEGRAPH (Nov. 23, 2008), http://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-Qaeda-praise-for-role-in-terror-attacks.html.
[223] Combatting Terrorism Center at West Point, *CTC Sentinel* (Apr. 2007), https://ctc.usma.edu/marriage-of-convenience-the-evolution-of-iran-and-al-qaidas-tactical-cooperation/.

interests in Jordan.

715.    In early September 2001, Zarqawi met Mohamed Abu Dhess, one of the Tawhid cell operatives in Germany, in Iran. During the meeting, Zarqawi instructed Abu Dhess to commit terrorist attacks against Jewish or Israeli facilities in Germany. Zarqawi's cell operatives included Mohamed Abu Dhess, Shadi Abdalla, Aschraf Aidagma, and Ismail Shalabi, who were living in Beckum, Germany. The members of the cell planned to use various weapons in order to attack a busy square in a German town or city and another German town in the immediate vicinity of an Israeli or Jewish property with the aim of killing as many people as possible, but were arrested by the German authorities on April 23, 2002.[224]

716.    On September 23, 2001, Tawhid (together with Iranian-sponsored Ansar al Sunna, discussed below) took hostages, tortured, and murdered (the majority of which were beheaded) 42 Peshmerga security officers in the Iraqi Kurd border town (on the border with Iran).

717.    In early 2002, Zarqawi escaped from U.S. forces in Afghanistan to Iran with other AQ leaders and operatives.[225] While staying in Iran, Zarqawi operated under the control of the IRGC and the IRGC-QF. Intelligence officials claimed the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq to establish the AQ subgroup al Qaeda in Iraq ("AQI").[226]

718.    AQI is an international terrorist organization and not a "military force" and

---

[224] U.S. Dep't of the Treasury, *Treasury Designates Six Al-Qaeda Terrorists* (Sept. 24, 2003), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.
[225] The Washington Institute, *Untangling the Terror Web: Identifying and Counteracting the Phenomenon of Crossover Between Terrorist Groups* (Spring 2004), https://www.washingtoninstitute.org/uploads/Documents/opeds/4224dcca0249e.pdf.
[226] United Against Iran, *Alliance Against America: Al Qaeda and Iran*, https://www.unitedagainstnucleariran.com/node/3295 (last visited Oct. 14, 2017). United Against Iran was founded in 2008 by Ambassador Mark D. Wallace, the late Ambassador Richard Holbrooke, former CIA Director Jim Woolsey and Middle East expert Ambassador Dennis Ross.

intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

719.    Several months later, Zarqawi returned to the Ansar al-Islam camp in northern Iraq, run by his Jund al-Islam/Tawhid lieutenants.[227]

720.    On September 24, 2003, the U.S. Treasury designated Zarqawi and several of his associates as SDGTs, stating that Zarqawi not only has "ties" to Hezbollah, but that plans were in place for his deputies to meet with both Hezbollah and Asbat al Ansar (a Lebanese Sunni terrorist group tied to AQ).[228]

721.    In 2004, Zarqawi changed the name of his group from Al Tawhid to al Qaeda in Iraq, and sworn allegiance to AQ.

722.    US Department of Treasury designated Tawhid al Jihad as an FTO and SDGT on October 15, 2004.[229] OFAC SDN designation was updated on December 1, 2004 to the other known names of al Qaeda in Iraq.[230]

723.    MOIS and IRGC-QF are under the general command of Section 101, also called the Leader's Intelligence and Security office. They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes, primarily via acts of international terrorism).[231]

724.    Department 15 of MOIS handles liaison responsibilities with foreign terror groups

[227] Matthew Levitt, *Untangling the Terror Web: Identifying and Counteracting the Phenomenon of Crossover Between Terrorist Groups*, SAIS Review (Winter-Spring 2004) (*available at* https://www.washingtoninstitute.org/uploads/Documents/opeds/4224dcca0249e.pdf).

[228] *Supra* n. 140. [U.S. Dep't of the Treasury, *Treasury Designates Six Al-Qaeda Terrorists* (Sept. 24, 2003), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.]
[229] U.S. Dep't of the Treasury, *Recent OFAC Actions* (Oct. 15, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041015.aspx.
[230] U.S. Dep't of the Treasury, *Recent OFAC Actions* (Dec. 1, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041201.aspx.
[231] Stratfor, *Iranian Intelligence and Regime Preservation* (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

while the IRGC relies on its IRGC-QF for many of the same functions.[232]

725.    On June 10, 2003, American intelligence officials asserted that MOIS and the IRGC-QF are deeply involved in supporting AQ.[233]

726.    In December 2006, two IRGC-QF agents were arrested in Baghdad, possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information… [and] information about importing modern specially shaped explosive charges into Iraq. Officials were particularly concerned by the fact the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[234] An American intelligence official said these documents "show how the [IRGC-QF]… is working with individuals affiliated with al Qaeda in Iraq and Ansar Al Sunna." [235] One of the detainees was – according to General Stanley McChrystal – Mohsen Chizari, commander of IRGC-QF's Operations and Training staff.[236]

727.    "Iranian involvement in Iraq with the Sunni terrorists has been an open secret in military and intelligence circles since the Fallujah uprising in March of 2004. Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province."[237]

728.    On February 16, 2012, the U.S. Department of Treasury designated MOIS,

---

[232] William Tucker, *A Reported Shift in Iran's IRGC* (Sept. 29, 2015), http://inhomelandsecurity.com/a-reported-shift-in-irans-irgc/. In Homeland Security Chief Correspondent William Tucker is a former terror specialist in the United States Army.

[233] *U.S. says Iran harbors al Qaeda 'associate'*, The Washington Times (June 10, 2003), http://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/.

[234] *Iraq Expels 2 Iranians Detained by U.S.*, THE WASHINGTON TIMES (Dec. 30, 2006), http://www.washingtonpost.com/wp-dyn/content/article/2006/12/29/AR2006122901510.html.

[235] Eli Lake, *Iran's Secret Plan for Mayhem*, N.Y. SUN (Jan. 3, 2007), http://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/.

[236] Michael Weiss & Hassan Hassan, *ISIS: Inside the Army of Terror* (2015).

[237] Bill Roggio, *Iran and Al Qaeda in Iraq*, FDD'S Long War Journal (Jan. 6, 2007), *available at* http://www.longwarjournal.org/archives/2007/01/iran_and_alqaeda_in.php.

indicating that it has facilitated al Qaeda operatives in Iran and provided them with documents, identification cards, and passports. The Treasury also stated that MOIS provided money and weapons to AQI, and negotiated prisoner releases of al Qaeda operatives.[238]

729.     Under Secretary for Terrorism and Financial Intelligence David S. Cohen on July 28, 2011, said that, "[b]y exposing Iran's secret deal with [al Qaeda], allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism. Today's action [designating the following al Qaeda terrorists and others] also seeks to disrupt this key network and deny [al Qaeda's] senior leadership much-needed support…Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan." Among terrorists designated was Ezedin Abdel Aziz Khalil (a/k/a Yasin al-Suri).[239]

730.     Ezedin Abdel Aziz Khalil, a prominent AQ facilitator, who has been operating under a secret agreement between AQ and the Iranian government. The Iranian regime has permitted Khalil to operate within its borders since 2005 and maintain a relationship with him. Khalil moved money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of AQ senior leaders. He was responsible for moving significant amounts of money via Iran for onward passage to AQ leadership in Iraq and Afghanistan.

731.     Muhsin al-Fadhli, was considered then "an [al Qaeda] leader in the Gulf countries." His 2005 designation states he was "considered an al Qaeda leader in the Gulf" who "provided support to Iraq-based fighters for attacks against" the U.S.-led Coalition. Al-Fadhli was also a "major facilitator" for deceased AQI leader Abu Musab al Zarqawi…Al-Fadhli began

---

[238] U.S. Dep't of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.
[239] U.S. Dep't of Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

working with [al Qaeda's] Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from AQ leader Yasin al-Suri later that year.

732. AQ leader Yasin al-Suri along with five other terrorist operatives used his safe harbor in Iran to move funds and recruits from Iran's neighboring Gulf countries to South Asia and elsewhere. Al Suri's network assisted senior AQ operatives in Iraq and Pakistan.

733. On February 5, 2014, the U.S. Treasury Department designated senior AQ member Jafar al-Uzbeki, part of an AQ network which operates in Iran "with the knowledge of Iranian authorities." The Treasury added that this network "uses Iran as a transit point for moving and funding foreign fighters through Turkey to support AQ-affiliated elements inside Syria."

734. Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to FTO AQI.

### D. FTO ANSAR AL ISLAM ("AAI")

735. AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to Iran, AQ, and JAM.

736. Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded AAI in December 2001 (at that time, with funding and logistical support from al-Qaeda and UBL, as well as support from Iran).

737. AAI has a number of aliases and/or subgroups, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; and Supporters of Islam in Kurdistan.

738. The United States has designated AAI/Ansar al Sunna as an FTO and an SDGT.

AAI was designated as a FTO on March 22, 2004.

739.    AAI is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

740.    AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern part of Iraq, western Iraq-Anbar province, and in the areas surrounding and including Mosul and Kirkuk since 2003.

741.    In 2001, AAI seized control of several villages near the town of Halabja and established an administration ruled by Shari'a Law.

742.    In late March 2003, the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

743.    Shortly after the U.S.-led invasion of Iraq in March 2003, the majority of AAI members were captured, killed, or fled to neighboring Iran. Mullah Krekar fled to Norway where he has remained ever since. In his place, Abu Abdullah al-Shafi, also known as Warba Holiri al-Kurdi, assumed command of the remnants of the organization. From Iran, the group continued to operate under Shafi's leadership and was temporarily renamed Ansar al-Sunna (it officially re-adopted the name AAI in 2007).

744.    According to AAI prisoners held by the Patriotic Union of Kurdistan in Sulaymaniyah, AAI used Iran as a base from which to plan operations against U.S. forces in Iraq.

745. During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, Lt. Gen. Norton Schwartz, who at the time was the Director of the Joint Staffs at the Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that AAI had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

746. In addition to committing terrorist attacks that are the subject of this lawsuit, AAI intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

a) The September 23, 2002 massacre at the village of Kheli Hama during which 42 police officers and Pershmerga (military forces of Iraqi Kurdistan) were killed, tortured, and beheaded;

b) The February 1, 2004 suicide bombing attacks on the offices of the two main Iraqi Kurdish political parties, the Kurdish Democratic Party, and the People's Union of Kurdistan party, killing at least 109 and injuring 130 civilians and elected officials;

c) Kidnappings of numerous foreign civilians in Iraq in 2004, and the subsequent broadcasting of their beheadings via the internet;

d) The June 27, 2004 video of a captured and blindfolded Marine. On July 3, 2004, Ansar al-Sunna claimed it had murdered hostage U.S. Marine Cpl. Wassef Ali Hassoun;

e) At 7:15 on September 7, 2004, Ansar al-Islam kidnapped journalists Scott Taylor (Canadian freelancer) and Zeynep Tugrul (Turkish journalist for Turkish Sabah newspaper) holding them for 5 days and continually torturing, beating, and threatening them with execution before releasing them;

f) Beheading of 12 civilian Nepalese hostages seized in Iraq (broadcast via video on the internet) claiming the hostages were "fighting the Muslims and serving Jews and the Christians" and "believing in Buddha as their God;" and

g) The October 3, 2004 beheading of an Iraqi contractor and videotaped message

threatened to kill other Iraqis working with Americans.

747.   From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100 civilians and injuring over 130 more. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals. AAI openly cooperated with AQI; however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established by AQI. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from AAI in early 2007 because its members wished to take a harder line against AQI) to form an anti-Coalition umbrella organization called the Reformation and Jihad Front. The Reformation and Jihad Front was a pan-Islamist organization that challenged AQI for leadership of the Iraqi Sunni Islamist movement.

748.   U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe haven and basic training to Iran-based [AAI] cadres.'" (Brackets in original).[240]

749.   On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on FOB Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S. soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar al-Sunna, claimed credit for

---

[240] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

the attack.

750.     Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[241] American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IED's."[242]

751.     In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an AAI safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities.

752.     According to Iraqi intelligence officers, captured AAI militants have admitted to receiving assistance from Iranian officials.

753.     Iran played a significant role in supporting AAI. Iran openly allowed the group to operate along its borders despite the group's alleged affiliation with the al-Qaeda network. AAI was tasked with conducting checks on cars, leaving their stronghold to go into Iran, indicating coordination with the Islamic Republic.

754.     According to a document from Iraqi intelligence dated June 13, 2002, and seized by U.S. forces in Iraq, a trust worthy source reported that Mullah Kraykar (Krekar), the head of the AAI organization arrived in Iran for negotiations with several Iranian officials. The information indicated the purpose of the visit was to confirm a unified strategy and to guarantee continuous Iranian support to that group.

755.     According to other sources, Mullah Krekar spent many years in Iran and was

---

[241] *Id.*
[242] *Id.*

arrested in Amsterdam after a flight from Tehran.

756.    In March 2005, The Washington Post published an interview with then-U.S. Ambassador to Iraq Zalmay Khalilzad, in which the Ambassador charged that Iran's security services–most notably the IRGC–were training, financing, and supplying AAI.

757.    On January 2, 2006, U.S. Forces in Iraq learned of an AAI cell formed to carry out terrorist attacks in Kirkuk. This AAI cell was formed and initiated by MOIS, who sent a MOIS operative to supervise the cell. The cell was specifically instructed to perform terrorist attacks in Kirkuk using explosives and car bombs that were delivered using rat lines from Iran, through Tuz Khurmatu, Iraq.

758.    AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadists to Iraq.

759.    Over the course of 2007-2008, AAI moved increasingly away from the Reformation and Jihad Front and strengthened its ties to AQI. It coordinated with AQI on several attacks against U.S. and PUK troops and began to adopt AQI's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

760.    On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured and imprisoned by U.S. forces in Baghdad. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim.

761.    AAI also had close operational ties to JAM. In 2003, AAI leader Abu Abdallah al-Hassan bin Mahmud told Beirut political weekly "Al-Muharrir" that his group works with al-Sadr's JAM. This cooperation is further substantiated by a note from al-Sadr's father, Muhammad Sadiq al-Sadr, that said if he is martyred his sons should "follow the fatwas of [Ayatollah] Al-

Sayyid [Kazim] al-Ha'iri and Shaykh Dr. Ahmad al-Kubaysi. You must unite with the Sunnis." Subsequently, AAI and JAM exchanged personnel and shared a relationship described as "intimate."[243]

762.    AAI conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and 147 wounded.

763.    On February 19, 2003, The Bank of England ordered British financial institutions to freeze AAI assets.

764.    The U.S. Department of Treasury designated AAI a SDT under E.O 13224 on February 20, 2003. The U.S. Department of State designated AAI a FTO on March 22, 2004.

765.    The United Nations Security Council Resolution 1267 Committee designated AAI as an AQ affiliate pursuant to UNCSRs 1267, 1390, and 1455 on February 27, 2003. The resolutions subjected it to the following sanctions:

> **ARMS EMBARGO**: Prevent the direct or indirect supply, sale, and transfer from their territories or by their nationals outside their territories, or using their flag vessels or aircraft, of arms and related materiel of all types, spare parts and technical advice, assistance, or training related to military activities, to designated individuals and entities.
>
> **ASSETS FREEZE**: Freeze without delay the funds and other financial assets or economic resources of designated individuals and entities, ensure that no funds, financial assets or economic resources are made available, directly or indirectly for their benefit.

766.    Australia, New Zealand, Canada, and the European Union have designated AAI as terrorist organization. The U.S. Treasury Department designated Mullah Krekar as an

---

[243] *See* https://www.rferl.org/a/1342699.html (last accessed Dec. 9, 2018).

individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

767. As such, AAI required alternate and clandestine sources of U.S. currency to continue its terror operations in Iraq. This source was Iran.

768. Iran provided significant logistical support to AAI by facilitating the flow of goods and weapons from Iran proper, and by providing safe haven in Iranian territory just behind AAI's mountain enclave, as well as permissive environments within Iraq for it to operate.

769. Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to AAI.

**E. IRAN'S SUNNI FTO NETWORK IN IRAQ PLANNED AUTHORIZED & COMMITTED ATTACKS AGAINST PLAINTIFFS**

770. As detailed above, Iran trained, armed, sheltered, and funded Sunni FTOs AQ, AQI and AAI that were responsible for terrorist attacks throughout Iraq. This material support from Iran extended to areas within the "Sunni Triangle," a 100-square-mile area between Baghdad, Ramadi and Tikrit, as well as other areas in Northern and Western Iraq. The permissive operational environments created with Iran's material support within which in these groups operated included the following areas (among others):

- **Ramadi** - 68 miles west of Baghdad, Ramadi is the capital of the Al Anbar Governorate, and in 2004, was a city with 400,000 inhabitants, controlled by AQ and its Iraqi allies (AAI) who desired to make the city the capital of its Islamic caliphate.[244] Through 2007 AQ/AQI had a significant organizational infrastructure in Ramadi and its outskirts.[245] From April 2004 to September 2007, AQ/AQI routinely and lethally attacked Coalition Forces in the area, and continued to ambush American and Iraqi Security forces with IEDs, complex attacks, and VBIEDS through 2011. Both AQ and AAI have claimed responsibility for numerous attacks against Coalition Forces and Iraqi civilians.

---

[244] Bill Roggio, *The Anbar Tribes vs. al Qaeda, Continued,* FDD Long War Jurn., (Nov. 22, 2006), http://www.longwarjournal.org/archives/2006/11/the_anbar_tribes_vs.php.
[245] Anthony Cordesman, *Iraq's Sunni Insurgents: Looking Beyond Al Qa'ida*, Center for Strategic and International Studies, (July 16, *2007) at 2.*

- **Baghdad** – Specific areas and neighborhoods of Baghdad were controlled by Iranian-funded elements of AQ/AQI and AAI throughout 2003 – 2011. In August 2003, Abu Musab al-Zarqawi and his Iraqi Sunni militant group, Tawhid wa al-Jihad, bombed the UN's headquarters in Baghdad, which left 22 people dead, including UN envoy Sergio Vieira de Mello. In October 2004, al-Zarqawi, pledged allegiance to AQ, forming AQI, and perpetrated attacks in and around Baghdad.[246] In 2007, AQ, using its unique methods of car bombings and suicide attacks, conducted attacks in the city, including at least two mass casualty attacks killing 31 and maiming 57 people.[247] In 2008, Coalition Forces and Shiite Iraqi's continued to be attacked by AQ/AQI/AAI in the area, and in that year alone 3 AQ senior commanders were captured or killed in Baghdad and the immediate surroundings.[248]

- **Baghdad's East al Rashid** (also known as "Dora") – Falling along sectarian fault lines in Baghdad, this neighborhood was predominately Sunni and was controlled by AQ and AQI through 2005. As the Special Groups gained more control of Baghdad and pushed Sunni elements out, JAM and the Special Groups launched attacks against Americans in this area in 2006. AQI eventually regained control of the neighborhood and used it as area of operations from 2007 onward.

- **Baghdad's Arab Jabour and Fadil Neighborhoods -** These two neighborhoods in Baghdad were home to a Sunni populace who permitted AQ and AQI operations from 2003 – 2011, and these groups launched attacks against Coalition forces routinely in these areas.

- **Baghdad's Iskan and Washash of West Baghdad -** Two neighborhoods in which Sunni and Shia control fluctuated over time, and with this so did the tactics used by the terrorist groups who operated in the area. From 2003 – 2005, AQ and AQI attacked Coalition Forces, but as Shia groups pushed into the area and committed atrocities against the Sunni residents, the area came under Special Group and JAM control from 2006 through 2011.

- **Fallujah** - According to CTC's study, Zarqawi's group has used car bombs, IEDs, ambushes, and large-scale defensive tactics as in Fallujah.[249] In addition, FDD's AQ expert Bill Roggio stated in 2007 "Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province."[250]

[246] British Broadcasting Corp., *Timeline: Al-Qaeda*, (Aug. 7, 2008), http://news.bbc.co.uk/1/hi/7546355.stm#2003.
[247] BILL ROGGIO, *The Iraq Offensive*, FDD's Long War Jun., (June 28 2007), https://www.longwarjournal.org/archives/2007/06/the_iraq_offensive.php.
[248] Bill Roggio, *Targeting Al Qaeda In Iraq's Network April-May 2008*, FDD's Long War Jun. (May 7, 2008), https://www.longwarjournal.org/archives/2008/05/targeting_al_qaeda_i_2.php.
[249] "Exploiting al-Qa'ida's Organizational Vulnerabilities", Combating Terrorism Center: United States Military Academy, February 14, 2006, p. 37, https://ctc.usma.edu/app/uploads/2010/06/Harmony-and-Disharmony.pdf.
[250] Bill Roggio, The Diyala Salvation Front, FDD's Long War Jun., (May 10, 2007), http://www.longwarjournal.org/archives/2007/05/the_diyala_salvation.php

- **Mosul** – Mosul was one of the main epicenters for Sunni insurgents and terror groups. "It is a critical hub for AQI funding and foreign terrorist facilitation."[251] In the second week of November 2004, AQI and AAI began attacking Coalition and Iraqi Security Forces across the city and targeting Kurds in eastern Mosul.[252] According to the U.S. Department of State, "[i]n Mosul alone, Zarqawi affiliates are reportedly responsible for more than 1,700 attacks on Coalition and Iraqi forces over a three month period in 2005."[253] In April 2008, U.S. and Iraqi forces killed or captured five senior al Qaeda leaders in Mosul, where AQ was attempting to reinvigorate its terror network. And Mosul remained an AQ "hotspot" through 2011.[254]

- **Samarra** – Located on the east bank of the Tigris River within the Saladin Governorate, 78 miles north of Baghdad. Despite being the home of several important Shia holy sites, the population was dominated by Sunni until recently. In 2006, AQ fatally attacked the Shiite al-Askari Mosque.[255] The Iraqi Government claimed to arrest the AQ senior commander who commanded the attack.[256]

- **Tal Afar** – A city and district in the Nineveh Governorate, located 40 miles west of Mosul. With 75% if its residents being Sunni, AQ/AQI fighters operated in the city from at least 2004 and onward. The area was considered critical to AQ/AQI infrastructure by Coalition Forces and used by AQ/AQI as a staging area for foreign fighters recruited and transported into Iraq by MOIS through the Syrian border, and from where AQ/AQI facilitated terror attacks throughout Iraq. On March 2007, AQ claimed responsibility for dual suicide attacks in Shia markets in Tal Afar.

- **Habbaniyah** – Located near a lake that bears the same name, this city marks the halfway point between Ramadi and Fallujah. Sunni terror groups that controlled the Habbaniyah region were dominated by al Qaeda and Iranian-supported foreign fighters, who had the cash and expertise to drive the violence and attacks against Iraqi and U.S. forces. These groups easily coopted local Sunni insurgents, and "[h]ard core al Qaeda eventually gained control[.]"[257]

- **Diyala Province, Baqubah** - Baqubah, also spelled Baquba and Baqouba, is the capital of Iraq's Diyala Governorate. The city is located some 50 km (31 mi) to the northeast of Baghdad, on the Diyala River. Al Qaeda in Iraq made Baqubah a center for its Islamic

[251] Eric Hamilton, "The Fight For Mosul", March 2003 - March 2008, Institute for the Study of War, p 3.

[252] Eric Hamilton, "The Fight For Mosul", March 2003 - March 2008, Institute for the Study of War, p. 9.

[253] Department of State: https://www.state.gov/documents/organization/65462.pdf

[254] Bill Roggio, *Targeting Al Qaeda In Iraq's Network, April – May 2008*, FDD's Long War Jun., (May 7, 2008), https://www.longwarjournal.org/archives/2008/05/targeting_al_qaeda_i_2.php; *see also* Bill Roggio, *Background on Ansar al Islam and its links to al Qaeda and Iran*, FDD's Long War Jun., *August 4, 2009* http://www.longwarjournal.org/archives/2009/08/iraqi_troops_detain.php

[255] "Iraq Shrine Blast Suspect Arrested", CBS, June 28 2006, https://www.cbsnews.com/news/iraq-shrine-blast-suspect-arrested/

[256] "Al Qaeda's Saedi 'triggered sectarian violence'", ABC, September 4 2006, http://www.abc.net.au/news/2006-09-04/al-qaedas-saedi-triggered-sectarian-violence/1254288

[257] Bill Roggio, "Habbaniyah and the 3/3-1 Snake Eaters", FDD's Long War Jun., (Jan, 19 2007), https://www.longwarjournal.org/archives/2007/01/habbaniyah_and_the_3.php

State of Iraq in 2006.    AQ and AQI used IEDs and some EFPs in attacks against Coalition Forces in this area.[258]

## 15. THE CONSPIRACY INVOLVED MULTIPLE ACTS OF INTERNATIONAL TERRORISM LEADING UP TO & INCLUDING EACH OF THE TERRORIST ATTACKS AT ISSUE IN THIS COMPLAINT

771.    At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran.

772.    At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or Iran's military forces or their agents engage in lawful acts of war against The United States.

773.    All of the violent acts described herein that resulted in death and/or injury to Plaintiffs were acts of international terrorism which were not the result of an "act of war" as that term is defined in 18 USCS § 2331.

774.    On October 3, 2018, the bipartisan Anti-Terrorism Clarification Act of 2018 was signed into law. Section 2 of the ATCA expressly amended 18 U.S.C. § 2331 and excluded from the "act of war" exception to the ATA's civil-liability provision two specific categories of government-designated terrorist organizations – "Foreign Terrorist Organizations" and "Specially Designated Global Terrorists." Pursuant to § 2331(6), the term "military force" does not include any person that:

    (A) has been designated as a:
        i.  Foreign Terrorist Organization by the Secretary of State under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); or
        ii.  Specially Designated Global terrorists (as such term is defined in section 594.310 of title 31, Code of Federal Regulations) by the Secretary of State or the Secretary of the Treasury; or
    (B) has been determined by the court not to be a "military force."

---

[258]  Bill Roggio, *The Battle of Baqubah I*, FDD's Long War Jun. (June 19 2007), http://www.longwarjournal.org/archives/2007/06/the_battle_of_baquba.php

18 U.S.C § 2331(6).

775. The specific attacks alleged herein were all carried out by foreign terrorist organizations ("FTOs") and/or SDGTs like Hezbollah, The Special Groups, AQ, AAI, and the Qods Force, not by the armed forces of recognized governments or military forces.

776. The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

777. At no time relevant to this action did the operatives of Iran, Hezbollah, the IRGC, MOIS, the Special Groups, AQ or AAI, who killed and injured Coalition Forces in Iraq and civilians (including Plaintiffs) carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

778. The conduct of Iran, the IRGC, Hezbollah, The Special Groups, AQ and AAI violated the laws of armed conflict (including, e.g., AAH/JAM operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

779. The acts of Iran, the IRGC, MOIS, Hezbollah, the Special Groups, AQ and AAI that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

780. The Western Bank Defendants not only conspired to, aided and abetted, and otherwise caused and/or substantially contributed to these acts of international terrorism, but their specific conduct contributing to the attacks against Plaintiffs satisfies the definition of "international terrorism" set forth in 18 U.S.C. § 2331(1), as follows:

781. **Defendants' Acts Were Dangerous to Human Life**: The Western Bank Defendants committed acts that were dangerous to human life by knowingly, purposefully and blatantly disregarding their legal duties to ensure compliance with counterterrorism financing regulations, standards, and protocols. These acts constituted violations of the criminal laws of the United States and the State of New York. Defendants purposefully designed, offered, used, and trained Iran and its Agents and Proxies, including the Terrorist Groups, with specialized expert knowledge on specific methods and tactics to successfully launder money and disguise transactions in order to circumvent U.S., E.U., and U.N. counter-terrorism sanctions and trade embargos. Defendants did this knowing that Iran and its Agents & Proxies were designated terrorist entities (including FTOs) that intended to commit terrorism against Americans, such as Plaintiffs. Defendants willingly and purposefully facilitated undetectable financial transactions for the benefit of known terrorists and sponsors of terror for many years, thousands of times, and in the amount of, at least, hundreds of billions of dollars.

782. Defendants' conduct in enabling Iran and other designated Iranian-entitiies to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies constituted acts that were dangerous to human life by their nature and as evidenced by their consequences. Defendants' illegal U.S. dollar clearing transactions on behalf of Iran, Iranian banks and high-risk customers were the mechanism through which the Terrorist Groups had the means and resources to carry

out acts that were directly and unequivocally dangerous to human life.

783.     Because the reasonably foreseeable consequence of such acts is the successful support and commission of international terrorism, such acts are inherently dangerous to human life.

784.     **Defendants' Activities Appear to be Intended to Influence the Policy of the United States Government by Coercion**: The Western Bank Defendants' activities not only appear to be, but were in fact, intended to influence the economic and foreign policies of the United States. Defendants utilized their unique position within the global financial system in conjunction with their enormous economic power and control to neutralize the U.S. counterterrorism and WMD sanctions programs, and ultimately, undermine the U.S. policies designed specifically to prevent terrorism financing. Rather than comply with the laws and rules related to OFAC-sanctioned entities, Defendants intentionally violated those laws, ignored their duties, and circumvented sanctions such that the policies of the United States could not achieve their intended purposes – the prevention of terrorism, collection of intelligence, and the interdiction of illicit funds. Defendants' own internal statements, as described herein, demonstrate that they intended to, through their coercive conduct, influence these U.S. policies or, at a minimum, prevent them from achieving their objectives. Defendants' success in this regard was fully evident in 2008 when the U.S. revoked the U-Turn exemption once it realized that Iran (with assistance from the Defendants) was using its banks to finance terrorist groups, including Hezbollah, and engaging in deceptive conduct to hide other prohibited transactions.

785.     Defendants' conduct provided direct support to Iran's terrorism network and its terrorism campaign in Iraq, which was too was intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of

the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

786. **Defendants' Activities Transcended National Boundaries**: The Western Bank Defendants' conduct occurred on a global scale, transcending national boundaries. The correspondent banking and trade finance transaction methods employed by Defendants involved accounts and bank branches in the United States, Europe, Asia, and the Middle East (among other areas). Ultimately, the result of such conduct was the realization of the overarching goal of the Conspiracy - the sponsorship and commission of international terrorism by Iran and the Terrorist Groups in Iraq, against Coalition Forces.

787. **Defendants' Conspired Directly with Iran and Iranian Entities Who Committed Acts of International Terrorism:** The Western Bank Defendants have admitted to directly conspiring with Iran and Iranian-banks that committed numerous individual acts of international terrorism leading up to and including the attacks against Plaintiffs in Iraq. Iran intends for and in fact uses its state-owned banks and companies to directly support FTOs in its terrorism network, including those that attacked Plaintiffs. Iran and its banks, as well as its government agencies, such as MOIS, IRGC, MODAFL, and its state-controlled industries, including NIOC, IRSIL and certain airlines, provide direct materially support to Hezbollah, AQ/AQI, AAI and KH, as well as terrorist groups working under the command and control of these FTOs. Providing any support to these FTOs are acts dangerous to human life, let alone funding, arming, training, sheltering and rewarding these FTOs at the expense of billions of dollars over decades. And Iran did all of this with the specific intent that these FTOs would plan,

authorize and commit the attacks that killed and injured Americans, including Plaintiffs, in Iraq.

## V.    OVERVIEW OF THE CONSPIRACY

### 1.    AGREEMENT AND KNOWLEDGE

788.    As noted above, the Conspiracy identified in this Complaint first began in the years immediately after Iran was first designated by the United States as a State Sponsor of Terrorism in 1984.

789.    As a result of that designation, Iran developed various ways to circumvent U.S. economic sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum and natural gas) without detection by the government in order to pursue foreseeably illicit objectives, including:

a) Concealing hundreds of billions of dollars of Iran's U.S. dollar- denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

b) Assisting Iran in transferring at least $150 million to the IRGC-QF, Hezbollah, the Special Groups, and other instruments of Iranian state- sponsored terrorism; and

c) Assisting Iran in acquiring technology and components for its illegal Weapons of Mass Destruction program and illicit conventional arms trade.

790.    To further those objectives, Iran enlisted several Iranian state-owned banks as well as Defendant Bank Saderat Plc and various international financial institutions, including the Western Bank Defendants in this Action, which agreed to alter, falsify, or omit information from payment order messages that involved Iran or Iranian parties, in particular several Iranian banks (as noted above, referred to herein occasionally as the "Iranian Bank Co-conspirators" (including Defendant Bank Saderat Plc)), as well as IRISL, for the express purpose of concealing Iran's financial transactions in the Eurodollar market from detection, scrutiny, or monitoring by U.S.

regulators, law enforcement, and/or depository institutions.

791. The Conspiracy between Iran, the IRGC, IRISL, Defendant Bank Saderat Plc, the other Iranian Bank Co-conspirators, and the Western Bank Defendants began no later than 1987, and continues to the present (though individual Defendants joined the Conspiracy at different dates).

792. The Conspiracy orchestrated by Iran made it possible for Iran to transfer: (1) hundreds of billions in U.S. dollar-denominated funds from its Eurodollar accounts maintained by various international banks, including the Defendants, through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

793. Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited, to Defendant Bank Saderat Plc, other Iranian Bank Co-conspirators, including but not limited to, the Central Bank of Iran, Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah (which are all instrumentalities of Iran), as well as the IRGC-controlled IRISL, under which the conspirators agreed to alter, falsify, or omit information from payment order messages for USD-denominated Eurodollar, trade-finance, precious metals and foreign exchange transactions that were purposefully directed at, and processed through, the United States, for the purpose of funding Iran's illegitimate activities, including sponsoring terrorism.

794. As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollar-denominated transactions on

behalf of Iran knowing that Iran was a designated State Sponsor of Terrorism.

795.    Each Defendant entered into its agreement with Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein, or other foreign financial institutions) were also actively participating in the Conspiracy, and shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States, and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it.

796.    Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran to further its sponsorship of terrorism; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions, so that it could continue to sponsor terror.

797.    In addition, each Defendant also knew, or was deliberately indifferent to, several of the Conspiracy's foreseeable purposes and criminal objectives that included:

a)  Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

b)  Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

c)  Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRGC-controlled IRISL including over 150 "stripped" transactions after IRISL was designated a SDN;

d)  Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state

sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

e) Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, Hezbollah, and the Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

798. As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism, and that U.S. law and regulations required it to fully disclose all funds transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

799. Despite that knowledge, each of the Defendants knowingly conspired with Iran and its agents (including Defendant Bank Saderat Plc) to violate those U.S. laws and to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the Eurodollar correspondent banking network for clearance and settlement in the United States on behalf of Iran, IRISL, and the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc.

800. From 2003 through 2011, and as set forth in greater detail herein, each of the Defendants knowingly agreed to join the Conspiracy; knowingly and willfully participated in the Conspiracy; knew or was deliberately indifferent to the Conspiracy's criminal purposes and objectives; took initiatives to improve its workings; and was aware of the participation of many (if not all) of its members.

## 2.  ACTS AND EFFECTS

801.  Through the Conspiracy, Iran provided material support to IRGC, MOIS and the Terrorist Groups, which targeted American citizens in Iraq, and with substantial assistance from the Western Bank Defendants, concealed and disguised the nature, location, source, and origin of the material support it provided to these terrorists, knowing and intending that the funds be used in preparation for and in carrying out acts of terrorism against Americans and others, including civilians, in Iraq.

802.  As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, regulators, bank auditors, and counter-terrorism agencies the flow of hundreds of millions (and in some cases, billions) of U.S. dollars it was clearing and settling in the United States, including transfers for the benefit of the IRGC, MOIS, and the Terrorist Groups, and through them to individuals actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

803.  The conduct of each Defendant, its awareness of other Defendants' and Co-conspirators' participation and conduct, and the resulting "glaring hole" in America's counter-financing of terrorism and sanctions architecture described by former Manhattan District Attorney Robert M. Morgenthau, provided Iran with vital access to the U.S. financial system.

804.  U.S. "dollar clearing and settlement" – primarily (in this case) through the Clearing House Interbank Payments System in New York or "CHIPS-NY" system and the Federal Reserve Bank of New York ("FRB-NY") – is an elaborate inter-bank system in the U.S. by which banks clear and settle credits and debits in their Eurodollar accounts with other banks all across the globe on a daily basis.

805.  The U.S. "dollar clearing and settlement" system is critical not only to the workings of the global economy, but provides financial institutions (and nation states) with

critical, essential access to global trade-finance credit denominated in U.S. dollars.

806. Thus, once Iran gained clandestine access to the U.S. "dollar clearing and settlement" system in New York, it could not only launder billions of dollars through its accounts in the Eurodollar market, but it could also borrow against the Eurodollar deposits it held in the Defendants' banks – facilitating further undetected transactions around the world in USD – both for ordinary commercial purposes and the illegal aims and objectives of the Conspiracy.

807. This broad-based access to the U.S. "dollar clearing and settlement" system was essential to Iran because of the scope of Iran's global ambitions at the time, which included driving the United States and its Coalition partners out of Iraq, dominating that country, and acquiring Weapons of Mass Destruction.

808. Thus, among the effects of the Conspiracy, a State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

809. In addition, absent the clandestine access to the U.S. "dollar clearing and settlement" system afforded to Bank Saderat (and the Iranian Bank Co-conspirators), by the Western Bank Defendants, both Iran and Hezbollah's uncontrolled access to USDs would have been extinguished, and Iran's ability to transfer large sums of USD to the Terrorist Groups would have been substantially impaired.

810.     By knowingly agreeing to enter into the Conspiracy, and by knowing or being deliberately indifferent to its lethal purposes, and by committing multiple overt acts in furtherance of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC, Hezbollah and the Terrorist Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq during the same period of time that the Conspiracy was proceeding, thereby substantially enhancing Iran, the IRGC's, Hezbollah's, and Terrorist Groups' ability to inflict the deaths and injuries described herein.

811.     The Conspiracy was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' deaths and injuries because the Conspiracy substantially assisted Iran, the IRGC, MOIS, IRISL, Mahan Air, Hezbollah, and the Terrorist Groups in committing the acts of international terrorism that killed and injured the Plaintiffs herein, by providing them collectively with more than $200 million U.S. dollars in funding that were used, *inter alia*, to arm, train and fund Iranian terror proxies in Iraq that targeted American citizens.

812.     By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused death and injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens who have been killed and injured by reason of acts of international terrorism perpetrated by Iran through its agents, including the IRGC, MOIS, and the Terrorist Groups.

813.     Defendant HSBC-US not only knowingly participated in the Conspiracy, but as a U.S. person within the meaning of 18 U.S.C. § 2332d also committed further acts of international

terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions directly with Iran, which it knew was a designated State Sponsor of Terrorism. HSBC-US's acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and HSBC-US is therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

814.    Defendants Barclays, Barclay's Bank PLC, SCB, ABN Amro (RBS N.V.), BNP Paribas, DB, CACIB, Commerzbank and their U.S. New York branches not only knowingly participated in the Conspiracy, but because their respective New York branches constitute U.S. persons within the meaning of 18 U.S.C. § 2332d, these Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions directly with Iran, which each such Defendant knew was a designated State Sponsor of Terrorism. Those acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

### 3.    DEFENDANT BANK SADERAT PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

815.    On September 8, 2006, the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the ITRs and excluded Bank Saderat from the Iranian U-Turn exemption.

816.    In announcing the 2006 change to the ITRs excluding Bank Saderat Iran from the U-Turn exemption, OFAC stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

817.    According to then-Under Secretary for Terrorism and Financial Intelligence

Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

818. The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization has received $50 million directly from Iran through Bank Saderat since 2001."

819. Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

820. For many years preceding the revocation of its U-Turn exemption, Bank Saderat illegally routed its USD transactions through the United States with the assistance of various Western commercial banks, including the Defendants herein.

821. From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to Hezbollah and other designated Terrorist Groups.

822. As detailed in a January 9, 2009, Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions of any reference to Iran or Bank Saderat.

823. In 2003, Lloyds exited its relationship with Bank Saderat Plc, and Defendant Credit Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as set forth below and, as also discussed below, in a Deferred Prosecution Agreement that Defendant Credit Suisse

signed in 2009).

824.    Notwithstanding the revocation of its access to the Iranian U-Turn exemption, Bank Saderat (and Bank Saderat Plc) continued to illegally direct USD transactions through the United States with the active assistance of the other Defendants listed herein.

825.    On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc. It also maintained other accounts for Bank Saderat Iran, including an account at SCB, Dubai.

826.    From 2003 to 2011, and as described in more detail below, Bank Saderat Plc, working in concert with Standard Chartered Bank, financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

827.    For example, Standard Chartered Bank facilitated at least 10 transactions involving Letters of Credit valued at $1,559,127, which involved the shipment of U.S.-origin export-controlled aircraft parts sold by the Singapore-based Monarch Aviation, a company that was part of Iran's illegal procurement network, to various MODAFL sub-agencies.

828.    A sub-agency of MODAFL obtained a Letter of Credit issued by Bank Refah, Iran, and sent it to Standard Chartered's branch in Singapore (where the Iranian front company Monarch Aviation maintained accounts) while reimbursement authorization was sent to the Iran Overseas Investment Bank London, *i.e.* Bank Saderat Plc's predecessor, which in turn either directly financed the illegal acquisition of goods from the United States, or provided a surety for Bank Refah's payment.[259]

---

[259] The Reimbursing Bank usually pays the Negotiating Bank (in this case SCB) against a valid reimbursement authority received from the Issuing Bank (in this case Bank Refah) and a validated statement from the Negotiating Bank that the documents complied with LC terms, but in certain cases it only serves as a surety for the payment. SCB-London was also one of Bank Refah's correspondent banks in the UK.

829.     The goods were shipped by Iran Air[260] from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

830.     The LCs were refinanced by Standard Chartered's Dubai branch through its credit facility with the CBI, with payment being made to Monarch Aviation's account with Standard Chartered, Singapore through the latter's U.S. dollar account with Standard Chartered Bank, London, which in turn received the funds into its USD nostro account with Standard Chartered's New York branch.

831.     In another instance discussed infra, Bank Saderat Plc knowingly sent a concealed and illegal payment via Standard Chartered's New York branch and JP Morgan Chase, New York, to Standard Chartered Bank in Dubai on behalf of a MODAFL's subsidiary, the Iran Helicopter Support and Renewal Company ("IHSRC").

832.     The payment facilitated IHSRC's acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts through an elaborate money laundering scheme intended to conceal from U.S. authorities: (1) the unlawful acquisition of U.S.-manufactured equipment for Iran's military; (2) the complex layering of the transaction involving Bank Melli's branches in London and Hong Kong; and (3) Bank Refah and Bank Saderat's involvement with SCB.

833.     The HSBC Defendants also maintained one or more accounts for Bank Saderat Plc during the relevant time period.

834.     In an October 9, 2006 email, Defendant HSBC-Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the

---

[260] Iran Air was designated by the U.S. Treasury Department in 2011: "Iran's national airline carrier, Iran Air, is a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment.… Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities. On numerous occasions since 2000, Iran Air shipped military-related electronic parts and mechanical equipment on behalf of MODAFL."

account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

835. As noted *supra*, in October 2007, Bank Saderat Iran (including Defendant Bank Saderat Plc), was designated a SDGT pursuant to E.O. 13224.

836. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.* (Emphasis added.)

837. As set forth below, Defendant Barclays closed its Eurodollar accounts for Bank Saderat Plc, in 2008, months *after* Bank Saderat Plc was designated a SDGT, and more than a year after the U.S. Treasury Department reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

838. The HSBC Defendants, and Defendants Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from Eurodollar payment order messages that they facilitated on behalf of Bank Saderat (and Bank Saderat Plc) at all times knowing, or deliberately indifferent to the fact, that Bank Saderat was facilitating Iranian-sponsored terrorism and, after October 2007, knowing, or deliberately indifferent to the fact, that Bank Saderat (including Bank Saderat Plc) was a SDGT so-designated for its very role as a "significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

839. Moreover, as a Lebanese-based terrorist organization, Hezbollah was (and remains) particularly in need of USD funds because much of the Lebanese economy is

"dollarized" (*i.e.,* banking and retail transactions, credit and debt instruments are often, if not primarily, conducted in USD funds).

840.    Accordingly, Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance in carrying out its terrorist activities in Iraq, including Hezbollah's participation in the terrorist attacks that killed and injured the Plaintiffs.

841.    Moreover, Plaintiffs' deaths and injuries herein were a reasonably foreseeable result of Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah.

### 4.    THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

842.    The Central Bank of Iran ("CBI") is fully controlled and run by individuals directly appointed by the Government of Iran.

843.    At all relevant times, the CBI has not functioned in the same manner as central banks in Western countries that are institutionally designed to be independent from political interference, nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates.

844.    Instead, the CBI is an alter-ego and instrumentality of the Iranian government and its Supreme Leader, and it has routinely used Iranian banks like Bank Melli Iran and Bank Saderat Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

845.    At all relevant times, the CBI was an active participant in the Conspiracy.

846.    For example, leading up to the adoption of UN Security Council Resolution 1747 (March 2007), which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets

from the impact of impending sanctions.

847.    Throughout the relevant time period, the CBI maintained Eurodollar accounts at Bank Melli Iran, Bank Melli Plc, Bank Saderat Iran and Defendant Bank Saderat Plc in various currencies, including USD.

848.    Bank Melli Iran's U.K. subsidiary (later Bank Melli Plc) managed the CBI's Eurodollar accounts in Europe.

849.    In the wake of U.S. and later European Union designations against Iranian banks (including Bank Saderat and Bank Melli), the CBI often acted as a secret proxy for those designated entities.

850.    As part of the Conspiracy, the CBI utilized Defendant Bank Saderat Plc to transfer USD funds to Hezbollah.

851.    The CBI also maintained Eurodollar accounts, and unlawfully transferred USD funds in furtherance of the Conspiracy, with the assistance of Defendants SCB, ABN Amro (RBS N.V.) and the HSBC Defendants, including facilitating billions of dollars in USD funds transfers on behalf of the IRGC, through the aforementioned NIOC, which was designated as a SDN by the United States because it was an IRGC agent during the relevant time period.

852.    As such, illicit transfers on behalf of the NIOC at that time were not for the benefit of a legitimate agency, operation or program of Iran.[261]

853.    In addition, the Iran Threat Reduction and Syria Human Rights Act 2012 stated that:

>    It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by

---

[261] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that NIOC continued to participate in the Conspiracy and launder U.S. dollars through U.S. financial institutions in 2013, https://www.courtlistener.com/recap/gov.uscourts.nysd.455095.7.0.pdf.

the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[262]

854. Moreover, according to a published report, the National Iranian Oil Company even took an active role in support of Iran's terrorist activities in Iraq by providing intelligence in support of attacks against Coalition Forces along the Iranian border by using its own helicopters to conduct surveillance on Coalition Forces' Forward Operating Bases ("FOBs").

855. In early 2001, and in furtherance of the Conspiracy, the CBI asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Eurodollar payments on behalf of the NIOC.

856. As alleged herein, SCB agreed to participate in the Conspiracy and remove identifying data on SWIFT-NET messages for these and other wire transfers.

857. Thereafter, between 2001 and 2006, the CBI sent approximately 2,226 payment order messages for a total value of *$28.9 billion* to Standard Chartered in London, the vast majority of which were illegally routed through the U.S. as described herein.

858. During the same time period, the CBI also maintained a Eurodollar credit facility at Standard Chartered Bank's branch in Dubai, UAE, which it used to assist Iran in illegally acquiring technology and components on behalf of MODAFL.

859. As detailed further below, and in furtherance of the Conspiracy, the CBI and Defendant ABN Amro (RBS N.V.) (which also maintained Eurodollar accounts for the CBI, and had numerous financial and business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

860. Between 2002 and 2004, Defendant ABN Amro (RBS N.V.) accepted USD Eurodollar deposits from the CBI on a regular basis with an average deposit size in the range of

---

[262] https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf

$200 million USD, and the CBI instructed, and ABN Amro (RBS N.V.) agreed, to follow illegal procedures to launder USD-denominated Eurodollar deposits to the CBI's Eurodollar and local currency accounts with other European banks with branches or offices in London.

861.     In furtherance of the Conspiracy, the CBI coordinated with Defendant ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their Eurodollar accounts with European banks with offices or branches in London.

862.     This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran, or any other reference relating to Iran.

863.     In 2001, the CBI also approached members of the HSBC Group, specifically Defendants HSBC-Middle East and HSBC-London, to obtain their agreement to move the CBI's clearing and settlement business from National Westminster Bank Plc to the HSBC Defendants, and intended to clear USD funds transactions through Defendant HSBC-US.

864.     Pursuant to that agreement, the CBI eventually moved its Eurodollar accounts to the HSBC Defendants, and by late 2003, the CBI was one of six Iranian banks that used members of the HSBC Group for (mostly illegal) correspondent banking through the U.S. dollar clearing and settlement in New York.

865.     With Defendant HSBC Holdings' knowledge, and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-London manually intervened in the processing of payment orders by the CBI by removing: the Central Bank of Iran's name; its SWIFT-NET account (identified by BIC address BMJIIRTH); and country of origin (Iran).

866.     Defendant HSBC-US also knew that other HSBC Defendants were altering and

omitting information in SWIFT-NET payment order messages regarding Iranian parties, *i.e.* "stripping" these transactions, but nevertheless knowingly continued processing transactions despite that very knowledge.[263]

### 5. BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

867. Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

868. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even today most are effectively controlled by the Iranian regime.

869. Melli Bank Plc in London, England, was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

870. According to the U.S. government, from 2004 to 2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded Terrorist Groups that targeted, killed and maimed American and Iraqi forces and civilians.

871. Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from

---

[263] In furtherance of the Conspiracy, the CBI also conducted illegal precious metals transactions, primarily in gold bullion. For example, the December 2012 Consent Order entered into between OFAC and Defendant HSBC Holdings Plc stated that, "[o]n May 24, 2006, the London branch of HBUS acted as a clearing bank in a book entry transfer of 32,000 ounces of gold bullion, valued at $20,560,000, for the ultimate benefit of Bank Markazi, Iran [the CBI], in apparent violation of the prohibition against the "exportation . . . , directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran." Located at: https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/121211_HSBC_Settlement.pdf

financial transactions when handling financial transactions on behalf of the IRGC.

872.  Bank Melli Iran and Melli Bank Plc were designated as SDNs pursuant to E.O. 13382 in October 2007, and included on OFAC's SDN list, which resulted in, *inter alia*, their exclusion from the U-Turn exemption for Iranian Eurodollar transactions.

873.  The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

874.  In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, confirmed that:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

875.  In mid-2007, Bank Melli Iran's branch in Hamburg ("Bank Melli-Hamburg") transferred funds for the Defense Industries Organization ("DIO").

876.  DIO is an Iranian government-owned defense manufacturer whose name, logo and/or product tracking information was stamped on munitions found in weapons caches that were seized from the Special Groups in Iraq; including large quantities of weapons produced by DIO in 2006 and 2007 (for example, 107 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars.)

877.     Since at least the mid-1980s, Bank Melli has maintained Eurodollar accounts, at one time or another, with Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, SCB, Commerzbank and the HSBC Defendants.

878.     As early as 1987, Bank Melli instructed Defendant Barclays to process Eurodollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc in London without referencing Bank Melli Iran's name in the SWIFT-NET payment orders.

879.     Bank Melli further instructed Barclays to send separate payment order message instructions, which included full transaction details, to Bank Melli's London Branch.

880.     Barclays agreed and assisted Bank Melli in its illegal conduct and continued to do so even after Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

881.     No later than December 2000, Bank Melli opened a Eurodollar account with Defendant ABN Amro (RBS N.V.)'s branch in Dubai, United Arab Emirates ("UAE") and worked with ABN Amro (RBS N.V.) to strip its U.S. dollar-denominated transactions.

882.     Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add Eurodollar accounts for five Iranian banks at SCB-London. Bank Melli was among the banks whose business SCB expressly sought to (and did) acquire.

883.     In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened Eurodollar accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

884.     In addition, Bank Melli Iran's branch in the UAE was instrumental in facilitating

U.S. sanctions-evading trade-finance and Eurodollar payment transactions on behalf of Mahan Air and MODAFL.

885.     For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 through Standard Chartered Bank, Dubai in favor of a UAE-based company called Aeronautical & Security for the shipment of an aircraft engine (identified by model number CF6-50C2) manufactured by General Electric and shipped from Luxemburg to Tehran, Iran.

886.     Bank Melli UAE instructed Credit Suisse, Zurich to make the payment, which in turn instructed Bank of New York in New York (one of Credit Suisse's U.S. clearing and settlement banks) to credit SCB's New York branch for further credit to the account of SCB-Dubai, which then credited Aeronautical & Security's Eurodollar account.

887.     The following flow-chart shows the overall flow of USD funds involved with Mahan Air's illegal acquisition of a U.S.-manufactured, export-controlled aircraft engine:



888.     In another example, Bank Refah Kargaran, Iran issued a Letter of Credit in USD to a MODAFL sub-agency through Standard Chartered Bank, Dubai in favor of a Dubai-based company called FP Aeroparts for the illegal shipment (via Iran Air) of U.S. aircraft parts.

889.     Bank Melli served as the Reimbursing Bank on the trade-finance transaction, and it subsequently instructed Credit Suisse, Zurich to debit its Eurodollar account as part of the flow of USD funds between the LCs counterparties.

890.     As the LC transaction proceeded, Credit Suisse then further instructed The Bank of New York to pay Standard Chartered Bank's New York branch (the clearing bank for the transaction), which further credited the USD account it maintained for SCB, Dubai with the amount due for the shipment of aircraft parts.

891. To close-out the LC transaction, SCB, Dubai then credited the Eurodollar account it maintained on behalf of FP Aeroparts Middle East for the amount of the shipment.

892. The following flow-chart shows the overall flow of USD funds involved with MODAFL's illegal acquisition of the U.S.-manufactured aircraft parts:



893. As reflected in the above flow-chart, and during the relevant time period, Defendant Credit Suisse maintained Eurodollar accounts in Zurich, Switzerland on behalf of Bank Melli.

894. Credit Suisse also instructed and trained Bank Melli employees, and conspired with Bank Melli, on ways to format Bank Melli's payment orders so that the resulting SWIFT-NET messages would avoid detection by the automated filter algorithms in U.S. depository

institutions' automated OFAC sanction screening software.

895.    During the relevant time period (and beginning no later than July 2003), Defendant Commerzbank also conspired with Bank Melli to route its Eurodollar clearing and settlement business through Commerzbank's correspondent banking relationships and SWIFT-NET accounts.

896.    Commerzbank further advised Bank Melli to list "non ref" in the ordering party field in all payment order messages because it would trigger a manual review of the overall Eurodollar payment transaction, thereby enabling Commerzbank personnel to ensure that the SWIFT-NET messages did not contain any information linked to Iran.

897.    Defendant HSBC-London also maintained Eurodollar accounts for Bank Melli Iran, and it used HSBC-US to provide illegal USD funds clearing and settlement services for Bank Melli during the relevant period.

898.    Yet despite the fact that several SWIFT-NET payment order messages were supposed to have been fully "stripped" by HSBC-London—before their transmittal to the U.S.—they were nevertheless blocked by the HSBC-US OFAC filter in New York because Bank Melli was referenced in error (thus placing HSBC-US on notice that HSBC-London was working in concert with Bank Melli to evade U.S. law, regulations and economic sanctions against Iran).

899.    Even with these blatant warning signs, HSBC-US continued to routinely provide Eurodollar clearing and settlement services to the HSBC Defendants, knowing full well that they were violating U.S. laws and regulations by laundering money on behalf of Bank Melli.

900.    Because, as discussed below, HSBC-US knew of this unlawful conduct—and continued to facilitate it— HSBC-US violated, *inter alia*, 18 U.S.C. § 2332d.

### 6. BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

901.    Bank Mellat provides banking services in support of Iran's Weapons of Mass Destruction program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

902.    In 2007, Bank Mellat was designated by the U.S. Treasury Department for providing "banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747."

903.    During the relevant time period, Bank Mellat provided financial services and maintained Eurodollar accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these designated customers.

904.    In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into a Eurodollar account it held for Novin Energy Company.

905.    As part of the Conspiracy, the CBI effectuated the payment(s) in USD funds to Bank Mellat's Eurodollar account in London for further credit to the Eurodollar account of Bank Mellat's client – Novin Energy Company.[264]

906.    In 2007, Bank Sepah facilitated payments in USD funds to Eurodollar accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization ("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL")

---

[264] Novin Energy Company was designated by the U.S. Treasury Department under E.O 13382 and by the United Nations Security Council in Resolution 1747.

that was designated by the United States on June 28, 2005.[265]

907. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under U.N. Security Council Resolution 1737 and designated by the United States under E.O. 13382.

908. Bank Mellat was designated by the United States on October 25, 2007 in connection with Weapons of Mass Destruction proliferation activities, and was included on OFAC's SDN list. The designation, *inter alia*, excluded Bank Mellat from accessing the U-Turn exemption for Iranian Eurodollar transactions.

909. In 2002, together with Iran's Bank Tejarat, Bank Mellat merged its London branch to form Persia International Bank Plc in the United Kingdom.

910. During the relevant time period, both Defendant HSBC-London and Defendant Barclays maintained Eurodollar accounts for Persia International Bank Plc and served as its "principal bankers" in the Eurodollar market.

### 7. BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

911. Bank Sepah is an Iranian government-owned and government-controlled financial institution.

912. In 2007, the U.S. Treasury Department designated Bank Sepah for providing support and services to designated Iranian proliferation firms. The designation was effectuated pursuant to E.O. 13382, due to Bank Sepah's Weapons of Mass Destruction proliferation-related

---

[265] When Bank Sepah was designated by the U.S. in January 2007, the U.S. government noted that Iran's missile industry, arranging financing and processing dozens of multi-million dollar transactions for AIO and its subordinates…" *See*, https://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx. "Bank Sepah is AIO's bank of choice, and since at least 2000, Sepah has provided a variety of critical financial services to [Iran]."

activities.

913.    Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the United Kingdom, was also designated.

914.    According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying Weapons of Mass Destruction.

915.    As a result of the designation, Bank Sepah (including Bank Sepah International Plc) was excluded from accessing the U-Turn exemption for Eurodollar transactions.

916.    During the relevant time period, Defendant HSBC-London provided illegal Eurodollar clearing and settlement services to Bank Sepah.

917.    During the relevant time period, Standard Chartered Bank provided illegal Eurodollar clearing and settlement services for Bank Sepah, as well as facilitating US dollar-denominated Letters of Credit for Bank Sepah. SCB, as discussed infra, also provided Eurodollar payments and trade-finance services for Bank Saderat and Bank Melli.

918.    As detailed below, Bank Sepah, acting in concert with SCB, illegally financed the acquisition of U.S. goods on behalf of Mahan Air.

919.    For example, in February 2006, Credit Suisse in Zurich paid SCB Dubai almost $30 million dollars (cleared and settled through the United States) on behalf of Bank Sepah, which had, in turn, financed Mahan Air's acquisition of an Airbus A320-232 and several aircraft engines.[266]

920.    In another case in 2002, Bank Sepah financed (in USD funds) the purchase of U.S. aircraft parts from an Iranian front company—the Malaysian and UK exporter Downtown

---

[266] Part of the trade-finance transaction was cleared through Standard Chartered's New York branch, and the paperwork indicates that SCB was aware that the transaction involved U.S. origin parts prohibited by U.S. sanctions.

Trading Ltd—on behalf of a MODAFL-controlled entity.

921. As part of the illegal scheme, once the U.S.-manufactured goods were transported from Malaysia to Iran by Iran Air, Downtown Trading Ltd., Malaysia sent documents to its bank, Maybank, Malaysia to collect payment against the Letter of Credit.

922. Maybank then presented documents under Bank Sepah's Letter of Credit to SCB, Dubai (the Negotiating Bank) for validation and subsequent clearing and settlement of the transaction's final Eurodollar payment through Citibank, New York.

923. Thus, Bank Sepah, with the assistance of Maybank and SCB, financed the illegal acquisition of U.S. aircraft parts by MODAFL, and induced Citibank in New York to provide dollar clearing and settlement to consummate the transaction.

924. As detailed below, Defendant Commerzbank AG's New York branch also provided illegal Eurodollar clearing and settlement services for Bank Sepah.

## 8. THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

925. The HSBC Defendants have a longstanding relationship with Iran.

926. In 1999, HSBC Group established a relationship with the Tehran office of Bank Melli Iran, and it launched an "Iran Representative" office in Tehran, Iran that same year.

927. In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran ("EDBI").

928. Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT-NET payment order messages including language such as, "*care sanctioned country*," "*do not mention our name in NY*," and "*do not mention Iran*."

929.    Eurodollar payment transactions with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East manually removed all references to Iranian-sanctioned entities from the SWIFT-NET messages associated with each transaction.

930.    Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate Eurodollar payments, trade finance and foreign exchange transactions on behalf of Iran through the United States that would evade U.S. sanctions by disguising Iran's financial activities as its USD funds were cleared and settled by U.S. financial institutions, including Defendant HSBC-US.

931.    Unlawful Iranian transfers of USD funds from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's USD correspondent accounts at HSBC-US by:

    a)  Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions), or otherwise altering the SWIFT-NET messages, to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

    b)  Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT 202 payment order message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC-US's electronic filter algorithms from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

932.    Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's automated OFAC filter software and reduce the need for "manual intervention" (*e.g.,* the re-formatting Eurodollar transactions), thus sparing HSBC-Europe's employees from the need to manually alter the SWIFT-NET messages in order to remove references that might otherwise identify the presence of Iranian parties to the transaction, and associated scrutiny.

933.    This enabled the HSBC Defendants' business with Iran in the Eurodollar market

to proceed quickly and profitably.

934.    In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive USD funds transactions involving Iran and other prohibited countries or persons that went through the bank.

935.    That "review" identified more than 25,000 illegal transactions that involved Iran, worth a total of more than $19.4 billion in USD funds.

936.    The payment orders had been sent to HSBC-US and other financial institutions in the United States without referencing Iran, ensuring that the Eurodollar payment transactions would be processed without delay and not be blocked nor rejected by the algorithms in the automated OFAC filtering systems.

937.    The HSBC Defendants deliberately amended SWIFT-NET payment order messages and used MT 202 cover payments to conceal the nature of the transactions from HSBC-US automated OFAC sanction screening filters and those of other financial institutions in the United States, and HSBC-US was aware that the other HSBC Defendants used such methods to alter payment order messages.

938.    At the same time, the HSBC Defendants further trained, mentored and educated their Iranian Co-conspirators on how to deceptively format SWIFT-NET payment order messages, *inter alia*, to avoid detection and scrutiny by U.S. financial institutions, thus ensuring that Iran could solicit other conspirators to facilitate Eurodollar payments in a like manner.

939.    Accordingly, the HSBC Defendants' (and other Defendants' and Co-conspirators') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payment transactions and effectuate—what would have otherwise been preventable—transfers of USD funds to Hezbollah and the IRGC.

940.    Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy with Iran as early as 2000.

941.    For example, HSBC Group AML Compliance Head Susan Wright received an email on June 9, 2000, from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure that the HSBC Defendants were already employing to avoid OFAC filter detection.

942.    Cooper explained:

a) A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

b) In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances*."

c) In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

943.    Cooper's email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

944.    Several days later, on June 14, 2000, Wright forwarded Cooper's June 9, 2000 email to the then-current Head of HSBC Group Compliance, Matthew King.

945.    In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

a) "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

b) "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-

to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

946.    Senior HSBC Group officials were aware of the Conspiracy, including the specific methods and overt acts by which Iran, the Iranian banks and the HSBC Defendants were carrying it out.

947.    However, despite this awareness, senior compliance officials of HSBC Group and its subsidiary banks and entities (including compliance officials at Defendants HSBC Holdings, HSBC-Europe, HSBC-Middle East, and HSBC-US) did not put an end to this illicit banking "practice" with Iran. Instead, with clear knowledge of its purpose—and awareness that other banks participated in the Conspiracy—they knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining their respective "procedures" to facilitate illegal Eurodollar payments from and for Iran in USD funds.

948.    In late 2000, in coordination with the CBI, HSBC signed a project finance framework agreement with six Iranian commercial banks: including Bank Melli, Bank Saderat, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran.

## A.    HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"

949.    In or around January 2001, Bank Melli's London branch maintained Eurodollar accounts with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD funds clearing and settlement business.

950.    In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC-Europe's proposal boasted that HSBC-Europe was "…confident that we have found a

solution to processing your payments with minimal manual intervention."

951. The Bank Melli Iran Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment order message and, thus, HSBC-Europe would ensure that Iranian transactions involving USD funds would not run into any 'speed bumps' or other obstacles.

952. The "solution" provided specific alternative wording, as it explained:

> "The key is to **always** populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' **never leave blank**. This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." (Emphasis in original.)

953. HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20: *Your Ref….*
21: *Related Ref….*
32: *Amount/currency/Value date….*
50: <u>**DO NOT QUOTE IF IRANIAN**</u>
52: *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53: **/68296908**
54:
56:
57: *Beneficiary Banker (SWIFT codes where possible)*
58: *Beneficiary (SWIFT codes where possible)*
70: *Any Payments details for beneficiary…*
72: **Please leave blank**
**MT100**
Pay as above.

(Emphasis in the original.)

954. Thus, the Bank Melli Proposal documented the HSBC Defendants' active

coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information from SWIFT-NET messages so as not to trigger OFAC sanctions screening filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions in USD funds.[267]

955.    In 2001, John Wilkinson served as HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account.

956.    In a June 28, 2001 email titled "Re: Bank Melli" to HSBC-US, Wilkinson discussed the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter the wording of Iranian payment order messages, and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

957.    In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

958.    In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payment order messages prior to sending them to New York for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

---

[267] An internal HSBC memorandum that was associated with the Bank Melli Proposal also makes clear HSBC's awareness of Defendant Standard Chartered Bank's role as NIOC's primary (Western) banker at the time.

959.     In an email exchange in October 2001 between David Bagley, Defendant HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later Head of) HSBC Group's Audit Department, King noted:

> We also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable.

960.     HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

961.     King's email further confirms that senior executives and managers within the HSBC Group comprehended what the HSBC Defendants (and other foreign banks) had "traditionally" been doing for years when they used "routes" (a euphemism for altering payment order messages prior to routing them to U.S. financial institutions through SWIFT-NET) to avoid disclosing a transaction's Iranian connections, and that some of those transactions might prove to be "connected to terrorism."

962.     A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy, but also their knowledge of the participation of other co-conspirators, and Iran's desire to further evade U.S. sanctions.

963.     The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the

UK and Europe, which in turn use their New York USD correspondents to effect the payments."

964.    In addition to acknowledging the existence of the Conspiracy, the HSBC-Middle East memorandum also advised:

> "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

965.    From at least 2003 forward, HSBC provided banking and payment services in the Eurodollar market to, among other Iranian entities, the NIOC (which, as noted previously, was later designated pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC during the relevant time period).[268]

966.    Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

967.    In an October 9, 2006 email, David Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

968.    Further demonstrating his awareness of the risks HSBC was engaged in with Iran,

---

[268] The HSBC Defendants also provided Eurodollar, trade-finance, and foreign exchange services for NIOC. For example, the aforementioned January 2003 HSBC-Middle East memorandum stated that:
> L/C's [Letters of Credit] issued for Iranian Companies Abroad – Various Group Offices. HSBC offices are developing relationships with Iranian Government and non-Government companies. The L/C's issued are normally denominated in USD. Following NIOC's acceptance of HSBC as one of its listed banks, HSBC Bank Middle East now handles Iran's oil export L/C's. Turnover for this business is about USD400M [million] per year.

Bagley was listed as the contact person on the April 19, 2007 Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

969.    Eight months later, in a June 8, 2007 email, Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others, that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

970.    Bagley's email thus confirmed that various relationships continued to exist in the Eurodollar market with Iran and Iranian banks, including Bank Saderat.

971.    Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

972.    On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement and pay a $1.256 billion forfeiture. As explained further infra, DOJ issued a press release announcing the DPA, and summarizing the HSBC Defendants' illegal conduct.[269]

973.    In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with: (1) willfully failing to maintain an effective AML program; (2) willfully failing to conduct due diligence on their foreign

---

[269] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the DPA entered into between the HSBC Defendants and the DOJ on or about December 11, 2012, as if fully set forth herein.

correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

974.    Despite its agreement to overhaul its U.S. and global compliance functions, HSBC remained a conduit for illicit funds.[270]

975.    On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as "a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali Husayn and Kassim Tajideen…. Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah."

976.    The designation also covered Kairaba Supermarket, a subsidiary business of Tajco Ltd.

977.    A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC-US compliance officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.[271]

978.    In December 2013, the Treasury Department announced that Defendant HSBC-US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594.

979.    The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and early 2011 worth about $40,000 that benefited Tajco.

---

[270] *See e.g,* Exhibit 4. Declaration of Everett A. Stern.
[271] *See* Exhibit 4, Declaration of Everett A. Stern at 5.

980.    Although a relatively small sum, the facilitation of terrorism financing for Hezbollah a considerable time <u>after</u> Defendants HSBC Holdings and HSBC-US began negotiating their deal with DOJ, strongly suggests that, as of early 2011, the HSBC Defendants had not seriously remediated their AML/CFT controls and procedures, even after being caught committing hundreds of felonies.[272]

### B.    DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332D

981.    As alleged in greater detail below, even though at all relevant times Defendant HSBC-US was aware that: the HSBC Defendants were participating in the Conspiracy to unlawfully transmit Iranian USD funds through U.S. banks (including HSBC-US); and periodically complained about Defendants HSBC-Middle East and HSBC-London's conduct and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d. Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of multiple overt acts in furtherance of the Conspiracy.

982.    One key example of HSBC-US's failure to take substantive measures to ensure that it would not facilitate the HSBC Defendants' provision of illegal material support and services to Iran is reflected in a July 12, 2001 e-mail to senior employees at HSBC-US (containing a memorandum authored by HSBC Group Representative for Iran, John Richards).

983.    Richards's memorandum outlined the business opportunities members of the

---

[272] *See* Exhibit 4, Declaration of Everett A. Stern at 5 – 11.

HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with Iran, the CBI and Bank Melli, explaining:

a) "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."

b) "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"

c) "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

984.    Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing and settlement business with the CBI in the Eurodollar market.

985.    On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "*Re: Bank Melli*" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond) [the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking."

986.    Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

987.    As early as 2001, senior HSBC-US payments, compliance and business managers were informed that Iranian Eurodollar payment transactions were being sent by Defendant

HSBC-London to HSBC-US for clearing and settlement in USD funds after references to Iran had been deleted.

988.     HSBC-US employees were also informed of an HSBC-London proposal to streamline the processing of Iranian U-turn transactions by omitting references to Iran so that the payment orders would not be halted by OFAC's sanctions screening filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-London proposal, but took no other action to stop or prevent the activity already occurring.

989.     As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled "Re: Bank Melli," which described HSBC-London's "usual method" of altering payment order messages and the reasons for doing so.

990.     Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-London's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

991.     The Eastwood Memorandum was sent to both HSBC-US and HSBC-London employees and forwarded to additional HSBC-US employees in separate emails.

992.     The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (i.e. funds are generally moving from an

(sic) European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC-US contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries i.e. Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

993.    In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had inadvertently been retained, demonstrating that undisclosed Iranian U-Turn exemption transactions continued to be sent through HSBC-US correspondent accounts.

994.    HSBC-US employees were copied on similar memoranda issued by other HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

995.    The memorandum also confirmed the HSBC Defendants' awareness that other

non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

996. An October 2003 document entitled "IRAN-STRATEGY DISCUSSION PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate USD funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

997. Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

998. Even when HSBC-US blocked Iranian payment transactions, it failed to take further action to ensure that other HSBC Defendants would not continue these illegal practices.

999. For example, in late December 2002, HSBC-US's OFAC sanctions screening filter stopped and rejected a payment order listing Bank Melli as the originator of the SWIFT-NET message that contained a field that read, "**Do not mention our name in NY.**"

1000. An internal HSBC-US email dated December 30, 2002, informed HSBC-US's

compliance team about the Bank Melli payment, which once again confirmed the HSBC Defendants' ongoing process of altering payment order messages.

1001.   On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000 in USD funds, because it included both a reference to Bank Melli and the words "*do not mention our name*."

1002.   In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment order messages for the express purpose of escaping detection in the United States.

1003.   During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately *7,000* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

1004.   HSBC-US did not report any of the HSBC Defendants' illegal conduct involving Iran to any of its regulators or to U.S. law enforcement at that time.

1005.   During 2005, in furtherance of the Conspiracy, HSBC-London and HSBC-Middle East together sent about 5,700 Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

1006.   On April 19, 2005, HSBC-US's OFAC filter again stopped a $362,000 payment order from Bank Melli because it contained the phrase "*do not mention our name in New York*."

1007.   HSBC-London re-submitted the same payment on April 22, 2005, but HSBC-US stopped it again, this time sending HSBC-London a SWIFT-NET message requesting full

disclosure of the name and address of the underlying originator and ultimate beneficiary of the USD funds.

1008. In early May 2005, HSBC-US stopped a $6.9 million USD payment order originating with Defendant Credit Suisse in Zurich because the SWIFT-NET message details included the phrase "*Bank Melli Iran*."

1009. In fact, forty-four of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

1010. On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-London transfers in the amounts of $1.9 million USD and $160,000 USD had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment transaction.

1011. HSBC-London responded that both payment orders were foreign exchange related, the originators were Bank Tejarat and Bank Melli,273 and the beneficiaries of the USD funds were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

1012. HSBC-US responded by requesting that HSBC-London follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

1013. According to information provided by Bank Melli through HSBC-London, the $160,000 payment denoted an internal transfer from Bank Melli's Eurodollar account with HSBC-London to Bank Melli's Eurodollar account with Defendant Credit Suisse's Zurich office.

1014. From July 2005 to June 2006, HSBC-Middle East sent more than 2,500 Iranian Eurodollar transactions – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – that

---

273 HSBC-London also maintained correspondent accounts for Bank Refah.

illegally concealed the required data relating to Iran.

1015.   On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," an HSBC-US OFAC Compliance officer notified HSBC-London that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC-London's USD account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-London]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

1016.   In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated *700* Iranian Eurodollar payment transactions sent by HSBC-London – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – continued to not disclose their connection to Iran.

1017.   In addition, through March 2010, HSBC-US was the conduit for at least twenty-four post-U.S. designation Eurodollar transactions on behalf of IRGC-controlled IRISL and/or its various subsidiaries and front companies.

1018.   During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that HSBC-US's USD clearing and settlement operations with CHIPS-NY (Eurodollar clearing and settlement), CLS Bank (foreign exchange) and FRB-NY (domestic USD clearing and settlement and central bank lender of last resort for the Eurodollar market) were being used by the HSBC Defendants to facilitate unlawful transactions in USD funds on behalf of Iran in furtherance of the Conspiracy.

1019.   As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-

US entered into a Deferred Prosecution Agreement with DOJ.

1020.  DOJ issued a press release announcing the 2012 DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC-US admitting to AML and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture.

1021.  In addition to the $1.256 billion forfeiture under the DPA, HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties – $500 million to the OCC and $165 million to the Federal Reserve – for the HSBC Defendants' AML/CFT program violations with Iran, other sanctioned countries, and transnational drug cartels.[274]

1022.  DOJ's press release announcing the DPA quoted then-Assistant Attorney General Lanny Breuer:

> HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries. The record of dysfunction that prevailed at HSBC for many years was astonishing.

1023.  The United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating:

> HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions.

1024.  Manhattan District Attorney Cyrus R. Vance Jr. was quoted in the same press release as stating:

---

[274] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement entered into between the HSBC Defendants and the United States Department of Treasury on or about December 11, 2012, as if fully set forth herein.

New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions.

## 9. DEFENDANT BARCLAYS BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1025.  Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli.

1026.  Barclays is a member of SWIFT-Brussels and has historically used the SWIFT-NET system to transmit international payment messages from and for financial institutions around the world.

1027.  Barclays originally processed USD payment messages through numerous global locations.

1028.  Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

1029.  Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process Eurodollar payment transactions in violation of U.S. sanctions.

1030.  As part of this effort to evade U.S. sanctions against Iran, Barclays:

a)  Followed instructions from Iran and its agents not to mention their names in USD payment transaction messages sent to Barclays-New York and to other U.S. financial institutions for clearance and settlement in USD funds;

b)  Routed transactions through an internal Barclays sundry account, thereby hiding the payment transactions' connection to Iranian entities;

c) Amended or reformatted SWIFT-NET payment order messages to remove information identifying Iranian entities involved in the transfer of USD funds; and

d) Re-sent Iranian entities' SWIFT-NET MT 103 payment order messages as cover payments to take advantage of the lack of transparency as to the ultimate originator/beneficiary that was achieved by using the MT 202 bank-to-bank cover payment message format.

1031. Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc and without referencing Bank Melli's name.

1032. Bank Melli further instructed Barclays to send separate payment order instructions, which included full details about the Eurodollar payment transactions to Midland Bank Plc and Bank Melli's London Branch.

1033. In response, Barclays memorialized Bank Melli's instructions for Eurodollar market transactions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payment transactions involving USD funds.

1034. Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.

1035. Over time, the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments (SWIFT-NET MT 202 payment order messages) when processing payments in USD funds for clearing and settlement in the United States, and omitting the names of U.S.-sanctions targets from the payment order messages so that U.S. financial institutions could not identify the

sanctions nexus of the payments.

1036.  In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."

1037.  The reason for, and effect of, these instructions was to disguise Iranian sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

1038.  Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned Iranian banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to Barclays' New York branch for clearing and settlement through CHIPS-NY and FRB-NY. For example, with regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank <u>without mentioning [the Iranian bank's]</u> <u>name</u> ...." (Underlined in the original.)

1039.  Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments of USD funds involving Iranian sanctioned entities. The general instructions for Iranian banks stated:

USD PAYMENTS TO IRAN

> Certain payments may be blocked by the US Authorities. Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

1040.  Barclays' standard operating procedures allowed and even educated its employees on how to bypass the sanction screening algorithms in both Poole's and the U.S. financial institution's OFAC filters to permit illegal payment transactions in USD funds.

1041. Pursuant to these "standard" procedures, when the Poole filter identified a Eurodollar payment transaction that referenced an Iranian entity, that payment order message was stopped for further review by Barclays' employees in Poole.

1042. If the Poole-based employees found that the payment order message referenced an Iranian entity, they would follow one of the following procedures: (i) return the payment order message to the remitting entity via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT-NET payment order message; or (iii) change the message type from a serial payment (MT 103) to a cover payment (MT 202) in order to hide any connection to the Iranian entity.

1043. The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment order message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment transaction was not stopped by the OFAC filter when resubmitted.

1044. The same Senior Manager noted that he was aware that Defendant Barclays' payment operators amended payment order messages in order to facilitate the transfer of USD funds to Iran and that this was a "*common practice*" at Barclays.

1045. As noted above, consistent with Barclays' "standard" procedures, when an Iranian payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment order message to the original remitting bank.

1046. Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole sanctions screening filter.

1047. The Barclays fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

1048. Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment order messages would thereafter be re-sent by the remitting bank on the SWIFT-NET network without the "offending" language.

1049. This deliberate omission enabled the payment order messages to pass through the Poole sanctions screening filter without being blocked, and thereby be cleared to settle in USD funds by Barclays' New York branch and unwitting U.S. financial institutions, giving Iran and/or other sanctioned Iranian entities/individuals undetectable access to USD that could and would be used to finance terrorism,

1050. In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration."

1051. In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

1052. Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

1053. Barclays' employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT 202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to

ensure that Barclays could continue its unfettered processing of USD funds transfers involving Iranian entities through Barclays' New York branch.

1054. For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized. A good example is Cuba which the US says we shouldn't do business with but we do.

1055. Barclays' employees understood the advantage of using bank-to-bank cover payments. The cover payment message format (MT 202), with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment message format (MT 103).

1056. A Barclays employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

1057. In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

1058. A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

1059. In July 2004, an internal assessment of Barclays' payments processing explained:

225

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions.... There is nothing in these payment messages [MT 103 and MT 202] that identifies them as linked for the purpose of screening.

1060.  In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover payments rather than MT 103 serial payments, and also acknowledged that other financial institutions such as the Western Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). (Emphasis added.)

1061.  In the spring of 2006, Barclays' senior management learned that four cover payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

1062.  Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

1063.  Barclays also continued to facilitate unlawful payments on behalf of Bank Saderat after Barclays knew that Bank Saderat had been designated a SDGT for enabling the transfer of USD funds to Hezbollah.

1064.  Barclays also continued facilitating unlawful Eurodollar payments on behalf of Bank Melli after Barclays knew that Bank Melli had been designated by the United States in part for its enabling the transfer of USD funds to the IRGC.

1065.  On August 18, 2010, DOJ announced that Barclays had entered into a Deferred

Prosecution Agreement with federal and New York State prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA.[275]

1066.  A criminal information was filed on August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating the IEEPA, and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and accepted and acknowledged responsibility for its criminal conduct.

1067.  In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted stating:

> Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully.

### 10.    DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

#### A.    STANDARD CHARTERED BANK CONSPIRED TO CONCEAL IRAN'S FINANCIAL ACTIVITIES AND TRANSACTIONS FROM DETECTION, SCRUTINY, AND MONITORING BY U.S. REGULATORS, LAW ENFORCEMENT, AND/OR DEPOSITORY INSTITUTIONS.

1068.  Defendant SCB provided, *inter alia*, trade-finance, Eurodollar and foreign exchange banking services to Iranian clients starting in or about 1993.

1069.  At some point thereafter, SCB began formulating plans to participate in and further the Conspiracy with Iran.

1070.  For example, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff: "if SCB London were to ignore OFACs regulations AND

---

[275] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPAs entered into between Barclays and the New York Department of Financial Services and the DOJ on or about August 16, 2010; and 2) the Settlement Agreements entered into between Barclays and the United States Department of Treasury in August 2010, as if fully set forth herein.

SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."

1071.  The SCB General Counsel also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

1072.  In the ensuing years, Standard Chartered Bank actively conspired with the CBI, Bank Melli Iran, Bank Saderat Plc's predecessor (Iran Overseas Investment Bank) and many other entities to assist Iran evade U.S. sanctions.

1073.  Standard Chartered Bank's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as the Central Bank of Iran's recipient bank for U.S. dollar proceeds from daily oil sales made by the NIOC in the Eurodollar market.[276]

1074.  An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of Standard Chartered as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI ...*"

1075.  Thus, Standard Chartered was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of, among others, the IRGC.

1076.  In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

1077.  Standard Chartered Bank and the CBI quickly developed operating procedures for USD funds transfers to mask the involvement of Iranian entities in payment orders sent to

---

[276] At some point, SCB Dubai also opened a Eurodollar credit facility for the CBI.

Standard Chartered's New York branch ("SCB-NY").

1078. When the beneficiary bank of a CBI Eurodollar payment transaction was an Iranian bank, SCB-London would send a SWIFT-NET MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

1079. In fact, SCB-London set up routing rules within its payment system to route all incoming SWIFT-NET messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent Standard Chartered Bank - London from automatically processing outbound payment instructions for clearance and settlement in the United States with a reference to the CBI in the payment message.

1080. Standard Chartered Bank - London's payment processing team initially instructed the CBI to insert Standard Chartered Bank - London's SWIFT-NET BIC address (identified as SCBLGB2L) in field 52 (ordering institution) of its incoming payment order messages so that SCB's payment system would not populate that field with the CBI's SWIFT-NET BIC address (identified as BMJIIRTH).

1081. When the CBI failed to remove its BIC address and insert Standard Chartered's BIC address into each SWIFT-NET message, Standard Chartered Bank - London wire operators would manually change field 52 to reference SCB - London's BIC in order to mask the CBI's involvement in the payments.

1082. Standard Chartered's willingness to further the Conspiracy in this manner attracted more illicit business.

1083. As early as February 2002, several additional Iranian banks approached Standard Chartered Bank - London to discuss the possibility of opening new accounts.

1084. SCB - London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

1085. SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from the Iranian banks.

1086. The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

1087. It was first issued to SCB London staff on February 20, 2004, and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCB-NY]).

1088. In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to process Iranian bank payments, which resulted in SCB London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT-NET payment order messages sent to Standard Chartered Bank's New York branch.

1089. This element of the Conspiracy was particularly important to Defendant Bank Saderat Plc, which repeatedly served as the Reimbursing Bank on Letters of Credit for other Iranian banks that were financing various illegal sanctions-evading transactions on behalf of the IRGC and MODAFL through the United States.

1090. Approximately 60,000 payments related to Iran, totaling **$250 billion**, were eventually processed by Standard Chartered Bank as part of the Conspiracy.

1091. An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking

Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that Standard Chartered Bank learned that another bank was "*withdrawing their services*" with one of its Iranian client banks "primarily for reputational risk reasons."

1092. In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuing additional Iranian business.

1093. An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

1094. When Standard Chartered Bank anticipated that its business with the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.

1095. Standard Chartered Bank's payment "Quality Operations Procedures" manual

contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT-NET MT 202 payment message fields to hide CBI's role as originator of the MT 202 cover payment transactions SCB was processing through New York in USD funds.

1096.   In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRB-NY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

1097.   The Written Agreement arose as a result of identified flaws in AML risk controls at Standard Chartered Bank's New York branch and it required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

1098.   The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

1099.   The review was intended to identify suspicious activity involving accounts or transactions at, by, or through Standard Chartered Bank's New York branch.

1100.   Standard Chartered Bank failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London and Dubai operations were secretly clearing hundreds of billions of dollars through Standard Chartered Bank's New York branch at the same time that it was promising to reform its AML practices.

1101.   SCB also failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London, Dubai, Bahrain, Singapore and Hong Kong operations were secretly helping MODAFL and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including

components for IEDs and EFPs used to kill and maim Coalition Forces in Iraq.

1102.  Standard Chartered Bank retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

1103.  On August 30, 2005, and again on September 17, 2005, Deloitte provided Standard Chartered Bank confidential historical transaction review reports that Deloitte had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

1104.  Deloitte's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

1105.  SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal Standard Chartered Bank's illegal Iranian-related practices.

1106.  In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure* to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

1107.  A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to Standard Chartered Bank's request that Deloitte delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal Standard Chartered Bank's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down

version."

1108.   In a December 1, 2005 internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that Standard Chartered Bank repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

1109.   A February 23, 2006 internal memorandum entitled "Iranian Business" sent from Standard Chartered Bank's General Counsel to SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

1110.   In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

1111.   In response, SCB searched its records for 2005 and 2006.

1112.   In a September 26, 2006 email from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at Standard Chartered Bank's New York branch, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

1113.  Faced with the prospect of disclosing billions of dollars in Iranian transactions, Standard Chartered Bank's New York branch's Head of Compliance was directed by his superiors at SCB to provide instead only *four days* of U-Turn data to regulators; these four days were masquerading as a log covering two-years of transaction data.

1114.  In October 2006, the CEO for SCB's U.S. Operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

1115.  SCB's Group Executive Director responded (as quoted by a Standard Chartered Bank's New York branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

1116.  In 2007, SCB successfully convinced the N.Y. State Banking Department and FRBNY to lift their consent order on SCB based on the watered down D&T report and its other fraudulent disclosures.

1117.  As noted above, from approximately January 2001 through 2007, SCB transferred at least *$250 billion* through Standard Chartered Bank's New York branch on behalf of the Iranian Bank Co-conspirators, including Bank Melli Iran and the CBI, as well as Defendant Bank Saderat Plc.

1118.  Standard Chartered Bank's New York branch processed **approximately 60,000 wire transfers** on behalf of the Iranian Bank Co-conspirators, with roughly half the transactions originating with SCB's London office, and the other half with SCB's branch in Dubai, UAE.

1119.  In early 2009, after being contacted by U.S. law enforcement authorities, SCB

conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices and technology.

1120.   Nonetheless, Standard Chartered Bank's New York branch was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

1121.   As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that Standard Chartered Bank's New York branch had:

a) No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and

b) Outsourced Standard Chartered Bank's New York branch's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and Standard Chartered Bank's New York branch.

**B.    SCB FACILITATED TRANSACTIONS ON BEHALF OF MODAFL, MAHAN AIR AND OTHER INSTRUMENTALITIES OF IRANIAN STATE-SPONSORED TERROR (INCLUDING A HEZBOLLAH AFFILIATED ENTITY) IN FURTHERANCE OF NUMEROUS VIOLATIONS OF THE U.S. TRADE EMBARGO, THEREBY SUBSTANTIALLY CONTRIBUTING TO THE PLAINTIFFS' INJURIES.**

1122.   From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit through stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions.[277]

1123.   Many of those LCs were issued for the benefit of Iran's military / terror network, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq.

---

[277] A more accurate accounting would probably exceed 9,000 trade-finance and Eurodollar payment transactions.

1124.  SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. These were acquired by various Iranian-controlled front companies on behalf of, *inter alia*, the following entities:

a)  Mahan Air;

b)  Four MODAFL subsidiaries: the AIO, the IACI, the IHRSC, and HESA;

c)  The Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah);

d)  The National Iranian Oil Company ("NIOC") and several of its subsidiaries; and

e)  Khoram Sanat Producing Co. – Iran.

1125.  None of these aforementioned entities is (or was) a legitimate agency, operation, or program of the Iranian government.

1126.  On the contrary, Mahan Air is a SDGT that, according to the U.S. government, "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah. [sic]"

1127.  Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from IED devices that were used to target, kill and maim U.S. and Coalition Forces.

1128.  Similarly, MODAFL is the principal procurement arm of Iran's military and terror network.

1129.  The Mapna group is also a key component of MODAFL and the IRGC's procurement chain.

1130.  Abbas Aliaabadi, Chairman of Mapna International FZE and President of the

Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

1131.   During the relevant time period, the National Iranian Oil Company was not only controlled by the IRGC but also served as the lifeblood of the Iranian regime's illicit financing activities, providing it with access to billions of dollars in oil and natural gas revenues that enabled the IRGC to gain access (through the Conspiracy) to the global financial system.

1132.   Standard Chartered Bank knowingly conspired with Iran to facilitate illicit trade for all of these entities in violation of U.S. law, thereby substantially assisting Iran in its criminal (and specifically terrorist) conduct in Iraq. The foreseeable consequence of that assistance was to enable Iran, the IRGC and Hezbollah to kill or wound, or try to kill, or conspire to kill more Americans in Iraq.

1133.   At all relevant times, SCB was fully aware of both the Iran Trade Regulations and the Export Administration Regulations, the U.S. State Department's United States Munitions List ("USML") and their many restrictions.

## C.   STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MAHAN AIR.

1134.   Between 2000 and 2006, Standard Chartered Bank facilitated LCs for the benefit of Mahan Air totaling more than $120 million.

1135.   As noted above, the Treasury Department designated Mahan Air in 2011, finding that:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC- QF.

In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

1136. Mahan Air also transported to Iran *thousands* of radio frequency modules illegally imported by OPTO Electronics in Singapore, NEL Electronics PTE Ltd. and Corezing International PTE Ltd. from the United States.[278]

1137. These modules were recovered by Coalition Forces in Iraq from IED devices that were used to target U.S. and Coalition Forces.

1138. The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

1139. In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

1140. Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

1141. Five LCs facilitated by Standard Chartered Bank listed Mahan Air as the "Applicant" and involved the illegal acquisition of materials ranging from aviation parts to a U.S. shipment of an Airbus A320.

1142. The Issuing Banks for the LC included Defendant Bank Saderat Plc, Bank Melli Iran and Bank Sepah.

---

[278] *See*, *Superseding Indictment in U.S. v. Larijani* at: https://www.justice.gov/opa/file/837996/download.

1143.   SCB's New York branch served as the clearing bank for these LCs.

1144.   Furthermore, in another transaction, Mahan Air was the listed Beneficiary of a $21 million dollar LC facilitating the leasing of several second-hand Airbus A320s from Europe.[279]

1145.   In facilitating these trade-finance transactions, often for explicitly "Non-EAR 99" goods of U.S. origin – *i.e.,* products on the Commerce Control List, Standard Chartered Bank knew that it was (1) working with Iranian banks, (2) concealing the Iranian connection to the trade-finance and Eurodollar transactions and (3) facilitating the unlawful delivery of these U.S. export controlled parts or products to Iranian entities in Iran.

1146.   For at least two transactions facilitated on behalf of Mahan Air (including one for export controlled goods of entirely U.S. origin), Credit Suisse in Zurich facilitated the payment on the LC to Standard Chartered Bank, Dubai, and on at least one of those transactions, the payment was routed by Credit Suisse in Zurich through New York on behalf of Bank Melli in the UAE with the transaction being cleared and settled in USD funds by Standard Chartered Bank's New York branch.

1147.   On one occasion, Mahan Air purchased an Airbus (aircraft) using Blue Sky Aviation as its intermediary. Standard Chartered Bank, Dubai provided the nearly $30 million to Blue Sky for the purchase, and Bank Sepah (Iran) guaranteed the payment through a re-payment made by Credit Suisse on its behalf in 2006.

1148.   The front companies listed as beneficiaries of the LCs facilitated by Standard Chartered Bank included Sirjanco Trading LLC ("Sirjanco") and Blue Sky Aviation Co FZE ("BSA FZE" or "BSA"), both later designated by the U.S. Treasury as SDGTs, in part, because

---

[279] Mahan Air was the target of a Temporary Denial Order ("TDO") by the U.S. Department of Commerce in March 2008 for, *inter alia,* "knowingly re-exporting to Iran three US-origin aircraft, specifically Boeing 747." The Bureau of Industry and Security's TDO was renewed subsequently several times.

of the illegal sanctions evading conduct facilitated and enabled by Standard Chartered.

1149.   Hamidreza Malekouti Pour served simultaneously as the Regional Manager for Mahan Air in the UAE, and Managing Director of Sirjanco and BSA FZE – effectively demonstrating how these companies are all part of the same IRGC supply chain. Pour has also been designated as a SDGT for, *inter alia*, supplying equipment to the IRGC-QF.

1150.   When designated by the U.S. Treasury Department in 2013 as a Specially Designated Global Terrorist,[280] Sirjanco was described as "a United Arab Emirates-based company designated pursuant to E.O. 13224 for acting for or on behalf of Mahan Air."

1151.   Sirjanco was established specifically to serve as a financial front for Mahan Air. Sirjanco has also served as a front for Mahan Air's acquisition of aircraft. Additionally, Iran's IRGC-QF has used Sirjanco to procure sanctioned goods."

1152.   A 2005 LC facilitated by Standard Chartered Bank listed Mahan as the Applicant, and Sirjanco as the beneficiary, for a total of $32,500,000.

1153.   Bank Melli financed the payment through Credit Suisse, which sent the payment order through New York (clearing and settling in USD funds through Standard Chartered Bank's New York branch).

1154.   The payment was made by Standard Chartered Bank, Dubai to Sirjanco's account with Bank Saderat, Dubai.

1155.   At least two other LCs facilitated by Standard Chartered Bank listed Mahan Air as the Applicant, and Blue Sky Aviation as the Beneficiary, for a total of over $60,000,000.[281] All told, between 2000 and 2006, Standard Chartered Bank facilitated at least 11 LCs for the "Blue Sky Group" for a total of more than $125 million.

---

[280] Sirjanco was previously the target of a Temporary Denial Order by the U.S. Department of Commerce in 2011.
[281] Plaintiffs' estimates are based on only one Promontory report. SCB's historical relationship with the Blue Sky Group was the subject of a separate Promontory Report not (yet) available.

1156.  When the U.S. Treasury Department designated Blue Sky Aviation in 2014, it described it as "a UAE-based company that is owned or controlled by Mahan Air and acts for or on behalf of the airline.

1157.  BSA FZE's primary function has been to serve as a payment channel for Mahan Air to obscure the origination of funds. Mahan Air has used BSA to make payments to oil suppliers, and purchase aircraft, engines, and parts."

1158.  In sum, Standard Chartered Bank was vital to Mahan Air's continued operations and its ability to facilitate travel by IRGC-QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq as well as transit personnel, weapons and goods on behalf of Hezbollah, which helped facilitate terrorist attacks in Iraq during the relevant time period.

1159.  While neither Mahan Air nor Blue Sky Aviation was designated as a terrorist at the time the LCs identified above were financed, Standard Chartered Bank engaged in criminal conduct in furtherance of the Conspiracy in order to aid these IRGC supply chain entities to evade U.S. sanctions knowing that its own conduct was illegal.

1160.  At the time it agreed to engage in overt acts in furtherance of the Conspiracy, Standard Chartered Bank knew that: (1) Iran was a U.S.-designated State Sponsor of Terrorism; (2) the U.S. had imposed strict sanctions and export controls on Iran and Iranian trade; (3) Mahan Air was seeking to illegally acquire U.S. export controlled defense and dual-use materials; and (4) Mahan Air was using front companies to do so.

1161.  In sum, Standard Chartered Bank affirmatively chose to facilitate Iran's illegal conduct and provide material support to its terror network, including Mahan Air, Blue Sky Aviation and Sirjanco. All of these entities were later designated as SDGTs in part because of the types of trade-finance and Eurodollar transactions facilitated by Standard Chartered Bank.

### D. STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MODAFL COMPANIES: AIO, IACI, IHRSC AND HESA.

1162. Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO") and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.[282]

1163. The AIO was designated on June 28, 2005 for weapons proliferation. Standard Chartered Bank knowingly provided financing for both the AIO directly, and for 3 major sub-agencies of MODAFL's IAIO: the Iran Aircraft Industries ("IACI")[283] a/k/a SAHA, the Iran Helicopter Support and Renewal Company ("IHSRC") a/k/a PANHA, and the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA"). Support for any of these entities, as sub-agencies of MODAFL and the IAIO, was not for legitimate agencies, operations or programs of SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO).

1164. In 2002, Standard Chartered Bank facilitated an LC for MODAFL's Aerospace Industries Organization that cleared through SCB's New York branch valued at $57,662 USD for the illegal purchase of U.S. export controlled goods.[284]

1165. That transaction was not for the benefit of any legitimate agencies, operations or programs of Iran.

---

[282] MODAFL was also sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000.
[283] IACI was also formerly listed by the European Union on July 26, 2010, and described as an entity that "[m]anufactures, repairs, and conducts overhauls of airplanes and aircraft engines and procures aviation-related parts often of US-origin typically via foreign intermediaries. IACI and its subsidiaries also have been detected using a worldwide network of brokers seeking to procure aviation-related goods." IACI was also formerly sanctioned by Switzerland, Norway, Japan, Australia, Canada, and the UK. It was designated by the United States in 2013.
[284] AIO was reportedly responsible for developing anti-tank guided weapons; artillery rocket systems; anti- tank missiles; precision machining and metal forming for a variety of Iranian weapons systems.

### E. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL'S [IRAN] AVIATION INDUSTRIES ORGANIZATION (IAIO)

1166.  On numerous additional occasions, Standard Chartered Bank illegally facilitated trade-finance and Eurodollar transactions on behalf of other MODAFL sub-agencies, including HESA. On September 17, 2008, the U.S. Treasury Department designated HESA,[285] finding that it is:

> owned or controlled by MODAFL, and also because it has provided support to the Iranian Revolutionary Guard Corps (IRGC). The IRGC, which was designated under Executive Order 13382 on October 25, 2007, is considered to be the military vanguard of Iran and has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD.

> HESA utilizes its own facilities for the inspection, maintenance, repair overhaul research, development, and manufacture of military and civilian aircraft and related military logistic systems. HESA conducts research on, development of, production of, and flight operations for unmanned aerial vehicles (UAVs) in Iran. The IRGC utilizes the "Ababil" UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack. Farasakht Industries is a subsidiary of HESA that specializes in the manufacturing of various aerospace tools and equipment.

### F. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY DOWNTOWN TRADING LTD.

1167.  Between 1998 and 2002, Standard Chartered Bank facilitated ten LCs involving a company based in Malaysia (and with links to a same named company registered in the U.K.), Downtown Trading Ltd ("Downtown Trading").

1168.  The total value of these ten LCs involving Downtown Trading amounted to $1,067,575.

---

[285] HESA was previously identified in a document distributed by the German government in July 2005, warning of its potentially illicit activities. It was also identified by the UK government in February 1998 as having procured goods and/or technology for WMD programs.

1169.  MODAFL-IAIO's subsidiary Iran Aircraft Industries ("IACI") was the Applicant on these LCs, i.e. the purchaser of the U.S. origin aircraft engine parts in question for seven of these transactions, while Downtown Trading was the reported Beneficiary.

1170.  In most or all of these transactions, primarily those for 2002, Bank Sepah (Iran) served as the Issuing Bank, Bank Sepah (London) served as the Reimbursing Bank, SCB Dubai served as the Negotiating Bank, and SCB's New York branch helped facilitate the transactions by serving as the Clearing Bank.

1171.  With respect to at least four of these transactions, the U.S. aircraft parts were transported by Iran Air, later designated as "a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment…. Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities."

1172.  IACI's illegal procurements were often financed by Bank Sepah (as the Issuing Bank), but Standard Chartered Bank in Dubai frequently served as the Negotiating Bank and

1173.  SCB's New York branch usually served as the Clearing Bank for these same trade-finance transactions, in at least one case paying Citibank in New York the fund due.

1174.  Citibank then paid Maybank, Malaysia, which effected the ultimate payment to the Eurodollar account of Downtown Trading.

1175.  Standard Chartered Bank also facilitated similar LCs in USD funds for Downtown Trading after April 2005.

1176.  In facilitating these transactions – 70% of which explicitly involved export-controlled "Non-EAR 99" goods of U.S. origin (*i.e.*, products on the Commerce Control List) – Standard Chartered Bank knew that it was: (1) working with Iranian banks; (2) concealing the

Iranian connection to the transactions; (3) facilitating the unlawful delivery of goods on the U.S. Commerce Control List to Iran's military and/or the IRGC; and (4) that these transactions were not for legitimate agencies, operations, or programs of Iran.

### G. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MAC AVIATION

1177. Mac Aviation is an Irish trading company incorporated in 1993 that purported to engage in the purchase and sale of aircraft and helicopter parts.

1178. The company and its owners[286] were indicted in 2008 for, among other things, violations of the IEEPA, the ITR, and U.S. export controls.

1179. During the relevant time period, Mac Aviation was a customer of Standard Chartered Bank in London.

1180. According to the indictment, between June 2005 and July 2008 Mac Aviation solicited purchase orders from customers in Iran for U.S. origin aircraft parts and then forwarded these requests for the parts to U.S. companies.

1181. The indictment further alleges that Mac Aviation wired funds to banks in the U.S. as payment for these parts, and concealed from U.S. sellers the ultimate end-use and Iranian end-users of the purchased parts.

1182. The indictment also alleges that Mac Aviation caused the export of these parts from the U.S. to third countries, including Malaysia, before sending their shipments onward to Iran.

1183. At least one of those shipments, directed by Mac Aviation in February 2006, resulted in a shipment to be made from a firm called Microset Systems Sdn Bhd in Kuala

---

[286] In 1994, one of the owners of Mac Aviation, Thomas McGuinn, was convicted by a Florida court for exporting defense products to Iran. He pled guilty and was sentenced on April 19, 1996, to time served and 3 years of supervision on release. McGuinn was also barred from receiving licenses for exporting U.S. defense articles.

Lumpur, Malaysia, to Sasadja Moavanate Bazargani in Tehran, Iran, an alter ego of Iran's Defense Industries Organization (DIO), which had been designated by Germany, the United Nations, and the United States as a procurer of unlawful weapons components beginning as early as 2005.

1184.  As noted above, weapons caches seized from Special Groups by Coalition Forces in Iraq included many 107mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60mm and 81mm mortars with DIO lot markings and 2006 production dates.

1185.  In another example, in January 2006, police in the southern Iraqi city of Amara, near the Iranian border, captured seventy blocks of TNT explosives and seventy-nine blocks of plastic explosive, which were used by the Special Groups as components of IEDs, all with markings and lot numbers showing that they were produced by DIO.

1186.  In July 2010, the DOJ obtained a 27-count superseding indictment in *USA v. Mac Aviation et al.*, charging the company and its officers with:

> [p]urchasing F-5 fighter aircraft parts, helicopter engines and other aircraft components from U.S. firms and illegally exporting them to Iran.…
>
> […] Beginning as early as August 2005… through July 2008, the defendants solicited purchase orders from customers in Iran for U.S.-origin aircraft engines and parts and then sent requests for aircraft components to U.S. companies. These parts included helicopter engines, aircraft bolts and vanes, and canopy panels for the F-5 fighter aircraft. The defendants wired money to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and end-users of the purchased parts.
>
> The defendants caused these parts to be exported from the U.S. to third countries like Malaysia before causing them to be transshipped to Iran. […]
>
> From 2005 [… to] 2006, the defendants caused canopy panels designed for the F-5 fighter aircraft, valued at approximately $44,500, to be exported from the U.S. to Iran. The defendants falsely stated that the end

user for the F-5 panels was the Republic of Nigeria. Instead, the panels were sold by the defendants to Sasadja Moavanate Bazargani, in Tehran, Iran for $86,400. The purchase was arranged through the Iran Aircraft Manufacturing Industrial Company, known by its Iranian acronym as HESA.

1187. According to the superseding indictment, Mac Aviation also shipped fifteen helicopter engines to Iran Aircraft Industrial Manufacturing Company ("HESA").

1188. These included ten Rolls-Royce Model 250 C-20B turboshaft engines, and five Rolls-Royce Model 250 C-20R2 turboshaft engines.

1189. Rolls-Royce Model 250 engines are used on HESA's 278 Shahed (military) helicopters (converted or adapted from the design of the American Bell 206B-III "Jet Ranger" and Bell 206L "Long Ranger" aircraft) flown by and developed for the IRGC.

1190. Between 2001 and 2005, Standard Chartered Bank facilitated at least 21 LCs involving Mac Aviation for a total of close to $8 million dollars.

1191. In each case, Mac Aviation was the nominal purchaser of the aircraft parts (Applicant), and the listed importer was either Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Industries ("IHSRC"), or Iran Aircraft Manufacturing Industrial Company ("HESA").[287]

1192. Most, if not all of these LCs appear to have been financed, at least in part, by: Bank Saderat in London (IOVB) serving as the Reimbursing Bank; Bank Refah Iran serving as the Issuing Bank; Standard Chartered Bank in London serving as the Advising Bank; SCB in Dubai serving as the Negotiating Bank; and Standard Chartered Bank's New York branch serving as the Clearing Bank.

---

[287] Iran used an Iranian national named Hossein Ali Khoshnevisrad as an intermediary. Khoshnevisrad used two Iranian companies – Ariasa AG (Tehran) and Onakish Co. (Kish Island, Iran) – to deal directly with Mac Aviation. Khoshnevisrad was arrested in the U.S. in 2009 and "charged with purchasing helicopter engines and advanced aerial cameras for fighter bombers from U.S. firms and illegally exporting them to Iran using companies in Malaysia, Ireland and the Netherlands. Among the alleged recipients of these U.S. goods was … HESA."

1193.  Some of the transactions were financed through the CBI's Eurodollar credit line with Standard Chartered Bank.

1194.  The other transactions were financed through reimbursements in USD funds claimed by Standard Chartered Bank, London primarily from Defendant Bank Saderat Plc with funds deposited received into Standard Chartered Bank London's U.S. dollar account with Standard Chartered's New York branch for further credit to the Eurodollar account of Mac Aviation (SCB's customer).

1195.  Iran Air was often used to deliver the illegally procured equipment to Iran.

1196.  Notably, Bank Refah Iran was designated on February 17, 2011, by the U.S. Treasury Department for:

> providing financial services to the Iranian Ministry of Defense and Armed Forces Logistics (MODAFL) and the Iran Aircraft Manufacturing Industrial Company (HESA). In recent years, Bank Refah has facilitated millions of dollars of weapons-related purchases by MODAFL. These purchases included missiles and tanks and enabled Iran's leadership to maintain its fighter jets and submarines. Bank Refah also facilitated payments from HESA to businesses and individuals linked to Iran's weapons-related procurement.[288]

1197.  Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military (aircraft) spare parts did not fund or facilitate Iran's legitimate agencies, operations, or programs.

1198.  Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and equipment and aircraft spare parts it desperately needed to sustain its violent and unlawful activities.

---

[288] Standard Chartered Bank maintained correspondent accounts for Bank Refah in Bangladesh, China, Hong Kong, India, Indonesia, Japan, South Korea, Malaysia, Qatar, Singapore, Sri Lanka, Taiwan, Thailand and UAE.

## H. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MONARCH AVIATION (SINGAPORE)

1199. Monarch Aviation was an Iranian front company based in Singapore that was owned and controlled by husband and wife, Brian Douglas Woodford, a UK citizen, and Laura Wang-Woodford, a dual U.S. and UK citizen.

1200. It purported to be a manufacturer, dealer, and repairer of aircrafts and related parts. At least during the period between 2001 and 2007, Standard Chartered Bank in Singapore ("SCB-Singapore) maintained accounts for Monarch Aviation, Brian Douglas Woodford, and Laura Wang-Woodford.

1201. At least one Monarch Aviation account at the SCB-Singapore Battery Road branch was listed as account number ACU- 26-0-000106-3.

1202. Defendant Credit Suisse's Singapore Branch at 80 Raffles Place also maintained a U.S. dollar account for Monarch Aviation with the account number K0100340.01.

1203. On January 15, 2003, Woodford and Wang-Woodford were indicted for, among other things, violations of the IEEPA, and U.S. export control laws.[289]

1204. Laura Wang-Woodford was arrested on December 23, 2007, and later pled guilty to conspiring to violate the U.S. trade embargo by exporting U.S. origin aircraft components to Iran.

1205. According to the Superseding Indictment, between January 1998 and December 2007, Monarch Aviation, Jungda International Pte Ltd. (a Singapore based successor to Monarch Aviation), Brian Douglas Woodford and his wife, Laura Wang-Woodford, exported U.S. aircraft parts to Singapore and Malaysia, and then re-exported those items to companies in Tehran, Iran, without obtaining the required U.S. government licenses, while falsely listing their companies as

---

[289] A Superseding Indictment was returned on May 22, 2008.

250

the ultimate recipients of the parts on export documents filed with the U.S. government.

1206. Specifically, according to the Superseding Indictment and the U.S. Justice Department's Sentencing Recommendation, the funds transferred by Monarch Aviation paid for Boeing CH-47 ("Chinook") helicopter parts, including vane assemblies and bevel gears that were listed under category VIII on the United States Munitions List ("USML") and illegally exported to Iran.

1207. The vane assemblies, part number 2-080-090-02 and national stock number ("NSN")[290] 2840-01-022-7142, and bevel gears, part number 2-080-013-03 and NSN 3020-00-860-7419, were manufactured by Honeywell International Inc., commercial and government entity ("CAGE")[291] code 99193, in Phoenix, Arizona.

1208. These export controlled, U.S. manufactured helicopter parts were used in Iran's fleet of Boeing CH-47 Chinook heavy-lift utility helicopters that were refurbished by HESA.

1209. Iran's CH-47 helicopters are operated by the Islamic Republic of Iran Army Aviation ("IRIAA") and the Islamic Republic of Iran Air Force ("IRIAF").

1210. The Superseding Indictment also listed the following parts, *inter alia*, that were illegally exported to Iran by Monarch Aviation: o-rings, shear bolts, bushings, and rotary wing shields.

1211. The o-rings, identified by part numbers S6135-20059-102 (NSN 5331-01-270-1765) and S6135-20059-106 (NSN 5331-01-270-1766), were manufactured by Sikorsky Aircraft Corporation (CAGE code 78266) in Stamford, Connecticut.

---

[290] The U.S. National Stock Number (NSN) is a unique thirteen-digit numerical identifier assigned to each part used by the U.S. Department of Defense (DOD). The NSN system is managed by DOD's Defense Logistics Agency ("DLA"). The DLA system of NSNs was mandated by the 1952 Defense Cataloging and Standardization Act (Pub L No 82-436).

[291] The CAGE code is a unique identifier assigned to, *inter alia*, U.S. defense contractors and DOD maintenance facilities. The CAGE code provides a standardized method of identifying a given government or defense contractor facility at a specific location.

1212.  These export controlled, U.S. manufactured parts were used in Iran's fleet of Sikorsky SH-3D ("Sea King") medium-lift utility/anti-submarine warfare helicopters that were refurbished by Iran HESA.

1213.  Iran's SH-3D helicopters are operated by the Islamic Republic of Iran Navy Aviation ("IRINA").

1214.  The following parts were manufactured by Bell Helicopter Textron, Inc. (CAGE code 97499) in Fort Worth, Texas:

   a)  Shear bolts, identified by part number NAS625-44 (NSN 5306-00-924- 6261);

   b)  Bushings, identified by part number 205-030-477-11 (NSN 1560-00-413-1492); and

   c)  Rotary-wing shields, identified by part number 204-012-118-1 (NSN 1615-00-865-7914).

1215.  These export controlled, U.S. manufactured parts were used in the following Iranian rotary-wing aircraft:

   a)  Bell AH-1J ("Cobra") air-assault helicopters (refurbished by HESA);

   b)  Bell UH-1 ("Iroquois") utility transport helicopters (refurbished by HESA);

   c)  Iranian Helicopter Support and Renewal Company ("PAHNA") 2091 ("Toufan") air-assault helicopters (the PAHNA 2091 is an Iranian remanufactured version of the Bell AH-1J helicopter); and

   d)  PAHNA 2-75 ("Shabaviz") utility transport helicopters (the PAHNA 2-75 is an Iranian remanufactured version of the Bell UH-1 helicopter).

1216.  Iran's fleet of Bell AH-1J, Bell UH-1, PAHNA 2091 and PAHNA 2-75 helicopters are operated by the Iranian Revolutionary Guard Corps Air Force ("IRGC-AF") and IRIAA.

1217.  From 1998 to 2005 (and likely thereafter), Standard Chartered facilitated at least 10 LCs financed by the CBI and Bank Refah with a total value of more than $1.5 million dollars

involving the shipment of U.S. origin aircraft parts sold by Monarch Aviation to MODAFL's sub-agencies Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Co. ("IHSRC"), and HESA.

1218.   Defendant Bank Saderat Plc served as the Reimbursing Bank on most, if not all, of these transactions, which cleared through Standard Chartered Bank's New York branch on their way to Monarch Aviation's accounts at Standard Chartered in Singapore.

1219.   The aircraft parts were transported by Iran Air from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

1220.   SCB in Dubai served as the Negotiating Bank, and funds from the financing were paid to Monarch Aviation's account with Standard Chartered Bank, Singapore through SCB Singapore's account with Standard Chartered, London, which in turn received the funds into its U.S. Dollar nostro account with Standard Chartered's New York branch from Standard Chartered Bank - Bahrain's Offshore Booking Unit ("OBU").[292]

1221.   In sum, various overseas branches of Standard Chartered Bank conspired with multiple MODAFL sub-agencies and Monarch Aviation, and used Standard Chartered's New York branch to both assist Iran's military in illegally acquiring contraband U.S. goods and to illegally disguise the illicit financing of those acquisitions through the Standard Chartered Bank's New York accounts.[293]

1222.   Standard Chartered Bank facilitated at least 316 additional transactions totaling $12,110,565 in USD funds that involved Monarch Aviation at its accounts at SCB in Singapore. Dozens of those transactions post-date Woodford and Wang-Woodford's 2003 indictment.

---

[292] SCB, Bahrain's Offshore Booking Unit sent proceeds of the Eurodollar loan as payment of Letter of Credit through SCB's New York branch to credit SCB London's USD account in New York for further payment to SCB Singapore.

[293] SCB, Singapore presented documents under Bank Refah Letter of Credit to SCB, Dubai (the Negotiating Bank) for negotiation and payment in USD funds through SCB's New York branch.

1223. Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military spare parts through Monarch Aviation did not fund or facilitate Iran's legitimate agencies, operations, or programs. Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror network obtain critical machinery and (aircraft) spare parts it desperately needed to sustain its violent and unlawful activities.

I.     **STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY JETPOWER INDUSTRIAL LTD (HONG KONG)**

1224. Jetpower Industrial Ltd ("Jetpower") was a Hong-Kong based Iranian front company purporting to be a trading company in aircraft parts controlled by Hok Shek Chan, a/k/a John Chan.

1225. In 2011, Chan was sentenced to 42 months for conspiring to illegally export, and attempting to illegally export, 10 indicators, used in C-130 military flight simulators, in violation of the Arms Export Control Act.

1226. According to the U.S. Department of Justice:

> In 1993, Chan's company, Jetpower Industrial, was convicted in Hong Kong of export violations related to his export of U.S. military parts to Iran. Chan then changed his business practices to avoid detection. Rather than shipping U.S. origin goods directly from Hong Kong to Iran, Chan set up a sophisticated procurement network involving front companies and an experienced freight forwarder in Malaysia. Using his network, the defendant was engaged in the illegal procurement and export of aircraft parts from the U.S. for customers located in Iran, including several military related entities in Iran such as the Iranian Air Force, in direct violation of the U.S. Embargo against Iran since 1997.

1227. In fact, according to U.S. officials, Jetpower repeatedly and illicitly exported arms

to Iran prior to Mr. Chan's arrest and conviction.[294]

1228.    At all relevant times, Jetpower was a customer of Bank Melli in Hong Kong.

1229.    The full scope of Standard Chartered Bank's involvement with and facilitation of Jetpower was extensive (involving at least dozens of transactions) but not yet fully known.

1230.    Illegal payments totaling close to $3 million dollars have specifically been identified, but the totals could be much higher.

1231.    What is clear is that Standard Chartered Bank repeatedly and knowingly facilitated the illegal shipment of U.S. origin aircraft parts sold by Jetpower to one of MODAFL's sub-agencies (IHSRC), and that Jetpower was a significant link in Iran's illegal weapons procurement chain.

1232.    For example, in 2001-2002, Bank Refah (the Issuing Bank) issued a LC to MODAFL's sub-agency IHSRC that was to be reimbursed by Bank Saderat Plc (known then as Iran Overseas Investment Bank), then amended the LC to be available with SCB-Dubai. Standard Chartered Bank's branches in New York, Singapore and Hong Kong were all instrumental in enabling Jetpower's receipt of payments at its Eurodollar account(s) with Bank Melli in Hong Kong.

1233.    When Jetpower transported the contraband goods (U.S. helicopter parts) to MODAFL (using Iran Air), it asked Bank Melli in Hong Kong to present the documents required under the LC for payment to Standard Chartered Bank Dubai.

1234.    However, in many instances, Standard Chartered Bank Dubai took at least four extra steps before Bank Melli in Hong Kong received the Eurodollar payment for Jetpower.

1235.    Upon acceptance of the documents from Bank Melli, Standard Chartered Bank

---

[294] At least one Jetpower shipment was seized by UAE officials in 2007 along with several other containers that U.S. officials feared might contain parts or materials that could be used in manufacturing IEDs and EFPs. Bank Mellat financed the transaction, and—according to the LC supporting documentation—the goods were consigned to HESA.

Dubai used the CBI's Eurodollar credit facility with Standard Chartered Bank Dubai and sent instructions for a Eurodollar loan to be issued by Standard Chartered Bank, Bahrain.

1236.   Standard Chartered Bank, Bahrain booked the loan and sent the proceeds in USD funds as payment under the Letter of Credit through Standard Chartered Bank's New York branch to National Westminster Bank's New York correspondent account for further credit to National Westminster, London for the Eurodollar account of its customer, Bank Melli, London.

1237.   Standard Chartered Bank, Dubai then sent instructions to Bank Melli, London to pay Bank Melli, Hong Kong upon receipt of USD funds.

1238.   Variations on this process were undertaken on multiple LCs in USD funds for the benefit of MODAFL's sub-agency.

1239.   In these cases, Standard Chartered Bank, Bahrain knowingly cleared U.S. dollars through Standard Chartered's New York branch for the illegal trade-finance transactions by repackaging the payments on the LCs as loans that secretly routed through the U.S. to Bank Melli Iran through various British banks.

1240.   Jetpower, in most cases, ultimately received payment in USD funds to its Eurodollar bank account with Bank Melli Plc's branch in Hong Kong for these illicit transactions with IHSRC.

1241.   According to BIS-Basel and the Hong Kong Monetary Authority ("HKMA"),[295] all USD transfers from SCB-Hong Kong to Jetpower's account with Bank Melli Plc's Hong Kong branch were cleared by the Hong Kong Clearing House Automated Transfer System, and settled by HSBC's Hong Kong subsidiary.

1242.   None of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

---

[295] HKMA is the *de facto* central bank of Hong Kong.

### J. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRAN POWER DEVELOPMENT COMPANY ("IPDC"), MAPNA AND ZENER ELECTRONICS SERVICES (AN AGENT OF HEZBOLLAH)

1243. The Iran Power Development Company ("IPDC"), an Iranian government-controlled entity, has worked extensively for years with a network of Iranian companies known as the Mapna Group.[296]

1244. Mapna International FZE is a UAE-based subsidiary. One of its directors, Mousa Refan, previously served as the first commander of the Air Force of the "Army of the Guardians of the Islamic Revolution [IRGC]."[297]

1245. Another director, Afshin Rezaei, pled guilty in the U.S. District Court for the Northern District of Georgia on April 24, 2008, to:

> one count of violating the IEEPA for the unlicensed export of computers to Iran via the United Arab Emirates. The computers were controlled for anti-terrorism reasons. On May 15, 2008, Rezaei was sentenced to six months of prison (credit for time served), followed by three years of supervised release, and agreed to forfeit $50,000. On February 18, 2010, a 10-year denial of export privileges was imposed on Rezaei, pursuant to Section 11(h) of the EAA.

1246. During the relevant time period, Mapna International maintained a Eurodollar account with Standard Chartered Bank, Dubai.[298]

1247. Between 2001 and 2007, Standard Chartered Bank facilitated at least 280 Letters of Credit involving Mapna International FZE (as Beneficiary). In most cases, SCB, Dubai acted as the Advising Bank on these transactions.

---

[296] The Mapna Group lists on its website 41 subsidiaries, some of which were listed by the British government in 2011 as entities of concern for Weapons of Mass Destruction-related procurement.

[297] As noted above, Abbas Aliaabadi, Mapna International FZE's chairman, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force and former member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah and with close links to the IRGC.

[298] Mapna's subsidiary, Mobin Petrochemicals, was added to the SDN list on June 16, 2010 (and removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action). During the relevant time period, it maintained a USD account with HSBC.

1248.  At least nine Letters of Credit involved Standard Chartered Bank's New York branch serving as the Clearing Bank for the transactions, and in some cases, SCB-London served as the Reimbursing Bank.

1249.  Standard Chartered Bank facilitated at least 7 LCs – totaling $1,384,972 in USD funds – that involved the illegal shipment of U.S. origin goods to the Iran Power Development Company.

1250.  The CBI served as the Issuing Bank on several of these LCs, and six of those seven involved goods shipped by IRISL.

1251.  Of particular note, between 2003 and 2004, Standard Chartered Bank knowingly facilitated at least four unlawful USD funds transfer transactions (cleared through its New York branch) that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah.[299]

1252.  The IPDC was listed as the Applicant for these transactions, and Mapna was identified as the 1st Beneficiary, but assigned the payments under the Letters of Credit to Zener Electronics (UAE) as a "2nd Beneficiary."

1253.  Each unlawful trade-finance transaction involved U.S. goods.

1254.  The Central Bank of Iran acted as the Issuing Bank on at least two of the transactions and SCB, Dubai acted as the Advising and Negotiating Bank.[300]

1255.  On at least one occasion, SCB-London served as the Reimbursing Bank for the payment to Zener Electronics, sending the credit through its New York branch to SCB Dubai's

---

[299] In June 2014, the U.S. Commerce Department identified Zener Electronics as "involved in activities contrary to the national security and foreign policy interests of the United States, specifically the activities described under paragraph (b)(1) (Supporting persons engaged in acts of terror) of § 744.11 of the EAR" and noted its attempts "to procure U.S. technology on behalf of persons involved in activities contrary to the national security and foreign policy interests of the United States. Specifically, these persons have been involved in supplying U.S.-origin items to persons designated by the Secretary of State as Foreign Terrorist Organizations without the required authorizations."

[300] On at least one occasion, SCB London also served as the Reimbursing Bank.

account with Standard Chartered in New York.

1256. Upon receipt of the funds to its USD account with SCB in New York, Standard Chartered Bank, Dubai instructed Standard Chartered Bank's New York branch to forward the funds to JP Morgan Chase in New York, which held an account for the Commercial Bank of Dubai.

1257. The Commercial Bank of Dubai, in turn, credited the account of its customer, Zener Electronics.

1258. These illicit transfers on behalf of Mapna resulted in payments to Zener Electronics (a key link in Hezbollah's illicit supply chain) and were not for the benefit of a legitimate agency, operation or program of Iran. In a Superseding Indictment filed in federal court on March 30, 2016, Mapna was again implicated in the Conspiracy.[301]

1259. This time, DOJ charged multiple individuals with covert transactions in 2011 through a U.S. bank, wherein Mapna's name was omitted from the transaction to hide its identity as a counterparty.

### K. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH NATIONAL IRANIAN OIL COMPANY (NIOC) SUBSIDIARIES

1260. The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co. and Kala Naft[302] are all subsidiaries of NIOC, which (as noted *supra*) was controlled by the IRGC during the relevant time period.

1261. Between 1999 and 2001, Standard Chartered Bank knowingly facilitated two illegal transactions totaling $750,744 on behalf of the Iranian Helicopter Aviation Company (listed as the Applicant).

---

[301] *See*, *U.S. v. Zarrab* filed in the S.D.N.Y (1:15-cr-00867).
[302] Kala Naft was designated by the United States in 2010.

1262.   The Beneficiary listed on both LCs was Limo Sarl. The goods involved in these transactions were U.S. origin helicopter parts.

1263.   Payments for both transactions were cleared through Standard Chartered Bank's New York branch, and refinanced under the CBI's Eurodollar credit facility with Standard Chartered Bank, Dubai.

1264.   The Paris-based Limo Sarl was directed by a Ms. Laleh Moein, reported to have also been in the employ of Iran's Ministry of Intelligence and Security ("MOIS").[303]

1265.   Between 2002 and 2004, SCB knowingly facilitated four (4) illegal transactions totaling $611,713 that involved U.S. origin goods illegally transported to Iran on behalf of Kala Naft.

1266.   At least two of these transactions had Standard Chartered Bank New York's branch serving as its Clearing Bank.

1267.   As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

1268.   Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oilfield equipment from the U.S.

1269.   Between 2001 and 2006, SCB knowingly facilitated at least two illegal transactions totaling $593,307 that involved U.S. origin goods illegally transported to Iran on behalf of Ahwaz Pipe Mill Co.

1270.   The CBI was used as the Refinancing Bank, and Standard Chartered Bank's New York branch served as the Clearing Bank.

1271.   The listed beneficiary of the Ahwaz Pipe Mill Co. trade-finance transactions was

---

[303] MOIS was designated by the U.S. for, *inter alia*, providing support to Terrorist Groups, including Hezbollah.

a Cypriot company named Polygon Co. Ltd.

1272.  Polygon's managing director and its owner had previously been indicted on November 19, 1992, in the Southern District of Florida for illegally conspiring to export oil field equipment and other goods, services and technology to Libya, demonstrating its history of illicit sanctions evasion on behalf of a State Sponsor of Terrorism.

1273.  The litany of trade-finance and Eurodollar transactions discussed *supra* often involved counterparties (such as Mac Aviation, Jetpower and Polygon) with established track records of criminal activity on behalf of Iran.

### L.      STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRANIAN FRONT COMPANY KHORAM SANAT PRODUCING CO.-IRAN

1274.  On June 20, 2005, Standard Chartered facilitated Khoram Sanat Producing Co.'s purchase of electromotors for hydraulic presses worth $2.79 million dollars.

1275.  The company is likely a subsidiary of another Iranian company known as "Alborz Steel."

1276.  The nominal purchaser of the equipment was an Iranian front company in the UAE called Diamonds Steel.[304]

1277.  Diamonds Steel maintained one or more accounts with Standard Chartered Bank Dubai.

1278.  Between 2001 and 2007, SCB, Dubai facilitated at least 173 transactions involving Diamonds Steel, totaling more than $130 million.

1279.  The aforementioned electromotors were illegally purchased from the United States with the LC facilitated by Standard Chartered Bank's New York branch, which served as

---

[304] SCB facilitated at least a dozen transactions on behalf of Diamonds Steel, mostly for the benefit of Alborz Steel, Iran. Many of these transactions involved both Bank Melli Iran, as well as Credit Suisse in Switzerland, acting on behalf of Bank Melli Iran or Bank Melli, Dubai.

the Clearing Bank for the transaction, while SCB, Dubai served as the Advising Bank.[305]

1280.  Standard Chartered Bank facilitated this transaction despite the fact that the machinery required an export license because the equipment could be used for terrorist purposes.[306]

1281.  Specifically, hydraulic presses are the precise type of machinery required to manufacture EFPs.[307]

1282.  The production of an EFP shaped-charge munition requires at least a 10-ton hydraulic press in order to form sheets of copper and steel, respectively, into the necessary shaped-charge geometry for defeating the plating of American armored vehicles of the type used by the U.S. military in Iraq.

1283.  Even assuming a steep mark-up in costs of delivery, Standard Chartered Bank financed Iran's acquisition of approximately fifty (50) hydraulic presses capable of manufacturing more than a hundred EFPs per day.[308]

1284.  The hydraulic press machinery was transported to Iran by IRISL.

1285.  Because Letters of Credit are intrinsically about the submission of detailed paperwork and required Standard Chartered Bank (Credit Suisse and other Defendants) to examine and retain the documentation evidencing Iran's illegal procurement chain, Standard

---

[305] This occurred during a period of time (between 2004 and 2007) when SCB's New York branch was subject to a formal supervisory action by the New York State Banking Department and the Federal Reserve Bank of New York ("FRBNY") for other regulatory compliance failures involving the Bank Secrecy Act (BSA), anti-money laundering policies and procedures ("AML"), and OFAC regulations.

[306] The product was designated with an ECCN of 2B999 (for Anti-Terrorism reasons) under Supplement 1 to Section 774 of the Commerce Control List (CCL).

[307] SCB facilitated another Letter of Credit on May 12, 2005, involving Khoram Sanat (as Applicant) and Diamonds Steel (as Beneficiary) for over $1.9 million for goods described as "Back Up Roll Change Carriage, Spare Back Up Roll with Chuck and Main Gear Box." These standard terms are used to describe metal working equipment that may be integrated into large hydraulic presses or deployed as stand-alone equipment stations.

[308] The dangers of Iran possessing hydraulic press equipment were evident from a 2009 reported incident wherein Turkish authorities, at the request of the U.S., halted a convoy of trucks heading from Iran to Syria that contained a large hydraulic press and punch press. The U.S. requested this action because "these items are likely intended for the production of explosively formed penetrators (EFPs)."

Chartered Bank's knowledge of its role in the Conspiracy is indisputable.

1286. Furthermore, because Iran's illegal procurement chain was dependent on access to U.S. dollars, Standard Chartered Bank's (and other Defendants') participation in the Conspiracy was essential to its success.

1287. In sum, Standard Chartered Bank was integral to Iran's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq.

## M. REGULATORY ACTIONS AND CRIMINAL INVESTIGATIONS AGAINST STANDARD CHARTERED BANK FROM 2012 – PRESENT

1288. On September 21, 2012, Standard Chartered Bank and the New York State's Department of Financial Services ("DFS") executed a Consent Order resolving charges that, from at least 2001 through 2007, Standard Chartered Bank provided Eurodollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through Standard Chartered's New York branch.

1289. DFS concluded that "SCB operated as a rogue institution."[309]

1290. On December 10, 2012, DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate the IEEPA, and that the forfeiture was

---

[309] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the Order entered by the New York Department of Financial Services on or about August 6, 2012; 2) the Consent Order entered by the New York Department of Financial Services on or about September 21, 2012; 3) the Settlement Agreement entered into between SCB and Department of Treasury on or about December 10, 2012; 4) the DPA entered into between SCB and Department of Justice on or about December 10, 2012; and 5) the Cease and Desist Order entered into between SCB and Board of Governors of the Federal Reserve System on or about December 10, 2012, as if fully set forth herein.

part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with DFS.

1291.   DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release, "accepted responsibility for its criminal conduct and that of its employees."

1292.   DOJ's 2012 press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Bruer as stating: "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable. Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

1293.   Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system. Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to

the fight against money laundering and terror financing."

1294. Prior to entering into the 2012 DPA and its settlement with DFS, Standard Chartered Bank retained Promontory Financial Group, LLC ("Promontory") in 2009 to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions."

1295. In the first half of 2010, Standard Chartered Bank reported to various regulators, including the New York State Banking Department ("NYSBD"), DFS's predecessor, that it had engaged in conduct related to the evasion of U.S. sanctions.

1296. On April 15, 2010, Standard Chartered hired Promontory again to identify, collect and review historical transaction records implicating sanctions violations.

1297. Thereafter, Promontory produced a number of reports and made various presentations to government authorities, including the NYSBD (later DFS).

1298. These Promontory reports included, *inter alia*, interim reports throughout 2010, final reports in January and March of 2011, as well as updates to those final reports in October 2011.

1299. DFS relied in part upon the work conducted and presented by Promontory to identify the scope of Standard Chartered's improper conduct prior to entering into the September 21, 2012 Consent Order.

1300. On June 18, 2013, Deloitte entered into a Settlement Agreement with DFS wherein it agreed, *inter alia*, to pay a penalty of $10 million for misusing confidential information from other Bank Defendants.

1301. For example, Deloitte provided Standard Chartered with copies of transaction review reports that Deloitte had prepared for these other clients and suggested to SCB

management that they be used as templates for SCB's transactions review report, and agreeing to Standard Chartered's request that Deloitte remove a recommendation from its written final report explaining how "cover payment" messages used by SWIFT-NET (MT 202s) could be manipulated by banks to evade U.S. money laundering controls.

1302.  On August 19, 2014, DFS announced an order regarding Standard Chartered's failures to remediate AML/CFT compliance problems as required in Standard Chartered's 2012 settlement with DFS.

1303.  Under the August 2014 DFS order, Standard Chartered was required to: (1) suspend dollar clearing through Standard Chartered Bank's New York branch for high-risk retail business clients at SCB's Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at SCB's branches in the UAE; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps.

1304.  Additionally, according to an October 29, 2014 article in The New York Times, federal and Manhattan prosecutors have reopened their investigation into Standard Chartered Bank.

1305.  The *New York Times* reported that prosecutors were questioning whether Standard Chartered Bank failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

1306.  In August 2015, DFS issued a "Report on Investigation of Promontory Financial Group, LLC."

1307.  The DFS report stated that:

> On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with

266

certain countries or certain Specially Designated Nationals ("SDNs") subject to sanctions" administered by OFAC. The engagement was known as Project Green.

As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation.

1308. DFS ultimately concluded that "There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank."[310]

1309. Examples identified by DFS included a written communication on January 19, 2011, wherein "the Bank's counsel wrote to Promontory that the title of a particular slide entitled 'The 77 non-u-turn payments fell into 3 categories' – meaning the transactions were potential OFAC violations – should be made 'more bland' and suggested a rewording to 'Categories identified in Amendment Analysis.' Promontory made the change to the more vague language requested by the Bank."

1310. The DFS Report further found that "Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time."

1311. The Report went on to cite a December 17, 2010 statement by a senior analyst at Promontory explaining:

---

[310] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the Order entered by the New York Department of Financial Services on or about August 19, 2014; and 2) the Report on Investigation of Promontory entered by the New York Department of Financial Services on or about August 18, 2015, as if fully set forth herein.

Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. **This will not be true with Dubai. I have a strong suspicion that people will not want to show the timelines for Dubai ([a particular client for which the Bank processed prohibited transactions] for example shows an upwardly sloping curve of violations).** If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel]. (Emphasis added.)

1312. As described above, Standard Chartered Bank's Dubai operations were a central hub for the IRGC's and MODAFL's illegal procurement efforts.

1313. In August 2015, *The New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

1314. The *Financial Times* also reported in September 2015:

Documents seen by the FT suggest that StanChart continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….

The material reviewed by the FT depicts a bank — one of the few foreign lenders with a license [sic] to operate in the country — determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat — which had sanctions imposed in 2006, or Bank Sepah — still had open accounts with no markers against them.

1315. Even as edited to be favorable to Standard Chartered Bank, the 2011 Promontory

Report[311] provides a window into the vast array of wrongdoings undertaken by Standard Chartered Bank in concert with Iran and its agents.[312]

1316.   As the Negotiating Bank on numerous illegal Iranian Letters of Credit, Standard Chartered Bank received the detailed documentation for the shipment of goods, and knew that it was helping Iran's military and terrorist network acquire prohibited U.S. goods and dual-use technologies.

1317.   In sum, as the Negotiating Bank on numerous illegal Iranian transactions for Mahan Air and various MODAFL sub-agencies, and as an active conduit and money-launderer for the CBI and other sanctioned Iranian banks, Standard Chartered Bank knew that: (1) it was dealing with Iran's military and terrorist network; (2) it was conspiring to evade U.S. export sanctions; (3) it was laundering money in USD funds for Iran's military and terrorist network; (4) its own customers were front companies for Iran's military and terrorist network; (5) that these customers were actively engaged in sanctions evasion and money laundering; and (6) that none of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

1318.   As recently as February 21, 2019, SCB had set aside $900 million to address anticipated penalties it expects to be assessed by U.S. and U.K. financial authorities for its **continued violations of counterterrorism sanctions**, specifically related to the services provided to its "Iran-based clients" of its Dubai branch.[313]

1319.   Despite being caught violating U.S. counterterrorism sanctions and agreeing to

---

[311] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the 2011 Promontory Report, attached as Exhibit A to the Second Amended Complaint, [DOC. 115. 115-1, 115-2], *Freeman et al. v HSBC Holdings PLC, et al.*, 1:14-cv-6601-DLI-CLP  (E.D.N.Y. 8/17/16).

[312] Other Promontory reports, which have not (for the time being) been publicly disclosed, detail Standard Chartered's Dubai operations and SCB's activities on behalf of the CBI, as well as its role in financing, *inter alia*, Blue Sky Aviation's acquisitions of various materials and technologies.

[313] *See Standard Chartered Puts Aside $900m for Potential Fines*, BBC (Feb. 21, 2019) (available at: https://www.bbc.com/news/business-47314388).

cease such conduct, SCB continued to knowingly violate sanctions involving Iran. In SCB's

2018 Annual Report, it revealed that it was:

> … continuing discussions with its discussions relating to the potential resolution of an investigation by the US authorities relating to historical violations of U.S. sanctions laws and regulations. In contrast to the 2012 settlements, which focused on the period before the Group's 2007 decision to stop doing new business with known Iranian parties, ***this investigation is focused on examining the extent to which conduct and control failures permitted clients with Iranian interests to conduct transactions through Standard Chartered Bank after 2007***.[314]

(Emphasis added).

1320. Just as SCB's recent prior public statements foretold, on April 9, 2019, yet

another enforcement action taken against Defendant SCB was announced.

1321. In its criminal filings, the United States set out the inherent danger to human life

in violating U.S. sanctions against Iran. The criminal information explains that SCB "***willfully***

***and knowingly conspired***" to violate sanctions which "***arose in response to repeated support by***

***[Iran and other sanctioned nations] for international terror against the United States and its***

***allies, and, with regard to Iran, the proliferation of weapons of mass destruction***." *United*

*States v. Standard Chartered Bank*, No. 12-cr-262 (JEB), ¶ 9 (D.D.C. April 9, 2019) (emphasis

added).

1322. According to SCB, "the vast majority of the issues under investigation ***pre-date***

***2012*** and none occurred after 2014."[315]

1323. This was during the exact time frame that Plaintiffs were being injured and

murdered by Iran's FTO proxies in Iraq.

1324. Lastly, Standard Chartered Bank chose to use its presence in the United States

(and its New York branch specifically) to effectuate its crimes.

---

[314] https://av.sc.com/corp-en/content/docs/SCB_ARA_2018_FINAL.pdf.
[315] *Id.* (Emphasis added).

11. **DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S AND ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

1325.   As alleged above, Defendant RBS N.V. is the legal successor to ABN Amro Bank. As noted above, this Defendant is referred to herein as "ABN Amro (RBS N.V.)"

1326.   In May 1995, top officials of ABN Amro (RBS N.V.) in Amsterdam e-mailed the entire management of ABN Amro (RBS N.V.) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD funds undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

1327.   Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN Amro (RBS N.V.) and other banks in aiding Iran to circumvent U.S. laws.

1328.   ABN Amro (RBS N.V.) employees were aware of these requests, discussed these requests with the other Co-conspirator banks, and thereafter approved of ABN Amro (RBS N.V.) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS N.V.) that its involvement in such transactions would potentially violate U.S. law.

1329.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) conspired with the Iranian Bank Co-conspirators (including the CBI, Bank Melli Iran and Defendant Bank Saderat Plc) and their agents to conceal evidence of ABN Amro (RBS N.V.)'s financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1330.   ABN Amro (RBS N.V.) was, at the same time, aware that numerous other non-

Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1331.  From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of U.S. dollars illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran).

1332.  In furtherance of the Conspiracy, ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators developed methods by which ABN Amro (RBS N.V.) would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1333.  When ABN Amro (RBS N.V.) employees received payment messages from the Iranian Bank Co-conspirators that contained certain words that could trigger a U.S. bank's automated OFAC filter software algorithms, ABN Amro (RBS N.V.) would manually alter or amend the messages (*i.e.*, "strip" the transactions) to ensure that the transaction would go undetected when it was cleared and settled by financial institutions in the United States.

1334.  ABN Amro (RBS N.V.) thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

1335.  Like Standard Chartered Bank, certain offices, branches, and subsidiaries of ABN Amro (RBS N.V.) also altered Letters of Credit and foreign exchange transactions involving

USD funds by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

1336. Beginning as early as 1995 and continuing until in or about 2005, ABN Amro (RBS N.V.) undertook various acts in furtherance of the Conspiracy. For example: The Dubai branch of ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions.

1337. For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters.

1338. A specific instruction from this manual stated: "Payments by order of Iranian Banks …maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

1339. In June 1995, an Iranian Bank Co-conspirator requested of ABN Amro (RBS N.V.) officials in Dubai that ABN Amro (RBS N.V.) act as a conduit for all U.S. dollar transactions for that Iranian bank in Dubai.

1340. The Iranian bank requested that all of its USD funds transfer be routed through, or be issued in the name of, ABN Amro (RBS N.V.) and carry no reference to the fact that these payments were issued on its behalf, and that all of its U.S. dollar receipts would come into ABN Amro (RBS N.V.)'s account.

1341. Thereafter, ABN Amro (RBS N.V.) undertook various specific acts to conceal its actions on Iran's behalf.

1342. ABN Amro (RBS N.V.) instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so that ABN Amro (RBS

N.V.) could first segregate these messages from normal message payment processing, and then amend the message by removing/altering any potentially problematic text, *i.e.*, any reference to Iran.

1343.   The payment message would then be stopped by ABN Amro (RBS N.V.), routed into a special queue, and manually altered to avoid being blocked by any OFAC sanctions screening filters.

1344.   In this manner, ABN Amro (RBS N.V.) assisted sanctioned entities, and ensured the processing of transactions by formatting payment order messages so that they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1345.   ABN Amro (RBS N.V.) added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

1346.   ABN Amro (RBS N.V.) used these same or materially similar procedures with respect to Letters of Credit in USD funds, and the processing of USD denominated checks and traveler's checks.

1347.   ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

1348.   ABN Amro (RBS N.V.) also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment order messages sent to ABN Amro (RBS N.V.)'s U.S. correspondent banks.

1349. In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN Amro (RBS N.V.) omit their names and BICs from payment order messages sent by ABN Amro (RBS N.V.) to ABN Amro (RBS N.V.)'s U.S. correspondent banks. ABN Amro (RBS N.V.) complied with the requests of these Iranian Bank Co-conspirators, and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1350. ABN Amro (RBS N.V.) also used SWIFT-NET MT 202 cover payment messages to shield the identities of the Iranian Bank Co-conspirators.

1351. Instead of using serial MT 103 payment messages that require the names and details of counter-parties to transactions, ABN Amro (RBS N.V.) began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the true identity of the ordering customer and beneficiary party for U.S. dollar payments sent through financial institutions in the United States.

1352. The Central Bank of Iran coordinated with ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London.

1353. This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran or any other reference relating to Iran.

1354. In or about June and July 1995, officials at ABN Amro (RBS N.V.)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN Amro (RBS N.V.) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1355.   An internal memorandum generated by ABN Amro (RBS N.V.) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must be strictly scrutinized and ABN Amro must weigh the risks before proceeding with any such transfers."

1356.   Also in June 1995, another Iranian Bank Co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD funds transfers for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1357.   Like the first request, the Iranian Bank Co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS N.V.).

1358.   As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS N.V.)'s Middle East and Africa Regional Office, ABN Amro (RBS N.V.) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1359.   On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS N.V.) wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN Amro (RBS N.V.) would take care of carrying out the scheme to evade and defeat the U.S. sanctions.

1360. The ABN Amro (RBS N.V.) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

1361. A July 19, 2003 e-mail written by John Ciccarone, Head of ABN Amro (RBS N.V.)'s USD Payments Product Management at ABN Amro (RBS N.V.)'s New York branch, discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1362. In a July 25, 2003 e-mail, John Philbin, Senior Relationship Banker for Iranian Banks, wrote to Ciccarone:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact, we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

1363. Also in 2003, Diane Perrin, a member of ABN Amro (RBS N.V.)'s Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1364. A 2003 memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" drafted by ABN Amro (RBS N.V.)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1365.  Bosch later coordinated the meeting in Dubai between ABN Amro (RBS N.V.)'s Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, CBI's Director General.

1366.  During the meeting with the CBI's officials, ABN Amro (RBS N.V.) officials discussed the establishment of the Representative Office by ABN Amro (RBS N.V.) in Tehran and further business development, including the acceptance of USD deposits by the CBI's Desk in Amsterdam.

1367.  In an April 20, 2004 e-mail, the aforementioned Philbin mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

Mike Louwerens [ABN Amro's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached. The structure below is very interesting and could have applicability for the banks in Iran as well. But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York. And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat. The Way for our doing significant business with the Iranian banks in cash may yet be clear.

1368.  On July 23, 2004, ABN Amro (RBS N.V.) and its New York branch entered into a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the "Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS N.V.)'s New York Branch relating to AML policies, procedures, and practices that included:

A pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action…. A. ABN AMRO lacked adequate

risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1369.  U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran. The payment instructions on the wire transfers had been modified by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1370.  U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1371.  As DOJ later concluded: "Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

1372.  Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS N.V.)'s Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN Amro (RBS N.V.)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards)

and concluded that ABN Amro (RBS N.V.)'s payment procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1373.  In addition, ABN Amro (RBS N.V.)'s then New York branch was the conduit for at least 90 post-U.S. designation transactions on behalf of the IRGC-controlled IRISL and its various front companies through March, 2010.

1374.  On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate the IEEPA, the TWEA, and the Bank Secrecy Act ("BSA").

1375.  In connection with a Deferred Prosecution Agreement ABN Amro (RBS N.V.) entered into, a criminal information was filed in the U.S. District Court for the District of Columbia charging the Defendant with one count of violating the BSA, and one count of conspiracy to defraud the United States and violate the IEEPA and the TWEA. ABN Amro (RBS N.V.) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."[316]

1376.  According to the criminal information, ABN Amro (RBS N.V.)'s participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN Amro (RBS N.V.) willfully and knowingly conspired, *inter alia*, to "engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

---

[316] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by RBS with the DOJ on or about May 10, 2010; 2) the Settlement Agreement between RBS and the Department of Treasury entered into on or about October 12, 2013; 3) the NYDFS Consent Order entered on December 11, 2013; 4) the Federal Reserve Consent Order entered on December 11, 2013, as if fully set forth herein.

1377. The criminal information confirmed that ABN Amro (RBS N.V.) was an active participant in the Conspiracy.

1378. The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1379. The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1380. The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1381. The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1382. Additionally, the criminal information stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

1383. The criminal information also stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1384. Finally, the criminal information further stated that: "It was part of the conspiracy

that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

## 12. DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1385.  Like the other Defendants in this Action, Credit Suisse worked hand-in-glove with Iran and Iranian Bank Co-conspirators acting at Iran's behest to develop procedures to structure USD payments in ways that would evade U.S. sanctions and leave U.S. regulators, law enforcement and financial institutions blind as to Iran's financial activities, and provide Iran the USD it needed to sponsor acts of international terrorism.

1386.  To this end, Credit Suisse worked diligently to (1) develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions that it was clearing and settling in the United States; (2) delete or omit certain information when transactions were to be processed through the United States; and (3) provide incorrect information in USD funds transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1387.  Credit Suisse worked closely with Bank Melli, Bank Saderat, and Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

1388.  Before 2003, Credit Suisse was an active participant in the Conspiracy, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli Plc, Defendant Bank Saderat Plc, and other Iranian agents moved their accounts to Credit Suisse.

1389.  For the next two years, Credit Suisse became one of the main USD funds clearing banks for the Iranian banking system, quadrupling in only 3 years the number of Iranian U.S.

dollar payments, from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1390.  The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, e-mails between Credit Suisse and its Iranian bank clients and internal e-mails involving, among others, a Credit Suisse Bank Payments Sector Head, Credit Suisse's Treasury and Trade Finance Departments, and the Head of Credit Suisse's Iran Desk.

1391.  Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: *"Do not mention the name of the Iranian bank in payment orders."*

1392.  Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary, and effectuated by Credit Suisse employees.

1393.  For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that *any* foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and accordingly advised:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1394.  Almost immediately after President Clinton issued E.O. Nos. 12957, 12959, and

13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1395.   Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests and purposefully omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1396.   After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD funds clearing and settlement from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents, and provided them with a pamphlet entitled "How to transfer USD payments."

1397.   The pamphlet provided detailed payment order formatting instructions for USD funds transfers on how to avoid triggering U.S. OFAC sanction screening filters.

1398.   In a 1998 letter to an Iranian Bank Co-conspirator explaining the transfer of its USD clearing services to the Bank of New York, New York, Defendant Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1399.   Beginning as early as 1995 and continuing through 2005, Credit Suisse, both internally and in coordination with the Iranian Bank Co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily the Bank of New York, New York.

1400.  By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1401.  This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

1402.  Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment order messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC sanction screening filters.

1403.  For example, one such screenshot showed all incoming payment messages listing an Iranian bank as the ordering institution in SWIFT-NET payment order message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1404.  A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1405.  Until 2004, Credit Suisse's use of "*Order of a Customer*" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1406.  Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1407.  In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank

customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1408. Credit Suisse documented similar directives in subsequent years. For example, in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

1409. Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: "*Execute USD payment orders always with direct order and cover payment*." These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

1410. An internal Credit Suisse memorandum dated March 12, 1999, stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

1411. Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank Co-conspirator clients via a standard letter, which stated in part: "*The most important issue is that you and/or your* correspondents do not mention your good bank's name in field 52."

1412. Credit Suisse's Iran Desk also informed Iranian Bank Co-conspirator clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment

286

order and cover payment order.'"

1413. In order to prevent straight-through processing of all payment orders sent by Iranian Bank Co-conspirators, Credit Suisse configured its payment system to interdict the payments for manual review.

1414. Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference, or contact the Iranian Bank Co-conspirators to request further instructions.

1415. Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank Co-conspirators, including:

a) Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, "*Order of a Customer*" or a similar phrase instead of the actual name of the ordering institution in SWIFT-NET payment order messages;

b) Forwarding payment messages received from Iranian Bank Co- conspirators falsely referencing "Credit Suisse" or Credit Suisse's SWIFT- NET account code (identified by BIC address CRESCHZZ) instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT-NET payment message. The instructions were to make no changes to the misleading information in the SWIFT-NET message's field "52" for serial payment messages made to U.S. financial institutions;

c) Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian Bank Co-conspirator;

d) Removing all references to Iranian names, addresses, cities, and telephone numbers from customer payments;

e) Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "*entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work;*" and

f) Converting SWIFT-NET MT 103 Messages to SWIFT-NET MT 202 Messages to hide the details of Iranian transactions, and using MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1416. A September 24, 2003 Credit Suisse internal email sent from a team leader in Customer Payments to a Sector Head within Customer Payments, described Credit Suisse's Iranian U.S. dollar processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

1417. In addition, Credit Suisse actually instructed its Iranian Bank Co-conspirator customers on how to format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions.

1418. Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

1419. In December 2003, an Iranian bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, *i.e.*, Plc).

1420.  On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank: "Reference is made to the various conversations and your email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we would like to confirm the account number ...."

1421.  In addition, Credit Suisse promised the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being first hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1422.  Credit Suisse also took a further step in the Conspiracy beyond the *provision of expert knowledge to and training of* the Iranian Bank Co-conspirators on how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use for training *other* banks or individuals on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1423.  In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks' London branches' U.S. dollar clearing activity.

1424.  As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

1425.  Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

1426.  Credit Suisse knew that without such alterations, amendments, and code words,

automated OFAC filters at U.S. clearing banks would likely halt the payment order messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.[317]

1427.   Credit Suisse manipulated payment order messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not be able to identify the transactions, and the transactions would be automatically processed without detection.

1428.   In July 2004, the Swiss Federal Banking Commission issued an ordinance to implement FATF's Special Recommendation on Terrorist Financing VII.

1429.   The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1430.   In April 2004, in preparation for the implementation of the ordinance, Credit Suisse's Iran Desk began to inform its Iranian Bank Co-conspirator clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages.

1431.   Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and the IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

1432.   Although Credit Suisse's payment processing units ceased to use the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance,

---

[317] Exhibit 3, Declaration of Robert Mazur at 30.

Credit Suisse employees nonetheless continued removing and/or altering information in SWIFT payment order messages sent to one of its U.S. correspondent banks.

1433.   For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1434.   Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian Bank Co-Conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1435.   From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of at least *$480,072,032*, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

1436.   For a brief period of time, Credit Suisse became one of the main U.S. dollar clearing and settlement banks for the Iranian banking system.

1437.   In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased U.S. dollar clearing transactions for Iran in November 2006.

1438.   On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank Co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006 to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank Co-conspirator, the total value of which was in excess of $8 million.

1439. As described *supra*, Credit Suisse also facilitated payments on Letters of Credit involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts.

1440. These included the illegal purchase of an aircraft engine and an Airbus A320-232 financed by Bank Melli, Bank Refah and Bank Sepah.

1441. In each case, Credit Suisse directed USD payments through the United States in furtherance of the Conspiracy.

1442. In March 2007, following the Deferred Prosecution Agreements of Lloyds and ABN Amro (RBS N.V.), Credit Suisse commenced an internal investigation of its historic USD funds clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1443. On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit $536 million in USD funds to the United States and to the Manhattan District Attorney's Office in connection with violations of the IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

1444. In connection with a DPA that Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA. Credit Suisse waived the indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1445. Credit Suisse also simultaneously entered into an agreement with OFAC to settle its violations of the IEEPA and agreed to a civil forfeiture as part of the DPA it entered into with

DOJ, the Manhattan District Attorney's Office and OFAC.[318]

1446. The press release announcing the agreements quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

### 13. DEFENDANT BNP PARIBAS S.A.'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1447. From at least 2002 through November, 2012, BNP Paribas S.A. actively participated in the Conspiracy by knowingly and intentionally structuring, conducting, and concealing USD transactions from regulators on behalf of sanctioned entities, including Iranian entities. These intentionally opaque USD transactions were processed through BNP's office in New York and other financial institutions throughout the United States. The illegal BNP transactions include a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Iran and routed the USD payments to go through the United States pursuant to those instruments; correspondent banking or retail banking transactions to or through the United States that involved the interest of a person subject to U.S. sanctions on Iran; processing a number of payments to or through the United States related to syndicated loans involving Iranian parties. Federal government authorities, as part of the investigation into BNP, probed approximately $100 billion of transactions. They found that that $30 billion of that amount were concealed, as part of BNP's effort to evade U.S. sanctions. New York's

---

[318] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by Credit Suisse and DOJ on or about December 16, 2009; and 2) the Settlement Agreement entered into by Credit Suisse and the United States Treasury Dept. on or about December 16, 2009, as if fully set forth herein.

Department of Financial Services identified $190 billion in transactions that broke federal and state laws, including false books and records violations.

1448.   Beginning at least as early as 2002, BNP entered into an agreement with Iran to provide it with access to billions of USD in violation of U.S. and international sanctions on Iran. BNP provided Iran with at least $160 billion USD through 2012 and ultimately pled guilty to violating U.S. and New York law in 2014. As part of the guilty plea to the criminal charges, which included conspiring with Iranian and Sudanese sanctioned entities to violate U.S. sanctions, BNP agreed to pay an $8.9 billion fine to federal and state authorities, terminate senior executives, and suspend U.S. dollar clearing operations for one year at business lines in which the misconduct centered, starting in 2015. BNP was also sentenced to five years' probation.

1449.   BNP received these punishments because its conduct supported global terrorism, including by violating sanctions. "The most important values in the international community—respect for human rights, peaceful coexistence, and a world free of terror—significantly depend upon the effectiveness of international sanctions," said District Attorney Vance in the DOJ press release accompanying the announcement of BNP's guilty plea. As found by the Superintendent of Financial Services for New York State, Benjamin Lawsky, BNP "illegally funneled money to countries involved in terrorism and genocide" and that "multiple senior executives" knew that BNP was involved in that long-standing scheme. New York Governor Andrew Cuomo likewise stated in connection with the proceedings against BNP: "New York State will not allow companies to break the law, especially when they put our national security at risk . . . . This enforcement action should serve as a warning to any company that provides financial support to global terrorism and enables human rights atrocities. . . ."

1450.   Numerous other officials in the U.S. government similarly concluded that BNP

willfully violated U.S. sanctions, provided rogue nations that support terrorism with access to the

U.S. financial system, and did not cooperate with law enforcement when it was finally caught, as

reflected in the DOJ press release:

a) "BNP Paribas went to elaborate lengths to conceal prohibited transactions, cover its tracks, and deceive U.S. authorities. These actions represent a serious breach of U.S. law," Attorney General Holder said. "Sanctions are a key tool in protecting U.S. national security interests, but they only work if they are strictly enforced. If sanctions are to have teeth, violations must be punished. . . . ."

b) "BNP ignored US sanctions laws and concealed its tracks. And when contacted by law enforcement it chose not to fully cooperate," Deputy Attorney General Cole said. "This failure to cooperate had a real effect—it significantly impacted the government's ability to bring charges against responsible individuals, sanctioned entities and satellite banks. This failure together with BNP's prolonged misconduct mandated the criminal plea and the nearly $9 billion penalty that we are announcing today."

c) "By providing dollar clearing services to individuals and entities associated with Sudan, Iran, and Cuba – in clear violation of U.S. law – BNPP helped them gain illegal access to the U.S. financial system," said Assistant Attorney General Caldwell. "In doing so, BNPP deliberately disregarded U.S. law of which it was well aware, and placed its financial network at the services of rogue nations, all to improve its bottom line. Remarkably, BNPP continued to engage in this criminal conduct even after being told by its own lawyers that what it was doing was illegal."

d) "BNPP banked on never being held to account for its criminal support of countries and entities engaged in acts of terrorism and other atrocities," said U.S. Attorney Bharara. "But that is exactly what we do today. BNPP, the world's fourth largest bank, has agreed to plead guilty and pay penalties of almost $9 billion for performing the hat trick of sanctions violations, unlawfully opening the doors of the U.S. financial markets to three sanctioned countries, Sudan, Iran, and Cuba. For years, BNPP provided access to billions of dollars to these sanctioned countries, as well as to individuals and groups specifically identified and designated by the U.S. government as being subject to sanctions. The bank did so deliberately and secretly, in ways designed to evade detection by the U.S. authorities. . . ."

1451. The District Court at BNP's sentencing expressed similar views regarding BNP's

conduct when it addressed some of the victims of state-sponsored terrorism that were present at

the sentencing: "Your presence in the room emphatically reminds BNPP and other banks

contemplating similar conduct of the pain and suffering states they illicitly transacted with can inflict, and your being here also illustrates why the United States imposes sanctions on the states in the first place."

1452.  For over a decade, BNP provided USD clearing services on behalf of Sudanese, Iranian, and Cuban parties with a value of more than $190 billion which were settled through its New York Branch and other New York-based financial institutions. Several BNP branches, including Paris, London, Geneva, Rome and Milan, developed and implemented policies and procedures to systematically conceal at least $160 billion in U.S. dollar-denominated payments on behalf of Iranian customers. At least $650 million in transactions from 2004 to 2012 involved sanctioned Iranian entities, including transactions for a petroleum company based in Dubai that was effectively a front for an Iranian petroleum company and an Iranian oil company. BNP continued these illegal transactions for nearly two years after the bank had commenced an internal investigation into its sanctions compliance and pledged to cooperate with the government.

1453.  Moreover, from on or about July 15, 2005, to on or about November 27, 2012 alone, BNP processed at least 318 electronic funds transfers in the aggregate amount of $1,182,075,543 to or through financial institutions located in the United States in apparent violation of the prohibitions against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204. From at least 2009 and again from at least December 2011 to November 2012, BNP transferred at least $686,600,000.00 on behalf of Iranian entities and persons in violation of U.S. sanctions.

1454.  In processing transactions on behalf of these sanctioned entities, BNP engaged in a systematic practice, as directed from high levels of the bank's group management, of removing

or omitting Sudanese, Iranian, or Cuban information from USD-denominated payment messages that it sent through the New York Branch and other non-affiliated New York-based U.S. financial institutions. This practice was done to "guarantee the confidentially of the messages and to avoid their disclosure to any potential investigatory authorities." BNP's violations were particularly egregious in part because they continued for many years after other banks were sanctioned for similar violations; involved numerous schemes expressly designed to deceive regulators; and were committed with the knowledge of multiple senior executives.

1455.  From at least 2003 up through and including 2012, BNP conspired with banks, including Defendants and Iran and/or its Agents and Proxies, as well as other entities located in or controlled by countries subject to U.S. sanctions, other financial institutions located in countries not subject to U.S. sanctions, and others known and unknown, to knowingly, intentionally and willfully move at least $8,833,600,000 through the U.S. financial system on behalf of sanctioned entities in violation of U.S. sanctions laws, including transactions totaling at least $4.3 billion that involved SDNs.

1456.  Among the means and methods by which BNP and its co-conspirators carried out the conspiracy were the following: BNP intentionally used a non-transparent method of payment messages, known as cover payments, to conceal the involvement of sanctioned entities in USD transactions processed through BNP Paribas New York and other financial institutions in the United States; BNP worked with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of sanctioned entities in order to prevent the illicit transactions from being blocked when transmitted through the United States; BNP instructed other co-conspirator financial institutions not to mention the names of sanctioned entities in USD payment messages sent to BNP Paribas New York and

other financial institutions in the United States; BNP followed instructions from co-conspirator sanctioned entities not to mention their names in USD payment messages sent to BNP Paribas New York and other financial institutions in the United States; and BNP removed information identifying sanctioned entities from USD payment messages in order to conceal the involvement of sanctioned entities from BNP Paribas New York and other financial institutions in the United States. BNP provided expert advice, financial services, financial securities, and access to the U.S. financial system to make it all possible.

1457. For example, for one sanctioned Iranian client alone (referred to as "Iranian Controlled Company 1"), from 2006 to 2012, BNP processed at least $650 million in connection with three letters of credit that facilitated the provision of liquefied petroleum gas to an entity in Iraq. The majority of those transactions—approximately $586 million—occurred **after** OFAC revoked the U-turn Exemption, **after** the New York Country District Attorney's Office and the DOJ approached BNP regarding its involvement with sanctioned entities, and **after** multiple other banks blocked BNP's payments relating to Iranian Controlled Company 1.

1458. BNP knew that Iranian Controlled Company 1 was controlled by an Iranian energy group based in Tehran, Iran ("Iranian Energy Group 1"). Its own internal Know Your Customer documentation on Iranian Controlled Company 1 showed that it was 100% owned by Iranian Energy Group 1. BNP's documentation also showed that Iranian Energy Group I, and in turn Iranian Controlled Company 1, was 100% owned by an Iranian citizen.

1459. The transactions involving Iranian Controlled Company 1 began in approximately December 2006, at a time when the U-turn Exemption permitted certain transactions involving Iranian entities so long as those transactions were between two non-U.S., non-Iranian banks. BNP's transactions involving Iranian Controlled Company 1 initially complied with the U-Turn

Exemption. BNP issued its "Revised Group Policy on Iran" on September 24, 2007, and OFAC revoked the U-turn Exemption in November 2008. Despite this new bank policy and the revocation, BNP continued to process U.S. dollar transactions involving Iranian Controlled Company 1 through November 2012.

1460.  On June 12, 2007, BNP Paribas Paris opened an account for a company incorporated in the UAE with an address listed in Dubai, UAE. An organizational chart submitted to BNP Paribas Paris indicated the company was part of a network of eight companies—four of which were incorporated in Iran—that comprised an Iranian energy group owned and controlled by an Iranian citizen ordinarily resident in Iran, who was also the sole beneficial owner of the company maintaining an account at BNP Paribas Paris. According to BNP Paribas Paris's account opening materials (and a report the company produced to BNP Paribas Paris in 2007), many of the company's activities involved selling and transporting petroleum products to, from, or through Iran. The company's General Business Plan described its goals to increase a number of Iran-related activities over the following three years (2007-2010). Based upon the records made available to the government, the government concluded that BNP's outbound transactions through the United States on behalf of the company appeared to have violated the prohibition contained in § 560.204 of the Iranian Transactions and Sanctions Regulations because the benefit of these transactions was received in Iran.

1461.  The company referenced above utilized its account at BNP Paribas Paris to receive payments related to its sale of Turkmen liquefied petroleum gas to Iraq. Between November 2008 and November 2012, BNP processed 114 transactions totaling approximately $415 million on behalf of the company to or through the United States. Although the messages related to the transfers sent through the United States did include references to the company's

name, they did not include references to Iran or to the company's Iranian ownership or connections. Most of the USD transfers BNP initiated on behalf of the company reached their intended beneficiary. On January 9, 2012, however, BNP Paribas Paris originated a $500,000 wire transfer on behalf of the company, destined for a refinery in Turkmenistan, and an unaffiliated correspondent bank located in the United States stopped the transaction and requested additional details from BNP Paribas New York. BNP Paribas New York informed BNP Paribas Paris the unaffiliated correspondent bank was holding the payment "due to OFAC concern" and requested information about the payment, the company, the company's owners, and "anyway [sic] the transaction is related to Iran directly or indirectly." BNP Paribas Paris contacted the company directly to relay the questions, and the response—which came from an email address belonging to the Iranian energy group noted above—denied any association between the company and Iran. A BNP Paribas Paris compliance officer reviewed and approved the response for transmission to the unaffiliated correspondent bank without verifying the information or consulting the customer profile form for the company. At the time of the transaction, the customer profile form included a handwritten note for the company that read "Iranian ownership." In light of the available information, BNP appears to have had reason to know of the company's connection to Iran, and it failed to pass any of that information on to the unaffiliated correspondent bank in response to its inquiry. Even after the rejected transaction described above, BNP failed to subsequently investigate either the payment or the company, despite the fact BNP Paribas Paris processed 64 additional transactions valued at over $292 million on behalf of the company through the United States between January 2012 and November 2012, at which time BNP Group Compliance first learned about these transactions (BNP closed the company's account on November 27, 2012).

1462.  BNP also continued to process transactions on behalf of Iranian Controlled Company 1 even after other banks blocked payments that involved that company. In December 2011, a U.K. Bank ("U.K. Bank l") blocked a payment involving Iranian Controlled Company 1 and informed BNP that it would no longer do business with Iranian Controlled Company 1 because of its ties to Iran—thus putting BNP on notice, to the extent that it was not before, that transactions with Iranian Controlled Company 1 were impermissible. Moreover, in January 2012, a U.S. branch of a German bank ("German Bank 1") rejected a payment made by BNP on Iranian Controlled Company l's behalf because German Bank 1's research showed that Iranian Controlled Company 1 was "controlled from Iran." And in June 2012, a BNP Paribas Paris compliance officer noted that Iranian Controlled Company 1 was sending payments from its account at BNP Paribas Paris to its account at an Indian bank ("Indian Bank l") with "known links to Iran." Nevertheless, despite these warnings—and despite claiming to be cooperating fully with the Government's investigation into sanctions violations—BNP continued to process U.S. dollar transactions for Iranian Controlled Company 1 until November 2012.

1463.  From December 2011, when U.K. Bank 1 blocked the payment involving Iranian Controlled Company 1 and in doing so put BNP on notice of the impermissibility of the transactions, through November 2012, when the transactions ended, BNP knowingly, intentionally and willfully processed a total of approximately $586.1 million in transactions with Iranian Controlled Company 1, in violation of U.S. sanctions against Iran.

1464.  BNP engaged in significant transactions with other sanctioned oil-and-gas companies in addition to Iranian Controlled Company 1. In in 2009, for example, BNP knowingly, intentionally, and willfully processed approximately $100.5 million in USD payments involving an Iranian oil company following the revocation of the U-Tum Exemption,

in violation of U.S. sanctions. The payments were in connection with six letters of credit issued by BNP that financed Iranian petroleum and oil exports—and the payments were made even after compliance personnel at BNP Paribas Paris alerted employees within BNP's trade finance group that the USD payments associated with these letters of credit "are no longer allowed by American authorities."

1465.   BNP engaged in this conduct despite knowing, almost from the outset, that it was illegal to do so. As early as June 2003, BNP issued a "general procedure" that pertained to "Financial Embargoes," which stated that "US financial embargoes apply within the US territory, to any US national or resident and to any transaction in US Dollar." In addition, on several occasions during the period covered by the bank's internal review, BNP sought external legal advice regarding its sanctions-related business, and specifically with regard to processing transactions on behalf of or involving sanctioned parties through the United States. Though not always consistent, the legal advice that BNP received described OFAC's comprehensive sanctions and explained why BNP should be careful in its business that involved parties subject to OFAC sanctions. Several BNP entities developed procedures or utilized payment practices that contravened the bank's June 2003 "general procedure" and processed thousands of transactions to or through the United States in violation of U.S. economic sanctions programs against Sudan, Iran, Cuba, and Burma.

1466.   When a Dutch bank (ABN Amro) reached a settlement with United States regulators in 2005 for similar avoidance-of-sanctions practices to those conducted by BNP, the Head of Ethics and Compliance North America for BNP stated in an email "***the dirty little secret, isn't so secret anymore, oui?***"

1467.   In early 2010, the New York County District Attorney's Office and the DOJ

jointly approached BNP regarding its involvement in transactions with sanctioned entities, such as the sanctioned Iranian entities. Despite agreeing to commence an internal investigation into its compliance with U.S. sanctions and cooperate fully with U.S. and New York authorities, BNP continued to process these transactions on behalf of Iranian Controlled Company 1.

1468.   BNP also provided access to substantial amounts of USD for sanctioned Sudanese entities, including those tied to Osama Bin Laden and al Qaeda. From at least November 1997 through in or around 2012, BNP conspired with Sudan, the Central Bank of Sudan, Al Shamal Islamic Bank, and al Qaeda to avoid OFAC sanctions that were put in place to deter, disrupt, and defeat terrorist activities. BNP maintained USD-denominated correspondent accounts for several Sudanese banks, including four banks that OFAC identified as SDNs. From 2005 to 2009 alone, BNP processed at least 2,663 electronic funds transfers in the aggregate amount of $8,370,372,624 to or through financial institutions located in the United States in apparent violation of U.S. sanctions on Sudan.

1469.   After other banks stopped doing illegal business with Sudan, Sudan and Sudanese banks began requesting assistance from European banks to defeat the sanctions. For example, on November 9, 1997, one of Credit Lyonnais (Suisse) S.A.'s Sudanese institutional clients "sent a Telex message to all of its correspondents (including [Credit Lyonnais]) informing the banks of the sanctions imposed against Sudan and requested its correspondents 'not to [] channel such transactions by intermediation of any U.S.A. bank, including banks domiciled in the U.S.A. territory, U.S.A. banks overseas branches and subsidiaries [or the] [a]ffiliates of[a] U.S.A. bank incorporated outside the United States.'"

1470.   BNP stepped in and, in 1997, effectively acted as Sudan's central banker for USD—BNP agreed to become Sudan's sole correspondent bank for one of Sudan's government

banks. Without BNP providing USD, as the U.S. government found at BNP's criminal sentencing, Sudan and its related entities "would not have had access to the US dollar markets."

1471.    BNP knew that Sudan had assisted al Qaeda prior to entering into the Conspiracy. Despite that knowledge, BNP decided to become their sole correspondent bank in Europe, allowing it access to the U.S. financial market.

1472.    All or nearly all major Sudanese banks had USD accounts with BNP Paribas Geneva. In addition to processing USD transactions, by or in 2000, BNP Paribas Geneva also developed a business in letters of credit for the Sudanese banks. Due to its role in financing Sudan's export of oil, BNP Paribas Geneva took on a central role in Sudan's foreign commerce market. By 2006, letters of credit managed by BNP Paribas Geneva represented approximately a quarter of all exports and a fifth of all imports for Sudan. Over 90% of these letters of credit were denominated in USD. In addition, the deposits of a Sudanese Government Bank at BNP Paribas Geneva represented about 50% of Sudan's foreign currency assets during this time period.

1473.    For example, soon after the imposition of U.S. sanctions against Sudan in 1997, BNP Paribas Geneva established account relationships with a network of nine unaffiliated regional banks located in Africa, Europe and the Middle East, some with no other business purpose than to clear payments for Sudanese clients. The accounts with the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.

1474.    Specifically, BNP utilized the Regional Banks in a two-step process designed to enable BNP's Sudanese clients to evade U.S. sanctions. In the first step, a Sudanese bank seeking to move USD out of Sudan transferred funds internally within BNP Paribas Geneva to an account specifically maintained by a Regional Bank to facilitate USD transfers from Sudan. In the second step, the Regional Bank transferred the money to the Sudanese bank's intended

beneficiary through a U.S. bank without reference to the Sudanese bank. As a result, it appeared to the U.S. bank the transaction was coming from the Regional Bank rather than a Sudanese bank.

1475. In order to further disguise the true nature of the Regional Bank transactions, employees at BNP Paribas Geneva frequently worked with the Regional Banks to wait between one and two days after the internal transfer before making a dollar-for-dollar, transaction-by-transaction, clearing of funds through the United States, artificially delinking the U.S. transfer of funds from the prior transfer involving the Regional Banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved sanctioned party.

1476. In 2006 and 2007 alone, for example, BNP processed at least approximately $6.4 billion through the United States on behalf of Sudanese sanctioned entities, including approximately $4 billion on behalf of a financial institution owned by the government of Sudan. BNP processed these transactions even though internal emails showed BNP employees expressing concern about the bank's assisting the Sudanese government in light of its role in supporting international terrorism and committing human rights abuses during the same time period. Indeed, in March 2007, a senior compliance officer at BNP wrote to other high-level compliance and legal employees reminding them that certain Sudanese banks with which BNP dealt "play a pivotal part in the support of the Sudanese government which . . . has hosted Osama Bin Laden and refuses the United Nations intervention in Darfur."

1477. BNP's compliance personnel allowed these transactions to occur because the bank was earning significant money from them. BNP's senior compliance personnel agreed to continue the Sudanese business and rationalized the decision by stating that "the relationship

with this body of counterparties is a historical one and the commercial stakes are significant. For these reasons, Compliance does not want to stand in the way."

1478.  BNP also transacted illegal business with Al Shamal Islamic Bank, a Sudanese bank that received at least $50 million in funding from Osama bin Laden in the 1990 time period. Al Shamal knowingly and intentionally provided financial services to al Qaeda, including maintaining and servicing al Qaeda bank accounts, including accounts for Osama bin Laden.

1479.  Al Shamal held a correspondent bank account at United European Bank, a subsidiary of BNP. BNP and/or United European Bank continued its facilitation of Al Shamal transactions even after public reporting of its ties to al Qaeda following the 1998 East African Embassy Attacks.

1480.  BNP used a number of methods, in addition to the two-step approach described above regarding Sudan, to conceal these illegal transactions from other financial institutions and law enforcement.

1481.  BNP internally published manuals instructing employees to cover payment messages being sent through the BNP Paribas New York headquarters to reflect only "the receiving institution (and not the Iranian beneficiary institution!)" As a result, this caused the BNP Paribas New York headquarters to be incapable of maintaining proper records of USD transactions cleared through that institution, and these transactions to go unnoticed by United States regulators.

1482.  From as early as 1995 through at least 2007, BNP circulated memoranda among its operations staff with the blanket directive for USD transactions involving Iran: "[d]o not stipulate in any case the name of the Iranian entities on messages transmitted to American banks or to foreign banks installed in the U.S."

1483.  BNP staff in the New York headquarters knew they were operating without adequate legal and compliance authority to ensure activities conducted by BNP outside of the United States, but directed at the United States, complied with New York and United States sanctions law in dealing with prohibited countries, such as Iran.

1484.  For example, in 2006, when questioning whether BNP practices with respect to whether an internal group at BNP dealing with energy and commodities exports ran the risk of circumventing United States sanction law, an employee described "a practice exists which consists in [sic] omitting the Beneficiaries/Ordering party's contact information for USD transactions regarding clients from countries that are under U.S. embargo: Sudan, Cuba, Iran. This avoids putting BNP NY in a position to uncover these transactions, to block them, and to submit reports to the regulators."

1485.  The highest levels of compliance authorities at BNP Paribas New York were aware of and accepted the widespread practice of amending, omitting or stripping information from USD payment transactions for the benefit of sanctioned countries, such as Iran.

1486.  BNP Geneva also intentionally implemented a "solution" to the problems presented by United States sanction law by using other, non-BNP financial institutions located in the United States to conduct its knowingly improper USD transactions on behalf of sanctioned countries, such as Iran.

1487.  Another scheme BNP used to evade sanctions and deceive regulators was to shift its illicit USD transactions from its New York Branch to another unaffiliated U.S. bank—once BNP began to come under regulatory pressure for unsatisfactory compliance procedures. BNP engaged in this strategy after authorities identified bank-wide failures in BNP's AML requirements.

1488.   Based on this illegal conduct, BNP pled guilty in the United States District Court for the Southern District of New York to one count of Conspiracy to Violate the IEEPA (50 U.S.C. § 1702, 1705) and the Trading with the Enemy Act (50 U.S.C. §§ 3, 5, 16).[319]

1489.   BNP also entered into a Consent Order with the DFS based on its illegal banking activities with sanctioned Countries, including Iran. In particular, BNP pled guilty to one count of falsifying business records in the first degree (New York Penal Law § 175.10) and one count of conspiracy.[320]

1490.   Further, BNP entered into a Settlement Agreement with OFAC for violations of a number of federal banking laws, including the breach of 31 C.F.R. § 560.204, prohibiting the exportation or re-exportation of services from the United States to Iran.[321]

1491.   As a result of the above transgressions targeting the United States financial system for the benefit of Iranian entities, BNP pled guilty to and voluntarily entered into multi-faceted, agreements with both the DOJ, the United States Department of the Treasury and the State of New York that required forfeiture of significant assets, extensive reshaping of their internal compliance departments and wide-ranging monitoring by United States law enforcement.

1492.   As required by its guilty plea in the United States District Court for the Southern District of New York, BNP agreed to:

a)      Forfeit $8,833,600,000 to the United States;

b)      The entry to a money judgment against it in that amount;

---

[319] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Guilty Plea entered into by BNP Paribas on or about July 10, 2014, as if fully set forth herein.

[320] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement entered into between BNP Paribas and the U.S. Department of Treasury on or about June 30, 2014, as if fully set forth herein.

[321] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Order entered into between BNP Paribas and the New York Department of Financial Services on or about June 30, 2014, as if fully set forth herein.

        c)      Be subject to judicial process in the United States for determining the locations of such funds, if not paid;

        d)      Be subject to the continuing jurisdiction of the United States to enforce the terms of its guilty plea and forfeiture;

        e)      Be subject to a term of probation supervised by the United States for a term of five years, including:

            i.      the standard terms of probation for all criminals convicted in the United States, and;

            ii.      compliance with all terms of the agreement entered into by BNP with the State of New York.

1493.   As a result of the guilty plea entered into with the State of New York, BNP agreed to:

        a)      Pay over three billion dollars of the amount agreed to be forfeited by its agreement with the United States to the State of New York in the form of reparations and restitution; and

        b)      Suspend its USD clearing services through its New York headquarters starting January 1, 2015 for a period of one year.

1494.   As a result of the guilty plea entered into with the State of New York, BNP agreed to:

        a)      Pay over three billion dollars of the amount agreed to be forfeited by its agreement with the United States to the State of New York in the form of reparations and restitution;

        b)      Suspend its USD clearing services through its New York headquarters starting January 1, 2015 for a period of one year;

        c)      Prohibit, for a period of twenty-four months, USD clearing unaffiliated third party banks in New York and London;

        d)      Not to take any action to avoid or circumvent these suspensions;

        e)      Extend for an additional two years the tenure of a previously agreed to Independent Consultant (through a prior agreement with the state of New York) who is on-site at the BNP Paribas New York headquarters to review

BNP compliance with United States regulations affecting transactions with sanctioned countries, such as Iran. The Independent Consultant will also:

     i.    Oversee BNP's remediation efforts to streamline USD transactions process through the BNP Paribas New York headquarters; and

    ii.    Monitor compliance with the previously referenced suspension of USD activities.

f)    Terminate 13 executives with responsibility for conducting or tacitly condoning the failure of BNP to comply with United States law regarding transactions with sanctioned entities, such as Iran;

g)    Discipline an additional 32 employees who were also responsible for circumventing United States sanction law, with such discipline including cuts in compensation, remedial training and warnings;

h)    Not hire, retain or indirectly retain any of the terminated employees; and

i)    To be prosecuted to the full extent of United States law in the event it breached the agreement with the State of New York.

1495.  As a result of the Settlement Agreement entered into between BNP and OFAC, BNP agreed:

a)    Provide all reports generated as a result of its other settlement with governmental entities to the United States Department of the Treasury; and

b)    Pay up to $963,619,900 to the United States in the event lesser amounts were assessed by other governmental entities as a result of BNP's improper conduct.

## 14.   DEFENDANT DEUTSCHE BANK AG'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1496.  In furtherance of Deutsche Bank AG's illegal conduct described in this Complaint, which conduct was a cause of the Plaintiffs' injuries, damages, and losses, DB used its United States' branches/offices and various correspondent banks in New York to execute USD-denominated transactions requested by its customers, and specifically its customers in Iran.

1497.  During times relevant to the claims alleged herein, and as part of its business in

the United States, DB utilized its United States' offices/branches and correspondent banks to transfer money to certain charitable organizations that were actually Iranian Agents and/or Proxies, money which DB knew was being used to fund the terrorist attacks that killed and injured the Plaintiffs.

1498.  In 2015, DB was fined $258 million for violating OFAC regulations and U.S. sanctions by providing billions of dollars to Iran and other sanctioned entities.

1499.  From at least 1999 through 2006, DB used non-transparent methods and practices to conduct more than 27,200 USD clearing transactions valued at over $10.86 billion on behalf of entities subject to U.S. economic sanctions, including Iranian sanctioned entities.

1500.  "Starting at least in 1999, [DB] employees recognized that U.S. sanctions rules, which applied at that time or over the course of subsequent years to Iranian, Syrian, Libyan, Burmese, or Sudanese customers or to customers who were listed on OFAC's SDN list, would pose problems for USD payments sent to or cleared through the U.S., including clearing done through Deutsche Bank New York. Payments involving sanctioned entities were subject to additional scrutiny and might be delayed, rejected, or frozen in the United States. In order to facilitate what it saw as "lucrative" USD business for sanctioned customers, Bank employees developed and employed several processes to handle dollar payments in nontransparent ways that circumvented the controls designed to detect potentially-problematic payments."[322]

1501.  DB intentionally processed these illegal transactions in such a manner as to avoid detection by United States regulators and law enforcement. In particular, DB removed identifying information about Iran and Iranian entities from the SWIFT payment messages, used non-transparent cover payment methods that were stripped of important identifying information

---

[322] New York State Department of Financial Services, *In re Deutsche Bank AG, Deutsche Bank AG New York Branch Consent Order Under New York Banking Law §§ 39 and 44*, http://www.dfs.ny.gov/about/ea/ea151103.pdf (last visited Oct. 15, 2017).

about the underlying party, and instructed Iranian clients to include notes or code words in requested payment transactions that would trigger "special processing" by DB employees to ensure DB employees would hide identifying information to avoid having the payment requests picked up by DB New York personnel and OFAC filter software.

1502.  As a result of this conduct, DB failed to maintain adequate and correct financial records of USD payment transactions and the omitted and modified payment requests set forth above likewise prevented DB New York from maintaining adequate and complete financial records as required by New York and United States law.

1503.  One method that DB employed was wire stripping, or alteration of the information included on the payment message. Bank staff in overseas offices handling Message Type 103 serial payment messages, or MT 103s, removed information indicating a connection to a sanctioned entity before the payment was passed along to the correspondent bank in the U.S. With any potentially problematic information removed (or, as was done in some cases, replaced with innocuous information, such as showing the bank itself as the originator), the payment message did not raise red flags in any filtering systems or trigger any additional scrutiny or blocking that otherwise would have occurred if the true details were included.

1504.  A second method was the use of non-transparent cover payments. The cover payment method involved splitting an incoming MT 103 message into two message streams: an MT 103, which included all details, sent directly to the beneficiary's bank, and a second message, an MT202, which did not include details about the underlying parties to the transaction, sent to DB New York or another correspondent clearing bank in the U.S. In this way, no details that would have suggested a sanctions connection and triggered additional delay, blocking, or freezing of the transactions were included in the payment message sent to the U.S. bank.

1505. DB employees recognized these handling processes were necessary in order to evade the sanctions-related protections and controls of DB New York and other correspondents. For example, a relationship manager who handled significant business for Iranian customers explained the need for special measures as follows, in a 2003 email to colleagues: DB employs "specific precautionary measures that require a great deal of expertise" because "[i]f we make a mistake, the amounts to be paid could be frozen in the USA and/or DB's business interests in the USA could be damaged." Or, as the Assistant Vice President who oversaw payments processing explained to a colleague who inquired about Iranian payments, DB needed to employ "the tricks and cunning of MT103 and MT202" because of the U.S. sanctions restrictions otherwise applicable to sanctions-related payments.

1506. Therefore, as explained in another email summing up the process for handling Iran-related payments, DB's preferred method was to process a payment using the cover payment method, and when that was not possible, "we will arrange for the order to be dropped . . . into a further repair queue, where the references to the principal will then be eliminated."

1507. As new sanctioned customers were brought into the fold, or as newly-enacted U.S. sanctions programs affected existing customers, these processes were extended so as to ensure that payments did not encounter U.S.-based sanctions problems. For example, when DB staff learned that possible new U.S. sanctions might affect certain Syrian customers, they discussed how Syrian payment orders "must be 'anonymised' in the same way as orders from Iran or Libya, i.e. coverage without mention of Syria can be directed via USA and the order is made directly to the beneficiary's bank."

1508. On some occasions, payments that were rejected by DB New York due to a suspected sanctions connection were simply resubmitted to a different U.S. correspondent by the

overseas office. Alternatively, some payments that were rejected in the U.S. when they were sent as MT 103 serial payments (which included details about the underlying parties) were then resubmitted as MT 202 cover payments – in other words, because the information included on the more detailed message caused the rejection, the overseas office simply sent the payment again using the less transparent method.

1509. The special processing DB used to handle sanctioned payments was anything but business as usual; it required manual intervention to identify and process the payments that needed "repair" so as to avoid triggering any sanctions-related suspicions in the U.S. Indeed, on occasion, customers whose payments received this special processing questioned the extra fees the bank was charging for the manual processing. They were told that this is what was necessary in order to circumvent the U.S.-based sanctions controls.

1510. DB instituted a series of policies starting in 2006 to end these practices and wind down business with U.S.-sanctioned entities. However, some instances of resubmitting rejected payments or processing sanctions-related payments through New York persisted even after the formal policies were instituted.

1511. DB relationship managers and other employees worked with DB's sanctioned customers in the process of concealing the details about their payments from U.S. correspondents.

1512. During site visits, in emails, and during phone calls, clients were instructed to include special notes or code words in their payment messages that would trigger special handling by the bank before the payment was sent to the United States. Sanctioned customers were told "it is essential for you to continue to include [the note] 'Do not mention our bank's name…' in MT103 payments that may involve the USA. [That note] ensures that the payments

are reviewed prior to sending. Otherwise it is possible that the [payment] instruction would be sent immediately to the USA with your full details. . . . [This process] is a direct result of the US sanctions." Customers, in turn, included notes in free-text fields of SWIFT messages such as "Please do not mention our bank's name or SWIFT code in any msg sent via USA," "PLS DON'T MENTION THE NAME OF BANK SADERAT IRAN OR IRAN IN USA," or "THE NAME BANK MELLI OR MARKAZI SHOULD NOT BE MENTIONED . . . IMPORTANT: NO IRANIAN NAMES TO BE MENTIONED WHEN MAKING PAYMENT TO NEW YORK."

1513.  But DB did not rely on the customer notes and code words alone; DB's payments processing staff were instructed to be on the lookout for any payment involving a sanctioned entity and ensure that no name or other information that might arouse sanctions-related suspicions was sent to the U.S. correspondents, even if the customer failed to include a special note to that effect.

1514.  In fact, DB's "OFAC-safe" handling processes and its experience in handling sanctions-related payments were selling points when soliciting new business from customers subject to U.S. sanctions. On one occasion, a relationship manager visiting a Syrian bank during a time when the U.S. was considering instituting certain Syrian sanctions pitched DB's "OFAC-safe vehicles," and when the client mentioned possibly splitting its business among several Asia-based banks, the relationship manager "highlighted that the Asian banks in general are not very familiar with OFAC procedures [and] [a]sked them to consider who their friends will be in the longer run, DB or Asian banks." In another instance, after DB staff responded to a client inquiry about handling USD payments relating to Iran and Syria with a favorable "OFAC safe" solution, the Bank relationship manager reported the client was so pleased that it "used the opportunity to

enquire whether we can also do USD payments into Burma/Myanmar."

1515.  The practice of non-transparent payment processing was not isolated or limited to a specific relationship manager or small group of staff. Rather, DB employees in many overseas offices, in different business divisions, and with various levels of seniority were actively involved or knew about it.

1516.  In addition, some evidence indicates that at least one member of DB's Management Board was kept apprised about and approved of DB's business dealings with customers who were subject to U.S. sanctions.

1517.  Certain non-U.S. employees, especially those who managed relationships with a high number of Iranian, Libyan, or Syrian clients or who regularly processed USD payments for sanctioned customers, were considered experts in the bank's "OFAC-safe" handling procedures. They regularly educated colleagues in other branches or in other divisions outside the U.S. about handling USD payments.

1518.  Moreover, DB disseminated formal and informal written instructions emphasizing the need for utmost care to ensure that no sanctions-related information was included in U.S.-bound payment messages and setting out the various methods to use when processing sanctions-related payments.

1519.  For example, DB staff told investigators that, at various times, an internal customer database included notes for certain sanctioned customers indicating their name must not be referenced in payment messages sent to the U.S.

1520.  Later, DB payments processing employees prepared a training manual for newly-hired payments staff in an overseas office. The manual included a section titled "US Embargo Payments" that explained how to handle payments with a sanctions connection. An early draft

included a warning, in bolded text: "Special attention has to be given to orders in which countries/institutes with embargos are involved. Banks under embargo of the US (e.g., Iranian banks) must not be displayed in any order to [Deutsche Bank New York] or any other bank with American origin as the danger exists that the amount will be frozen in the USA."

1521.  A revised version of the payments manual admonished that payments from Iran and Syria "have to be treated with caution as [ ] the payment gets released from the queue; there is a probability the funds will be frozen by the Federal Reserve thereby causing financial and reputation loss for the Bank." A later version of the manual noted the payment message might include key words such as "Embargo" or "Do not pay via US," but it also cautioned employees that code words might not necessarily be present. In any event, non-U.S. employees were instructed that information linking a customer to a U.S. sanctions program must not be displayed in any message sent to DB New York or any other American bank. The preference, they were told, was to send two messages (that is, to use the cover payment method), but if that was not possible, they must reformat the message so that it gets routed for additional repair and reformatting "in such a way that the Embargo names are not visible to the receiving US banks." The manual included computer screenshots illustrating how these problematic messages might appear and how to handle them.

1522.  Moreover, less formal instructions were disseminated to certain staff via email. In one email chain regarding possible recruitment of a new customer with Libyan connections, DB staff were cautioned to "please be careful in regard to the US, since it does violate OFAC," and were told, "please do not mention OFAC names in the subject line of e-mails!" In another instance, when certain U.S. regulations against a Syrian bank were imposed in 2004, relevant employees were told: "Let us be very careful while effecting USD-denominated transaction[s]

with Syria. In case we have to effect any USD-denominated remittance to Syria, please ensure that name of Syria should not appear in the message."

1523.   At the same time, DB staff took care to avoid publicizing details about their non-transparent payments handling, both within and outside the bank. Employees recognized the legal and reputational concerns and acted to keep the payment handling methods—and indeed the fact of the bank's business dealings with sanctioned entities in general—on a need-to-know basis.

1524.   For example, one non-U.S. relationship manager who asked for advice about USD processing was told, "Please be informed that any info on OFAC-safe business patterns (THAT DB does it and HOW DB does it) is strictly confidential information. Compliance does not want us to distribute such info to third parties, and forbids us explicitly to do so in any written or electronic form." In another email, a senior compliance executive with oversight of this area told a non-U.S. relationship manager who was asking about the possibility of doing business with a Syrian customer that Compliance "agreed to do business on a low key level without public announcements etc." Later, when that relationship manager was offering advice to another non-U.S. colleague about assisting a client who needed to make and receive USD payments with Iranian and Syrian connections, he cautioned his colleague: "As usual, let's not revert to the client in writing due to the reputational risk involved if the e-mail goes to wrong places. Someone should call [the client] and tell them orally and ensure that the conversation is not taped. . . . Let's also keep this e-mail strictly on a 'need-know' basis, no need to spread the news in [Deutsche Bank's Asian offices about] what we do under OFAC scenarios."

1525.   Around the same time, that same relationship manager told another non-U.S. colleague: "Please note that while DB is prepared to do business with Syria, we obviously have

sizeable business interests in the US, too, which DB wants to protect. So any Syrian transaction should be treated STRICTLY confidential and should involve any colleagues on a 'Must-Know' basis only! . . . [W]e do not want to create any publicity or other 'noise' in the markets or media."

1526.   In addition, while one of the main purposes of the nontransparent practices was to keep the DB's U.S. staff in the dark about the sanctions connections of the payments they were processing, DB New York staff occasionally raised objections to the Bank's business relationship with U.S.-sanctioned parties based on U.S. law. Their European colleagues, however, did nothing to stop the practice but instead redoubled their efforts to hide the details from their American colleagues. For example, a relationship manager who did significant business with Iranian customers complained to his boss that colleagues in the Middle East "participated in a major conference call with senior management of [DB New York] and provided an overview of DB's account activities with Syria outside the U.S. Senior management of [DB New York] complained strongly to DB Frankfurt that they see this as a breach of law." The relationship manager viewed this incident not as a prompt to reexamine the bank's business, however, but rather as indicating a need to better train the non-U.S. staff who handle the "very lucrative" Syrian and Iranian business to ensure such disclosures do not occur in the future.

1527.   Based on the conduct described above, DB entered into Consent Orders with both the DFS and with the Board of Governors of the United States Federal Reserve System based on DB's violation of New York and United States' law. In conjunction with reaching these consent orders, DB and DB New York agreed the facts alleged in the above paragraphs are true and

correct.[323]

1528.  Based on this and other illegal conduct on behalf of Iran aimed at the United States financial system, DB chose to enter into a sweeping consent order with the DFS for failing to maintain accurate books, accounts, and records in violation of New York Banking Law §§ 104, 200-c and 3 N.Y.C.R.R. 3.1 and failing to notify the State of New York or United States regulators upon the discovery of fraudulent conduct in violation of 3 N.Y.C.R.R. 300.1.

1529.  In the Consent Order, DB agreed to:

a) Pay a $200,000,000 civil penalty to the State of New York;

b) Implement an independent monitor, at its own expense but chosen by the State of New York, and who will report directly to the State of New York, whose job it will be to fully assess the (1) elements of DB's corporate governance system that contributed in any way to the improper conduct, (2) the thoroughness of DB's existing OFAC compliance mechanisms, (3) the organizational structure of the portion of DB's operations that deal with OFAC compliance, and (4) adequacy of any remedial efforts undertaken by DB;

c) Fully cooperate with all state and federal regulators and the chosen independent monitor in their investigations into DB's money laundering on behalf of sanctioned entities, including Iran and Iranian entities;

d) Develop an action Plan to address shortcomings identified by the independent monitor and submit this action plan to the State of New York;

e) Allow the independent monitor to oversee the implementation of any corrective measures noted by the action Plan;

f) Allow the independent monitor to assess compliance with the corrective measures noted in the action Plan and agree that all findings of the independent monitor in this regard will be submitted to the State of New York;

g) Fire, and not rehire, a number of employees who were directly involved in the illegal USD transactions on behalf of Iran and Iranian entities; and

h) That DB remains subject to prosecution by the State of New York should DB materially breach the terms of this Consent Order.

---

[323] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Orders entered into between DB and the New York Department of Financial Services on or about November 3, 2015, as if fully set forth herein.

1530. Based upon the conduct described herein, the United Stated Federal Reserve also investigated DB's conduct with respect to violations of the Trading with the Enemy Act (50 U.S.C. §§ 5, 16) and the IEEPA (50 U.S.C. §§ 1701-06) and found sufficient grounds to compel DB to enter into the Cease and Desist Order. [324]

1531. Based on the conduct described herein, DB also agreed to the following terms with the United Stated Federal Reserve:

a) Pay a $58 million penalty to the Federal Reserve; and

    i. Implement a timetable for full compliance with OFAC regulations;

b) Submit a proposed program, subject to approval by the Reserve, designed to:

    i. Provide an annual assessment to the Reserve of OFAC compliance risks posed by DB's customer base;

    ii. Global policies and procedures for DB and all its subsidiaries regarding OFAC compliance;

    iii. The establishment of a uniform OFAC compliance system that is widely publicized throughout the organization;

    iv. Ensure that DB's OFAC compliance measures are adequately staffed and funded;

    v. Training for DB employees that have responsibilities for OFAC compliance that is tailored to their particular job level;

    vi. Establish an audit program designed to test for OFAC compliance; and

    vii. Establish an annual OFAC compliance review that will be conducted by a third party as approved by the Reserve and that will be submitted to the Reserve within 90 days of completion.

1532. The services provided by DB to Iran and its Agents and Proxies consist of the provision of USD funds, expert advice, and/or financial services described above.

1533. Since agreeing to cease & desist its wrongful conduct, and promising to establish

---

[324] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Orders entered into between DB and the United States Federal Reserve System on or about November 4, 2015, as if fully set forth herein.

better internal OFAC and ALM compliance programs, DB has struggled to remain a law-abiding bank in the U.S. and abroad.

1534. For example, on November 29, 2018, German police raided DB's Frankfurt offices seeking evidence in money laundering investigations focused on DB's practice of hiding money offshore to elude tax collectors and government regulators. According to media reports, German prosecutors are investigating at least two employees who assisted customers in setting up offshore firms *to avoid anti-money laundering safeguards* when transferring money to accounts at DB.[325]

1535. Additionally, on February 7, 2019, Senators Chris Van Hollen (Maryland) and Elizabeth Warren (Massachusetts), delivered a letter to Senator Mike Crapo (Idaho), the Chairman of the Senate Committee on Banking, Housing, and Urban Affairs. This letter renewed requests for further congressional oversight of Defendant Deutsche Bank. This request (and those preceding it) cited in part to DB's conduct and role in correspondent banking by which it provides its customers with access to the U.S. banking system. For example, a prior request dated December 13, 2018, included reference to DB's participation in the following:

    a. Facilitating $10 billion in suspicious transactions for unknown Russians behind anonymous Russia-based shell corporations over a four year period;

    b. Providing correspondent banking services for ABLV, a Latvian Bank that FinCEN found was laundering money and evading sanctions against North Korea; and

    c. Handling $150 billion of suspicious transactions tied to Danske Bank, the largest financial institution in Denmark, implicating it in a $230 billion money laundering scheme.

1536. In seeking congressional review of DB's business dealings, Senators Van Hollen

---

[325] *See e.g.* Bill Chappell, *Deutsche Bank Offices are Raided in Money Laundering Probe*, NPR (Nov. 29, 2018) (available at https://www.npr.org/2018/11/29/671820502/deutsche-bank-offices-are-raided-in-money-laundering-probe ).

and Warren point specifically to the fact that, "[for[ many years, correspondent banking has been recognized as a vulnerable pathway for the movement of illicit funds on behalf of terrorists, drug traffickers, corrupt officials, and fraud operations. The September 11, 2001 terrorist attacks and the 2012 consent orders and settlements with [Defendant] HSBC… demonstrate that criminal networks continue to launder money with the help of correspondent baking."[326]

### 15. DEFENDANT CREDIT AGRICOLE S.A. & CREDIT AGRICOLE CORPORATE & INVESTMENT BANK'S, AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1537. Credit Agricole S.A. ("CASA"), including its New York Branch, Credit Agricole Corporate & Investment Bank New York Branch ("CACIB"), agreed to provided Iran, Iranian entities, Iranian SDNs, and others with billions of USD, money that those entities used to finance terrorist activities, including those that injured or killed Plaintiffs. They agreed to provide USD in violation of U.S. law and sanctions put in place to prevent Iranian entities from financing terrorist activities, including those that injured or killed Plaintiffs. They participated by illegally providing billions of USD over a number of years, which ultimately supported the Terrorist Groups involved in the terrorist acts that injured or killed Plaintiffs. That participation earned CACIB and CASA a significant amount of profits. Further, CACIB and CASA engaged in these transactions fully aware the reason for the U.S. laws and sanctions they violated was to inhibit Iran's ability to fund terrorism using USD.

1538. From at least August 2003 to September 2008, CACIB had a continuous, ongoing relationship with Iran and its Agents and Proxies. CACIB's relationship with, and its illegal processing of USD transactions on behalf of, Iranian entities stretches back even further. In addition to Iranian entities, CACIB during this period processed more than 4,000 transactions on

---

[326] See https://www.vanhollen.senate.gov/news/press-releases/van-hollen-warren-ask-senate-banking-committee-to-investigate-deutsche-bank (last accessed April 22, 2019).

behalf of 11 Sudanese banks, six of which were SDNs.

1539.   During its review of $32 billion of transactions during this time frame, the DFS found that more than 4,000 of those transactions, valued at approximately $442 million, were illegal under various U.S. sanction programs. The DFS also specifically found, from the sample it reviewed, the bank processed 280 transactions totaling approximately $50 million involving SDNs. The DFS also found that about 90% of the bank's illegal transactions (which accounted for approximately 80% of the total value of the illegal transactions) were processed by the bank's Geneva subsidiary.

1540.   During this time, CACIB and its subsidiaries (including CASA), predecessors and affiliates, systematically and repeatedly violated U.S. and New York law by sending prohibited USD payment transactions though its branch in New York on behalf of Iran and Iranian entities. To accomplish this goal, CACIB and its subsidiaries and predecessors designed these payments to hide the fact payments were requested by Iran or Iranian entities to avoid detection by both United States banking personnel and United States and New York regulators and law enforcement.

1541.   From at least 2003 to 2008, CACIB used a series of schemes to process more than $32 billion in U.S. dollar payments through its New York Branch from its branches in Paris, London, Singapore, Geneva, Hong Kong and the Gulf, providing U.S. dollar clearing services on behalf of Sudanese, Iranian, Burmese and Cuban entities, including SDNs. From at least August 1, 2003 to September 1, 2008, CACIB transferred at least $312,000,000 in transactions on behalf of Iranian entities and other sanctioned persons in violation of U.S. sanctions.

1542.   Specifically, CACIB and its subsidiaries and predecessors (1) sent USD payment transactions through the United States on behalf of Iran and Iranian entities without reference to

the payment requestor's origin, (2) eliminated payment data from USD transactions that would have revealed the involvement of Iran or Iranian entities, and (3) used alternative USD payment methods to mask the involvement of Iran and Iranian entities.

1543.  CACIB engaged in billions of dollars of transactions involving Iran while it was the bank's policy to not disclose the Iranian connection of these transactions to authorities in the United States, as detailed further below. Internal procedures at CACIB, found by the DFS investigation, stated that CACIB had been "dealing with these [Iranian] counterparts for over 14 years" and, like "all our competitors in this market," were stripping wire information from USD transactions sent through the United States "in order to prevent funds being seized by the US authorities." CACIB policy during this time instructed those within CACIB to send payment messages to the United States "**WITH NO MENTION OF IRAN**." An internal CACIB memorandum cautioned staff in 2005 that "no mention of Iran is made" in the payment messages transiting through the United States and that "we have been routing USD payments in the manner specified below in order to prevent funds being seized by the U.S. authorities."

1544.  At least by 2002, CLS, a predecessor to CACIB, was routing payment messages through a bank branch in New York that omitted references to Iranian parties and instead referred the ordering party as "one of our customers." In 2004, a CLS senior back office manages disseminated a policy that required the ordering party be reflected on payment messages, except when a risk of embargo was possible, in which case the bank stripped the client information from the messages and often replaced it with ambiguous phrases such as "one of our clients" or "our good customer." Other CACIB entities employed the same tactic during the same timeframe.

1545.  Specifically, the bank instructed employees to "send a separate MT 202 (bank to bank transfer) to our NY correspondent instructing the transfer of USD xxx to the NY

correspondent of the receiver of the MT 103. No mention on this message of payment to any Iranian counterpart or beneficiary. This, the message containing the 'Iranian details,' is not sent to the U.S." Thus, CACIB would generally process outgoing USD payments on behalf of its Iranian clients by generating an MT 103 payment message destined for the non-U.S. beneficiary with complete information related to the transaction's parties as well as an MT 202 cover payment destined for the intermediary U.S. financial institution that did not include the names of any Iranian entities. CACIB knew, or was deliberately and/or recklessly indifferent to these facts.[327]

1546. The various bank departments were aware of "this special treatment." As the DFS found, "it was the policy of the Bank, as directed by its compliance professionals, to intentionally omit Sudanese, Iranian, Burmese or Cuban information from U.S. dollar denominated payment messages." The bank engaged in this conduct even though it knew it was illegal, as explained by a 2005 internal memorandum: "Iran is subject to an embargo from OFAC [] of the U.S. Treasury Department. This embargo is applicable directly to all 'US persons' and indirectly to all transactions denominated in USD even when performed out of the United States."[328]

1547. Through this conduct, CACIB and its subsidiaries and predecessors (1) prevented detection by United States and New York regulators and law enforcement, (2) prevented United States and New York financial institutions from filing reports required by the United States government and State of New York, (3) caused false information to be recorded in the records of United States and New York financial institutions, (4) caused United States and New York financial institutions to not make records that should have been made as required by United States and New York law, and (5) caused false entries to be made in the business records of

[327] Exhibit 3, Declaration of Robert Mazur at 30.
[328] *Id.*

financial institutions located in the United States and the State of New York.

1548. Based on this conduct, CACIB was charged by the DOJ with violating the Trading with the Enemies Act (18 U.S.C. § 371) by conspiring to commit violations of regulations prohibiting the export of services to Iran and Iranian entities from the United States.

1549. CACIB, through Crédit Agricole (Suisse) SA ("CAS") and its predecessor entities, intentionally used non-transparent methods for payment messages, as described above, to conceal the involvement of sanctioned entities and SDNs in USD transactions processed in the United States. CACIB, through CAS and its predecessor entities, engaged in those acts with the specific intent to evade U.S. sanctions. The Conspiracy was successful, in part, because the massive number of lawful USD payments that CACIB processed made it easier for the unlawful payments to go unnoticed.

1550. CACIB was also charged by the State of New York with violations of New York State Penal law 175.05, 3 N.R.C.R.R. § 3.1 for falsifying business records, and failing to maintain accurate books, accounts and records as required by New York Banking Law§ 200-c.

1551. CACIB also entered into a settlement agreement with the United States Department of the Treasury, relying on the same factual predicate of consistent and widespread abuse of the United States financial system on behalf of Iranian entities that served as the basis for the DOJ and the DFS actions taken. While CACIB, and its predecessors, engaged in billions of dollars of transactions with Iranian entities over many years, OFAC specifically identified sixteen electronic funds transfers in the aggregate amount of $397,453 from October 2003 to December 2006 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204.

1552.  CACIB entered into a DPA with the DOJ and OFAC in 2015, agreeing to hundreds of millions of dollars in fines for violating U.S. sanctions, including sanctions on Iran.[329]

1553.  In resolution of these charges, CACIB admitted to certain facts which are examples of the extent to which CACIB and its subsidiaries, predecessors, and affiliates conducted illegal transactions utilizing the United States financial system.

1554.  For example, from at least in or around August 2003 up through and including September 2008, CACIB, through its subsidiary in Switzerland, CAS, and its predecessor entities, Crédit Agricole Indosuez (Suisse) SA ("CAIS") and CLS, violated U.S. laws by sending prohibited payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions. In an effort to evade detection by U.S. bank personnel as well as U.S. authorities, CAS and its predecessor entities knowingly, intentionally, and willfully concealed the sanctioned entities' involvement with these transactions. Consequently, U.S. financial institutions processed transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by OFAC relating to transactions involving sanctioned countries and parties.

1555.  The conduct of CAS and its predecessor entities included, among other things, (i) sending payments on behalf of sanctioned customers without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned countries with the specific intent to evade U.S. sanctions; and (iii) using alternative payment methods to mask the involvement of sanctioned entities, including the use of two payment messages, for

---

[329] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by CACIB and DOJ on or about October 20, 2015; 2) the Consent Order entered by NYDFS on or about October 15, 2015; and 3) the Settlement Agreement entered into by CACIB and the United States Treasury Dept. on or about October, 19, 2015, as if fully set forth herein.

payments involving sanctioned financial institutions that were sent to the United States.

1556.  By providing banking services on behalf of sanctioned entities, CAS and its predecessor entities: (i) prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions; (ii) prevented U.S. financial institutions from filing required reports with the U.S. government; (iii) caused false information to be recorded in the records of U.S. financial institutions; (iv) caused U.S. financial institutions not to make records they otherwise would have been required by U.S. law to make; and (v) caused false entries to be made in the business records of financial institutions located in the United States. These payment methods deceived U.S. financial institutions and created the false appearance the transactions had no connection to sanctioned entities.

1557.  During times relevant to the claims alleged herein, CACIB typically executed and processed international U.S. dollar denominated wire payments on behalf of clients in two ways. The first method, known as a "serial payment," was to send a single message, commonly referred to as an MT 103, to each financial institution in the transmission chain, identifying the originator and beneficiary of the USD denominated payment. The second method, known as a "cover payment" involved sending two SWIFT messages in connection with a single payment. In the cover payment method, one message—typically an MT 103—identifying the originating customer and beneficiary of the payment, was sent directly from the customer's bank (i.e., Foreign Bank A) to the ultimate beneficiary's bank (i.e., Foreign Bank B) while a second message—typically an MT 202—identifying only the originating bank (but not the customer or the beneficiary) accompanied the funds as they transferred through the United States. During times relevant to the claims alleged herein, cover payment messages typically did not require the sending bank to identify the party originating a payment or its ultimate beneficiary, whereas

serial payment messages did.

1558. Financial institutions in the United States that process U.S. dollar transactions from overseas, including CACIB's branch in New York ("CACIB NY"), are expected to screen financial transactions, including international wire payments effected through the use of SWIFT messages, to ensure such transactions do not violate U.S. sanctions. Because of the vast volume of wire payments processed by financial institutions in the United States, most institutions employ sophisticated computer software, commonly referred to as filters, to automatically screen all wire payment messages against a list of sanctioned entities. When the filters detect a possible match to a sanctioned entity, the payment is stopped and held for further manual review. When a financial institution detects a transaction that violates sanctions, the institution must "reject" the payment—that is, refuse to process or execute the payment and notify OFAC of the attempted transaction. If a party to the payment is an SDN, then the payment must be frozen or "blocked" and the bank must notify OFAC. The sending bank must then demonstrate to OFAC the payment does not violate sanctions before the funds can be released and the payment processed.

1559. During times relevant to the claims alleged herein CACIB NY utilized an automated OFAC filter that screened all incoming MT 103 and MT 202 payment messages, including all USD denominated payment messages sent by CAS and other CACIB branches, to identify both SDNs and companies owned or controlled by SDNs, or persons located in targeted countries. CLS, CAIS, and CAS, for the duration of the times relevant to the claims alleged herein, failed to conduct comprehensive filtering akin to the type of filtering conducted by CACIB NY. After September 11, 2001, in accordance with Swiss regulations, CLS and CAIS added terrorists designated by OFAC—a subset of the SDN List—to their filters. However, CAS did not actually filter against the complete SDN List until after September 2005. And it was not

until 2008 that CAS began filtering transactions to identify, in a comprehensive fashion, entities involved in transactions that were owned by, controlled by, or located in targeted countries, including Iran.

1560. The practice of omitting or removing sanctions-identifying information in outbound USD payment messages was spread to multiple business lines throughout the bank and was noted in a February 2, 2004 notice written by a CAIS Back Office Analyst:

> Various payments of ours were stopped by the U.S. banks, because within the text body of our instructions (MTI 03 or 202), certain words such as Iraq, Iran, etc. were used, words which appear on the U.S. Banks [sic] automatic block list. Consequently, be vigilant and do not put too much detailed information in your payments, thus avoiding costly back values.

1561. CAIS (and subsequently CAS) continued to receive numerous indications that its interpretation of U.S. sanctions laws was incorrect. For example, CACIB's New York branch blocked or rejected a number of transactions originated by CAS for processing and provided CAS with additional information regarding U.S. sanctions, informed the Head Office of such issues and suggested additional sanctions-related training. Later, on December 1, 2005, a Compliance employee from CACIB's Head Office in Paris distributed a memorandum describing the group's policy with regard to Iran. The memorandum included statements suggesting that CAS's understanding of U.S. sanctions was incorrect, including: "Iran is subject to an embargo from OFAC [] of the U.S. Treasury Department. This embargo is applicable directly to all 'US persons' and indirectly to all transactions denominated in USD even when performed out of the United States." Despite receiving these warnings, CAS did not seek clarification from either its Head Office or its New York branch regarding the applicability of OFAC sanctions to CAS.

1562. With full understanding of the improper nature of its conduct, in September 2005, CACIB London drafted a memorandum entitled Special Treatment of Iranian Related

Payments/Operational Risk that directed that "no mention of Iran" should be "made on [the MT 202 cover payment]" to the U.S. correspondent banks. The memo noted the knowledge of "the various departments involved in this process i.e. front, middle and the back-office … of this special treatment as procedures have been implemented to cover this aspect of operational risk." A separate cover memo to the memo stated that this matter had been vetted "through Compliance and Legal to ensure that all aspects are covered. . .. The method for [USD] payments is as follows: no mention of Iran is made on this instruction."

1563.  In particular, the memo stated the bank had been "routing USD payments" in a manner that "prevent[ed] funds being seized by the U.S. authorities." Not surprisingly, personnel within the CACIB network viewed this policy as CACIB memorializing a procedure for circumventing U.S. sanctions. For example, in a February 2006 email to a senior compliance officer at CAS, a senior manager within the Monitoring and Investigations Unit ("MOIN") noted "[a]lthough a note has been drawn up by the Group in particular for transactions in USD with Iran as the destination (commercial transactions/oil), the question finally arises of the implementation of a payments system allowing the US embargo rules **to be got around**." (Emphasis added).

1564.  Furthermore, on March 21, 2007, a Head Office Financial Security employee wrote in an email to another employee, "…on the express condition the goods are never of Iranian origin or manufacture-this does not fall within the scope of the note. However, it is evident that in the event of flows and therefore of SWIFT's references to IRAN in the free fields must be avoided, so as not to have to provide lengthy justification to the Yankee authorities." On March 22, 2007, the same employee approved an otherwise permissible U-turn transaction regarding goods of Iranian origin owned by a Turkish company if there was "No reference to the

country of origin in the SWIFT 10X or 20X messages."

1565. Compliance staff in the Geneva branch actually developed a presentation detailing how to conceal USD transactions for Iran and Iranian entities: "Transfer instructions (MT 202) sent to Bank A's U.S. correspondent **WITH NO MENTION OF IRAN**. . . no reference to Iran is made regarding this transaction." (Emphasis in bold added).

1566. Similar instructions were circulated in the head office in Paris: "[w]e send a separate MT 202 (bank to bank transfer) to our NY correspondent instructing the transfer of USD xxx to the NY correspondent of the receiver of the MT 103. No mention is made on this message of payment to an Iranian counterpart or beneficiary. Thus, the message containing the "Iranian details" is not sent to the US."

1567. Similarly, in October 2005, an employee at CACIB Dubai—in response to press reports of RBS's U.S. sanctions violations—referenced the use of cover payments for Iranian payments, specifically noting the MT 202 message was to be sent "without mentioning the name of the Iranian Bank, or any related reference to the concerned transaction," and questioned whether CACIB's practices were lawful. This email was ultimately forwarded to compliance personnel at CACIB NY, who promptly raised the issue with CACIB's compliance department in Paris. In the course of raising concerns, a compliance officer at CACIB NY explained the email raised concerns that "stripping" was occurring within the Bank's network.

1568. On January 31, 2006, another CACIB NY compliance officer questioned the lack of transparency with cover payments, asking a senior manager responsible for compliance at CACIB Paris whether CACIB policy prohibited bank personnel from noting in MT 202s whether the bank-to-bank payment was related to an underlying customer payment (i.e., an MT 103). The senior manager from CACIB Paris responded, stating that Paris reviewed and approved Iranian-

related USD payments and that bank personnel were not precluded from noting that an MT 202 was related to an MT 103. But the senior manager failed to disclose that, for Iranian payments, CACIB Paris had a policy that precluded CACIB from mentioning Iran in messages sent through the United States related to U-turn payments. Accordingly, while CACIB NY Compliance personnel had the broadest knowledge of U.S. sanctions of any personnel within the CASA network, CACIB's, CLS's, CAIS's, and CAS's policies, procedures and/or practices for processing international payments involving sanctioned countries or entities removed CACIB NY compliance personnel, their filter, and their expertise from the review process.

1569.  In 2003, CAIS's Compliance department was divided into two groups: (1) Legal and Compliance, and (2) the MOIN. Both were under the supervision of the Office of the General Secretary. Prior to 2004, Legal and Compliance had responsibility for U.S. sanctions compliance, meaning the business lines and operational units turned to, and relied upon, Legal and Compliance for guidance. In 2004, this responsibility was shifted from Legal and Compliance to MOIN.

1570.  Throughout the time period relevant to the claims alleged herein, certain CAIS and CAS personnel, including personnel within Legal and Compliance and MOIN, knew that U.S. sanctions laws applied to transactions that CAIS and CAS sent through the United States.

1571.  CAS developed policies and procedures to use cover payments (i.e., MT 202 messages) which did not reference any sanctioned entity's involvement in transactions, fully recognizing that this payment method would conceal the fact these transactions concerned sanctioned parties. CAS did not share its policies and procedures for processing international payments with CACIB NY, and CACIB NY lacked access to CAS's systems that contained these policies and procedures.

1572. As early as 2001, an attorney who was part of CAIS's management team sent an email to a CACIB employee based in Paris, which stated that "to the extent the process used by our establishment via our U.S. correspondent bank ([U.S. Bank 1]), and whereby our establishment erroneously misleads the latter as to the real beneficiary for the transfers…and by the designation of an institutional beneficiary instead and in place of the actual one…whose identity [the U.S. correspondent] is unaware, we could expose ourselves to various sanctions in the USA. To our knowledge, the majority of the Group entities operate in the same manner."

1573. In 2004, when responsibilities for U.S. sanctions compliance were shifted to MOIN, the group required all transactions concerning countries subject to U.S. sanctions, and sanctions imposed by other jurisdictions, to be forwarded to MOIN for review and authorization.

1574. As early as June 10, 2004—shortly after this shift—a senior manager within MOIN, after noting in an email that "the reach of the American sanctions is . . . limited" and only applied to the "American territory," acknowledged that a payment involving a sanctioned entity that transited through the United States could potentially be blocked if the U.S. clearer learned of the existence of the sanctioned entity.

1575. Beginning in April 2005, a senior manager within MOIN commonly acknowledged in emails that U.S. sanctions applied to transactions that were sent through the United States: "OFAC (United States) has taken economic sanctions against Sudan and Iran for transactions which occur on U.S. territory and/or which are made out in Dollars and/or for which U.S. companies and individuals appear . . . and for which individual approval must be obtained from the U.S. authorities." This language demonstrates that certain CAS employees knew that U.S. sanctions applied to transactions that transited through the United States.

1576. In and around 2006, MOIN's own compliance materials acknowledged the "extra-

territorial reach" of U.S. sanctions laws and that these laws cover "all investments and transactions in the United States or that involve a U.S. person anywhere in the world."

1577. On or about February 2, 2006, the Office of the General Secretary drafted a memorandum that stated, "The simple fact of using a clearing bank in the United States requires complying with [anti-money laundering and OFAC] rules."

1578. Despite this knowledge, MOIN authorized many of the USD transactions forwarded to them, even though they violated U.S. sanctions, often precisely because the payment messages that were going to be sent to the United States would not reference a sanctioned entity's involvement in a transaction. The clear intent of ensuring that payment messages sent to the United States did not reflect information about sanctioned entities is reflected in a series of communications regarding two transactions that were rejected on or about March 29, 2006. After CACIB NY notified a senior manager within the Office of the General Secretary of the rejected payments, the senior manager raised these rejected payments with a senior manager within MOIN and another member of MOIN. Rather than asking how payments that violated sanctions were sent to the United States, the senior manager within the Office of the General Secretary questioned why MT 103s were sent in connection with the payments and why CAS's systems that were processing payments involving sanctioned entities used this message type (a message type that would clearly reveal the involvement of sanctioned entities). When the senior manager within MOIN reported the back office sent MT 202 messages to CACIB NY containing the ordering party's name and that CACIB NY learned of the Sudanese connection to the transactions through its own due diligence, CAS personnel complained about the heightened due diligence from their U.S. counterparts. No one within CAS took any steps, at that time, to stop all USD MT 202 payments involving sanctioned entities that cleared through the United

States.

1579.    Instead, MOIN authorized a number of other transactions involving sanctioned entities to transit through the United States while emphasizing payment messages that would be sent through the United States did not reference Sudan. For example, in March 2006, in an email copying a senior manager within the Office of the General Secretary, MOIN authorized a LC for a Sudanese SDN bank, one of which was not on the SDN List, but was considered an SDN by operation of law. Specifically, the email stated that "at no moment shall information related to the transactions as such (End Beneficiary/Counterparty/End Bank) be transmitted/indicated within the aforementioned messages in accordance with what is acceptable under U.S. regulations." MOIN authorized the transaction despite the fact less than a year earlier CACIB NY rejected a nearly half-million dollar payment involving this Sudanese bank.

1580.    CAS also employed the practice of replacing client information on payment messages with ambiguous phrases such as, "one of our clients" and "our good customer." The practice continued despite the fact CACIB NY had entered into a Commitment Letter in September 2005 with the Federal Reserve Bank of New York and the DFS (then the New York State Banking Department) in which it committed to enhance its AML and Bank Secrecy Act functions.

1581.    In December 2006, the Head Office decided to diversify USD clearing banks and CAS started using a non-affiliated bank based in the United States as its exclusive clearer. After establishing a relationship with a new clearing bank, MOIN persisted in approving transactions involving sanctioned entities, so long as messages that were sent to the United States did not reveal the involvement of the sanctioned entities.

1582.    In total, from approximately August 2003 through approximately September

2008, CLS and CAIS, and later CAS, processed at least $312 million in payments in violation of U.S. sanctions laws.

1583.    CLS maintained a policy dating back to 2002 to utilize cover payments for outgoing USD Iranian-related transactions. In June 2002, CLS New York sent an inquiry to CLS Paris in relation to an outgoing transaction the latter had originated that referenced the ordering party as "one of our customers." CLS Paris's Head Office Financial Security subsequently identified the originator as an Iranian party and sought legal guidance from external counsel. The bank noted that its external counsel drafted a legal memorandum in October 2002 regarding U.S. sanctions laws, including the U-turn rule. Thereafter, Credit Lyonnais' Financial Security department determined that cover payments were part-and-parcel of the U-turn rule and Credit Lyonnais used cover payments to process U-turns involving Iranian corporate entities. This informal policy was maintained by CACIB Financial Security after the merger, as the unit was largely comprised of the former compliance personnel from CLS Paris. As a result, throughout the review period, CACIB would generally process outgoing USD payments on behalf of its Iranian clients by generating a SWIFT MT 103 payment message destined for the non-U.S. beneficiary financial institution with complete information related to the transaction's parties, and a SWIFT MT 202 cover payment destined for the intermediary U.S. financial institution that did not include the names of any Iranian banks and/or persons.

1584.    Prior to the merger between CLS and Crédit Agricole Indosuez, Crédit Agricole Indosuez Paris's branch processed Iranian-related capital market transactions (i.e., treasury and foreign exchange transactions) with direct SWIFT MT 202s with the account number of the Iranian bank listed in Field 72. The Paris system would send a SWIFT MT 210 (Notice to Receive) message to the U.S. clearing bank which included the SWIFT BIC of the Iranian bank.

Following the merger, the bank's Capital Markets unit requested guidance from Head Office Financial Security regarding these types of transactions. In response, the Head Office Financial Security instructed the Capital Markets unit to begin processing its transactions by using cover payments in the same manner described above (i.e., using an outgoing SWIFT MT 103 and SWIFT MT 202). Although the Capital Markets unit questioned these instructions, the Financial Security department confirmed its instruction, indicating the use of cover payments for Iranian transactions was supported by the October 2002 legal memo received by external counsel.

1585.  The practice of utilizing cover payments for Iranian-related payments was not officially adopted as policy until late 2005, in or around the time at which various U.S. regulatory authorities were preparing to announce a settlement with Defendant and co-conspirator RBS in response to its violations of U.S. economic sanctions (including several related to Iran). The policy adopted by CACIB emphasized that "no mention of Iran" should be "made on the [SWIFT MT202 cover payment.]" At least sixteen Iranian-related transactions did not meet the terms of the U-turn general license and constituted apparent violations of the Iranian Transactions and Sanctions Regulations.

1586.  From October 2003 to December 2006, CACIB, including its subsidiaries and their predecessors, processed 16 electronic funds transfers in the aggregate amount of $397,453 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204.

1587.  The conduct of CACIB and its predecessors was not based on a mistaken assumption, but was intentional.

1588.  As a result of this knowing exploitation of the United States financial system for

its own benefit and the benefit of its Iranian customers, CACIB entered into a DPA with the DOJ to be overseen by the United States District Court for the District of Columbia.

1589. This DPA resulted in the forfeiture of $312 million dollars to the United States government by CACIB, a portion of which was directly attributable to the illegal USD transactions on behalf of Iran.

1590. In this DPA, CACIB and its subsidiaries subjected itself to the continuing jurisdiction of the DOJ and the United States District Court for the District of Columbia for three years. This level of oversight, directly related to the manipulation of the United States financial system on behalf of sanctioned Iranian entities, consisted of:

a) CACIB must cooperate with the Department of Justice and any other United States law enforcement or regulatory agency in any investigation into CACIB and its subsidiaries and predecessors' involvement in the illegal laundering of funds on behalf of Iran and Iranian entities;

b) CACIB must make employees available to United States law enforcement officials for interview or testimony related to this investigation;

c) CACIB must provide United States law enforcement officials with all documents and information necessary to authenticate documents and information for purposes of admitting such document or information into evidence in a judicial proceeding; and

d) CACIB must implement a compliance and ethics program designed to prevent and detect USD payment transactions sought on behalf of sanctioned entities, including Iran and Iranian entities. The terms of this compliance agreement are broad, requiring CACIB to:

i. Apply a current and complete OFAC sanctions list against all USD transactions, including both incoming and outgoing payment messages;

ii. Specifically agree to not undertake any USD transaction for Iran or any Iranian entity;

iii. Complete Financial Economic Crime sanction training addressing United States sanction and trade control laws for all employees;

iv.        Require the use of SWIFT MT 202COV bank-to-bank payment messages that strictly adhere to the SWIFT guidelines;

v.        Implement compliance and training designed to ensure the CACIB compliance officer is timely made aware of known requests or attempts by any entity to omit its name or obscure identifying information in an attempt to evade United States sanction law;

vi.        Maintain all SWIFT payment messages and all documents and material produced by the company to the DOJ for the duration of the DPA;

vii.        Abide by all measures and actions required by OFAC as a result a settlement reached between OFAC and CACIB in October of 2015;

viii.        Abide by all measures and requirements of the settlement agreement reached between CACIB and the DFS;

ix.        Provide the Department of Justice with all reports, disclosures and information that CACIB provides to any other governmental entity as a result of any such agency's investigation into CACIB's conduct with respect to sanctioned entities and USD payment transactions;

x.        Notify the United States of any criminal, administrative or regulatory investigation commenced against it or any of its executives or personnel;

xi.        Report to the Department of Justice every 90 days during the term of the three-year period of the agreement consisting of detailed accounts of CACIB's compliance with all aspects of the agreement;

xii.        They agree that it would be subject to federal prosecution in the United States District Court for the District of Columbia should it breach the terms of the agreement, without regard to the statute of limitation;

xiii.        At the conclusion of the three-year period, the Head of Compliance must certify its compliance to the DOJ;

xiv.        Transfer the material obligations of the agreement to any purchaser of the company; and

xv.        Not make any public statement that is inconsistent with the

admissions contained in, or obligations undertaken by, entering into the agreement.

1591.   In addition to the terms of the formal DPA, CACIB voluntarily undertook the following steps as a result of the investigation to enhance and optimize its compliance program in an effort to avoid further violations of United States law and regulation:

a)   Install more sophisticated filtering software;

b)   Create more compliance-focused groups to address sanctions compliance and correspondent bank due diligence;

c)   Hiring additional compliance employees; and

d)   Adopting written compliance policies that address United States sanctions against Iran and other sanctioned entities.

1592.   CACIB and CASA also entered into a Consent Order with the DFS based on its rampant processing of illegal USD transactions on behalf of Iran and Iranian entities.[330] In this Consent Order, CACIB and CASA were required to submit to the jurisdiction of the State of New York for implementation of the following conditions of its deferred prosecution:

a)   CACIB and CASA paid a $385,000,000 penalty to the DFS, a portion of which was directly attributable to the illegal transactions processed on behalf of Iranian entities;

b)   Terminate a specific bank employee;

c)   Hire an independent consultant, at their own expense, dictated by the State of New York, for the term of one year to conduct a comprehensive review of the compliance programs, policies and procedures at the CACIB New York branch and its other branches throughout Europe that deal with USD transactions conducted through New York;

d)   CACIB and CASA are required to fully cooperate with the consultant and provide access to all personnel, documents and other items necessary in any of its locations;

e)   In response to the consultant's report at the conclusion of its investigation,

---

[330] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Order, as if fully set forth herein.

CACIB and CASA will be required to submit a Management Oversight Plan to the State of New York to address concerns raised by the consultant's report;

f)     The independent consultant would oversee the implementation of any corrective measures identified by the Management Oversight Plan; and

g)     The independent consultant will also be responsible for assessing CACIB and CASA's compliance with the Management Oversight Plan and will be required to submit progress reports to the State of New York.

1593.  In terms of its Settlement Agreement with OFAC,[331] based on the conduct set forth above, CACIB agreed:

a)     To a contingent fine in the amount of $329,593,585 in the event that amount levied against it by the Department of Justice and the DFS was less that that sum;

b)     That it had terminated, among other things, all of the illegal conduct described herein with respect to Iran and other sanctioned entities;

c)     That is would maintain policies and procedure resulting from the agreements with the Department of Justice and the State of New York that would minimize, and prohibit if possible, the risk of similar conduct in the future; and

d)     To provide the Department of the Treasury copies of all reports submitted to the United States Federal Reserve relating to its illegal conduct described herein.

## 16.     DEFENDANT COMMERZBANK AG'S AND COMMERZBANK AG NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1594.  According to its website, Commerzbank was the first German bank to have a branch in the United States, and its "[d]ecades of experience have allowed Commerzbank to gain a true insight into the North-American market, *with all its particularities and rules*. This in-depth knowledge, combined with our financial expertise, allows us to provide extensive services to both international corporations with presence in the USA, Canada or Mexico and US-based

---

[331] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement, as if fully set forth herein.

companies with activities in Europe."[332]

1595. As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015 Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others … unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others …to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder. A further goal of the conspiracy was for COMMERZBANK and others … to violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.[333]

1596. Like many of the other Defendants who entered into the Conspiracy, Commerzbank adopted a variety of methods to facilitate Iran's illegal goals.[334]

1597. In particular, Commerzbank worked with Bank Sepah, Bank Melli, Bank Saderat and Bank Refah to facilitate the goals of the Conspiracy, stripping, altering or changing tens of thousands of SWIFT-NET payment order messages.

1598. Since 2002, Commerzbank also appears to have engaged in various illegal gold transactions on behalf of the CBI, including trading orders through its New York branch while disguising the Iranian source of the trades.

---

[332] *See* https://www.commerzbank.us/portal/en/cb/us/firmenkunden/usa.html (last accessed April 13, 2019) (emphasis added).
[333] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into between Commerzbank and the DOJ on or about March 11, 2015; 2) the Consent Order entered into between Commerzbank the New York Department of Financial Services on or about March 12, 2015; and 3) the Settlement Agreement entered into between Commerzbank the United States Department of Treasury on or about March 12, 2015, as if fully set forth herein.
[334] *See* New York State Department of Financial Services, *In re Commerzbank AG, Commerzbank AG New York Branch, Consent Order Under New York Banking Law §§ 39 and 44*, http://www.dfs.ny.gov/about/ea/ea150312.pdf (last visited Oct. 15, 2017).

1599.  A March 2015 Amended Complaint filed in a *qui tam* case against Defendant Commerzbank AG stated that:

> …the gold trade has been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. It has a substantial amount of gold reserves, amounting to $112 billion in gold, which it accumulated in part by trading oil for gold. It used gold to preserve its wealth especially to withstand the devaluation of its currency and to engage in trading that would bypass U.S. sanctions.[335]

1600.  On April 17, 2003, Commerzbank finalized a policy document entitled "Routing Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order." In other words, the German-based recipients of this policy were instructed to never mention Iranian customers nor Iranian connections to any payment messages sent to the United States.

1601.  Taking advantage of the fact that Lloyds and other competitors were exiting the Iran market, Commerzbank solicited more Iranian clients.

1602.  The resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a centralized process for handling certain Iranian dollar denominated payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The task of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

1603.  This increase in volume was in part due to illicit trade-finance, foreign exchange, and Eurodollar transactions undertaken by Commerzbank on behalf of Bank Refah, Bank Sepah, Bank Melli and Bank Saderat.

---

[335] In July 2015, Commerzbank settled the *qui tam* case, 13-cv-8095 (S.D.N.Y. 2013), for approximately $866,000.

1604.  In July 2003, a Back Office employee emailed other bank employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD funds clearing business through Commerzbank. The Back Office employee closed his email by writing, "***If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!!!***" (Exclamation marks in the original).

1605.  On September 17, 2003, a Back Office employee sent an email advising a major Iranian Bank that maintained a US dollar account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.

1606.  The author of the email had tested Commerzbank's compliance systems in Frankfurt, and knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any information revealing the true Iranian involvement in the transaction.

1607.  In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type of information from their payment orders so that Commerzbank employees would not have to manually remove it.

1608.  For example, Bank Sepah's UK subsidiary (Bank Sepah International Plc) provided its Iranian customers with routing instructions for "payments to our US Dollar account from outside the United States" noting the SWIFT Code for Commerzbank's New York branch and the Bank's account number at Commerzbank followed by the instruction:

***Please ensure that no mention is made of any recognisable Iranian entity in any message sent through the United States.***

(Emphasis in the original.)

1609. On October 13, 2003, the Head of Commerzbank's Internal Audit division emailed a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

1610. On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian payments, including using MT 202 cover transactions (*i.e.*, splitting a payment into two messages and sending a MT 103 to the foreign (non-U.S.) branch of the beneficiary and an MT 202 to the clearing institution in the United States), and using serial MT 103 messages that manually replaced the name of the (Iranian) ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

1611. It appears that Commerzbank may have ceased stripping some transactions in July 2004, relying primarily on cover payments (MT 202 payment order messages) to effectuate its unlawful conduct. At the same time, Commerzbank conspired with Bank Melli to facilitate over one hundred (100) checks totaling approximately $2 million in USD funds that Commerzbank issued for illegal payments in the United States.

1612. However, as noted *supra*, Bank Sepah International Plc (Bank Sepah's UK subsidiary) provided "stripping" instructions to its clients even in 2006 directing that U.S. dollars wire transfers be sent through Commerzbank's New York branch.

1613. DOJ described "the rigor with which the Bank enforced the policy during this

period" by citing an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the Conspiracy "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings." (Emphasis in the original.)

1614.  This ongoing conduct involving both "stripping" transactions and converting otherwise transparent SWIFT-NET MT 103 messages into opaque MT 202 cover transactions resulted in tens of millions of dollars being illegally transferred on Iran's behalf.

1615.  However, parallel to its illegal conduct on behalf of Bank Sepah, Bank Saderat and Bank Melli, as noted above, Commerzbank also directly coordinated with the IRGC-controlled IRISL in laundering U.S. dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons.

1616.  Between 2002 and 2008, Commerzbank worked directly with IRISL to facilitate illicit payments through the United States.

1617.  In January 2005, Commerzbank's New York branch rejected a series of payment transactions on behalf of Lancelin Shipping Company Ltd., an IRISL-formed entity registered in Cyprus, because the payment messages contained references to IRISL Europe GmbH, a wholly-owned IRISL subsidiary registered in Hamburg and designated by the United States in 2008.

1618.  This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005.

1619.  A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…. *The number of rejected payments recently increased sharply since the word "IRISL" results in inquiries at foreign banks.* Based on inquiries from Commerzbank, New York we assume that it appears as a term on the embargo list." (Emphasis

in the original.)

1620.  In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*" (Emphasis in the original).

1621.  The presentation then explained that "payments which are sent through a ... subsidiary are unlikely to be rejected to our present knowledge."

1622.  Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated USD funds transfers through the U.S., using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL U.S. dollar transactions.

1623.  Moreover, to assist IRISL in its bookkeeping, Commerzbank would sweep those accounts daily and zero them out so that IRISL could keep track of which USD funds belonged to it – as opposed to its subsidiaries.

1624.  On April 18, 2006, Commerzbank's New York branch rejected a payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

1625.  In fact, in only four months ***following*** IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions.

1626.  These post-designation transactions, laundered by Commerzbank through the U.S. financial system, were self-evidently not for the benefit of a legitimate agency, operation or program of Iran.

1627. Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization ("DIO").

1628. The 2008 diplomatic cable further warned of the dangers of ongoing conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah…. We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

1629. Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) USD transactions in October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition, and headed to Syria from Iran.

1630. The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had in fact been under charter to IRISL for several years.

1631. The *Hansa India* carried seven containers of small arms ammunition, as well as one container containing copper discs, which constitute, as noted *supra*, a key component in EFPs used to kill and maim many of the Plaintiffs herein.

1632. Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct.

1633. For example, in June 2006, in response to a request from the new Chief Compliance Officer asking if there were any concerns they wanted her to share with the new Global Head of Compliance in Germany, a New York compliance employee responded

"[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

1634. In February 2007, Commerzbank's then Chief Executive Officer Klaus-Peter Mueller and Board Member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by The Wall Street Journal (in a January 2007 article) which he said made it appear that the Bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

1635. *The Wall Street Journal* reported on January 10, 2007 that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state owned banks. Like several other European banks, it will cease handling only dollar transactions."

1636. *The Wall Street Journal* article went on to report:

> The risks of doing business with Iran are the same in all currencies," said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks. Commerzbank says it ceased dealing with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. "Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions," the bank said in a statement. Commerzbank, in a response to an inquiry from *The Wall Street Journal* about its dealings with Iran, also said "all such [dollar clearing] transactions are currently being phased out" as of Jan. 31. It added that "any clearing conducted by our U.S. operations is in strict compliance" with U.S. government regulations.

1637. Commerzbank's assurances to *The Wall Street Journal*, like its assurances to U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

1638. As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL network of

companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

1639. The next day, on September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York.

1640. The press release was then forwarded to Commerzbank employees in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

1641. Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed close to $40 million on behalf of IRISL subsidiaries and related entities through the United States.

## 17.    DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON E.V.

1642. During this same time period that Commerzbank was providing fraudulent financial services to IRISL and other costumers with direct ties to terrorism, Commerzbank also knowingly, or with deliberate indifference to the fact, maintained an account numbered 7001688 for an established and notorious FTO Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project Lebanon e.V.").

1643. Commerzbank maintained this account despite well-publicized public German media and government reports identifying the account holder as a "charitable" fundraising organization for Hezbollah.

1644. While a customer of Commerzbank, The Orphans Project Lebanon e.V. stated in no uncertain terms on its world-wide website that the funds it raised were transferred directly to

the bank account of the Lebanese Martyrs Foundations.[336]

1645.    Hezbollah's Martyrs Foundation was established in 1982, and is a well-known "social services" organization that utilizes its $100 million dollar annual budget to subsidize and award the families of suicide bombers.

1646.    It was designated as an SDN by the U.S. Treasury on July 24, 2007.[337]

1647.    It wasn't until 2014, that Germany regulators finally shut down The Orphans Project Lebanon e.V., by which time it had also raised at least $4.5 million for the Lebanese Shahid Foundation, another well-known and integral part of Hezbollah.

1648.    The German Ministry of Interior had put The Orphans Project Lebanon e.V. under surveillance by 2009, the same year that the European Foundation for Democracy published a report that announced The Orphans Project Lebanon e.V. funneled donations to the Al Shahid Association in Lebanon and was disguised as a humanitarian organization that promotes violence and terrorism in the Middle East using donations collected in Germany and elsewhere.[338]

1649.     Despite the obvious and overwhelming public knowledge The Orphans Project Lebanon e.V was directly connected to Hezbollah, Commerzbank knowingly, or with deliberate indifference to the fact, continued to provide financial services to Waisenkinderprojekt Libanon e.V. and hence continued to transfer funds directly to FTO Hezbollah.

1650.    Because it is a financial institution operating in the United States, Commerzbank AG through its Commerzbank AG, New York Branch knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank AG and Commerzbank AG, New York Branch to FTO Hezbollah and that Hezbollah would use that

---

[336] See Matthew Leavitt, *Hezbollah: The Global Footprint of Lebanon's Party of God*, 233 (2013).
[337] *See* https://www.treasury.gov/press-center/press-releases/pages/hp503.aspx (last accessed on April 21, 2019).
[338] See https://europeandemocracy.eu/2009/07/efd-report-hezbollah-fundraising-in-germany-tax-deductible-2/ (last accessed April 21, 2019).

support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

## VI. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM

1651. Terrorist attacks, in virtually all cases, are the combined result of numerous acts of international terrorism.

1652. Acts of international terrorism, as defined by 18 U.S.C. 2331(1), range from the attacks on the ground (e.g., pulling the trigger, planting the IED, etc.) to acts further up the chain like the Iranian banks and their customers providing money, weapons, training, and supplies to designated terrorist organizations.

1653. Iranian banks (Central Bank of Iran, Bank Saderat, Bank Melli, Bank Mellat, Bank Tejarat, Bank Sepah, and the Export Development Bank of Iran), and their customers (e.g., IRGC, Quds Force, MOIS, MODAFL, Mahan Air, IRISL, Alborz Steel, National Iranian Copper, Inc., Hezbollah, and others) with the critical and necessary assistance of the Western Bank Defendants, committed acts of international terrorism by providing substantial material support in the form of money, money laundering, weapons, training, and supplies to FTOs.

### 1. SECONDARY LIABILITY PURSUANT TO JASTA

1654. JASTA created "substantive causes of action for aiding and abetting and conspiracy liability" under the ATA. 130 Stat. 852, 853.

1655. JASTA[339] provides for secondary liability for aiding and abetting and conspiracy when:

---

[339] 18 U.S.C. Sec. 2333(d), states: "In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

    a. a **person**;

    b. commits an **act of international terrorism**;

    c. that **caused injury** to a plaintiff;

    d. an **FTO planned, committed, or authorized** the act of international terrorism; and

    e. Defendant **aids and abets or conspires with the person who committed the act** of international terrorism.

1656. **Iranian Banks and Their Customers are Persons**. Under JASTA, a "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. Thus, Iranian banks and their customers, including the IRGC, Quds Force, MOIS, Mahan Air, IRISL, Alborz Steel, Diamonds Steel FZE, Khoram Sanat Producing, Co., National Iranian Copper, Inc., Hezbollah, and other Iranian entities are all "persons" under JASTA.

1657. **Iranian Banks and Their Customers Committed Acts of International Terrorism**. The acts committed by Iranian banks and their customers of providing material support in the form of money, weapons, training, and supplies to FTOs constituted acts of international terrorism because:

    a. They were acts dangerous to human life – providing money, weapons, training, and supplies to FTOs is akin to handing a child a loaded gun;

    b. Violated the criminal laws of the United States, including 18 U.S.C. §§ 2339A and 2339B because the Iranian banks and their customers provided money, weapons, training, and supplies to FTOs, knowing and intending that the money, weapons, training, and supplies were to be used in carrying out terrorist attacks;

    c. Were intended to intimidate and coerce the Iraqi civilian population, influence the policy of the Iraqi and U.S. governments by intimidation, and to affect the conduct of the Iraqi and U.S. governments by mass destruction; and

    d. Occurred primarily outside the territorial jurisdiction of the United States.

1658.	**Iranian Banks and Their Customers Caused Injury to Plaintiffs**. The Iranian

banks and their customers provided material support in the form of money, weapons, training,

and supplies to FTOs and, as alleged in the sections related to the specific terrorist attacks, such

material support was a substantial contributing factor in the chain of events that led to Plaintiffs'

injuries.

1659.	**The Acts of International Terrorism Were Committed, Planned, or**

**Authorized by an FTO**. The acts committed by the Iranian Banks and their customers of

providing material support in the form of money, weapons, training, and supplies to FTOs were

committed, planned, and/or authorized by FTOs. Receiving material support is not a passive role.

For example, FTO's play a large role in directing, planning, and authorizing where and how

funds should be allocated, where weapons and supplies should be shipped, etc.

## 2.	DEFENDANTS AIDED AND ABETTED IRANIAN BANKS AND THEIR CUSTOMERS IN PROVIDING MATERIAL SUPPORT DIRECTLY TO FTOS

1660.	Between September 11, 2001 and 2011, Iranian banks and their customers

provided over $2 billion in material support to Hezbollah:

a.	In 2007, the U.S. Department of the Treasury reported: "The Qods Force provides roughly **$100 to $200 million in funding a year to Hizballah**."[340]

b.	"Since the early 1990s, Hezbollah has operated with a guaranteed annual contribution of at least $100 million from Tehran" and by the early 2000's, "Iran doubled that investment to more than **$200 million a year**," and "[b]y 2009, Israeli intelligence estimated that, **since the summer of 2006, Iran had provided Hezbollah more than $1 billion in direct aid**."[341]

---

[340] *See* "U.S. Department of the Treasury Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," dated October 25, 2007, available at https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx (last visited on April 22, 2019).

[341] *See* "Iran's Support for Terrorism in the Middle East," Testimony of Dr. Matthew Levitt before the U.S. Senate Committee on Foreign Relations, July 25, 2012, at 7, available at https://www.foreign.senate.gov/imo/media/doc/REVISED_Matthew_Levitt_Testimony.pdf (last visited on April 22, 2019).

c. "From 2001 to 2006, **[Defendant] Bank Saderat** transferred **$50 million** from the Central Bank of Iran . . . for the **benefit of Hizbalah**."[342]

d. "Bank Melli . . . was used to send at least **$100 million to the IRGC-Qods Force** between 2002 and 2006."[343]

1661. "These payments, in U.S. Dollars, were payments made to a known foreign terrorist organization (FTO) (i.e., Hezballah) that would have had to go through the OFAC filters in New York."[344]

1662. Essentially, OFAC filters apply search terms to the financial documents associated with wire transfers. When Iranian banks and entities were allowed by Defendant Banks to take advantage of the U-Turn exception (prior to November 10, 2008), if the names of an Iranian bank or entity were found, the transaction would be stopped and scrutinized by OFAC anti-money laundering and counter-terrorism regulators. If the regulators determined the transaction to be legitimate and not related to terrorist financing, the transaction would be successfully processed. If the transaction was suspicious for terrorism financing, the funds would be seized.

1663. To ensure transactions related to terrorist financing passed through the OFAC filters without the funds being seized, the Iranian banks committed fraud, falsified financial documents, and concealed their identities, the identities of their customers, and the nature of the transactions. The U.S. Department of the Treasury reported:[345]

a. "**Iran Uses its Banks to Finance Terrorism**."

b. "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises

---

[342] *See* See "U.S. Department of the Treasury Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," dated October 25, 2007, available at https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx (last visited on April 22, 2019).

[343] *See* "U.S. Department of the Treasury Fact Sheet: Treasury Strengthens Preventive Measures Against Iran," dated November 16, 2008, available at https://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx (last visited on April 22, 2019).

[344] *See* Exhibit 1, Declaration of Thomas E. Nollner at 17.

[345] *See* "U.S. Department of the Treasury Fact Sheet: Treasury Strengthens Preventive Measures Against Iran," dated November 16, 2008, *supra* Fn. 343.

its involvement in these illicit activities through the use of a wide array of deceptive techniques."

    c.   "Hizballah also used Bank Saderat to send funds to other terrorist organizations."

    d.   "It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions."

    e.   "Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to determine the true parties to a transaction."

    f.   "Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC."

    g.   The Central Bank of Iran (CBI) . . . has not only engaged in deceptive practices itself – such as asking for its name to be removed from transactions – but has also encouraged such practices among Iran's state-owned banks."

1664.   However, the Iranian banks and their customers, like the Quds Force, could not have committed this fraud alone; Iranian banks are banned from processing transactions through New York.

1665.   "Iranian banks cannot send transfers directly to New York, and therefore would have had to engage a non-Iranian bank with a U.S. correspondent bank account to process the transfers."[346] Because of this, Iranian banks required an accomplice. Enter Defendants. The Defendant Banks held accounts in New York and were more than willing to commit fraud, falsify financial documents, and conceal the identities of the Iranian banks and their customers – as long as they made as much money as possible.

1666.   The Defendants filled this critical role of corrupt banker for the Iranian banks:

    a.   The Iranian banks would send wire transfers or payment instructions to the Defendant banks.

    b.   The Defendant banks falsified the financial documents themselves and trained the Iranian banks on how to falsify the documents ahead of time.

---

[346] *See* Exhibit 1, Declaration of Thomas E. Nollner at 17.

c.  The Defendants would then send the falsified wire transfers and payment instructions to a New York correspondent account.

d.  Because the financial documents were falsified and the names of the true parties and beneficiaries to the transactions were concealed, the transactions passed through the OFAC filters without being flagged – and were never scrutinized by OFAC's anti-money laundering and counter-terrorism regulators.

1667.  Defendants admitted their conduct, as described in the Factual Statements "violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, 'with intent to defraud... (i) make or cause a false entry in the business records of an enterprise.. .or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise.'"[347]

1668.  Thus, all Defendants admitted to committing fraud and falsifying financial documents for Iranian banks and their customers – during the exact same time period as the fraudulent transfers, totaling over $2 billion, were sent to Hezballah.

1669.  Other than Defendants, no plausible suspect exists that could have helped the Iranian entities process over $2 billion in fraudulent transactions through the OFAC filters in New York.

### 3.  DEFENDANTS WERE GENERALLY AWARE THAT BY ASSISTING THE IRANIAN BANKS AND THEIR CUSTOMERS COMMIT FRAUD THEY WERE ASSUMING A ROLE IN THE FINANCING OF TERRORISM

1670.  The world changed after September 11, 2001. Immediately after September 11, 2001, banks, such as Defendants, were legally required to assume a role in the *prevention* of terrorist financing:

---

[347] *See* Barclay's Factual Statement at 7; BNP Paribas Consent Order with New York State Department of Financial Services at 2; Commerzbank Factual Statement at 7; Credit Agricole Factual Statement at 10; Credit Suisse Factual Statement at 6; HSBC Factual Statement at 21; Royal Bank of Scotland Consent Order with New York State Department of Financial Services at 3, fn. 4; and Standard Chartered Bank Factual Statement at 7. Plaintiffs have previously, or hereby, adopt and incorporate by reference these documents pursuant to Fed. R. Civ. P. 10(c).

a. On October 31, 2001, in direct response to the September 11, 2001 terrorist attacks, the Financial Action Task Force ("FATF") set forth eight "Special Recommendations on Terrorist Financing."

    i. When it released the Special Recommendations, FATF stated on its website:

        "After the recent tragic events that took place in the United States on 11 September 2001, a number of governments are calling for a **rapid and coordinated effort to detect and prevent the misuse of the world financial system by terrorists**."[348]

    ii. FATF President, Clarie Lo, stated:

        "Today the FATF has issued **new international standards to combat terrorist financing**, which we **call on all countries in the world to adopt and implement.**"[349]

        "**Implementation of these Special Recommendations will deny terrorists and their supporters access to the international financial system**."[350]

b. On October 26, 2001, the U.S. PATRIOT Act was signed into law.

    "The act contained strong measures to prevent, detect, and prosecute terrorism and international money laundering, and establishes new rules and responsibilities affecting U.S. banking organizations, other financial institutions, and non- financial commercial businesses. Among other things, the act criminalized the financing of terrorism and augmented the existing BSA framework, allows the application of special measures on jurisdictions, institutions, or transactions that are of primary money-laundering concern, requires financial institutions to increase their due diligence standards when dealing with foreign private banking and correspondent accounts, establishes minimum standards for customer identification at account opening, and requires checks against government-provided lists of known or suspected terrorists."[351]

1671. Not only were the Defendant Banks under an obligation to scrutinize their customers to prevent terrorist financing, but they were also required to classify their clients based

---

[348] *See* FATF Homepage, October 31, 2001, available at https://web.archive.org/web/20011201011531/http://www.fatf-gafi.org/ (last visited April 20, 2019).
[349] *See* "FATF Cracks Down on Terrorist Financing," October 31, 2001, available at https://web.archive.org/web/20040719043946/http://www.fatf-gafi.org/pdf/PR-20011031_en.pdf (last visited April 20, 2019).
[350] *Id*.
[351] *See* Exhibit 1, Declaration of Thomas E. Nollner at 7-8.

upon degree of risk. High risk customers required significant scrutiny to ensure the bank was not aiding in the financing of terrorism.

1672. "Iranian related entities, customers, and transactions were **high risk** based on the institution's offering and providing **high-risk products and services**, based on the fact that products and services included **high-risk entities**, and based on the fact that the locations where the transactions occurred involved **high-risk geographies**."[352]

1673. "International high-risk geographic locations generally include: Countries subject to OFAC sanctions, including state sponsors of terrorism."[353]

    a. "As a normal part of carrying out their work, financial institutions **should be aware** of elements of individual transactions that could indicate **funds involved in terrorist financing**."[354]

        i. "The following list of potentially suspicious or unusual activities is meant to show types of transactions that could be a cause for additional scrutiny":

        "When opening an account, the **customer refuses to provide information required by the financial institution**, attempts to reduce the level of information provided to the minimum or provides **information that is misleading or difficult to verify**." Annex 1, A(3).

        "Wire transfers to or for an individual where **information on the originator**, or the person on whose behalf the transaction is conducted, **is not provided** with the wire transfer, when the inclusion of such information would be expected." Annex 1, C(2)

        "Sending or receiving funds by international transfers from and/or to **locations of specific concern**." Annex 1, E(7).

1674. On March 27, 2002, FATF stated: "[C]ertain aspects related to the transaction could **make it suspicious** (origin in a **country known to provide safe haven to terrorists** or

---

[352] *See Id*. at 17.

[353] S*ee* Bank Secrecy Act/Anti-Money Laundering Examination Manual, July 28, 2006, p. 21, available at https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf (last visited April 20, 2019).

[354] See "FATF Guidance for Financial Institutions in Detecting Terrorist Financing, p. 7, April 24, 2002, available at https://web.archive.org/web/20030405184511/http://www.fatf-gafi.org/pdf/GuidFITF01_en.pdf (last visited April 22, 2019).

terrorist organizations, for example) and thus warrant eventual reporting to the competent authority."

1675. Thus, requests to commit fraud, falsify documents, and conceal information by high-risk entities, owned and/or controlled by a State Sponsor of Terrorism, located in a high-risk geographic location were additional, and very serious, red flags that the transactions were related to the financing of terrorism.

1676. The Iranian risk for terrorism financing was heightened further because Bank Melli refused to reveal the identities of its customers to Defendants.

    a. On May 22, 2001, "I met Melli yesterday and enquired re names of the principal beneficiaries of their payments . . . as expected, Melli could not assist."[355]

1677. This should have been an immediate red flag for HSBC to address *immediately*. Moreover, it is entirely plausible that Defendants should have known that by Bank Melli—the largest of all Iranian banks—refusing to reveal the identities of its customers, it was also plausible that such customers were designated terrorist groups. It is implausible to say the Defendant Banks were not aware of the likelihood that Bank Melli—the largest Iranian bank in the world and entirely owned by Iran—was not funding terrorism. Indeed, some HSBC employees strongly objected.

1678. After September 11, 2001, the Defendant Banks recognized they were legally required to play a role in preventing terrorism financing. The HSBC emails exemplify and plausibly provide a reasonable basis to infer what the awareness of other Defendant Banks would have been.

1679. For example, high-level HSBC employees knew about and talked about HSBC's obligations under the FATF Special Recommendations on Terrorist Financing:

---

[355] *See* Exhibit 14 to this Amended Complaint, HSBC REPORT at 756

a. October 10, 2001, Matthew King, a member of HSBC Group's Audit Department, wrote: **"[T]hings have changed since September 11"** and because of concern that HSBC might "**process a payment which turns out to be connected to terrorism,**" stated, "the routes traditionally used to avoid the impact of US OFAC sanctions may **no longer be acceptable.**"[356]

b. On October 8, 2002, Gary Boon, one of HSBC-Middle East's account relationship managers for Iran, stated "**HBEU have [sic] to comply with the FATF regulations soon, which means full disclosure** for all MT100/Mt103 payments from all banks."[357]

**c.** On November 14, 2002, HSBC-London's Multicurrency Payments Department Head, Malcolm Eastwood**,** stated, "**under FATF principles we should not be amending these payments instructions."**

1680. Defendants were clearly aware of the FATF Special Recommendations on Terrorist Financing, but they decided to use the new counter-terrorism regulations (which adopted the FATF recommendations) as a **business opportunity**.

1681. Instead of fulfilling their legal role in the prevention of terrorism financing, Defendants decided it would be more profitable to aid the Iranian banks and their customers (entities objectively classified as at high risk for financing terrorism) to avoid the additional scrutiny by OFAC and counter-terrorism regulators required by the new anti-terrorism financing laws :

> "[T]here is **substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...**The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. **The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC.**[358]

1682. In putting this business plan in place, one HSBC employee stated: "A further wrinkle is FATF Special Recommendation 7, which calls for accurate and meaningful originator

---

[356] *See Id.* at 769.
[357] *See Id.* at 774.
[358] *See Id.* at 780.

information."[359]

1683.   Indeed, Special Recommendation on Terrorist Financing 7 is titled "Wire Transfers," and states:

> [E]nsure that financial institutions . . . **include accurate and meaningful originator information** (name, address and account number) on funds transfers and . . . conduct **enhanced scrutiny** of and monitor for suspicious activity funds transfers which **do not contain complete originator information** (name, address and account number).[360]

1684.   Special Recommendation on Terrorist Financing 7 was "developed with the objective of **preventing terrorists and other criminals from having unfettered access to wire transfers** for moving their funds and for detecting such misuse when it occurs."[361]

1685.   By committing fraud for Iranian banks and their customers and deliberately "repairing" the wire transfers to delete or conceal "accurate and meaningful originator information" on the wire transfers, the Defendants were not merely evading economic sanctions and preventing U.S. law enforcement from interdicting money transfers to FTOs and other terrorists, but rather the Defendants were knowingly giving "terrorists . . . unfettered access to wire transfers." This awareness is exemplified by an HSBC email, dated July 4, 2007:

> [T]he whole concept of filtering of payments . . . **was to ensure that we as a Bank are not conducting business with known terrorists** . . . . It is therefore critical that we know who the transaction is ultimately between and this is not masked by funds passing between a multitude of intermediary banks and third parties."[362]

1686.   Despite knowing that the entire concept of the OFAC filters was to ensure that the Defendants were not doing business with known terrorists, Defendants were doing the exact opposite by agreeing to falsify financial documents. Even worse, Defendants provided the

---

[359] *See Id*. at 801.

[360] *See supra* Fn. 349, "FATF Cracks Down on Terrorist Financing," October 31, 2001.

[361] *See* FATF Special Recommendation VII: Wire transfers, "Text of the Special Recommendation and Interpretive Note" available at https://www.un.org/sc/ctc/wp-content/uploads/2016/03/9special-rec7.pdf (last visited April 20, 2019).

[362] *See* Exhibit 14, HSBC REPORT at 1838.

Iranian banks with expert advice about how to successfully commit fraud and 'insider knowledge' about the standard language HSBC used when communicating with other banks.

    a.   June 28, 2001, Email titled "Re: Bank Melli" to HSBC-US, John Wilkinson stated:

> "[W]e have instructed Bank Melli to alter the format of it's [sic] payments to achieve straight through processing. **The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations.**"[363]

1687.   "Straight through processing" is code for falsifying the records so the transfer is not stopped by the OFAC filter and scrutinized by counter-terrorism regulators.

1688.   Providing the Iranian banks with this expert advice truly gave the Iranian banks and their customers unfettered access to wire transfers:

> **HBUS will not be able to confirm whether or not the underlying transaction actually meets the "U-Turn" requirement**. . . . In an effort to facilitate "straight-through processing", it now appears that HBEU will train Bank Melli on formatting the payments and that **we will be relying on Bank Melli to ensure that only qualifying payments are processed through HBEU's account with HBUS.**[364]

1689.   Nevertheless, as documented in an email from November 11, 2003, HSBC provided "periodic" updates to the Iranian banks as to how to falsify the transfers so that they would pass through the OFAC filters:

> **MPD Compliance are very uncomfortable at being asked periodically (currently by Nigel Weir and Gary Boon in Middle East) whether a certain formatting methodology will pass successfully through an OFAC filter.** They feel it a relationship management responsibility to understand what the Iran payments represent, and give advice/guidance to the Iranian banks on the circumstances, if any, in which payments are acceptable."[365]

1690.   Defendants knew exactly what they were doing. They made a business decision to

---

[363] *See Id.* at 765.
[364] *See Id.* at 762.
[365] *See Id.* at 1843.

commit fraud for the state-owned banks of a State Sponsor of Terrorism, while knowing that by doing so they would be giving FTOs and other terrorists illegal and "unfettered access to wire transfers."

1691.   Only HSBC's emails have been made publicly available and they provide a basis for a reasonable inference that the other Defendants possessed the same general awareness, and Plaintiffs allege that the other Defendants had at least as much general awareness as HSBC that by committing fraud for the Iranian banks and customers, that the Defendants were assuming a role in the financing activities of FTOs and other terrorist organizations.

1692.   Nonetheless, Defendants knowingly entered into the Conspiracy and specifically requested the banks they were doing business with to provide specific instructions regarding how to process transactions. For example:

    a.   July 15, 2002, HSBC employee, Paul Proctor states:

> "You should refer payments falling within the above criteria back to the sending party . . . point out only that OFAC sanctions exist and ask for further instructions. On no account should you deliberately guide, encourage or coerce the sender into amending the payment details so as to circumvent the OFAC sanctions. **Any action taken must be determined by the sending party. We will simply process as instructed**."[366]

1693.   Defendants were aware that after 9/11, Iran was looking for a solution to these new counter-terrorism regulations that would afford Defendants "massive opportunities." By way of example:

    a.   October 17, 2002, Gary Boon states:

> "[B]ooked to **visit Iran in November** and ideally want our position sorted re USD payments. I'm therefore getting eager to talk to you as if we can **there are massive opportunities**. It appears **London and Iran are seeking a solution** to this so you [sic] help is much appreciated."[367]

---

[366] *See Id.* at 1842.
[367] *See Id.* at 773.

1694. However, not everyone was willing to put profits over everything else.

   a. November 14, 2002, HSBC-London's Multicurrency Payments Department Head, Malcolm Eastwood, sent a memorandum to both HSBC-US and HSBC-London, employees, and stated:

   "Whilst I am told that there are **significant business opportunities** particularly with countries such as Iran there are also **substantial Reputational and Operational Risks**, not to mention financial losses associated with it." [368]

1695. HSBC continued this practice until at least 2010 when HSBC processed at least twenty-four transactions on behalf of IRISL – after it had been designated.

1696. The Declaration of Everett Stern, attached as Exhibit 4, provides additional factual support to show HSBC's participation in the Conspiracy through 2011.

1697. In total, HSBC *got caught* committing fraud and falsifying financial documents for over 25,000 transactions, worth $19.4 million, for Iranian banks and their customers.

1698. Defendants also committed fraud and falsified documents for the illegal shipments of weapons and supplies to Iran (which Iran provided to FTOs) in direct violation of the Anti-Terrorism Controls of Section 6(j) of the Export Administration Act.

1699. The 2002, U.S. Department of Commerce Report on Foreign Policy Export Controls, Chapter 4, Anti-Terrorism Controls states:

   a. These controls respond to the continued Iranian sponsorship of terrorism. The **purpose of the controls is to restrict exports of equipment that would be useful in enhancing Iran's military or terrorist supporting capabilities** . . . .

   The controls allow the United States to prevent shipments of U.S.-origin equipment to Iran for uses that could pose a direct threat to U.S. interests. Iran continues to support groups that practice terrorism, including terrorism to disrupt the Middle East peace negotiations.

1700. Iran used large hydraulic presses to manufacture Explosively Formed Penetrators (EFPs) – which are classified as weapons of mass destruction – and then provided the EFPs to

---

[368] *See Id.* at 1528.

terrorists.

1701.   Khoram Sanat Producing Co., Diamond Steel FZE, and Alborz Steel are all Iranian front companies and the customers of Iranian banks.

1702.   On June 20, 2005, Diamonds Steel (which also had an account with Standard Charter Bank) sold $2,790,000 worth of 160 liter hydraulic pumps/electromotors for large (likely 20-ton) hydraulic presses to Khoram Sanat Producing Co., and they were shipped to Tehran, Iran by IRISL (a later designated SDGT).[369]

1703.   This shipment was illegal and the Anti-Terrorism Controls of Section 6(j) of the EAA prohibited hydraulic pumps/electrometers for large hydraulic presses from being sent to because hydraulic presses could be used to manufacture weapons of mass destruction for terrorists, such as the weapons used by Iranian sponsored FTOs who killed and wounded the Plaintiffs and hundreds of other American citizens and service men and women..

1704.   Defendant Standard Charter Bank, and likely Defendant Credit Suisse, processed this fraudulent transaction and also possessed the shipping documents for this transaction (the same documents relied on by Promontory to create its Report). These documents would have revealed these products were large hydraulic pumps/electromotors for hydraulic presses – which were prohibited from being shipped to Iran specifically because they could be used to manufacture weapons for FTOs and other Iranian sponsored terrorists.

1705.   There are at least 12 other transactions listed in the Promontory Report, totaling over $26,773,000, between Khoram Sanat Producing Co., Diamond Steel FZE, and/or Alborz Steel in the 2005-2006 timeframe for the shipment of components for hydraulic presses to Iran. Again, IRISL was used to ship the equipment to Iran.[370]

---

[369] *See* Exhibit 15 attached to this Amended Complaint, Promontory Report at 77.
[370] *See* Exhibit 15 attached to this Amended Complaint, Promontory Report at 121.

1706.  EFP slugs are made of copper, and in June 2006, Standard Charter Bank and HSBC were involved in facilitating at least one transaction that was processed fraudulently between National Iranian Copper, Inc. and Standard Metals, LTD for $203,798.[371]

1707.  These transactions reflect that during 2005-2006 Standard Charter Bank and Credit Suisse were involved in fraudulent transactions that specifically enabled equipment for manufacturing EFPs to be shipped to Tehran, Iran.

1708.  Following those shipments, there was a significant increase in terrorist attacks in Iraq involving EFPs – exactly as would be expected if Iran did, in fact, use the equipment to mass produce EFPs.

1709.  "E.F.P. attacks had nearly doubled in 2006 compared with the previous year and a half."[372] Indeed, all 19 EFP attacks involved in this case occurred in 2005 or later.

1710.  Standard Charter Bank and Credit Suisse knowingly processed fraudulent transactions involving the shipments of components for hydraulic presses to Iran in the 2005-2006 timeframe.[373]

1711.  Defendants knowingly facilitated the illegal shipments of the exact equipment that Iran needed to manufacture EFPs – at the exact time Iran significantly increased its manufacturing of EFPs.

1712.  Defendants were, at minimum, generally aware that by committing fraud and falsifying financial documents in tens of thousands of transactions over a prolonged period of time for the benefit of entities that are required to be classified as being at high risk for financing terrorism, they were participating in Iran's overarching Conspiracy and assuming a role in the

---

[371] *See Id*. at 208.
[372] *See* Jim Glanz, "U.S. Says Arms Link Iranians to Iraqi Shiites," New York Times (Feb. 12, 2007), available at https://www.nytimes.com/2007/02/12/world/middleeast/12weapons.html?pagewanted=all (last visited april 22, 2019).
[373] *See* Exhibit 15 attached to this Amended Complaint, Promontory Report at 121.

financing of terrorism. This is true and factual despite Defendants not actually committing the ultimate terrorist act that resulted in the injury or death of Plaintiffs.

1713. In short, general awareness can be inferred from the following facts:

    a. Defendants were legally required, by many different laws and regulations, to assume a role in the *prevention* of terrorist financing;

    b. Regardless of whether the Iranian banks and their customers were designated, Iranian banks and their Iranian clients were objectively in the category of being at high risk for terrorist financing and transactions involving those entities required a high degree of scrutiny;

    c. The regulators were clear, especially with regard to FATF's Special Recommendation on Terrorist Financing 7, by not requiring "accurate and meaningful" information about the originator, banks are providing terrorists with "unfettered access" to wire transfers;

    d. Defendants tried to manufacture plausible deniability, which is further evidence of fraudulent conduct;

    e. Defendants committed fraud, falsified documents, and concealed the identities of entities at high risk for financing terrorism. All of this was done in furtherance of the Conspiracy.

    f. Without the Defendant Banks' participation in the Conspiracy, Iran and its Agents and Proxies could not have funded terrorism to the extent it did. Indeed, without Defendants participation in the Conspiracy, Iran and its Agents and Proxies could not have carried out the terrorist attacks that resulted in the injury or death of Plaintiffs.

1714. Defendants knowingly and substantially assisted the Iranian banks and their customers, including FTOs like Hezbollah, in providing material support to FTOs, like Hezbollah.

## VII. THE PLAINTIFFS

1715. At issue are terrorist attacks perpetrated by the Terrorist Groups who were materially supported by Defendants, through Iran and its Agents and Proxies, and that killed or injured Plaintiffs (hereafter the "Terrorist Attacks").

1716. The injuries and deaths caused by Defendants and suffered by Plaintiffs were the

result of acts of international terrorism as defined by 18 U.S.C. § 2331(1). Each act of international terrorism was committed, planned, or authorized by organizations designated as FTOs as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Further, Defendants provided material support to, conspired with, and aided and abetted Iran and the FTOs in their commission, planning and authorizing of the Terrorist Attacks by, among other things, knowingly providing illegal and undetectable access to the U.S. financial system and USD that was used by Iran and its Agents and Proxies, including the Terrorist Groups, to commit, plan and authorize the Terrorist Attacks.

1717.   All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

1718.   Without Defendants' conduct and material support described herein, Iran and the Terrorist Groups would not have had the funding or material support necessary to carry out the Terrorist Attacks.

1719.   Plaintiffs are individuals who were injured or killed in terrorist attacks that occurred in Iraq, and who, as a result, experienced physical and mental pain and suffering and emotional distress. Some Plaintiffs are decedents, whose personal representatives and Estates, bring claims for the named-individuals who were killed in those attacks, as well as all heirs thereof. Other Plaintiffs are family members of the victims of the terrorist attacks and have experienced injuries including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

1720.   The following Plaintiffs are United States' nationals injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals.

## 1.   THE MARCH 2, 2008 ATTACK – SAFWAN, IRAQ

### A.   PLAINTIFF TIMOTHY JOSEPH O'SULLIVAN

1721.   Plaintiff Timothy Joseph O'Sullivan is a citizen of the United States and is domiciled in the State of Ohio.

1722.   On March 2, 2008, Timothy Joseph O'Sullivan, age 36, was serving as a peacekeeping serviceman in the U.S. Air Force and as Senior Advisor to British Forces stationed in Basra, Iraq.

1723.   Iranian-sponsored Terrorist Groups in Mr. O'Sullivan's area of operation ("AO") were awarding USD bounties for the killing, kidnapping, or maiming of Coalition service members. At the time, Mr. O'Sullivan held the rank of Captain, O-3. Higher bounties were placed on high-ranking officers, such as Mr. O'Sullivan.

1724.   At the time of the March 2, 2008 Terrorist Attack, Mr. O'Sullivan was performing his duties as the Senior Advisor to British Forces, and was riding in an armored Warrior Infantry Fighting Vehicle as part of a five-vehicle convoy travelling near Safwan, Iraq (south-east of Basra).

1725.   Due to the high bounties being paid by and to Iranian-supported terrorists for American casualties, Mr. O'Sullivan was traveling in a British vehicle in order to reduce the chance of an attack.

1726.   The vehicle was hit and destroyed by a massive EFP explosion, severely injuring Mr. O'Sullivan.

1727.   The weapon used to attack and injure Mr. O'Sullivan was an Iranian-

manufactured/supplied EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1728. Additionally, during Mr. O'Sullivan's time in Basra, from approximately 2007 through 2008, his unit was attacked approximately 800 – 1,100 times with Iranian Improvised Rocket Assisted Munitions ("IRAMs") rockets that were manufactured in/or provided by Iran.

1729. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attacks, which injured Mr. O'Sullivan.

1730. The Iranian-supported FTO Hezbollah, working in concert with the Shia Special Group JAM, committed, planned and authorized the attacks, as evident from operational data, including but not limited to the date and location of the attacks, the munitions used, as well as the tactics, techniques, and procedures utilized.

1731. The Iranian-funded and Hezbollah-backed Shia JAM claimed responsibility for the EFP attack that resulted in injury to Mr. O'Sullivan.

1732. As a result of the March 2, 2008 EFP attack and his exposure to multiple rocket attacks, Timothy Joseph O'Sullivan suffered injuries and is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 2. THE OCTOBER 12, 2011 ATTACK – COS GARRY OWEN

### A. PLAINTIFFS THE ALLDRIDGE FAMILY

1733. Plaintiff Brian Clark Alldridge is a citizen of the United States and is domiciled in the State of Texas.

1734. On the night of October 12, 2011, Brian Clark Alldridge, age 35, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with rockets.

1735.    Mr. Alldridge was injured in the attack.

1736.    Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Alldridge.

1737.    The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Group AAH, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1738.    The Iranian-funded and Hezbollah-backed JAM Special Group AAH claimed responsibility for the rocket attack that resulted in injury to Mr. Alldridge.[374]

1739.    On October 13, 2011, the New York Times reported that, according to American officials, the attack was committed by "[m]ilitants trained and financed by Iran's Quds Force… training by the Quds Force typically occurs in Iran, where officers offer intelligence support and pass orders to the leaders of the militias, many of whom live in Iran[.]"[375]

1740.    As a result of the October 12, 2011 Terrorist Attack and the injuries he suffered, Brian Clark Alldridge is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1741.    Plaintiff Joann Alldridge is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Brian Clark Alldridge.

1742.    Plaintiff Andrew Charles Major is a citizen of the United States and is domiciled

---

[374] The Claim of Responsibility for the October 12, 2011 attack is attached hereto as Exhibit 5.
[375] Michael Schmidt, *Militants Aided by Iran Fired at G.I's in Iraq, Officials* Say, New York Times (Oct. 13, 2011) (https://www.nytimes.com/2011/10/14/world/middleeast/militants-aided-by-iran-fired-at-american-forces-in-iraq.html); *see also* Jennifer Griffin, *After Deadly Attacks in Iraq, Iran Lays Low While U.S. Plans Withdrawal,* Fox News (Oct. 3, 2011) (https://www.foxnews.com/world/after-deadly-attacks-in-iraq-iran-lays-low-while-u-s-plans-withdrawal) (discussing attacks in Iraq against COS Garry Owen by AAH, Hezbollah and Iran).

in the State of Texas. He is the son of Joann Alldridge and the stepson of Brian Clark Alldridge.

1743.  Plaintiff Ashley Meikel Major is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Joann Alldridge and the stepdaughter of Brian Clark Alldridge.

1744.  Plaintiff A.M.M., a minor, represented by her legal guardian Joann Alldridge, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Joann Alldridge and the stepdaughter of Brian Clark Alldridge.

1745.  Plaintiff Ronald Alldridge is a citizen of the United States and is domiciled in the State of Washington. He is the father of Brian Clark Alldridge.

1746.  Plaintiff Dianna Alldridge is a citizen of the United States and is domiciled in the State of Washington. She is the mother of Brian Clark Alldridge.

1747.  Plaintiff Todd Alldridge is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Brian Clark Alldridge.

1748.  As a result of the October 12, 2011 Terrorist Attack and the injuries suffered by Brian Clark Alldridge, Plaintiffs Joann Alldridge, Andrew Charles Major, Ashley Meikel Major, A.M.M., a Minor, Ronald Alldridge, Dianna Alldridge, and Todd Alldridge, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

3.    **THE JULY 10, 2011 ATTACK – COS GARRY OWEN**

A.    **PLAINTIFFS THE NIQUETTE FAMILY**

1749.  Plaintiff Sean M. Niquette is a citizen of the United States and is domiciled in the State of New York.

1750.  On July 10, 2011, Sean M. Niquette, age 25, was serving as a peacekeeping

serviceman in the U.S. Army when he was attacked with rockets.

1751.  Mr. Niquette was injured in the attack.

1752.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Niquette.

1753.  De-classified intelligence reports related to the July 10, 2011 attack attribute the rocket to a "known EFP-maker" and member of JAM Special Group PDB with a "high degree of confidence."[376]

1754.  The Iranian-funded and Hezbollah-backed JAM Special Group AHH claimed responsibility for the rocket attack that resulted in injury to Mr. Niquette.[377]

1755.  The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups PDB and AAH, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1756.  As a result of the July 10, 2011 Terrorist Attack and the injuries he suffered, Sean M. Niquette is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1757.  Plaintiff Lauren Niquette is a citizen of the United States and is domiciled in the State of New York. She is the spouse of Sean M. Niquette.

1758.  As a result of the July 10, 2011 Terrorist Attack and the injuries suffered by Sean M. Niquette, Plaintiff Lauren Niquette is entitled to past and future noneconomic damages,

---

[376] De-classified intelligence reports related to the July 10, 2011 attack attached hereto as Exhibit 6.; *see also* video of attack posted to AAH website at: http://ahlualhaqmedia.com/video_watch_149.html, footage begins at 17:02 (warning: graphic content).
[377] The Claim of Responsibility for the July 10, 2011 attack is attached hereto as Exhibit 7.

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### B.     PLAINTIFF WILLIAM M. CHINN

1759.   Plaintiff William M. Chinn is a citizen of the United States and domiciled in the State of Texas.

1760.   On the morning of July 10, 2011, William M. Chinn, age 32, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with rockets.

1761.   Mr. Chinn was injured in the attack.

1762.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Chinn.

1763.   De-classified intelligence reports related to the July 10, 2011 attack attribute the rocket to a "known EFP-maker" and member of JAM Special Group PDB with a "high degree of confidence."[378]

1764.   The Iranian-funded and Hezbollah-backed JAM Special Group AAH claimed responsibility for the rocket attack that resulted in injury to Mr. Chinn.[379]

1765.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups PDB and AAH, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1766.   As a result of the July 10, 2011 Terrorist Attack, and the injuries he suffered, William M. Chinn is entitled to past and future noneconomic damages, including for severe

---

[378] De-classified intelligence reports related to the July 10, 2011 attack attached hereto as Exhibit 6.; *see also* video of attack posted to AAH website at: http://ahlualhaqmedia.com/video_watch_149.html, footage begins at 17:02 (warning: graphic content).
[379] The Claim of Responsibility for the July 10, 2011 attack is attached hereto as Exhibit 7.

physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 4. THE JUNE 6, 2011 ATTACK – JSS LOYALTY

### A. PLAINTIFF WALTER LEMAN THOMAS

1767. Plaintiff Walter Leman Thomas is a citizen of the United States and is domiciled in the State of Florida.

1768. On June 6, 2011, Walter Leman Thomas, age 22, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with IRAMs.

1769. Mr. Thomas was injured in the attack.

1770. The weapons used to attack and injure Walter Leman Thomas were Iranian-manufactured/supplied IRAMs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1771. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thomas.

1772. The Iranian-supported and Hezbollah-backed Special Group FTO KH committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1773. FTO KH claimed responsibility for the IRAM attack that resulted in injury to Mr. Thomas.[380]

---

[380] The Claim of Responsibility for the June 6, 2011 attack is attached hereto as Exhibit 8.; *See also* Chelsea Carter, *U.S. Military blames Shiite Militia in Iraq for Killing of 5 Soldiers*, CNN (June 12, 2011) located at https://web.archive.org/web/20110617040243/http:/edition.cnn.com/2011/world/meast/06/12/iraq.us.troops/index.ht ml, *see also* the video of attack posted by KH to the world-wide web but has since been removed, however, an archived version is available at:
https://archive.org/details/HezbollahBrigadestheIramflyingIedsattackThatHaveKilled5American (last accessed April 18, 2019).

1774.  As a result of the June 6, 2011 Terrorist Attack, and the injuries he suffered, Walter Leman Thomas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 5.   THE FEBRUARY 16, 2011 ATTACK—ROUTE TOMATOES, NISSAN

#### A.   PLAINTIFF WALTER LEMAN THOMAS

1775.  Plaintiff Walter Leman Thomas is a citizen of the United States and is domiciled in the State of Florida.[381]

1776.  On February 16, 2011, Walter Leman Thomas, age 22, was serving as a peacekeeping serviceman in the U.S. Army when the Humvee he was in was attacked with an EFP.

1777.  Mr. Thomas was injured in the attack.

1778.  The weapon used to attack and injure Walter Leman Thomas was an Iranian-manufactured/supplied EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1779.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thomas.

1780.  The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1781.  As a result of the February 16, 2011 Terrorist Attack, and the injuries he suffered,

---

[381] Plaintiff Walter Leman Thomas was also injured in the above-mentioned June 6, 2011 attack.

Walter Leman Thomas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**6.  THE NOVEMBER 20, 2009 ATTACK – MSR TAMPA NEAR FOB KALSU**

**A.  PLAINTIFFS THE HOLLADAY FAMILY**

1782.  Plaintiff Joshua Lionel Holladay is a citizen of the United States and is domiciled in the State of Alabama.

1783.  On November 20, 2009, Joshua Lionel Holladay, age 26, was serving as a peacekeeping serviceman in the U.S. Army National Guard when a convoy he was in was attacked with an EFP.

1784.  Mr. Holladay was injured in the attack.

1785.  The weapon used to attack and injure Mr. Holladay was an Iranian-manufactured EFP provided by Iran and/or one of its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1786.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Holladay.

1787.  The Iranian-supported FTO Hezbollah, working in concert with JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1788.  As a result of the November 20, 2009 Terrorist Attack and the injuries he suffered, Joshua Lionel Holladay is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future

economic damages, including medical expenses, lost income, and loss of earning capacity.

1789. Plaintiff Shirley Atkinson is a citizen of the United States and is domiciled in the State of Alabama. She is the mother of Joshua Lionel Holladay.

1790. Plaintiff Crystal Hastings is a citizen of the United States and is domiciled in the State of Alabama. She is the sister of Joshua Lionel Holladay.

1791. As a result of the November 20, 2009 Terrorist Attack and the injuries suffered by Joshua Lionel Holladay, Plaintiffs Shirley Atkinson and Crystal Hastings are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 7. THE AUGUST 21, 2009 ATTACK – ROUTE VERNON, BAGHDAD

### A. PLAINTIFF RANDALL LAVIS KLINGENSMITH

1792. Plaintiff Randall Lavis Klingensmith is a citizen of the United States and is domiciled in the State of Georgia.

1793. On August 21, 2009, Randall Lavis Klingensmith, age 38, was serving as a peacekeeping serviceman in the U.S. Army when he was in was attacked with an EFP.

1794. Mr. Klingensmith was injured in the attack.

1795. The weapon used to attack and injure Mr. Klingensmith was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1796. De-classified intelligence reports related to the August 21, 2009 attack attribute the EFP emplacement to a JAM Special Group cell "operating out of the Jihad District of

Baghdad."[382]

1797.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Klingensmith.

1798.   The Iranian-supported FTO Hezbollah, working in concert with JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1799.   As a result of the August 21, 2009 Terrorist Attack and the injuries he suffered, Randall Lavis Klingensmith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 8.   THE NOVEMBER 22, 2008 ATTACK –EN ROUTE TO FOB KALSU

### A.   PLAINTIFFS THE OWEN FAMILY

1800.   Plaintiff Michael L. Owen is a citizen of the United States and is domiciled in the State of Arizona.

1801.   On November 22, 2008, Michael L. Owen, age 24, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with a multiple-array EFP.

1802.   Mr. Owen was injured in the attack.

1803.   The weapons used to attack and injure Mr. Owen on November 22, 2008 were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1804.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or

---

[382] De-classified intelligence reports related to the August 21, 2009 attack attached hereto as Exhibit 9.

other material support used to commit the attack, which injured Mr. Owen.

1805.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1806.   The Iranian-funded and Hezbollah-backed JAM was operating in the area around FOB Kalsu at the time of the November 22, 2008 Terrorist Attack, and has claimed responsibility for attacks in that area against U.S. Forces at the time of the attack that injured Mr. Owen.

1807.   As a result of the November 22, 2008 Terrorist Attack and the injuries he suffered, Michael L. Owen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1808.   Plaintiff Laurie Miller is a citizen of the United States and is domiciled in the State of Kansas. She is the mother of Michael L. Owen.

1809.   Plaintiff R.O., a minor, represented by her legal guardian Michael L. Owen, is a citizen of the United States and is domiciled in the State of Kansas. She is the daughter of Michael L. Owen.

1810.   As a result of the November 22, 2008 Terrorist Attack and the injuries suffered by Michael L. Owen, Plaintiff Laurie Miller and R.O., a minor, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## B.    PLAINTIFFS THE WILLIAMS FAMILY

1811.   Plaintiff Sean Lee Williams is a citizen of the United States and is domiciled in the State of Missouri.

1812.   On November 22, 2008, Sean Lee Williams, age 36, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with the multiple-array EFP.

1813.   Mr. Williams was injured in the attack.

1814.   The weapons used to attack and injure Mr. Williams during the November 22, 2008 Terrorist Attack were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1815.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Williams.

1816.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1817.   The Iranian-funded and Hezbollah-backed JAM was operating in the area around FOB Kalsu at the time of the November 22, 2008 Terrorist Attack, and has claimed responsibility for attacks in that area against U.S. Forces at the time of the attack that injured Mr. Williams.

1818.   As a result of the November 22, 2008 Terrorist Attack and the injuries he suffered, Sean Lee Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future

economic damages, including medical expenses, lost income, and loss of earning capacity.

1819. Plaintiff Sue Ann Williams is a citizen of the United States and is domiciled in the State of Missouri. She is the wife of Sean Lee Williams.

1820. As a result of November 22, 2008 Terrorist Attack and the injuries suffered by Sean Lee Williams, Plaintiff Sue Ann Williams is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 9. THE OCTOBER 10, 2008 ATTACK – ROUTE JACKSON, BAGHDAD

### A. PLAINTIFFS THE MORIN/HARELSTON FAMILY

1821. Plaintiff Baltazar Morin, Jr. is a citizen of the United States and is domiciled in the State of Texas.

1822. On October 10, 2008, Baltazar Morin, Jr., age 19, was serving in the U.S. Army when the convoy he was in was attacked with an EFP and small arms.

1823. Mr. Morin was injured in the attack.

1824. The weapon used to attack and injure Mr. Morin was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1825. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Morin.

1826. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the

tactics, techniques, and procedures utilized.

1827.  As a result of the Attack and the injuries he suffered, Baltazar Morin, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1828.  Plaintiff Miranda Arispe Harelston is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Baltazar Morin, Jr.

1829.  As a result of the October 10, 2008 Terrorist Attack and the injuries suffered by Baltazar Morin, Jr., Plaintiff Miranda Arispe Harelston is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 10.     THE APRIL 28, 2008 ATTACK – FOB LOYALTY

### A.     PLAINTIFFS THE COE FAMILY

1830.  Plaintiff Thomas Milton Coe II is a citizen of the United States and is domiciled in the State of Texas.

1831.  On April 28, 2008, Thomas Milton Coe II, age 26, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with rockets and RPGs.

1832.  Mr. Coe was injured in the attack.

1833.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Coe.

1834.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the

tactics, techniques, and procedures utilized.

1835.  As a result of the April 28, 2008 Terrorist Attack and the injuries he suffered, Thomas Milton Coe II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1836.  Plaintiff Heather Nicole Coe is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Thomas Milton Coe II.

1837.  Plaintiff V.T.C., a minor, represented by his legal guardians Thomas Milton Coe II and Heather Nicole Coe, is a citizen of the United States and is domiciled in the State of Texas. He is the son of Thomas Milton Coe II and Heather Nicole Coe.

1838.  As a result of the April 28, 2008 Terrorist Attack and the injuries suffered by Thomas Milton Coe II, Plaintiffs Heather Nicole Coe and V.T.C., a minor, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 11.    THE APRIL 13, 2008 ATTACK – SADR CITY

### A.    PLAINTIFF MICHAEL JAMES BELL

1839.  Plaintiff Michael James Bell is a citizen of the United States and is domiciled in the State of Nevada.

1840.  On April 13, 2008, Michael James Bell, age 24, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with rockets.[383]

1841.  Mr. Bell was injured in the attack.

---

[383] Video of the attack is located at: https://www.youtube.com/watch?v=z3eHcFqjN7Y&feature=youtu.be (last visited April 7, 2019).

1842.   The weapons used to attack and injure Mr. Bell were 107-mm rockets provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1843.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

1844.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1845.   The Iranian-funded and Hezbollah-backed Shia Special Group JAM was operating in Sadr City at the time of the April 13, 2008 Terrorist Attack, and has claimed responsibility for attacks in that area against U.S. Forces at the time of the attack that injured Mr. Bell.[384]

1846.   As a result of the April 13, 2008 Terrorist Attack, and the injuries he suffered, Michael James Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 12.   THE APRIL 8, 2008 ATTACK – ASR MILTON, SOUTH-EAST OF BALAD

### A.   PLAINTIFFS THE COLLINS FAMILY

1847.   Plaintiff Quentin D. Collins is a citizen of the United States and is domiciled in

---

[384] See e.g. *U.S. and Iraq Kill 13 Rebels in Sadr City*, Reuters (April 13, 2008) (https://www.nytimes.com/2008/04/13/world/middleeast/13iraq.html); *see also* David E. Johnson *et al., The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("2008 Battle of Sadr City"), (https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/ RAND_RR160.pdf).

the State of New Mexico.

1848. On April 8, 2008, Mr. Collins, age 49, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with IEDs.

1849. Mr. Collins was injured in the attack.

1850. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attacks, which injured Mr. Collins.

1851. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1852. As a result of the April 8, 2008 Terrorist Attack and the injuries he suffered, Quentin D. Collins is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1853. Plaintiff Melida Collins is a permanent resident of the United States and is domiciled in the State of New Mexico. She is the wife of Quentin D. Collins.

1854. Plaintiff Siera Nicole Collins is a citizen of the United States and is domiciled in the State of New Mexico. She is the daughter of Quentin D. Collins.

1855. Plaintiff Shawn Christopher Alan Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

1856. Plaintiff Michael Anthony Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

1857. Plaintiff I.C.C., a minor, represented by his legal guardians Quentin D. Collins and Melida Collins, is a citizen of the United States and is domiciled in the State of New Mexico.

He is the minor son of Quentin D. Collins and Melida Collins.

1858.   As a result of the April 8, 2008 Terrorist Attack and the injuries suffered by Quentin D. Collins, Plaintiffs Melida Collins, Siera Nicole Collins, Shawn Christopher Alan Collins, Michael Anthony Collins, and I.C.C., a minor, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 13.   THE APRIL 4, 2008 ATTACK – VICTORY BASE COMPLEX, BAGHDAD

#### A.   PLAINTIFFS THE VON LETKEMANN FAMILY

1859.   Plaintiff Grant Blaney Von Letkemann II is a citizen of the United States and is domiciled in the State of Colorado.

1860.   On April 4, 2008, Grant Blaney Von Letkemann II, age 35, was serving as a peacekeeping serviceman as part of the Personal Security Detail for U.S. General David Petraeus, when he was attacked with a rocket.

1861.   Mr. Von Letkemann was injured in the attack.

1862.   Mr. Von Letkemann was attacked with a 107-mm rocket. The remains of the rocket bore markings and stamps indicating the rocket had been manufactured in Iran in 2006.

1863.   The weapon used to attack and injure Mr. Von Letkemann was an Iranian-manufactured 107-mm rocket provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1864.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Von Letkemann.

1865.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special

Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1866. As a result of the April 4, 2008 Terrorist Attack and the injuries he suffered, Grant Blaney Von Letkemann II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1867. Plaintiff Kelly Lynn Von Letkemann is a citizen of the United States and is domiciled in the State of Colorado. She is the wife of Grant Blaney Von Letkemann II.

1868. As a result of April 4, 2008 Terrorist Attack and the injuries suffered by Grant Blaney Von Letkemann II, Plaintiff Kelly Lynn Von Letkemann is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 14. THE MARCH 26, 2008 ATTACK – FOB PHOENIX

### A. PLAINTIFFS THE HERNANDEZ FAMILY

1869. Plaintiff Ernesto P. Hernandez III is a citizen of the United States and is domiciled in the State of Virginia.

1870. On March 26, 2008, Ernesto P. Hernandez III, age 39, was serving as a peacekeeping serviceman in the U.S. Air Force when he was attacked with rockets.

1871. Mr. Hernandez was injured in the attack.

1872. The weapon used to attack and injure Mr. Hernandez was an Iranian-manufactured 107-mm rocket provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1873. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hernandez.

1874. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1875. As a result of the March 26, 2008 Terrorist Attack and the injuries he suffered, Ernesto P. Hernandez III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1876. Plaintiff Laura Fay Hernandez is a citizen of the United States and is domiciled in the State of Virginia. She is the wife of Ernesto P. Hernandez III.

1877. Plaintiff Ernesto Hernandez IV is a citizen of the United States and is domiciled in the State of Virginia. He is the son of Ernesto P. Hernandez III and Laura Fay Hernandez.

1878. Plaintiff N.H., a minor, represented by his legal guardians Ernesto P. Hernandez III and Laura Fay Hernandez, is a citizen of the United States and is domiciled in the State of Virginia. He is the son of Ernesto P. Hernandez III and Laura Fay Hernandez.

1879. Plaintiff Ernesto I. Hernandez II is a citizen of the United States and is domiciled in the State of Texas. He is the father of Ernesto P. Hernandez III.

1880. As a result of the March 26, 2008 Terrorist Attack and the injuries suffered by Ernesto P. Hernandez III, Plaintiffs Laura Fay Hernandez, Ernesto Hernandez IV, N.H., a minor, and Ernesto I. Hernandez II are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of

consortium, and past and future economic damages, including loss of services and support.

## 15. THE NOVEMBER 2, 2007 ATTACK – ROUTE SENATORS HIGHWAY, BAGHDAD

### A. PLAINTIFFS THE POOLE FAMILY

1881. Plaintiff James Joseph Poole III is a citizen of the United States and is domiciled in the State of Texas.

1882. On November 2, 2007, Mr. Poole, age 24, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked by EFPs.

1883. Mr. Poole was injured in the attacked.

1884. The weapons used to attack and injure Mr. Poole were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1885. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Poole.

1886. De-classified intelligence reports related to the November 2, 2007 attack attribute the EFP to a JAM-affiliated bomb maker who "works for the Iranian Talaat (sic) [that in turn supplies him] with IEDs and money… [and who] has an unidentified individual use a very powerful camera to film the attacks he conducts against American forces…. [He] waits until he has approximately 15-20 attacks on one CD, and then sends it to Iran to receive money."[385]

1887. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

---

[385] De-classified intelligence reports related to the November 2, 2007 attached hereto as Exhibit 10. "Talaat" is a common phonetic term for the Iranian Intelligence Service MOIS. Ettela'at is Farsi for "Intelligence."

1888. As a result of the November 2, 2007 Terrorist Attack and the injuries he suffered, James Joseph Poole III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1889. Plaintiff, Allison Poole Roosien is a citizen of the United States and is domiciled in the State of Michigan. She is the sister of James Joseph Poole III.

1890. As a result of the November 2, 2007 Terrorist Attack and the injuries suffered by James Joseph Poole III, Plaintiff Allison Poole Roosien is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 16.     THE OCTOBER 31, 2007 ATTACK – SADR CITY, BAGHDAD

### A.     PLAINTIFF KOMA KEKOA TEXEIRA

1891. Plaintiff Koma Kekoa Texeira is a citizen of the United States and is domiciled in the State of Hawaii.

1892. On October 31, 2007, Koma Kekoa Texeira, age 30, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with an EFP and small arms.

1893. Mr. Texeira was injured in the attack.

1894. The weapon used to attack and injure Mr. Texeira was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1895. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attacks, which injured Mr. Texeira.

1896.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups committed, planned and authorized the attacks, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1897.   As a result of the October 31, 2007 Terrorist Attack and the injuries he suffered, Koma Kekoa Texeira is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 17.   THE SEPTEMBER 29, 2007 ATTACK – DORA, BAGHDAD

### A.   PLAINTIFF ERIC JAMES ATKINSON

1898.   Plaintiff Eric James Atkinson is a citizen of the United States and is domiciled in the State of Colorado.

1899.   On September 29, 2007, Eric James Atkinson, age 28, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked by sniper fire and an IED.

1900.   Mr. Atkinson was injured in the attack.

1901.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Atkinson.

1902.    Prior to the attack, the Iranian-supported FTO AQ "declared Doura (sic) to be the capital of the Islamic State of Iraq inside Baghdad" and terrorist activity in the "neighborhoods is clearly identified as al Qaeda in Iraq."[386]

1903.   The FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions

---

[386] Bill Roggio, *Counterinsurgency in al Qaeda's Last Bastion in Baghdad*, FDD Long War Journal (Sept. 25, 2007) (https://www.longwarjournal.org/archives/2007/09/counterinsurgency_in.php).

used, as well as the tactics, techniques, and procedures utilized.

1904.  As a result of the September 29, 2007 Terrorist Attack, and the injuries he suffered, Eric James Atkinson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 18.  THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA, BAGHDAD

### A.  PLAINTIFF BRIAN ROBERT SCHAR

1905.  Plaintiff Brian Robert Schar is a citizen of the United States and is domiciled in the State of Colorado.

1906.  On September 19, 2007, Brian Robert Schar, age 25, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with a multiple-array EFP.

1907.  Mr. Schar was injured in the attack.

1908.  The weapon used to attack and injure Mr. Schar was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1909.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attacks, which injured Mr. Schar.

1910.  De-classified intelligence reports related to the September 19, 2007 attack attribute the EFP to a cell of terrorists that "receives IED training at an unknown location in Iran," who are responsible for all IED "emplacement throughout Shulla (sic)… and Shikuk, Baghdad," and who "use[d] unidentified motorcycles to transport and emplace IED (sic) since

there are numerous roadblocks in the area." [387]

1911.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attacks, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1912.   As a result of the September 19, 2007 Terrorist Attack and the injuries he suffered, Brian Robert Schar is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 19.   THE SEPTEMBER 4, 2007 ATTACK – ROUTE PREDATOR NEAR SADR CITY

### A.   PLAINTIFFS THE MIXSON FAMILY

1913.   Plaintiff Joseph Catlin Mixson is a citizen of the United States and is domiciled in the State of Florida.

1914.   On September 4, 2007, Joseph Catlin Mixson, age 21, was serving as a peacekeeping serviceman in the U.S. Army when his patrol was attacked with an EFP.

1915.   Mr. Mixson was injured in the attack.

1916.   The weapon used to attack and injure Mr. Mixson was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed the attack.

1917.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mixson.

1918.   The Iranian-supported and Hezbollah-backed JAM Special Groups committed,

---

[387] De-classified intelligence reports related to the September 19, 2007 attached hereto as Exhibit 11.

planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1919. The JAM Special Group KH claimed responsibility for the EFP attack that resulted in injury to Mr. Mixson.[388]

1920. As a result of the September 4, 2007 Terrorist Attack and the injuries he suffered, Joseph Catlin Mixson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1921. Plaintiff Virginia BreAnn Mixson is a citizen of the United States and is domiciled in the State of Florida. She is the spouse of Joseph Catlin Mixson.

1922. Plaintiff Joseph Johnson Mixson Jr. is a citizen of the United States and is domiciled in the State of Florida. He is the father of Joseph Catlin Mixson.

1923. Plaintiff Karon Mixson is a citizen of the United States and is domiciled in the State of Florida. She is the mother of Joseph Catlin Mixson.

1924. Plaintiff Alicia Mixson is a citizen of the United States and is domiciled in the State of Florida. She is the sister of Joseph Catlin Mixson.

1925. As a result of the September 4, 2007 Terrorist Attack and the injuries suffered by Joseph Catlin Mixson, Plaintiffs Virginia BreAnn Mixson, Joseph Johnson Mixson Jr., Karon Mixson, and Alicia Mixson are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

---

[388] *See* https://archive.org/details/KataibHezbollahhezballahBrigades-Efp492007 (warning: graphic content).

## 20.  THE AUGUST 22, 2007 ATTACK – RUSAFA DISTRICT, BAGHDAD

### A.  PLAINTIFF JERRALD J. JENSEN

1926.  Plaintiff Jerrald J. Jensen is a citizen of the United States and is domiciled in the State of Colorado.

1927.  On August 22, 2007, Jerrald J. Jensen, age 37, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with EFPs and small arms.

1928.  Mr. Jensen was injured in the attack.

1929.  The weapons used to attack and injure Mr. Jensen were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1930.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jensen.

1931.  The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1932.  As a result of the August 22, 2007 Terrorist Attack and the injuries he suffered during that attack, Jerrald J. Jensen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 21. THE JULY 17, 2007 ATTACK – ADHAMIYAH DISTRICT, BAGHDAD

### A. PLAINTIFFS THE PEARCY FAMILY

1933. Plaintiff Colin Laird Pearcy is a citizen of the United States and is domiciled in the State of Illinois.

1934. On July 17, 2007, Colin Laird Pearcy, age 24, was serving as a peacekeeping serviceman in the U.S. Army when his patrol was attacked with an EFP.

1935. Mr. Pearcy was injured in the attack.

1936. The weapon used to attack and injure Mr. Pearcy was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1937. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pearcy.

1938. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1939. As a result of the July 17, 2007 Terrorist Attack and the injuries he suffered, Colin Laird Pearcy is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1940. Plaintiff Laird Pearcy is a citizen of the United States and is domiciled in the State of Illinois. He is the father of Colin Laird Pearcy.

1941. Plaintiff Anne Pearcy is a citizen of the United States and is domiciled in the State

of Illinois. She is the mother of Colin Laird Pearcy.

1942. Plaintiff Jody Striker is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of Colin Laird Pearcy.

1943. Plaintiff Karyn McDonald is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of Colin Laird Pearcy.

1944. Plaintiff Andrew Pearcy is a citizen of the United States and is domiciled in the State of Wisconsin. He is the brother of Colin Laird Pearcy.

1945. Plaintiff Patrick Pearcy is a citizen of the United States and is domiciled in the State of Ohio. He is the brother of Colin Laird Pearcy.

1946. As a result of the July 17, 2007 Terrorist Attack and the injuries suffered by Colin Laird Pearcy, Plaintiffs Laird Pearcy, Anne Pearcy, Jody Striker, Karyn McDonald, Andrew Pearcy, and Patrick Pearcy are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 22. THE JULY 11, 2007 ATTACK – FOB HAMMER

### A. PLAINTIFFS THE SMITH FAMILY

1947. Plaintiff Kevin Randall Smith is a citizen of the United States and domiciled in the State of Missouri.

1948. On July 11, 2007, Kevin Randall Smith, age 31, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with rockets.

1949. Mr. Smith was injured in the attack.

1950. The weapon used to attack and injure Mr. Smith was an Iranian-manufactured rocket provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1951.  On July 13, 2007, Colonel Wayne Grigsby appeared on Fox News to report that Coalition Forces had just intercepted 46 rockets stating "these rockets which are pointed at [FOB] Hammer came right out of Iran… we've had 9 EFPs and we've captured 31 RPGs as well that we think came right out of Iran."[389] He further confirmed that the twelve rockets fired at FOB Hammer on July 11 were also from Iran.

1952.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

1953.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1954.  As a result of the July 11th, 2007 Terrorist Attack, and the injuries he suffered, Plaintiff Kevin Randall Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1955.  Plaintiff Jackay Lynn Smith is a citizen of the United States and is domiciled in the State of Missouri. She is the wife of Plaintiff Kevin Randall Smith.

1956.  Plaintiff Dylan Elijah Smith is a citizen of the United States and is domiciled in the State of Missouri. He is the son of Plaintiff Kevin Randall Smith and Jackay Lynn Smith.

1957.  Plaintiff L.D.R.S., a minor, represented by his legal guardians Kevin Randall Smith and Jackay Lynn Smith is a citizen of the United States and is domiciled in the State of Missouri. He is the son of Plaintiff Kevin Randall Smith and Jackay Lynn Smith.

---

[389] *See* https://www.youtube.com/watch?v=yJcWZ-fvS8A; *see also* https://www.youtube.com/watch?v=oY8sJYtZ6Vo (showing raw aerial footage of the rockets arrayed and aimed at FOB Hammer on July 12, 2007).

1958.  Plaintiff Kayla Michelle Gulley is a citizen of the United States and is domiciled in the State of Missouri. She is the step-daughter of Plaintiff Kevin Randall Smith.

1959.  As a result of the July 11th, 2007 Terrorist Attack, and the injuries suffered by Plaintiff Kevin Randall Smith, Plaintiffs Jackay Lynn Smith, Dylan Elijah Smith, L.D.R.S., a minor, and Kayla Michelle Gulley are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 23.    THE JULY 10, 2007 ATTACK – PATROL BASE CAVALIER, TAJI

### A.    PLAINTIFFS THE SEGERS FAMILY

1960.  Plaintiff Daniel Wayne Segers is a citizen of the United States and is domiciled in the State of Alabama.

1961.  On the July 10, 2007, Daniel Wayne Segers, age 20, was serving as a peacekeeping serviceman in the U.S. Army when a vehicle he was in was attacked by an Iranian two-stage RPG.

1962.  Mr. Segers was injured in the attack.

1963.  The weapon used to attack the occupants of the Humvee on July 10, 2007 was an Iranian-manufactured/supplied dual-stage RPG-7 provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1964.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Segers.

1965.   The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1966.  As a result of the July 10, 2007 Terrorist Attack and the injuries he suffered, Daniel Wayne Segers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1967.  Plaintiff Larry Segers is a citizen of the United States and is domiciled in the State of Alabama. He is the father of Daniel Wayne Segers.

1968.  Plaintiff Sharon Wynona Parker is a citizen of the United States and is domiciled in the State of Alabama. She is the mother of Daniel Wayne Segers.

1969.  Plaintiff David Larry Segers is a citizen of the United States and is domiciled in the State of Alabama. He is the brother of Daniel Wayne Segers.

1970.  As a result of the July 10, 2007 Terrorist Attack and the injuries suffered by Daniel Wayne Segers, Plaintiffs Larry Segers, Sharon Wynona Parker, and David Larry Segers are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 24.  THE JUNE 17, 2007 ATTACK – ASR ASPEN, DHI QAR PROVINCE

### A.  PLAINTIFF GRANT RANSOM BLACKWELL

1971.  Plaintiff Grant Ransom Blackwell is a citizen of the United States and is domiciled in the State of South Carolina.

1972.  On the late afternoon of June 17, 2007, Grant Ransom Blackwell, age 25, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with an EFP.

1973.  Mr. Blackwell was injured in the attack.

1974. The weapon used to attack and injure Mr. Blackwell was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1975. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Blackwell.

1976. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1977. As a result of the June 17, 2007 Terrorist Attack and the injuries he suffered, Grant Ransom Blackwell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 25. THE MAY 31, 2007 ATTACK – ROUTE SENATORS, BAGHDAD

### A. PLAINTIFF JOHN MAINE

1978. Plaintiff John Maine is a citizen of the United States and is domiciled in the State of Oregon.

1979. On the afternoon of May 31, 2007, John Maine, age 20, was serving as a peacekeeping serviceman in the U.S. Army, when a he was attacked with an EFP.

1980. Mr. Maine was injured in the attack.

1981. The weapon used to attack and injure Mr. Maine was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1982. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Maine.

1983.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

1984.   As a result of the May 31, 2007 Terrorist Attack and the injuries he suffered, John Maine is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 26.   THE MAY 28, 2007 ATTACK – NEW BAGHDAD DISTRICT

### A.   PLAINTIFF GREGORY EDWARD HOGANCAMP

1985.   Plaintiff Gregory Edward Hogancamp is a citizen of the United States and is domiciled in the State of Florida.

1986.   On May 28, 2007, Gregory Edward Hogancamp, age 24, was serving as a peacekeeping serviceman in the U.S. Army, when the tank he was in was attacked with an EFP.

1987.   Mr. Hogancamp was injured in the attack.

1988.   The weapon used to attack and injure Mr. Hogancamp was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

1989.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hogancamp.

1990.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the

tactics, techniques, and procedures utilized.

1991. As a result of the May 28, 2007 Terrorist Attack and the injuries he suffered, Gregory Edward Hogancamp is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 27.    THE MAY 17, 2007 ATTACK – DORA DISTRICT, BAGHDAD

### A.    PLAINTIFFS THE GAUTIER/HOUCHINS FAMILY

1992. Plaintiff Aaron Daniel Gautier was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

1993. On May 17, 2007, Aaron Daniel Gautier, age 19, was serving as a peacekeeping serviceman in the U.S. Army when he was ambushed in a complex attack involving small arms fire followed by the explosion of a massive IED.

1994. Mr. Gautier was mortally wounded and died after being evacuated to safety.

1995. A de-classified intelligence report related to the May 17, 2007 attack attributed the complex attack to FTO AQ who "was using IEDs to set up defensive belts to protect meetings and ethnic cleansing throughout the [area of operation]. The report concluded that, "[t]his IED attack was perpetrated [to] protect AQI lines of communication and offensive operations."[390]

1996. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured and killed Mr. Gautier.

1997. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

---

[390] De-classified intelligence report related to the May 17, 2007 attack attached hereto as Exhibit 12.

1998.   Plaintiff Tina Louise Houchins is a citizen of the United States and is domiciled in the State of Virginia. She is the mother of Aaron Daniel Gautier. Plaintiff Tina Louise Houchins brings an action individually, and on behalf of the Estate of Aaron Daniel Gautier, and all heirs thereof, as its legal representative.

1999.   The Estate of Aaron Daniel Gautier is entitled to recover economic and non-economic damages from Defendants, due to his murder by FTO AQ.

2000.   Plaintiff Daniel Gautier is a citizen of the United States and is domiciled in the State of North Carolina. He is the father of Aaron Daniel Gautier.

2001.   Plaintiff Patricia Alexandria Gautier is a citizen of the United States and is domiciled in the State of Virginia. She is the sister of Aaron Daniel Gautier.

2002.   Plaintiff Alexis Houchins is a citizen of the United States and is domiciled in the State of Virginia. She is the sister of Aaron Daniel Gautier.

2003.   As a result of the May 17, 2007 Terrorist Attack and the injuries and death suffered by Aaron Daniel Gautier, Plaintiffs Tina Louise Houchins, Daniel Gautier, Patricia Alexandria Gautier, and Alexis Houchins, have experienced, and continue to experience, severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Aaron Daniel Gautier's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and, along with any and all of his heirs, the net accumulation to the Estate of Aaron Daniel Gautier.

## 28.   THE APRIL 27, 2007 ATTACK – FALLUJAH, IRAQ

### A.   PLAINTIFF GUILLERMO CASTILLO

2004.   Plaintiff Guillermo Castillo is a citizen of the United States and domiciled in the State of Florida.

2005.   On April 27, 2007, Guillermo Castillo, age 28, was serving as a peacekeeping

serviceman in the U.S. Army when he was attacked with an IED and small arms.

2006.   Mr. Castillo was injured in the attack.

2007.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Castillo.

2008.    The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2009.   As a result of the April 27, 2007 Terrorist Attack, and the injuries he suffered, Guillermo Castillo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 29.    THE FEBRUARY 26, 2007 ATTACK – CSC SCANIA

### A.    PLAINTIFF JOSHUA BRADLEY WOLFE

2010.   Plaintiff Joshua Bradley Wolfe is a citizen of the United States and is domiciled in the State of Washington.

2011.   On February 26, 2007, Joshua Bradley Wolfe, age 27, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with an EFP.

2012.   Mr. Wolfe was injured in the attack.

2013.   The weapon used to attack the convoy on February 26, 2007, and resulting in injury to Mr. Wolfe, was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

2014.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wolfe.

2015.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2016.   As a result of the February 26, 2007 Terrorist Attack and the injuries he suffered, Joshua Bradley Wolfe is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 30.   THE FEBRUARY 3, 2007 ATTACK – ROUTE DOVER, SOUTH OF CAMP TAJI

#### A.   PLAINTIFFS THE BASS FAMILY

2017.   Plaintiff Travis Ryan Bass is a citizen of the United States and is domiciled in the State of Indiana.

2018.   On February 3, 2007, Mr. Bass, age 24, was serving as a peacekeeping serviceman in the U.S. Army when the convoy he was in was attacked with EFPs.

2019.   Mr. Bass was injured in the attack.

2020.   The weapons used to attack and injure Mr. Bass were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

2021.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bass.

2022.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the

tactics, techniques, and procedures utilized.

2023.   As a result of the February 3, 2007 Terrorist Attack and the injuries he suffered, Travis Ryan Bass is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2024.   Plaintiff Harold Carl Bass is a citizen of the United States and is domiciled in the State of Indiana. He is the father of Travis Ryan Bass.

2025.   Plaintiff Mary Louise Milton is a citizen of the United States and is domiciled in the State of Indiana. She is the mother of Travis Ryan Bass.

2026.   Plaintiff Harold Allen Milton is a citizen of the United States and is domiciled in the State of Indiana. He is the stepfather of Travis Ryan Bass.

2027.   Plaintiff Aaron Bass is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Travis Ryan Bass.

2028.   Plaintiff Adam Christopher Bass is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Travis Ryan Bass.

2029.   Plaintiff Lisa Lambert is a citizen of the United States and is domiciled in the State of Indiana. She is the sister of Travis Ryan Bass.

2030.   As a result of the February 3, 2007 Terrorist Attack and the injuries suffered by Travis Ryan Bass, Plaintiffs Harold Carl Bass, Mary Louis Milton, Harold Allen Milton, Aaron Bass, Adam Christopher Bass, and Lisa Lambert, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**31.    THE JANUARY 29, 2007 ATTACK – ROUTE MICHIGAN, BAGHDAD**

**A.    PLAINTIFFS THE NICHOLS FAMILY**

2031.   Plaintiff James R. Nichols III is a citizen of the United States and is domiciled in the State of Virginia.

2032.   On the evening of January 29, 2007, James R. Nichols III, age 30, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was ambushed in a complex attack with an IED, PKC machine guns, and RPGs.

2033.   Mr. Nichols was injured in the attack.

2034.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nichols.

2035.   The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attacks, the munitions used, as well as the tactics, techniques, and procedures utilized.

2036.   As a result of the January 29, 2007 Terrorist Attack and the injuries he suffered, James R. Nichols III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2037.   Plaintiff Queen Nichols is a citizen of the United States and is domiciled in the State of Illinois. She is the mother of James R. Nichols III.

2038.   Plaintiff James Nichols Jr. is a citizen of the United States and is domiciled in the State of Illinois. He is the father of James R. Nichols III.

2039.   Plaintiff Thomas Nichols is a citizen of the United States and is domiciled in the State of Illinois. He is the brother of James R. Nichols III.

2040.  Plaintiff Sharon Nichols is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of James R. Nichols III.

2041.  As a result of the January 29, 2007 Terrorist Attack and the injuries suffered by James R. Nichols III, Plaintiffs Queen Nichols, James Nichols Jr., Thomas Nichols, and Sharon Nichols are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 32.  THE DECEMBER 19, 2006 ATTACK - RAMADI

### A.  PLAINTIFF WILLIAM ROBERT BIGGS

2042.  Plaintiff William Robert Biggs is a citizen of the United States and is domiciled in the State of California.

2043.  On December 19, 2006, William Robert Biggs, age 20, was serving as a peacekeeping serviceman in the U.S. Marine Corps when he was attacked with three victim-initiated IEDs that were built into the walls at the Qatana Security Station in Ramadi.

2044.  Mr. Biggs was injured in the attack.

2045.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Biggs.

2046.  The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2047.  As a result of the December 19, 2006 Terrorist Attack, and the injuries he suffered, William Robert Biggs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

413

**33. THE NOVEMBER 27, 2006 ATTACK – KADAMIYAH, BAGHDAD**

    **A. PLAINTIFFS THE STRONG FAMILY**

2048. Plaintiff Travis MacCody Strong is a citizen of the United States and is domiciled in the State of Colorado.

2049. On November 27, 2006, Travis MacCody Strong, age 29, was serving as a peacekeeping serviceman in the U.S. Army when his unit was attacked with an EFP.

2050. Mr. Strong was injured in the attack.

2051. The weapon used to attack and injure Mr. Strong on November 27, 2006 was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack

2052. De-classified intelligence reports related to the November 27, 2006 attack indicate that Mr. Strong's unit was on patrol in the area with the specific mission to "prevent JAM reprisal killings" of Iraqi civilians, and that the EFP was emplaced in the road 20-30 minutes after a different Coalition unit had conducted route clearance of the area.[391]

2053. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Strong.

2054. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2055. As a result of the November 27, 2006 Terrorist Attack and the injuries he suffered, Travis MacCody Strong is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future

---

[391] De-classified intelligence reports related to the November 27, 2006 attack attached hereto as Exhibit 13.

economic damages, including medical expenses, lost income, and loss of earning capacity.

2056. Plaintiff Tayler Heston is a citizen of the United States and is domiciled in the State of Arizona. She is the mother of Travis MacCody Strong.

2057. Plaintiff Anthony Joseph Durkacs is a citizen of the United States and is domiciled in the State of Nevada. He is the brother of Travis MacCody Strong.

2058. As a result of the November 27, 2006 Terrorist Attack and the injuries suffered by Travis MacCody Strong, Plaintiffs Tayler Heston and Anthony Joseph Durkacs are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 34. THE FEBRUARY 14, 2006 ATTACK – KADAMIYAH, BAGHDAD

### A. PLAINTIFF TARA KATHLEEN HUTCHINSON

2059. Plaintiff Tara Kathleen Hutchinson is a citizen of the United States and is domiciled in the State of Texas.

2060. On February 14, 2006, Tara Kathleen Hutchinson, age 29, was serving as a peacekeeping servicewoman in the U.S. Army when her unit was attacked with an EFP.

2061. Ms. Hutchinson was injured in the attack.

2062. The weapon used to attack and injure Ms. Hutchinson was an Iranian-manufactured EFP provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

2063. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Hutchinson.

2064. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data,

including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2065.   As a result of the February 14, 2006 Terrorist Attack and the injuries she suffered, Tara Kathleen Hutchinson, is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 35.   THE OCTOBER 26, 2005 ATTACK – AL AZIM, DIYALA PROVINCE

### A.   PLAINTIFF MARTIN SICAIROS

2066.   Plaintiff Martin Sicairos is a citizen of the United States and is domiciled in the State of California.

2067.   On October 26, 2005, Martin Sicairos, age 26, was serving as a peacekeeping serviceman in the U.S. Army when he was ambushed in a complex attack involving IEDs, RPGs and small arms.

2068.   Mr. Sicairos was injured in the attack.

2069.   During the time that this attack occurred FTO AQ had approximately 2000 "hardened" terrorists in the area trained in and employing the specific tactics, techniques, and procedures utilized in this complex attack.[392]

2070.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sicairos.

2071.   The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

---

[392] *See* Bill Roggio, *The Battle of Baqubah 1*, FDD Long War Journal (June 9, 2007) (https://www.longwarjournal.org/archives/2007/06/the_battle_of_baquba.php).

2072.  As a result of the October 26, 2005 Terrorist Attack, and the injuries he suffered, Martin Sicairos is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 36.  THE OCTOBER 8, 2005 ATTACK – RAMADI, IRAQ

### A.  PLAINTIFF KADE LUTHER HINKHOUSE

2073.  Plaintiff Kade Luther Hinkhouse is a citizen of the United States and domiciled in the State of Colorado.

2074.  On October 8, 2005, Kade Luther Hinkhouse, age 19, was serving as a peacekeeping serviceman in the U.S. Marine Corps when a convoy he was in was ambushed in a complex attack involving IEDs, RPGs, and small arms.

2075.  Mr. Hinkhouse was injured in the attack.

2076.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hinkhouse.

2077.  The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2078.  As a result of the October 8, 2005 Terrorist Attack, and the injuries he suffered, Kade Luther Hinkhouse is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 37.  THE AUGUST 26, 2005 ATTACK – HIT, IRAQ

### A.  PLAINTIFFS THE BEYERS FAMILY

2079.  Plaintiff Mark Howard Beyers is a citizen of the United States and domiciled in

the State of New York.

2080.  On August 26, 2005, Mark Howard Beyers, age 26, was serving as a peacekeeping serviceman in the United States Marine Corps when he was attacked with an IED and small arms.

2081.  Mr. Beyers was injured in the attack.

2082.  This attack occurred near the time of Operation Sword, a mission intended to push terrorists out of the western Euphrates River valley (including Hit), an established "haven"[393] for FTO AQ - considered "the most dangerous and violent element of the insurgency from the region."[394] In response to Coalition Forces launching Operation Sword, FTO AQ issued a public statement on June 28, 2005, congratulating their members in the Anbar region for "hitting the non-believers and giving them a taste of torture."[395]

2083.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Beyers.

2084.  The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2085.  As a result of the August 26, 2005 Terrorist Attack, and the injuries he suffered, Mark Howard Beyers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2086.  Plaintiff Denise Beyers is a citizen of the United States and is domiciled in the

---

[393] Robert Schultz, *The Marines Take Anbar: the Four Year Fight Against Al Qaeda*, Naval Institute Press (2013).
[394] Bill Roggio, *Recent Operations on the Euphrates*, FDD Long War Journal (Oct. 10, 2005) (https://www.longwarjournal.org/archives/2005/10/recent_operatio.php).
[395] *See* https://ent.siteintelgroup.com/site-institute-6-28-05-aqii-announces-the-broken-sword-on-the-land-of-al-anbar-and-cheering-of-victory.html (last visited April 9, 2019).

State of New York. She is the wife of Mark Howard Beyers.

2087.   As a result of the August 26, 2005 Terrorist Attack, and the injuries suffered by Mark Howard Beyers, Plaintiff Denise Beyers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 38.   THE AUGUST 13, 2005 ATTACK – SADR CITY, BAGHDAD

### A.   PLAINTIFF BRAD LEE SCHWARZ

2088.   Plaintiff Brad Lee Schwarz is a citizen of the United States and is domiciled in the State of Illinois.

2089.   On August 13, 2005, Brad Lee Schwarz, age 20, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was attacked with a multiple-array EFP.

2090.   Mr. Schwarz was injured in the attack.

2091.   The weapons used to attack and injure Mr. Schwarz were Iranian-manufactured EFPs provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including those who committed this attack.

2092.   Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schwarz.

2093.   The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2094.   As a result of the August 13, 2005 Terrorist Attack and the injuries he suffered, Brad Lee Schwarz is entitled to past and future noneconomic damages, including for severe

physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 39. THE JULY 5, 2005 ATTACK – HIT, IRAQ

#### A. PLAINTIFFS THE COOLEY FAMILY

2095. Plaintiff Joshua Jonathon Cooley is a citizen of the United States and domiciled in the State of Florida.

2096. On July 5, 2005, Joshua Jonathon Cooley, age 28, was serving as a peacekeeping serviceman in the U.S. Marine Corps when he was attacked with a Vehicle-Borne Improvised Explosive Device ("VBIED").

2097. Mr. Cooley was injured in the attack.

2098. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cooley.

2099. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2100. As a result of the July 5, 2005 Terrorist Attack, and the injuries he suffered, Joshua Jonathon Cooley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2101. Plaintiff Christine Cooley is a citizen of the United States and is domiciled in the State of Florida. She is the mother and full-time caretaker of Joshua Jonathon Cooley.

2102. As a result of the July 5, 2005 Terrorist Attack, and the injuries suffered by Joshua Jonathon Cooley, Plaintiff Christine Cooley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life,

and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**40.    THE APRIL 19, 2005 ATTACK – ROUTE MIDLAND, NORTH-WEST OF ISKANDARIYA**

### A.    PLAINTIFF ANTONIO MARTINEZ FREDERICK

2103.    Plaintiff Antonio Martinez Frederick is a citizen of the United States and is domiciled in the State of Mississippi.

2104.    On April 19, 2005, Antonio Martinez Frederick, age 33, was serving as a peacekeeping serviceman in the U.S. Army when a convoy he was in was ambushed in a complex attack involving IEDs and small arms.

2105.    Mr. Frederick was injured in the attack.

2106.    Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Frederick.

2107.    The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2108.    As a result of the April 19, 2005 Terrorist Attack and the injuries he suffered, Antonio Martinez Frederick is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### B.    PLAINTIFF WYMAN HARRELL JONES

2109.    Plaintiff Wyman Harrell Jones is a citizen of the United States and is domiciled in the State of Florida.

2110.    On April 19 2005, Wyman Harrell Jones, age 42, was serving as a peacekeeping

serviceman in the U.S. Army when a convoy he was in was ambushed in a complex attack involving IEDs and small arms.

2111. Mr. Jones was injured in the attack.

2112. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jones.

2113. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2114. As a result of the April 19, 2005 Terrorist Attack and the injuries he suffered, Wyman Harrell Jones is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 41. THE MARCH 13, 2005 ATTACK – AMERIYA, BAGHDAD

### A. PLAINTIFF DOUGLAS HAMILTON KINARD JR.

2115. Plaintiff Douglas Hamilton Kinard Jr. is a citizen of the United States and is domiciled in the State of Georgia.

2116. On March 13, 2005, Douglas Hamilton Kinard Jr., age 34, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with an IED.

2117. Mr. Kinard was injured in the attack.

2118. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kinard.

2119. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2120.  As a result of the March 13, 2005 Terrorist Attack, and the injuries he suffered, Douglas Hamilton Kinard Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 42.    THE JANUARY 1, 2005 ATTACK – HADITHA

### A.    PLAINTIFFS THE KUNIHOLM FAMILY

2121.  Plaintiff Jonathan F. Kuniholm is a citizen of the United States and is domiciled in the State of Oregon.

2122.  On January 1, 2005, Jonathan F. Kuniholm, age 33, was serving as a peacekeeping serviceman in the U.S. Marine Corps when his patrol was ambushed in a complex attack involving small arms and an IED.

2123.  Mr. Kuniholm was injured in the attack.

2124.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kuniholm.

2125.  The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2126.  As a result of the January 1, 2005 Terrorist Attack and the injuries he suffered, Jonathan F. Kuniholm is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity

2127.  Plaintiff Michele Terese Quinn is a citizen of the United States and is domiciled in the State of Oregon. She is the wife of Jonathan F. Kuniholm.

2128.  Plaintiff S.K., a minor, represented by his legal guardians Jonathan F. Kuniholm

and Michele Terese Quinn, is a citizen of the United States and is domiciled in the State of Oregon. He is the son of Jonathan F. Kuniholm and Michele Terese Quinn.

2129.   Plaintiff Bruce Kuniholm is a citizen of the United States and is domiciled in the State of North Carolina. He is the father of Jonathan F. Kuniholm.

2130.   Plaintiff Elizabeth Kuniholm is a citizen of the United States and is domiciled in the State of North Carolina. She is the mother of Jonathan F. Kuniholm.

2131.   Plaintiff Erin Kuniholm is a citizen of the United States and is domiciled in the State of Oregon. She is the sister of Jonathan F. Kuniholm.

2132.   As a result of the January 1, 2005 Terrorist Attack and the injuries suffered by Jonathan F. Kuniholm, Plaintiffs Michele Terese Quinn, S. K., a minor, Bruce Kuniholm, Elizabeth Kuniholm, and Erin Kuniholm are entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 43.    THE DECEMBER 21, 2004 ATTACK – FOB MAREZ, MOSUL

2133.   FOB Marez was a Coalition Force base located in Mosul, Iraq.

2134.   On December 21, 2004, a suicide bomber wearing an Iraq National Guard ("ING") uniform gained access to the base with the assistance of Iraqi security guards. The bomber entered the Dining Facility ("DFAC") and approached a large group of U.S. soldiers, detonating himself and killing twenty-two people. At the time, this was the single deadliest suicide attack on American soldiers in Iraq, with fourteen U.S. soldiers killed. Seventy-two other personnel were injured in the attack. All of these victims were in or near the DFAC at the FOB located next to the main U.S. military airfield at Mosul.

2135.   As part of this coordinated attack, the terrorists had determined that the wounded

would be transported to a nearby aid station at FOB Diamondback. The terrorists waited until the wounded arrived at the aid station and then targeted it with precision mortar fire, injuring those rendering aid to the DFAC victims.

2136. Between the time of the suicide bomber attacking the DFAC and the mortar attack, there was a small arms attack on the gate of FOB Diamondback.

2137. It was the conclusion of Coalition Force commanders that all three attacks had been a coordinated effort by a sophisticated and well-trained terrorist group.

2138. The Iranian-supported FTO AAI (a/k/a Ansar al Sunna) immediately claimed responsibility for the attack. In its claim of responsibility, AAI said the suicide bomber was a 24-year-old man from Mosul who worked at the base for two months and had provided information about the base to the group.

2139. Moreover, in subsequent sworn Detainee Statements, individuals with knowledge of the planning and preparation of the attack, as well as those considered responsible for its coordination, admitted they were members of the FTO AAI

2140. Weeks before the attack, soldiers from the base intercepted a document that mentioned a proposal for a massive "Beirut"-type attack on U.S. forces. The reference was to the techniques, tactics, and procedures utilized in the 1983 Beirut barracks bombing funded by Iran and committed by Hezbollah and Iranian Ministry of Intelligence and Security ("MOIS") agents.

2141. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack on FOB Marez.

2142. The Iranian-supported FTO AAI committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the

munitions used, as well as the tactics, techniques, and procedures utilized.

## A. PLAINTIFFS THE RUHREN FAMILY

2143. Plaintiff David Alan Ruhren was a citizen of the United States and was domiciled in the State of Virginia at the time of his death.

2144. On December 21, 2004, David Alan Ruhren, age 20, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2145. Mr. Ruhren was killed in the attack.

2146. Plaintiff Sonja Ruhren is a citizen of the United States and is domiciled in the State of Virginia. She is the mother of David Alan Ruhren.

2147. Plaintiff Sonja Ruhren brings an action individually, and on behalf of the Estate of David Alan Ruhren, and all heirs thereof, as its legal representative.

2148. The Estate of David Alan Ruhren is entitled to recover economic and non-economic damages from Defendants, due to his murder by FTO AAI.

2149. As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by, and death of, David Alan Ruhren, Plaintiff Sonja Ruhren has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of David Alan Ruhren's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and, along with any and all of his heirs, the net accumulation to the Estate of David Alan Ruhren.

## B. PLAINTIFF MARK JOSEPH PRATT

2150. Plaintiff Mark Joseph Pratt is a citizen of the United States and is domiciled in the State of Virginia.

2151. On December 21, 2004, Mark Joseph Pratt, age 39, was serving as a peacekeeping serviceman in the U.S. Army National Guard and was in/near the DFAC when it was attacked.

426

2152.  Mr. Pratt was injured in the attack.

2153.  As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Mark Joseph Pratt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## C.    PLAINTIFF EVAN WAYNE BYLER

2154.  Plaintiff Evan Wayne Byler is a citizen of the United States and is domiciled in the State of Idaho.

2155.  On December 21, 2004, Evan Wayne Byler, age 27, was serving as a peacekeeping serviceman in the U.S. Army National Guard and was in/near the DFAC when it was attacked.

2156.  Mr. Byler was injured in the attack.

2157.  As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Evan Wayne Byler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## D.    PLAINTIFF TERAY ANTON BUNDY

2158.  Plaintiff Teray Anton Bundy is a citizen of the United States and is domiciled in the State of Virginia.

2159.  On December 21, 2004, Mr. Bundy, age 22, was serving as a peacekeeping serviceman in the U.S. Army National Guard and was in/near the DFAC when it was attacked.

2160.  Mr. Bundy was injured in the attack.

2161.  As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Teray Anton Bundy is entitled to past and future noneconomic damages, including for severe

physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### E.    PLAINTIFF JEFF MCKINLEY WRIGHT

2162.   Plaintiff Jeff McKinley Wright is a citizen of the United States and is domiciled in the State of Virginia.

2163.   On December 21, 2004, Mr. Wright, age 20, was serving as a peacekeeping serviceman in the U.S. Army National Guard and was in/near the DFAC when it was attacked.

2164.   Mr. Wright was injured in the attack.

2165.   As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Jeff McKinley Wright is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### F.    PLAINTIFFS THE TURAY FAMILY

2166.   Plaintiff Brima Charles Turay is a citizen of the United States and is domiciled in the State of Virginia.

2167.   On December 21, 2004, Brima Charles Turay, age 21, was serving as a peacekeeping serviceman in the U.S. Army National Guard and was in/near the DFAC when it was attacked.

2168.   Mr. Turay was injured in the attack.

2169.   As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Brima Charles Turay is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2170.   Plaintiff Ruth Turay is a citizen of the United States and is domiciled in the State

of Maryland. She is the mother of Brima Charles Turay.

2171. As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by Brima Charles Turay, Plaintiff Ruth Turay is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### G.     PLAINTIFF DANIEL BIVENS

2172. Plaintiff Daniel Bivens is a citizen of the United States and is domiciled in the State of Tennessee.

2173. On December 21, 2004, Daniel Bivens, age 21, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked..

2174. Mr. Bivens was injured in the attack.

2175. As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Daniel Bivens is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### H.     PLAINTIFF ERIC JAMES ATKINSON

2176. Plaintiff Eric James Atkinson is a citizen of the United States and is domiciled in the State of Colorado.[396]

2177. On December 21, 2004, Eric James Atkinson, age 25, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2178. Mr. Atkinson was injured in the attack.

2179. As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Eric James Atkinson is entitled to past and future noneconomic damages, including for

---

[396] Plaintiff Eric James Atkinson was also injured in the above-mentioned September 29, 2007 attack.

severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## I.   PLAINTIFF ANGELA KONEN

2180.   Plaintiff Angela Konen is a citizen of the United States and is domiciled in the State of Washington.

2181.   On December 21, 2004, Angela Konen, age 28, was serving as a peacekeeping servicewoman in the U.S. Army and was in/near the DFAC when it was attacked.

2182.   Ms. Konen was injured in the attack.

2183.   As a result of the December 21, 2004 Terrorist Attack, and the injuries she suffered, Angela Konen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## J.   PLAINTIFF JONATHAN B. HOGGE

2184.   Plaintiff Jonathan B. Hogge is a citizen of the United States and is domiciled in the State of Washington.

2185.   On December 21, 2004, Mr. Hogge, age 21, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2186.   Mr. Hogge was injured in the attack.

2187.   As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Jonathan B. Hogge is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## K.   PLAINTIFF JAMES MICHAEL OHRT

2188.   Plaintiff James Michael Ohrt is a citizen of the United States and is domiciled in

the State of Washington.

2189.   On December 21, 2004, Mr. Ohrt, age 26, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2190.   Mr. Ohrt was injured in the attack.

2191.   As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, James Michael Ohrt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## L.      PLAINTIFFS THE WILLIAMS FAMILY

2192.   Plaintiff George Lon Williams is a citizen of the United States and is domiciled in the State of Washington.

2193.   On December 21, 2004, George Lon Williams, age 36, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2194.   Mr. Williams was injured in the attack.

2195.   As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, George Lon Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2196.   Plaintiff Elizabeth Grace Williams is a citizen of the United States and is domiciled in the State of Washington. She is the wife of George Lon Williams.

2197.   Plaintiff Kayleigh Ann Williams is a citizen of the United States and is domiciled in the State of Washington. She is the daughter of George Lon Williams.

2198.   Plaintiff Nickolas Alan Williams a citizen of the United States and is domiciled in the State of Washington. He is the son of George Lon Williams.

2199. As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by George Lon Williams, Plaintiffs Elizabeth Grace Williams, Kayleigh Ann Williams, and Nickolas Alan Williams are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## M.    PLAINTIFFS THE WARD FAMILY

2200. Plaintiff Antonio Harold Ward is a citizen of the United States and domiciled in the State of Oregon.

2201. On December 21, 2004, Antonio Harold Ward, age 23, was serving as a peacekeeping serviceman in the U.S. Army and was in/near the DFAC when it was attacked.

2202. Mr. Ward was injured in the attack.

2203. As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Antonio Harold Ward, is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2204. Plaintiff Dennis Ward is a citizen of the United States and is domiciled in the State of Arizona. He is the father of Antonio Harold Ward.

2205. Plaintiff Dalis Ward is a citizen of the United States and is domiciled in the State of Arizona. She is the mother of Antonio Harold Ward.

2206. As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by Antonio Harold Ward, Plaintiffs Dennis Ward and Dalis Ward are entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## N.    PLAINTIFFS THE ANDERSON FAMILY

2207.   Plaintiff Christopher Bryant Anderson is a citizen of the United States and is domiciled in the State of Texas.

2208.   On December 21, 2004, Christopher Bryant Anderson, age 24, was serving as a peacekeeping serviceman in the United States Army and was in/near the DFAC when it was attacked.

2209.   Mr. Anderson was injured in the attack.

2210.   As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Christopher Bryant Anderson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2211.   Plaintiff Tahnee Anderson is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Christopher Bryant Anderson.

2212.   Plaintiff T.A.1, a minor, represented by her legal guardians Christopher Bryant Anderson and Tahnee Anderson, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Christopher Bryant Anderson.

2213.   Plaintiff T.A.2, a minor, represented by her legal guardians Christopher Bryant Anderson and Tahnee Anderson, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Christopher Bryant Anderson.

2214.   Plaintiff K.A, a minor, represented by her legal guardians Christopher Bryant Anderson and Tahnee Anderson, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Christopher Bryant Anderson.

2215.   As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by

Christopher Bryant Anderson, Plaintiffs Tahnee Anderson, T.A.1, T.A.2, and K.A are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### O.    PLAINTIFFS THE COLLINS FAMILY

2216.   Plaintiff Quentin D. Collins is a citizen of the United States and is domiciled in the State of New Mexico.[397]

2217.   On December 21, 2004, Quentin D. Collins, age 46, was serving as a peacekeeping serviceman in the U.S. Air Force.

2218.   On December 21, 2004, Quentin D. Collins was waiting to enter the dining facility (DFAC) at FOB Marez, Mosul, Iraq when an Iranian-affiliated suicide bomber detonated an explosive device in the DFAC. After the explosion, he entered the DFAC to assist in rendering aid. Approximately 1 to 1 ½ hours later he was counseling the injured survivors that had been transported to the field hospital at FOB Diamondback which was located next to FOB Marez. While talking with injured soldiers, Mr. Collins heard several mortar strikes inside FOB Diamondback coming closer to his location. A mortar hit approximately five meters behind him. The explosion knocked him unconscious and shrapnel struck his lower back below his body armor.

2219.   Mr. Collins was injured in the attack.

2220.   The weapon(s) used to attack and injure Mr. Collins on December 21, 2004 were Iranian-manufactured/supplied mortars provided by Iran and/or its Agents and Proxies to Iranian-funded and Iranian-trained terror operatives, including the Terrorist Groups, in Iraq.

---

[397] Plaintiff Quentin D. Collins was also injured in the above-mentioned April 8, 2008 attack.

2221.  As a result of the December 21, 2004 Terrorist Attack and the injuries he suffered, Mr. Collins has past and future noneconomic damages, including severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2222.  Plaintiff Melida Collins is permanent resident of the United States and is domiciled in the State of New Mexico. She is the wife of Quentin D. Collins.

2223.  Plaintiff Siera Nicole Collins is a citizen of the United States and is domiciled in the State of New Mexico. She is the daughter of Quentin D. Collins.

2224.  Plaintiff Shawn Christopher Alan Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

2225.  Plaintiff Michael Anthony Collins is a citizen of the United States and is domiciled in the State of New Mexico. He is the son of Quentin D. Collins.

2226.  As a result of the December 21, 2004 Terrorist Attack and the injuries suffered by Quentin D. Collins, Plaintiffs Melida Collins, Siera Nicole Collins, Shawn Christopher Alan Collins, and Michael Anthony Collins are entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 44.     THE NOVEMBER 24, 2004 ATTACK – ZAYONA, BAGHDAD

### A.     PLAINTIFFS THE FONDREN FAMILY

2227.  Plaintiff Jay Myrle Fondren is a citizen of the United States and is domiciled in the State of Texas.

2228.  On November 24, 2004, Jay Myrle Fondren, age 24, was serving as a peacekeeping serviceman in the U.S. Army when his patrol was attacked with IEDs.

2229. Mr. Fondren was injured in the attack.

2230. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fondren.

2231. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2232. As a result of the November 24, 2004 Terrorist Attack and the injuries he suffered, Jay Myrle Fondren is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2233. Plaintiff Anne Hollingsworth Fondren is a citizen of the United States and is domiciled in the State of Texas. She is the spouse of Jay Myrle Fondren.

2234. Plaintiff M.J.F., a minor, represented by his legal guardians Jay Myrle Fondren and Anne Hollingsworth Fondren, is a citizen of the United States and is domiciled in the State of Texas. He is the son of Jay Myrle Fondren and Anne Hollingsworth Fondren.

2235. As a result of the November 24, 2004 Terrorist Attack and the injuries suffered by Jay Myrle Fondren, Plaintiffs Anne Hollingsworth Fondren and M.J.F., a minor, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 45. THE NOVEMBER 9, 2004 ATTACK – ISKANDARIYA

### A. PLAINTIFFS THE NOLTE FAMILY

2236. Plaintiff Nicholas S. Nolte was a citizen of the United States and was domiciled in

the State of Nebraska at the time of his death.

2237. On November 9, 2004, Nicholas S. Nolte, age 25, was serving as a peacekeeping serviceman in the U.S. Marine Corps when the vehicle he was in was attacked with an IED two kilometers north of Camp Kalsu.

2238. On November 24, 2004, Mr. Nolte died as result of his wounds sustained in the attack.

2239. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured and killed Mr. Nolte.

2240. The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2241. Plaintiff Melina Rose Nolte is a citizen of the United States and is domiciled in the State of Colorado. She is the widow of Nicholas S. Nolte.

2242. Plaintiff Melina Rose Nolte brings an action individually, and on behalf of the Estate of Nicholas S. Nolte, and all heirs thereof, as its legal representative.

2243. The Estate of Nicholas S. Nolte is entitled to recover economic and non-economic damages from Defendants, due to his murder by FTO AQ.

2244. Plaintiff A.N., a minor, represented by her legal guardian Melina Rose Nolte, is a citizen of the United States and is domiciled in the State of Colorado. She is the daughter of Melina Rose Nolte and Nicholas S. Nolte.

2245. Plaintiff Anita Nolte is a citizen of the United States and is domiciled in the State of Nebraska. She is the mother of Nicholas S. Nolte.

2246. Plaintiff Jessica Nolte is a citizen of the United States and is domiciled in the

State of Nebraska. She is the sister of Nicholas S. Nolte.

2247. As a result of the November 9, 2004 Terrorist Attack and the injuries suffered by, and the resulting death of, Nicholas S. Nolte, Plaintiffs Melina Rose Nolte, A.N., a minor, Anita Nolte, and Jessica Nolte have experienced, and continue to experience, severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Nicholas S. Nolte's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, and, along with any and all of his heirs, the net accumulation to the estate of Nicholas S. Nolte.

## 46.    THE OCTOBER 31, 2004 ATTACK – FOB MAREZ, MOSUL, IRAQ

### A.    PLAINTIFF JONATHAN B. HOGGE

2248. Plaintiff Jonathan B. Hogge is a citizen of the United States and is domiciled in the State of Washington.[398]

2249. On October 31, 2004, Jonathan B. Hogge, age 21, was serving as a peacekeeping serviceman in the U.S. Army when he was attacked with an Iranian 81-mm mortar.

2250. Mr. Hogge was injured in the attack.

2251. The Iranian-supported FTO known as AAI was operating in Mosul and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Hogge.

2252. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hogge.

2253. The Iranian-supported FTO AAI committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

---

[398] Plaintiff Jonathan B. Hogge was also injured in the above-mentioned December 21, 2004 attack.

2254.  As a result of the October 31, 2004 Terrorist Attack, and the injuries he suffered, Jonathan B. Hogge is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 47.    THE AUGUST 16, 2004 ATTACK – SADR CITY, BAGHDAD

### A.    PLAINTIFF DAVID ALLEN SIMMONS II

2255.  Plaintiff David Allen Simmons II is a citizen of the United States and is domiciled in the State of Alabama.

2256.  On August 16, 2004, David Allen Simmons II, age 20, was serving as a peacekeeping serviceman in the U.S. Army, when his patrol was ambushed in a complex attack involving RPGs and small arms.

2257.  Mr. Simmons was injured in the attack.

2258.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Simmons.

2259.  The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2260.  As a result of the August 16, 2004 Terrorist Attack and the injuries he suffered, David Allen Simmons II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 48. THE JUNE 29, 2004 ATTACK – CAMP FALLUJAH

### A. PLAINTIFFS THE MILLS FAMILY

2261.  Plaintiff Hardy Pierce Mills IV is a citizen of the United States and is domiciled in the State of Texas.

2262.  On June 29, 2004, Hardy Pierce Mills IV, age 19, was serving as a peacekeeping serviceman in the U.S. Marines when he was attacked with an Iranian mortar.

2263.  Mr. Mills was injured in the attack.

2264.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mills.

2265.  The Iranian-supported FTO AQ committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2266.  As a result of the June 29, 2004 Terrorist Attack, and the injuries he suffered, Hardy Pierce Mills IV is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2267.  Plaintiff Cathy Jean Mills is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Hardy Pierce Mills IV.

2268.  Plaintiff Jacob Mills is a citizen of the United States and is domiciled in the State of Texas. He is the brother of Hardy Pierce Mills IV.

2269.  Plaintiff Joshua Mills is a citizen of the United States and is domiciled in the State of Texas. He the brother of Hardy Pierce Mills IV.

2270.  As a result of the June 29, 2004 Terrorist Attack and the injuries suffered by Hardy Pierce Mills IV, Plaintiffs Cathy Jean Mills, Jacob Mills, and Joshua Mills are entitled to

past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 49. THE JUNE 21, 2004 ATTACK – COP APACHE, ADHAMIYAH, BAGHDAD

### A. PLAINTIFF ARTHUR B. STOKENBURY

2271. Plaintiff Arthur B. Stokenbury is a citizen of the United States and is domiciled in the State of Arkansas.

2272. On June 21, 2004, Arthur B. Stokenbury, age 28, was serving as a peacekeeping serviceman in the U.S. Army National Guard when he was attacked with Iranian mortars.

2273. Mr. Stokenbury was injured in the attack.

2274. Iran and/or its Agents and Proxies provide funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Stokenbury.

2275. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2276. As a result of the June 21, 2004 Terrorist Attack and the injuries he suffered, Arthur B. Stokenbury is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 50. THE APRIL 9, 2004 ATTACK – MARKET AREA OF BAIJI

### A. PLAINTIFF DOMENICK JARED ALAGNA

2277. Plaintiff Domenick Jared Alagna is a citizen of the United States and is domiciled

in the State of Texas.

2278.    On April 9, 2004, Domenick Jared Alagna, age 20, was serving as a peacekeeping serviceman in the U.S. Army when he was ambushed in a complex attack involving small arms and RPGs.

2279.    Mr. Alagna was injured in the attack.

2280.    The Iranian-supported FTO known as AAI was operating in Baiji, and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Alagna.

2281.    The tactics, techniques, and procedures employed in the attack against Mr. Alagna were taught to AAI terrorists by the Iranian IRGC-QF and Hezbollah in training camps in Iran.

2282.    Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Alagna.

2283.    The Iranian-supported FTO AAI committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2284.    As a result of the April 9, 2004 Terrorist Attack and the injuries he suffered, Domenick Jared Alagna is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 51.    THE MARCH 13, 2004 ATTACK – KARBALA

### A.    PLAINTIFF ROBERT JAMES PEARSON

2285.    Plaintiff Robert James Pearson is a citizen of the United States and is domiciled in the State of North Carolina.

2286.    On March 13, 2004, Robert James Pearson, age 35, was serving as a

442

peacekeeping serviceman in the U.S. Army when he was ambushed in a complex attack involving and IED and small arms.

2287. Mr. Pearson was injured in the attack.

2288. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pearson.

2289. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilize.

2290. As a result of the March 13, 2004 Terrorist Attack, and the injuries he suffered, Robert James Pearson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 52. THE DECEMBER 23, 2003 ATTACK – SADR CITY, BAGHDAD

### A. PLAINTIFF ROGER LEE YOUNG

2291. Plaintiff Roger Lee Young is a citizen of the United States and is domiciled in the State of Kentucky.

2292. On December 23, 2003, Roger Lee Young, age 33, was serving as a peacekeeping serviceman in the U.S. Army when the vehicle he was in was attacked with an IED.

2293. Mr. Young was injured in the attack.

2294. Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Young.

2295. The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data,

including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2296.  The Iranian-supported and FTO Hezbollah-backed JAM was operating in Sadr City and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Young.

2297.  As a result of the December 23, 2003 Terrorist Attack and the injuries he suffered, Roger Lee Young is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 53.  THE DECEMBER 17, 2003 ATTACK – SADR CITY, BAGHDAD

### A.  PLAINTIFF ALLEN RYAN VAUGHT

2298.  Plaintiff Allen Ryan Vaught is a citizen of the United States and is domiciled in the State of Texas.

2299.  On December 17, 2003, Allen Ryan Vaught, age 32, was serving as a peacekeeping serviceman in the U.S. Army Reserve when he was ambushed in a complex attack involving IEDs and small arms.

2300.  Mr. Vaught was injured in the attack.

2301.  Iran and/or its Agents and Proxies provided funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Vaught.

2302.  The Iranian-supported FTO Hezbollah, working in concert with the JAM Special Groups, committed, planned and authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munitions used, as well as the tactics, techniques, and procedures utilized.

2303.  Subsequent investigation into the attack revealed the convoy's location and

444

mission had been shared by local tribal leaders with JAM terrorists.

2304.   The Iranian-supported and FTO Hezbollah-backed JAM was operating in Sadr City and has claimed responsibility for attacks against U.S. Forces at and near the time of the attack that injured Mr. Vaught.

2305.   As a result of the December 17, 2003 Terrorist Attack and the injuries he suffered, Allen Ryan Vaught is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## VIII.   VIOLATING COUNTER-TERRORISM FINANCING SANCTIONS CAUSES ACTS OF INTERNATIONAL TERRORISM

2306.   As described above, Defendants actively and knowingly participated in a years' long conspiracy to materially support and commit acts of international terrorism.

2307.   Defendants abandoned their trusted role as financial gatekeepers and acted overtly in facilitating and training its high-risk customers, including designated Iranian entities and individuals (and other customers indisputably tied to terrorism), to defeat U.S. counterterrorism sanctions and gain undetectable access to the U.S. financial system, and resulting in the fraudulent acquisition of USD and/or dual-technologies used to support and commit the violent acts of international terrorism that injured Plaintiffs.

2308.   Counterterrorism financing sanctions are the most effective non-militaristic and non-violent tool that nations have to stamp out the scourge of terrorism.

2309.   Underscoring the importance of counterterrorism financing sanctions in preventing terrorism are the comments made in 2008 by Stuart A. Levey, then Under Secretary for Terrorism and Financial Intelligence of the U.S. Department of Treasury, when he stated:

> The guiding principle of the Treasury Department's approach is that these [terrorism and transnational] threats all have one thing in common: they rely on

445

financial support networks. These networks are a key source of intelligence. Money trails don't lie; financial intelligence is uniquely reliable.

. . .

[T]errorist networks and organizations require real financing to survive. The support they require goes far beyond funding attacks. They need money to pay operatives, support their families, train, travel, and bribe officials. When we restrict the flow of funds to terrorist groups or disrupt a link in their financing chain, they are forced to shift their focus from planning attacks to worrying about their financial viability.[399]

2310. Counterterrorism financing sanctions specifically target these critical financing networks. Strict compliance with sanctions laws provides the collection of "key source intelligence [that] is uniquely reliable," and can effectively cripple the ability of a person, group, or State actor from carrying out their terroristic goals.

2311. When Counterterrorism financing sanctions are followed, **they work**.

2312. For example, on April 2, 2019, Mr. Robert Palladino, Deputy Spokesperson for the U.S. Department of State, and Mr. Brian Hook, Special Representative for Iran and Senior Advisor to the Secretary of State, conducted a Department Press Briefing. The purpose of the press briefing was to inform the public about the efforts that the government had undertaken to re-institute economic sanctions against Iran that (as was true at all times relevant in this action), are primarily intended to cripple its ability to use its terrorist network to commit or support acts of international terrorism. At the Press Briefing, Brian Hook stated:

We have targeted Iran's illicit oil shipping networks, which enrich the brutal Assad regime and terrorist partners like Hezbollah…

Almost one year after the United States ended its participation in the Iran nuclear deal, and five months after the full reimposition of our sanctions, it is clear that our actions are restricting Iran's cash flow. ***They are constraining its ability to operate freely in the region***.

Our oil sanctions have taken approximately 1.5 million barrels of Iranian oil exports off the market since May of 2018. This has denied the regime access to

---

[399] Remarks by Mr. Stuart A. Levey, Under Secretary for Terrorism and Financial Intelligence, Before the American Bar Association's 22nd Annual National Institute on White Collar Crime(March 6, 2008) (HP-863), at 1- 3.

well over $10 billion in revenue. That is a loss of at least $30 million a day, and this is only with respect to the oil. *Iran would otherwise use this money to support its destructive and destabilizing activities*.

Since the IRGC controls up to half of Iran's economy, this lack of investment *means less money for the Quds Force and Iran's network of proxies. Our sanctions are draining Iran's support to its proxies, and for the first time in a very long time, they have less access to revenue to spread terror and militancy*. In March, Hassan Nasrallah, the leader of Lebanese Hizballah, publicly appealed for donations for the first time ever. He has been forced to undertake unprecedented austerity measures. There are reports that some Hizballah fighters are receiving half of their pay, and that others are only being paid $200 a month. Other Hizballah employees report receiving 60 percent of their normal monthly salaries.

A new analysis released last month by the Washington Institute corroborates these findings. Hizballah has closed almost a thousand offices and paused hiring of new personnel. The report further concludes that *Hizballah itself attributes this belt-tightening to U.S. sanctions on Iran, which has historically provided the group with $700 million annually. That is 70 percent of Hizballah's entire budget*.

Hizballah is not alone in feeling the strain of American sanctions. Iranian proxies in Syria and elsewhere are experiencing a lack of funding from Tehran. Fighters are going unpaid, and the services they once relied upon are drying up. Last week *The New York Times* quoted a Shia fighter in Syria who said that, quote, "The golden days are gone and will never return. Iran doesn't have enough money to give us."

*When we identified ships smuggling illicit Iranian oil for the Quds Force to support Hizballah* and the Assad regime, Secretary Pompeo dispatched diplomatic teams to work with our allies and partners to help prevent it. We have been working with countries on almost every continent to identify vessels of concern and disrupt their operations. More than 75 vessels involved in illicit activity have been denied the flags that they need to sail.

Our sanctions are laying bare this regime's mismanagement and lack of transparency. Shortly after the President exited the Iran nuclear deal, Foreign Minister Zarif bragged that Iran would, quote, "thrive" under U.S. sanctions. His optimism was misplaced. A few months later, the supreme leader said that the regime is under, quote, *"unprecedented pressure," end quote. President Rouhani has since said Iran faces its, quote, "most severe economic crisis in 40 years."*

First, our pressure is aimed at reversing Iran's strategic gains. *From roughly 2007 through 2016, Iran was able for a variety of reasons to deepen its support of proxies and entrench itself in regional conflicts without facing negative*

*consequences. Iran does this by letting its proxies do the dying for them in regional wars. The proxies also give the regime plausible deniability*, a 40-year fiction this administration refuses to honor.

The effects of Iran's meddling had been felt most sharply by the region's innocent civilians. Men, women, and children are casualties of Iran's dangerous expansionism almost every day.

In Syria, Iran has ***[aided] and abetted*** Assad's brutal war machine as that machine has killed hundreds of thousands and displaced millions of civilians. Under the cover of the Syrian war, the IRGC is now trying to plant military roots in Syria and establish a new strategic base to threaten Syria's neighbors such as Israel.

In Lebanon, the Iranian regime's obsession with using Hizballah to provoke conflict with Lebanon's neighbors threatens the safety of the Lebanese people. IRGC backing enables Hizballah to use murder, terrorism, and corruption to intimidate other Lebanese parties and communities.

*In Iraq, I can announce today, based on declassified U.S. military reports, that Iran is responsible for the deaths of at least 608 American service members. This accounts for 17 percent of all deaths of U.S. personnel in Iraq from 2003 to 2011. This death toll is in addition to the many thousands of Iraqis killed by the IRGC's proxies.*[400]

(Emphasis added).

2313.   As evidenced by this statement, the past and present effort by the United States to strictly enforce sanctions is directly related to Iran's malign activities in Iraq - conduct that is specifically pleaded in this Amended Complaint – that resulted in the deaths and injuries to American service members, including Plaintiffs, at the hands of Iran and its FTO terrorist proxies. These sanctions directly target Iran's terrorist network of state-controlled banks, companies, and industries that Iran has, for decades, intends to and uses to commit terrorism, including the specific Iranian banks and Iranian companies at issue in this action.

2314.   The statement also demonstrates how Iran's state structure, especially its state-owned banking, shipping and petroleum companies (Defendants' customers), are in fact

---

[400] Video and transcript of statement available at: https://www.state.gov/r/pa/prs/dpb/2019/04/290841.htm (last accessed April 21, 2019).

designed and intended to commit and support acts of international terrorism and thereby "export" the Iranian Revolution abroad. From these recent Department of State comments it is apparent that these industries have played critical roles in Iran's terroristic aims and objectives.

2315.   The statement is further evidence that U.S. counterterrorism sanctions, when complied with by banks and others (including Defendants), are extremely effective in preventing Iran from being able to commit and support acts of terrorism, and directly impact the ability of terrorists, like FTO Hezbollah, to sustain their operations

2316.   The statement also supports Plaintiffs' allegations that Iran's undetectable, unfettered, and illegal access (as provided by Defendants) to the U.S. financial system was used to fuel Iran's ***illegitimate*** goals of committing and supporting terrorism.

2317.   Moreover, the statement fully supports Plaintiffs' allegations that such sanctions have a significant and material effect on Iran's ability to support, directly or indirectly, its terrorist proxies FTOs Hezbollah, AQ, AAI, KH and others. It further confirms that Iran's financial backing represents a majority of the operational funds received by these FTOs, and these FTOs consider Iran's financial and logistical support their lifeline in order to sustain their daily operations.

2318.   The statement also supports Plaintiffs' allegations that, because of Defendants' fraudulent conduct, the counterterrorism sanctions were ineffective and Iran was able to make strategic gains in the Middle East, including destabilizing Iraq and killing Americans.

2319.   Because of Defendants' willful participation, Iran's overarching goal of the Conspiracy was achieved - the enormous and sustained material support of its FTO proxies in their commission of international terrorism in Iraq, while affording Iran (and Defendants) plausible deniability of these heinous acts.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) OF ALL DEFENDANTS FOR CONSPIRACY TO PROVIDE MATERIAL SUPPORT FOR INTERNATIONAL TERRORISM

2320.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2321.   In knowingly agreeing to provide, and providing, material support or resources explicitly to designated Foreign Terrorist Organizations (FTOs) in violation of 18 U.S.C. § 2339B, or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A, and knowing, or generally aware of the fact that the object of the Conspiracy was to provide material support for terrorism and to commit acts of terrorism, and having committed and completed overt acts in furtherance of the Conspiracy, each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

### The Conspiracy

2322.   The Bank Defendants conspired with Iran, and Iran's terrorist proxies, to provide material support for terrorism, through providing support to a designated State Sponsor of Terrorism and its Agents and Proxies, including FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

2323.   Through fraudulent and unlawful acts committed directly by the Bank Defendants in the form of deliberately concealing information from financial transactions to prevent OFAC filters from identifying suspicious financial transactions, the Bank Defendants directly participated in the Conspiracy and furthered the goal of the Conspiracy.[401]

2324.   The Bank Defendants provided material support to Iran and its Agents and

---

[401] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

Proxies in the form of U.S. dollars, financial services, and securities that enabled Iran to fund and support terrorism in Iraq, including the terrorist attacks that killed or injured Plaintiffs. The Bank Defendants provided additional material support by providing expert advice to their Iranian customers, including Iran's state-controlled banks and SDNs, by teaching them how to avoid the detection of regulators and banking authorities. Providing this expert advice to their sanctioned and "high-risk" clients would not have been necessary but for the fact that Iran required clandestine access to USD in order to support its illicit terrorist activities. Defendant Banks, given their business practices, expertise, and awareness of laws and regulations, knew or reasonably should have known the illicit ends to which this expert advice would be utilized.[402]

2325.   Once the Conspiracy was formed, all its members, including the Bank Defendants became liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.   The Bank Defendants need not have participated actively in or benefited from the wrongful action in order to be found liable.   The Bank Defendants need not even have planned or known about the injurious action so long as the purpose of the tortious action was to advance the overall object of the Conspiracy.

### Object of the Conspiracy and the Goals of the Co-Conspirators

2326.   The object of the Conspiracy was to provide material support for terrorism, and to commit international terrorism.

2327.   The Bank Defendants' goal in participating in the conspiracy was pure financial gain. The Bank Defendants gained business worth hundreds of millions of dollars.

2328.   Iran's goal in participating in the Conspiracy was threefold.   By providing material support for terrorism they would: First push coalition forces out of Iraq; second keep

---

[402] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

Shiites in power, who have strong ties to Iran; and third support Iraqi federalism, as a federal Iraq divided among Shiite, Kurdish, and Sunni regions would be weaker than a strong centralized state.

2329.  Iran's terrorist proxies' goals in participating in the Conspiracy were to obtain much needed money and supplies to fund their attacks against the U.S. and coalition forces, and pay for the terrorist work and activities of their supporters.

2330.  The Bank Defendants had a legal duty to be aware of Iran's network of proxies and its terrorism campaign in Iraq. The U.S. State Department issued reports in 2006, 2007 and 2008 documenting Iran's efforts to provide terrorists in Iraq with EFPs, IEDs, rockets, mortars and small arms and to provide training and funding to terror proxies. These reports also connected Hezbollah and the IRGC-QF to the sophisticated IED technology that was used against U.S. forces in Iraq.

2331.  In February 2002, the U.S. Treasury Department announced bank regulations designed to help identify and impede the funding of terrorism, implementing additional anti-terrorism provisions of the USA PATRIOT Act. These regulations put the Bank Defendants on notice because they were explicitly aimed at terrorism financing and required the Bank Defendants to take affirmative action, giving the Financial Crimes Enforcement Network (FinCEN), a division of the U.S. Treasury, the power to require certain financial institutions to share information with law enforcement to help combat the funding of terrorism.

2332.  In 2006, the U.S. Treasury and State Department launched a campaign to warn a number of major international banks, including the Defendant Banks, about the risks of conducting business with Iran. Defendants Standard Chartered, Commerzbank and HSBC were briefed at that time about these risks of terror financing in conducting business in Iran.

2333. The Bank Defendants were put on further notice of Iran's terrorism campaign when the Financial Action Task Force (FATF) stated in October 2007 that Iran's lack of a comprehensive anti-money laundering and combating the financing of terrorism (AML/DFT) regime represented a significant vulnerability in the international financial system. On March 3, 2008, the United Nations Security Council passed Resolution 1803 (UNSCR 1803), calling on all states to exercise vigilance over activities of financial institutions in their territories with all banks domiciled in Iran and their branches and subsidiaries abroad. The FATF statement, combined with the UN's specific call for vigilance, made clear to the Bank Defendants the risk of terrorism posed by the Iranian financial sector, and by providing support thereto.

2334. The financial sector was specifically warned that dealing with Bank Saderat and Bank Melli would be supporting Iran's "prohibited proliferation related activity and terrorist financing" in an advisory issued by FinCEN on March 20, 2008. The advisory warned of the very activity the Bank Defendants have admitted to engaging in, "[t]hrough state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection. The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction."

2335. These statutes, regulations, advisories, Executive Orders and U.N. Resolutions, along with the affirmative steps each Bank Defendant took in concert with Iranian banks and known front companies of FTOs to utilize deceptive techniques specifically designed to avoid suspicion and evade detection, constitute evidence the Bank Defendants knew or were, at least, generally aware they were participating in the Conspiracy and, indeed, were playing an integral

role in the Conspiracy.

## Elements of Conspiracy

2336.   The elements of a conspiracy are:

1. An agreement to join a conspiracy, which can be inferred from a tacit understanding;
2. The performance of unlawful acts as part of the conspiracy;
3. Injury caused by one or more of the parties; and
4. That these overt acts were pursuant to the common scheme and objective of the conspiracy.

## Evidence of the Agreement

2337.   Each of the Bank Defendants signed Deferred Prosecution Agreements with the Department of Justice, as well as Consent Orders with the NYDFS, documenting the Bank Defendants' willing involvement in the Conspiracy and outlining the duration, scope, techniques, and volume of transactions, mad in furtherance of the Conspiracy.  The Statement of Facts in each of those agreements, admitted by the Bank Defendants, detail how each of the Defendants provided illegal access to the U.S. financial system, to Iran and its terrorist proxies in its network.

2338.   All banks, including Defendants, that operate in the United States and have international operations or relationships with correspondent banks have a duty under the Bank Secrecy Act, 31 U.S.C. §§ 5311 et. seq., based on international banking norms, to adopt know-your-customer ("KYC"), anti-money laundering ("AML") and anti-terrorist financing ("ATF") standards, as defined by and enforced by the Financial Action Task Force ("FATF") and its supporting governments.

2339.   Each Bank Defendant was headquartered in a country that is a member of the FATF and/or was obligated to comply with the standards for combating money laundering, the

financing of terrorism, and the proliferation of weapons of mass destruction set by the FATF.[403] The Forty Recommendations issued by the FATF establish a minimum for international AMF standards and include a due diligence obligation to monitor publicly accessible information relating to "high risk" customers.

2340.   At all relevant times hereto, Defendants Barclays, Credit Suisse, Deutsche Bank, HSBC, Standard Chartered, and RBS were all members of the Wolfsberg Group, an association of large global banks that, in 2000, developed and agreed to a set of AML principles and guidelines to promote transparency and increase the effectiveness of global anti-terrorist financing programs, including requiring significant due diligence in collecting and recording account information, including the identity of the principle beneficial owners of an account, the purpose and reasons for opening the account, and the source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening) along with other identifying information.

2341.   During the same time that Defendant Banks conspired with Iran, many public documents and government reports highlighted how Iran provided direct monetary support by paying terror proxies in Iraq between $4,000 and $13,000 per rocket or roadside bomb.   Public documents and government reports also reveal how Iran established training camps within its border to train its proxies and agents on how to build and place roadside bombs in Iraq.   As one of many examples, the trainer in charge of terrorist attacks in Karbala was paid $3 million in U.S. currency every month.

2342.   Numerous   government   reports   and   other   publicly   available   information

---

[403] Defendant HBME is lead-regulated by the Dubai Financial Services Authority, but remains locally regulated in each of the countries in which it operates by the country's Central Bank and its other regulators. The Co-operation Council for the Arab States of the Gulf, which includes the United Arab Emirates, has also been a regional organization member of FATF since 1991.

disseminated prior to and during the period of the Conspiracy, of which the Bank Defendants were aware or should have been aware, describe Iran's role in providing assistance to FTOs such as Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq with EFPs, IEDs, rockets, mortars and small arms and to provide training and funding to terror proxies. These reports also connect Hezbollah and the IRGC-QF to sophisticated IED technology.

2343. These government reports were preceded well in advance by news and media reports, journalists, and public statements by U.S. Department of Defense officials and others about which Defendants were aware or should have been aware.

2344. By agreeing to participate in the funding scheme, the Bank Defendants knew, or should have known, that they were potentially providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism as early as 1984, and had been subject to sanctions for many years. The information available to the Bank Defendants at the time, combined with the banks intentionally seeking ways to surreptitiously arrange for funding and U.S. dollar transfers that did not identify Iranian connections even though legitimate means were in fact available, indicates that at a minimum, the defendant banks knew that what they were doing was illegal, and was not appropriate conduct for international financial institutions.

2345. In the various Deferred Prosecution Agreements that are incorporated by reference herein, the Bank Defendants' admitted purposeful and fraudulent violations of the Bank Secrecy Act, Trading with the Enemy Act, International Emergency Economic Powers Act, various money laundering criminal statutes, the FATF standards, and the Wolfsberg Group

principles. Cease and Desist Letters, as well as Consent Orders entered into with the Department of Justice, U.S Department of the Treasury, Federal Reserve, and NYDFS, constitute further evidence of each Defendant's agreement to join, and their participation in, the Conspiracy, as well as each Defendant's tacit (if not overt) understanding of Iran's objective in the illicit enterprise.

## Unlawful Acts

2346. The numerous unlawful acts committed by the Bank Defendants – including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information, and failing to notify the authorities/regulators of these suspicious Iranian activities – all in an effort to provide material support either explicitly to FTOs, in violation of 18 U.S.C. § 2339B or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – constitute the "unlawful acts" of defendants in their roles as members of the Conspiracy.

2347. The conduct of the Bank Defendants working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions and prevent U.S., U.K., and other law enforcement agencies from interdicting the illegally transferred funds and preventing the funding of the FTOs and their affiliated agencies and other terrorist groups, was unlawful and did not constitute "routine business transactions." Each Bank Defendant engaged in multiple illegal transactions over a period of years, using manipulative and deceptive methods designed to fraudulently conceal the identity of the Iranian participants and provide cover and plausible deniability to themselves and Iran.[404]

2348. Details of the unlawful acts performed by each respective Bank Defendants, in

---

[404] Exhibit 3, Declaration of Robert Mazur at 22-23.

concert with Iran and its proxies and agents, are further summarized in the body of the Amended Complaint, as well as in the Deferred Prosecution Agreements and Consent Orders signed by certain Bank Defendants and also referenced in the body of the Amended Complaint.

## Material Support in the Form of U.S. Dollars

2349. The Defendants herein and Iran agreed to, and did in fact, purposefully transfer hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference: (1) facilitate the transfer of hundreds of millions of U.S. dollars in payments to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, through the international financial system; and (2) prevent the U.S. government as well as U.S., and U.K. law enforcement agencies from interdicting the illegal transfers of funds. In doing so, the Defendants agreed to join and participate in the Conspiracy, and were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities. In doing so, each Defendant violated 18 U.S.C. § 2339B by, among other things, knowingly entering and participating in the Conspiracy, which provided material support to FTOs that were responsible for Plaintiffs' injuries.[405]

## Material Support in the Form of Financial Services and Securities

2350. Each Defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions. Congress defined "material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "any property,

---

[405] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 19.

tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services." Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the Bank Defendants' dollar-clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339B, and violate Congress' stated goal of cutting off the flow of money to terrorists.

**Material Support in the Form of Expert Advice**

2351.   Each Defendant also provided material support in the form of expert advice and assistance to FTOs, or known front companies of FTOs. Included in the definition of "material support or resources" is "expert advice or assistance."   Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."   The Bank Defendants each had compliance departments that were responsible for and received extensive training on detecting and preventing the flow of money to terrorists.   Despite this, the Defendants brazenly (and knowingly) provided technical, and highly specialized knowledge to SDNs, SDGTs, and FTOs, including the IRGC, Hezbollah, National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi as part of their package of financial services to specifically ensure that such known front organizations of these FTOs as well as their individual members would know how to conduct illegal dollar transfers to avoid detection with the goal of funding the Terrorist Attacks.

**Foreseeable Risk**

2352.  Violence against American and other Coalition troops and civilians is a

"foreseeable risk" and not outside the scope of a conspiracy to provide material support for terrorism.

2353. Each Plaintiff's injuries and/or deaths constitute a harm falling within the risk contemplated by each Defendant's violations of U.S. and international law and sanctions. Further, each Defendant had knowledge of, or general awareness of the fact that a specific, foreseeable aim and purpose of the Conspiracy was to commit acts of terrorism and to provide material support to Iran's terrorism network that included FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. Injuries and deaths resulting from terrorist attacks planned, designed, assisted, funded, initiated, authorized and/or overseen by FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, are precisely the risks contemplated by the statutes, regulations advisories, Executive Orders and U.N> Resolutions that were designed to ensure that FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

### Injury Caused by One of the Parties

2354. Plaintiffs were killed or injured as a result of the Terrorist Attacks committed by one or more members of the Conspiracy.

2355. These attacks were all committed, planned or authorized by FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and/or al Qaeda in Iraq as part of their role in Iran's Conspiracy to commit terrorism in Iraq.

2356. Plaintiffs were killed or injured by roadside bombs, mortars, IEDs, EFPs, small arms fire, and other forms of terrorism traced to FTO members of Iran's terrorism network and

funded with U.S. dollars obtained in concert with the Bank Defendants.

2357.  Each of the Plaintiffs was killed or injured by an act of international terrorism –
namely, the Terrorist Attacks and other conduct designed to kill and maim Coalition troops and
terrorize ordinary Iraqis.  These overt acts committed by other members of the Conspiracy
qualify as "violent acts or acts dangerous to human life" intended to "intimidate and coerce a
civilian population", "influence government policy or affect the conduct of the government by
mass destruction, assassination or kidnapping" as required by 18 U.S.C. § 2331.

## Overt Acts Pursuant to Common Scheme

2358.  Iran's terrorism network, through its member FTOs, performed overt acts
pursuant to a common scheme to support and commit acts of international terrorism, waging a
terrorism campaign in Iraq by repeatedly attacking U.S. and Coalition forces. Without the
Defendant Banks participating in the Conspiracy, these terrorist attacks would not have been
possible.

2359.  The Bank Defendants' provision of material support in the form of U.S. dollars,
financial services and securities, and expert advice was done in furtherance of the Conspiracy.
Without the access to U.S. dollars and other material support provided by the Bank Defendants,
the terrorist entities would not have been able to obtain the necessary funds, training, supplies, or
avoid detection, or otherwise allow them to engage in the overt acts necessary to plan, commit
and authorize the Terrorist Attacks that killed or injured Plaintiffs, and by failing to report the
suspicious transactions the Bank Defendants provided cover and plausible deniability to Iran as it
waged its terrorism campaign via proxies in Iraq.[406]

2360.  The Bank Defendants conspired directly with Bank Melli, Bank Saderat, Bank
Markazi, IRGC, NIOC, IRISL, and known front companies of the FTOs within Iran's terrorism

---

[406] Exhibit 3, Declaration of Robert Mazur at 22-23.

network - the very FTOs that planned, committed and/or authorized the attacks on Plaintiffs - and therefore conspired directly with the "person" who committed acts of international terrorism. The Bank Defendants did not have to meet or deal directly with (or even know the identity of) the specific co-conspirator who committed the final violent act(s) of terrorism to be liable under § 2333(d). It is enough that they conspired directly with members of the terrorism network that committed, planned or authorized any act of international terrorism along the causal chain culminating the final Terrorist Attack.

2361.   Once the Conspiracy was formed, all its members, including the Bank Defendants became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them.   Each of the conspirators played a crucial role in the success of the Conspiracy:

> c) the Bank Defendants provided funding, financial services and securities, and expert advice and assistance, to Iran and its Agents and Proxies through their methods for circumventing U.S. sanctions and regulations.   The Bank Defendants also provided assurances that U.S., U.K. and other law enforcement agencies would not interdict their illegal transfers

> d) Iran and Iran's Agents and Proxies, including the IRGC, MODAFL, and others, were conduits for the funds obtained through the Bank Defendants that were then transferred to FTOs, along with other terror groups, which committed, planned, and/or authorized the terror acts.

2362. The Bank Defendants' overt acts were in "furtherance of the conspiracy." Without the Bank Defendants' funding and assistance, the terrorist entities would not have been able to receive the necessary material support from Iran they required to engage in the overt acts of actualizing the Terrorist Attacks that killed or injured Plaintiffs to "the same extent and magnitude" as they did, and Iran and its entities would have been severely hampered in its terror financing.

2363.   Although the Bank Defendants may not have directly committed the ultimate act

462

of murder or bombing, they, as members of the Conspiracy, are liable for the foreseeable injuries suffered as a result of the Conspiracy.

2364. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied the ability of Iran's terrorism network, including FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's to successfully engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2365. Although the Bank Defendants may not have committed the ultimate acts of murder or bombing and may not have agreed or conspired to commit the specific act of international terrorism that injured and killed Plaintiffs, they did commit fraudulent and overt acts in furtherance of Iran's overall Conspiracy and knowingly conspired with Iran and members of its terrorism network that committed various acts of international terrorism leading up to and culminating in the Terrorist Attacks committed, planned and/or authorized by FTOs.

### Acts of International Terrorism

2366. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2367. Each Defendant's agreement to enter into the Conspiracy and clandestine purposeful transfer (collectively) of hundreds of billions of U.S. dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were

thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's role in killing and injuring hundreds of American nationals in Iraq.

2368. Each terrorist entity and individual that is alleged to have injured Plaintiffs is a part of the Conspiracy, as are the Bank Defendants that funded and supported their activities as described above.

2369. Through the conduct as described above, and by knowingly entering into and participating in the Conspiracy, the Bank Defendants provided material support, directly or indirectly, to terrorist and FTOs, all while being generally aware of and having agreed to the unlawful enterprise knowing of the Conspiracy's goal of supporting and committing terrorist acts, each Defendant is civilly liable for damages to each Plaintiff for his/her injuries caused by members of the Conspiracy pursuant to 18 U.S.C. § 2333(d).[407]

## SECOND CLAIM FOR RELIEF

## SECONDARY CIVIL LIABILITY OF ALL DEFENDANTS UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING

2370. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2371. In knowingly agreeing to provide, and providing, material support and resources to Iran, and Iran's Agents and Proxies, in an illegal manner, and knowing that by aiding and

---

[407] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

abetting Iran, and Iran's Agents and Proxies, to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, each Defendant violated § 2339B's express prohibition against aiding and abetting any person to provide material support to an FTO, within the meaning of § 2339B.[408]

2372.   The Defendants aided and abetted the acts of international terrorism sponsored by Iran and planned, committed and authorized by FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

### Types of Material Support Provided

2373.   Congress defined "Material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…expert advice or assistance…false documentation or identification…"   The Defendants aided and abetted Iran with three broad forms of material support: currency and monetary instruments; expert advice and false documentation; financial services and securities.

### Material Support in the Form of U.S. Dollars

2374.   The Defendants aided and abetted Iran by purposefully transferring hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq through the

---

[408] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to substantially assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, aiding and abetting Iran to provide material support to FTOs that were responsible for Plaintiffs' injuries.[409]

2375.   Each of the Defendants also knew or was deliberately indifferent to the fact that providing tens of millions of dollars to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, clandestinely using the defendant banks dollar clearing services, is squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C § 2339B, and violates Congress' stated goal of cutting off the flow of money to terrorists.

### Material Support in the Form of Expert Advice and False Documentation

2376.   The Defendants also aided and abetted Iran by purposefully providing Iran with expert advice and assistance in an illegal manner, knowing or deliberately indifferent to the fact that such illegal expert advice and assistance facilitated Iran's well-known support for FTOs including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. Congress defined material support or resources to include "expert advice or assistance" which is defined in 18 U.S.C. § 2339 to include "advice or assistance derived from …technical or other specialized knowledge."  The defendant banks each received extensive training and guidance on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  The defendant banks brazenly provided that technical and highly specialized knowledge to Iran, as part of their package of illicit financial services knowing, or with deliberate indifference to the fact that Iran would use that knowledge to conduct tens of

---

[409] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

millions of dollars of illegal dollar transfers, to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, without being detected by the various enforcement agencies. The defendant banks also altered Fedwires to conceal their client's identities from authorities.

**Material Support in the Form of Fraudulent Financial Services and Securities**

2377. Each defendant also provided material support, in the form of fraudulent financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions. Congress defined "Material support or resources" in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the defendant banks dollar clearing services, as well as underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

**Aiding and Abetting**

2378. Each of the Defendants was aware of Iran's designation as a state sponsor of terror; Iran's stated goal of "Death to America"; and Iran's involvement with sponsoring terrorism in Iraq against U.S. peacekeepers as a means to push the U.S. out of Iraq. Each of the Defendants was generally aware that by aiding and abetting Iran, and Iran's Agents and Proxys, they were violating both U.S. and international laws, and their participation was not only criminal but they risked significant reputational harm if caught. Each Defendant was also aware of OFAC's SDN List, and the dangers presented by the entities and individuals on that list. In spite of the above dangers to American lives, the Defendant's willingly engaged in illegal

activities to aid and abet Iran, and Iran's Agents and Proxies. The assistance which the Defendants knowingly provided Iran, and Iran's Agents and Proxies, was substantial according to the factors outlined in *Halberstam*.

## Nature of the Acts Encouraged

### (First *Halberstam* Factor)

2379.  The conduct of the Defendants, and the acts that they encouraged, are extreme and outrageous such that it demonstrates either the specific intent to commit terrorism, or the reckless indifference to, the harm and severe physical and emotional distress suffered by the victims of Iranian-sponsored terrorism. Each of the Defendants took purposeful and concerted steps to deny, conceal, and mask their role in aiding and abetting Iran, and Iran's Agents and Proxies.  In the process, Defendants knowingly violated U.S. and international sanctions, laws, and treaties.

2380.  The Defendants were instrumental in providing Iran with an illegal financial structure, with which they secretly transferred money to, from and between SDNs, enabling such SDNs and associated front companies, to facilitate the sourcing of essential parts for IEDs, fund training housing, supplies and transportation for terrorist cells, as well as provide bank notes to ensure further anonymity. Specifically, Defendants conduct encouraged and allowed Iran to focus its finances, infrastructure, agents and instrumentalities to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families.

2381.  By training Iran, and Iran's Agents and Proxies, on how to circumvent U.S. counterterrorism sanctions, Defendants encouraged and promoted Iran's sponsorship of terrorism. The Defendants conduct demonstrates a policy of encouraging, supporting and directing Iran to access the U.S. financial system in order to conduct a campaign of deadly acts

of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious.

2382. The fact that the Defendants were successfully able to hide their illegal activities for so many years from U.S. regulators, and thereby undermine sanctions, not only removed the intended consequences of such sanctions but encouraged and emboldened Iran's, and Iran's Agents and Proxies, deep-seated and malicious hatred of the United States and allowed Iran, through its FTO Agents and Proxies to intentionally authorize, plan and commit terrorism against U.S. Nationals.

## The Amount of Material Support Provided Was Substantial and Essential

### (Second *Halberstam* Factor)

2383. The Defendants' assistance to Iran was substantial for the following reasons. As a result of the assistance received from each of the defendants, Iran was able to transfer U.S. dollars to and from any party, at any time, regardless of the laws declaring such transfers illegal, regardless of whether the recipient was a Foreign Terrorist Organization, and regardless of the bank's legal obligations under the laws of the United States to stop such transfers. As a result of the assistance received from each of the defendants, Iran was able to hide billions of dollars in illegal transfers, within a much larger pool of legal dollar transfers. As a result of the assistance received from each of the Defendants, the economic sanctions against Iran, which aimed at stopping Iran from sponsoring terrorism, were ineffective. As a result of the assistance received from each of the Defendants', Iran learned how to evade the vast network of tools established by regulators to prevent terrorism. Finally, as a result of the assistance received from each of the Defendants, Iran was able to achieve their goal of providing material support to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq and other FTO's for many

years, while evading detection from authorities.

2384. The Defendants' assistance to Iran was not only substantial because of what each of the Defendants did for Iran, but also substantial because of what each of the defendants did not do, that they were legally required to do. Each of the Defendant banks were legally obligated to report to the authorities, transfers to all SDNs or from Foreign Terrorist Organizations. Instead, each of the Defendants remained silent, content with the enormous fees paid to them by Iran and Iran's Agents and Proxies, for violating U.S. laws, and turning a blind eye to the horrific injuries and loss of life experienced by the plaintiffs and their families in this case.

### The Material Support Provided Was Essential

2385. The assistance provided by each of the Defendants to Iran was essential. Each of the banks illegally allowed Iran access to the U.S. financial system, the largest U.S. dollar clearing system in the world. There is no alternative financial system capable of transferring the hundreds of billions of U.S. dollars, around the world that Iran and Iran's Agents and Proxies required. Alternative methods such as black market exchanges, bulk cash smugglers, and third party intermediaries, are not only unsafe and inefficient, but they do not have the collective ability to transfer hundreds of billions of dollars. Perhaps even more importantly, unlike the cartels whose business is conducted in "cash", proceeds from oil sales are denominated in U.S. dollars and transferred electronically.

2386. Having gained access to the U.S. financial system it was essential to the success of the conspiracy that the thousands of illegal wire transfers and letters of credit made on behalf of Iran and its Proxies and Agents be concealed from regulatory agencies and law enforcement. Only the Bank Defendants were in a position to provide access to the U.S. financial system, provide the necessary services, and hide such transfers from regulatory and law enforcement

agencies. As a result, it was essential for Iran and Iran's Agents and Proxies to obtain the assistance from the Bank Defendants.

### The Defendants' Presence During the Commission of the Terrorist Attacks

### (Third *Halberstam* Factor)

2387. Each of the Defendant banks remained ever present during the commission of the terrorist attacks. The Defendants provided the trade finance that enabled the terrorists to acquire essential parts from the around the world, necessary for the construction of IEDs and EFPs. The Defendants provided access to the US financial system which enabled funds to be secretly transferred to, from and between SDNs. The Defendants provided bulk bank notes, sometimes pallets at a time, which were used to fund those terrorists on the ground responsible for building and placing bombs, as well as providing safe harbor, training, feeding and housing terrorists. The Defendants enabled Iran to circumvent the sanctions that had been implemented to pressure Iran to stop sponsoring terrorism. The banks served as money launderers to the terrorists effectively hiding their flow of dirty money in the vast pool of legitimate dollar transfers in the U.S. financial system. The Defendants did all of the above while obligated to abide by laws which required them to report each such instance to U.S. regulators.

### The Defendants' Relationship with Iran, and Iran's Agents and Proxies

### (Fourth *Halberstam* Factor)

2388. Each of the bank Defendants had a close relationship with Iran, and many of Iran's Agents and Proxies, that lasted many years. In fact, many of the defendants have been operating in the Middle East, since the inception of OPEC in 1960. As a result, as a member of OPEC, Iran has been a client for many years prior to the start of this conspiracy. Iran trusted the Bank Defendants and the Bank Defendants trusted Iran to keep their collective illegal affairs a

secret.  Iran trusted the banks to clear hundreds of millions of U.S. dollars each day, in oil sale proceeds, in violation of international sanctions.  Iran trusted the Defendants to not disclose to authorities their illegal transfers of U.S. dollars to FTO's.

## The Defendants' State of Mind

### (Fifth *Halberstam* Factor)

2389.   Each of the Defendants knew that Iran was classified as a state sponsor of terror, for committing the same types of acts that caused the injuries to the Plaintiffs in this case.  Each of the banks knew of the prohibition against transferring funds to people/entities on the Specially Designated Nationals (SDN) list, and knew of the dangers that these individuals/entities represented. Despite this knowledge each of the Defendants agreed to covertly and illegally transfer funds to and from entities, including FTOs, listed on the SDN list, on behalf of Iran. Each of the Defendant's knew of the sanctions in place against Iran, knew the reason those sanctions were implemented, and knew that the types of transactions they were performing on behalf of Iran, and Iran's Agents and Proxies, were illegal, but performed them anyway. The banks acted knowingly or with deliberate indifference to the fact that the substantial assistance would be used to provide material support to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, and were deliberately indifferent to the irreparable harm that it would cause American peacekeepers.[410]

2390.   As part of the Know Your Customer – Anti Terrorist Act / Bank Secrecy Act laws, each of the defendant banks were required to know their customers. To accomplish this requirement each of the defendant banks had extensive tools and procedures in place to understand their customer, the nature of their customer's business, the laws that apply to their customers, as well as the risks associated with each of their customers.   As bankers, the

---

[410] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

Defendants were able to access information about their customers not available to governments or the public. These tools gave the Defendants an insider's view as to the source and use of their customer's funds.

**Knowledge of FTOs Designation and Engagement in Terrorism**

2391.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

2392.   While each Defendant was aiding and abetting Iran, by providing Iran with material support in an illegal manner, each Defendant knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to numerous U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

2393.   Each Defendant knew that Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, were designated an FTO at all times relevant to this action and that Kata'ib Hezbollah was designated an FTO on June 24, 2009.   Each Defendant also knew that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

2394.   Each Defendant knew or was deliberately indifferent to the fact that by aiding and abetting Iran to provide material support in an illegal manner, each unlawfully evaded U.S.

sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxies, agents, and strategic partners, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

2395.   The acts of aiding and abetting, as well as the acts of international terrorism that injured the Plaintiffs, constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2396.   Each Defendant also: knew of the existence of some or all of the other Defendants; was aware that the other Defendants and Iranian Banks engaged in the same or similar conduct, and that the other Defendants also provided material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxies, agents, and strategic partners, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

2397.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific objectives in providing material support to Iran was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, in order to prevent the interdiction of the illegally-transferred funds which would have prevented the funds from reaching the FTOs and other Iranian sponsored terrorists, and thus also knew or was deliberately indifferent to the fact that the material support each provided facilitated that specific objective.

2398.   Having aided and abetted Iran by providing Iran material support in an illegal

manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship), each Defendant knew or was deliberately indifferent to the fact, that aiding and abetting Iran would foreseeably result in Iran and Iran's Agents and Proxies transferring millions of dollars to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq all of which are FTOs.

2399.  The material support that each Defendant, through aiding and abetting Iran, knowingly, or with deliberate indifference, provided to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, constituted material and substantial assistance to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, thereby facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and have caused injuries to Plaintiffs.[411]

2400.  The Defendants' knowingly provision of material support to Iran – a known and designated State Sponsor of Terrorism – in an illegal manner, and the resultant, purposeful transfer of hundreds of billions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

2401.  The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2402.  Each Defendant's purposeful transfer (collectively) of hundreds of billions of

---

[411] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's role in killing and injuring hundreds of American nationals in Iraq.

2403.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2404.   Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowledge of, or deliberate indifference to, the fact that by illegally aiding and abetting Iran, it was foreseeable they would be providing material support to FTOs Hezbollah, Kata'ib Hezbollah's, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq.   Injuries resulting from terrorist attacks committed, planned, authorized, designed, assisted, funded, initiated, and/or overseen by Hezbollah, Kata'ib

Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

2405.   Through its conduct as described above, by knowingly aiding and abetting Iran, and Iran's Agents and Proxies, by providing material support to Iran, and Iran's Agents and Proxies, in an illegal manner, and knowing, or deliberately indifferent to the fact, that the material support would be used to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, each Defendant violated § 2339B, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).[412]

2406.   Furthermore, regardless of the Iranian banks and other Iranian entities being designated as SDN's or SDGT's, Iranian banks and their customers were objectively in the category of entities at "high risk" for financing terrorism – which required Defendants to be hyper-vigilant when processing transactions for those entities and to significantly increase the level of scrutiny applied to each and every transaction. Instead, the Defendants did the opposite – using their knowledge about the level of scrutiny OFAC regulators would apply to the transactions (if the identity of the parties to the transaction were known) as a guide for successfully falsifying the documents so that the transactions would not be flagged or scrutinized.

---

[412] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

## Duration of Assistance Provided By Defendants

## (Sixth *Halberstam* Factor)

2407.   The duration of the assistance Defendants provided to the Iranian banks and their customers might be the most egregious part of the Defendants' conduct. Each of the Defendants' conduct began in the late 1990's and lasted for over a decade. Some of the Defendants continued their fraudulent conduct until 2012. For example, SCB conducted its fraudulent conduct until (at least) 2011; HSBC conducted its fraudulent conduct until (at least) 2011[413]; and BNP Paribas conducted its fraudulent conduct until (at least) 2012.  This was during a time when Iranian banks and entities were designated as SDN's and SDGT's and long after the U.S. revoked the U-Turn exception due to exploitation by the Iranian banks in using the exception as a means to finance terrorism.

2408.   Defendants' substantial efforts to illegally assist Iran and the Iranian banks and other high-risk customers occurred over many years. This assistance occurred during the time immediately leading up to, and overlapping with the period in which Plaintiffs were being attacked by Iran's FTO proxies in Iraq.

2409.   Defendants' substantial assistance also occurred during times in which terrorist attacks against Americans in Iraq were well publicized, and suspicion of Iran's involvement widely reported.

2410.   Certain Defendants allegedly stopped their illegal assistance to Iran when their conduct was eventually uncovered by regulatory agencies. These regulatory actions were also highly-publicized, and in fact, discussed internally by other Defendants while they continued provided their illegal and substantial assistance to Iran.

---

[413] But *see generally* Exhibit 4, Declaration of Everett A. Stern, stating that this illegal conduct occurred beyond 2012.

2411. The length of time that the Defendants' assisted Iran and its terrorism network was so sustained and long-term that it weighs heavily in supporting the fact that Defendants were aware of and knowingly participated in the acts alleged herein.

### THIRD CLAIM FOR RELIEF

### SECONDARY LIABILITY AGAINST COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING ORPHAN'S PROJECT

**(Providing material support to FTO by aiding and abetting Orphans Project's attempt to provide same to Hezbollah under 2339B)**

2412. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2413. During the relevant period of time, Commerzbank AG and Commerzbank AG New York Branch knowingly and unlawfully provided material support and resources, including U.S. dollars, expert advice, services and false documentation, and fraudulent financial services, by aiding and abetting Waisenkinderprojekt Libanaon e.V.'s (Orphans Project Lebanon e.V.) attempt to provide same, to Hezbollah, which at all relevant times was designated by the Secretary of State as a FTO, knowing that Hezbollah was a designated FTO, that Hezbollah engages and has engaged in terrorist activity, and that Hezbollah engages and has engaged in terrorism, in violation of 18 USC 2339B.

2414. Commerzbank AG and Commerzbank AG New York Branch aided and abetted the acts of international terrorism sponsored by Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.) and planned, committed and authorized by FTO Hezbollah.

### Types of Material Support Provided

2415. Congress defined "Material support or resources" in 18 USC 2339B(g)(4) as having the same meaning given that term in 18 USC 2339A to include "…any property, tangible

479

or intangible, or service, including currency or monetary instruments or financial securities, financial services,…expert advice or assistance…false documentation or identification…" Commerzbank AG and Commerzbank AG New York Branch aided and abetted Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.) with three broad forms of material support: currency and monetary instruments; financial services and securities; and expert advice, services, and false documentation.

### Material Support in the Form of Currency and Monetary Instruments

2416. Commerzbank AG and Commerzbank AG New York Branch and Orphans Project Lebanon e.V., purposefully transferred U.S. dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of millions of dollars in payments to Hezbollah, through the international financial system. In doing so, Commerzbank AG and Commerzbank AG New York Branch was willing to, and did, commit numerous felonies under U.S. law to assist Orphans Project Lebanon e.V. in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, providing material support to Hezbollah that was responsible for Plaintiffs' injuries.[414]

### Material Support in the Form of Financial Services and Securities

2417. Commerzbank AG and Commerzbank AG New York Branch also provided material support, in the form of financial services and financial securities, by underwriting millions of dollars in illegal trade finance transactions. Congress defined "Material support or

---

[414] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

resources" in 18 USC 2339B to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Secretly facilitating the transfer of millions of U.S. dollars to a known front company of Hezbollah, using the defendant banks dollar clearing services are squarely within the definition of "material support or resources" contemplated by Congress, and violate Congress' stated goal of cutting off the flow of money to terrorists.

### Material Support in the Form of Expert Advice, Services and False Documentation

2418.  Commerzbank AG and Commerzbank AG New York Branch also provided material support in the form of expert advice and assistance to Hezbollah, and Orphans Project Lebanon e.V., a known front company of Hezbollah. Included in the definition of "Material support or resources" is "expert advice or assistance."  Congress defined "expert advice or assistance" in 18 USC 2339A and 18 USC 2339B to include "advice or assistance derived from …technical or other specialized knowledge."  Commerzbank AG and Commerzbank AG New York Branch received highly specialized and technical training and guidance, on detecting and preventing the flow of money to terrorists, from the government agencies tasked with enforcing the laws.  Commerzbank AG and Commerzbank AG New York Branch brazenly provided that technical, and highly specialized knowledge to Orphans Project Lebanon e.V. and Hezbollah as part of their package of illicit financial services to specifically ensure that the known front organization of Hezbollah, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.  Commerzbank AG and Commerzbank AG New York Branch also falsified Fedwires to conceal their client's identities from authorities.

2419.  Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs'

injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

## Aiding and Abetting

2420. Commerzbank AG and Commerzbank AG New York Branch was aware of Hezbollah's designation as a FTO, that Hezbollah engages and has engaged in terrorist activity, and that Hezbollah engages and has engaged in terrorism. Commerzbank AG and Commerzbank AG New York Branch was also aware of Iran's designation as a state sponsor of terrorism; Iran's involvement with sponsoring terrorism in Iraq against U.S. peacekeepers; and Hezbollah's role in committing terrorism on behalf of Iran. Commerzbank AG and Commerzbank AG New York Branch was aware that by aiding and abetting Orphans Project Lebanon e.V., attempt to provide material support to Hezbollah, they were violating both U.S. and international laws, and their participation was not only criminal but risked significant reputational harm if caught. In spite of those dangers, Commerzbank AG and Commerzbank AG New York Branch knowingly provided material support and resources, by aiding and abetting Orphans Project Lebanon e.V. attempt to provide material support to Hezbollah. The assistance which Commerzbank AG and Commerzbank AG New York Branch knowingly provided Orphans Project Lebanon e.V., and Hezbollah, was substantial according to the factors outlined in *Halberstam*.[415]

## Nature of the Acts Encouraged

### (First *Halberstam* Factor)

---

[415] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

2421.    Commerzbank AG and Commerzbank AG New York Branch's conduct, and the acts it encouraged, is extreme and outrageous such that it demonstrates either the specific intent to commit terrorism, or the reckless indifference to, the harm and severe physical and emotional distress suffered by the victims of terrorism planned, authorized or committed by Hezbollah. The Defendants took purposeful and concerted steps to deny, conceal, and mask their role in aiding and abetting Orphans Project Lebanon e.V., and Hezbollah.   In the process, Commerzbank AG and Commerzbank AG New York Branch knowingly violated U.S. and international sanctions, laws, and treaties.

2422.    Commerzbank AG and Commerzbank AG New York Branch were instrumental in providing Orphans Project Lebanon e.V.  with an illegal financial structure, with which they secretly transferred money to, from and between Orphans Project Lebanon e.V. and Hezbollah, enabling Orphans Project Lebanon e.V.  and Hezbollah, to facilitate the sourcing of essential parts for IEDs, fund training housing, supplies and transportation for terrorist cells, as well as provide bank notes to ensure further anonymity. Specifically, the Defendants' conduct encouraged and allowed Orphans Project Lebanon e.V. to transfer millions of dollars to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families.

2423.    By training Orphans Project Lebanon e.V. and Hezbollah, on how to circumvent U.S. counterterrorism sanctions, Commerzbank AG and Commerzbank AG New York Branch encouraged and promoted both Orphans Project Lebanon e.V.'s and Hezbollah's sponsorship of terrorism. The Defendants' conduct demonstrates a policy of encouraging, supporting and directing Orphans Project Lebanon e.V. to access the U.S. financial system in order to conduct a campaign of deadly acts of terrorism directed at civilians and peacekeeping forces, and in

particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious.

2424. The fact that Commerzbank AG and Commerzbank AG New York Branch was successfully able to hide their illegal activities for so many years from U.S. regulators, undermining sanctions and their intended consequences, enabled Hezbollah's efforts to authorize, plan and commit terrorism against U.S. Nationals.

## **The Amount of Material Support Provided Was Substantial and Essential**

### **(Second *Halberstam* Factor)**

2425. Commerzbank AG and Commerzbank AG New York Branch's assistance to Hezbollah via Orphans Project Lebanon e.V. was substantial for the following reasons. As a result of the assistance received from the Defendants, Orphans Project Lebanon e.V. was able to transfer USDs to Hezbollah, despite laws declaring such transfers illegal, despite Hezbollah's designation as a FTO, and despite the Defendant's legal obligations under the laws of the United States to stop such transfers. As a result of the substantial material support received from Commerzbank AG and Commerzbank AG New York Branch, Orphans Project Lebanon e.V. was able to hide their illegal transfers, within a much larger pool of legal USD transfers. As a result of the substantial material support received from the Defendants, Orphans Project Lebanon e.V. learned how to evade the vast network of tools established by regulators to prevent terrorism. Finally, as a result of the substantial material support received from Commerzbank AG and Commerzbank AG New York Branch, Orphans Project Lebanon e.V. was able to achieve their goal of providing material support to Hezbollah for many years while evading detection from authorities.

2426. Commerzbank AG and Commerzbank AG New York Branch's substantial

material support to Orphans Project Lebanon e.V. was not only substantial because of what each Defendant did for Orphans Project Lebanon e.V., but also substantial because of what each Defendant did not do, but that each Defendant was legally required to do. Commerzbank AG and Commerzbank AG New York Branch were legally obligated to report to the appropriate authorities, USD transfers to or from FTOs. Instead, the Defendants remained silent, content with the enormous fees paid to them by Orphans Project Lebanon e.V. and others, for violating U.S. laws, and turning a blind eye to the horrific injuries and loss of life experienced by Plaintiffs and their families in this case.

## The Material Support Provided Was Essential

2427.   The assistance provided by Commerzbank AG and Commerzbank AG New York Branch to Orphans Project Lebanon e.V. was essential.   The Defendants illegally allowed Orphans Project Lebanon e.V. access to the U.S. financial system, the largest U.S. dollar clearing system in the world.   There is no alternative financial system capable of instantly transferring millions of U.S. dollars around the world that Iran required.   Alternative methods such as black market exchanges, bulk cash smugglers, and third party intermediaries, are not only unsafe and inefficient, but they do not have the collective ability to transfer millions of dollars virtually anywhere in the world instantly. Perhaps even more importantly, unlike the cartels whose business is conducted in "cash", proceeds from oil sales are transferred electronically in U.S dollars.   As a result, it was essential for Iran, Orphans Project Lebanon e.V., and Hezbollah to obtain access to the U.S. financial system.

## Commerzbank's Presence During the Commission of the Terrorist Attacks

### (Third *Halberstam* Factor)

2428.   Commerzbank AG and Commerzbank AG New York Branch remained ever

present during the commission of the terrorist attacks. Commerzbank provided the trade finance that enabled the Hezbollah to acquire essential parts from the around the world, necessary for the construction of IEDs and EFPs. The Defendants provided access to the US financial system which enabled funds to be secretly transferred to, from and between Orphans Project Lebanon e.V. and Hezbollah. The Defendants provided bulk bank notes, which were used to fund those terrorists on the ground responsible for building and placing bombs, as well as training, feeding and housing terrorists. The Defendants enabled Orphans Project Lebanon e.V. to circumvent the sanctions that had been implemented to pressure Iran to stop sponsoring terrorism. The Defendants served as money launderers for Orphans Project Lebanon e.V. and Hezbollah effectively hiding their flow of dirty money in the vast pull of legitimate dollars transfers in the U.S. financial system. Commerzbank AG and Commerzbank AG New York Branch did all of the above while obligated to abide by laws which required them to report each such instance to U.S. regulators.

### Commerzbank's Relationship with Orphans Project Lebanon e.V. and Hezbollah

### (Fourth *Halberstam* Factor)

2429. Commerzbank AG and Commerzbank AG New York Branch had a close relationship with both, Orphans Project Lebanon e.V. and Hezbollah that lasted many years. Orphans Project Lebanon e.V. was a customer of Commerzbank AG and Commerzbank AG New York Branch. Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007, the United States designated the Lebanese organization that was the primary recipient of funds donated from the account (Hezbollah's charity, Lebanese Martyrs Foundation), Commerzbank AG and Commerzbank AG New York Branch knowingly, or with deliberate indifference to the fact,

continued to provide financial services to Orphans Project Lebanon e.V. and hence continued to transfer funds directly to FTO Hezbollah.[416]

## Commerzbank's State of Mind

### (Fifth *Halberstam* Factor)

2430.   Commerzbank AG and Commerzbank AG New York Branch knew that Iran was classified as a state sponsor of terror, for committing the same types of acts that caused the injuries to the plaintiff's in this case. The Defendants knew that Hezbollah was a designated FTO and that Hezbollah was created, funded and controlled by Iran. The Defendants knew of the prohibition against transferring funds to people/entities on the Specially Designated Nationals (SDN) list, and knew of the dangers that these individuals/entities represented as a result of their connections to terrorism. Despite this knowledge, Commerzbank AG and Commerzbank AG New York Branch agreed to covertly and illegally transfer funds to and from Orphans Project Lebanon e.V. and prevent disclosure of such illegal transfers to U.S. and other law enforcement, military and intelligence agencies, thereby ensuring that such funds would not be interdicted by the U.S. or other governments. The Defendants knew of the sanctions in place against Iran, knew the reason those sanctions were implemented, and knew that the types of transactions they were performing on behalf of Orphans Project Lebanon e.V. were illegal, but performed them anyway. Commerzbank AG and Commerzbank AG New York Branch acted knowingly or with deliberate indifference to the fact that the substantial assistance would be used to provide material support to Hezbollah and were deliberately indifferent to the irreparable harm that it would cause American peacekeepers.

---

[416] Exhibit 2, Declaration of Donald Charles Semesky, Jr. at 20.

## Commerzbank's Knowledge of Waisenkinderprojekt Libanaon e.V.'s (Orphans Project Lebanon e.V.)

### (Sixth *Halberstam* Factor)

2431.  As part of the Know Your Customer – Anti Terrorist Act / Bank Secrecy Act laws, Commerzbank AG and Commerzbank AG New York Branch was required to know its customers. To meet its legal obligation the Defendants had teams of professionals armed with extensive tools and procedures in place to understand their customers, the nature of its customer's business, the laws that apply to its customers, as well as the risks associated with each of its customers.  The Defendants had information about its customers not available to governments or the public. These tools gave the Defendants an insider's view as to the source and use of its customer's funds.  As a result, Commerzbank knew who controlled Orphans Project Lebanon e.V., the source of its funds, where and to whom its funds were being sent, and who its associates were.

2432.  Moreover, Orphans Project Lebanon e.V openly disclosed on its website that its funds were used to directly support Hezbollah.

### Knowledge of Hezbollah's Designation and Engagement in Terrorism

2433.  Because Commerzbank AG and Commerzbank AG New York Branch operated in the United States, at all times relevant to the Complaint, Commerzbank is deemed by law to be aware of all designations made to the SDN list.

2434.  While the Defendants were aiding and abetting Orphans Project Lebanon e.V, attempt to provide material support to Hezbollah, the Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to numerous U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs,

and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

2435.  Commerzbank AG and Commerzbank AG New York Branch knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331). Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that Hezbollah and Iran sponsored terrorists were perpetrating lethal attacks against U.S. nationals (including Plaintiffs) and others in Iraq during the period it processed the illegal financial transactions referenced herein.

2436.  The acts of aiding and abetting, as well as the acts of international terrorism that injured the Plaintiffs, constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2437.  The material support that Commerzbank AG and Commerzbank AG New York Branch, through aiding and abetting Orphans Project Lebanon e.V., knowingly, or with deliberate indifference, provided to Hezbollah, constituted material and substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

2438.  Commerzbank AG and Commerzbank AG New York Branch's overt acts in providing material support by aiding and abetting Orphans Project Lebanon e.V. to attempt to provide same, to Hezbollah in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their

consequences.

2439.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2440.   The Defendants' purposeful transfer of millions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to Hezbollah, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

2441.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by the Defendants' violations, including the Defendants' agreement to maintain a customer relationship with Orphans Project Lebanon e.V., the overt acts the Defendants performed on behalf of Orphans Project Lebanon e.V., and the Defendants' knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of Orphans Project Lebanon e.V. was to provide material support to Hezbollah. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah, had restricted access to U.S. dollars, financial services, and expert advice, and

that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked.

2442. Through its conduct as described above, Commerzbank AG and Commerzbank AG New York Branch knowingly and unlawfully aided and abetted Orphans Project Lebanon e.V.'s attempt to provide material support and resources to Hezbollah, in violation of 18 USC 2339B and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## Duration of Assistance Provided By Commerzbank

### (Sixth Halberstam Factor)

2443. The duration of the assistance Commerzbank provided to the Orphans Project Lebanon e.V. was long-term and sustained.

2444. As discussed in the sections above, Commerzbank continued to maintain an active bank account for Orphans Project Lebanon e.V. even after it had been widely reported that it was a charitable arm of FTO Hezbollah and was using funds to support the suicide bombers and other illicit terrorist activities.

## FOURTH CLAIM FOR RELIEF

### SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) AGAINST COMMERZBANK AG AND COMMERZBANK AG NEW YORK BRANCH FOR CONSPIRING WITH ORPHAN'S PROJECT

#### (Conspiring with Orphans Project to provide material support to Hezbollah under 2339B)

2445. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2446. Commerzbank AG and Commerzbank AG New York Branch violated 18 U.S.C. § 2339B by conspiring with Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.)

to provide material support to Hezbollah by knowingly agreeing to provide, and providing, material support to Orphans Project Lebanon e.V. in an illegal manner, and knowing, or deliberately indifferent to the fact, that the objects and aims of the Conspiracy were to provide material support to Hezbollah, an FTO, Commerzbank AG and Commerzbank AG New York Branch violated 18 U.S.C § 2339B's express prohibition against conspiring to provide material support within the meaning of 18 U.S.C. § 2339B, and committed and completed overt acts in furtherance of the Conspiracy, including acts of international terrorism sponsored planned, committed and/or authorized by one or more FTOs, as alleged hereinabove, which caused injuries to Plaintiffs.

### Evidence of the Agreement

2447.  Commerzbank AG and Commerzbank AG New York Branch signed a Deferred Prosecution Agreement with the Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the their involvement in the conspiracy.  The Statement of Facts in each of those agreements, admitted by Commerzbank AG and Commerzbank AG New York Branch, detail how they provided illegal access to the U.S. financial system, to Iran and Iran's terrorist proxies.

### Unlawful Acts

2448.  Numerous unlawful acts, admitted to by Commerzbank AG and Commerzbank AG New York Branch in its Deferred Prosecution Agreement - including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information – all in an effort to provide material support either explicitly to Hezbollah via Orphans Project Lebanon e.V, in violation of 18 U.S.C. § 2339B or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – constitute the

"unlawful acts" of Commerzbank in its role as a member of the Conspiracy.

## Overt Act Pursuant to Common Scheme

2449.   Once the conspiracy was formed, Commerzbank AG and Commerzbank AG New York Branch became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them.

2450.   Commerzbank AG and Commerzbank AG New York Branch played an essential role in the success of the Conspiracy. Commerzbank AG and Commerzbank AG New York Branch provided funding, financial services and securities, and expert advice and assistance, to Orphans Project Lebanon e.V., knowing that it was a conduit and a solicitor of funds for FTO Hezbollah, by circumventing U.S. sanctions and regulations and ensured that U.S., U.K. and other law enforcement agencies would be prevented from interdicting the illegally transfers of funds to Hezbollah.

2451.   Commerzbank AG and Commerzbank AG New York Branch's overt acts were in "furtherance of the conspiracy" by providing funding to FTO Hezbollah which committed, planned and authorized hundreds of terrorist attacks against U.S. nationals in Iraq, including the Plaintiffs.

2452.   Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

**Material Support in the Form of U.S. Dollars**

2453.   Commerzbank AG, Commerzbank AG New York Branch, and Orphans Project Lebanon e.V. agreed to, and did in fact, purposefully transfer U.S. dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of millions of dollars in payments to Hezbollah, through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Orphans Project Lebanon e.V. in concealing its financial activities and violated 18 U.S.C § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to Hezbollah that were responsible for Plaintiffs' injuries.

**Material Support in the Form of Financial Services**

2454.   Commerzbank AG and Commerzbank AG New York Branch also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions and concealed the material support they provided from regulatory and law enforcement officials.  Congress defined "Material support or resources" in 18 USC 2339B to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of millions of U.S. dollars to a known front company of Hezbollah, using the defendant banks dollar clearing services are squarely within the definition of "material support or resources" contemplated by Congress, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice

2455.  Commerzbank AG and Commerzbank AG New York Branch also provided material support in the form of expert advice and assistance to Hezbollah, and Orphans Project Lebanon e.V., a known front company of Hezbollah. Included in the definition of "Material support or resources" is "expert advice or assistance."  Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A and 18 U.S.C. § 2339B to include "advice or assistance derived from …technical or other specialized knowledge."  The Bank Defendants each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  Commerzbank AG and Commerzbank AG New York Branch brazenly provided that technical, and highly specialized knowledge to Orphans Project Lebanon e.V. and Hezbollah as part of their package of financial services to specifically ensure that the known front organization of Hezbollah, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

2456.  Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

## Knowledge of the Organizations' Connection to Terrorism

2457.  Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that, Hezbollah was designated an FTO at all times relevant to

this action, in addition to being designated as a SDT and SDGT.

2458.   Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that, their agreement to provide Hezbollah material support in an illegal manner, and the overt acts they completed in connection with the Conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Hezbollah would carry out, support, fund, plan for, prepare, or facilitate acts of international terrorism.

2459.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2460.   Commerzbank AG and Commerzbank AG New York Branch also knew, or were deliberately indifferent to the fact that, one of the specific aims and objectives of the Conspiracy was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to the illicit movement of U.S. dollars through the international financial system, who would otherwise block such transfers, and thus also knew or was deliberately indifferent to the fact that the overt acts it performed in furtherance of the Conspiracy facilitated that specific objective.

2461.   Commerzbank AG and Commerzbank AG New York Branch also knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was using them to transfer funds to Hezbollah, and it was foreseeable that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

2462.   Commerzbank AG and Commerzbank AG New York Branch's overt acts in entering into the Conspiracy and knowingly agreeing to provide Hezbollah – a designated FTO –

material support and services in an illegal manner, and resultant, purposeful transfer of millions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

2463.  Commerzbank AG and Commerzbank AG New York Branch's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2464.  Commerzbank AG and Commerzbank AG New York Branch's agreement to enter into the Conspiracy and purposeful transfer of millions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to Hezbollah, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

2465.  Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by the Bank Defendants' violations, including Commerzbank AG and Commerzbank AG New York Branch's knowing agreement to enter into the Conspiracy, the overt acts they each performed in furtherance of the Conspiracy, and their knowledge of, or

deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

2466. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG New York Branch committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## FIFTH CLAIM FOR RELIEF

### SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) OF ALL DEFENDANTS FOR CONSPIRACY TO PROVIDE MATERIAL SUPPORT FOR INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339A

**(Conspiring to Provide Material Support to Terrorists under 2339A)**

2467. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2468. By knowingly agreeing to provide, and providing, material support to Iran and Iran's Agents and Proxies, in an illegal clandestine manner, and knowing, or with deliberate indifference to the fact, that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy, including acts of international terrorism sponsored planned, committed and/or authorized by one

or more FTOs, as alleged hereinabove, which caused injuries to Plaintiffs.

## The Conspiracy

2469.   The Bank Defendants conspired with Iran, and Iran's terrorist proxies, to provide material support for terrorism, through providing support to a State Sponsor of Terrorism and its Agents and Proxies, including FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

2470.   Once the Conspiracy was formed, all its members, including the Bank Defendants became liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.   The Bank Defendants need not have participated actively in or benefited from the wrongful action in order to be found liable.   The Bank Defendants need not even have planned or known about the injurious action so long as the purpose of the tortious action was to advance the overall object of the Conspiracy.

## Object of the Conspiracy and the Goals of the Co-Conspirators

2471.   The object of the Conspiracy was to provide material support for terrorism.

2472.   The Bank Defendant's goal in participating in the conspiracy was based on greed and for financial gain. The bank defendants gained business worth hundreds of millions of dollars.

2473.   Iran's goal in participating in the Conspiracy was threefold.   By providing material support for terrorism they would: First push coalition forces out of Iraq; second keep Shiites in power, who have strong ties to Iran; and third support Iraqi federalism, as a federal Iraq divided among Shiite, Kurdish, and Sunni regions would be weaker than a strong centralized state.

2474.   Iran's terrorist proxies' goals in participating in the Conspiracy were to obtain

much needed money and supplies to fund their attacks against the U.S. and coalition forces, and pay for the terrorist work and activities of their supporters.

## Elements of Conspiracy

2475.   The elements of a conspiracy are:

1. An agreement to join a conspiracy, which can be inferred from a tacit understanding;
2. The performance of unlawful acts as part of the conspiracy;
3. Injury caused by one or more of the parties; and
4. That these overt acts were pursuant to the common scheme and objective of the conspiracy.

## Evidence of the Agreement

2476.   Each of the Bank Defendants signed Deferred Prosecution Agreements with the Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the Bank Defendants' involvement in the conspiracy.   The Statement of Facts in each of those agreements, admitted by the Bank Defendants, detail how each of the Defendants provided illegal access to the U.S. financial system, to Iran and Iran's terrorist proxies, as well as other state sponsors of terror.

2477.   Similarly, many public documents and government reports document how Iran provided direct monetary support by paying terror proxies in Iraq between $4,000 and $13,000 per rocket or roadside bomb.   Public documents and government reports also reveal how Iran established training camps within its border to train its proxies and agents on how to build and place roadside bombs in Iraq.   As one of many examples, the trainer in charge of the attacks in Karbala was paid $3 million in U.S. currency every month.

2478.   Numerous government reports and other publicly available information disseminated prior to and during the period of the conspiracy, of which the Bank Defendants were aware or should have been aware, describe Iran's role in providing assistance to Iran's

terror Agents and Proxies including FTOs such as Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq with EFPs, IEDs, rockets, mortars and small arms and to provide training and funding to terror proxies. These reports also connect Hezbollah and the IRGC-QF to sophisticated IED technology.

2479. By agreeing to participate in the funding scheme, the Bank Defendants knew, or should have known, that they were potentially providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism as early as 1984, and had been subject to sanctions for many years. The information available to the bank defendants at the time, combined with the banks intentionally seeking ways to surreptitiously arrange for funding and U.S. dollar transfers that did not identify Iranian connections even though legitimate means were in fact available, indicates that at a minimum, the defendant banks knew that what they were doing was illegal.

## Unlawful Acts

2480. The numerous unlawful acts committed by the Bank Defendants – including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information – all in an effort to provide material support to entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – which constitute the "unlawful acts" of defendants in their roles as members of the Conspiracy.

2481. The conduct of the Bank Defendants working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions and prevent U.S., U.K., and other law enforcement agencies from interdicting the illegally transferred funds and preventing the funding of the FTOs and their affiliated agencies and other terrorist groups, is anything but

routine business transactions. Each Bank Defendant engaged in multiple illegal transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.

2482. Details of the unlawful acts performed by each of the bank defendants, in concert with Iran and its proxies and agents, are further summarized in the body of the complaint, as well as in the Deferred Prosecution Agreements and Consent Orders signed by each of the bank defendants and also referenced in the body of the complaint.

## Overt Act Pursuant to Common Scheme

2483. Once the conspiracy was formed, all its members, including the Bank Defendants became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them. Each of the conspirators played a crucial role in the success of the Conspiracy:

a) the Bank Defendants provided funding, financial services and securities, and expert advice and assistance, to Iran and its Agents and Proxies through their methods for circumventing U.S. sanctions and regulations. The Bank Defendants also provided assurances that U.S., U.K. and other law enforcement agencies would not interdict their illegal transfers

b) Iran and Iran's Agents and Proxies, including the IRGC, MODAFL, and others, were conduits for the funds obtained through the Bank Defendants that were then transferred to FTOs, along with other terror groups, which committed, planned, and/or authorized the terror acts.

2484. The Bank Defendants' overt acts were in "furtherance of the conspiracy." Without the Bank Defendant funding, the terrorist entities would not have been able to engage in the overt acts of actualizing the Terrorist Attacks that killed or injured Plaintiffs to "the same extent and magnitude" as they did, and Iran and its entities would have been severely hampered in its terror financing.

2485. Although the Bank Defendants may not have committed the ultimate act of

murder or bombing, they, as members of the Conspiracy, are liable for the injuries suffered as a result.

2486. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

## Material Support in the Form of U.S. Dollars

2487. Each Defendant's conduct in agreeing to provide Iran, and Iran's Agents and Proxies, with hundreds of millions (or more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

## Material Support in the Form of Financial Services and Securities

2488. Each defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions. Congress defined "Material support or resources" in 18 U.S.C. § 2339A to include

"…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the defendant banks dollar clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice

2489.   Each Defendant also provided material support in the form of expert advice and assistance to terrorist organizations, or known front companies of terrorist organizations. Included in the definition of "Material support or resources" is "expert advice or assistance." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge." The Defendant Banks each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws. The defendant banks brazenly provided that technical, and highly specialized knowledge to the National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi as part of their package of financial services to specifically ensure that such known front organizations of terrorists would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

## Knowledge of the Organizations' Connection to Terrorism

2490.   Each Defendant also had knowledge of Iran's and Iran's Agents and Proxies

connection to terrorism.

2491.   Each Defendant knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, SDT and SDGT.

2492.   Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda had been designated an FTO.

2493.   Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda in Iraq had been designated an FTO.

2494.   Each Defendant knew, or was deliberately indifferent to the fact, that Ansar al-Islam, had been designated an FTO.

2495.   Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah.

2496.   Each Defendant knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

2497.   Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

2498.   Each Defendant knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2499.   Each Defendant also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

2500.  Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

2501.  Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2502.  The Conspiracy between Iran and Iran's Agents and Proxies, and the Defendants and other non-defendant Co-conspirators resulted in the transfer of: (a) almost one trillion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to Hezbollah, Kata'ib Hezbollah, al Qaeda, al Qaeda in Iraq, Ansar Al Sunna/Ansar Al Islam (AAI), Asa'ib Ahl al-Haq (AAH), Jaysh al Mehdi (JAM), Promise Day Brigades (PDB), Badr Organization, Quds Force, the IRGC and other terrorist organizations (including the Special Groups), or to known front companies for such terrorist organizations, such as the National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli, Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi, actively engaged in murdering and maiming U.S. nationals in Iraq.

2503.  The Defendants together with other non-defendant Co-conspirators (including

Iran and Iran's Agents and Proxies) agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to Iran and Iranian agents, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

2504. At the time each Defendant knowingly agreed to provide Iran and Iran's Agents and Proxies, material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, inter alia, Iran used the IRGC and Hezbollah as primary mechanisms to cultivate and support terrorism and that the financial services provided would generally facilitate the activities of these organizations.

2505. Among other things, and as documented in the U.S. State Department's 2013 Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs, IEDs, Mortars, Rockets and other advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

2506. Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC, Hezbollah, and the Special Groups engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by

the Special Groups. Each Defendant knew or was deliberately indifferent to the fact that the financial services provided would generally facilitate these activities.

2507. Each Defendant knew or was deliberately indifferent to the fact that AQ, AQI and AAI engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), and that Iran, IRGC and MOIS provided material support for these FTOs, including training, safe haven and a protected environment for command and control within Iran, safe passage across international borders, weapons and other material support. Each Defendant knew or was deliberately indifferent to the fact that the financial services provided would generally facilitate these activities.

2508. Through this clandestine stream of U.S. dollars, each Defendant knew, or was deliberately indifferent to the fact that as a result of knowingly agreeing to join the Conspiracy to provide Iran and Iran's Agents and Proxies, with illegal material support, such conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars in payments to the IRGC and Hezbollah and alter-ego of FTOs through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants, and that these financial services would generally facilitate the terrorist activities of these organizations.

2509. Each Defendant knowingly and purposefully agreed to provide material support and services to Iran and Iran's Agents and Proxies, in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah, and that such agreements and resultant overt acts and conduct would foreseeably facilitate acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S.

nationals by the IRGC, Hezbollah and/or the Special Groups (including KH, JAM and AAH), as well as attacks conducted by weapons of mass destruction, such as EFPs, IEDs, Rockets, Mortars and other bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and/or the Special Groups.

2510. The material support that Defendants knowingly agreed to illegally provide to Iran, provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

2511. The material support that Defendants knowingly agreed to illegally provide to Iran and Iran's Agents and Proxies, included facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to enable numerous violations of the U.S. trade embargo against Iran, concealing Iran's efforts to evade U.S. sanctions and enabling Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

2512. Each Defendant also knew of the existence of other conspirators including some or all of the Defendants, was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support to Iran, and Iran's Agents and Proxies, in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

2513.  Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's, and Iran's Agents and Proxy's, movement of U.S. dollars through the international financial system, and preventing the interdiction of illegal funds supporting terrorism by U.S. law enforcement, military and intelligence agencies, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

2514.  Having entered into an agreement to provide Iran, and Iran's Agents and Proxies, material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran, and Iran's Agents and Proxies, transferring millions of dollars in order to engage in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

2515.  The Defendants' overt acts and agreement to purposefully transfer billions of dollars through the United States to Iran in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

2516.  The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2517.   Each Defendant's agreement to enter into the Conspiracy and purposeful transfer of almost one trillion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, inter alia, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and/or the Special Groups, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and/or the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

2518.   Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced the IRGC, MOIS, the FTOs and the Special Groups' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2519.  Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, each Defendant's performance of overt acts in furtherance of the Conspiracy, and each Defendant's knowledge or deliberate indifference to the

full scope, objectives, and results of the Conspiracy.

2520. Injuries resulting from terrorist attacks (including attacks launched by the IRGC, Hezbollah and the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including, without limitation, designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and the IRISL) enacted specifically to ensure that Iran had restricted access to USD and financial services under conditions of maximum transparency, that such dollars were used only for legitimate agencies, operations, and programs and not by or for the benefit of SDNs, and not for Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition Forces), and to ensure that any funds Iran did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2521. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

## PRIMARY CIVIL LIABILITY OF ALL DEFENDANTS UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Providing Material Support to Terrorists under 2339A)

2522. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2523. By knowingly providing U.S. dollars, expert services, and trade finance to

individuals, groups and entities on OFAC's SDN list who served as front companies and agents of terrorists, the Defendants provided material support to terrorists in violation of 18 U.S.C. § 2339A.

## Material Support in the Form of U.S. Dollars

2524.  Each Defendant's conduct in clandestinely and illegally providing hundreds of millions (or more) of USD to known terrorist agents and front companies violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

## Material Support in the Form of Non-Routine Financial Services and Securities

2525.  Each Defendant also provided material support in the form of non-routine financial services and financial securities, and fraudulently and illegally concealed the provision of such irregular unlawful financial services and funding from the U.S. government and U.S., U.K. and other law enforcement agencies, by underwriting billions of dollars in illegal, false and fraudulent trade finance transactions.  Congress defined "[M]aterial support or resources" in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…"  Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies and agents of terrorists, using the defendant banks dollar clearing services, as well as the underwriting of billions of dollars in

illegal, false and fraudulent trade finance transactions, are squarely within the definition of "material support or resources" adopted by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Illegal Expert Advice

2526.   Each Defendant also provided material support in the form of illegal expert advice and assistance to known front companies and agents of terrorist organizations.  Included in the definition of "Material support or resources" is "expert advice or assistance." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."   The defendant banks each received extensive directives and training to detect and prevent the flow of money to terrorists from government agencies tasked with enforcing the anti-terrorism laws.   The defendant banks then brazenly provided that technical, and highly specialized knowledge to the many front companies and agents of terrorists on OFACs SDN list, in addition to National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi, as part of their package of financial services.  This provision of technical and highly specialized knowledge by the defendant banks was carried out for the specific purpose of ensuring that such known terrorist agents and front companies  would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies charged with combating terrorist groups and their known agents and front groups, and preventing acts of international terrorism, including the attacks on Plaintiffs and others.

## Knowledge of the Organizations' Connection to Terrorism

2527.  Because Defendants are financial institutions operating in the United States, at all

times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah and IRISL (including multiple IRISL entities).

2528.  Each Defendant had knowledge of the connections of the front companies and agents to terrorism.

2529.  Each Defendant knew or was deliberately indifferent to the indisputable fact that Hezbollah had been designated an FTO, SDT and SDGT.

2530.  Each Defendant knew or was deliberately indifferent to the indisputable fact that al Qaeda had been designated an FTO.

2531.  Each Defendant knew or was deliberately indifferent to the indisputable fact that al Qaeda in Iraq had been designated an FTO.

2532.  Each Defendant knew or was deliberately indifferent to the indisputable fact that Ansar al-Islam, had been designated an FTO.

2533.  Each Defendant knew or was deliberately indifferent to the indisputable fact that the IRGC-QF had been designated an SDGT.

2534.  Each Defendant knew or was deliberately indifferent to the indisputable facts that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah, transferring tens of millions of USD to Hezbollah, via Defendant Bank Saderat's London bank via its branch in Beirut.

2535.   Each Defendant knew or was deliberately indifferent to the indisputable fact that the IRGC had been designated an SDN.

2536.   Each Defendant knew or was deliberately indifferent to the indisputable facts that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2537.   Each Defendant also knew or was deliberately indifferent to the indisputable fact that the IRISL and multiple IRISL entities had been designated SDNs.

2538.   The acts of international terrorism that injured the Plaintiffs were acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2539.   The acts of the Defendants in providing material support to known terrorist agents and front companies in the form of U.S. dollars, financial services and securities, as well as expert advice to include preventing the blocking or interdiction of illegal funds transfers by U.S. and other law enforcement, military and intelligence agencies, were acts dangerous to human life, committed in violation of the criminal laws of the United States and would be a criminal violation if committed within the jurisdiction of the United States or of any State.

2540.   The Defendants' actions resulted in the transfer of: (a) almost one trillion dollars through the United States in a manner specifically, intentionally and fraudulently designed by the Defendants to purposefully circumvent monitoring of financial transactions by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to known front companies and agents of terrorists including Hezbollah, Kata'ib Hezbollah, Al Qaeda, al Qaeda in Iraq, Ansar Al Sunna/Ansar Al Islam (AAI), Asa'ib Ahl al-Haq (AAH), Jaysh al Mehdi (JAM),

Promise Day Brigades (PDB), Badr Organization, Quds Force, the IRGC and other terrorist organizations (including the Special Groups), actively engaged in murdering and maiming U.S. nationals in Iraq.

2541.  The Defendants agreed to, and did in fact fraudulently, purposefully and illegally transfer billions of USD through the United States knowing that such funds would be delivered to known terrorist agents and front companies, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally falsified, structured, designed, and processed by them in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

2542.  At the time each Defendant knowingly agreed to provide the front companies and agents of terrorists with material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, inter alia, Iran also used the known terrorist agents and front companies  as primary mechanisms to cultivate and support terrorism, and accordingly that the U.S. dollars, financial services and securities, and expert advice Defendants provided would facilitate the activities of these known terrorist agents and front companies .

2543.  Each Defendant knew or was deliberately indifferent to the fact that many of the companies and individuals on OFACs SDN list engaged in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.  Each Defendant knew or was deliberately indifferent to the fact that the U.S. dollars, financial services, and expert advice they provided would generally facilitate these activities.

2544.  In facilitating the flow of this clandestine stream of U.S. dollars each Defendant knew or was deliberately indifferent to the fact that as a result of providing illegal material support to known terrorist agents and front companies, their conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars to terrorists through the international financial system, including fraudulent and illegal payments knowingly falsified, initiated, processed, altered, modified or released by or through the Defendants, and that these U.S. dollars, financial services, along with the Defendants' expert advice, would facilitate terrorism.

2545.  Each Defendant knowingly, purposefully and illegally agreed to provide and did provide material support to known terrorist agents and front companies on the OFAC SDN list, knowing or deliberately indifferent to the fact that such illegal, false and fraudulent U.S. dollar transfers, financial services, and expert advice facilitated acts of terrorism, including homicides, attempted homicides, and conspiracies to commit homicide against U.S. nationals by terrorists and their agents, as well as attacks conducted using weapons of mass destruction, such as EFPs, IEDs, Rockets, Mortars and other bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities.

2546.  The provision of illegal material support and the concealing of such illegal material support that Defendants knowingly agreed to provide and did provide to known terrorist agents and front companies  provided foreseeable and substantial material support, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

2547.  The illegal material support that Defendants knowingly agreed to provide and did provide to known terrorist agents and front companies enabled extensive and pervasive

violations of the U.S. trade embargo against Iran, concealed the efforts and campaigns of known terrorist agents and front companies to evade U.S. sanctions and enabled the acquisition by known terrorist agents and front companies from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs used with destructive force against Coalition Forces in Iraq, causing death and mutilation.

2548.   The Defendants' overt acts and agreement to purposefully, fraudulently, and illegally transfer billions of dollars through the United States to known terrorist agents and front companies in a manner expressly designed to ensure that the funds could be transferred by and to such known terrorist agents and front companies without being monitored or interdicted by U.S. regulators and law enforcement agencies were acts that were dangerous to human life by their nature and as further evidenced by their consequences.   Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of known terrorist agents and front companies, and knowingly assist known terrorist agents and front companies in their covert contravention of laws and regulations designed and implemented to combat the flow of financing to terrorists, were acts directly and unequivocally dangerous to human life.

2549.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2550.   Each Defendant's purposeful, illegal, and fraudulent transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies, as well as each Defendant's provision of financial services and expert advice, foreseeably resulted in indispensable material support being provided

to known terrorist agents and front companies in order for such terrorist agents and front companies to prepare for and carry out violations of, inter alia, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by terrorists, and were thus acts of international terrorism endangering human life because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating terrorists abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

2551. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced terrorists' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit violent acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2552. Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations. The injuries resulting from terrorist attacks that were planned, supported by, funded, or assisted by the known front companies and agents of terrorists, are precisely the risks contemplated by the Executive Orders, statutes and regulations enacted specifically to restrict access to USD, financial services and expert advice, and ensure that any funds flowing through U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2553. Through its conduct as described above, by knowingly violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism endangering human life and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## **SEVENTH CLAIM FOR RELIEF**

## **PRIMARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) OF ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

### **(Providing Material Support or Resources to FTOs under 2339B)**

2554. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2555. The Defendants illegally and knowingly provided material support to FTOs in violation of 18 U.S.C. § 2339B by intentionally, fraudulently and illegally supplying U.S. dollars, expert services, and trade finance to individuals, groups and entities on OFAC's SDN list who served as known agents of and front companies for Foreign Terrorist Organizations (FTOs) designated under section 219 of the Immigration and Nationality Act, including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq..

### **Material Support in the Form of U.S. Dollars**

2556. The Defendants herein illegally, purposefully and fraudulently transferred hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies, prevent the interdiction of illegal funds by U.S. and other law enforcement, military and intelligence agencies, and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of hundreds of millions of U.S. dollars in payments to known front companies and agents of Hezbollah, Kata'ib Hezbollah,

Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, through the U.S financial system. In doing so, the Defendants were willing to and did commit numerous felonies under U.S. law to conceal their fraudulent financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference providing material support to FTOs that were responsible for Plaintiffs' injuries.

## Material Support in the Form of Financial Services and Securities

2557. Each Defendant also provided material support in the form of financial services and financial securities by underwriting billions of dollars in illegal trade finance transactions. Congress defined "Material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies and agents of FTOs; using the defendant banks' dollar clearing services; as well as underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339B, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice

2558. Each Defendant also provided illegal material support to FTOs or known front companies and agents of FTOs in the form of expert advice and assistance - "expert advice or assistance" is expressly and unambiguously included in the definition of "material support or resources." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge." The defendant banks each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws. Instead of assisting to

detect and prevent the flow of money to terrorists, the Defendants brazenly provided that technical, and highly specialized knowledge to front companies and agents of FTOs on OFACs SDN list, as part of their package of financial services, thereby specifically ensuring that such known front companies and agents of FTOs would know precisely how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

### Knowledge of FTO's Designation and Engagement in Terrorism

2559.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to have been aware of all designations made to the SDN list, including without limitation the designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, and individuals or entities acting for, belonging to or controlled by them.

2560.   At the time each Defendant knowingly and illegally agreed to provide material support to and for FTO front companies and agents, each Defendant knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, and that Iran used Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, as primary mechanisms to enable Iran to cultivate and support terrorism.

2561.   Each Defendant knew that Hezbollah Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, were each designated as an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. §

2656f), and acts of international terrorism (18 U.S.C. § 2331).

2562.  Each Defendant knew or was deliberately indifferent to the fact that by illegally providing material support to FTO front companies and agents, the FTO front companies and agents thereby evaded U.S. sanctions and regulations directed at mitigating the risk that such terrorist agents and front companies would facilitate acts of international terrorism by and through FTOs.

2563.  The acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

2564.  Each Defendant knew or was deliberately indifferent to the fact that by illegally and affirmatively hiding the movement of U.S. dollars by terrorist agents and front companies through the international financial system from U.S. depository institutions, law enforcement and counter-terrorism agencies, the Defendants were thereby knowingly, fraudulently, and illegally providing material support to FTOs.

2565.  By illegally, knowingly, and fraudulently providing material support to known terrorist agents and front companies, in direct contravention of U.S. laws and regulations enacted expressly to combat and disrupt terrorism and terrorist organizations, each Defendant knew or was deliberately indifferent to the fact that the material support each provided would foreseeably result in the transfer of millions of dollars to FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, and that such transferred funds would be used to plan, authorize and commit terrorism.

2566.  The material support that each Defendant knowingly or with deliberate indifference provided to known terrorist agents and front companies of FTOs Hezbollah, Kata'ib

524

Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, facilitated acts of international terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and caused Plaintiffs' injuries.

2567. The Defendants' knowing transfer of hundreds of billions of USD to known terrorist agents and front companies of FTOs through the United States financial system in a manner expressly, fraudulently, and illegally designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – were acts dangerous to human life by their nature and as further evidenced by their consequences. Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of known terrorist agents and front companies, and knowingly assist known terrorist agents and front companies in their covert contravention of laws and regulations designed and implemented to combat the flow of financing to FTOs and other terrorists, were acts directly and unequivocally dangerous to human life.

2568. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

2569. The Defendants collectively transferred  hundreds of billions of U.S. dollars through the United States in a manner illegally and fraudulently designed to purposefully circumvent attempted monitoring by U.S. regulators and law enforcement agencies and prevent the interdiction of such illegal funds, and such illegal and fraudulent acts of and by the Defendants foreseeably resulted in the provision of material support to FTOs, and were thus themselves acts of international terrorism endangering human life because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of

the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the roles of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's in killing and injuring hundreds of American nationals in Iraq.

2570. The illegal and fraudulent conduct of each Defendant was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably and substantially accelerated and multiplied the ability of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2571. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's overt acts, and each Defendant's knowledge of, or deliberate indifference to, the fact that they were providing material support to front companies and agents of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that such front companies and agents of FTOs were restricted from accessing U.S. dollars, financial services, and expert advice and services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

2572. Through its conduct as described above, by knowingly, illegally and fraudulently

violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism endangering human life and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## EIGHTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY OF COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Providing Material Support to Terrorists under 2339A)**

2573. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2574. Defendants Commerzbank AG and Commerzbank AG, New York Branch provided material support to the IRGC through their acts on behalf of IRISL, and Commerzbank AG and Commerzbank AG, New York Branch illegally and fraudulently violated § 2339A by intentionally and knowingly concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that IRISL and the IRGC would use that support in preparation for and, carrying out violent acts of international terrorism, including contraventions of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f. Defendants Commerzbank AG and Commerzbank AG, New York Branch knew or were deliberately indifferent to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

2575. The conduct of Defendants Commerzbank AG and Commerzbank AG, New York Branch's was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the ability of IRGC,

Hezbollah, and the Special Groups to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or to commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

2576.   The material support knowingly and illegally provided by Commerzbank AG and Commerzbank AG, New York Branch to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus the illegal conduct of Commerzbank AG and Commerzbank AG, New York Branch's was a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2577.   Commerzbank AG and Commerzbank AG, New York Branch's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

2578.   Commerzbank AG and Commerzbank AG, New York Branch's knowing or deliberately indifferent provision of illegal financial services to the IRGC and IRISL were acts that were dangerous to human life by their nature and as evidenced by their consequences. Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of known terrorist agents and front companies, and knowingly assist known terrorist agents and front companies in their covert contravention of laws and regulations designed and implemented to combat the flow of financing to FTOS and other terrorists, were acts directly and unequivocally dangerous to human life.

2579.   The illegal conduct of Commerzbank AG and Commerzbank AG, New York Branch's itself was international terrorism endangering human life because it either was or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of

the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2580.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank AG and Commerzbank AG, New York Branch's material support to the IRGC and IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC, IRISL and Iran had restricted access to USD and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

2581.   Through its illegal conduct as described above, by knowingly or with deliberate indifference providing material support to Iran, the IRGC, and IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG, New York Branch are liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## NINTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY OF STANDARD CHARTERED BANK UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Providing Material Support to Terrorists under 2339A)**

2582.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2583.   Defendant Standard Chartered Bank illegally provided material support to the

IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, through its acts on behalf of Mahan Air, MODAFL and other entities identified *supra* in violation of § 2339A by fraudulently and illegally concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities identified *supra*, knowing or deliberately indifferent to the fact that the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, would use that support in preparation for or in carrying out violent acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

2584. Defendant Standard Chartered Bank each knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, inter alia, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

2585. Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

2586. Iran could not have successfully evaded U.S. sanctions and obtained raw materials and manufacturing equipment prohibited by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs") simply by establishing front companies in foreign jurisdictions like

Malaysia, Singapore or Dubai because those front companies could not have negotiated international payments without being able to provide U.S. and other suppliers with conventional letters of credit drawn on Western banks with established correspondent accounts with U.S. clearing banks.

2587.   Nor could the front companies that participated in Iran's clandestine supply chain have succeeded in their efforts had they been forced to rely solely on financing by Iranian banks because those banks could not have provided financing directly since they could not maintain correspondent accounts with U.S. clearing banks and most of them were blacklisted at one point in time or another and frozen out of the US dollar-clearing system.

2588.   For example, no legitimate U.S. manufacturer would have agreed to transport materials subject to the ITARs, EARs or ITRs to an unknown company in Singapore or Dubai based on a letter of credit issued by Bank Saderat or Bank Melli.

2589.   The linchpin of Iran's illegal and clandestine supply chain was the cooperation of Standard Chartered Bank and Standard Chartered Bank, New York Branch and the other Western Bank Defendants who concealed both the role of Iranian banks in providing the credit necessary to finance the transactions and the identities of the Iranian military and IRGC sub-agencies that were actually purchasing the raw materials and manufacturing equipment (invariably being transported to Iran by IRISL, Mahan Air or Iran Air).

2590.   Defendant Standard Chartered Bank knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank  to evade U.S. sanctions and acquire materials used, inter alia, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

2591.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

2592.   With the necessary and illegal assistance of Standard Chartered Bank and the other Western Bank Defendants, MODAFL did in fact acquire spare parts for various military aircraft.

2593.   With the necessary and illegal assistance of Standard Chartered Bank and the other Western Bank Defendants, Iranian front companies did purchase hydraulic press components of the kind used to manufacture EFPs and did purchase steel and copper and other materials necessary for the manufacturing of EFPs and other weapons deployed against Coalition Forces in Iraq.

2594.   This illegal substantial assistance to Iran's terror network (including the IRGC and MODAFL), knowingly provided by Defendant Standard Chartered Bank made it possible for Iran to procure the radio frequency modules, metals, and hydraulic presses used to manufacture the copper plates and steel cylinders necessary to manufacture the EFPs and other Iranian weapons used in the attacks on the Plaintiffs, as well Iran's transport of weapons, supplies, and IRGC and Hezbollah operatives (who conducted, supervised, and trained the perpetrators of those attacks).

2595.   The illegal conduct of Defendant Standard Chartered Bank was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and commit acts of international terrorism as that term is defined in 18 U.S.C. § 2331.

2596. The illegal substantial assistance that Standard Chartered Bank knowingly and illegally provided to Iran through its Agents and Proxies, including Mahan Air, MODAFL and other entities identified *supra* provided foreseeable material support to the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus the illegal conduct of Standard Chartered Bank was a substantial and foreseeable factor in bringing about the Plaintiffs' injuries.

2597. The illegal conduct of Standard Chartered Bank transcended national boundaries in terms of the means by which it was accomplished.

2598. The knowing or deliberately indifferent provision of illegal financial services by Standard Chartered Bank to the IRGC, Mahan Air, MODAFL and other entities identified *supra*, were acts that were dangerous to human life by their nature and as evidenced by their consequences. Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of known terrorist agents and front companies, and knowingly assist known terrorist agents and front companies in their covert contravention of laws and regulations designed and implemented to combat the flow of financing to terrorists, were acts directly and unequivocally dangerous to human life.

2599. The illegal conduct of Standard Chartered Bank constituted acts of international terrorism endangering human life because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other

nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2600. Furthermore, each Plaintiff's injuries constitute harm falling within the risk contemplated by and known to Standard Chartered Bank by virtue and in view of their illegal material support to the IRGC, the IRGCQF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

2601. Through its illegal conduct as described above, by knowingly or with deliberate indifference violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Standard Chartered Bank is liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## TENTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY OF COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

#### (Providing Material Support or Resources to FTOs under 2339B)

2602. Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

2603. Defendants Commerzbank AG and Commerzbank AG, New York Branch violated § 2339B by providing material support to Hezbollah through the illegal acts of Commerzbank AG and Commerzbank AG, New York Branch's on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.).

2604. Commerzbank AG and Commerzbank AG, New York Branch knew or were deliberately indifferent to the fact that Orphans Project Lebanon e.V. was transferring funds through Commerzbank AG and Commerzbank AG, New York Branch to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

2605. The illegal conduct of Defendant Commerzbank AG and Commerzbank AG, New York Branch's was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that term is defined in 18 U.S.C. § 2331.

2606. The material support knowingly and illegally provided by Commerzbank AG and Commerzbank AG, New York Branch to the Orphans Project Lebanon e.V. and hence to Hezbollah provided foreseeable substantial assistance to the Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was a substantial and foreseeable factor in bringing about the Plaintiffs' injuries.

2607. The illegal conduct of Commerzbank AG and Commerzbank AG, New York Branch's transcended national boundaries in terms of the means by which it was accomplished.

2608. Commerzbank AG and Commerzbank AG, New York Branch's knowing or deliberately indifferent provision of illegal financial services to Hezbollah were acts that were dangerous to human life by their nature and as evidenced by their consequences. Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of known terrorist agents and front companies, and knowingly assist known terrorist agents and front companies in their covert contravention of laws and regulations designed and implemented to combat the flow of financing to FTOs and other terrorists, were acts directly and unequivocally dangerous to human life.

2609. Commerzbank AG and Commerzbank AG, New York Branch's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2610. Commerzbank AG and Commerzbank AG, New York Branch knew or were deliberately indifferent to the fact that Hezbollah had been designated an FTO, SDT and SDGT.

2611. Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

2612. Furthermore, each Plaintiff's injuries constitute a harm within the risk known to

and contemplated by Commerzbank AG and Commerzbank AG, New York Branch's by and through their material support to Hezbollah. Injuries resulting from terrorist attacks planned, supported by, funded, or assisted by Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2613. Through its illegal conduct as described above, by knowingly or with deliberate indifference, providing material support to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG, New York Branch is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## ELEVENTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY OF HSBC BANK USA, N.A. AND HSBC NORTH AMERICA HOLDINGS, INC AND HSBC HOLDINGS PLC AND HSBC BANK PLC AND HSBC BANK MIDDLE EAST LIMITED UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Conducting financial transactions with Iran under 2332d)**

2614. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2615. As alleged above, at all relevant times HBSC Bank USA, N.A. and HSBC North America Holdings, Inc. and HSBC Holdings Plc and HSBC Bank Plc and HSBC Bank Middle East Limited knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HBSC Bank USA, N.A. nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

537

2616.  Defendant HSBC Bank USA, N.A. and HSBC North America Holdings, Inc.  are juridical persons organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C), and each is also deemed to be a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

2617.  Section 2331(3) explicitly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property"

2618.  HSBC Bank USA, N.A. is a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. ("HSBC North America"). HSBC North America is an indirect subsidiary of HSBC Holdings. HSBC Holdings Plc is the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,900 offices in over 80 countries (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").

2619.  Both HSBC Bank USA, N.A. and HSBC Holdings Plc acknowledged that their illegal and fraudulent conduct described herein violated the International Emergency Economic Powers Act ("IEEPA") and violating the Trading with the Enemy Act ("TWEA"), in the Statement of Facts incorporated by reference as part of the Deferred Prosecution Agreement they entered with the Department of Justice.

2620.  Each Defendant knew or was deliberately indifferent to the indisputable fact that Hezbollah had been designated an FTO.

2621.  Each Defendant also knew or was deliberately indifferent to the indisputable fact that Kata'ib Hezbollah had been designated an FTO.

2622.  Each Defendant also knew or was deliberately indifferent to the indisputable fact that Ansar al-Islam had been designated an FTO.

2623. Each Defendant also knew or was deliberately indifferent to the indisputable fact that al Qaeda had been designated an FTO.

2624. Each Defendant also knew or was deliberately indifferent to the indisputable fact that al Qaeda in Iraq had been designated an FTO.

2625. Each Defendant also knew or was deliberately indifferent to the indisputable fact that the IRGC-QF had been designated an SDGT.

2626. Each Defendant also knew or was deliberately indifferent to the indisputable facts that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a direct conduit between the Government of Iran and Hezbollah.

2627. Each Defendant also knew or was deliberately indifferent to the indisputable fact that the IRGC had been designated an SDN.

2628. Each Defendant also knew or was deliberately indifferent to the indisputable facts that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2629. Each Defendant also knew or was deliberately indifferent to the indisputable facts that the IRISL and multiple IRISL entities had been designated SDNs.

2630. As alleged above, the Defendants knowingly conducted illegal and fraudulent financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury

Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C.§ 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

2631.  In fact, the transactions at issue (including at least the $183 million that HBSC Bank USA, N.A. illegally and fraudulently facilitated on behalf of sanctioned entities in Iran that were identified in HSBC Bank USA, N.A.'s December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R § 535.701 (a)(2) and 31 C.F.R § 560.203.

2632.  Defendant HBSC Bank USA, N.A. knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately, illegally and fraudulently falsifying, altering and omitting information in funds transfer payment order messages being processed through HSBC Bank USA, N.A., thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

2633.  As alleged in detail above, throughout the relevant time period, HBSC Bank USA, N.A. knew that other HSBC Defendants such as HSBC-London and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HBSC Bank USA, N.A. also knew its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

2634.  Defendant HBSC Bank USA, N.A. also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C.

§ 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other violent acts of international terrorism, such as those planned, attempted, and/or perpetrated by the Special Groups.

2635. Knowing that Defendants HSBC-London and HSBC-Middle East were illegally and fraudulently moving billions of sanctions-evading Iranian USD through HSBC Bank USA, N.A.'s offices with the specific intent of defeating HSBC Bank USA, N.A.'s OFAC filters and violating HBSC Bank USA, N.A. reporting requirements, it was reasonably foreseeable that HSBC Bank USA, N.A.'s conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, Kata'ib Hezbollah, al Qaeda, al Qaeda in Iraq, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

2636. Because Defendant HBSC Bank USA, N.A. is a financial institution operating in the United States, at all times relevant to the Complaint, it is deemed by law to have been aware of all designations made to the SDN list, including without limitation the designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

2637. Defendant HBSC Bank USA, N.A. thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc) Bank Mellat, and Bank Sepah had been designated SDNs before November 2008,

and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2638.   Defendants' illegal and fraudulent U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not separate from Iran's material support of terrorism; they were the mechanism through which the material support was accomplished.

2639.   Defendant HSBC Bank USA, N.A.'s illegal and fraudulent conduct foreseeably and substantially enhanced the ability of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC's and the Special Groups' and other Iranian-sponsored terrorists' to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus HSBC Bank USA, N.A.'s conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2640.   Defendant HSBC Bank USA, N.A.'s knowing, or deliberately indifferent provision of illegal and fraudulent financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore were acts that were dangerous to human life, by their nature and as evidenced by their consequences.   Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of Iran, and knowingly assist Iran in its covert contravention of laws and regulations designed and implemented to combat the flow of financing to terrorists and terrorist-supporting states and entities, were acts directly and unequivocally dangerous to human life.

2641.   Defendant HSBC Bank USA, N.A.'s illegal and fraudulent acts transcended national boundaries in terms of the means by which they were accomplished.

2642.  Defendant HSBC Bank USA, N.A.'s conduct was act of international terrorism endangering human life  because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

2643.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk known to and contemplated by Defendant HSBC Bank USA, N.A.'s as a result of its illegal and fraudulent violations, including its knowing agreement and scheme to provide illegal and fraudulent services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda, and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations  designed  to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

2644.  Through its illegal and fraudulent conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HBSC Bank USA, N.A. and HSBC North America Holdings, Inc. and HSBC Holdings PLC and HSBC Bank PLC and HSBC Bank Middle East Limited committed acts of international terrorism endangering human life, and are liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## TWELFTH CLAIM FOR RELIEF

## PRIMARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) OF ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Conducting financial transactions with Iran under 2332d)

2645.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2646.  As set forth above, each of the Defendants knew or had reasonable cause to know that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

2647.  Each of the Bank Defendants signed Deferred Prosecution Agreements with the U.S. Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the Bank Defendants' illegal financial transactions.  The Statement of Facts in each of those agreements, admitted by the Bank Defendants, detail how the Defendants provided Iran and other state sponsors of terror illegal access to the U.S. financial system, violating the International Emergency Economic Powers Act ("IEEPA") and violating the Trading with the Enemy Act ("TWEA").

2648.  Defendants each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

2649.  Section 2331(3) explicitly defines "person" to include "any individual or entity

capable of holding a legal or beneficial interest in property."

2650.  Each Defendant knew or was deliberately indifferent to the indisputable facts that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq had each been designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated SDNs.

2651.  The Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and were therefore legally excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2652.  As set forth above, the illegal transactions knowingly and fraudulently facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

2653.  The fraudulent transactions at issue directly and explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

2654.  The Defendants' illegal and fraudulent acts committed by and through their New York branches transcended national boundaries in terms of the means by which they were accomplished.

2655.  Each of the above-referenced Defendants' illegal and fraudulent conduct by and through their New York branches foreseeably and substantially enhanced the ability to engage in

terrorist activity of Hezbollah, Kata'ib Hezbollah', Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGCs and Special Groups and other Iranian sponsored terrorists, including the preparation and facilitation of acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above Defendants' illegal and fraudulent conduct by and through their New York branches was a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2656.  Each of the above-referenced Defendants knowingly or with deliberate indifference provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies charged with the responsibility to detect, regulate, and preclude such illegal transactions. That conduct involved acts that were dangerous to human life by their nature and as evidenced by their consequences.  Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of Iran, and knowingly assisting Iran in its covert contravention of laws and regulations designed and implemented to combat the flow of financing to terrorists and terrorist-supporting states and entities, were acts directly and unequivocally dangerous to human life.

2657.  Defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not separate from Iran's material support of terrorism.  Rather, these illegal and fraudulent acts by the Defendants were the very mechanism through which the material support to terrorists was accomplished.

2658.  Each Defendant's conduct was an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian

population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder, including its use of FTO proxies to commit, plan or authorize acts of international terrorism.

2659.  Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each of the Defendants' unlawful conduct, including their knowing agreement to provide illegal and fraudulent services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah, and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2660.  Through the illegal and fraudulent conduct as described herein, by knowingly violating 18 U.S.C. § 2332d in the manner and with the state of mind alleged herein, Defendants committed acts of international terrorism and are liable for damages to Plaintiffs for their injuries or deaths pursuant to 18 U.S.C. § 2333(a).

## THIRTEEN CLAIM FOR RELIEF

## PRIMARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) OF BNP PARIBAS, S.A. FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Conducting financial transactions with Iran and Sudan under 2332d)

2661. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2662. As set forth above, BNP Paribas, S.A. knew or had reasonable cause to know that Iran and Sudan had been designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as countries supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the governments of Iran and Sudan through their U.S. operations.

2663. Defendant BNP Paribas, is a juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C).

2664. Defendant BNP Paribas, S.A. is deemed to be a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

2665. Section 2331(3) explicitly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."

2666. BNP Paribas, S.A. utilized its BNP Paribas, S.A. New York Branch in connection with its agreement to provide Iran and Sudan material support in an illegal manner in order to effectuate and facilitate the Conspiracy.

2667. BNP Paribas pled guilty to a one-count information filed in the U.S. District Court for the Southern District of New York on June 30, 2014, which accused the Bank of conspiracy to commit an offense against the United States in violation of Title 18, United States

Code, Section 371, by conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Section 1701 et seq., and regulations issued thereunder, and the Trading with the Enemy Act ("TWEA"), codified at Title 50. United States Code Appendix. Section 1 et seq., and regulations issued thereunder.

2668.  BNP Paribas also pled guilty to one count of Falsifying Business Records in the First Degree, pursuant to New York Penal Law Section 175.10, and one count of Conspiracy in the Fifth Degree, pursuant to New York Penal Law Section 105.05(1).

2669.  In connection with the federal and state charges listed above, BNP Paribas admitted certain facts and conduct, including:

- that BNPP developed and implemented policies and procedures for processing U.S. dollar-denominated transfers through the New York Branch and unaffiliated U.S. financial institutions in a manner that was designed to conceal relevant information regarding Sudan, Iran and Cuba that would permit the institutions and their regulators to determine whether the transactions were lawful and consistent with New York State and U.S. laws and regulations; and

- that BNPP's conduct allowed sanctioned countries and entities, including Specially Designated Nationals, to access the U.S. financial system and engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. sanctions and embargos.

- From at least 2002 through 2012, BNP Paribas provided U.S. dollar clearing services on behalf of Sudanese, Iranian, and Cuban parties ("Sanctioned Parties") with a value of more than $190 billion which were settled through the New York Branch and other New York-based financial institutions.

- Even the highest levels of the compliance division for the New York Branch recognized and accepted that amending, omitting and stripping was widespread among foreign banks transmitting funds through the U.S. When a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance North America wrote in an email to another employee, "the dirty little secret isn't so secret anymore, oui?"

2670.  On June 29, 2014 Jean-Laurent Bonnafe, CEO of BNP Paribas, signed a Consent

Order with the NYDFS on behalf of BNP Paribas, S.A. New York Branch admitting the above violations.

2671.  The illegal and fraudulent transactions at issue explicitly violated 31 C.F.R § 535.701(a)(2) and 31 C.F.R § 560.203.

2672.  The Defendant's illegal and fraudulent acts transcended national boundaries in terms of the means by which they were accomplished.

2673.  The Defendant's illegal and fraudulent conduct foreseeably and substantially enhanced the ability to engage in terrorist activity of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC and Special Groups and other Iranian sponsored terrorists, including the preparation and facilitation of acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus the Defendant's illegal and fraudulent conduct by and through its New York branch was a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

2674.   The Defendant knowingly or with deliberate indifference provided financial services to Iran and Sudan in the United States, knowing that its conduct enabled Iran and Sudan to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies charged with the responsibility to detect, regulate, and preclude such illegal transactions. That illegal and fraudulent conduct involved acts that were dangerous to human life by their nature and as evidenced by their consequences.  Specifically, the fraudulent and illegal acts described herein were anything but routine banking services, and instead, by directly serving to augment the resources of Iran and Sudan, and knowingly assisting Iran and Sudan in their covert contravention of laws and regulations designed and implemented to combat the flow of financing

to terrorists and terrorist-supporting states and entities, were acts directly and unequivocally dangerous to human life.

2675.   Defendant's illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks and Sudan and Sudanian banks were not separate from the material support of terrorism by Iran and Sudan.   Rather, these illegal and fraudulent acts by the Defendants were the very mechanism through which the illegal and fraudulent material support was accomplished.

2676.   The Defendant also knew or was deliberately indifferent to the indisputable fact that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq had each been designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) and Sudanese actors and agents had been designated SDNs.

2677.   The Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

2678.   As set forth above, the illegal transactions knowingly facilitated through New York by BNP Paribas, S.A. did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

2679.   The Defendant's conduct was an act of international terrorism because it either was or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of

the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran and Sudan's ability to prepare for and/or carry out mass destruction and murder.

2680.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by the Defendant's unlawful conduct, including its knowing agreement to provide illegal services to Iran and Sudan. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah, and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran and Sudan had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

2681.  Through the conduct as described herein, by knowingly violating 18 U.S.C. § 2332d in the manner and with the state of mind alleged herein, BNP Paribas, S.A. committed acts of international terrorism and is liable for damages to Plaintiffs for their injuries or deaths pursuant to 18 U.S.C. § 2333(a).

X.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a)  Accept jurisdiction over this action;

b)  Enter judgment against the Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

c)  Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

d)        Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e)        Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

f)        Grant such other and further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted,                      Dated: April 22, 2019

By: */s/ Christopher G. Paulos*
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**Levin, Papantonio, Thomas, Mitchell,**
**Rafferty and Proctor, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6123
Email: cpaulos@levinlaw.com

*Counsel for Plaintiffs*