**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TIMOTHY O'SULLIVAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:17-cv-08709-LTS-GWG** |
| ) | |
| **DEUTSCHE BANK AG, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
<u>**PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR COMPLAINT**</u>

<u>**[ORAL ARGUMENT REQUESTED]**</u>

**TABLE OF CONTENTS**

I.    Introduction ..................................................................................................................1

II.   Overview of Case ..........................................................................................................2

III.  Curing the Perceived Deficiencies ...............................................................................5

    A.   Details of the Attacks ............................................................................................5

    B.   Secondary Liability ...............................................................................................8

        1.   Aiding and Abetting: Defendants' General Awareness of their Role in Terrorism ....................................................................................................8

        2.   Conspiracy: Defendants' Agreement ...........................................................17

    C.   Primary Liability .................................................................................................21

        1.   Proximate Cause .........................................................................................21

        2.   Act of International Terrorism .....................................................................23

    D.   Commerzbank and the Orphans Project ..............................................................24

IV.   Conclusion ..................................................................................................................25

## I.      Introduction

The Court, in its March 28 Opinion & Order granting Defendants'[1] motion to dismiss under Fed. R. Civ. P. 12(b)(6), permitted Plaintiffs to move for leave to amend their Complaint. Doc. 195. Plaintiffs now request such leave pursuant to Fed. R. Civ. P. 15(a)(2). The rule provides that a party may amend its pleading with "the court's leave" and states courts "should freely give leave when justice so requires." Courts may deny leave to amend only when "there is a substantial reason to do so." *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000). It is rare for leave to be denied, especially when there has been no prior amendment. *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."); *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion"); *see also Ronzani*, 899 F.2d at 198 ("Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground.").

No amendment has yet been made—or attempted—in this case. Moreover, Plaintiffs have identified each aspect of the Complaint the Court perceived to be deficient, as set forth in its Opinion & Order.[2] Pursuant to the Court's March 28 Opinion and Order, Plaintiffs attached to their Motion to Amend as Exhibit A their Proposed Amended Complaint. Attached to Plaintiffs' Motion to Amend as Exhibit B is a blackline of that proposed complaint against the original Complaint filed in the instant action. Attached as Exhibit C to Plaintiffs' Motion to Amend is a

---

[1]   The Court did not dismiss Plaintiffs' claims against Defendant Bank Saderat.

[2]   Plaintiffs respectfully disagree with the reasoning set out in the Court's order of dismissal, including the Court's legal analysis and its conclusion that the Complaint is deficient. Plaintiffs seek to amend the complaint in order to address what the Court views as deficiencies in the Complaint under the legal framework adopted by the Court. In so doing, Plaintiffs do not waive any challenge to the legal analysis or other conclusions in the order of dismissal.

Proposed Order Granting Plaintiffs' Motion to Amend. What follows is a summary explanation of how the proposed Amended Complaint addresses and cures those perceived deficiencies, along with example citations to the relevant amendments. In addition, Plaintiffs attach to their Amended Complaint certain exhibits, including declarations of individuals with expert knowledge in and understanding of the banking industry. These exhibits provide strong support for the factual allegations in the proposed Amended Complaint and demonstrate the plausibility of Plaintiffs' legal claims against Defendants.

## II.    Overview of Case

This case arises out of 53 terrorist attacks[3] committed in Iraq between 2003 and 2011 that targeted U.S. soldiers serving as part of the U.N.-authorized peacekeeping mission designed to stabilize the country and establish a democratic government. Plaintiffs include soldiers who were injured and killed in those attacks and their family members. Defendants are the banks that knowingly or with reckless disregard provided financing to the designated Foreign Terrorist Organizations (FTOs) that committed, planned, and authorized the attacks. This lawsuit seeks to hold Defendants liable under the Anti-Terrorism of 1992 (the "ATA"), 18 U.S.C. § 2331 *et seq.*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016) (codified in part at 18 U.S.C. § 2333(d)(2)), for the injuries and deaths caused by the terrorist attacks.

JASTA was enacted by Congress "to provide civil litigants ***with the broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons, entities,

---

[3]    Plaintiffs' original Complaint included 55 attacks. One client (Ioan Kelemen) has been removed from the Amended Complaint, and two original attacks (those involving Antonio Martinez Frederick and Wyman Harrell Jones) have been combined into one, as they were subsequently confirmed to be the same attack.

and foreign countries, *wherever acting and wherever they may be found*, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b). The terrorist acts that resulted in Plaintiffs' injuries/deaths were substantially funded by Iran using U.S. Dollars (USD), and Defendants, all global financial institutions entrusted to prevent terrorism financing, knowingly facilitated Iran's and FTOs' much-needed illegal access to USD so that it could systematically target and kill Americans serving in Iraq between 2003 and 2011.

Plaintiffs filed their Complaint (Doc. 1) on November 9, 2017. Defendants filed their motions to dismiss on March 2, 2018 (Docs. 102–105, 107), Plaintiffs filed their opposition brief on May 2, 2018 (Doc. 119), Defendants filed their replies on June 1, 2018 (Docs. 133–137), and Plaintiffs filed a sur-reply with the Court's permission on July 2, 2018 (Docs. 145, 146). The Court issued its ruling on the motions to dismiss on March 28, 2019, granting Defendants' motion under Fed. R. Civ. P. 12(b)(6) and permitting Plaintiffs to move for leave to amend their Complaint.

For decades, international banks, including the Defendants in this case, have been aware that money laundering is necessary for terrorist organizations to fund and carry out their operations. This case seeks to hold Defendants liable based on their support of Iran and its Agents and Proxies. Defendants entered into and participated in a conspiracy with Iran and its Agents and Proxies to provide material support for, and to commit, international terrorism. The Conspiracy was led by Iran, who along with the other members of the terrorism network, including Defendants, shared the goal of sustaining and advancing Iran's international terrorism campaigns. Defendants participated in the Conspiracy for financial gain.

Defendants, knowing the type of USD transfers they performed on behalf of sanctioned Iranian entities were illegal and the money used for illegitimate purposes, devised clever—and

fraudulent—ways of evading U.S. laws and the U.S. government's mechanisms of counter-terrorism enforcement. They intentionally disguised financial payments to and from USD-denominated accounts and conducted illicit trade-finance transactions on Iran's behalf. By doing so, Defendants provided the billions of dollars of support Iran needed to fund its terrorism campaign in Iraq that U.S. sanctions would otherwise have denied them. Collectively, they gained business worth hundreds of millions of dollars. Among other things, Defendants participated in the Conspiracy by agreeing to alter, falsify, and omit information from bank-to-bank payment orders in order to:

1. Conceal sanctioned Iranian entities' dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

2. Facilitate illicit transactions totaling:

   a. at least $50 million USD for the benefit of Hezbollah;

   b. at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

   c. more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated a SDN;

   d. tens of millions of dollars on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions, and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

3. Enable Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, MOIS, Hezbollah, the Special Groups, and Al Qaeda, Ansar al Islam to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 18 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

The Western Bank Defendants admitted to willfully evading U.S. laws and regulations, conducting illicit trade-finance transactions, and intentionally disguising financial payments to and from USD-denominated accounts. The Western Bank Defendants further admitted to laundering billions of dollars on behalf of Iran and Iran-sanctioned entities. Additionally, the Amended Complaint alleges the Iranian bank defendants committed acts of international terrorism by providing material support directly to FTOs.

The Amended Complaint clearly demonstrates Defendants' knowledge that the material support they were providing to Iran and its Agents and Proxies were being used, at least in part, to fund terrorism. The fact Defendants may not have known when such funds were going to be used to commit acts of international terrorism or against whom such acts of international terrorism were going to be perpetrated is of no consequence when determining whether Defendants are liable to Plaintiffs in this action. What is of consequence is the fact Defendants were fully aware they were providing material assistance to Iran, a state sponsor of terror, and that such funds likely would be used in the very types of acts of international terrorism at issue in this case. More to the point, the Amended Complaint alleges, and case law supports, the Western Bank Defendants did not have to meet or deal directly with, or even know the identity of, the specific conspirator(s) who committed the final violent act(s) of terrorism to be liable under § 2333(d). Rather, it is enough that they conspired with members of the terrorism network that were responsible for any act of international terrorism along the causal chain culminating in the final terrorist attack. Plaintiffs' Amended Complaint addresses these issues. *See* Amended Complaint, Section V.

### III.   Curing the Perceived Deficiencies

#### A.  Details of the Attacks

In its March 28 Opinion & Order, the Court focused upon several perceived deficiencies

in Plaintiffs' attack-specific allegations related to the identity of, and involvement of, specific FTOs in the attacks that injured (in some cases, killed) Plaintiffs. *See, e.g.*, Op. & Order, Doc. 195, pp. 3, 4, and 12. In their Amended Complaint, Plaintiffs have now specifically identified the FTOs that allegedly committed, planned and/or authorized each attack. *See, e.g.,* Amended Complaint, Section VII. Additionally, Plaintiffs have added and cited to public information or recently declassified information proving (or at least supporting a reasonable inference) that Iran, through its FTO proxies, materially supported each of the terrorist attacks at issue. This includes additional factual allegations about Iran's connections to and support of FTOs Hezbollah, al Qaeda, Ansar al Islam, and Kata'ib Hezbollah, as well as FTO Hezbollah's command and control over the Iraq-based terror groups Jayesch al Mahdi ("JAM") and Asa'ib Ahl al Haq ("AAH")—which means JAM and AAH were in fact agents of Hezbollah when they perpetrated the relevant terrorist attacks. *See, e.g.*, *id.* at Section IV(9-15). Because those attacks were committed by Hezbollah's agents at Hezbollah's direction, those attacks were (legally speaking) committed by Hezbollah with its authorization. *Cf.* Op & Order, Doc. 195, p. 19 n.13 ("The Court notes, however, that to the extent that Plaintiffs' JASTA claims are premised upon attacks committed by JAM and AAH, the claims must be dismissed because neither group is alleged to be a designated FTO pursuant to 8 U.S.C. § 1189, and the Complaint alleges no facts from which the Court can infer that an FTO like Hezbollah otherwise planned or authorized those attacks.").

Plaintiffs have also corrected some locations and dates of attacks (based on newly acquired information), as well as other facts related to the terrorist attacks, further supporting inferences related to the FTOs' involvement in the attacks. *See, e.g.,* Amended Complaint, Section VII. This includes facts supporting or showing the type of Iranian munitions used in the attack and (where pertinent) the specific tactics, techniques and procedures (TTPs) used to carry out the attacks.

Those TTPs are unique to specific Iranian-backed FTOs and taught by FTO Hezbollah and the IRGC-QF to Iraqi (or other foreign) militants in training camps in Iran. These amendments also demonstrate the attacks occurred in areas that were either strategically important to Iran's terrorism strategy and its overall goal of killing Americans and sowing discord in the region. The amendments also plausibly and specifically allege that the attacks occurred in or originated from known havens or staging areas for Iranian-backed FTOs. *See id.*

The Court acknowledged in its Opinion & Order that, "based upon Plaintiffs' allegations that the attacks were committed using Iranian-manufactured weapons," "that Iran has provided funding and weapons to Hezbollah, a designated FTO," and "that Hezbollah trains and supports Iraqi terrorist groups," the subject terrorist attacks were committed, planned, or authorized by FTOs. Op. & Order, Doc. 195, p. 19 n.13. The Amended Complaint adds further detail connecting the terrorist attacks to FTOs, including (in particular) the attacks carried out by JAM and AAH operatives, who, as already noted, were acting as agents of Hezbollah.

These plausible allegations also support and demonstrate not only that Iran, through its FTO proxies, was engaged in a massive campaign to attack and kill Americans in Iraq (including Plaintiffs), but also that this terrorist activity was occurring at *the exact same time* as Defendants' illegal facilitation of Iran's and Iranian-SDNs' violation of counterterrorism sanctions and illegal access to USD and dual-purpose goods. These allegations also show that Iran's reliance upon and use of FTO terrorist proxies in Iraq was being addressed publicly by the media, and the U.S. Departments of Defense, State, and the Treasury, and that, in their unique position, Defendants were fully aware of such activities.

### B.  Secondary Liability

#### 1.  Aiding and Abetting: Defendants' General Awareness of their Role in Terrorism

JASTA imposes secondary liability on those who aid and abet or conspire with a person who commits any of these acts of international terrorism, so long as the plaintiff's injury arose from (*i.e.*, was proximately caused by)[4] the act of international terrorism and an FTO planned, committed, or authorized the act of international terrorism. Plaintiffs' injuries in this case arose from acts of international terrorism, including the attacks themselves and the separate and distinct acts of international terrorism of providing money, weapons, and supplies to FTOs. The acts of providing money, weapons, and supplies to the FTOs were *authorized* by the FTOs and *committed* by Iranian banks and their customers: IRGC; Quds Force; Mahan Air; IRSL; and others.

The Court acknowledged that, to be liable for aiding and abetting, "a defendant need not know of or intend to bring about the specific attacks at issue." Op. & Order, Doc. 195, p. 22. The Court nevertheless dismissed Plaintiffs' aiding-and-abetting claim because—the Court found— the Complaint did not allege Defendants were "generally aware" that by "providing financial services" they were "thereby playing a 'role' in an FTOs violent or life-endangering activities." *Id.* The Amended Complaint adds allegations demonstrating Defendants' general awareness they

---

[4]   In the context of primary liability, the proximate causation issue is whether a defendant's conduct proximately caused a plaintiff's injury. By contrast, secondary liability, especially for aiding and abetting or conspiracy, focuses on the relationship between the defendant and the persons who committed the acts of international terrorism. In *Linde*, the Second Circuit recognized this distinction: "[T]he substantiality inquiry for causation is not identical to the substantiality inquiry for aiding and abetting." *Linde v. Arab Bank*, PLC, 882 F.3d 314, 330 (2d Cir. 2018). "Causation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury. By contrast, aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct." *Id.* at 330-31 (citations omitted). Plaintiffs have plausibly alleged the acts of international terrorism of providing material support to FTOs was not appropriate conduct for international financial institutions and proximately caused Plaintiffs' injuries.

were intentionally undertaking a role in Iran's material support for terrorism, as well as the substantial assistance the Western Bank Defendants provided to the Iranian banks and their customers in transferring money, weapons, and supplies to FTOs. The pertinent allegations can be found in Section VI of the Amended Complaint.

For example, the Amended Complaint alleges, based upon official statements from the U.S. Department of the Treasury, that between September 11, 2001 and 2011, the Iranian banks and the IRGC's Quds Force transferred *at least* $2 billion dollars to Hezbollah (more recent reports from the Treasury indicate that number might be as high as $7 billion). Plaintiffs further allege that, before reaching Hezbollah, the transfers had to pass through a New York clearing bank (here, the Western Bank Defendants) because all transactions involving U.S. dollars must pass through New York and be subjected to filters imposed by the Office of Foreign Assets Control (OFAC).[5] To ensure transactions related to terrorist financing passed through the OFAC filters without the funds being seized, the Iranian banks needed the assistance of the Western Bank Defendants. The Western Bank Defendants participated in the overarching Conspiracy with Iran and the Iranian banks by, among other things, committing fraud, falsifying financial documents, and concealing the identities of the Iranian banks and their customers.

The Amended Complaint further adds new factual allegations describing how Defendants filled this critical and necessary role. Specifically, the Iranian banks would send a wire transfer or payment instructions to the Western Bank Defendants. The Western Bank Defendants falsified the

---

[5]   Essentially, the OFAC filters work by automatically applying search terms to the financial documents associated with wire transfers. When Iranian banks and entities were allowed to take advantage of the U-Turn exception (prior to 2008), if the names of an Iranian bank or entity were found, the transaction would be stopped and scrutinized by OFAC anti-money laundering and counter-terrorism regulators. If the regulators determined the transaction to be legitimate and not related to terrorist financing, the transaction would be successfully processed. If the transaction was suspicious for terrorism financing, the funds would be seized.

financial documents and trained the Iranian banks on how to falsify the documents on their end. Defendants then sent the falsified wire transfers and payment instructions to a New York correspondent account. Because the financial documents were falsified and the names of the true parties and beneficiaries to the transactions were concealed, the transactions passed through the OFAC filters without being flagged—and were never scrutinized by OFAC's anti-money laundering and counter-terrorism regulators. Additionally, the Iranian banks and their customers used the exact same fraudulent scheme to purchase and transport weapons, airplanes, and equipment for manufacturing EFPs.

The Amended Complaint cites the Factual Statements in the Deferred Prosecution Agreements in which all Western Bank Defendants admitted their fraudulent conduct. As described in the Factual Statements, the Western Bank Defendants "violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, '… defraud ... (i) make or cause a false entry in the business records of an enterprise ... or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise.'"[6] Thus, all the Western Bank Defendants have admitted to committing fraud and falsifying financial documents for Iranian banks and their customers during the exact same time period the fraudulent transfers—totaling over $2 billion—were sent to Hezbollah. If Defendants believed any of these transactions were legal and the funds being provided by the Western Bank Defendants were not being used for terrorist, or even potential terrorist, activities, then there would have been no need for the Western Bank Defendants to commit fraud and subsequently admit to such fraud—because there was a legal way to transmit money for legitimate purposes to Iran: the U-Turn exemption. It is more than plausible that the Western Bank Defendants committed the systemic fraud so Iran could send this

---

[6]   *See* Amended Complaint, ¶ 1667.

money to Hezbollah. In fact, after a decade of investigations and criminal prosecutions by the Department of Justice and the New York State Department of Financial Services, there are no other plausible suspects.

To further address the Court's identified deficiencies, the Amended Complaint describes the regulations implemented in response to the September 11, 2001 terrorist attacks. In particular, the Financial Action Task Force's ("FATF") Special Recommendations on Terrorist Financing were published on October 31, 2001. FATF President, Clarie Lo, stated: "**Implementation of these Special Recommendations will deny terrorists and their supporters access to the international financial system**."[7]

The Amended Complaint alleges Defendants were legally required to assume a role in the *prevention* of terrorist financing—and the Amended Complaint cites specific facts demonstrating the Western Bank Defendants recognized this role. *See, e.g.,* Amended Complaint, Section VI(3). For example, on October 10, 2001, Matthew King, a member of HSBC Group's Audit Department, wrote: "**[T]hings have changed since September 11**" and because of concern that HSBC might "**process a payment which turns out to be connected to terrorism,**" stated, "the routes traditionally used to avoid the impact of US OFAC sanctions may **no longer be acceptable**."[8] On October 8, 2002, Gary Boon, one of HSBC-Middle East's account relationship managers for Iran, stated "**HBEU have [sic] to comply with the FATF regulations soon, which means full disclosure** for all MT100/Mt103 payments from all banks."[9] On November 14, 2002, HSBC-London's Multicurrency Payments Department Head, Malcolm Eastwood**,** stated, "**under FATF**

---

[7]   *See* Amended Complaint, ¶ 1670.

[8]   *See id.* at ¶ 1679.

[9]   *See* Amended Complaint, ¶ 1679.

**principles we should not be amending these payments instructions**."

Defendants were not only aware of the FATF Special Recommendations on Terrorist Financing; they used the new counter-terrorism regulations which adopted the FATF recommendations as a business opportunity. Instead of fulfilling their legal role in the prevention of terrorist financing, the Amended Complaint alleges Defendants made an intentional decision to put profits over their duties to ensure they were not funding terrorism:

> "[T]here is **substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations** ... The [requirements of the] new regulations … increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. **The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC.**[10]

In putting this business plan in place, one HSBC employee stated: "A further wrinkle is **FATF Special Recommendation 7, which calls for accurate and meaningful originator information**."[11] Indeed, Special Recommendation on Terrorist Financing 7 is titled "Wire Transfers," and states:

> **[E]nsure that financial institutions** . . . **include accurate and meaningful originator information** (name, address and account number) on funds transfers and . . . conduct **enhanced scrutiny** of and monitor for suspicious activity funds transfers which **do not contain complete originator information** (name, address and account number).[12]

Special Recommendation on Terrorist Financing 7 was "developed with the objective of **preventing terrorists and other criminals from having unfettered access to wire transfers** for moving their funds and for detecting such misuse when it occurs."[13] This point is underscored in

---

[10]   *See id.*

[11]   *See id.* at ¶ 1682.

[12]   *See id.* at ¶ 1684.

[13]   *See* Amended Complaint, ¶ 1684.

the Amended Complaint: by committing fraud for Iranian banks and their customers and deliberately not including "accurate and meaningful originator information" on the wire transfers, the Defendants were not merely evading economic sanctions, but rather knowingly giving "terrorists . . . unfettered access to wire transfers."[14] This awareness is exemplified by an HSBC email, dated July 4, 2007:

> **[T]he whole concept of filtering of payments** . . . **was to ensure that we as a Bank are not conducting business with known terrorists** . . . . It is therefore critical that we know who the transaction is ultimately between and this is not masked by funds passing between a multitude of intermediary banks and third parties."[15]

But while the Western Bank Defendants were committing fraud, and especially after teaching the Iranian banks how to falsify the financial documents in advance, the Western Bank Defendants knew nothing was stopping the terrorists from having unfettered access to wire transfers. This awareness is exemplified by an HSBC email, dated July 11, 2001:

> HBUS will not be able to confirm whether or not the underlying transaction actually meets the "U-Turn" requirement. . . . In an effort to facilitate "straight-through processing", it now appears that HBEU will train Bank Melli on formatting the payments and that **we will be relying on Bank Melli to ensure that only qualifying payments are processed through HBEU's account with HBUS.**[16]

Furthermore, as documented in an email from November 11, 2003, HSBC provided "periodic" updates to the Iranian banks as to how to falsify the transfers so they would pass through the OFAC filters:

> **MPD Compliance are very uncomfortable at being asked periodically (currently by Nigel Weir and Gary Boon in Middle East) whether a certain formatting methodology will pass successfully through an OFAC filter.** They feel it a relationship management responsibility to understand what the Iran payments represent and give advice/guidance to the Iranian banks on the

---

[14]   *See id.* at ¶ 1685.

[15]   *See id.* at ¶ 1685.

[16]   *See id.* at ¶ 1688.

circumstances, if any, in which payments are acceptable."[17]

The Amended Complaint thus demonstrates Defendants knew exactly what they were doing—and that what they were doing was benefiting Iran's terrorist activities in Iraq, which were carried out with the necessary involvement of FTOs. They made a business decision to commit fraud for the state-owned banks of a State Sponsor of Terrorism, while knowing that by doing so they would be giving terrorists unfettered access to wire transfers. Only HSBC's emails have been made publicly available, and even *they* provide a basis for a reasonable inference the other defendants possessed the same general awareness.

Finally, Defendants cannot escape liability by claiming that even if they processed the transactions that provided funds to FTOs, they didn't know the transfers were for terrorists—that they were just a "cog" in the terrorism wheel. The acts of committing fraud and falsifying hundreds of thousands of financial documents—worth hundreds of billions of dollars—over a prolonged period of time for the purpose of providing terrorism money is what provides a bright- line distinction between the Western Bank Defendants in this case and the rest of the international banking community, and is the core of Plaintiffs' plausible allegation that these banks are subject to liability under the ATA as amended by JASTA.

The Court further concluded that Plaintiffs' Complaint was deficient because it did not allege plausibly that Defendants provided substantial assistance to Iran and its Agents and Proxies. *See, e.g.*, Op. & Order, Doc. 195, pp. 12-13. In addition to adding allegations regarding the $2 billion Defendants helped fraudulently transfer to Hezbollah, the Amended Complaint also alleges Defendants committed fraud and falsified documents for the shipments of weapons and supplies to Iran (which Iran provided to FTOs) in direct violation of the Anti-Terrorism Controls of Section

---

[17] *See* Amended Complaint, ¶ 1689.

6(j) of the Export Administration Act (EAA).

The Amended Complaint alleges Iran used large hydraulic presses to manufacture Explosively Formed Penetrators (EFPs)—which are classified as weapons of mass destruction—and then provided the EFPs to terrorists. The Amended Complaint also alleges Iran started ramping up its production of EFPs in 2005-2006, which is when there was a significant increase in terrorist attacks in Iraq involving EFPs. Indeed, all 19 EFP attacks involved in this case occurred in 2005 or later. The Amended Complaint further alleges Standard Chartered Bank and Credit Suisse processed fraudulent transactions involving the shipments of components for hydraulic presses to Iran in the 2005-2006 timeframe. These shipments were illegal and violated the Anti-Terrorism Controls of Section 6(j) of the EAA because hydraulic presses could be used to manufacture weapons of mass destruction for terrorists. That is, Defendants facilitated the illegal shipments of the exact equipment Iran needed to manufacture EFPs at the exact time Iran significantly increased its manufacturing of EFPs. *See, e.g.,* Amended Complaint, Section VI(3). This fact, alone, creates a plausible inference that fully supports Plaintiffs' claims.

Khoram Sanat Producing Co., Diamond Steel FZE, and Alborz Steel are all Iranian front companies and customers of Iranian banks. On June 20, 2005, Diamond Steel (which also had an account with Standard Chartered Bank) sold $2,790,000 worth of 160-liter hydraulic pumps/electromotors for large (likely 20-ton) hydraulic presses to Khoram Sanat Producing Co., and they were shipped to Tehran, Iran by IRISL (a later-designated SDGT).[18] Defendant Standard Chartered Bank, and likely Defendant Credit Suisse, processed this fraudulent transaction and also possessed the shipping documents for this transaction (the same documents relied on by

---

[18]   *See* Exhibit 15 attached to the Amended Complaint, Promontory Report at 77.

15

Promontory to create its report[19]). These documents would have revealed these products were large hydraulic pumps/electromotors for hydraulic presses—which were prohibited from being shipped to Iran specifically because they could be used to manufacture weapons for terrorists. The Amended Complaint further alleges there are at least 12 other transactions listed in the Promontory Report, totaling over $26,773,000, between Khoram Sanat Producing Co., Diamond Steel FZE, and/or Alborz Steel in the 2005-2006 timeframe for the shipment of components for hydraulic presses to Iran. Again, IRISL was used to ship the equipment to Iran.[20]

EFP slugs are made of copper, and the Amended Complaint contains allegations showing Standard Chartered Bank and HSBC were involved in facilitating transactions fraudulently processed between National Iranian Copper, Inc. and Standard Metals, LTD for $203,798.[21] In *Linde*, the Second Circuit held the question of general awareness was a jury question based upon much less evidence:

> There is some record evidence that might permit a jury, properly instructed as to aiding abetting, to infer the requisite awareness. For example, certain communications dating from as early as 2001, i.e., before the attacks here at issue, could have alerted the bank that the transfers being requested therein were payments for suicide bombers . . . [b]ut we cannot conclude that such evidence, as a matter of law, compels a finding that the bank was aware that by processing future transfers it was playing a role in violent or life-endangering acts whose apparent intent was to intimidate or coerce civilians or to affect a government. Thus, we are obliged to vacate and **remand for a jury to decide that question.**

*Linde*, 882 F.3d at 330.

---

[19]  Promontory Financial Group, LLC ("Promontory") was engaged in 2009 by Standard Chartered to identify, collect, and review historical transaction records "with certain countries or certain Specially Designated Nationals ('SDNs') subject to sanctions" administered by OFAC. Promontory issued a report in 2011 that provides a window into the vast array of wrongdoings undertaken by Standard Chartered Bank in concert with Iran and its agents and proxies.

[20]  *See* Exhibit 15 attached to the Amended Complaint, Promontory Report at 121-138.

[21]  *See* Exhibit 15 attached to the Amended Complaint, Promontory Report at 208.

### 2. Conspiracy: Defendants' Agreement

The Court also dismissed Plaintiffs' conspiracy claim because (according to the Court) the Complaint did not allege Defendants entered into an agreement to commit an act of international terrorism, shared a common purpose or plan with the FTOs to commit international terrorism, or knew the financial services they provided would be directed toward international terrorism. *See, e.g.,* Op. & Order, Doc. 195, p. at 21 ("Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue."); *id.* ("Plaintiffs do not allege any facts from which the Court can infer that … Defendants shared a common purpose or plan with FTOs like Hezbollah."); *id.* ("The Complaint pleads no facts from which the Court can infer that Defendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah, AAI and KH for the purpose of committing violent or life-endangering acts.").

The amendments summarized above and set forth in Section V and VI of the Amended Complaint, insofar as they demonstrate the plausibility of the aiding-and-abetting theory of liability, simultaneously establish the plausibility of—and cure the perceived deficiencies with respect to—the conspiracy theory of liability.

As further support that Defendants (1) aided and abetted Iran and its Agents in Proxies in committing acts of international terrorism; and (2) entered into the Conspiracy that proximately caused Plaintiffs' injuries/deaths, Plaintiffs' Amended Complaint attaches the declarations of Donald Semesky, Jr.,[22] Robert Mazur,[23] Everett Stern,[24] and Thomas Nollner.[25] Each declaration

---

[22]   *See* Exhibit 2 attached to the Amended Complaint, Declaration of Donald Semesky, Jr.

[23]   *See* Exhibit 3 attached to the Amended Complaint, Declaration of Robert Mazur.

[24]   *See* Exhibit 4 attached to the Amended Complaint, Declaration of Everett Stern.

[25]   *See* Exhibit 1 attached to the Amended Complaint, Declaration of Thomas Nollner.

is briefly summarized below.

Donald Semesky, Jr. is an expert in complex financial and money laundering investigations and in financial sanctions programs administered by the U.S. government, including those focused directly on anti-terrorism efforts. He spent thirty-five years in federal law enforcement, first working for the Criminal Investigation Division of the Internal Revenue Service and then the Drug Enforcement Administration. In both agencies, Mr. Semesky's work focused on the prevention, detection and prosecution of complex financial fraud and crime. In this matter, he reviewed publicly available information as to the investigations by the Department of Justice of the Western Bank Defendants, including their respective Deferred Prosecution Agreements and associated Statements of Facts. Mr. Semesky's affidavit provides a directly applicable overview of the development of controlling frameworks for due diligence and anti-money laundering ("AML") regulations and laws which the Western Bank Defendants were obliged to adopt, implement and follow. Premised upon that foundation, Mr. Semesky opines that every Defendant Bank had AML compliance requirements and procedures in place during the time period relevant to this litigation. He further opines that these AML procedures would have been mandatory both for US and EU divisions of the Western Bank Defendants.

Mr. Semesky also reviews and explains the common money laundering strategies devised around the structures of correspondent banking relationships and commercial banking, and the role of banks in encouraging, facilitating and concealing such schemes, particularly as to foreign nations which sponsor terrorism. Based on all the foregoing, he opines further that, afforded the opportunity to conduct discovery, the plaintiffs in this litigation will find additional evidence establishing that all Western Bank Defendants were well aware of the prohibitions against financial dealings with Iran and its agencies, banks, businesses and individuals, but intentionally disregarded

those prohibitions, thereby endangering human life.

Robert Mazur is a former Special Agent and served for twenty-seven years with one of three U.S. federal agencies: the IRS (Criminal Investigation), the US Customs, Office of Enforcement (now DHS, Homeland Security Investigations), and the Drug Enforcement Administration (DEA). In all three of these criminal law enforcement agencies, his principal areas of responsibility involved long-term investigations and prosecutions of international money launderers and drug traffickers. while employed as a Special Agent in a Long-Term Undercover Agent capacity, infiltrated various international drug trafficking organizations. Mr. Mazur's undercover role involved the coordination of laundering drug proceeds with various corrupt financial institutions, businessmen, bankers, and financial planners. His affidavit offers insight regarding the practice of amending payment messages, cover payments, the role of account managers, the banker's perspective, banks as facilitators of the underworld, and know your customer procedures. After his review of publicly available information, it is his opinion that it is more likely than not the Western Bank Defendants willfully and purposely engaged in transactions they knew, or should have known, violated U.S. sanctions intended to deny the Iranian government and its agents from gaining enrichment that enabled them to carry out state sponsored terrorism against the U.S. and others. He also opines there are critical records and information concerning these transactions that would corroborate the knowledge and intent of the banks, the banks' employees, and the banks' customers that carried out these transactions. He specifies the exact types of documents that could be obtained through the discovery process to support and further prove Plaintiffs' allegations.

Everett Stern was employed as an Anti-Money Laundering Officer at HSBC from October 2010 through October 2011. While employed at HSBC Mr. Stern was tasked with reviewing

19

banking transactions, including wire transfers of U.S. dollars on behalf of HSBC and customers of its correspondent banking services. While performing his job, Mr. Stern routinely saw current and prior transactions processed by HSBC in which the originator or beneficiaries were specially designated nationals or entities designated as Foreign Terrorist Organizations. Mr. Stern was directed by HSBC management to underreport such transactions. Mr. Stern discovered that the systems and procedures in place to monitor and clear alerts were being manipulated by HSBC's management to fraudulently decrease the number of alerts, and to fraudulently clear alerts without performing proper due diligence. These systems include: Requests For Information (RFI); Country Risk Ratings (CRR), Customer Account Monitoring Program (CAMP); Alert Monitoring System (AMS); NORCOM; placing alerts in "watch" mode; and the mass clearing of alerts. Mr. Stern provides additional and specific examples of this fraudulent conduct, too.

Thomas E. Nollner is an expert in banking compliance, specializing in the fields of anti-money laundering (AML) and combatting the financing of terrorism (CFT). For thirty years, he served as a National Bank Examiner for the Office of the Comptroller of the Currency (OCC), where he examined community, mid-sized, and large multi-national banks on issues of safety, soundness, and compliance with various laws and regulations including the Bank Secrecy Act (BSA) and Patriot Act, as well as the sanctions program administered and enforced by OFAC. In 2009, following his tenure with the OCC, Mr. Nollner joined the Office of Technical Assistance, a branch of the U.S. Treasury Department. In this role, he spent three months assigned to Baghdad, Iraq, where he assessed the AML/CFT regulatory regime of the Central Bank of Iraq. He continues to work with the Central Bank of Iraq on AML/CFT regulatory issues to this day.

Mr. Nollner's declaration provides an overview of the governmental entities responsible for combatting both anti-money laundering and the financing of terrorism. Mr. Nollner also details

the voluminous body of legislation, regulations, and guidelines applicable to all banks transacting business within the U.S. financial system. Mr. Nollner opines that between 2003 and 2011, information was readily available to the Western Bank Defendants concerning how their institutions could be used to support terrorism. Mr. Nollner details how transactions in U.S. Dollars must go through the OFAC filters in New York, and he explains that in order to evade the filters, information from the wire transfers was stripped (*i.e.*, removed from) or altered (*e.g.*, adding dots/dashes) in order to conceal the actual parties to the transactions. Mr. Nollner thus concludes the Western Bank Defendants knew, or were willfully and purposefully ignorant or indifferent to, their role in terror financing. Mr. Nollner goes on to opine that if these wire transfers had not been stripped or altered, the sanctioned Iranian entities involved with the wires would have been identified and flagged through OFAC, the transactions would have been blocked, and the funds would not have been used to provide material support of terrorism.

### C. Primary Liability

The Court dismissed the primary liability claims because it perceived that the Complaint did not allege enough facts to demonstrate proximate cause or that Defendants committed "an act of international terrorism." Plaintiffs remedy the identified deficiency as follows:

#### 1. Proximate Cause

The Court found the Complaint to contain insufficient allegations to support the proximate cause element of primary liability. *See, e.g.,* Op. & Order, Doc. 195 at 12, stating:

> "[T]he Complaint does not allege that Defendants participated in the attacks or provided money or goods directly to AAI, AAH, JAM, KH, or any other direct perpetrator of a relevant attack. Indeed, the Complaint does not even allege that Defendants provided money directly to the IRGC-QF, Hezbollah, or Al-Qaeda, but rather alleges that Defendants indirectly supported those organizations by providing financial services to Iranian banks, airlines, shipping and oil companies with relationships to those organizations. The Complaint proffers no nonconclusory allegation that the funds processed by Defendants for various Iranian entities were

21

> in fact transferred to AAI, AAH, JAM, or KH, nor does it allege facts sufficient to support plausibly the inference that Iran and its Agents and Proxies would have been unable to assist AAI, AAH, JAM and KH in carrying out the attacks without Defendants' assistance."

The Amended Complaint (at Sections V and VI) contains additional factual allegations (discussed above) addressing the stated deficiencies in two primary ways: (1) by showing the substantial connection between Defendants' conduct and the money transferred to terrorists; and (2) by showing the substantial connection between Defendants' conduct and the weapons the terrorists used to kill/injure Plaintiffs.

*First*, based upon the well pled factual allegations in the Amended Complaint (as discussed above), it is a reasonable inference that Defendants were, in fact, the banks who committed the fraud that enabled over $2 billion to be transferred to Hezbollah. Indeed, it's not only plausible that Defendants committed the fraud involved in those transactions; there are no other plausible suspects other than the Defendants in this case. The Amended Complaint further alleges, based upon the Deferred Prosecution Agreements, that each Defendant admitted to processing fraudulent transactions on behalf of SDNs, which is a category that includes Specially Designated Global Terrorists and members of FTOs. The identity of those SDNs is not publicly available. However, every single one of those transactions could not have occurred but for Defendants' fraud (unless they enlisted another bank to commit the fraud).

*Second*, the Amended Complaint contains well pled factual allegations that Defendants Standard Chartered Bank and Credit Suisse were involved in the fraudulent transactions that allowed Iran to procure the equipment necessary to manufacture EFP's. These facts provide a direct connection to Defendants' acts of international terrorism and the Plaintiffs who were injured by EFPs (which were involved in 19 of the 55 attacks).

Based upon Defendants' participation in the fraudulent transfers of over $2 billion to

Hezbollah, committing fraud and for SDNs, and falsifying documents to facilitate Iran's procurement of equipment to manufacture EFPs, Defendants' conduct was a substantial contributing factor in the sequence of events that led to the deaths/injuries of Plaintiffs.

### 2.  Act of International Terrorism

The Court found "Plaintiffs have not alleged plausibly that Defendants' conduct constituted acts of international terrorism under the ATA." Op. & Order, Doc. 195 at 15. International terrorism is an act that, among other things, is dangerous to human life. *Id.* The Court stated the allegations in the Complaint "provide no proper factual basis for an inference that Defendants' provision of financial services to various Iranian entities augmented the resources of the terrorist organizations that ultimately injured Plaintiffs." *Id.* at 17. The Court concluded "[t]he Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life." *Id.* at 17-18.

The Amended Complaint cures this perceived deficiency by describing in detail the precise nature of Defendants' illegal, fraudulent, and false acts, and by explaining in detail how those acts directly imperiled human life. Moreover, the Amended Complaint details how the acts not only presented and created a risk to human life but in fact served as a conduit for and indispensable link in the chain of events that caused actual harm to and loss of human life. *See, e.g.,* Amended Complaint, Section VIII. The Amended Complaint also discusses the fact Defendants willingly and purposefully facilitated undetectable financial transactions for the benefit of known terrorists and terrorism sponsors for many years, thousands of times, and in the amount of, at least, billions of dollars. *Id.* Because the reasonably foreseeable consequence of such acts is the successful support and commission of acts of terrorism, such acts are inherently dangerous to human life. *Id.*

23

### D. Commerzbank and the Orphans Project

The Court noted in a footnote that, although "Plaintiffs allege that Commerzbank maintained an account for Orphans Project Lebanon e.V., and that the funds in this account were transferred primarily to the Hezbollah Martyrs Foundation, a 'designated' organization," the "Complaint does not allege facts from which the Court can infer that Commerzbank knew about the Orphans Project's transfers to the Martyrs Foundation, or that the funds transferred to the Martyrs Foundation account were then used to support AAH, JAM, KH or any of the other 'Terrorist Groups' or 'Special Groups' that allegedly committed the attacks that injured Plaintiffs." Op. & Order, Doc. 195, p. 13 n. 10. The Amended Complaint adds additional factual allegations demonstrating Commerzbank did in fact know the Orphans Project was transferring funds to the Martyrs Foundation to support terrorism. Specifically, that Amended Complaint alleges that while a customer of Commerzbank, The Orphans Project Lebanon e.V. stated on its world-wide website that the funds it raised were transferred directly to the bank account of the Lebanese Martyrs Foundations[26] and that the Martyrs Foundation was designated as an SDN on July 24, 2007. The Amended Complaint further alleges that, based on public reports and Commerzbank's level of sophistication and expertise in banking, it knew the Orphans Project was a Hezbollah fundraising organization and that Hezbollah was the primary recipient of funds donated from the account Martyrs Foundation, which leads to the plausible inference that funds transferred to the Orphans Project were then given directly to Hezbollah. *See, e.g.,* Amended Complaint, Section V(17).[27]

---

[26]  *See* Matthew Leavitt, *Hezbollah: The Global Footprint of Lebanon's Party of God*, 233 (2013).

[27]  Plaintiffs' Amended Complaint contains other changes, such as the reordering of the causes of action and the correction of the spelling of certain Plaintiffs' names. These changes are not directly relevant to the perceived deficiencies, as identified in the Court's Opinion & Order, and do not otherwise alter the parties, the substantive factual allegations, or the legal claims presented in this case.

Likewise, the Amended Complaint makes clear the HSBC Defendants also provided financial services directly to FTOs.[28]

## IV.    Conclusion

For the foregoing reasons, which are amplified in the proposed Amended Complaint and the accompanying exhibits and declarations, Plaintiffs respectfully request that their Motion for Leave to Amend be granted. Additionally, Plaintiffs request oral argument regarding the instant motion.

Respectfully Submitted,                         Dated April 22, 2019


By: /s/ Christopher G. Paulos
Christopher G. Paulos (*Pro Hac Vice*)
Florida Bar No. 0091579
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
**RAFFERTY AND PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: 850.435.7000
Facsimile: 850.436.6123
Email: cpaulos@levinlaw.com

*Counsel for Plaintiffs*

---

[28]   This fact is further supported by the government enforcement actions, as well as the Declaration of Everett Stern.

25